**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

**RAMI KHALED EL ALI,** by and through
his guardian Mariam Ahmad Ghaddar**;**
**MIA KHALED EL ALI;** by and through
her guardian Mariam Ahmad Ghaddar;
**KHALED EL ALI;**
**MUTASEM JARDANEH;**
**JOHN DOE;**
**BILAL ABDURRASHID;**
**MOHAMMAD PARYAVI;**
**HAWA WEHELIE;**
**ABDIRIZAK WEHELIE;**
**AND**
**SHAMSA HASHI NOOR;**
**FATIMA WEHELIE;**
**MAHAD MOHALLIM;**
**MOUSTAFA EL-SHAHAT;**
**FARID SULAYMAN;**
**FADI SULIMAN;**
**JOHN DOE 2;**
**BABY DOE,** by and through
his guardian Father Doe 2;
**CHILD DOE,** by and through
his guardian Father Doe**;**
**CHILD DOE 2,** by and through
her guardian Father Doe**;**
**HASHEM NADER SEHWAIL;**
**MOHAMAD ALBADAWI;**
**HICHAM HALL;**
**FAATIMAH KNIGHT;**
**KHALIL THADI;**
**ESMAEEL PARYAVI;** and
**FARAZ SIDDIQUI;** and

**ZIJAD BOSNIC;**

    Plaintiffs,

    v.

**JEFFERSON SESSIONS,** Attorney
General of the United States, United States

Case No. 18-cv-
**Case No. 8:18-cv-02415-PX**
Hon. **Paula Xinis**

**FIRST AMENDED COMPLAINT**
COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF
AND DAMAGES

**JURY TRIAL DEMANDED**

Department of Justice, in his official
capacity, only;

**CHRISTOPHER WRAY**, Director of the
Federal Bureau of Investigation, in his
official capacity, only;

**CHARLES H. KABLE, IV**, Executive
Assistant Director of the Terrorism
Screening Center, in his official capacity,
only;

**RUSSEL TRAVERS**, Acting Director of the
National Counterterrorism Center, Office
of the Director of National Intelligence, in
his official capacity, only;

**JOHN C. DEMERS**, Assistant Attorney
General for National Security, National
Security Division, United States
Department of Justice, in his official
capacity, only;

**BETH A. WILLIAMS**, Assistant Attorney
General, Office of Legal Policy, United
States Department of Justice, in her
official capacity, only;

**PETER A. WINN**, Acting Chief Privacy and
Civil Liberties Officer, Office of Privacy
and Civil Liberties, United States
Department of Justice, in his official
capacity, only;

**DANIEL R. COATS**, Director National
Intelligence, Office of the Director of
National Intelligence, in his official
capacity, only;

**KIRSTJEN NIELSON**, Secretary of
Homeland Security, United States
Department of Homeland Security, in her
official capacity, only;

**KEVIN K. MCALEENAN**, Commissioner, United States Customs and Border Protection, in his official capacity, only;

**DAVID P. PEKOSKE**, Administrator, Transportation Security Administration, United States Department of Homeland Security, in his official capacity, only;

**L. FRANCIS CISSNA**, Director, United States Citizenship and Immigration Services, United States Department of Homeland Security, in his official capacity, only;

**RONALD D. VITIELLO**, Deputy Director, United States Immigration and Customs Enforcement, in his official capacity, only;

**CAMERON QUINN**, Officer, Office for Civil Rights and Civil Liberties, United States Department of Homeland Security, in her official capacity, only;

**DAVID J. GLAWE**, Under Secretary, Office of Intelligence and Analysis, United States Department of Homeland Security, in his official capacity, only;

**JOHN MITNICK**, General Counsel, United States Department of Homeland Security, in his official capacity, only;

**JAMES W. MCCAMENT**, Deputy Under Secretary, Office of Strategy, Policy, and Plans, United States Department of Homeland Security, in his official capacity, only;

**SAM KAPLAN**, Chief Privacy Officer, Privacy Office, United States Department of Homeland Security, in his official capacity, only;

**MIKE POMPEO**, Secretary of State, United States Department of State, in his official capacity, only;

**JAMES N. MATTIS**, Secretary of Defense, United States Department of Defense, in his official capacity, only;

**GENERAL PAUL M. NAKASONE**, Commander, United States Cyber Command and Director, National Security Agency/Chief, Central Security Service, United States Department of Defense, in his official capacity, only;

**LIEUTENANT GENERAL ROBERT P. ASHLEY, JR., USA**, Director, Defense Intelligence Agency, in his official capacity, only;

**STEVEN MNUCHIN**, Secretary of Treasury, United States Department of Treasury, in his official capacity, only;

**KEN BLANCO**, Director, Financial Crimes Enforcement Network, Office of Terrorism and Financial Intelligence, United States Department of Treasury, in his official capacity, only; and,

**WATCHLISTING ADVISORY COUNCIL;**

**UNIDENTIFIED FBI AGENTS**, in their individual capacities only; and,

**UNIDENTIFIED CBP AGENTS**, in their individual capacities only

    Defendants.

---

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES**

**JURY TRIAL DEMANDED**

4

Plaintiffs **Rami Khaled El Ali,** by and through his guardian Mariam Ahmad Ghaddar**,** **Mia Khaled El Ali,** by and through her guardian Mariam Ahmad Ghaddar**, Khaled El Ali, Mutasem Jardaneh, John Doe , Bilal Abdurrashid, Mohammad Paryavi, Hawa Wehelie, Abdirizak Wehelie, Shamsa Hashi Noor, Fatima Wehelie, Mahad Mohallim, Moustafa El-Shahat, Farid Sulayman, Fadi Suliman, John Doe 2, Baby Doe,** by and through his guardian Father Doe 2**, Child Doe,** by and through his guardian Father Doe, **Child Doe 2,** by and through her guardian Father Doe, **Hashem Nader Sehwail, Mohamad Albadawi, Hicham Hall, Faatimah Knight, Khalil Thadi, Esmaeel Paryavi, Faraz Siddiqui, and Zijad Bosnic** by and through their attorneys, CAIR Legal Defense Fund ("CAIR"), CAIR-Florida ("CAIR-FL"), CAIR-Michigan ("CAIR-MI"), CAIR-Washington ("CAIR-WA"), CAIR-New Jersey ("CAIR-NJ")"). CAIR-Minnesota ("CAIR-MN"). and Pastor & Associates, P.C., state as follows:

<u>**Introduction**</u>

1.      The federal government has imposed a kind of second-class citizenship on the Plaintiffs.  Without charges, without arrests, without even an investigation sometimes—the agency defendantsDefendants act in concert to deprive thousands of innocent Americans, mostly Muslim, of their right to be free from a government that extrajudicially designates them as worthy of permanent suspicion.

2.      That permanent suspicion, embodied in the federal government's watchlisting enterprise, has sweeping consequences for the Plaintiffs as well as the more than one million others who bear it.  They are separated from their children, denied employment

opportunities, prevented from traveling by air to attend weddings and funerals, and denied or delayed immigration benefits. The rights of Plaintiffs to purchase firearms, to wire money and keep a bank account, to receive their passports and be granted visas ~~to foreign countries~~ are all constrained. For ~~one plaintiff~~several Plaintiffs, the Defendants' actions have diminished his standing and ability to provide religious leadership to his community. For others, Defendants have leveraged their presence on the No Fly List to coerce them into becoming informants against the Muslim community.

3.   Through an interagency watchlisting system, led by Defendants' Watchlisting Advisory Council, the Defendants have identified the Plaintiffs as worthy of permanent suspicion, imposing burdens and disabilities on them in all aspects of their lives.

4.   In deciding to target the Plaintiffs, the watchlisting system behaves lawlessly, acting ~~in the absence of~~absent Congressional approval and ~~in some ways~~in oversight, and even in direct opposition to ~~what Congress requires of its agencies~~Congressional directives.

5.   To identify its targets, some parts of the watchlisting system, such as the Terrorism Screening Database ("TSDB"), utilize a nonsense-on-stilts inclusion standard that is always satisfied. Other parts, such as the TSA's Quiet Skies initiative – a program that also behaves lawlessly and without Congressional approval and oversight – and other "rules-based" lists, do not use any standard and instead rely upon the inarticulate hunches of federal officials, rank profiling, and vulgar guilt-by-association practices.

6.   Through their watchlisting system, the federal government makes it known— to every law enforcement agency in the country, every part of the federal government, more than 60 foreign countries, an unknown number of private companies, international bodies,

and other third parties—that the Plaintiffs should be treated as dangerous threats.  The Plaintiffs' friends, family, and others with whom the Plaintiffs associate are punished for their relationship with a watchlisting system's target.

7.     The Defendants know that their watchlisting system has never prevented an act of terrorism inside the United States and is completely ineffective, but they continue to expand it anyways.

8.7.     Plaintiffs and almost all others targeted by the watchlisting system have never been arrested, charged, or convicted of any type of terrorism-related offense.  Nonetheless, the federal government has designated them as "known or suspected terrorists," wreaking havoc on Plaintiffs' personal, religious and professional lives.

8.     The Defendants know that their watchlisting system has never prevented an act of terrorism inside the United States and is completely ineffective, but they continue to expand it anyways.  In the last 10 years alone, Defendant CBP reports that its encounters with individuals suspected of having terrorism-related or national security concerns has skyrocketed from 365 per year (in 2008) to more than 550,000 per year (in 2017).

9.     The federal governmentgovernment's watchlisting system uses secret and automated "rules" to monitor Americans' travel patterns and their associations.  Americans who travel to the Middle East, speak or study Arabic, donate to Muslim charities, are family members of already-watchlisted individuals, travel with already-watchlisted individuals, or communicate with already-watchlisted individuals are routinely flagged for heightened scrutiny.  The government designates these individuals as "unknown or partially known terrorists," monitors and investigates them, and then uses any information learned to

nominate them as "known or suspected terrorists."   The Boston Globe unearthed one such "risk-based passenger targeting rules" program on July 28, 2018; it is called "Quiet Skies."

~~10.~~ ~~The federal government uses guilt-by-association presumptions to place family members, friends, traveling companions, and associates of listed persons under intense surveillance and on the watchlist.~~ ~~Leaked government documents as well as public governmental reports, reveal that the federal government's terrorist watchlisting system is discriminatory, standardless, and devoid of adequate procedures.  These documents include the March 2013 Watchlisting Guidance (Exhibit 1), the Directorate of Terrorist Identities (DTI): Strategic Accomplishments 2013 (Exhibit 2), the Department of Justice's March 2014 Audit of the Federal Bureau of Investigation's Management of Terrorist Watchlist (Exhibit 3), and a 2018 informational bulletin on the "Quiet Skies" program (Exhibit 4),~~

~~11.~~10. Many Americans, including children, end up targeted by the watchlisting system based on who their mother or father is, what mosque their family attends, how they exercise their constitutional rights, where they travel, with whom they associate, or their perceived religious beliefs.

~~12.~~11. Speaking Arabic, traveling to Muslim-majority countries, and even undertaking religious pilgrimages—activities that American Muslims are likely to engage in—qualify as bases and factors for rules-based monitoring, Quiet Skies listing, watchlist nominations, and watchlist placements.

~~13.~~ ~~The federal government also uses guilt-by-association presumptions to place family members, friends, traveling companions, and associates of listed persons under intense surveillance and on the watchlist.~~

8

14.12.  The federal government adds many Americans to the watchlist or subjects them to terrorist-level scrutiny due to typos, coincidentally similar names and outright mistakes.  This happens as a result of the government employing few checks or quality assurance standards before permitting names to be added.

13.    Leaked government documents as well as public governmental reports, reveal that the federal government's terrorist watchlisting system is discriminatory, standardless, and devoid of adequate procedures.  These documents include the March 2013 Watchlisting Guidance (Exhibit 1), the Directorate of Terrorist Identities (DTI): Strategic Accomplishments 2013 (Exhibit 2), the Department of Justice's March 2014 Audit of the Federal Bureau of Investigation's Management of Terrorist Watchlist (Exhibit 3), and a 2018 informational bulletin on the "Quiet Skies" program (Exhibit 4).

15.14.  The federal government's additions to the TSDB have dramatically increased over the last decade.  The number of individuals Defendants added to the TSDB in 2016 is more than triple the number added in 2009.  Approximately 99% of all proposed additions are accepted each year.  There are now more than one million people in the TSDB.

16.15.  Although the Department of Homeland Security operates DHS TRIP, ostensibly to assist Americans in resolving travel complaints including those related to their watchlist status, the DHS TRIP is largely ineffective.  DHS TRIP refuses to discuss specific facts and refuses to even process many redress complaints related to watchlistees or those subjected to rules-based "terrorist" monitoring.   Moreover, the DHS TRIP redress process often only affects air travel, not land border crossings or other watchlist consequences. Meanwhile, innocent Americans suffer paralyzing consequences.

17.16. Each of the Plaintiffs' injuries are directly attributable to Defendants' compilation, implementation and dissemination of the federal terrorist watchlisting system, including rules-based monitoring, Quiet Skies, and the TSDB.

**Plaintiffs**

18.17. Plaintiff Rami Khaled El Ali, by and through his guardian Mariam Ahmad Ghaddar, is a United States citizen and a Muslim residing in Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

19.18. Plaintiff Mia Khaled El Ali, by and through her guardian Mariam Ahmad Ghaddar, is a United States citizen and a Muslim residing in Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

20.19. Plaintiff Khaled El-Ali is a Belgium national and a Muslim residing in Belgium. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

21.20. Plaintiff Mutasem Jardaneh is a United States citizen and a Muslim residing in Orlando, Florida. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

21. Plaintiff John Doe is a United States citizen and a Muslim residing in Mexico. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

22.     Plaintiff Bilal Abdurrashid is a United States citizen and a Muslim residing in Orlando, Florida.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

23.     Plaintiff Mohammad Paryavi is a United States citizen and a Muslim residing in Rockville, Maryland.  Venue is proper because this is the district within which Mr. Paryavi resides, and because a substantial part of the events or omissions giving rise to his claims occurred within this district.

24.     Plaintiff Hawa Wehelie is a United States citizen and a Muslim residing Virginia.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

25.     Plaintiff Abdirizak Wehelie is a United States citizen and a Muslim residing Virginia.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

26.     Plaintiff Shamsa Hashi Noor is a United States citizen and a Muslim residing Virginia.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

27.     Plaintiff Fatima Wehelie is a United States citizen and a Muslim residing Virginia.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

28.     Plaintiff Mahad Mohallim is a United States citizen and a Muslim residing in Kenya.  Venue is proper because a substantial part of the vents or omissions giving rise to his claims occurred within this district.

28.29. Plaintiff Moustafa El-Shahat is a United States citizen and a Muslim residing Indiana. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

29.30. Plaintiff Farid Sulayman is a United States citizen and a Muslim residing in Washington state. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

30.31. Plaintiff Fadi Suliman is a United States citizen and a Muslim residing in Florida. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

32. Plaintiff John Doe 2 is a Syrian national and a Muslim residing in New Jersey. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

31.33. Plaintiff Baby Doe, by and through his guardian Father Doe 2, is a United States citizen and a Muslim residing in Virginia. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

32.34. Plaintiff Child Doe, by and through his guardian Father Doe, is a United States citizen and a Muslim residing in New Jersey. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

33.35. Plaintiff Child Doe 2, by and through her guardian Father Doe, is a United States citizen and a Muslim residing in New Jersey. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

36.     Plaintiff Hashem Nader Sehwail is a United States citizen and a Muslim residing in Florida.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

37.     Plaintiff Mohamed Albadawi is a United States citizen and a Muslim residing in Kansas.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

38.     Plaintiff Hicham Hall is a United States citizen and a Muslim residing in Virginia.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

34.39.  Plaintiff Faatimah Knight is a United States citizen and a Muslim residing in Virginia.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

35.40.  Plaintiff Khalil Thadi is a United States citizen and a Muslim residing in Virginia.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

36.41.  Plaintiff Esmaeel Paryavi is a United States citizen and a Muslim residing in California.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

37.42.  Plaintiff Faraz Siddiqui is a United States citizen and a Muslim residing in New Jersey.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

13

43.    Plaintiff Zijad Bosnic is a United States citizen and a Muslim residing in Florida. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

**Defendants**

38.44.   Defendant ~~Jeff~~Jefferson Sessions is United States Attorney General of the U.S. Department of Justice ("DOJ").  The DOJ is a regular agency attendee of the Watchlisting Advisory Council ("WLAC"), a government agency that promulgates decisions regarding all policies, procedures, practices and instructions pertaining to the federal terrorist watchlist, including, but not limited to: (1) watchlist nomination and removal procedures; (2) specific criteria used to nominate persons to the TSDB; (3) redress procedures; (4) vetting of information used to nominate persons to the TSDB; and, (5) dissemination of a person's designation in the TSDB to state and local authorities, courts, foreign governments, private corporations, private contractors, airlines, gun sellers, financial institutions, the captains of sea-faring vessels, and others.  The DOJ is represented at WLAC meetings by the Federal Bureau of Investigation ("FBI"); the Terrorism Screening Center ("TSC") (one of two cochairs of the WLAC); and various USDOJ headquarters offices, including the National Security Division ("NSD"); the Office of Legal Policy ("OLP"); and the Office of Privacy and Civil Liberties ("OPCL").  Because the WLAC operates by consensus, the DOJ and/or its agency subcomponents have both decision-making authority and veto power over all decisions made by the WLAC.  Upon information and belief, the DOJ and/or its agency subcomponents accepted the nominations of some or all of the Watchlisted Plaintiffs and continues to accept the nominations of other similarly situated American citizens, to the federal terrorist watchlist.  The DOJ and/or its agency subcomponents also oversee the dissemination of the

"known or suspected terrorists" stigmatizing label attached to the Watchlisted Plaintiffs and other similarly situated American citizens to state and local authorities, courts, foreign governments, private corporations, private contractors, airlines, gun sellers, financial institutions, the captains of sea-faring vessels, and others. Additionally, DOJ utilizes the TSDB in order to screen persons against it that are applying for security clearances or employment to work with DOJ and/or its agency subcomponents in order to deny them employment. Defendant Sessions is being sued in his official capacity, only.

39.45. Defendant Christopher Wray is Director of the Federal Bureau of Investigation ("FBI"). The FBI is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*. The FBI represents the DOJ at WLAC meetings. Because the WLAC operates by consensus, the FBI and/or its agency subcomponents have both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, the FBI and/or its agency subcomponents nominated some or all of the Watchlisted Plaintiffs, and continue to nominate other similarly situated American citizens, to the federal terrorist watchlist. Additionally, the FBI utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with the FBI and/or its agency subcomponents in order to deny them employment. Defendant Wray is being sued in his official capacity, only.

40.46. Defendant Charles H. Kable, IV is the Executive Assistant Director of the Terrorism Screening Center ("TSC") of the Federal Bureau of Investigation ("FBI"). The TSC is one of two cochairs of the WLAC, a government agency described more fully in paragraph 3844 *supra*. The TSC represents the DOJ at WLAC meetings. Because the WLAC operates by consensus, the TSC has both decision-making authority and veto power over all decisions

made by the WLAC. Upon information and belief, the TSC develops and maintains the federal government's consolidated Terrorism Screening Database ("TSDB"), accepted the nominations of some or all of the Watchlisted Plaintiffs, and continues to accept the nominations of other similarly situated American citizens, to the federal terrorist watchlist. Additionally, the TSC utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with the TSC in order to deny them employment. Defendant Kable, IV is being sued in his official capacity, only.

41.47. Defendant Russel Travers is Acting Director of the National Counterterrorism Center ("NCTC") of the Office of the Director of National Intelligence ("ODNI"). The NCTC is one of two cochairs of the WLAC, a government agency described more fully in paragraph 38.44 *supra*. The NCTC represents the ODNI at WLAC meetings. Because the WLAC operates by consensus, the NCTC has both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, the NCTC nominated some or all of the Watchlisted Plaintiffs, and continues to nominate other similarly situated American citizens, to the federal terrorist watchlist. Additionally, the NCTC utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with the NCTC and/or its agency subcomponents in order to deny them employment. Defendant Travers is being sued in his official capacity, only.

42.48. Defendant John C. Demers is Assistant Attorney General for National Security of the National Security Division ("NSD") of the U.S. Department of Justice ("DOJ"). The NSD represents the DOJ at WLAC meetings. Because the WLAC operates by consensus, the NSD has both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, the NSD nominated some or all of the Watchlisted Plaintiffs,

and continues to nominate other similarly situated American citizens, to the federal terrorist watchlist. Additionally, the NSD utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with the NSD in order to deny them employment. Defendant Demers is being sued in his official capacity, only.

43.49. Defendant Beth A. Williams is Assistant Attorney General for the Office of Legal Policy ("OLP") of the U.S. Department of Justice ("DOJ"). The OLP represents the DOJ at WLAC meetings. Because the WLAC operates by consensus, the OLP has both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, the OLP nominated some or all of the Watchlisted Plaintiffs, and continues to nominate other similarly situated American citizens, to the federal terrorist watchlist. Additionally, the OLP utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with the OLP in order to deny them employment. Defendant Williams is being sued in her official capacity, only.

44.50. Defendant Peter A. Winn is Acting Chief Privacy and Civil Liberties Officer of the Office of Privacy and Civil Liberties ("OPCL") of the U.S. Department of Justice ("DOJ"). OPCL represents the DOJ at WLAC meetings. Because the WLAC operates by consensus, OPCL has both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, OPCL nominated some or all of the Watchlisted Plaintiffs, and continues to nominate other similarly situated American citizens, to the federal terrorist watchlist. Additionally, OPCL utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with OPCL in order to deny them employment. Defendant Winn is being sued in his official capacity, only.

17

45.51. Defendant Daniel R. Coats is Director of National Intelligence of the Office of the Director of National Intelligence ("ODNI"). The ODNI is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*. The ODNI is represented at WLAC meetings by the National Counterterrorism Center ("NCTC"), one of two cochairs of the WLAC. Because the WLAC operates by consensus, the ODNI has both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, the ODNI accepted the nominations of some or all of the Watchlisted Plaintiffs and continues to accept the nominations of other similarly situated American citizens, to the federal terrorist watchlist. Additionally, ODNI utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with ODNI in order to deny them employment. Defendant Coats is being sued in his official capacity, only.

46.52. Defendant Kirstjen M. Nielson is Secretary of U.S. Department of Homeland Security ("DHS"). DHS is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*. DHS is represented at WLAC meetings by U.S. Customs and Border Protection ("CBP"); Transportation and Security Administration ("TSA"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Immigration and Customs Enforcement ("ICE"); and various DHS headquarters offices, including the Office for Civil Rights & Civil Liberties ("OCRCL"); the Office of Intelligence & Analysis ("OIA"); the Office of the General Counsel ("OGC"); the Office of Strategy, Policy, and Plans ("DHS Policy"); and the Privacy Office. Because the WLAC operates by consensus, DHS and/or its agency subcomponents have both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, DHS and/or its agency subcomponents act

as front-line agencies that utilize the TSDB to screen individuals against the TSDB, including the Watchlisted Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to:  (1) impeding air travel at airports; (2) burdening travel at land border crossings and other ports of entry; (3) denying participation in programs that allow for expedited screening at ports of entry; and (4) indefinitely delaying or denying immigration benefits. Additionally, DHS is responsible for overseeing and administering the DHS Traveler Redress Inquiry Program ("DHS TRIP"), the only administrative complaint process by which the Watchlisted Plaintiffs and other similarly situated American citizens may challenge their nominations to the TSDB.  DHS also utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with DHS and/or its agency subcomponents in order to deny them employment.  Defendant Nielson is being sued in her official capacity, only.

47.53.  Defendant McAleenan is Commissioner of the United States Customs and Border Protection ("CBP") of the United States Department of Homeland Security ("DHS"). CBP is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*.  CBP represents DHS at WLAC meetings.  Because the WLAC operates by consensus, CBP has both decision-making authority and veto power over all decisions made by the WLAC.  Upon information and belief, CBP acts as a front-line agency that utilizes the TSDB to screen individuals against the TSDB, including the Watchlisted Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to:  (1) impeding air travel at airports; (2) burdening travel at land border crossings and other ports of entry; (3) denying

19

participation in programs that allow for expedited screening at ports of entry; and (4) indefinitely delaying or denying immigration benefits. Moreover, upon information and belief, CBP nominated some or all of the Watchlisted Plaintiffs, and continues to nominate other similarly situated American citizens, to the federal terrorist watchlist. Additionally, CBP utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with CBP in order to deny them employment. Defendant McAleenan is being sued in his official capacity, only.

48.54. Defendant David P. Pekoske is Administrator of the Transportation Security Administration ("TSA") of the United States Department of Homeland Security ("DHS"). TSA is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*. TSA represents DHS at WLAC meetings. Because the WLAC operates by consensus, TSA has both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, TSA acts as a front-line agency that utilizes the TSDB to screen individuals against the TSDB, including the Watchlisted Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding air travel at airports; (2) burdening travel at land border crossings and other ports of entry; (3) denying participation in programs that allow for expedited screening at ports of entry; and (4) indefinitely delaying or denying immigration benefits. Moreover, upon information and belief, TSA nominated some or all of the Watchlisted Plaintiffs, and continues to nominate other similarly situated American citizens, to the federal terrorist watchlist. Additionally, TSA utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with TSA in order to deny them employment. The

TSA also implements the "Quiet Skies" program. The "Quiet Skies" program cross-references the TSDB as part of a system of targeting rules that identifies and then flags for investigation and surveillance "unknown or partially known terrorists." "Quiet Skies" scrutiny results in individuals being treated like TSDB ~~listees~~Listees and may result in nomination to the TSDB. Defendant Pekoske is being sued in his official capacity, only.

~~49.~~55. Defendant L. Francis Cissna is Director of the United States Citizenship and Immigration Services ("USCIS") of the Department of Homeland Security ("DHS"). USCIS is a regular agency attendee of the WLAC, a government agency described more fully in paragraph ~~38~~44 *supra*. USCIS represents DHS at WLAC meetings. Because the WLAC operates by consensus, USCIS has both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, USCIS acts as a front-line agency that utilizes the TSDB to screen individuals against the TSDB, including the Watchlisted Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding air travel at airports; (2) burdening travel at land border crossings and other ports of entry; (3) denying participation in programs that allow for expedited screening at ports of entry; and (4) indefinitely delaying or denying immigration benefits. Moreover, upon information and belief, USCIS nominated some or all of the Watchlisted Plaintiffs, and continues to nominate other similarly situated American citizens, to the federal terrorist watchlist. Additionally, USCIS utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with USCIS in order to deny them employment. Defendant Cissna is being sued in his official capacity, only.

50.56. Defendant Ronald D. Vitiello is Deputy Director of the United States Immigration and Customs Enforcement ("ICE") of the Department of Homeland Security ("DHS"). ICE is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*. ICE represents DHS at WLAC meetings. Because the WLAC operates by consensus, ICE has both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, ICE acts as a front-line agency that utilizes the TSDB to screen individuals against the TSDB, including the Watchlisted Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding air travel at airports; (2) burdening travel at land border crossings and other ports of entry; (3) denying participation in programs that allow for expedited screening at ports of entry; and (4) indefinitely delaying or denying immigration benefits. Moreover, upon information and belief, ICE nominated some or all of the Watchlisted Plaintiffs, and continues to nominate other similarly situated American citizens, to the federal terrorist watchlist. Additionally, ICE utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with ICE in order to deny them employment. Defendant Vitiello is being sued in his official capacity, only.

51.57. Defendant Cameron Quinn is Officer of the Office for Civil Rights and Civil Liberties ("CRCL") of the United States Department of Homeland Security ("DHS"). CRCL is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*. CRCL represents DHS at WLAC meetings. Because the WLAC operates by consensus, CRCL has both decision-making authority and veto power over all decisions made by the WLAC. Additionally, CRCL utilizes the TSDB in order to screen

persons against it that are applying for security clearances or for employment to work with CRCL in order to deny them employment. Defendant Quinn is being sued in her official capacity, only.

52.58. Defendant David J. Glawe is Under Secretary of the Office of Intelligence and Analysis ("OIA") of the United States Department of Homeland Security ("DHS"). OIA is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*. OIA represents DHS at WLAC meetings. Because the WLAC operates by consensus, OIA has both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, OIA utilizes the TSDB to screen individuals against the TSDB, including the Watchlisted Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding air travel at airports; (2) burdening travel at land border crossings and other ports of entry; (3) denying participation in programs that allow for expedited screening at ports of entry; and (4) indefinitely delaying or denying immigration benefits. Additionally, OIA utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with OIA in order to deny them employment. Defendant Quinn is being sued in his official capacity, only.

53.59. Defendant John Mitnick is General Counsel ("GC") of the United States Department of Homeland Security ("DHS"). The GC is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*. The GC represents DHS at WLAC meetings. Because the WLAC operates by consensus, the GC has both decision-making authority and veto power over all decisions made by the WLAC. Additionally, the GC utilizes the TSDB in order to screen persons against it that are applying for security

clearances or for employment to work with the GC in order to deny them employment. Defendant Mitnick is being sued in his official capacity, only.

54.60. James W. McCament is Deputy Under Secretary of the Office of Strategy, Policy, and Plans ("DHS Policy") of the United States Department of Homeland Security ("DHS"). DHS Policy is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*. DHS Policy represents DHS at WLAC meetings. Because the WLAC operates by consensus, DHS Policy has both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, DHS Policy develops policies for front-line screening agencies regarding utilizing the TSDB to screen individuals against the TSDB, including the Watchlisted Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding air travel at airports; (2) burdening travel at land border crossings and other ports of entry; (3) denying participation in programs that allow for expedited screening at ports of entry; and (4) indefinitely delaying or denying immigration benefits. Moreover, upon information and belief, DHS Policy nominated some or all of the Watchlisted Plaintiffs, and continues to nominate other similarly situated American citizens, to the federal terrorist watchlist. Additionally, DHS Policy utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with DHS Policy in order to deny them employment. Defendant McCament is being sued in his official capacity, only.

55.61. Sam Kaplan is Chief Privacy Officer of the Privacy Office ("DHS Privacy") of the United States Department of Homeland Security ("DHS"). DHS Privacy is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*.

24

DHS Privacy represents DHS at WLAC meetings. Because the WLAC operates by consensus, DHS Privacy has both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, DHS Privacy develops policies for front-line screening agencies regarding the collection of information for inclusion on the TSDB and the utilization of the TSDB to screen individuals against the TSDB, including the Watchlisted Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding air travel at airports; (2) burdening travel at land border crossings and other ports of entry; (3) denying participation in programs that allow for expedited screening at ports of entry; and (4) indefinitely delaying or denying immigration benefits. Moreover, upon information and belief, DHS Privacy nominated some or all of the Watchlisted Plaintiffs, and continues to nominate other similarly situated American citizens, to the federal terrorist watchlist. Additionally, DHS Privacy utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with DHS Privacy in order to deny them employment. Defendant Kaplan is being sued in his official capacity, only.

56.62. Defendant Mike Pompeo is Secretary of State, U.S. Department of State ("DOS"). DOS is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*. DOS is represented at WLAC meetings by Consular Affairs and the Bureau of Counterterrorism. Because the WLAC operates by consensus, DOS and/or its agency subcomponents have both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, DOS and/or its agency subcomponents act as front-line agencies that utilize the TSDB to screen individuals against the TSDB, including the Watchlisted Plaintiffs and other similarly situated American citizens,

in order to deny them government benefits and impose consequences upon them, including but not limited to indefinitely delaying or denying visas and visa waivers. Additionally, DOS utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with DOS and/or its agency subcomponents in order to deny them employment. Defendant Pompeo is being sued in his official capacity, only.

57.63. Defendant James N. Mattis is Secretary of Defense, U.S. Department of Defense ("DOD"). DOD is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*. DOD is represented at WLAC meetings by the National Security Agency ("NSA") and the Defense Intelligence Agency ("DIA"). Because the WLAC operates by consensus, DOD and/or its agency subcomponents have both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, DOD and/or its agency subcomponents utilize the TSDB to screen individuals against the TSDB, including the Watchlisted Plaintiffs and other similarly situated American citizens, in order to impose consequences upon them, including but not limited to denying them access to military bases. Additionally, DOD utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with DOD and/or its agency subcomponents in order to deny them employment. Defendant Mattis is being sued in his official capacity, only.

58.64. Defendant General Paul M. Nakasone is Commander of the United States Cyber Command and Director of the National Security Agency/Chief ("NSA"), Central Security Service of the U.S. Department of Defense ("DOD"). The NSA is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*. The NSA represents the DOD at WLAC meetings. Because the WLAC operates by consensus, the NSA

26

has both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, the NSA utilizes the TSDB to screen individuals against the TSDB, including the Watchlisted Plaintiffs and other similarly situated American citizens, in order to impose consequences upon them, including but not limited to denying them access to military bases. Additionally, the NSA utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with the NSA in order to deny them employment. Defendant Nakasone is being sued in his official capacity, only.

59.65. Defendant Lieutenant General Robert P. Ashley, Jr., USA is Director of the Defense Intelligence Agency ("DIA") of the U.S. Department of Defense ("DOD"). The DIA is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*. The DIA represents the DOD at WLAC meetings. Because the WLAC operates by consensus, the DIA has both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, the DIA utilizes the TSDB to screen individuals against the TSDB, including the Watchlisted Plaintiffs and other similarly situated American citizens, in order to impose consequences upon them, including but not limited to denying them access to military bases. Additionally, the DIA utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with the DIA in order to deny them employment. Defendant Ashley, Jr. is being sued in his official capacity, only.

60.66. Defendant Steven Mnuchin is Secretary of Treasury, U.S. Department of Treasury ("DOT"). DOT is a regular agency attendee of the WLAC, a government agency described more fully in paragraph 3844 *supra*. DOT is represented at WLAC meetings by the Financial Crimes Enforcement Network ("FinCEN"). Because the WLAC operates by

27

consensus, DOT and/or its agency subcomponents have both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, DOT and/or its agency subcomponents oversaw the dissemination of the "known or suspected terrorists" stigmatizing label attached to the Watchlisted Plaintiffs, and continue to oversee the dissemination of the "known or suspected terrorists" stigmatizing label attached to the Watchlisted Plaintiffs and other similarly situated American citizens to financial institutions so that the financial institutions impose consequences upon them, including, but not limited to, closing their bank accounts without notice and blocking them from conducting wire transfers. Additionally, DOT utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with DOT and/or its agency subcomponents in order to deny them employment. Defendant Mnuchin is being sued in his official capacity, only.

~~61.~~67. Defendant Ken Blanco is Director of the Financial Crimes Enforcement Network ("FinCEN") of the Office of Terrorism and Financial Intelligence of the United States Department of Treasury. FinCen is a regular agency attendee of the WLAC, a government agency described more fully in paragraph ~~38~~44 *supra*. FinCEN represents DOT at WLAC meetings. Because the WLAC operates by consensus, FinCEN has both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, FinCEN oversaw the dissemination of the "known or suspected terrorists" stigmatizing label attached to the Watchlisted Plaintiffs, and continues to oversee the dissemination of the "known or suspected terrorists" stigmatizing label attached to the Watchlisted Plaintiffs and other similarly situated American citizens to financial institutions so that the financial institutions impose consequences upon them, including, but not limited to, closing their bank

accounts without notice and blocking them from conducting wire transfers. Additionally, FinCEN utilizes the TSDB in order to screen persons against it that are applying for security clearances or for employment to work with FinCEN in order to deny them employment. Defendant Blanco is being sued in his official capacity, only.

62.68. Defendant Watchlisting Advisory Council is a government entity that promulgates decisions regarding all policies, procedures, practices and instructions pertaining to the federal terrorist watchlist, including, but not limited to: (1) watchlist nomination and removal procedures; (2) specific criteria used to nominate persons to the TSDB; (3) redress procedures; (4) vetting of information used to nominate persons to the TSDB; and, (5) dissemination of a person's designation in the TSDB to state and local authorities, courts, foreign governments, private corporations, private contractors, airlines, gun sellers, financial institutions, the captains of sea-faring vessels, and others.

69. Defendants Unidentified FBI Agents are agents and officers of the United States who have interrogated Plaintiffs about their Muslim faith, and who have sought to coerce Plaintiff John Doe into violating his sincere religious beliefs by becoming an FBI Information in exchange for removal from the No Fly List. Defendants Unidentified FBI Agents are sued in their individual capacities, only.

70. Defendants Unidentified CBP Agents are agents and officers of the United States who have personally directed or carried out the seizure, confiscation, searching, copying, downloading, or uploading of information from Plaintiffs' electronic devices. Unidentified CBP Agents have conducted these electronics searches pursuant to CBP policy and Defendants' watchlisting and intelligence practices which require the search, seizure, copying, and uploading of electronic devices to anyone on a federal terrorist watchlist.

71.   For purposes of this First Amended Complaint, "Defendants" and "the Government" only refers to official-capacity Defendants, except where otherwise noted in the Religious Freedom Restoration Act and Fourth Amendment *Bivens* claims.

### Jurisdiction and Venue

63.72. Under U.S. Const. Art. III § 2, this Court has jurisdiction because the rights sought to be protected herein are secured by the United States Constitution.

64.73. Jurisdiction is proper pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, 5 U.S.C. § 706, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the United States Constitution, and federal common law.

65.74. This Court has authority to grant the declaratory relief requested herein pursuant to the Declaratory Judgment Act, 28 U.S.C. § § 2201-02, because the action presents an actual case or controversy within the Court's jurisdiction, and pursuant to the general, legal, and equitable powers of this Court.

66.75. This action also seeks damages pursuant to The Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. 2000bb *et. seq.*, 28 U.S.C. § 1343(a)(4), and 28 U.S.C. § 1357. *See Tanvir v. Tanzin*, 894 F.3d 449 (2d Cir. 2018).

67.76. A substantial part of the unlawful acts alleged herein were committed within the jurisdiction of the United States District Court for the District of Maryland.

68.77. Venue is proper under 42 U.S.C. § 1391(e)(1) because at least one of the Plaintiffs resides in this district; because Defendants are officers or employees of agencies of the United States sued in their official capacities; because Defendants regularly conduct business in the State of Maryland; because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district including the dissemination of

the federal terrorist watchlist and the stigmatizing label of "known or suspected terrorist" attached to each of the Plaintiffs to the State of Maryland, Maryland state and local law enforcement officers, Maryland courts, and other governmental and private partners within the State of Maryland; and because the action involves no real property.

## Factual Background

**The Federal Government's Terrorist Watchlisting System And Its Subcomponents**

~~69.~~78.  In September 2003, Attorney General John Ashcroft established the Terrorist Screening Center ("TSC") to consolidate the government's approach to terrorism screening. The TSC, which is administered by the FBI, develops and maintains the federal government's consolidated Terrorism Screening Database ("TSDB" or "federal terrorist watchlist").  TSC's consolidated watchlist is the federal government's master repository for suspected international and domestic terrorist records and is used for watchlist related screening.

~~70.~~79.  The Government publicly states that to be included in the TSDB, an individual must be reasonably suspected of being a known or suspected terrorist.  More specifically, a government nominator "must rely upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities."  *See* January 2018 Overview of the U.S. Government's Watchlisting Process and Procedures (Exhibit 5.)

~~71.~~80.  The "totality of the circumstances" analysis for TSDB inclusion may include assessment of an individual's race, ethnicity, country of origin, religion, religious practices, languages spoken, family, associations, travel history, social media history, and other activities protected by the First Amendment, Fifth Amendment, Fourteenth Amendment, and U.S. Constitution.[1]

~~72.~~81.  Anyone listed in the TSDB is a "TSDB Listee" subjected to varying forms of heightened scrutiny and adverse repercussions.  In addition, TSDB Listees may have their records annotated or categorized with additional sub-classifications subjecting them to differential treatment.

~~73.~~82.  One set of TSDB sub-classifications is utilized primarily by the TSA, DHS, and TSC as relates to air travel.  It includes the No Fly List, the Selectee List, and the Expanded Selectee List.

~~74.~~83.  Since April 2011, persons nominated and added to the TSDB are placed on the Expanded Selectee List by default, provided their records contain a minimum amount of name and birth date identifying information.

~~75.~~84.  TSDB Listees may also be categorized under the heightened Selectee List if their records contain additional "derogatory information."  According to the 2013 Watchlisting Guidance promulgated by the Watchlisting Advisory Council, TSDB Listees may

---

[1] ~~1.~~  The TSA conducts a similar assessment of the family relationships, associations and travel patterns of individuals in order to flag them as "unknown or partially known terrorists" and place them on the "Quiet Skies Selectee List," which operates ~~independently of~~in parallel to the TSDB.  Quiet Skies may, however, cross-reference TSDB information and serve as a stepping stone in the process of identifying and investigating individuals which leads to TSDB nomination.

**Formatted:** Font: 12 pt

**Formatted:** Font: 12 pt

**Formatted:** Font: 12 pt

**Formatted:** Font: 12 pt

**Formatted:** Font: 12 pt

be designated as Selectees if the government suspects them of association or affiliation with a foreign or domestic terrorist organization, or other association with terrorist activities.

85. TSDB Listees sub-classified on either the Expanded Selectee List or Selectee List are systematically subjected to extra screening at airports, and often find "SSSS" printed on their boarding passes. "SSSS" indicates a passenger's watchlist status to airline employees, airport employees, and screeners.

76.86. TSDB Listees may also be categorized under the heightened No Fly List if their records contain additional "derogatory information." TSDB Listees may also be categorized under the heightened No Fly List if their records contain additional "derogatory information." According to information released by the governmentGovernment (following 2015 No Fly List litigation), TSDB Listees may be placed on the No Fly List if the government believes they pose a threat of committing an act of terrorism in the United States, against an international U.S. government facility, with respect to an aircraft, or if they are otherwise operationally capable of carrying out a violent act of terrorism. *See* January 2018 Overview of the U.S. Government's Watchlisting Process and Procedures at 4 (Exhibit 5.)

87. TSDB Listees sub-classified on either the Expanded Selectee List or Selectee List are systematically subjected to extra screening at airports, and often find "SSSS" printed on their boarding passes. "SSSS" indicates a passenger's watchlist status to airline employees, airport employees, and screeners. Persons on the No Fly List, including some of the Watchlisted Plaintiffs, are prevented from boarding flights that fly into, out of, or even through United States airspace.

77.88. TSDB Listees who are *not* on the No Fly List may also be blocked from crossing U.S. land borders or from boarding international flights headed to the United States.

78.89. Other screening agencies, including CBP, screen TSDB Listees but do not regularly use the No Fly List, Selectee List, and Expanded Selectee classifications. Instead, the CBP designates TSDB Listees as "Armed and Dangerous," refers them to secondary inspection, or otherwise automatically flags them as potential terrorists in automatic alerts sent to officers.

79.90. Pursuant to official CBP policy adopted in January 2018, (CBP Directive No. 3340-049A), the CBP conducts secondary inspection including advanced electronics searches of theany electronics carried by TSDB Listees. "An advanced search is any search in which an officer connects external equipment through a wired or wireless connection to an electronic device not merely to gain access to the device, but to review, copy, and analyze its contents." "The presence of an individual on a government operated and government vetted terrorist watch list," alone constitutes grounds for the CBP to search, copy, and store the contents of laptops, tablets, and smartphones, etc. without requesting or obtaining consent.

80.91. Another set of TSDB sub-classifications is utilized by DHS, NCIC, and other federal, state, and local law enforcement officers to determine operational responses to TSDB Listees. These are known asThe TSC distributes the "Known or Suspected Terrorist" or "KST" file to the NCIC for further dissemination to more than 18,000 law enforcement agencies and 100,000 law enforcement officers. This KST file is then marked with "Handling Codes," which are set by the TSC and, upon information and belief, overseen by the Watchlisting Advisory Council and its participating agencies. Four TSC handling codes have been published by Baltimore Police Department Policy 802, Handling Codes: Terrorist

Response (Sept. 8, 2016) (Exhibit 6), as well as other federal, state, and local law enforcement guidebooks:

"**Handling Code 1:** The subject is confirmed to associate with terrorism, and there is a valid, outstanding arrest warrant.

**Handling Code 2:** The subject is of an "investigative interest" regarding their association with terrorism.

**Handling Code 3:** This individual may have possible ties with terrorism.

**Handling Code 4:** The identity provided by this individual may have possible ties with terrorism."

~~81.~~92. In 2005, according to an analysis done by the DOJ's Office of the Inspector General, less than 1% of all TSDB Listees were designated under either Handling Code 1 or 2. In other words, less than 1% of all TSDB Listees either had an outstanding arrest warrant or were under active investigation for terrorism. The overwhelming majority of records, more than 96%, were designated under Handling Codes 3 or 4, as maybe having possible ties to terrorism. A follow-up audit in 2007 confirmed the same general percentages: 1.5% of TSDB Listees were classified under Handling Code 1 or 2, with the remainder classified under a consolidated Handling Code 3 or 4, or "other." Upon information and belief, these ratios continue to approximate the Handling Code subdivisions of TSDB Listees in 2018.

~~82.~~93. In addition to the various "terrorist" sub-classifications of TSDB Listees, the TSDB also lists foreign individuals under an exception to the TSDB's ordinary 'reasonable suspicion of being a known or suspected terrorist' standard. Pursuant to this exception, the TSDB includes identifying information of foreign individuals who may have espoused support for terrorist activities, or who are related to TSDB ~~listees~~Listees. The Department of Homeland Security and the Department of State use this TSDB exception to screen foreign

individuals for admissibility, visas and immigration. TSDB "Exceptions" are separately categorized by the TSC and disseminated to DHS and the State Department.

83.94. Even though they are not TSDB Listees, airplane passengers occasionally receive boarding passes stamped with "SSSS". These designations are commonly the product of the TSA's and CBP's secretive and automated "risk-based targeting rules." These targeting rules examine passengers' itineraries, travel histories, travelling companions, associations with TSDB Listees, and numerous other undisclosed factors in order to flag passengers as "unknown or partially known terrorists." Upon information and belief, the secretive and undisclosed factors include "totality of the circumstances" analysis related to passengers' race, ethnic origin, national origin, sex, and religion.

84.95. The TSA's Quiet Skies program assembles the results of these "risk-based targeting rules" onto a separate TSA watchlist known as the "Quiet Skies Selectee List," and then subjects the passengers to intense investigation and scrutiny. Within the Quiet Skies program, Federal Air Marshalls and plainclothes TSA officers collect detailed behavioral and surveillance information on Quiet Skies Selectees, including passengers' bathroom usage, wardrobe changes, meals, conversations, whether they sleep on their flights, and reactions when they realize they are being stalked. Based on their observations and investigations, the TSA may nominate Quiet Skies Selectees to the TSDB.

96. The TSA's Quiet Skies program and/or the TSA's other rules-based programs target family members and traveling companions of TSDB Listees, including Plaintiffs, because of their relationships. These family members and traveling companions are themselves then treated as known or suspected terrorists.

85.97. CBP employs comparable risk-based targeting rules to the TSA in order to single out individuals at ports of entry for secondary inspection, detention, investigation and deportation. Upon information and belief, CBP also maintains separate "unknown or partially known terrorist" watchlists ~~independent of~~in parallel to the TSDB in order to label and treat individuals presenting themselves at land borders as terrorists. Upon information and belief, CBP utilizes the results of high-risk targeting rules and resulting inspections and investigation as a factual predicate for nominating individuals to the TSDB.

86.98. Upon information and belief, Plaintiffs are all TSDB Listees or family members of TSDB Listees. Upon information and belief and in addition, Plaintiffs and similarly-situated Americans have also been designated by the TSA and/or CBP as potential terrorists as a result of the TSA and/or CBP's automated high-risk targeting rules and creation of separate "unknown or partially known terrorist" watchlists.

**Nominations To The Federal Terrorist Watchlist**

87.99. Although TSA, CBP, and other agencies may use the records provided by the TSC, it is the TSC that maintains and controls the TSDB database of suspected terrorists.

88.100. Two government entities are primarily responsible for "nominating" individuals for inclusion in the terrorist watchlist—NCTC and FBI. The NCTC, which is managed by the Office of the Director of National Intelligence, relies on information from other federal departments and agencies when including alleged known or suspected international terrorists in its Terrorist Identities Datamart Environment ("TIDE") database. The NCTC reviews TIDE entries and recommends specific entries to the TSC for inclusion in the watchlist. TIDE is the main source of all international terrorist information included in

the watchlist. The FBI, in turn, nominates to the watchlist individuals with what it characterizes as suspected ties to domestic terrorism.

89.101. Other government agencies, including DHS, TSA and CBP, also have the ability to nominate individuals for inclusion in the terrorist watchlist.

90.102. All nominations to the TSDB must be approved and implemented by the TSC. The TSC makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watchlist as a known or suspected terrorist. TSC also decides which screening systems will receive the information about that individual.

91.103. Former Director of the Terrorism Screening Center Timothy Healy has testified that in evaluating whether an individual meets the criteria for inclusion on the consolidated watchlist, the TSC determines whether the nominated individual is "reasonably suspected" of having possible links to terrorism. According to the TSC, "reasonable suspicion requires articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual is known or suspected to be or has been engaged in conduct constituting, in preparation for, in and of or related to terrorism and terrorist activities."

92.104. Defendants have provided only limited information about and otherwise not stated publicly what standards or criteria are applied to determine whether an American citizen will be placed on the TSDB, No Fly List, Selectee List, Expanded Selectee List, Quiet Skies Selectee List, or any other terrorist watchlist that is distributed to the TSA, CBP or other screening agencies.

93.105. The standards for watchlist inclusion do not evince even internal logic. Defendants define a "suspected terrorist" as an "individual who is reasonably suspected to

38

be, or have been, engaged in conduct constituting, in preparation for, in aid of, or related to terrorism and terrorist activities based on articulable and reasonable suspicion." In other words, Defendants place American citizens on the federal terrorist watchlist based upon a "reasonable suspicion" that they are "reasonably suspected" of nefarious activities. This standard falls far below the typical "reasonable suspicion" and "probable cause" standards required for criminal investigation.

94.106.    The federal government utilizes guilt-by-association as a basis for watchlist inclusion. For example, immediate relatives of listed persons can be listedbecome TSDB Listees without any derogatory information—other than the bonds of family. Nonetheless, suchLikewise, they can be subjected to TSA and CBP rules-based 'terrorist' monitoring on the basis of family alone. Such designation signals to screening agencies, officers, employers, and others that the immediate relative is a violent threat engaged in nefarious activities.

95.107.    Being a known associate—a friend, colleague, fellow community member, etc.—of a listed individual can also provide a basis for watchlist inclusion.

96.108.    Even if an American citizen is acquitted of terrorism charges or those charges are otherwise dismissed, the federal government retains for itself the authority to continue to include them in the watchlist.

97.109.    For reasons unknown, Defendants also place what they call "non-investigatory subjects" on the federal terrorist watchlist, i.e., American citizens that they have chosen not to investigate.

98.110.    Defendants place individuals on the federal terrorist watchlist without any information regarding an individual's intended target.

99.111.   Defendants place individuals on the Selectee List without any information that they pose a threat to aviation.

100.112.   Defendants place individuals on the No Fly List without any information that they pose a threat to aviation.

101.113.   Under these practices and standards, the number of records in the consolidated watchlist has swelled.  Over 1.1 million new names have been added to the watchlist since fiscal 2009.  More than 98% of the names nominated to the TSDB are accepted.  In 2013, TSC accepted 98.96 percent of all nominations made.  A 2007 GAO report found that TSC rejects only approximately one percent of all nominations to the watchlist.[2]

102.114.   Because of these loose standards and practices, the federal terrorist watchlist's rate of growth has dramatically increased.  In fiscal 2009, there were 58,999 new additions to the watchlist.  In fiscal 2016, there were 176,014 new additions.

103.115.   Upon information and belief, in 2001, there were 16 people who the federal government systematically prevented from flying.  In 2013By 2009, the number grew to approximately 3,400.  By 2016, that number increased to approximately 4781,000.

104.116.   Once an American citizen has been placed on the watchlist, the individual remains on the list until the agency that supplied the initial information in support of the nomination determines the individual should be removed.

105.117.   At a March 10, 2010 Senate Homeland Security Committee hearing, Russel E. Travers, Deputy Director of the National Counterterrorism Center, stated that

---

[2] *See* United States Government Accountability Office Report to Congressional Requesters entitled *Terrorist Watchlist Screening:  Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List*, GAO-08-110, October 2007, at 22.

"[t]he entire federal government is leaning very far forward on putting people on list," and that the watchlist is "getting bigger, and it will get even bigger."

106.118.    The federal terrorist watchlist's and rules-based terror lists' inclusion standards are so permissive, pliable, and laden with discriminatory assessments of race, ethnicity, national origin, and religion, that they bear at best a fleetingly marginal connection to actual terrorist activities.  The inclusion standards themselves violate the Watchlisted Plaintiffs' procedural and substantive due process rights.

**Dissemination & Consequences Of The Terrorist Watchlist**

107.119.    Subsets of TSDB watchlist information isare disseminated from the TSC across the federal government, to state and local governments, and to more than 60 foreign countries, including all Visa Waiver Program countries.

108.120.    TSC disseminates records from its terrorist watchlist to other government agencies that in turn use those records to identify suspected terrorists. For example, applicable TSC records are provided to TSA for use by airlines in pre-screening passengers and to CBP for use in screening travelers entering the United States at land borders, seaports, airports, and other ports of entry.

109.121.    Upon information and belief, Defendants disseminated the records of the Watchlisted Plaintiffs from the TSDB to other government agencies, including TSA for use by airlines in pre-screening the Watchlisted Plaintiffs, and CBP for use in screening the Watchlisted Plaintiffs upon entering the United States.

110.122.    Upon information and belief, Defendants disseminated the records pertaining to the Watchlisted Plaintiffs from their terrorist watchlist to foreign governments with the purpose and hope that those foreign governments will constrain the movement of the Watchlisted Plaintiffs in some manner.

111.123.    Upon information and belief, Defendants' intention in disseminating watchlist records, including those of the Watchlisted Plaintiffs and similarly situated American citizens, as widely as possible is to constrain and monitor their movements and activities, both in the United States and abroad. For example, some countries detain individuals listed on the federal terrorist watchlist who enter their borders, question those

individuals at the behest of United States officials, or altogether prevent those individuals from entering those countries.

112.124.    Thus, while the TSC maintains and controls the database of suspected terrorists, it is the front-line agencies like the TSA, CBP, and law enforcement that carry out the screening function.  These agencies and law enforcement entities cross-reference the names and identities of individuals they encounter against the TSDB in order to determine whether they are on the TSDB or are a potential match to the TSDB.

113.125.    Agencies throughout the federal government utilize the federal terrorist watchlist to conduct and promote screening, subjecting listed persons to a comprehensive portfolio of consequences that cover large aspects of their lives.

114.126.    Government agencies routinely cross-reference the TSDB in connection with applications for or audits of a wide range of government benefits.  The TSDB is referenced in connection with and used as a basis to deny federal government employment, security clearances (regardless of whether the individual needs that clearance for either government or private contractor employment), travel benefit programs like TSA PreCheck and Global Entry, and a wide variety of government licenses and credentials used in both public and private employment, including FAA licenses, Hazmat licenses, Transportation Worker Identity Credentials, and security credentials needed for critical infrastructure projects like power plants.

115.127.    Indeed, Defendants disseminated the federal terrorist watchlist to government authorities, private corporations and individuals with the purpose and hope that these entities and/or individuals will impose consequences on those individuals Defendants have listed, including the Watchlisted Plaintiffs.

116.128.     Upon information and belief, the status of the Watchlisted Plaintiffs and similarly situated American citizens as known or suspected terrorists on the federal terrorist watchlist diminishes and even imperils their ability to access and utilize the financial system.

117.129.     Defendants have provided information regarding TSDB Listees to banks, prompting banks to close the bank accounts of individuals listed on the federal terrorist watchlist. Financial institutions have also declined to allow some watchlisted individuals to make wire transfers.

118.130.     Moreover, upon information and belief, family-based immigration applications filed by individuals listed on the federal terrorist watchlist are delayed indefinitely due to an "FBI name check" and not adjudicated, thereby denying and hindering the Watchlisted Plaintiffs and similarly situated American citizens of the rights that flow from citizenship, including the ability to sponsor lawful permanent residency for immediate relatives living abroad.

119.131.     Among the entities and individuals to which the federal government disseminates its federal terrorist watchlist are state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, financial institutions, and captains of sea-faring vessels, among others.

120.132.     Upon information and belief, because the names of the Watchlisted Plaintiffs and similarly situated American citizens are included on the federal terrorist watchlist, their names were disseminated to state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.

44

121.133.    In fact, in 2015, former Director of the Terrorist Screening Center Christopher Piehota gave an exclusive interview to CNN and stated the following, in relevant part:

> It's concerning that our partners don't use all of our data. We provide them with tools. We provide them with support, and I would find it concerning that they don't use these tools to help screen for their own aviation security, maritime security, border screening, visas, things like that for travel.[3]

122.134.    Former TSC Director Piehota went on to state that the United States shares its federal terrorist watchlist with the European Union, but that European Union countries don't systematically utilize it to identify suspected terrorists or screen migrants coming.

123.135.    Because the federal government disseminates its federal terrorist watchlist to foreign governments, listed persons, including the Watchlisted Plaintiffs and similarly situated American citizens, are often not allowed to enter other nations.  This is because the United States is telling other nations, without any modicum of due process, that thousands of its own citizens and residents are "known or suspected terrorists."

124.136.    The federal government, through Defendants, disseminates its federal terrorist watchlist to state and local police officers which allows those officers to query the names of persons, including the Watchlisted Plaintiffs, against the TSDB as disseminated through the NCIC.  Watchlisted Plaintiffs and similarly situated watchlisted individuals are

---

[3] First on CNN: Top U.S. intel official: Europe not taking advantage of terror tracking tools, CNN, *available at*:  http://www.cnn.com/2016/04/07/politics/christopher-piehota-us-intel-europe-terror-tracking/

**Formatted:** Font: 12 pt

**Formatted:** Font: 12 pt

often identified and treated as terrorists during routine police encounters including traffic stops.

125.137.    Disseminating the federal terrorist watchlist to state and local police officers creates a dangerous situation insofar as the federal terrorist watchlist effectively directs state and local officers to treat thousands of Americans, including the Watchlisted Plaintiffs, charged with or convicted of no crime yet who are listed as a "known or suspected terrorist" as extremely dangerous.

126.138.    With the advent and deployment of automatic license plate readers by police departments across the country, federal, local and state authorities have relied heavily upon a driver's (or a car associated with a driver's) watchlist status as the basis of a border or traffic stop. Watchlisted Plaintiffs and similarly situated American citizens have been subjected to this treatment.

127.139.    Being on the federal terrorist watchlist can prevent listed persons, including the Watchlisted Plaintiffs and similarly situated American citizens and lawful permanent residents, from purchasing a gun. For example, New Jersey passed a law in 2013 that banned persons on the federal terrorist watchlist from owning guns. Additionally, Connecticut is in the process of setting up an institutional mechanism to prevent individuals whose names are included on the federal terrorist watchlist, such as the Watchlisted Plaintiffs, from being able to buy a gun in the state of Connecticut. Accordingly, the Watchlisted Plaintiffs and similarly situated American citizens are unable to purchase guns in states that ban persons on the federal terrorist watchlist from owning guns.

128.140.    There are perennial federal proposals to ban all TSDB Listees from purchasing guns, although none has yet been formally adopted. Nonetheless, upon

46

information and belief, Defendants disseminate the TSDB (through the NCIC or otherwise) throughout the gun market. ~~Upon and information and belief,~~The gun permitting and gun sale process ~~often involve~~involves name cross-checks against the TSDB. ~~Upon information and belief, gun~~ Gun permits and sales have been denied based on Plaintiffs' and similarly situated American citizens' status as TSDB Listees.  The GAO reported on March 7, 2016 that TSDB Listees are, as a matter of course, subjected to gun-purchase delays, and 212 TSDB Listees have been barred from purchasing guns altogether.

~~129.~~141.     Because the federal government conducts a security risk assessment that includes querying the federal terrorist watchlist prior to issuing a license to commercial drivers to transport hazardous materials, being on the federal terrorist watchlist can prevent listed persons, including the Watchlisted Plaintiffs and similarly situated American citizens, from obtaining or renewing their Hazmat license.

~~130.~~142.     The federal government conducts a security risk assessment for private and public transportation workers, including those who enter airports and maritime ports. Approved individuals are issued Transportation Worker Identity Credentials ("TWIC").  The TWIC credential process includes querying the federal terrorist watchlist.  On May 9, 2012, Assistant Administrator David Nicholson testified to Congress that the TSA vets more than 13 million transportation workers against the terrorist watch list each week.  Defendants have prevented TSDB Listees from obtaining or renewing their TWICs, thus depriving them of a requirement for their employment.

~~131.~~143.     Being on the federal terrorist watchlist can also result in the denial or revocation of a Federal Aviation Administration (FAA) license of individuals listed on the

federal terrorist watchlist, including the Watchlisted Plaintiffs and similarly situated American citizens.

132.144.    Being on the federal terrorist watchlist can also prevent listed persons, including the Watchlisted Plaintiffs and similarly situated American citizens, from accompanying minors or passengers with disabilities to their gate, from working at an airport, or working for an airline insofar as listed persons are not allowed to enter so-called "sterile areas" of airports.

133.145.    Being on the federal terrorist watchlist can also result in the listing of the false stigmatizing label of "known or suspected" terrorist on the criminal records of the Watchlisted Plaintiffs and similarly situated American citizens and lawful permanent residents.  Criminal record information is accessible to the general public.

134.146.    Defendants make the federal terrorist watchlist available to municipal courts, which may make bail determinations based on an individual's status on the watchlist.

135.147.    The federal terrorist watchlist diminishes, rather than enhances, our national security because the number of innocent Americans on the list is becoming so voluminous that the purpose of having a list is significantly undermined as all are being treated as the same.

136.148.    The consequences of being on the federal terrorist watchlist are meted out publicly.  Members of the public can witness the extra and intrusive screening to which individuals on the federal terrorist watchlist are subject.  This screening oftentimes occurs in front of family and colleagues, including TSDB Listees being pulled out of their cars at gunpoint, being ordered to leave their vehicles with their hands held above their head, being handcuffed, being singled out and escorted first off of a plane by law enforcement officers,

being subjected to lengthy detentions, and having their electronics confiscated and searched, among other stigmatizing measures.

137.149.    Because travel is regularly done with family, friends, community acquaintances, and professional contacts, a person's watchlist status is revealed to travel companions.  Travel companions come to learn of a person's watchlist status based on how screeners treat TSDB Listees.  Moreover, TSA and CBP screening and rules-based practices often flag travel companions are often as themselves being potential terrorists, causing them to be treated the same as TSDB Listees by screeners.

138.150.    In practice, frontline screeners disclose the status of individuals on the federal terrorist watchlist to federal, state, local, and foreign authorities, as well as private employees of airports, airlines, and other transportation employees.  The operation of the federal terrorist watchlist enlists air carriers to assist the federal government in tracking passengers on the federal terrorist watchlist.

139.151.    Defendants who contributed to the placement of the Watchlisted Plaintiffs and similarly situated American citizens on the federal terrorist watchlist knew that their actions violated clearly established federal and constitutional law.

140.152.    Defendants knew at the time they acted unlawfully that Supreme Court precedent required that, whenever a citizen is deprived of a liberty interest, the federal government must at least provide the deprived with some form of notice that a deprivation occurred, and an opportunity to contest or correct it.

**The Federal Government's Terrorist Watchlist**
**Is No More Effective Than a List of Randomly Selected Individuals**

141.153.    Defendants' ability to watchlist persons who actually pose a threat of terrorism can be measured and described using a quantitative analysis based on factual allegations made in this Complaint as well as publicly available information describing the current operation of the federal terrorist watchlist.

142.154.    The federal government has added approximately 1.1 million persons to the federal terrorist watchlist over the last ten years.  These additions include thousands of U.S. citizens and lawful permanent residents.

143.155.    Moreover, based on the University of Maryland's Global Terrorism Database, a project funded in part by the Department of Homeland Security, there have been less than 250 terrorist acts inside the United States over the last decade.  These terrorist acts were perpetrated by less than 250 persons.

144.156.    Only one of these perpetrators was designated on the federal terrorist watchlist by the federal government prior to their criminal conduct.  This single person designated on the federal terrorist watchlist, however, was removed from the federal terrorist watchlist prior to perpetrating the terrorist attack.

145.157.    Upon information and belief, in order to designate a person on the federal terrorist watchlist, the federal government must first have information about that person.  Because the federal government does not possess information on every person in the world, existing law enforcement and intelligence practices produce a subset of persons who the federal government can then screen against the federal terrorist watchlist's inclusion standards.

146.158. The precise size of this subset is unknown; however, a survey of law enforcement and intelligence practices indicates that the size of this subset is greater than 50 million people.

147.159. Upon information and belief, the practices that produce this subset exclude some persons who do pose a threat of terrorism and include some persons who do not pose a threat of terrorism.

148.160. Upon further information and belief, the federal government does not screen the entire subset of people known to it. Moreover, Defendants do not make individual determinations as to whether each person about whom they have information should be placed on the federal terrorist watchlist. Defendants utilized automated algorithms and risk-based targeting rules to select individuals for scrutiny, investigation, and nomination to one or more terrorist watchlists.

149.161. In order to designate a person on the federal terrorist watchlist, a federal government official must make a nomination and a TSC official must accept the nomination. TSC officials accept nominations at a rate above 98 percent.

150.162. Based on the facts alleged in this Complaint and the publicly known processes of the federal terrorist watchlist, a quantitative analysis can be constructed to measure and describe the performance and efficacy of the federal terrorist watchlist.

151.163. A quantitative analysis requires that, in order to accomplish the federal terrorist watchlist's stated objectives, Defendants must have at least some greater-than-random ability to identify future terrorists. This is due to the nature of the processes Defendants utilize to place persons on the federal terrorist watchlist and the size of the

population Defendants can—if they so choose—screen against the federal terrorist watchlist's inclusion standards.

~~152.~~164.     A quantitative analysis demonstrates that Defendants' watchlisting system would perform similarly if inclusion on the watchlist was done via random selection instead of the existing inclusion standards Defendants utilize.

~~153.~~165.     A quantitative analysis therefore indicates that Defendants have no ability to watchlist persons whose placement on the watchlist would further Defendants' stated objectives.

**Watchlist Practices Target And Disproportionately Harm American Muslims**

~~154.~~166.     As of January 2018, the Pew Research Center estimates that there are 3.45 million Muslims living in the United States, accounting for 1.1% of the total U.S. population.  Particularly robust Muslim populations live, *inter alia*, in Michigan, Illinois, Washington, D.C., New Jersey, New York, and California.

~~155.~~167.     Dearborn, Michigan is a suburb of Detroit with a large Arab-Muslim community, comprising 40% of its approximately 100,000-person population.  Due to Dearborn's significant Muslim population, it has earned a reputation as the "Muslim Capital of America."  As of 2013, Dearborn was second only to New York City (population: 8.5 million) for the total number of residents listed on the federal terrorist watchlist.

~~156.~~168.     Defendants' over-eager practice of approving watchlist nominations of relatives or associates of already-listed individuals imposes overwhelming network effects in Muslim communities such as Dearborn.  One watchlist nomination, even if grounded in probable cause or a preexisting criminal conviction, can rapidly spiral into the government

classifying nearly every member of an extended family or community mosque as a potential or suspected terrorist.

~~157.~~169.    The federal terrorist watchlist and its inclusion standards disproportionately target and affect American Muslims.  Defendants use impermissible and inaccurate religious profiles in order to nominate, accept, disseminate, and deploy the federal terrorist watchlist against American Muslims in a manner that is different from other faith backgrounds.

~~158.~~170.    Defendants consider origin from Muslim-majority countries, travel to Muslim-majority countries, travel on religious pilgrimages, learning Arabic, attending mosques, *zakat* donations to Muslim charities, the wearing of typical Muslim dress, the frequency of Muslim prayer, adherence to Islamic religious practices, affiliations with Muslim organizations, and associations with other Muslims as suspicious factors supporting inclusion in the TSDB, on the Quiet Skies Selectee List, and on other high-risk-potential-terrorist watchlists.

~~159.~~171.    In fact, almost all – if not, all – legal challenges regarding designations on the federal terrorist watchlist have been filed by Muslims nationwide.[4]

---

[4] See *Rahman v. Chertoff*, No. 05-cv-3761 (N.D. Ill.); *Ibrahim v. U.S. Dep't of Homeland Sec.*, No. 06-cv-00545 (N.D. Cal.); *Scherfen v. U.S. Dep't of Homeland Security*, No. 3:08-cv-1554 (M.D. Pa.); *Latif v. Holder*, 3:10-cv-00750 (D. Or.); *Shearson v. Holder*, No. 1:10-cv-1492 (N.D. Ohio); *Mohamed v. Holder*, No. 1:11-cv-50 (E.D. Va.); *Abdallah v. JetBlue Airways Corp.*, No. 12-cv-1050 (D.N.J.); *Mokdad v. Holder*, 2:13-cv-12038 (E.D. Mich.); *Fikre v. FBI*, 3:13-cv-00899 (D. Or.); *Tarhuni v. Holder*, 3:13-cv-00001 (D. Or.); *Tanvir v. Tanzin*, No. 13-CV-6951 (S.D.N.Y.) ; *Ege v. U.S. Dep't of Homeland Security*, No. 13-1110 (10th Cir.); *Beydoun v. Lynch*, No. 14-cv-13812 (E.D. Mich.); *Kadura v. Lynch*, No. 14-cv-13128 (E.D. Mich.); *Long v. Lynch*, 1:15-cv-01642 (E.D. Va.); *Bazzi v. Lynch*, 16-cv-10123 (E.D. Mich.); *Elhady v. Piehota*, No. 1:16-cv-375 (E.D. Va.); *Amiri v. Kelly*, No. 17-cv-12188 (E.D. Mich.); *Abdi v. Wray*, No. 2:17-cv-622 (D.

Formatted: Font: 12 pt

Formatted: Font: 12 pt

160.172.    Upon information and belief, when Defendants review lists of social networks and known associates of a currently watchlisted individual, they routinely chose to nominate Arab or Muslim names that cross their desk on the stereotyped basis of race, religion, or national origin alone.  Meanwhile, Defendants gloss over any stereotypically white, Christian, English, or Western-European names that may appear in the same network lists, such as classmates or colleagues.

161.173.    Upon information and belief, Defendants dismiss mass violence perpetrated by white Christians as "lone wolf" events unconnected to "organized" terrorism, while overreacting to comparable or even less serious events perpetrated by Muslims.  This is fueled by a media culture which, according to researchers at Georgia State University, dedicates nearly five times as much reporting to Muslim perpetrators than to white ones.

162.174.    Upon information and belief, even though they facially satisfy the same known associate watchlist criteria, close families and friends of convicted white-nationalist domestic terrorists are not routinely added to the federal terrorist watchlist, while distant families and friends of innocent Muslims often discover that their mere association with other watchlistees has caused them to be labeled potential terrorists.

163.175.    Defendants' 2013 Watchlisting Guidance indicates that "[t]ravel for no known lawful or legitimate purpose to a locus of terrorist activity" can be a basis for being listed.  While a "locus of Terrorist Activity" is not defined by the document, upon information and belief, it likely includes any place where many Muslims reside.

---

Utah); *Bosnic v. Wray*, 3:17-cv-826 (M.D. Fl.); *Kovac v. Wray*, 3:18-cv-110 (N.D. Tx.).  Many of these legal challenges were filed by groups of multiple Muslim plaintiffs.

~~164.~~176.	By emphasizing Arab origins or Islamic faith above all else, Defendants have utilized the watchlist far beyond its intended purpose.  Instead of serving as a targeted tool to enhance aviation and border security, the watchlist has become a bludgeon to coerce everyday American Muslims into spying on their neighbors and becoming government informants.  Presence on the watchlist is deployed as an intimidation tactic and used to coercively justify the denial of American-Muslims' civil rights, such as the right to have an attorney present during law enforcement questioning.

~~165.~~177.	Public examples of this phenomenon abound.  *See Latif v. Holder*, 2014 U.S. Dist. LEXIS 85450, *19 (D. Or. June 24, 2014) (an FBI agent told Steven Washburn that he "would help remove Washburn's name from the No-Fly List if he agreed to speak to the FBI"); *Id.* at *21-22 (FBI agents told Ibraheim Mashal that "his name would be removed from the No-Fly List and he would receive compensation if he helped the FBI by serving as an informant."): *Id.* at *22-23 (FBI agents offered Amir Meshal "the opportunity to serve as a government informant in exchange for assistance in removing his name from the No-Fly List.").  *See also Fikre v. FBI*, 2014 U.S. Dist. LEXIS 73174 (D. Or. May 29, 2014) (Emirati officials told Yonas Fikre that he "could not travel to the United States by air because he is on the No-Fly List" and an FBI agent told Fikre that "the FBI could take steps to remove [him] from the No-Fly List if he agreed to be an informant."); ~~*Tanveer v. Holder*, et. al., No. 13-cv-6951, Dkt. 15 (April 22, 2014) (Naveed Shinwari "declined to act as an informant for the Federal Bureau of Investigation and to spy on [his] own American Muslim communities and other innocent people~~*Tanvir v Tanzin*, 894 F.3d 449 (2d Cir. 2018) (multiple Muslim Plaintiffs "asked to  gather information on members of Muslim communities and report that information to the FBI…In some instances, the FBI's request was accompanied with severe

pressure, including threats of deportation or arrest; in others, the request was accompanied by promises of financial and other assistance.").

~~166.~~178.    The FBI has sought to recruit some of the Plaintiffs, and similarly situated watchlisted Americans, as informants.

~~167.~~179.    To American Muslims, the watchlist is an ever-present threat of increased scrutiny and adverse consequences which descends without notice, cannot be effectively redressed, and chills their constitutionally-protected exercise of speech and religion.

**Inadequacy of the DHS Traveler Redress Inquiry Program Process**

~~168.~~180.    Defendants have not provided travelers, including the Watchlisted Plaintiffs and similarly situated American citizens and foreign nationals, with a clear, fair, timely, or effective mechanism through which they can challenge the TSC's decision to designate them as a potential terrorist and place them on the watchlist.  Nor can Watchlisted Plaintiffs and similarly situated American citizens and foreign nationals challenge DHS's inclusion of Plaintiffs on separate but related high-risk potential-terrorist lists such as Quiet Skies.

~~169.~~181.    No single government entity is responsible for removing an individual from the TSDB.  The FBI administers the TSC and the watchlist but does not accept redress inquiries from the public.  The NCTC which manages the TIDE list (which in turn supplies names to the TSC watchlist) also does not accept redress inquiries from the public.  Neither entity directly provides final disposition letters to individuals who have submitted redress inquiries.

170.182.    The only redress "process" available to individuals included on the terrorist watchlist is the DHS Traveler Redress Inquiry Program.  Individuals who have been denied entry or boarding, subjected to additional screening, or who otherwise suspect that they may be on the watchlist, may seek redress by submitting an inquiry to DHS TRIP.  At that time, DHS TRIP provides individuals with a "Redress Control Number."

171.183.    The DHS TRIP Redress process primarily affects the TSA's screening of airport travelers and TSDB listeesListees; it has limited (if any) impact on TSDB Listees' overall TSDB status, including their screening at land borders by CBP, or their screening for immigration, visas, employment, security clearances, or credentialing by other federal agencies.

172.184.    DHS TRIP submits the traveler complaints of TSDB Listees to the TSC, which determines whether any action should be taken.  The TSC has not provided any publicly available information about how it evaluates complaints or makes that decision.  The TSC is the final arbiter of whether an individual's name is retained on or removed from the watchlist, including those of the Watchlisted Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals.  In 2009, the TSC testified to Congress that of the watchlist DHS TRIP cases "approximately 51 percent are appropriately watchlisted, 22 percent have been modified or reviewed prior to redress, 10 percent were similar names, and 15 percent were removed or downgraded due to the redress process."

173.185.    The TSA Administrator may provide input regarding whether a DHS TRIP Redress applicant listed on the TSDB should be removed, but as of December 2017, the TSA Administrator had taken no action regarding the removal of TSDB Listees in two years.

57

174.186.    Being removed from the No Fly List or the Selectee List does not mean that a individual is also removed from the TSDB.

175.187.    Being removed from the TSDB does not mean that an individual will cease to be treated as a terrorist, as they may continue to be subjected to terrorist-level scrutiny through the operation of the TSA and CBP's rules-based targeted terrorist monitoring lists.

176.188.    The ~~government~~Government does not provide an American citizen with a meaningful opportunity to confront, or to rebut, the grounds for his or her possible inclusion on the watchlist.  No information is available to the Watchlisted Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals about what specific facts the TSC considers during the redress process, and no opportunity is provided for the Watchlisted Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals to contest or correct those facts.

177.189.    Once the TSC makes a determination regarding a particular individual's status on the watchlist, ~~including the Watchlisted Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals,~~ it sends the result to DHS TRIP. DHS TRIP in turn responds to the individual with a standard form letter that neither confirms nor denies the existence of any terrorist watchlist records relating to the individual.

178.190.    In response to prior litigation, DHS TRIP letters are now required to affirmatively state whether a U.S. complainee is presently on the No Fly List.  However, DHS TRIP does not disclose Selectee, Expanded Selectee, or Quiet Skies Selectee list status.   The DHS TRIP letters continue to provide no information on historical watchlist status, no information as to whether a person is included in the TSDB generally, no meaningful factual

58

basis for the individual's inclusion on the watchlist, and no information as to whether the government has resolved the specific complaint at issue.

~~179.~~191.    As such, DHS TRIP offers no meaningful or substantive review of the watchlist designation and in effect shields the TSC's actions with respect to the individual nominations or classes of nominations from meaningful review by any independent authority, including the judiciary.

~~180.~~192.    Instead, DHS TRIP operates as a mere middleman, forwarding complaints to the TSC while shielding the TSC's substantive determinations from individual, independent, or judicial review.  Thus, the only "process" available to individuals caught up in the federal terrorist watchlisting system is to submit their names and other identifying information to DHS TRIP, a government entity that itself has no authority to provide redress, and then hope that some other unspecified government agency self-identifies an error or changes its mind.

~~181.~~193.    Individuals are justifiably skeptical of Defendants' willingness to engage in meaningful introspection or self-correction.  Famously, in *Ibrahim v. Department of Homeland Security, et al.,* 06-CV-00545, ECF 701-1 (N.D. Cal. Feb. 6, 2014), Defendants vigorously contested a Muslim graduate student's challenge to her No Fly List designation and subsequent revocation of her student visa.  Defendants' actions had stranded her in Malaysia for *nine years.*  Following trial, it was ultimately revealed that her placement on the No Fly List was the result of an FBI agent's error in November 2004.  He had accidentally checked the wrong box.  *Id.* at 9.

~~182.~~194.    The government's own internal audits of the watchlist system point to serious flaws.  For example, a March 2008 DOJ Office of the Inspector General report entitled

59

*Audit of the U.S. Department of Justice Terrorism Watchlist Nomination Processes* found significant problems with the nomination and removal process. Rather than address those problems, Defendants' approach since 2008 has been to double-down on questionable nomination and redress practices, exponentially increasing the watchlist's size and adverse consequences.

183.195. A federal judge observed in *Gulet Mohamed v. Eric R. Holder, Jr.*, et al., No. 11-cv-00050, Dkt. 70 at 19 (E.D. Va. 2011), that "[a] showing of past or ongoing unlawful conduct does not seem to be required,... But the Court has little, if any, ability to articulate what information is viewed by TSC as sufficiently 'derogatory' beyond the labels it has provided the Court. In sum, the No Fly List assumes that there are some American citizens who are simply too dangerous to be permitted to fly, no matter the level of pre-flight screening or on-flight surveillance and restraint, even though those citizens cannot be legally arrested, detained, or otherwise restricted in their movements or conduct." (Memorandum Opinion attached as Exhibit 7).

184.196. The *Mohamed v. Holder* court went on to find that "[i]nclusion on the No Fly List also labels an American citizen a disloyal American who is capable of, and disposed toward committing war crimes, and one can easily imagine the broad range of consequences that might be visited upon such a person if that stigmatizing designation were known by the general public... The process of nomination to the No Fly List is based on a suspected level of future dangerousness that is not necessarily related to any unlawful conduct." *See id.* at 14, 17.

185.197. Another federal ~~judge has~~case permitted a broad challenge to the federal terrorist watchlist to proceed. In *Elhady, et al., v. Piehota, et al.*, No. 1:16-cv-375, Dkt.

47, (E.D. Va. 2016) the court ~~recently~~ held that the "'central meaning of procedural due process'" is that "[p]arties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" *See id* at 15 (Memorandum Opinion attached as Exhibit 8). The Court went on to state that the "Government's 'trust us' approach is inconsistent with the fundamental procedural protections applicable to the deprivation of a protected liberty interest, including the right to be heard." *See id.* at 16.

**The Experiences of the Plaintiffs on the Federal Terrorist ~~watchlist~~Watchlist Being Treated as "Known or Suspected Terrorists"**

198. All of the Plaintiffs that are challenging their designation on the federal terror watch list are practicing Muslims (together the "Watch Listed Plaintiffs").

199. All of the Watchlisted Plaintiffs are United States citizens, with the exception of Plaintiff Khaled El Ali, who is a Belgium national.

200. None of the Watchlisted Plaintiffs have ever been arrested, charged or convicted of any type of terrorism-related offense.

201. Upon information and belief, the nomination and designation of the Watchlisted Plaintiffs to the federal terror watch list was made based solely upon a hunch and/or based upon their race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities.

202. Upon information and belief, because the Watchlisted Plaintiffs are included on the federal terror watch list, Defendants disseminated and are continuing to disseminate their designation as "known or suspected terrorists" to governmental and private partners.

203.    At no time were any of the Watchlisted Plaintiffs given notice of the factual basis for their placement on the federal terror watch list, and at no time were they offered a meaningful opportunity to contest their designation.

204.    Moreover, at no time were any of the Watchlisted Plaintiffs given notice of the deprivation of their liberty interests or violation of their constitutional rights.

205.    The experience of the Watchlisted Plaintiffs on the federal terror watch list is indicative of government practice, policy, and the experiences of thousands of other Americans, particularly American Muslims, who have been deemed suspected terrorists without notice and without redress.

206.    Each of the Watchlisted Plaintiffs experience anxiety, shame and humiliation as a result of being designated and treated by the government as "known or suspected terrorists" in public, and in some cases, in front of family members, friends and colleagues.

207.    Many of the Watchlisted Plaintiffs have suffered monetary losses as a result of being designated and treated by the government as "known or suspected terrorists" in the form of lost business opportunities, missed flights, among other things.

208.    Several of the Watchlisted Plaintiffs experienced additional anxiety, shame and humiliation, and in some cases the loss of important associations, as a result of family members, friends and/or colleagues also being treated as "known or suspected terrorists" simply because they travelled together, described more fully below.

209.    All of the Watchlisted Plaintiffs have been discouraged from traveling as a result of being treated as "known or suspected terrorists," and because of the anxiety, shame and humiliation they are subjected to each time they travel.

210.    Many of the Watchlisted Plaintiffs have avoided and have continued to avoid traveling by air or crossing land ports of entry as a result of being treated as "known or suspected terrorists," and because of the anxiety, shame and humiliation they are subjected to each time they travel.

211.    Many of the Watchlisted Plaintiffs have been subjected to interrogations about their religious practices and beliefs, the answers of which, upon information and belief, are factors that were considered in their inclusion to the federal terror watchlist.

212.    The practice of Islam of the Watchlisted Plaintiffs, in addition to family members that have been subjected to similar interrogations due to their relationships with the Watchlisted Plaintiffs, have been substantially burdened by Defendants.

213.    Upon information and belief, as of the date of this filing, the Watchlisted Plaintiffs all remain on the federal terror watch list.

**The El Ali Family**

**Plaintiffs Rami Khaled El Ali and Mia Khaled El Ali**
**(Family Members of a Watch Listed Plaintiff)**

186.214.    Rami Khaled El Ali ("Rami") and Mia Khaled El Ali ("Mia"), by and through their mother and guardian Mariam Ahmad Ghaddar ("Ms. Ghaddar"), are United States citizens and practicing Muslims.

215.    Rami is 11-years-old and the son of Plaintiff Mr. El Ali.

187.    Mia is 14-years-old and the daughter of Plaintiff Mr. El Ali.

188.216.    Rami is 11-years-old and the son of Plaintiff Mr. El Ali.

189.217.    In 2010, Mia and Rami relocated to Michigan and now live with their mother. Prior to that, they lived with their entire family, including father, Plaintiff Mr. El Ali, in Belgium.

190.218.    Mia is an active eighth grader with a passion for basketball and volleyball. She has been a part of her school's basketball team for six years. She's played volleyball on and off for six years too.

191.219.    Rami is an active sixth grader with a love for basketball, baseball, soccer, and chess.

192.220.    Mia and Rami have a close relationship with their father. Until Mr. El Ali was barred from the United States, Mia and Rami had never celebrated a birthday without him. Even though their father lives in Belgium, he would travel every single year to celebrate their birthdays in Michigan.

193.221.    Mia's and Rami's father would visit them for approximately two weeks at a time in March (to celebrate Mia's birthday), in May (before school ends for summer), and in November (to celebrate Rami's birthday). Mr. El Ali would rent a condo and Mia and Rami would stay with him during those visits.

194.222.    Since March 2017, Mia's and Rami's father has not been able to visit them in the United States. Instead, last year, they had to travel to and from Amsterdam, Netherlands alone on two occasions, so they could see and spend time with him.

195.223.    During one of Mia's travels from Belgium to Michigan, Mia's boarding pass was stamped with the "SSSS" designation indicating that she was a "known or suspected terrorist." She was patted down at the security checkpoint. Upon information and belief,

Mia received the "SSSS" designation and enhanced screening because of her relationship to her father, Mr. El Ali.

196.224.    At the gate and before being allowed to board, in public view and in front of her little brother, Rami, Mia was once again subjected to another round of screening. Mia was forced to remove her shoes and her laptop from her bag. Mia was subjected to chemical residue testing on her laptop.  Additionally, Mia was questioned.

197.225.    Upon information and belief, Mia was subjected to enhanced screening, chemical testing, and questioning by Belgium authorities due to her relationship to her father, Mr. El Ali and his status on the federal terror watch list being shared with Netherlandic authorities by Defendants.

198.226.    Because of Mr. El Ali's status on Defendants' watchlist and inability to enter the United States, for the first time ever, Mia had to celebrate her birthday without her father in March 2018.  Her birthday had always been a happy and festive occasion for the family.  However, this year, Mia did not want to even have a birthday party.  She was angry, sad, and confused as to why her father could not come spend time with her. Instead of celebrating her birthday with her father in person, she was only able to see him *via* a video phone call on FaceTime at which point she became extremely emotional and began to cry as he started to talk.

199.227.    Mia is routinely asking her mother when she's "going to see baba[5]?" Recently, she expressed that she wants to move back to Belgium.

200.228.    Mia is a rising ninth grader.  She is excited for another year of volleyball and basketball.  However, Mia wants to spend as much time with her father as possible this

---

[5] Baba is an Arabic word of endearment meaning "father" or "dad."

summer. Unfortunately, this upcoming year, volleyball season starts weeks before the academic school year. Due to her father's inability to travel to Michigan, Mia is forced to choose between spending more time with her father in Belgium this summer or shortening her summer trip so she can return to Michigan and join her friends on the volleyball team. This is a choice no 14-year-old should ever have to make.

~~201.~~229.    In May 2018, during a phone call with her father, Mia could not bring herself to discuss whether she would forgo part of her summer trip in Belgium to join the volleyball team. Feeling overwhelmed, she broke down and began to sob during the call.

~~202.~~230.    Because his father has not been able to visit, Rami's education has been adversely affected. Rami's grades have drastically taken a turn for the worse.

~~203.~~231.    Rami's health is also being severely affected. Rami is continuously depressed. Every activity he participates in, Rami wishes his father was with him. Whenever his father would visit, they were inseparable; they would do everything together.

~~204.~~232.    To help with his education and depression, Rami's mother has been forced to hire a tutor so that Rami can get more personal time to work on his emotions and grades.

~~205.~~233.    Whenever Rami sees other children with their fathers, he routinely asks "when is baba gonna be able to come back?" It breaks his mother's heart that she cannot provide him with a concrete answer or reason for why his father cannot visit.

~~206.~~234.    Approximately every two weeks, Rami gets overwhelmed with the fact that his father cannot visit him. When his mother asks him what's wrong, Rami says that he misses his father and begins to choke up and uncontrollably sob.

207.235.     While Rami excels in active sports, he is particularly fond of playing chess because his father taught him how to play.  Each time his father would visit, they would play chess together.  Nowadays, they are regulated to playing chess online.

208.236.     Rami's father would visit and celebrate his birthday in November every year.  Rami's entire family—father, mother, and sister—would have a family dinner together.  They would also have an extended family party at the house and a party for all of his friends at a kid-friendly place in Michigan.

209.237.     Because of his father's inability to enter the United States, Rami's father could not attend his eleventh birthday.  As a result, Rami was depressed on his birthday.  He did not want to have a birthday party without his dad.  Instead, Rami's mom organized a small family gathering.

210.238.     Rami is a rising seventh grader.  He is excited for another year of baseball and soccer.  Because Rami's father cannot visit him in the United States, Rami is being forced to miss the end of baseball season and the beginning of soccer so that he can go to Belgium and spend as much time with his father as possible.  This is a sacrifice no 11-year-old should ever have to make.

211.239.     Since her father has been barred from entering the United States, Mia has missed out on many father-daughter moments that are instrumental in a young woman's life.

212.240.     Since his father has been barred from entering the United States, Rami has missed out on many father-son moments that are instrumental in a teenager's life.

213.241.     Mia and Rami video chat on FaceTime with their father every day.

214.242. ~~Every young child needs a father figure in their life.~~ Mia and Rami need their father~~; and,~~ Defendants are the main cause that they are left without a father in the United States.

215.243. Because Defendants have improperly placed their father, Mr. El Ali, on the Selectee and/or No Fly List, which subsequently caused the revocation of his ESTA waiver and placement on administrative status of his non-immigrant visa, Defendants are interfering with Mia's and Rami's liberty interest in their familial relations. Defendants have done so without providing Mia and Rami any due process.

**Plaintiff Khaled El Ali**
**(A ~~Watch Listed~~Watchlisted Plaintiff)**

216.244. Mr. El Ali is the father of Plaintiffs Mia Khaled El Ali ("Mia") and Rami Khaled El Ali ("Rami").

217.245. Pursuant to a custody agreement, Mia and Rami reside with their mother in the United States year-round except for the summers and Christmas holidays which are spent in Belgium with their father, Mr. El Ali.

218.246. In February 2017, Mr. El Ali traveled from Belgium to Michigan to celebrate Mia's 13th birthday.

219.247. Mr. El Ali's flight into the U.S. originated from Amsterdam, Netherlands to Detroit Metropolitan Airport on Delta Airlines.

220.248. While in Amsterdam, Mr. El Ali was not able to check-in online or at the airport kiosk. Instead, he was directed to an airline representative for further assistance.

221.249.    At the ticket counter, after a delay, Mr. El Ali received his boarding pass. Mr. El Ali's boarding passes was stamped with the "SSSS" designation, indicating that he is designated as a "known or suspected" terrorist.

222.250.    At the gate, Mr. El Ali was selected for enhanced screening.  He was instructed to remove his shoes. Thereafter, chemical residue testing was conducted on his person and carry-on in public view.  This was done even though Mr. El Ali had been cleared with no issues at the security checkpoint.

223.251.    Mr. El Ali felt ashamed and humiliated, especially because he was treated as a "known or suspected terrorist" in public view.

224.252.    Once Mr. El Ali landed in Detroit, Michigan, he went through customs and inserted his passport at the kiosk.  The kiosk displayed a red "X" and he was instructed to proceed to a CBP officer for further processing.

225.253.    The CBP officer took Mr. El Ali's fingerprints and interrogated him. Thereafter, he was taken to secondary inspection and waited until ~~plain clothed~~plainclothes officers arrived to interrogate him in a private room.

226.254.    The officers interrogated him about his past, work and travel history, and his family.  They interrogated him about where he grew up; what he does in Lebanon when he visits; where he stays where he goes to Lebanon; and if he knows anyone that has any legal problems.

227.255.    Mr. El Ali was forced to unlock his phone.  The officers searched his cell phone and interrogated him about his contacts.  The officers also searched through his photographs for approximately 40 minutes.

69

228.256.　　Mr. El Ali was interrogated for almost 2 hours. Thereafter, he was allowed entry into the United States.　Prior trips to the United States have resulted in similar treatment.

229.257.　　Mr. El Ali entered the U.S. on an Electronic System for Travel Authorization ("ESTA") waiver.　The ESTA program is an automated system used to determine the eligibility of visitors to travel to the U.S. under the Visa Waiver Program. Approved ESTA applications are valid for a period of two years, or until the passport expires, whichever comes first, and multiple trips to the United States may be made without the traveler having to re-apply for another ESTA waiver.

230.258.　　On March 2, 2017, within days of entering the United States, Mr. El Ali received an email informing him that his ESTA Travel Authorization Status had changed.

231.259.　　After celebrating Mia's birthday, Mr. El Ali returned to Belgium on or about March 11, 2017.

232.260.　　From 2002 to 2017, Mr. El Ali was subjected to substantially similar treatment as described above.

233.261.　　His boarding passes for his flights are routinely stamped with the "SSSS" designation, indicating that he has been designated by Defendants as a "known or suspected terrorist."

234.262.　　He is routinely unable to check in for his flights online or print his boarding pass.

235.263.　　Rather, Mr. El Ali is directed to an airline representative, who then contacts Defendants to obtain clearance to allow him to board his flight, a process that can take a very long time.

236.264. Once the airline representative receives clearance from Defendants allowing him to board his flight, the airline representative prints his boarding pass with the "SSSS" designation on it.

237.265. Mr. El Ali is routinely subjected to enhanced screening. Mr. El Ali feels ashamed and humiliated, especially because he is routinely treated as a "known or suspected terrorist" in public view and in front of his children and former wife when they travel with him and because his family is delayed and humiliated because they are traveling with Mr. El Ali.

238.266. On or about March 23, 2017, Mr. El Ali went to the U.S. Embassy in Brussels, Belgium to interview for a non-immigrant visa. During the interview, Mr. El Ali was asked if he had ever been to flight school, what he does for a living, and what he'll be doing in the United States.

239.267. At the U.S. Embassy, Mr. El Ali was informed that he was not approved for the visa, that additional security checks were needed, and that his application is under administrative processing.

240.268. Mr. El Ali is a dedicated and committed father. Since his children relocated to the United States in 2010 after his divorce and up until February 2017, Mr. El Ali had visited his children, Mia and Rami, every year during the following times:

a. March – for approximately two weeks to visit and celebrate Mia's birthday;

b. May – before Mia's and Rami's school year ends for summer vacation. Mia and Rami would accompany Mr. El Ali to Belgium once the school year ended; and

c. November – to celebrate Rami's birthday.

71

241.269. Until February 2017 when Defendants revoked Mr. El Ali's ESTA waiver and barred him from the United States, Mr. El Ali had never missed his children's birthdays.

242.270. Upon information and belief, Mr. El Ali's ESTA waiver was revoked because of his status on the federal terror watch list.

243.271. Upon information and belief, Mr. El Ali's non-immigrant visa was not approved and instead has been placed on administrative processing since March 2017 because of his status on Defendants' federal terror watch list.

244.272. Recently, Mia visited Mr. El Ali in Amsterdam, Netherlands. Her boarding pass contained an "SSSS" designation indicating she is a "known or suspected terrorist." Upon information and belief, Mia was subjected to this designation because she is Mr. El Ali's daughter.

245.273. Upon information and belief, Mr. El Ali remains on the federal terror watch list.

**Plaintiff Mutasem Jardaneh**
**(A Watchlisted Plaintiff)**

246.274. On August 9, 2017, Mr. Jardaneh was returning from a brief trip to Canada through the Ambassador Bridge land port of entry in Michigan with his sister, brother-in-law, and four-year-old nephew.

247.275. Upon presenting the primary CBP officer with his passport card, the CBP officer pressed a button to alert other CBP officers and instructed him to place his hands on the steering wheel and look forward.

248.276. Several armed CBP officers immediately surrounded Mr. Jardaneh and his family on all sides with their hands on their hips near their guns.

72

249.277.    The CBP officers ordered Mr. Jardaneh to exit the car, hands first, and to walk backwards until instructed to stop.  Thereafter, he was detained.

250.278.    The CBP officers then ordered his brother-in-law out of the car, hands first, and to walk backwards until instructed to stop.

251.279.    Mr. Jardaneh's sister and nephew were also forced to exit the vehicle and walk to the CBP officers.

252.280.    Then, Mr. Jardaneh was escorted by the CBP officers to a holding cell and detained, where he was subjected to an invasive pat down, fingerprinted, searched and interrogated for over four hours.  His belongings were also seized and searched.

253.281.    Mr. Jardaneh's brother-in-law was detained in a separate room and thoroughly searched.

254.282.    While Mr. Jardaneh was being interrogated, Mr. Jardaneh requested to contact an attorney; however, the CBP officers denied his request, prevented him from contacting an attorney, and continued to interrogate him.

255.283.    The CBP officers confiscated his cell phone, and upon information and belief, downloaded the information and data from his cell phone without his consent. The CBP officers temporarily confiscated Mr. Jardaneh's brother-in-law's cell phone also.  Upon information and belief, Defendants downloaded the information from Mr. Jardaneh's brother-in-law's cell phone.

256.284.    Mr. Jardaneh had an anxiety attack as a result of the treatment he was being subjected to.  An ambulance was called and paramedics arrived to take Mr. Jardaneh to an emergency room at a nearby hospital.

257.285.    The CBP officers handcuffed Mr. Jardaneh to the stretcher in the ambulance and accompanied him to the hospital where he received medical treatment.  The CBP officers told the hospital that Mr. Jardaneh was a "prisoner."

258.286.    Defendants did not return Mr. Jardaneh's cell phone until four or five days later *via* mail.

259.287.    Mr. Jardaneh felt ashamed and humiliated that his family and the hospital staff witnessed him being treated by the government as a criminal and a "known or suspected terrorist."

260.288.    Moreover, Mr. Jardaneh also felt ashamed and humiliated that his family members that were traveling with him were also treated as criminals and "known or suspected terrorists" just because they were traveling with him.

261.289.    Ever since this encounter, Mr. Jardaneh has suffered from anxiety and trauma and has been taking prescription medications to help him cope.

262.290.    A few days later, Mr. Jardaneh arrived at Detroit Metropolitan Airport to board his flight to Florida.

263.291.    He was unable to check-in online or at the airport kiosk.  Rather, he was directed to an airline representative for further assistance.

264.292.    After presenting himself to the airline representative at the ticket counter, Mr. Jardaneh had to wait approximately an hour before the airline representative obtained clearance for Mr. Jardaneh to board his flight.

265.293.    His boarding pass was stamped with the "SSSS" designation, indicating that he was designated as a "known or suspected terrorist."

266.294.    Once Mr. Jardaneh arrived at the TSA security checkpoint, he provided his boarding pass and identification documents to the TSA agent stationed at the entrance to the TSA security checkpoint.

267.295.    The boarding pass scanner indicated a red light when Mr. Jardaneh's boarding pass was scanned.

268.296.    Mr. Jardaneh was escorted to a different line than the other travelers passing through the TSA security checkpoint and subjected to enhanced screening.

269.297.    Mr. Jardaneh was subjected to an extensive and lengthy screening, an invasive pat down including a search of his groin area, an extensive search of all his personal belongings and chemical residue testing of his person and his belongings in public view at the TSA checkpoint.  Mr. Jardaneh felt the intense glares of other travelers staring at him while he was being screened.  A TSA agent confiscated Mr. Jardaneh's prescription eyeglasses.  The TSA screening lasted forty-five minutes.

270.298.    Once Mr. Jardaneh finally arrived at the gate, several TSA agents were waiting for him to arrive.  The TSA agents had with them a cart with chemical testing machines.

271.299.    While Mr. Jardaneh waited to board his flight, he noticed two air marshals following him throughout the airport.

272.300.    At the gate and before being allowed to board, in public view, Mr. Jardaneh was once again subjected to an invasive and lengthy pat down, all of his personal belongings were searched again, and he and his belongings were subjected to another round of chemical residue testing despite the fact that he had just cleared security with no issues at the TSA security checkpoint.

75

273.301.　Once on the airplane, the two air marshals that were tailing him inside the airport sat near him, one of each side, and surveilled him during the flight.

274.302.　Mr. Jardaneh's roommate and her ex-husband were both interrogated about Mr. Jardaneh.

275.303.　Mr. Jardaneh became terrified for his life and safety; and as a result of the above-described experiences, he left the United States and applied for asylum in Canada seeking protection from the United States government.

276.304.　Mr. Jardaneh has lost business opportunities as a direct result of being designated on the federal terror watchlist.

277.305.　Moreover, upon information and belief, Mr. Jardaneh's movements and online activities are being surveilled by Defendants without a warrant.

278.306.　Mr. Jardaneh filed a redress application through DHS TRIP. On September 29, 2017, Mr. Jardaneh received a letter as described in paragraph 178 and was assigned a Redress Control Number.

279.307.　As a result of being placed on the federal terror watchlist, Mr. Jardaneh will be closing two businesses that he has operated at or near the beginning of 2017.

280.308.　Mr. Jardaneh operates a real estate company and a consultant business. Both business ventures require significant travel. Due to the difficult and hassle associated with his travel, Mr. Jardaneh has not been able to freely travel and explore his business opportunities.

281.309.　Upon information and belief, Mr. Jardaneh remains on Defendants' federal terror watchlist.

**Plaintiff John Doe**
**(A Watchlisted Plaintiff)**

310.    Mr. John Doe is frequently prevented from flying as a result of his designation on the federal terror watchlist.

311.    In May 2017, Mr. John Doe arrived at Los Angeles International Airport for an international trip to Honduras.  Mr. John Doe was planning to meet his family members at a health spa because his cousin was diagnosed with cancer.

312.    He was unable to check-in online or at the airport kiosk.  Rather, he was directed to an airline representative for further assistance.

313.    Upon presenting himself to the airline representative at the ticket counter, Mr. John Doe was met by five agents who told him that he would not be able to board his flight.  The agents refused to explain why they were preventing Mr. John Doe from boarding his flight.  Mr. John Doe was unable to obtain a full refund his flight or the trip costs for which he had already paid.  Additionally, Mr. John Doe was prevented from being with his family and providing comfort and assistance to his cousin who was recently diagnosed with cancer.  Mr. John Doe was devasted that he could not be with his family during that time.

314.    The agents, who upon information and belief were FBI agents, escorted him off the airport premises.

315.    A few months later, in October 2017, Mr. John Doe arrived once again at Los Angeles International Airport for an international trip to Indonesia.

316.    Upon presenting himself to the airline representative at the ticket counter, the airline representative made a call to the Defendants in order to obtain clearance for him to board his flight.

317.    After ending the call, the airline representative asked Mr. John Doe if he was carrying any weapons and then told him he would not be able to board his flight.

318.    Mr. John Doe was not provided with a refund for his ticket.

319.    He was ashamed, humiliated and frightened by these experiences.

320.    After leaving the airport, Mr. John Doe received a call from FBI agents who said they wanted to speak with him about what he needed to do in exchange for being permitted to fly. Mr. John Doe declined to speak with them without an attorney present.

321.    Around July 2017, Mr. John Doe was again prevented from checking in online for a domestic flight from San Diego to Florida.

322.    As a result of his previous experiences, Mr. John Doe was discouraged from flying and cancelled his flight.

323.    Mr. John Doe's watchlist designation has prevented him from visiting family members and close friends.

324.    On June 3, 2018, Mr. John Doe arrived at San Diego International Airport for an international trip to Indonesia to visit his fiancée and meet her family for the first time.

325.    Upon presenting himself to the airline representative at the ticket counter, the airline representative made a call to Defendants to obtain clearance for him to board his flight.

326.    After ending the call, the airline representative told Mr. John Doe that she could not provide him with a boarding pass and explained that TSA could not provide him with assistance.

327.    The airline representative instructed Mr. John Doe to file a police report with the police department.

78

328.    Mr. John Doe felt humiliated, especially since his fiancée and her family were expecting him to arrive to meet her in Indonesia.

329.    Mr. John Doe's fiancée and her family learned of his status on Defendants' federal terror watchlist as a result of Mr. John Doe's experience being denied boarding.

330.    Because Mr. John Doe's watchlist designation has prevented him from flying every time he attempts to board a flight, Mr. John Doe has been forced to resort to other means of travel that are costly and burdensome.

331.    For example, in January 2018, Mr. John Doe took a train from San Diego to New York City in order to avoid the shame and humiliation he experiences at airports as a result of Defendants' treatment and because he knew that he would be prevented from flying anyway.

332.    The train ride lasted between four and five days and cost between 500 and 600 dollars for a one-way trip.

333.    While the train was stopped at a connection in New Orleans, Louisiana, five or six FBI agents attempted to conduct a canine search of Mr. John Doe's personal belongings and detained him for approximately one hour.

334.    On February 28, 2018, Mr. John Doe arrived at Chicago O'Hare International Airport to try to board another flight, this time to San Diego.

335.    Upon presenting himself to the airline representative at the ticket counter, the airline representative was unable to print Mr. John Doe's boarding pass.

336.    The airline representative made a phone call to Defendants to obtain clearance for Mr. John Doe to board his flight.

337.    The airline representative then directed Mr. John Doe to the TSA office, where he waited approximately two to three hours until the TSA office opened at 7 am.

338.    When the TSA office finally opened, he was told by a TSA agent that nothing could be done for him.

339.    Approximately one hour later, FBI agents Jake and Samir escorted Mr. John Doe to a secluded area for interrogation where he was interrogated for approximately eight hours.

340.    Mr. John Doe was interrogated about where he was going, how he traveled to the airport, what he had been doing, what he was trying to do, why he was attempting to fly, people he knew, and whether he had plans to travel for military training.

341.    As a result of his designation on the federal terror watchlist, Mr. John Doe has been subjected to several more FBI interrogations.

342.    For example, around approximately April or May of 2017, Mr. John Doe was subjected to a secondary inspection after arriving at the San Ysidro Port of Entry to cross back into the United States by land.

343.    FBI agents interrogated Mr. John Doe and pressured him to work for them as an FBI informant. They also offered Mr. John Doe money and told him they would resolve his travel issues in exchange for him agreeing to become an informant.

344.    In July 2017, Mr. John Doe arrived in Mexico City and attempted to board a flight from Mexico to Honduras when Mexican intelligence agents detained and interrogated him.

345. The Mexican authorities informed Mr. John Doe that he had an FBI warrant out for his arrest. After his detention and interrogation, Mexican authorities deported Mr. John Doe to the Rosarito Land Port of Entry.

346. Upon information and belief, the Mexican authorities detained, interrogated, and deported Mr. John Doe due to his status of the federal terror watchlist being shared with Mexican authorities by Defendants.

347. Upon arrival at Rosarito Land Port of Entry, FBI agents interrogated Mr. John Doe about his religious beliefs and asked him where he prays, how long he has been attending his mosque, who he knows at his mosque, how he finds the strength to practice Islam, and the struggles he deals with to practice his faith.

348. As a result of his designation on the federal terror watchlist, Mr. John Doe is also routinely detained at land border crossings up to ten hours at a time.

349. In January 2017, Mr. John Doe was handcuffed and detained at San Ysidro Port of Entry, in front of his step-daughter. He was interrogated for approximately six hours. This was the second time Mr. John Doe step-daughter witnessed CBP officers handcuff her step-father. Mr. John Doe was ashamed and humiliation that his step-daughter witnessed him being treated as a criminal and "known or suspected terrorist."

350. In February 2017 alone, Mr. John Doe was detained at the San Ysidro Port of Entry between approximately six and eight hours on four different occasions.

351. On February 22, 2017, Mr. John Doe was detained at the San Ysidro Port of Entry for approximately ten hours.

352. Sometime between March and July 2017, Mr. John Doe was detained for approximately four to six hours.

81

353.    Because of the above described treatment, Mr. John Doe is routinely humiliated in public and in front of family members and has been discouraged from flying and has been stigmatized and treated as a criminal because of his status on Defendants' federal terror watchlist.

354.    Further, because of the above described treatment, Mr. John Doe was forced to drop out from an online educational course because CBP agents confiscated Mr. John Doe's laptop and cell phone for two months. Mr. John Doe lost all the money he invested in course supplies, software, and other material.

355.    Over two years of stored data on Mr. John Doe's cell phone was lost when CBP downloaded his cell phone's data.

356.    Moreover, due to his watchlist designation, Mr. John Doe was forcibly separated from his wife.

357.    In October 2016, CBP officers detained Mr. John Doe and his wife at the time, handcuffed him and interrogated him for approximately eight hours at Otay Mesa Port of Entry.

358.    CBP officers handcuffed Mr. John Doe to a bench while they took Mr. John Doe's wife to a separate room. They interrogated her about her religious affiliation, whether she planned to go to Hajj, whether she was Sunni-Muslim or Shiite-Muslim, and which Imams she was familiar with.

359.    CBP officers threatened to deport Mr. John Doe's wife to Somalia, despite the fact she was a Canadian citizen and United States lawful permanent resident.

360.    Mr. John Doe's wife was terrified of being deported to Somalia, where she would likely be tortured.

361.   Mr. John Doe was shocked and frightened that Defendants would threaten his wife, potentially with her life, just because she was married to him.

362.   Ever since this incident, their marriage became strained.

363.   Moreover, shortly after this incident, ICE agents searched Mr. John Doe's home in search of his wife.

364.   Upon information and belief, Defendants' above-mentioned treatment targeting Mr. John Doe's wife were designed to pressure and target Mr. John Doe.

365.   As a result of Defendants' above-mentioned treatment, Mr. John Doe moved to Mexico.

366.   His wife at the time chose to remain in the United States because she feared traveling with her husband would result in Defendants arresting and deporting her.

367.   The stress and physical separation caused by Mr. John Doe's watchlist designation strained Mr. John Doe's marriage, which led to his eventual divorce.

368.   Mr. John Doe has filed a redress application through DHS TRIP. Mr. John Doe received a letter as described above and was assigned a Redress Control Number.

369.   Upon information and belief, Mr. John Doe remains on Defendants' federal terror watchlist.

**Plaintiff Bilal Abdurrashid**
**(A Watchlisted Plaintiff)**

282.370.   Mr. Abdurrashid is a former executive of Lockheed Martin.  In his decades long service in the Aerospace and Defense industry, Mr. Abdurrashid has held a Secret Security Clearance.  Additionally, Mr. Abdurrashid holds a Transportation Worker Identification Credential ("TWIC").

83

283.371.    Mr. Abdurrashid is an avid outdoor sportsman.  He loves to camp and fish; and he is routinely seen enjoying the outdoors on his boats.  In accordance with the Seafarers' Identity Documents Convention (Revised), 2003, of the International Labor Organization, Mr. Abdurrashid operates his offshore boat pursuant to his Merchant Mariner Credential issued by the United States Coast Guard National Maritime Center.

284.372.    Mr. Abdurrashid is also a staunch believer in the Second Amendment and owns several guns.  He has a Florida Concealed Carry Permit.

285.373.    In order to obtain the above licenses, credentials, and clearances, Mr. Abdurrashid was required to submit fingerprints that were checked against the Florida Information Center database, the National Crime Information Center database and National Instant Criminal Background Check System for disqualifying offenses.

286.374.    In June 2017, Mr. Abdurrashid arrived at an Orlando, Florida area airport for a trip to Morocco.  His itinerary was Orlando to New York to Marrakech, Morocco.

287.375.    Mr. Abdurrashid was traveling to visit family with his wife and child.  Mr. Abdurrashid's family witnessed the entire treatment that he was subjected to that day, described below.

288.376.    At first, Mr. Abdurrashid was prevented from checking in online and at the airport kiosk.  Instead, he was directed to an airline representative for further assistance.

289.377.    Mr. Abdurrashid's and his family's boarding passes were stamped with the "SSSS" designation indicating that they each have been labeled as "known or suspected terrorists."

290.378.    After presenting himself to the airline representative at the ticket counter, the airline representative informed Mr. Abdurrashid that she could not issue

boarding passes for him or his family. Mr. Abdurrashid was told that he and his family were barred from checking in. After several phone calls and a long delay, the airline representative was able to obtain clearance from Defendants so that Mr. Abdurrashid and his family could board his flight.

291.379. Once Mr. Abdurrashid and his family arrived at the TSA security checkpoint, they provided their boarding passes and identification documents to the TSA agent stationed at the entrance of the TSA security checkpoint.

292.380. Mr. Abdurrashid and his family were escorted to a different line than the other travelers passing through the TSA security checkpoint and subjected to enhanced screening.

293.381. Mr. Abdurrashid was subjected to an extensive and lengthy screening, an invasive pat down including a search of his groin area, in addition to a TSA male agent placing his fingers inside and around Mr. Abdurrashid's waist, an extensive search of all his personal belongings and chemical residue testing of his person and his belongings in public view and in front of his family. Mr. Abdurrashid's wife and thirteen-year-old son received the same treatment.

294.382. When Mr. Abdurrashid and his family arrived in New York's JFK airport to board their connecting flight to Morocco, they were forced to go through the entire TSA enhanced screening process, described above, all over again.

295.383. On July 31, 2017, Mr. Abdurrashid and his family arrived at the airport in Marrakech, Morocco for their flights to New York with a stop at the Casablanca, Morocco airport.

296.384.     In Marrakech, Mr. Abdurrashid's wife and son were able to obtain their boarding passes.  However, the airline representative could not issue Mr. Abdurrashid a boarding pass.  After several unanswered calls, the airline representative gave Mr. Abdurrashid a boarding pass but only to Casablanca.

297.385.     At the Casablanca airport, the airline representative made several calls to the United States before the airline representative could obtain clearance for Mr. Abdurrashid to board his flight to New York.

298.386.     Mr. Abdurrashid's and his family's boarding passes were stamped with the "SSSS" designation indicating that they were each labeled as a "known or suspected terrorist."

299.387.     Mr. Abdurrashid and his family underwent enhanced screening, as described above, before being allowed to board their flight.

300.388.     When they landed in New York, the airplane's loudspeakers instructed the passengers to have their passports out.  Two armed plainclothes CBP officers checked the passengers' passports as they stepped out of the airplane.  When Mr. Abdurrashid gave his passport to the CBP officers, they told him that he was the person they were looking for.  They escorted Mr. Abdurrashid and his family in public view to get their luggage.

301.389.     Mr. Abdurrashid was escorted to secondary inspection where he was detained and interrogated.  He was detained in a separate room from his wife and child.

302.390.     The CBP officers confiscated Mr. Abdurrashid's cell phone.   They proceeded to search his cell phone and social media.  Mr. Abdurrashid also had his luggage searched.

86

303.391. While he was detained, the CBP officers also interrogated Mr. Abdurrashid.  He was questioned about his trip to Morocco and his social media usage.  At the same time, Mr. Abdurrashid's wife was interrogated about her background.  But for a weather delay, Mr. Abdurrashid and his family would have missed their flight from New York to Orlando.

304.392. After being allowed to leave by CBP, Mr. Abdurrashid and his family rushed to get their boarding passes for their flight to Orlando.  At first, his family received their boarding passes without an "SSSS" designation.  However, once the airline representative realized that his family was traveling with Mr. Abdurrashid, his wife and son had their boarding passes stamped with the "SSSS" designation indicating that they each have been labeled as a "known or suspected terrorist."  Mr. Abdurrashid's boarding pass was stamped with the "SSSS" designation too.

305.393. Mr. Abdurrashid and his family were again subjected to the enhanced screening at the TSA security checkpoint in public view as described above.

306.394. At the gate, Mr. Abdurrashid was allowed to board his flight.  However, as Mr. Abdurrashid was taking his seat inside the plane, he was informed that his wife and son were being prevented from boarding.  Mr. Abdurrashid returned to the gate area to speak with the airline representatives.

307.395. After a lengthy delay, Mr. Abdurrashid's family obtained clearance to board the flight with him.

308.396. Mr. Abdurrashid has experienced similar enhanced screening and humiliation when traveling by air ever since 2014.

87

309.397.    His boarding passes for his flights are routinely stamped with the "SSSS" designation, indicating that he has been designated by Defendants as a "known or suspected terrorist."

310.398.    He is routinely unable to check in for his flights online or print his boarding pass.

311.399.    Rather, Mr. Abdurrashid is directed each time to an airline representative, who then contacts Defendants to obtain clearance to allow him to board his flight, a process that can take a very long time.

312.400.    Once the airline representative receives clearance from Defendants allowing him to board his flight, the airline representative prints his boarding pass with the "SSSS" designation on it.

313.401.    Upon seeing the "SSSS" designation on his boarding pass, as protocol, TSA agents then subject Mr. Abdurrashid to substantially similar routine, extensive and lengthy screening, an invasive pat down including a search of his groin area, an extensive search of all of his personal belongings and chemical residue testing of his person and his belongings at the TSA security checkpoint, in public view and in front of his family.

314.402.    Moreover, when Mr. Abdurrashid's family is traveling with him, they are also treated as "known or suspected terrorists" just because they are traveling with him.

315.403.    Mr. Abdurrashid minimizes his travel in order to avoid the humiliation and hassle associated with being labeled as a "known or suspected terrorist" by Defendants because of his status on Defendants' federal terror watchlist.  As a result, Mr. Abdurrashid and his family have missed several trips they would have gone on but for Mr. Abdurrashid's status on Defendants'' federal terror watchlist.

316.404.    For instance, in April 2018, Mr. Abdurrashid and his family were invited to his wife's niece's wedding in Washington, D.C.  However, they did not want to go through the humiliation and hassle of travel.  Because the drive to Washington, D.C. from Orlando is thirteen hours, Mr. Abdurrashid and his family could not attend the wedding.

317.405.    On other occasions, Mr. Abdurrashid and his family have forgone skiing trips with family friends and trips to see his adult children and grandchildren.

318.406.    As a result of his status on Defendants' federal terror watchlist, Mr. Abdurrashid is only able to see his grandchildren if they travel to Orlando to visit him.  If he was not on Defendants' federal terror watchlist and subjected to humiliating and invasive enhanced screenings, he and his family would visit his adult children and grandchildren.

319.407.    Since he and his family are unable to travel unless they undergo humiliating and invasive public enhanced screenings, Mr. Abdurrashid's thirteen-year-old son is not able to form a stronger bond with his adult brothers and sister and nieces and nephews.

320.408.    In February 2018, Mr. Abdurrashid purchased a Smith and Wesson 9mm firearm.  When Mr. Abdurrashid went to pick up the firearm from the dealer in Florida, he completed the Florida Department of Law Enforcement Firearm Purchase application ("FDLE Application").

321.409.    After a three-day delay, the local gun dealer contacted Mr. Abdurrashid and informed him that his FDLE Application was denied.  As a result, Mr. Abdurrashid was not able to complete his purchase of the Smith and Wesson firearm.

322.410.    Mr. Abdurrashid contacted FDLE and requested the reasons why FDLE denied his application.  The FDLE representative informed Mr. Abdurrashid that he could not

89

inform him why his application was denied but that he would inform Mr. Abdurrashid if Mr. Abdurrashid was able to guess the reason for his application's denial.

~~323.~~411.    Mr. Abdurrashid was not able to guess the reason of his application's denial.  The FDLE representative refused to divulge any information to Mr. Abdurrashid as to why his application was denied.

~~324.~~412.    Upon information and belief, Mr. Abdurrashid's FDLE Application was denied because of his status on Defendants' federal terror watchlist.

~~325.~~413.    Mr. Abdurrashid has filed a DHS TRIP inquiry.  He has since received a form letter ~~as described in paragraph 178 above~~ and ~~was~~has been assigned a Redress Control Number.

~~326.~~414.    Upon information and belief, Mr. Abdurrashid remains on the federal terror watch list.

### Plaintiff Mohammad Paryavi
### (A Watchlisted Plaintiff)

~~327.~~415.    On June 4, 2017, Mr. Paryavi arrived at a Washington, D.C. area airport for a flight to Houston, Texas.

~~328.~~416.    Mr. Paryavi was traveling with a co-worker for a business trip who witnessed the entire treatment that Mr. Paryavi was subjected to that day, described below.

~~329.~~417.    At first, Mr. Paryavi was unable to check-in online or at the airport kiosk.  Rather, he was directed to an airline representative for further assistance.

~~330.~~418.    After presenting himself to the airline representative at the ticket counter, Mr. Paryavi and his coworker had to wait almost forty minutes before the airline representative obtained clearance from Defendants for Mr. Paryavi to board his flight.

~~331.~~419.     The boarding passes of both Mr. Paryavi and his coworker were stamped with the "SSSS" designation, indicating that they were both designated as "known or suspected terrorists."

~~332.~~420.     Once Mr. Paryavi and his coworker arrived at the TSA security checkpoint, they provided their boarding passes and identification documents to the ~~CBP~~ officer stationed at the entrance to the TSA security checkpoint.

~~333.~~421.     The boarding pass scanner indicated a red light when Mr. Paryavi's boarding pass was scanned.

~~334.~~422.     Mr. Paryavi and his co-worker were both escorted to a different line than the other travelers passing through the TSA security checkpoint and subjected to enhanced screening.

~~335.~~423.     Mr. Paryavi was subjected to an extensive and lengthy screening, an invasive pat down including a search of his groin area, an extensive search of all his personal belongings and chemical residue testing of his person and his belongings in public view and in front of his coworker.

~~336.~~424.     Once Mr. Paryavi and his coworker finally arrived at the gate, approximately six to ten TSA agents were waiting for Mr. Paryavi to arrive.

~~337.~~425.     The TSA agents had ~~with them~~ a cart with chemical testing machines.

~~338.~~426.     At the gate and before being allowed to board, in public view and in front of his coworker, Mr. Paryavi was once again subjected to an invasive and lengthy pat down, all of his personal belongings were searched again, and he and his belongings were subjected to another round of chemical residue testing despite the fact that he had just cleared security with no issues at the TSA security checkpoint.

339.427. Then, when Mr. Paryavi scanned his boarding pass at the gate to board their flight, the scanner once again indicated a red light.

340.428. Mr. Paryavi and his coworker were once again delayed until the airline representative at the gate finally obtained clearance from Defendants to allow Mr. Paryavi to board his flight.

341.429. Mr. Paryavi felt ashamed and humiliated, especially because he was treated as a "known or suspected terrorist" in public view and in front of his coworker and because his coworker was also delayed, humiliated and subjected to extensive screening just because he was traveling with Mr. Paryavi.

342.430. Ever since that trip, every time Mr. Paryavi travels by air, he is subjected to substantially similar treatment.

343.431. His boarding passes for his flights are routinely stamped with the "SSSS" designation, indicating that he has been designated by Defendants as a "known or suspected terrorist."

344.432. He is routinely unable to check in for his flights online or print his boarding pass.

345.433. Rather Mr. Paryavi is directed each time to an airline representative, who then contacts Defendants to obtain clearance to allow him to board his flight, a process that can take a very long time.

346.434. Once the airline representative receives clearance from Defendants allowing him to board his flight, the airline representative prints his boarding pass with the "SSSS" designation on it.

347.435.     Upon seeing the "SSSS" designation on his boarding pass, as protocol, TSA agents then subject Mr. Paryavi to routine, extensive and lengthy screening, an invasive pat down including a search of his groin area, an extensive search of all of his personal belongings and chemical residue testing of his person and his belongings – twice – at the TSA security checkpoint and again at the gate, in public view and in front of his travel companions.

348.436.     He then has to wait again at the gate for an airline representative to obtain clearance from Defendants a second time to board his flight, even though Defendants already provided clearance for him to board his flight prior to his boarding pass being printed in the first place.

349.437.     Moreover, oftentimes the people that Mr. Paryavi travels with are also treated as "known or suspected terrorists" just because they are traveling with him.

350.438.     On or about January 2018, Mr. Paryavi was re-entering the United States with a business client, his wife and his daughter, all of whom witnessed the treatment he was subjected to that day, described below.

351.439.     Once his flight landed in Dulles International Airport in Virginia, there were two CBP officers waiting for him before he arrived at passport control.

352.440.     Mr. Paryavi was escorted from the gate to an interrogation room where he was detained and interrogated by FBI agents about his travel and his work.  All of his personal belongings were also searched.

353.441.     Mr. Paryavi applied to both *TSA Pre✓* ® and Global Entry, TSA and CBP programs respectively that allow for expedited screening at ports of entry.  Both applications were denied without providing any explanation.

354.442.    Upon information and belief, his applications to participate in the *TSA Pre✓ ®* and Global Entry programs were denied because of, upon information and belief, his status on the federal terror watch list.

355.443.    Mr. Paryavi has been interrogated by FBI agents about his Islamic religious beliefs and practices and political opinions, including but not limited to, questions about what mosque he belongs to, how far his mosque is, who the imam is at his mosque, and detailed questions about his political opinions about Iran.

356.444.    Upon information and belief, his answers to the questions asked by the FBI agents were factors that contributed to his designation on the federal terror watch list.

357.445.    Mr. Paryavi has filed a DHS TRIP inquiry. He has since received a form letter as described in paragraph 178 above and was has been assigned a Redress Control Number.

358.446.    Because of the travel issues resulting from his status on Defendants' federal terror watchlist, Mr. Paryavi now experiences anxiety when traveling because he knows that he will be subjected to the invasive and humiliating screenings described above.

359.447.    To ensure that his travel plans are not interrupted, Mr. Paryavi arrives at the airport four hours prior to takeoff.

360.448.    Upon information and belief, Mr. Paryavi remains on the federal terror watch list.

**The Wehelie Family**

**Plaintiff Hawa Wehelie**

**(A Watchlisted Plaintiff)**

~~361.~~449.     Plaintiff Hawa Wehelie is the daughter of Plaintiffs Abdirizak Wehelie ("Mr. Wehelie") and Shamsa Hashi Noor's ("Mrs. Noor") and the sister of Plaintiff Fatima Wehelie's ("Ms. F. Wehelie") (collectively referred to as "Wehelie Family").

~~362.~~450.     On October 22, 2017, Ms. Hawa Wehelie and her family members were re-entering the United States through the Peace Bridge land port of entry in New York after a trip to Canada.

~~363.~~451.     After Ms. Hawa Wehelie handed her identification information to the primary inspection officer, her vehicle was immediately surrounded by several armed CBP officers.  She, along with her family members, were ordered to exit the vehicle and detained. They were instructed to leave their personal belongings in the vehicle.

~~364.~~452.     Ms. Hawa Wehelie and her family were escorted by the armed CBP officers to secondary inspection.  They were also interrogated.

~~365.~~453.     CBP confiscated Ms. Hawa Wehelie's cell phone and laptop without her consent.  Ms. Hawa Wehelie's electronics were not returned to her until approximately two months later.  Upon information and belief, Defendants downloaded and made a copy of Ms. Hawa Wehelie's cell phone and laptop data and information without her consent.

~~366.~~454.     Ms. Hawa Wehelie was scared for her and her family's safety.  Ms. Hawa Wehelie was ashamed and humiliated because of the treatment she received.  Additionally, she was ashamed and humiliated that her family was treated as "known or suspected terrorists" because of their relation to her.

~~367.~~455.     On January 7, 2018, Ms. Wehelie and her sister, Plaintiff Fatima Wehelie, were returning to the United States through Pearson International Airport.  Ms.

95

Hawa Wehelie's boarding pass was stamped with the "SSSS" designation, indicating that she had been designated by Defendants as a "known or suspected terrorist."

368.456.     Upon seeing the "SSSS" designation on her boarding pass, as protocol, the agents then subjected Ms. Hawa Wehelie to routine, extensive and lengthy screening, an invasive pat down, and an extensive search of all of her personal belongings and chemical residue testing of her person and his belongings in public view and in front of her sister.

369.457.     Upon information and belief, Ms. Hawa Wehelie was subjected to the above described treatment by the Canadian authorities due to her status on the federal terror watchlist being shared with Canadian authorities by Defendants.

370.458.     After going through the security checkpoint, and before boarding the plane, Ms. Hawa Wehelie and her sister scanned their passports at the Automated Passport Control kiosk.  The printed declaration form contained an "X" over Ms. Hawa Wehelie's and Ms. F. Wehelie's photos.  They were instructed to go to a Customs officer.

371.459.     When Ms. Hawa Wehelie and her sister presented their declaration forms to a Customs officer, they were detained and interrogated.

372.460.     Ms. Hawa Wehelie and her sister were detained in separate rooms so that CBP officers could interrogate them separately.

373.461.     The interrogation rooms arewere situated across the hallway from small holding cells that look like jail cells; and, upon seeing them, Ms. Hawa Wehelie's sister felt faint and light-headed.  Ms. Hawa Wehelie feared for her sister's safety because she was afraid that they would both be arrested and detained in the holding cells.

374.462.     CBP Officer Bustamante interrogated Ms. Hawa Wehelie for approximately one hour about whether she attended church, whether she is enrolled in

religious courses, what organizations she belongs to, whether she financially supports her family members, whether she has family in Somalia, where she traveled during the past 10 years, and why she does not practice as an attorney.

~~375.~~463.     After the interrogation, Officer Bustamante confiscated Ms. Hawa Wehelie's cell phone, and upon information and belief, downloaded the information from her cell phone without her consent.

~~376.~~464.     The entire process lasted nearly four hours. As a result, Ms. Hawa Wehelie and her sister missed their flight and were forced to reschedule their flight for the next morning.

~~377.~~465.     Ms. Hawa Wehelie felt ashamed and humiliated, especially because she was treated as a "known or suspected terrorist" in public view and in front of her sister, and because her sister was delayed, humiliated, subjected to detention and interrogation, and missed her flight because of traveling with Ms. Hawa Wehelie and because of her relation to Ms. Hawa Wehelie.

~~378.~~466.     The next morning, Ms. Hawa Wehelie's boarding pass, again, contained the "SSSS" designation, indicating that she had been designated as a "known or suspected terrorist."

~~379.~~467.     As the previous day, upon seeing the "SSSS" designation on her boarding pass, as protocol, the agents then subjected Ms. Hawa Wehelie to routine, extensive and lengthy screening, an invasive pat down, and an extensive search of all of her personal belongings and chemical residue testing of her person and his belongings in public view and in front of her sister.

380.468. Upon information and belief, Ms. Hawa Wehelie was subjected to the above described treatment by the Canadian authorities due to her status on the federal terror watchlist being shared with Canadian authorities by Defendants.

381.469. After going through the security checkpoint, and before boarding the plane, Ms. Hawa Wehelie and her sister scanned their passports at the Automated Passport Control kiosk. The printed declaration form contained an "X" over Ms. Hawa Wehelie's and Ms. F. Wehelie's photos. They were instructed to go to a Customs officer.

382.470. While waiting in line at customs and before reaching the counter, and in public view, a CBP officer approached Ms. Hawa Wehelie and her sister and escorted them into a back room for interrogation.

383.471. CBP officers interrogated Ms. Hawa Wehelie and her sister about where they stayed the night before and who had picked them up from the airport.

384.472. Ms. Hawa Wehelie and her sister were forced to write their responses to each question on a piece of paper.

385.473. Ms. Hawa Wehelie felt ashamed and humiliated, especially because she was treated as a "known or suspected terrorist" in public view and in front of her sister, and because her sister was delayed, humiliated, subjected to detention and interrogation because of traveling with Ms. Hawa Wehelie and because of her relation to Ms. Hawa Wehelie.

386.474. On July 31, 2018, Ms. Hawa Wehelie and her parents were re-entering the United through the Peace Bridge land port of entry in New York.

387.475. Immediately after they presented their passports to the CBP officer, their vehicle was surrounded by six or seven armed CBP officers. Ms. Hawa Wehelie and her parents were ordered to exit the vehicle and detained.

388.476. CBP Officer Tucker interrogated Ms. Hawa Wehelie and her father about the locations of family members, where they traveled, where they stayed, where they worked, where they lived, and asked them to provide his phone number, e-mail address, and the addresses where they stayed in Canada.

389.477. Thereafter, CBP confiscated Ms. Hawa Wehelie cell phone for approximately 45 minutes, and upon information and belief, downloaded the information and data from her cell phone without her consent. Ms. Hawa Wehelie and her family's vehicle and belongings were also searched.

390.478. Ms. Hawa Wehelie felt ashamed and humiliated, especially because she was treated as a "known or suspected terrorist" in front of her parents. Ms. Hawa Wehelie was also scared for her safety and her parents' safety as she feared that an armed CBP officer may kill them if they made any sudden moves. Ms. Hawa Wehelie suffered anxiety because of the above described treatment.

391.479. Ms. Hawa Wehelie also felt ashamed and humiliated that her parents were delayed, humiliated, subjected to detention and interrogation because of traveling with Ms. Hawa Wehelie and because of their relation to Ms. Hawa Wehelie. Ms. Hawa Wehelie's parents suffered from anxiety because of the above described treatment.

392.480. Upon information and belief, Ms. Hawa Wehelie's family members that travel with her are subjected to the above described treatment because of their relation to her and because of her status on Defendants' federal terror watchlist.

393.481.    Upon information and belief, Ms. Hawa Wehelie remains on the federal terror watchlist.

**Plaintiffs Plaintiff Abdirizak Wehelie**
**(A Watchlisted Plaintiff)**

482.    In May 2015, Mr. Wehelie, arrived at Washington Dulles International Airport in Virginia for an international trip to Somalia.

483.    When Mr. Wehelie arrived at the gate, two TSA agents and an FBI agent were waiting for him.

484.    At the gate and before being allowed to board, in public view, an FBI agent interrogated Mr. Wehelie about why he had purchased a one-way ticket, why one of his children applied for a passport, and about his sons.  Mr. Wehelie was scared, confused, and humiliated because he was interrogated by the FBI in public.  He was made to feel like a criminal.

485.    On October 22, 2017, Mr. Wehelie and his family were re-entering the United States through the Peace Bridge land port of entry in New York.

486.    CBP officers ordered Mr. Wehelie and his family to pull aside and enter the building for secondary inspection.

487.    Mr. Wehelie was interrogated about his travels including where he was going, where he stayed in Canada, where he worked, where he had traveled, and why he previously traveled to Somalia.

488.    Thereafter, Mr. Wehelie and his family were detained in a private room.  Mr. Wehelie was interrogated by two CBP officers and an FBI agent.

489.    After Mr. Wehelie was interrogated, they were escorted back to the waiting room where they waited for approximately two hours.

490. CBP officers then searched their personal belongings and person, which involved removing all items from their pockets, and removing their shoes

491. CBP Supervisor Marshman confiscated Mr. Wehelie's cell phone, and the cell phones of the rest of the family, without their consent.

492. CBP retained Mr. Wehelie's electronics, and his family's electronics, for approximately two months.

493. Upon information and belief, CBP downloaded Mr. Wehelie data, and the data of his other family members, and content from their electronic devices without their consent.

494. On July 31, 2018, Mr. Wehelie and his family were re-entering the United through the Peace Bridge land port of entry.

495. Immediately after they presented their passports to the CBP officer, their vehicle was surrounded by six or seven armed CBP officers. Mr. Wehelie and his family were ordered to exit the vehicle and detained.

496. CBP Officer Tucker interrogated Mr. Wehelie about the locations of his father and mother, where he traveled, where he stayed, where he worked, where he lived, and asked him to provide his phone number, e-mail address, and the addresses where he stayed in Canada.

497. Mr. Wehelie felt ashamed and humiliated, especially because he was treated as a "known or suspected terrorist" in front of his family.

498. Mr. Wehelie also felt ashamed and humiliated that his family was delayed, humiliated, subjected to detention and interrogation because of traveling with Mr. Wehelie and because of their relation to Mr. Wehelie. Mr. Wehelie and his wife suffered from anxiety because of the above described treatment.

499.    Mr. Wehelie is also regularly subjected to extensive searches, unreasonable delays and interrogations when returning from Canada to the United States through land ports of entry.

500.    On August 7, 2018, upon arriving at Washington Dulles International Airport, Mr. Wehelie was not able to check-in-online or at the airport kiosk. Instead, he was directed to an airline representative for further assistance.

501.    At the ticket counter, after 45-minute delay, and after the airline representative asked Mr. Wehelie if he was carrying any firearms, Mr. Wehelie received his boarding pass. Mr. Wehelie's boarding pass was stamped with the "SSSS" designation, indicating that he is designated as a "known or suspected" terrorist.

502.    Once Mr. Wehelie arrived at the TSA security checkpoint, he provided his boarding pass and identification documents to the TSA agent stationed at the entrance to the TSA security checkpoint

503.    The boarding pass scanner indicated a red light when Mr. Wehelie's boarding pass was scanned.

504.    Mr. Wehelie was escorted to a different line than the other travelers passing through the TSA security checkpoint and subjected to enhanced screening.

505.    Mr. Wehelie was subjected to an extensive and lengthy screening, an invasive pat down including a search of his groin area, an extensive search of all his personal belongings and chemical residue testing of his person and his belongings in public view at the TSA checkpoint.

506.    Mr. Wehelie felt ashamed and humiliated, especially because he was treated as a "known or suspected terrorist" in front of his family.

507. Upon information and belief, Mr. Wehelie received the "SSSS" designation and enhanced screening because of his relationship to his daughter, Ms. Hawa Wehelie, who is also on the federal terror watchlist.

508. Mr. Wehelie has filed DHS Trip inquiries. He has since received letters as described above and was assigned redress control numbers.

509. Upon information and belief, Mr. Wehelie remains on the federal terror watchlist.

**Plaintiffs Shamsa Hashi Noor, and Fatima Wehelie**
**(Family Members of a Watchlisted Plaintiff)**

394. Plaintiff Abdirizak Wehelie ("Mr. Wehelie") is Plaintiffs Hawa Wehelie's and Fatima Wehelie's ("F. Wehelie") father and Plaintiff Shamsa Hashi Noor's ("Mrs. Noor") husband (collectively referred to as "Wehelie Family").

395.510. Plaintiff Mrs. Noor is Plaintiffs Hawa Wehelie's and F. Wehelie's mother and Mr. Wehelie's wife (collectively referred to as "Wehelie Family").

396.511. Plaintiff F. Wehelie is Plaintiff Hawa Wehelie's sister and daughter of Plaintiffs Mr. Wehelie and Mrs. Noor.

397. Since approximately 2014, as a result of Ms. Hawa Wehelie's watchlist designation, the Wehelie Family is regularly subjected to enhanced screening, unreasonable delays, and interrogations.

398.1. In May 2015, Mr. Wehelie arrived at Washington Dulles International Airport in Virginia for an international trip to Somalia.

399.1. When Mr. Wehelie arrived at the gate, two TSA agents and an FBI agent were waiting for him.

103

400.512. ~~At the gate and before being allowed to board, in public view, an FBI agent interrogated Mr. Wehelie about why he had purchased a one-way ticket, why one of his children applied for a passport, and about his sons. Mr. Wehelie was scared, confused, and humiliated because he was interrogated by the FBI in public. He was made to feel like a criminal.~~

401.513. On January 7, 2018, Ms. Hawa Wehelie and Ms. F. Wehelie were returning to the United States through Toronto Pearson International Airport. Ms. Hawa Wehelie's boarding pass was stamped with the "SSSS" designation, indicating that she had been designated by Defendants as a "known or suspected terrorist."

402.514. After going through the CBP security checkpoint, and before boarding the plane, Ms. Hawa Wehelie and Ms. F. Wehelie scanned their passports at the Automated Passport Control kiosk. The printed declaration form contained an "X" over Ms. Hawa Wehelie's and Ms. F. Wehelie's photos. They were instructed to go to a Customs officer.

403.515. When Ms. Hawa Wehelie and Ms. F. Wehelie presented their declaration forms to a Customs officer, they were detained and interrogated.

404.516. Ms. Hawa Wehelie and Ms. F. Wehelie were detained in separate rooms so that CBP officers could interrogate them separately.

405.517. The interrogation rooms are situated across the hallway from small holding cells that look like jail cells; and, upon seeing them, Ms. F. Wehelie felt faint and light-headed. She feared for her sister's safety because she was afraid that they would both be arrested and detained in the holding cells.

518. CBP officer Ramos interrogated Ms. F. Wehelie about where she stayed in Toronto, who she traveled with, where she lived, what she does in Virginia, where she went to school, where she lives in Virginia, who she lives with and who her siblings are.

519. After being subjected to lengthy interrogations, the Ms. Hawa Wehelie's and Ms. F. Wehelie's luggage, which were pulled after being checked-in, were searched by CBP officers. Ms. Hawa Wehelie and Ms. F. Wehelie had to check in their luggage again.

520. Officer Bustamante confiscated Ms. Hawa Wehelie and Ms. F. Wehelie's cell phones and demanded the passwords to each phone.

521. The phones were returned after one hour and, upon information and belief, CBP downloaded Ms. Hawa Wehelie's and Ms. F. Wehelie's data and content from their cell phones.

522. The entire process lasted nearly four hours and as a result, Ms. Hawa Wehelie and Ms. F. Wehelie missed their flight and were forced to reschedule for the next morning.

523. The next morning, Ms. Hawa Wehelie's boarding pass, again, contained the "SSSS" designation, indicating that she had been designated as a "known or suspected terrorist."

524. After going through the CBP security checkpoint, and before boarding the plane, Ms. Hawa Wehelie and Ms. F. Wehelie scanned their passports at the Automated Passport Control the kiosk. Once again, there declaration forms contained an "X" over their photos. Once again, they were instructed to see a Customs officer for assistance.

413.525. While waiting in line at customs and before reaching the counter, and in public view, a CBP officer approached Ms. Hawa Wehelie and Ms. F. Wehelie and escorted them into a back room for interrogation.

414.526. CBP officers interrogated Ms. Hawa Wehelie and Ms. F. Wehelie about where they stayed the night before and who had picked them up from the airport.

415.527. Ms. Hawa Wehelie and Ms. F. Wehelie were forced to write their responses to each question on a piece of paper.

416.528. On October 22, 2017, Mr. Wehelie, Mrs. Noor, and Ms. Hawa Wehelie were re-entering the United States through the Peace Bridge land port of entry in New York.

417.529. CBP officers ordered Mr. Wehelie, Mrs. Noor, and Ms. Hawa Wehelie to pull aside and enter the building for secondary inspection.

418.530. Mr. Wehelie was interrogated about his travels including where he was going, where he stayed in Canada, where he worked, where he had traveled, and why he previously traveled to Somalia.

419.531. Thereafter, Mr. Wehelie, Mrs. Noor, and Ms. Hawa Wehelie were detained in a private room. Mr. Wehelie was interrogated by two CBP officers and an FBI agent.

420.532. After Mr. Wehelie was interrogated, they were escorted back to the waiting room where they waited for approximately two hours.

421.533. CBP officers then searched their personal belongings and person, which involved removing all items from their pockets, and removing their shoes

534.     CBP Supervisor Marshman confiscated Mr. Wehelie's, Mrs. Noor's, and Ms. Hawa Wehelie's cell phones without their consent.  Also, Ms. Hawa Wehelie's laptop was confiscated without her consent.

535.     CBP retained Mr. Wehelie's, Mrs. Noor's, and Ms. Hawa Wehelie's electronics for approximately two months.

536.     Upon information and belief, CBP downloaded Mr. Wehelie's, Mrs. Noor's, and Ms. Hawa Wehelie's data and content from their electronic devices without their consent.

537.     On July 31, 2018, Ms. Hawa Wehelie, Mr. Wehelie, and Mrs. Noor were re-entering the United through the Peace Bridge land port of entry.

538.     Immediately after they presented their passports to the CBP officer, their vehicle was surrounded by six or seven armed CBP officers.  Mr. Wehelie, Mrs. Noor, and Ms. Hawa Wehelie were ordered to exit the vehicle and detained.

539.     CBP Officer Tucker interrogated Mr. Wehelie about the locations of his father and mother, where he traveled, where he stayed, where he worked, where he lived, and asked him to provide his phone number, e-mail address, and the addresses where he stayed in Canada.

540.     The Wehelie Family is also regularly subjected to extensive searches, unreasonable delays and interrogations when returning from Canada to the United States through land ports of entry.

541.     Upon information and belief, the Wehelie Family is subjected to lengthy detentions, searches, and interrogations by CBP officers at US-Canada land ports of entry due

107

to their relation to Ms. Hawa Wehelie and because of her status on Defendants' federal terror watchlist.

430.542. As a result of the above described experiences, the Wehelie Family has suffered severe anxiety, humiliation, and have been discouraged from traveling with Ms. Hawa Wehelie.

431.543. The Wehelie Family has also been subjected to FBI interrogations because of their relation to Ms. Hawa Wehelie and because of her status on Defendants' federal terror watchlist.

432.544. Mr. Wehelie and Mrs. Noor havehas filed DHS Trip inquiries. They haveShe has since received letters as described in paragraph 178 above and werewas assigned redress control numbers.

**Plaintiff Mahad Mohallim
(A Watchlisted Plaintiff)**

545. Mahad Mohallim is a United States Citizen who has been living in Kenya since 2015.

546. Since approximately 2015, as a result of Mr. Mohallim's watchlist designation, Mr. Mohallim is regularly subjected to enhanced screening, unreasonable delays and interrogations. As of the date of this filing, Mr. Mohallim is subject to Defendants' flight ban which prevents him from flying through US airspace.

547. On or about 2015, Mr. Mohallim arrived at Minneapolis-Saint Paul International Airport for an international trip to Kenya.

108

548.   He was prevented from checking in online or at the kiosk in the airport. Rather, he was directed to an airline representative for further assistance.

549.   After presenting himself to the airline representative at the ticket counter, the airline representative was unable to print Mr. Mohallim's boarding pass.

550.   Mr. Mohallim had to wait while the airline representative called Defendants in order to obtain clearance to print his boarding pass and allow him to board his flight.

551.   Mr. Mohallim was subjected to an extensive and lengthy screening, an invasive pat down including a search of his groin area, an extensive search of all his personal belongings and chemical residue testing of his person and his belongings in public view at the TSA checkpoint.

552.   This intensive screening caused Mr. Mohallim to experience humiliation and shame and otherwise stigmatize him in the eyes of his family, friends, and fellow travelers.

553.   When he arrived at the gate, Mr. Mohallim was interrogated about his trip and about how much money he was carrying before he was allowed to board his flight increasing the amount of humiliation and shame he experienced and further stigmatizing him in the eyes of his family, friends, and fellow travelers.

554.   On July 17, 2018, Mr. Mohallim went to Jomo Kenyatta International Airport in Kenya, with his mother, to board a flight back to the United States.

555.   Upon presenting airport security with their passports, the security officer placed red stickers in both Mr. Mohallim and his mother's passports.

556.   When Mr. Mohallim approached the ticket agent for his boarding pass, the airline representative falsely told him that the plane had already finished boarding.

557.   The ticket agent took both passports and left for ten minutes.

558.    When the ticket agent returned, he told Mr. Mohallim that he and his mother would not be able to fly that day and directed them to ticket sales to rebook their flight.

559.    Mr. Mohallim felt humiliated and ashamed that his mother witnessed him being treated by the government as a criminal and a "known or suspected terrorist."

560.    Mr. Mohallim felt ashamed and humiliated that his mother felt compelled to remain in Kenya with him because he was unable to board his flight.

561.    However, when Mr. Mohallim attempted to rebook his flight at the ticket sales office, he was unable to do so, and he had to purchase a new plane ticket for $1,600.

562.    On July 21, 2018, Mr. Mohallim and his mother returned to the airport for their flight.

563.    After presenting himself to the airline representative at the ticket counter, the airline representative was unable to print Mr. Mohallim's boarding pass.

564.    The airline representative called Defendants in order to obtain clearance to print his boarding pass and allow him to board his flight.

565.    The airline representative then informed Mr. Mohallim that he would be unable to board his flight to the United States and directed him to contact the embassy or immigration.

566.    Mr. Mohallim felt humiliated and ashamed that his mother witnessed him being treated by the government as a criminal and a "known or suspected terrorist."

567.    Mr. Mohallim felt ashamed and humiliated that his mother felt compelled to remain in Kenya with him because he was unable to board his flight.

568.    On July 22, 2018, Mr. Mohallim arrived at the United States Embassy in Kenya for his appointment.

569.  When the receptionist called Mr. Mohallim's name, she stated, "They already know you," and rescheduled Mr. Mohallim's appointment for July 24, 2018.

570.  On July 24, 2018, Mr. Mohallim and his mother returned to the embassy and were met by two FBI agents.

571.  The FBI agents separated Mr. Mohallim's mother from Mr. Mohallim and interrogated her.

572.  When Mr. Mohallim's mother objected to an interrogation of her son and requested to have an attorney present, the agents told her that their situation would be more difficult and result in an indefinite delay of their return by plane to the United States if she insists on having an attorney present.

573.  The FBI agents told Mr. Mohallim's mother that they would immediately ensure her son's successful return to the United States if she consented to an interrogation of her son without the presence of an attorney.

574.  Since this ordeal, as a result of Mr. Mohallim's watchlist designation, Mr. Mohallim and his mother are unable to return to the United States and remain stranded abroad.

575.  Upon information and belief, Mr. Mohallim was added to the No Fly List after he left the United States, and accordingly he was unable to board a flight to return to his home in the United States.

576.  As a result of his designation on the federal watch list, Mr. Mohallim was subjected to additional FBI interrogations.

577.  Around 2015, FBI Agent Dan attempted to interrogate Mr. Mohallim, who was 15 at the time, about who he speaks with and his social media accounts.

578.   FBI agent Dan also requested permission to search Mr. Mohallim's phone.

579.   Around 2015, an employee at Jomo Kenyatta International Airport in Kenya told Mr. Mohallim that an FBI agent interrogated airport employees about Mr. Mohallim.

580.   The agent provided airport employees with a photo of Mr. Mohallim and falsely said that Mr. Mohallim was attempting to join ISIS, asked for his location, and asked why he hadn't left Kenya.

581.   On August 29, 2018, Mr. Mohallim and his mother will make their third attempt to return to the United States, Mr. Mohallim's country of citizenship.

582.   On August 3, 2018, Mr. Mohallim's counsel contacted and provided Defendants' counsel with Mr. Mohallim's itinerary and requested assurance that Mr. Mohallim and his mother would be allowed to board their flights to the United States. The U.S. Embassy in Doha, Qatar was also contacted and provided this information.

583.   Defendants' counsel notified Mr. Mohallim's counsel that the earliest flight he would be allowed to board was for August 29, 2018. Mr. Mohallim rebooked his and his mother's flights for August 28, 2018. A copy of Mr. Mohallim itinerary for August 29, 2018, was provided to Defendants' counsel and U.S. Embassy in Qatar via electronic mail.

584.   Despite being denied boarding twice, as described above, on August 19, 2018, the U.S. Embassy in Doha, Qatar sent an email to Mr. Mohallim stating, "we have no reason to think you cannot fly on this itinerary…."

585.   Upon information and belief, Mr. Mohallim remains on Defendants' federal terror watchlist and is subject to its flight ban.

**Plaintiff Moustafa El-Shahat**
**(A Watchlisted Plaintiff)**

112

433.586.     Sometime in 2013 or 2014, Mr. El-Shahat arrived at John F. Kennedy International Airport ("JFK") in Queens, New York, from an international trip to Egypt.

434.587.     Once his flight landed in JFK, there were two CBP officers waiting for him before he arrived at passport control.

435.588.     Mr. El-Shahat was escorted to an interrogation room where he was detained and interrogated by FBI agents.

436.589.     All of his personal belongings were searched, and his laptop, cellphone, and documents were confiscated by CBP officers.

437.590.     Upon information and belief, his documents were photocopied and the information on his electronic devices were downloaded without his consent.

438.591.     Mr. El-Shahat was interrogated by the FBI agents for approximately three and a half hours.

439.592.     He was interrogated about what he thinks of jihad[6], what mosque he attends, how religious he is, whether he teaches at a mosque, whether he is an imam (an Islamic religious leader), among other invasive questions about his Islamic religious beliefs and practices.

440.593.     Upon information and belief, his answers to the questions asked by the FBI agents were factors that contributed to his designation on the federal terror watch list.

441.594.     When he was finally released, a CBP officer escorted Mr. El-Shahat out of the airport to ensure he left the premises.

---

[6] Jihad is an Arabic Islamic term that means "spiritual struggle."

442.595. Ever since that trip and subsequent FBI interrogation, every time Mr. El-Shahat travels by air, his boarding pass is routinely stamped with the "SSSS" designation, indicating that he has been designated by Defendants as a "known or suspected terrorist."

443.596. He is routinely unable to check in online or print his boarding pass.

444.597. Rather Mr. El-Shahat is directed each time to an airline representative, who then contacts Defendants to obtain clearance to allow him to board his flight, a process that can take a very long time.

445.598. Once the airline representative receives clearance from Defendants allowing him to board his flight, the airline representative prints his boarding pass with the "SSSS" designation on it.

446.599. Upon seeing the "SSSS" designation on his boarding pass, as protocol, TSA agents then subject Mr. El-Shahat to routine, extensive and lengthy screening, an invasive pat down including a search of his groin area, an extensive search of all of his personal belongings and chemical residue testing of his person and his belongings – twice – at the TSA security checkpoint and again at the gate, in public view and in front of his travel companions.

447.600. He is also often interrogated at the gate in public view.

448.601. On one occasion, the TSA agent interrogating Mr. El-Shahat informed him that he is subjected to enhanced screening because he frequently travels to countries in the Middle East, because he travels alone, and because he is a Muslim male.

449.602. On another occasion, an officer confirmed that he is designated on the federal terror watchlist.

114

450.603.     On another occasion, while at an airport in Abu Dhabi, a TSA agent made Mr. El-Shahat stand with his hands against the wall, and then kicked Mr. Al-Shahat to force his legs apart, causing him pain.

451.604.     The TSA agent treated Mr. El-Shahat like a criminal, likely because of his status on the federal terror watchlist.

452.605.     Due to the above-described treatment, Mr. El-Shahat has missed at least three flights.

453.606.     Mr. El-Shahat avoids flying whenever possible and drives instead to avoid the above-described treatment.

454.607.     On or about five years ago, Mr. El-Shahat was stopped at a US-Canada port of entry on his way into Canada and escorted to secondary screening by two Canadian Border Services Officers.

455.608.     He was detained and interrogated for a lengthy period of time while his car and personal belongings were searched.

456.609.     Upon information and belief, Mr. El-Shahat was subjected to a lengthy detention, search, and interrogation by the Canadian Border Services Officers due to his status on the federal terror watch list being shared with Canadian authorities by Defendants.

457.610.     Mr. El-Shahat has filed multiple DHS TRIP inquiries.   He has since received multiple letters as described in paragraph 178 above and was assigned multiple Redress Control Numbers in connection with those letters.

458.611.     Further, as a result of his status on the federal terror watch list, his wife's immigration application was significantly delayed for over three years, and as a result has suffered a painful prolonged separation from his wife and loss of consortium.  Mr. El-

Shahat also suffered from shame and humiliation that his wife knew the reason that the processing of her immigration application was delayed significantly was because Defendants believe Mr. El-Shahat is a "known or suspected terrorist."

~~459.~~612.     Upon information and belief, Mr. El-Shahat remains on the federal terror watch list.

**Plaintiff Farid Sulayman**
**(A Watchlisted Plaintiff)**

~~460.~~613.     Imam Farid Sulayman is a local Imam[7] in the Seattle, Washington area. As a well-known religious leader in his area and as part of his sincerely-held religious beliefs, Imam Sulayman routinely leads large groups of American Muslim worshippers on an annual Umrah[8] pilgrimage to Mecca, Saudi Arabia.

~~461.~~614.     On February 24, 2018, Imam Sulayman was returning to the United States at the U.S.-Canada land bordering crossing near Blaine, Washington, with his wife and four children.

~~462.~~615.     Upon presenting the primary CBP officer with his and his family's passports, the CBP officer escorted them to secondary inspection. At this time, the CBP officer seized Imam Sulayman's cell phone. Upon information and belief, Defendants made copies of the information on his cell phone without his consent.

~~463.~~616.     Imam Sulayman and his family waited in a waiting room for approximately three hours before another CBP officer came to interrogate Imam Sulayman.

---

[7] "Imam" is a term for a Muslim religious leader.
[8] Umrah is a pilgrimage made by Muslims to Mecca. Unlike Hajj which is an Islamic pilgrimage that may only be performed at specific dates according to the Islamic lunar calendar, Umrah may be performed at any time during the year.

While waiting, Imam Sulayman's children began to cry, were scared, and kept asking why they could not go home.

464.617.    Thereafter, Imam Sulayman was questioned by a CBP officer about his studies, work, and an upcoming trip for Umrah that Imam Sulayman had planned for approximately forty Muslim community members.  Imam Sulayman does not know how the CBP officer was aware of his upcoming Umrah trip.

465.618.    After the interrogation, Imam Sulayman and his family waited another forty-five minutes before being allowed to leave.  At no point was Imam Sulayman provided any information as to why he was questioned or taken to secondary inspection.

466.619.    Imam Sulayman felt ashamed and humiliated that his family witnessed him being treated by the government as a criminal and a "known or suspected terrorist."

467.620.    Moreover, Imam Sulayman felt ashamed and humiliated that his wife and children were also treated as criminals and "known or suspected terrorists" just because they were traveling with him.

468.621.    Imam Sulayman, his wife, and four children made another trip to Canada the following month.  Upon presenting the primary CBP officer with his passport, Imam Sulayman heard an alarm as the CBP officer scanned his passport.  The CBP officer then ordered Imam Sulayman and his family to secondary inspection.

469.622.    Once again, Imam Sulayman's cell phone was confiscated, and upon information and belief, Defendants made copies on his cell phone without his consent.

470.623.    On or about March 31, 2018, Imam Sulayman arrived at the Seattle-Tacoma International Airport to board his flight with 28 Muslim community members to

Umrah in Saudi Arabia. Among the 28 community members were Imam Sulayman's elderly mother, sister, brother-in-law, and two aunts.

471.624. Imam Sulayman's travel companions and family members were able to print their boarding passes from the airport kiosk or obtained their boarding passes without delay.

472.625. However, Imam Sulayman was unable to check-in online or at the kiosk. Instead, he was directed to an airline representative for further assistance.

473.626. After presenting himself to the airline representative at the ticket counter, Imam Sulayman was delayed until the airline representative obtained clearance for Imam Sulayman to board his flight. Due to the significant delay in obtaining his boarding pass, Imam Sulayman's travel companions and family members proceeded to the TSA checkpoint and cleared screening without any issues.

474.627. His boarding pass was stamped with the "SSSS" designation, indicating that he was designated as a "known or suspected terrorist."

475.628. Even though his family members had already cleared TSA security and were waiting for him at the gate, Imam Sulayman was informed that his family members were being forced to return to the TSA security checkpoint because they were traveling with him.

476.629. Upon seeing the "SSSS" designation on his boarding pass, as protocol, TSA agents subjected Imam Sulayman to routine, extensive and lengthy screening, an invasive pat down including a search of his groin area, an extensive search of all of his personal belongings and chemical residue testing of his person and his belongings at the TSA security checkpoint in public view and in front of his family members.

477.630.    Imam Sulayman was detained for an hour and interrogated about his studies and travel itinerary in front of his family members.

478.631.    Imam Sulayman's family members including his seventy-eight-year old mother who is handicapped and had to be escorted around the airport in a wheel chair had their boarding passes stamped with the "SSSS" designation indicating they were designated as "known or suspected terrorists."

479.632.    Imam Sulayman's family members, including his seventy-eight-year-old mother, were subjected to the same invasive and humiliating screening as Imam Sulayman in public view.   Imam Sulayman felt ashamed and humiliated especially because his elderly mother in a wheelchair was treated like a criminal in public all because of his status on Defendants' federal terror watchlist.  Imam Sulayman's profusely apologized to his mother for the humiliation and mistreatment she experienced.

480.633.    Imam Sulayman and his travel companions only made their flight because a friendly airport employee held the boarding door until the 28 community members and Imam Sulayman arrived.

481.634.    On April 16, 2018, Imam Sulayman and his 28 travel companions were scheduled to return to the United States by air from Saudi Arabia to Dubai to Seattle, Washington.

482.635.    At the airport in Saudi Arabia, the boarding passes of his family members, including Imam Sulayman's elderly mother, were stamped with the "SSSS" designation indicating that they were designated as "known or suspected terrorists."

483.636.    When Imam Sulayman approached the ticket agent for his boarding pass, the airline representative was not able to print his boarding pass.  An airline supervisor

119

was called and Imam Sulayman was informed that the airline had to "call America" to figure out what was happening.

484.637.    After a forty-five-minute delay, the airline representatives only received clearance to print Imam Sulayman's boarding pass from Saudi Arabia to Dubai. Imam Sulayman's boarding pass was stamped with the "SSSS" designation indicating that he is a "known or suspected terrorist."

485.638.    Once in Dubai, Imam Sulayman was delayed another forty-five-minutes for the airline representative to print his boarding pass which was stamped with the "SSSS" designation indicating that he is a "known or suspected terrorist."

486.639.    When Imam Sulayman landed in Seattle, Washington, CBP officers were planeside asking passengers if they were Imam Sulayman.  Once Imam Sulayman identified himself to the CBP officers, he was escorted along with his elderly mother in public view and in front of his travel companions to an interrogation room.

487.640.    To spare his elderly mother from further humiliation, heartache, and hassle, Imam Sulayman begged CBP officers to let his elderly mother out of secondary inspection.  Imam Sulayman pleaded with CBP officers and informed them "I know you want me not my mother."

488.641.    The CBP officers interrogated Imam Sulayman about his studies, work, and travel.  The CBP officers also asked Imam Sulayman if he knew certain individuals whose photographs he was shown.

489.642.    Imam Sulayman was detained and interrogated for four-and-a-half hours.

490.643.     Imam Sulayman felt powerless to assist his elderly mother during this Umrah trip.  He felt ashamed and began to question whether he should ever travel with his elderly mother so that she would no longer be subjected to the above described travel experience because of her relation to him and his status on Defendants' federal terror watchlist.

491.644.     On May 19, 2018, Imam Sulayman drove family members to the Islamic Center of Olympia so they could break their Ramadan[9] fast.  Imam Sulayman could not break fast with his family because he had a fundraiser in Seattle to attend.

492.645.     Since Imam Sulayman works as an Uber driver in his spare time, he decided to pick up an Uber fare as he drove back to Seattle.  He accepted to pick up an Uber fare from the Fort Lewis military base near Tacoma, Washington.

493.646.     When Imam Sulayman arrived at the military base, the officer at the checkpoint informed him that he needed to register his information.  Imam Sulayman proceeded to the registration area and provided his license, registration and insurance information.  He asked how long this would take and was informed that it was only a five to ten-minute process.  He decided to wait for his fare instead of cancelling.

494.647.     After twenty minutes, an officer detained and placed handcuffs on Imam Sulayman.  Imam Sulayman has no criminal record.  He was extremely frightened and did not understand why he was been apprehended.

---

[9] Ramadan is the Islamic holy month when Muslims fast, without food or water, from sunrise to sunset.

495.648.     Imam Sulayman asked the officer why he was handcuffed and detained. The officer stated that Imam Sulayman's name popped up when his driving information was being inputted.

496.649.     Imam Sulayman asked the officer to read what was said when his name appeared.  Imam Sulayman was given three reasons.

497.650.     At first, the officer stated that there was an issue related to ICE.  After Imam Sulayman informed the officer that he was a U.S. citizen.  The officer did not respond.

498.651.     The second explanation provided by the officer was that Imam Sulayman was a "threat." Imam Sulayman asked why he was being labeled a "threat." The officer did not provide an explanation.

499.652.     The third explanation provided by the officer was that there was a warrant out for Imam Sulayman's arrest.  After he asked for more information about the outside arrest warrant, the officer made at least two calls to obtain more information.

500.653.     After an hour of custodial detention, Imam Sulayman was released. During his detention, Imam Sulayman asked if the handcuffs could be removed and if he could stand up.  He was told that neither are allowed because of standard procedure.

501.654.     Imam Sulayman was unable to pick up his Uber fare.  His income ability was hindered because of his status on Defendants' federal terror watchlist.

502.655.     Upon information and belief, Imam Sulayman was custodially detained and handcuffed at Fort Lewis military base because of his status on Defendants' federal terror watchlist.

503.656.     Muslim community members have informed Imam Sulayman that FBI agents have questioned them about him.  Upon information and belief, these community

members have been interviewed by the FBI because of their association with Imam Sulayman and because of his status on Defendants' federal ~~terror~~terrorist watch list.

~~504.~~657.    Since Imam Sulayman is a religious leader in his community, he travels frequently with large groups for Umrah.  Due to the difficulty, hassle, and humiliation associated with his travel experiences because of his status on Defendants' federal terror watchlist, Imam Sulayman is afraid to travel again.  Additionally, Imam Sulayman standing in his community has been greatly diminished since his travel companions, as described above, discovered he was on Defendants' federal terror watchlist.  Imam Sulayman is also discouraged from organizing and leading Muslim community members for Umrah trips because of the above described treatment, and accompanying shame, fear, and humiliation, that he experiences because of his status on Defendants' federal terror watchlist.

~~505.~~658.    Upon information and belief, Imam Sulayman remains on Defendants' federal terror watchlist.

**Plaintiff Fadi Suliman**
**(A Watchlisted Plaintiff)**

~~506.~~659.    On January 11, 2018, Mr. Suliman arrived at a Miami area airport for a flight to Las Vegas, Nevada.

~~507.~~660.    Mr. Suliman was traveling to a business convention with his employees (one Muslim and one non-Muslim), a customer, and a vendor, each of whom witnessed the entire treatment that Mr. Suliman was subjected to that day, described below.

~~508.~~661.    At first, Mr. Suliman was prevented from checking in online and at the airport kiosk.  Rather, he was directed to an airline representative for further assistance.

~~509.~~662.    After presenting himself to the airline representative at the ticket counter, Mr. Suliman and his travel companions had to wait almost forty minutes before the

123

airline representative was able to obtain clearance from Defendants so that Mr. Suliman could board his flight.

510.663. While the airline representative was on the phone, Mr. Suliman overheard the representative state "no, he doesn't have any weapons on him." The airline representative then asked Mr. Suliman if any of the individuals traveling with him havehad any weapons.

511.664. All the boarding passes given to Mr. Suliman and his travel companions were stamped with the "SSSS" designation, indicating that they were all designated as "known or suspected terrorists," with the exception of one. The only travel companion that did not have an "SSSS" designation on his boarding pass was the sole non-Muslim employee traveling with Mr. Suliman despite the fact that all the tickets were purchased by Mr. Suliman's company under the same reservation.

512.665. Once Mr. Suliman and his travel companions arrived at the TSA security checkpoint, they provided their boarding passes and identification documents to the TSA agent stationed at the entrance of the TSA security checkpoint.

513.666. The boarding pass scanner indicated a red light when Mr. Suliman's boarding pass was scanned. The TSA agent called over a supervisor and stated, "We have a house guest."

514.667. Mr. Suliman and his travel companions that were designated "SSSS" were escorted to a different line than the other travelers passing through the TSA security checkpoint and subjected to enhanced screening. The non-Muslim employee was not subjected to enhanced screening and went through normal screening.

515.668.     Mr. Suliman was subjected to an extensive and lengthy screening, an invasive pat down including a search of his groin area, in addition to a TSA male agent placing his fingers inside and around Mr. Suliman's waist, an extensive search of all his personal belongings and chemical residue testing of his person and his belongings in public view and in front of his travel companions.  Mr. Suliman's Muslim travel companions received the same treatment.

516.669.     Meanwhile, a TSA agent was on the phone seeking clearance to allow Mr. Suliman to pass the security checkpoint.

517.670.     Once Mr. Suliman and his Muslim travel companions finally arrived at the gate, approximately five TSA agents were waiting for Mr. Suliman to arrive.

518.671.     The TSA agents had with them a cart with chemical testing machines.

519.672.     At the gate and before being allowed to board, in public view and in front of his travel companions, Mr. Suliman was once again subjected to an invasive and lengthy pat down; all of his personal belongings were searched again; and, he and his belongings were subjected to another round of chemical residue testing despite the fact that he had just cleared security with no issues at the TSA security checkpoint.

520.673.     Due to the additional enhanced screening at the gate, Mr. Suliman missed his direct flight to Las Vegas.  As a result, Mr. Suliman was forced to rebook with a connecting flight to Dallas Fort Worth airport in Dallas, Texas and travel separately than his travel companions.

521.674.     When Mr. Suliman arrived at Dallas to board his flight to Las Vegas, the airline representative scanned his boarding pass at the gate to board their flight and the scanner once again indicated a red light.

522.675.    Mr. Suliman was once again delayed until the airline representative at the gate finally obtained clearance from Defendants to allow him to board his flight.

523.676.    Additionally, Mr. Suliman had to wait at the gate until TSA agents arrived and subjected Mr. Suliman to another invasive and lengthy pat down, a search of all his personal belongings, and another round of chemical residue testing for himself and his belongings although he had not left the secure, sterile area of the airport and was only on a connecting flight.  This was once again conducted in public view.

524.677.    Mr. Suliman felt ashamed and humiliated, especially because he was treated as a "known or suspected terrorist" in public view and in front of his employees, customer, and vendor, and because his Muslim travel companions were also delayed, humiliated and subjected to extensive screening just because they were traveling with Mr. Suliman.

525.678.    Because of all the delays, it took Mr. Suliman 15 hours to arrive in Las Vegas for the convention.  Mr. Suliman's original flight schedule was scheduled for 5 hours.

526.679.    Because of all the delays resulting from his status on the federal terror watchlist, Mr. Suliman missed two business meetings and was forced to reschedule a meeting with a Hong Kong vendor.

527.680.    Mr. Suliman's employees, customer, and vendor were shocked at the treatment they witnessed and endured while traveling with Mr. Suliman.

528.681.    On the return flight from Las Vegas to Miami, Mr. Suliman experienced the same treatment as described above.  Mr. Suliman's Muslim travel companions were once again subjected to the same treatment.  The non-Muslim employee once again did not have

126

an "SSSS" stamp on his boarding pass and did not experience any enhanced screening or delays.

~~529.~~682.    After their travel experience, Mr. Suliman's Muslim travel companions informed him that they would not travel with him again because of the treatment they suffered when traveling with him.

~~530.~~683.    Ever since that trip, every time Mr. Suliman travels by air, he is subjected to substantially similar treatment.

~~531.~~684.    His boarding passes for his flights are routinely stamped with the "SSSS" designation, indicating that he has been designated by Defendants as a "known or suspected terrorist."

~~532.~~685.    He is routinely unable to check in for his flights online or print his boarding pass.

~~533.~~686.    Rather Mr. Suliman is directed each time to an airline representative, who then contacts Defendants to obtain clearance to allow him to board his flight, a process that can take a very long time.

~~534.~~687.    Once the airline representative receives clearance from Defendants allowing him to board his flight, the airline representative prints his boarding pass with the "SSSS" designation on it.

~~535.~~688.    Upon seeing the "SSSS" designation on his boarding pass, as protocol, TSA agents then subject Mr. Suliman to substantially similar routine, extensive and lengthy screening, an invasive pat down including a search of his groin area, an extensive search of all of his personal belongings and chemical residue testing of his person and his belongings

– twice – at the TSA security checkpoint and again at the gate, in public view and in front of his travel companions.

536.689.    He then has to wait again at the gate for an airline representative to obtain clearance from Defendants a second time to board his flight, even though Defendants already provided clearance for him to board his flight prior to his boarding pass being printed in the first place.

537.690.    Moreover, oftentimes the people that Mr. Suliman travels with are also treated as "known or suspected terrorists" just because they are traveling with him.

538.691.    On May 2018, Mr. Suliman was forced to fly to China to meet with the Hong Kong business vendor that he was originally scheduled to meet in Las Vegas on the trip described above.  At New York's JFK airport to connect for his flight to China, Mr. Suliman was referred to by TSA as a "house guest" again at the TSA security checkpoint.

539.692.    A TSA agent instructed Mr. Suliman to have a seat and delayed him for 40 minutes until an airline representative came looking for Mr. Suliman and asked if TSA was going to clear him.  At this point, TSA cleared Mr. Suliman but another female TSA agent re-detained Mr. Suliman and TSA agents called yet again for clearance.

540.693.    After being cleared again, Mr. Suliman rushed to the gate only to be delayed by TSA for another round of clearance checks.  The TSA agent at the gate took a picture of his boarding pass.

541.694.    Fortunately, the captain of his flight refused to take off until Mr. Suliman boarded, otherwise he would have missed his flight.

542.695.    Mr. Suliman's belongings did not make it to China.

543.696.    Because of his past screening experiences, Mr. Suliman had avoided taking a carry-onson and therefore had no clothes to change into for two days.  Mr. Suliman did not take a carry-on, so he could minimize the screening delays and humiliation.

544.697.    On May 11, 2018, Mr. Suliman was traveling from China to Miami with a connecting flight in Los Angeles International Airport.  When Mr. Suliman arrived at the airport in China, the airline representative received a message that stated, "Passenger not allowed to board before clearance."

545.698.    Supervisors for the airline were called over and Mr. Suliman was escorted to an office where the airline employees called Defendants to get clearance.

546.699.    The airline employees took approximately 2 hours before Defendants gave them a code to input into the system, which allowed them to assign Mr. Suliman a seat.  Mr. Suliman arrived four hours before takeoff and still almost missed his flight.

547.700.    When Mr. Suliman landed in Los Angeles, there were five armed CBP officers waiting for him planeside.  They escorted Mr. Suliman in public view to get his luggage.

548.701.    Mr. Suliman was escorted to secondary inspection where he was detained and interrogated about his travel, businesses, and business partners.  During the interrogation, Mr. Suliman commented to an African-American CBP officer "Imagine if I was a black Muslim." The CBP officer responded, "Lately, most of the people that come to this room are from your background."

549.702.    The CBP officers forced Mr. Suliman to show them photographs of his trip to China, his family, and employees.

129

550.703.    CBP officers also seized Mr. Suliman's smartphone.  A CBP supervisor gave Mr. Suliman a document informing him that his phone was being seized.  As of this date, Mr. Suliman has not received his phone back.

551.704.    Mr. Suliman was detained for approximately 2 hours.  As a result, Mr. Suliman missed his flight to Miami and was forced to spend the night at the airport.

552.705.    Mr. Suliman applied to the TSA Pre✓ ® program, but his application was denied without providing any explanation.

553.706.    Upon information and belief, his application to participate in the TSA Pre✓ ® program was denied because of, upon information and belief, his status on the federal terror watch list.

554.707.    Mr. Suliman has filed a DHS TRIP inquiry.  He has since received a letter as described in paragraph 178 above and was assigned a Redress Control Number.

555.708.    Upon information and belief, Mr. Suliman remains on the federal terror watch list.

**Plaintiff John Doe 2**
**(A Watchlisted Plaintiff)**

556.709.    Since approximately 2013, every time John Doe 2 travels by air, his boarding pass is routinely stamped with the "SSSS" designation, indicating that he has been designated by Defendants as a "known or suspected terrorist."

557.710.    He is routinely unable to check in for his flights online or print his boarding pass.

130

558.711.   Rather John Doe 2 is directed each time to an airline representative, who then contacts Defendants to obtain clearance to allow him to board his flight, a process that can take a very long time.

559.712.   Once the airline representative receives clearance from Defendants allowing him to board his flight, the airline representative prints his boarding pass with the "SSSS" designation on it.

560.713.   When John Doe 2 scans his boarding pass at the entrance to the TSA security checkpoint, the scanner indicates a red light.

561.714.   Upon seeing the "SSSS" designation on his boarding pass, as protocol, TSA agents then subject John Doe 2 to routine, extensive and lengthy screening, an invasive pat down including, an extensive search of all of his personal belongings and chemical residue testing of his person and his belongings – twice – at the TSA security checkpoint and again at the gate, in public view and in front of his travel companions.

562.715.   Oftentimes, John Doe's Doe 2's name is called on the loudspeaker before he is subjected to interrogation at the gate in public view.

563.716.   On one occasion, DHS officers interrogated John Doe 2 about whether he was going to Syria and whether he was going to fight in the country.

564.717.   Whenever John Doe 2 arrives in the United States from international trips, two CBP officers check everyone's passports as they deplane until they find him.

565.718.   The two CBP officers then escort him from the gate to an interrogation room where he is detained and interrogated by FBI agents.  All of his personal belongings are also searched.

131

566.719.    Additionally, whenever John Doe 2 has electronics in his possession, CBP officers confiscate his electronics and upon information and belief, download the information from them, including his laptop and his cell phone, without his consent.

567.720.    On one occasion, CBP officers seized John Doe'sDoe 2's phone and searched through his photos despite his objections.

568.721.    Upon arriving in the United States from an international flight in Saudi Arabia, CBP officers interrogated John Doe 2 about who he married, whether his wife was Syrian, whether he and his wife visited Syria, whether John Doe 2 supported the Assad regime in Syria, and what his thoughts were about Syrian President Assad and ISIS.

569.722.    Upon returning to the United States on a flight from Turkey, CBP officers interrogated John Doe 2 about where he traveled to, where he obtained the money to travel, and about his job managing an Islamic center.

570.723.    Further, CBP officers interrogated John Doe 2 about a prayer book they found among his personal belongings, the content of the book and the specific details of his Islamic faith.

571.724.    On another occasion, upon returning to the United States from a trip to Turkey, a DHS agent called John Doe 2 after he exited the airport and told him that he had been scheduled for additional screening and interrogation and that he needed to return to the airport.

572.725.    The DHS agent further told John Doe 2 that he would be detained at his next flight if he did not return to the airport.

573.726.    After 15 minutes, a DHS supervisor called John Doe 2 and interrogated him about his trip, the purpose of his trip, and who he stayed with during his trip.

574.727.    As a result of his watchlist designation, John Doe 2 is often subjected to interrogations at international airports.

575.728.    On one occasion, John Doe 2 was interrogated by a CBP officer at an airport in the United Arab Emirates.

576.729.    John Doe 2 was interrogated about how he paid for his trip, the current locations of his family members, his place of birth, and his place of citizenship.

577.730.    As a result of the interrogation, John Doe 2 missed his flight.

578.731.    After returning to the airport the next day because he missed his flight, once again, the same CBP officer interrogated John Doe 2.

579.732.    John Doe 2 has filed multiple DHS TRIP inquiries.  He has since received multiple form letters as described in paragraph 178 above and washas been assigned multiple Redress Control Numbers in connection with those letters.

580.733.    Further, shortly after John Doe 2 was designated on the federal watch list, he was subjected to FBI interrogations at his home.

581.734.    On one occasion, FBI agents interrogated John Doe 2 about where his family is from, where they currently reside, whether he knows individuals who fight in Syria, what he knows about groups including ISIS and an anti-ISIS journalist group, and whether he sent money to Syria.

582.735.    On another occasion, FBI agent James Fobert told John Doe 2, "You're an asset. We want to get information from you that can prevent people from joining ISIS."

583.736.    FBI agents offered to pay John Doe 2 in exchange for informationJohn Doe 2 agreeing to act as an informant.

133

737.   Upon information and belief, John Doe 2 remains on Defendants' federal terror watchlist.

**Plaintiff Baby Doe**
**(A Family Member of a Watchlisted Individual)**

738.   Baby Doe is a 1-year-old toddler.

739.   He was four or five-months-old when his boarding pass was first stamped with the "SSSS" designation, indicating that he was designated as a "known or suspected terrorist."

740.   While passing through airport security, he was subjected to extensive searches and pat downs.

741.   Defendants subjected Baby Doe to chemical residue testing of is person and his personal belongings were searched thoroughly, including his diapers and his diaper bag.

742.   Upon information and belief, Baby Doe received the "SSSS" designation and enhanced screening because of his relationship to his father, who is also on the federal terror watchlist.

584.

**Formatted:** Normal,  No bullets or numbering

**Plaintiffs Child Doe and Child Doe 2**
**(Family Members of a Watchlisted Individual)**

585.743.   As a result of Father Doe's watchlist designation and treatment while traveling, when Child Doe (age 7) and Child Doe 2 (age 8) travel with him, they are regularly subjected to enhanced screening, which includes TSA agents pulling them aside and searching their personal belongings.

586.744.     As a result of Father Doe's watchlist designation and treatment while traveling, Child Doe and Child Doe 2, and their family travel separately from Father Doe to avoid similar treatment.

587.745.     In early 2016, Child Doe and Child Doe 2 traveled separately from their father to avoid the travel delays and humiliation resulting from their father's watchlist designation.

588.746.     After they went through security, a TSA agent discovered their relationship to Father Doe and asked him, "Are they with you?" When Father Doe confirmed the relation, Child Doe and Child Doe 2 were forced to go through the security checkpoint again.

589.747.     When TSA agents attempted to force Child Doe to go through the metal detector, Child Doe was four-years-old at the time, he began to sob uncontrollably and clung to his father's leg.  His personal belongings were searched.

590.748.     TSA agents also forced Child Doe 2 to go through the metal detector and they searched her personal belongings.  They also subjected her to chemical residue testing. Child Doe 2, who was only six-years-old at the time, also began to sob.

**Plaintiff Hashem Nader Sehwail
(A Watchlisted Plaintiff)**

749.     Plaintiff Hashem Nader Sehwail is a United States citizen who lives in Florida.

750.     Last year, Mr. Sehwail left the United States to visit and spend time with his family in Palestine.

751.     On January 21, 2018, Mr. Sehwail appeared at Istanbul Atatürk Airport, in order to board his flight back home to the United States.

135

752.    Mr. Sehwail had previously purchased a plane ticket for a Turkish Airlines flight from Istanbul, Turkey to Hartsfield-Jackson Atlanta International Airport, and on to Miami International Airport in Florida.

753.    Mr. Sehwail presented himself at the Turkish Airlines counter with plenty of time prior to his flight, when a Turkish Airlines representative informed Mr. Sehwail that he was no longer allowed to board his flight.

754.    In response to an inquiry as to why he was being denied boarding, the Turkish Airlines representative directed Mr. Sehwail to the U.S. Embassy to obtain information as to why he is no longer permitted to board a flight back to his home in the United States.

755.    Mr. Sehwail requested information from the United States Embassy in Istanbul, Turkey regarding why he was denied boarding and being prevented from returning to his home in the United States.

756.    However, the United States Embassy informed Mr. Sehwail that they had no information regarding why he was being denied boarding.

757.    Upon information and belief, Mr. Sehwail was added to the No Fly List after he left the United States, and accordingly he was unable to board a flight to return to his home in the United States.

758.    Mr. Sehwail filed a federal lawsuit in the Middle District of Florida on January 25, 2018.  The Florida judge subsequently transferred the case to the Eastern District of Virginia.

759.    On January 30, 2018, counsel for Plaintiff provided counsel at the U.S. Department of Justice a copy of the initial complaint and Mr. Sehwail's itinerary for his February 5, 2018 flight.

760.     On February 2, 2018, counsel at the U.S. Department of Justice e-mailed Plaintiff's counsel stating that Plaintiff's flight was booked on a codeshare flight operated by a foreign carrier.  According to the U.S. DOJ, Plaintiff's flight must not be a codeshare flight operated by a foreign carrier.

761.     Mr. Sehwail did not receive any such correspondence from the U.S. Embassy prior to booking his February 5, 2018 flight back to the U.S.

762.     Notably, Mr. Sehwail could not find a flight out of Jordan that is not a codeshare flight operated by a foreign carrier.  Mr. Sehwail had no other means of leaving Jordan to return to his home in Florida.

763.     On February 5, 2018, Mr. Sehwail attempted to return to the United States for a second time.  Mr. Sehwail was scheduled to fly from Jordan to Jacksonville International Airport.

764.     When Mr. Sehwail arrived at the airport in Jordan to board his flight, he was once again denied boarding.

765.     Mr. Sehwail had already spent significant sums on cancellation and rebooking fees caused by Defendants refusal to allow him to board a flight to his country of citizenship.

766.     Mr. Sehwail made a third attempt to return to the United States and rebooked his flight from Amman, Jordan to Frankfurt, Germany, to New York, New York, to Jacksonville, Florida on February 12, 2018.

767.     After presenting himself to the airline representative at the ticket counter, Mr. Sehwail had to wait while the airline representative obtained clearance from the Department of Homeland Security for Mr. Sehwail to board his flight.

768. The airline representative was unable to print his boarding passes to the United States. Mr. Sehwail only received a boarding pass to Frankfurt and was told to obtain his boarding pass to the United States in Frankfurt, Germany.

769. When Mr. Sehwail arrived in Frankfurt, he presented himself to the airline representative at the ticket counter and had to wait once again for the airline representative to obtain clearance from the Department of Homeland Security so that Mr. Sehwail could board his flight.

770. Upon providing Mr. Sehwail his boarding pass, the airline representative drew a colored mark on the boarding pass.

771. When Mr. Sehwail arrived at Newark Liberty International Airport, he was met by two CBP officers at the gate who asked to look at his passport. The officers did not ask to look at any other passengers' passports.

772. The CBP officers escorted him to passport control.

773. Upon arriving at passport control, Mr. Sehwail was met by two more CBP officers who escorted him to a room for interrogation.

774. The CBP officers interrogated Mr. Sehwail about where his family was, what he does for a living, and where he was traveling to.

775. The CBP officers searched through Mr. Sehwail's cell phone, and upon information and belief, downloaded the data from it without his consent.

776. When Mr. Sehwail arrived at the gate to board his flight to Jacksonville, he was subjected to an additional search in public view even though he had already cleared security.

777. When Mr. Sehwail arrived in Jacksonville, he purchased a plane ticket to Fort Lauderdale.

138

778.    Upon presenting himself to the airline representative at the ticket counter, Mr. Sehwail was told that he would not be allowed to board his flight.

779.    Mr. Sehwail was forced to drive from Jacksonville to Fort Lauderdale, which added an additional five hours to his return trip to his home in the United States.

780.    On August 14, 2018, Mr. Sehwail voluntarily dismissed his Eastern District of Virginia case without prejudice, in order to join this action.

781.    Upon information and belief, Mr. Sehwail remains on the federal terror watch list.

**Plaintiff Mohamad Albadawi**
**(A Watchlisted Plaintiff)**

Formatted: Font color: Auto

~~591.~~782.    Since approximately 2013, every time Mr. Albadawi travels by air, his boarding pass is routinely stamped with the "SSSS" designation, indicating that he has been designated by Defendants as a "known or suspected terrorist."

~~592.~~783.    He is routinely unable to check in for his flights online or print his boarding pass.

~~593.~~784.    Rather Mr. Albadawi is directed each time to an airline representative, who then contacts Defendants to obtain clearance to allow him to board his flight, a process that can take a very long time.

~~594.~~785.    Once the airline representative receives clearance from Defendants allowing him to board his flight, the airline representative prints his boarding pass with the "SSSS" designation on it.

~~595.~~786.    When Mr. Albadawi scans his boarding pass at the entrance to the TSA security checkpoint, the scanner indicates a red light.

139

596.787.    Upon seeing the "SSSS" designation on his boarding pass, as protocol, TSA agents then subject Mr. Albadawi to routine, extensive and lengthy screening, an invasive pat down including a search of his groin area, an extensive search of all of his personal belongings and chemical residue testing of his person and his belongings – twice – at the TSA security checkpoint and again at the gate, in public view and in front of his travel companions.

597.788.    At the gate, the second search described in paragraph 210 above is conducted by a minimum of eight to twelve TSA agents, including a TSA supervisor after he scans his boarding pass to board his flight.

598.789.    As a result of the treatment described above, Mr. Albadawi stopped traveling with carry-on luggage.

599.790.    Oftentimes, Mr. Albadawi's name is called on the loudspeaker before he is subjected to the second search at the gate.

600.791.    Moreover, oftentimes the people that Mr. Albadawi travels with are also treated as "known or suspected terrorists" just because they are traveling with him.

601.792.    In 2013, upon arriving at an international airport in the United Arab Emirates, the airline representative at the ticketing counter was unable to print his ticket and told Mr. Albadawi that they needed to contact the United States government to obtain clearance for him to board his flight back to his home in the United States.

602.793.    The airline representative contacted Defendants, and after a delay, obtained clearance for Mr. Albadawi to board his flights to the United States and printed his boarding pass.

140

603.794.    Mr. Albadawi was then interrogated, upon information and belief, by CBP officers in public view before he was allowed to board his flight.

604.795.    Mr. Albadawi was subjected to similar treatment in connection with other international flights returning to the United States, including from the United Arab Emirates and Germany.

605.796.    As a result of the above-described treatment, Mr. Albadawi has missed several domestic and international flights.

606.797.    For example, on July 31, 2018, Mr. Albadawi was returning to the United States from a trip to Turkey. When Mr. Albadawi arrived at the ticket counter to check in for his connecting flight to Amsterdam, Netherlands, the airline representative was unable to print his boarding pass. The airline representative contacted Defendants for clearance to allow Mr. Albadawi to board his flight. Mr. Albadawi waited for more than an hour and missed his flight because the airline representative could not get clearance from Defendants to board in time.

607.798.    Eventually, Mr. Albadawi was rebooked on another flight and was allowed to board a flight to Amsterdam.

608.799.    However, when Mr. Albadawi arrived at Amsterdam Airport Schiphol, he presented himself at the ticket counter for his boarding pass. The airline representative called Defendants to obtain clearance but once again due to the delay, Mr. Albadawi missed his flight to the United States.

609.800.    After Mr. Albadawi rebooked his flight to the United States, the airline representative once again contacted Defendants, and after another lengthy delay, obtained clearance for Mr. Albadawi to board his flight to the United States. The boarding pass was

stamped with the "SSSS" designation indicating that Defendants have labeled him a "known or suspected terrorist."

610.801.    When Mr. Albadawi arrived at Hartsfield-Jackson Atlanta International Airport, he went to an Automated Passport Control kiosk at customs. His declaration form had an "X" printed on it with instructions to go to a customs agent.   Mr. Albadawi noticenoticed a CBP officer looking at him.  Mr. Albadawi approached the CBP officer and asked if he was waiting fromfor him.  The CBP officer laughed and responded, "how did you know?"

611.802.    Mr. Albadawi waited two hours for CBP to provide an approval code for him.  Because of the delay, Mr. Albadawi missed his flight to Chicago.

612.803.    After rebooking, Mr. Albadawi went to a TSA security checkpoint and experienced substantially similar enhanced screening experience as described above.

613.804.    When Mr. Albadawi finally arrived at the gate to board his rebooked flight, Mr. Albadawi was told he could not board because he did not have approval and as a result, Mr. Albadawi was forced to return to the TSA security checkpoint, go through the same invasive screening and clearance he had just completed, and obtain approval to board his flight again.

614.805.    Once again, Mr. Albadawi missed his flight and he had to rebook his flight.

615.806.    When Mr. Albadawi finally arrived at the gate to board his flight, there were several TSA agents with chemical testing machines.  Mr. Albadawi was once again subjected to enhanced and invasive screening as described above in public view.

616.807.     Because of his status on Defendants' federal terror watchlist, Mr. Albadawi missed four flights in the same trip and it took approximately 43 hours to return to the United States.

617.808.     Whenever Mr. Albadawi arrives in the United States from international trips, two CBP officers check everyone's passports as they deplane until they identify him.

618.809.     The two CBP officers then escort him from the gate to an interrogation room where he is detained and interrogated by FBI agents.  All of his personal belongings are also searched.

619.810.     Additionally, whenever Mr. Albadawi has electronics in his possession, CBP officers confiscate his electronics and upon information and belief, download the information from them, including his laptop and his cell phone, without his consent.

620.811.     As a result, Mr. Albadawi has stopped carrying his laptop when he travels.

621.812.     Upon returning from an international flight from Turkey, Mr. Albadawi was interrogated by FBI agents about Muslim religious leaders that he invited to participate in a convention that he organized.

622.813.     During many of the trips that Mr. Albadawi traveled with his wife, daughter, friends and colleagues, they were subjected to substantially similar treatment as him.

623.814.     Approximately one year ago, when Mr. Albadawi and his daughter had a connecting flight in South Carolina and attempted to go to their connecting gate, they were told they were both told to go through the TSA security checkpoint again before being allowed to board their flight.

624.815. Additionally, in the event that Mr. Albadawi purchases flight tickets for colleagues, those colleagues are also subjected to substantially similar treatment as him and interrogated about him, which has caused him to suffer from shame and embarrassment.

625.816. Approximately two years ago, when Mr. Albadawi's daughter and her husband returned from a trip to Mexico and arrived at customs, Mr. Albadawi's daughter was interrogated about whether her father was Mohammad Albadawi, how often she visits him, how far his home is from hers, and about the conversations they have with one another.

626.817. Upon information and belief, Mr. Albadawi's family and travel companions are subjected to the above described treatment because of their relation to him and because of his status on Defendants' federal terror watchlist.

627.818. Mr. Albadawi has filed multiple DHS TRIP inquiries. He has since received multiple letters as described in paragraph 128 above and was assigned multiple Redress Control Numbers in connection with those letters.

628.819. Further, shortly after Mr. Albadawi was designated on the federal watch list, his personal bank account he had open for 18 years was suddenly closed without notice or explanation of the reasons why it was closed.

629.820. Upon information and belief, Defendants disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Albadawi to his bank, and as a result, his bank account was closed without notice.

630.821. Because of the above described treatment, Mr. Albadawi is routinely humiliated in public and in front of his family, discouraged from flying, and stigmatized as a criminal because of his status on Defendants' federal terror watchlist.

822.    In August 2018, Mr. Albadawi arrived at Kansas City International Airport for a flight to Chicago where he planned to attend his daughter's wedding.

823.    Approximately 25-30 people on Mr. Albadawi's flight were guests attending his daughter's wedding.

824.    Mr. Albadawi was unable to check in for his flight online or print his boarding pass and was directed to an airline representative, who then contacted Defendants to obtain clearance to allow him to board his flight. His boarding pass was stamped with the "SSSS" designation on it.

825.    Mr. Albadawi's son, who booked his flight separately, also received a boarding pass with the "SSSS" designation on it, indicating that he was designated as a "known or suspected terrorist." Mr. Albadawi's son was subjected to the same treatment as his father.

826.    Upon information and belief, Mr. Albadawi's son received the "SSSS" designation on his boarding pass due to his relationship with his father and because he was traveling with his father.

827.    When Mr. Albadawi and his son scanned their boarding passes at the entrance to the TSA security checkpoint, the scanner indicated a red light for each, and, as protocol, TSA agents then subjected Mr. Albadawi and his son to routine, extensive and lengthy screenings, an invasive pat down including a search of their groin area, an extensive search of all of their personal belongings and chemical residue testing of their person and their belongings – twice – at the TSA security checkpoint and again at the gate, in public view and in front of their travel companions.

828. When Mr. Albadawi's travel companions arrived at the gate, approximately ten wedding guests were randomly selected for an additional search at the gate and in public view, despite having cleared the TSA security checkpoint with no issues.

829. The wedding guests were subjected to an extensive search of all of their personal belongings and chemical residue testing of their person and belongings.

830. Since this incident, many of his family members and his friends have arranged to fly on completely separate flights, even if traveling to the same destination as Mr. Albadawi, in order to avoid enhanced screening and humiliation by Defendants.

831. Mr. Albadawi felt ashamed and humiliated in front of his friends and family because they were treated as "known or suspected terrorists" because of their relationship or association with him, and because they were traveling with him.

631.832. Upon information and belief, Mr. Albadawi remains on the federal terror watch list.

**Plaintiffs Hicham Hall and Faatimah Knight**
**(Watchlisted Plaintiffs)**

833. Plaintiff Hicham Hall ("Mr. Hall") and Plaintiff Faatimah Knight's ("Mrs. Knight") are husband and wife (collectively referred to as "Hall Family").

834. Since approximately 2014, every time Mr. Hall travels by air, his boarding pass is routinely stamped with the "SSSS" designation, indicating that he has been designated by Defendants as a "known or suspected terrorist."

835. Since early 2018, after Mrs. Knight married Mr. Hall, every time Mrs. Knight travels by air, her boarding pass is routinely stamped with the "SSSS" designation, indicating that she has been designated by Defendants as a "known or suspected terrorist." Upon

146

information and belief, Mrs. Knight is subjected to the treatment described above and was added to Defendants' federal terror watchlist because of her association and relations to her husband, Mr. Hall.

836.    The Hall Family is routinely unable to check in for their flights online or print their boarding passes at the airport kiosk.

837.    Instead, the Hall Family is directed each time to an airline representative, who then contacts Defendants to obtain clearance to allow them to board their flight, a process that can take a very long time.

838.    Once the airline representative receives clearance from Defendants allowing them to board their flight, the airline representative prints their boarding passes with the "SSSS" designation on it.

839.    When the Hall Family scans their boarding passes at the entrance to the TSA security checkpoint, the scanner indicates a red light.

840.    Upon seeing the "SSSS" designation on their boarding passes, as protocol, TSA agents then subject the Hall Family to routine, extensive and lengthy screening, an invasive pat down including a search of their groin area, an extensive search of all of their personal belongings and chemical residue testing of their person and their belongings – twice – at the TSA security checkpoint and again at the gate, in public view and in front of their travel companions.

841.    Often, whenever the Hall Family arrives in the United States from international trips, two CBP officers check everyone's passports as they deplane until they identify them.

842.    The two CBP officers then escort them from the gate to an interrogation room where they are detained and interrogated by FBI agents.  All of their personal belongings are also searched.

843.    Sometimes, whenever the Hall Family arrives in the United States from international trips, upon scanning their passports in an Automated Passport Control kiosk at customs, their declaration forms have an "X" printed on them with instructions to go to a customs agent.

844.    Additionally, whenever the Hall Family has electronics in their possession, CBP officers confiscate their electronics and upon information and belief, download the information from them, including their laptop and their cell phone, without their consent.

845.    In 2014, upon arriving at an international airport in Morocco, the airline representative at the ticketing counter was unable to print his boarding pass and told Mr. Hall that they needed to contact the United States government to obtain clearance for him to board his flight back to his home in the United States.

846.    The airline representative contacted Defendants, and after a delay, obtained clearance for Mr. Hall to board his flights to the United States and printed his boarding pass.

847.    However, due to the delay, Mr. Hall missed his flight and had to spend a significant sum of money to rebook his flight.

848.    Upon arrival at John F. Kennedy International Airport, the pilot made an announcement on the loudspeaker asking all passengers to present their passports to the two officers waiting at the gate upon deplaning.

849.    Upon identifying Mr. Hall, the officers announced "We got him." This occurred in public view and Mr. Hall was humiliated because he was being treated like a criminal in front of the rest of the passengers.

850.    The CBP officers escorted Mr. Hall to passport control and into a private room where he was detained and interrogated.

851.    Mr. Hall was interrogated about the location and purpose of his trip, why he chose to study Arabic in Morocco, and who he studied with.

852.    CBP officers made copies of Mr. Hall's Arabic language books.

853.    CBP officers also confiscated Mr. Hall's cell phone and laptop and took them into a private room. Upon information and belief, CPB officers downloaded the information from him, without his consent.

854.    On August 4, 2018, the Hall Family arrived at Washington Dulles International Airport for an international trip to Morocco.

855.    The Hall Family was not able to check-in online or at the passport kiosk. Instead, they were directed to an airline representative for further assistance.

856.    At the ticket counter, after a 30-40 minute delay, and after the airline representative obtained clearance from Defendants, the Hall Family received their boarding passes. Mr. Hall's boarding pass was stamped with the "SSSS" designation, indicating that he is designated as a "known or suspected" terrorist.

857.    Mrs. Knight's boarding pass was also stamped with the "SSSS" designation, indicating that she is designated as a "known or suspected" terrorist.

858.    Upon information and belief, Mr. Hall received a boarding pass with the "SSSS" designation because he was traveling with Mrs. Knight.

859.   Upon information and belief, Mrs. Knight received a boarding pass with the "SSSS" designation because she was traveling with Mr. Hall.

860.   Upon seeing the "SSSS" designation on their boarding passes, as protocol, TSA agents then subjected the Hall family to routine, extensive and lengthy screening, an invasive pat down, an extensive search of all of their personal belongings and chemical residue testing of their persons and belongings at the TSA security checkpoint, and in public view.

861.   When the Hall Family finally arrived at the gate, several TSA agents were waiting for them to arrive. The TSA agents had with them a cart with chemical testing machines.

862.   At the gate and before being allowed to board, in public view, the Hall Family was once again subjected to an invasive and lengthy pat down, all of their personal belongings were searched again, and they and their belongings were subjected to another round of chemical residue testing despite the fact that they had just cleared security with no issues at the TSA security checkpoint.

863.   Moreover, TSA agents took photographs of the Hall Family before they were allowed to board their plane.

864.   The Hall Family was mortified that they were treated like criminals in front of the same passengers that they were going to board the flight with.

865.   Mr. Hall was also ashamed and embarrassed that his wife was subjected to humiliating treatment as a result of her traveling with him.

866.   Mrs. Knight was ashamed and embarrassed that her husband was subjected to humiliating treatment as a result of traveling with her.

867. Upon information and belief, Mr. Hall and travel companions are subjected to the above described treatment because of their relation and association with him, because they travel with him, and because of his status on Defendants' federal terror watchlist.

868. Upon information and belief, Mrs. Knight and travel companions are subjected to the above described treatment because of their relation and association with her, because they travel with her, and because of her status on Defendants' federal terror watchlist.

869. Mr. Hall is ashamed and humiliated that his wife witnesses him being treated by Defendants as a criminal and a "known or suspected terrorist." Moreover, Mr. Hall is ashamed and humiliated that his travel companions are routinely made to suffer just because they are traveling with him.

870. Mrs. Knight is ashamed and humiliated that her husband witnesses her being treated by Defendants as a criminal and a "known or suspected terrorist." Moreover, Mrs. Knight is ashamed and humiliated that her travel companions are routinely made to suffer just because they are traveling with her.

871. Because of the above described treatment, the Hall Family is routinely humiliated in public and in front of their family, discouraged from flying, and stigmatized as a criminal because of their status on Defendants' federal terror watchlist.

872. The Hall Family is routinely subjected to FBI interrogations because of their watch list status.

873. In 2016, the Hall Family returned from an international trip to Germany when CBP officers escorted them from the gate to an interrogation room where FBI agents were waiting to interrogate them.

874. FBI agents told Mr. Hall they would resolve his travel issues and remove him from the "list" if he agreed to become an informant.

875. In January of 2017, the Hall Family arrived at Washington Dulles International Airport on their way back from an international trip from Tunisia.

876. When the Hall Family went through customs and inserted their passports at the kiosk, the kiosk displayed a red "X" and they were instructed to proceed to a CBP officer for further processing.

877. CBP officers escorted the Hall Family to secondary inspection where they were taken to a private room for interrogation.

878. Mrs. Knight was interrogated about the purpose of her trip, the length of their trip, what she and her husband studied in Tunisia, why she chose to study Arabic in Tunisia, what she was studying regarding religion, and how she and her husband spend their days in the United States.

879. Mrs. Knight was then escorted to a waiting area while FBI agents interrogated Mr. Hall for almost one hour.

880. As a result of electronic searches caused by the Hall Family's watch list status, Mr. Hall's laptop was destroyed.

881. In January or February 2015, Mr. Hall was returning from an international trip to Morocco. CBP Officers escorted Mr. Hall to an interrogation room.

882. CBP officers seized Mr. Hall's laptop and took it into a separate room. And upon information and belief, Defendants searched and copied the data and contents of his laptop.

152

883.    As a result of tampering with his laptop, Defendants corrupted his laptop and Mr. Hall was forced to purchase a new laptop.

884.    As a result, Mr. Hall has stopped carrying his laptop when he travels.

885.    Upon information and belief, Mr. Hall remains on the federal terror watch list.

886.    Upon information and belief, Mrs. Knight remains on the federal terror watch list.

**Plaintiff Khalil Thadi**
**(A Watchlisted Plaintiff)**

632.887.    In March 2017, Mr. Thadi arrived at Joint Base Myer-Henderson Hall to provide a carpet estimate at the request of a contractor.

633.888.    Mr. Thadi completed the appropriate form to go inside the base. After submitting the form, security officers pulled Mr. Thadi aside for questioning. Security instructed Mr. Thadi to get out of his car.

634.889.    Mr. Thadi was questioned about the purpose of his visit. He and his car were also photographed.   This process lasted for 45 minutes. Mr. Thadi was ultimately denied entry to the base.

635.890.    Upon information and belief, Mr. Thadi was denied entry to Joint Base Myer-Henderson Hall because of his status on the watchlist.  As a consequence, Mr. Thadi was unable to provide a carpet estimate to the contractor; thus, he was not awarded a subcontract and lost out on an important business opportunity.

636.891.    Since 2004, every time Mr. Thadi travels he is subjected to substantially similar treatment.  His boarding passes for his flights are routinely stamped with the "SSSS"

153

designation, indicating that he has been designated by Defendants as a "known or suspected terrorist."

637.892.    He is routinely unable to check in for his flights online or print his boarding pass.

638.893.    Instead, Mr. Thadi is directed each time to an airline representative, who then contacts Defendants to obtain clearance to allow him to board his flight, a process that can take a very long time. Once the airline representative receives clearance from Defendants allowing him to board his flight, the airline representative prints his boarding pass with the "SSSS" designation on it.

639.894.    Upon seeing the "SSSS" designation on his boarding pass, as protocol, TSA agents then subject Mr. Thadi to routine, extensive and lengthy screening, an invasive pat down including a search of his groin area, an extensive search of all of his personal belongings and chemical residue testing of his person and his belongings at the TSA security checkpoint in public view.

640.895.    Whenever Mr. Thadi returns from an international flight into the United States, he also experiences substantially similar mistreatment each time.

641.896.    Whenever Mr. Thadi arrives in the United States, he is routinely escorted to secondary inspection where he is detained and subjected to lengthy interrogations by CBP officers.

642.897.    The CBP officers search his luggage and seize and search his electronics.  Upon information and belief, Defendants downloaded and made copies of the information on his electronic devices without his consent.

643.898.    Because of the above-described screening experiences, Mr. Thadi has missed multiple flights.

644.899.    Since 2004, the FBI have repeatedly interrogated Mr. Thadi at his home about a variety of issues including: the purpose of his trips to Morocco, when and where he and his family went, and whether individuals coerced Mr. Thadi's family to leave the United States. Agents have also interrogated Mr. Thadi about specific individuals.

645.900.    Mr. Thadi has twice been subjected to irregularly long traffic stops. When Mr. Thadi is pulled over by police, he is told that his name matches with a name within a list accessed by officers and is detained for long periods of time. Upon information and belief, Mr. Thadi's long traffic stops occurred because of his status on Defendants' federal terror watchlist.

646.901.    Mr. Thadi filed a redress request through DHS TRIP. On March 13, 2018, Mr. Thadi received a letter, as described in paragraph 178 above and was assigned a Redress Control Number.

647.902.    As a result of being placed on the federal terror watchlist, Mr. Thadi has been discouraged from traveling in order to avoid the lengthy delays, enhanced screening and interrogations by Defendants and the humiliation and stigma associated with the above described screening experiences.

903.    Upon information and belief, Mr. Thadi remains on the federal terror watchlist.

648.

Formatted: Indent: Left: 0.5", No bullets or

**Plaintiff Esmaeel Paryavi**
**(A Watchlisted Plaintiff)**

~~649.~~904.	Mr. Esameel Paryavi ("Mr. E. Paryavi") is the son of Plaintiff Mohammad Paryavi.  Upon information and belief, Defendants have placed Mr. E. Paryavi on the federal terror watchlist because of his relation to Plaintiff Mohammad Paryavi.

~~650.~~905.	On April 22, 2018, Mr. E. Paryavi was departing El Dorado International Airport in Bogota, Columbia, on his way back from an international trip to Columbia with friends.

~~651.~~906.	He was prevented from checking in online or at the kiosk in the airport. Rather, he was directed to an airline representative for further assistance.

~~652.~~907.	The airline representative called Defendants in order to obtain clearance to print his boarding pass and allow him to board his flight.

~~653.~~908.	After having passed through the security checkpoint without incident, Columbian agents pulled Mr. E. Paryavi aside before he was told that he had been randomly selected for additional screening.  In public view and in front of his friends, Mr. E. Paryavi was subjected to a pat down and a search of his personal belongings.

~~654.~~909.	Mr. E. Paryavi was a Global Entry Holder. Once he arrived at customs at Dallas/Fort Worth International Airport, he scanned his fingerprints at a kiosk. He received a receipt marked with an X.

~~655.~~910.	Mr. E. Paryavi presented the receipt to a CBP officer, who explained that he had been randomly selected for secondary screening.  Mr. E. Paryavi was escorted to a back waiting area where he was met by two other CBP officers who escorted him to another room.

156

656.911.    Mr. E. Paryavi's personal belongings were searched. The CBP officers required him to count the money in his wallet. They searched through photos in Mr. E. Paryavi's cell phone and made note of the model number and specifications of the phone.

657.912.    The CBP officers required Mr. E. Paryavi to fill out a worksheet with information about his place of residence, his place of work, his date of birth, and other information.

658.913.    A CBP officer also required Mr. E. Paryavi to provide contact information for his roommates, the friends he traveled with to Columbia, and immediate family members. He was also required to provide the nationality, current place of residence, and date of birth for all immediate family members.

659.914.    Mr. E. Paryavi was interrogated for approximately one hour.

660.915.    Five days later, Mr. E. Paryavi received an email explaining that his Global Entry had been revoked.

661.916.    Upon information and belief, Mr. E. Paryavi's Global Entry was revoked because of his status on Defendants' federal terror watchlist.

662.917.    Moreover, upon information and belief, Mr. E. Paryavi's *TSA Pre*✓ ® status was has also been revoked, because his boarding passes no longer contain the words, "TSA Precheck."

663.918.    Upon information and belief, Mr. E. Paryavi's *TSA Pre*✓ ® was revoked because of his status on Defendants' federal terror watchlist.

664.919.    Ever since that trip, when Mr. E. Paryavi travels by air, his boarding pass is routinely stamped with the "SSSS" designation, indicating that he has been designated by Defendants as a "known or suspected terrorist."

157

665.920.    He is routinely unable to check in online or print his boarding pass.

666.921.    Rather, Mr. E. Paryavi is routinely directed to an airline representative, who then contacts Defendants to obtain clearance to allow him to board his flight, a process that can take a very long time.

667.922.    Once the airline representative receives clearance from Defendants allowing him to board his flight, the airline representative prints his boarding pass with the "SSSS" designation on it.

668.923.    Upon seeing the "SSSS" designation on his boarding pass, as protocol, TSA agents then subject Mr. E. Paryavi to routine, extensive and lengthy screening, an invasive pat down, an extensive search of all of his personal belongings and chemical residue testing of his person and his belongings at the TSA security checkpoint, in public view and in front of his travel companions.  Mr. E. Paryavi is ashamed and humiliated that his friends witness him being treated by Defendants as a criminal and a "known or suspected terrorist." Moreover, Mr. E. Paryavi is ashamed and humiliated that his travel companions are routinely made to suffer just because they are traveling with him.

669.924.    On one occasion, while traveling domestically, an agent at the gate asked Mr. E. Paryavi to approach the counter and notified him that he needed to verify his documentation. The agent told Mr. E. Paryavi that the system required his passport. However, because it was a domestic flight, Mr. E. Paryavi did not have his passport with him. The agent then called a supervisor. Eventually, the agent told Mr. E. Paryavi he would be able to board his flight. When Mr. E. Paryavi attempted to board, the system rejected his boarding pass. Again, an agent spoke with a supervisor to obtain clearance for him to board his flight.

670.925.    On or about May 28, 2018, Mr. E. Paryavi and his friends were stopped at a US-Mexico port of entry on his way into the United States. They were directed to pull over and turn off the car ignition.  CBP officers confiscated the passports of Mr. E. Paryavi and his travel companions.  A yellow sticker was placed in Mr. E. Paryavi's passport.

671.926.    After two hours of waiting in the car, a CBP officer escorted Mr. E. Paryavi to a room where he was interrogated about his travel history, his occupation, and his family.

672.927.    The CBP officer searched through Mr. E. Paryavi's personal belongings and his photos on his cell phone.

673.928.    Mr. E. Paryavi filed a DHS Trip inquiry. He received a form letter as described in paragraph 178response and washas been assigned a Redress Control Number in connection with that latterletter.

674.929.    Upon information and belief, Mr. Paryavi remains on the federal terror watch list.

**Plaintiff Faraz Siddiqui**
**(A Watchlisted Plaintiff)**

675.930.    Since approximately 2010, every time Mr. Siddiqui travels by air, his boarding pass is routinely stamped with the "SSSS" designation, indicating that he has been designated by Defendants as a "known or suspected terrorist."

676.931.    He is routinely unable to check in for his flights online or print his boarding pass.

159

677.932.    Rather Mr. Siddiqui is directed each time to an airline representative, who then contacts Defendants to obtain clearance to allow him to board his flight, a process that can take a very long time.

678.933.    Once the airline representative receives clearance from Defendants allowing him to board his flight, the airline representative prints his boarding pass with the "SSSS" designation on it.

679.934.    When Mr. Siddiqui scans his boarding pass at the entrance to the TSA security checkpoint, the scanner indicates a red light.

680.935.    Upon seeing the "SSSS" designation on his boarding pass, as protocol, TSA agents then subject Mr. Siddiqui to routine, extensive and lengthy screening, an invasive pat down, an extensive search of all of his personal belongings and chemical residue testing of his person and his belongings – twice – at the TSA security checkpoint and again at the gate, in public view and in front of his travel companions.

681.936.    Whenever Mr. Siddiqui arrives in the United States from international trips, two CBP officers check everyone's passports as they deplane until they identify him.

682.937.    The two CBP officers then escort him from the gate to an interrogation room where he is detained and interrogated by FBI agents or CBP officers.  All of his personal belongings are also searched.

683.938.    Additionally, whenever Mr. Siddiqui has electronics in his possession, CBP officers confiscate his electronics and upon information and belief, download the information from them, including his laptop and his cell phone, without his consent.

684.939.    Upon returning on a flight from Saudi Arabia, Mr. Siddiqui was interrogated about whether he ever crossed the border from Saudi Arabia to Yemen,

160

whether he knew anyone who worked for Al Qaeda, and what his opinions are on foreign matters.

685.940. During many of the trips that Mr. Siddiqui traveled with his wife and children, they were subjected to substantially similar treatment as him.

686.941. On one occasion, Mr. Siddiqui's two-months old daughter was screened.

687.942. In order to avoid being treated as "known or suspected terrorists" when they travel, Mr. Siddiqui's wife and children now travel separately from Mr. Siddiqui.

688.943. On more than one occasion, FBI agents attempted to interrogate Mr. Siddiqui in his home. Shortly after Mr. Siddiqui refused to speak with FBI agents without an attorney present, FBI agents interrogated a relative of Mr. Siddiqui. Upon information and belief, Mr. Siddiqui's relative was subjected to an FBI interrogation because of his relation to Mr. Siddiqui and due to Mr. Siddiqui's status on Defendants' federal terror watchlist.

689.944. Further, shortly after Mr. Siddiqui was designated on the federal watchlist, his personal bank accounts were suddenly closed without notice or explanation of the reasons why they were closed.

690.945. Upon information and belief, Defendants disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Siddiqui to his bank, and as a result, his bank accounts were closed without notice.

691.946. Relatives who share a last name with Mr. Siddiqui also had personal bank accounts suddenly closed without notice or explanation of the reasons why they were closed. Upon information and belief, this occurred because of their relation to Mr. Siddiqui and his status on Defendants' federal terror watchlist.

692.947.　Mr. Siddiqui has filed multiple DHS TRIP inquiries.　He has since received multiple form letters as described in paragraph 178 above and washas been assigned multiple Redress Control Numbers in connection with those letters.

693.948.　As a result of his watchlist designation and his treatment while traveling, Mr. Siddiqui is unable to apply for jobs which require him to travel.

694.949.　Further, Mr. Siddiqui desires to return to Saudi Arabia for Hajj, a religious obligation for Muslims, but has not done so out of fear of the treatment he would receive by Defendants.

695.950.　Mr. Siddiqui has considered permanently moving his family outside the United States to avoid the treatment he receives as a result of his watchlist designation.

696.951.　Upon information and belief, Mr. Siddiqui remains on the federal terror watchlist.

**Plaintiff Zijad Bosnic**
**(A Watchlisted Plaintiff)**

952.　Plaintiff Zijad Bosnic (hereinafter "Mr. Bosnic") was originally born in Bosnia in 1972 and moved to the United States in 1997.　Thereafter, Mr. Bosnic became a United States citizen.

953.　Mr. Bosnic is a commercial truck driver.　He has been married for twenty-two years. Together, Mr. Bosnic and his wife have three children, all of whom are United States citizens.

954.　Mr. Bosnic lives in Jacksonville, Florida, where he owns his home.

955.     Because Mr. Bosnic's wife and children live in Bosnia, he regularly travels from the United States to Bosnia to spend time with his family.

956.     On March 1, 2017, Mr. Bosnic appeared at Sarajevo International Airport in order to board his flight back home to the United States.

957.     Mr. Bosnic had previously purchased a plane ticket for a Turkish Airlines flight to Istanbul, Turkey, and he was scheduled to fly to John F. Kennedy International Airport, and on to Jacksonville International Airport in Florida.

958.     Mr. Bosnic presented himself at the Turkish Airlines counter with plenty of time prior to his flight.

959.     When Mr. Bosnic first arrived at the ticketing counter, the airline representative printed his boarding passes and presented them to him.

960.     However, as the Turkish Airlines representative started to tag his luggage, the representative informed Mr. Bosnic that he was no longer allowed to board his flight.

961.     The Turkish Airlines representative requested that Mr. Bosnic return his boarding passes, and his luggage was returned to him.

962.     In response to an inquiry as to why he was being denied boarding, the Turkish Airlines representative directed Mr. Bosnic to the U.S. Embassy to obtain information as to why he is no longer permitted to board a flight back to his home in the United States.

963.     The following morning, Mr. Bosnic went to the United States Embassy in Sarajevo, Bosnia to inquire regarding why he was denied boarding and being prevented from returning to his home in the United States.

964.    The United States Embassy informed Mr. Bosnic that they had no information regarding why he was being denied boarding.  However, he was advised to fill out a DHS TRIP complaint.

965.    Mr. Bosnic immediately filed a DHS TRIP complaint.

966.    Approximately one week after being denied boarding at the airport, two men who identified themselves as being employed by the United States Embassy contacted Mr. Bosnic's brother and requested that Mr. Bosnic return to the Embassy.  They advised Mr. Bosnic's brother that they would help Mr. Bosnic return to his home in the United States.

967.    The two men did not leave contact information.

968.    Mr. Bosnic's brother contacted Mr. Bosnic, relayed what transpired, and told him to return to the United States Embassy.

969.    After arriving at the United States Embassy, Mr. Bosnic was interviewed by two FBI agents, including FBI Agent Lopez.

970.    During the interview, the FBI agents asked Mr. Bosnic a series of routine questions, including his name, where he worked, and what he did for a living.

971.    The FBI agents interrogated Mr. Bosnic regarding whether he was a terrorist, whether he believed that ISIS is the reason that he can't fly, and whether he believed in terrorism.

972.    The FBI agents advised Mr. Bosnic they were not certain why he could not fly, but that they would help him fly again.

973.    Nearly two months later, on April 21, 2017, Mr. Bosnic received an email from DHS TRIP stating they had received his travel inquiry form and identity documentation, and from that point on he could continue to check the status of his inquiry online.

164

974.    Approximately three months after being denied boarding and from returning to his home in the United States, Mr. Bosnic again arrived at Sarajevo International Airport in an attempt to board another flight home. He reserved a ticket that connected in Turkey on his way back to his home in Jacksonville, Florida.

975.    This time, Turkish Airlines personnel were unable to check Mr. Bosnic in for his flight and did not issue him a boarding pass.

976.    On or before May 22, 2017, Mr. Bosnic checked the status of his DHS TRIP complaint on the DHS TRIP website provided. The website indicated that Mr. Bosnic was missing documents that he had already provided when he initially filed his complaint on March 3, 2017.

977.    Mr. Bosnic immediately emailed DHS TRIP and requested that they not delay his complaint process any further and attached the alleged missing documents.

978.    On May 24, 2017, DHS TRIP emailed Mr. Bosnic informing him they had made a final determination of his case.  In the same email, a letter dated May 18, 2017 was attached, which confirmed that Mr. Bosnic was on Defendants' No Fly List.

979.    On or about June 19, 2017, TSA issued a letter that states in part "(TSA) has determined that you may pose a security threat warranting the immediate revocation of your Transportation Worker Identification Credential (TWIC) and unescorted access to secure areas.  The letter further stated that "your TWIC has been suspended until this matter is resolved."

980.    The TSA determination to suspend Mr. Bosnic's TWIC® card, as stated in the letter, was made "for reasons set forth in 49 C.F.R. § 1572.107"

981.    Section (a) of 49 C.F.R. § 1572.107 provides that "TSA may determine that an applicant poses a security threat based on a search of … (2) Terrorist watchlists and related databases" and "(3) Any other databases relevant to determining whether an applicant poses, or is suspected of posing, a security threat, or that confirm an applicant's identity."

982.    Upon information and belief, Mr. Bosnic's TWIC® card was suspended due to his placement on the federal terror watch list.

983.    Mr. Bosnic is a truck driver by trade and much of his livelihood derives from driving to and from ports and other areas which require a TWIC® card.

984.    On June 14, 2017, Mr. Bosnic received a one-time waiver that allowed him to finally return home in the United States.

985.    Approximately one month later Mr. Bosnic arrived at Jacksonville International Airport for another international trip to Bosnia.

986.    He was once again unable to check-in online or at the airport kiosk.  Rather, he was directed to an airline representative for further assistance.

987.    After presenting himself to the airline representative at the ticket counter, Mr. Bosnic had to wait approximately 40 minutes before the airline representative obtained clearance for Mr. Bosnic to board his flight.

988.    His boarding pass was stamped with the "SSSS" designation, indicating that he was still designated as a "known or suspected terrorist."

989.    Once Mr. Bosnic arrived at the TSA security checkpoint, he provided his boarding pass and identification documents to the TSA agent stationed at the entrance to the TSA security checkpoint.

166

990. The boarding pass scanner indicated a red light when Mr. Bosnic's boarding pass was scanned.

991. Mr. Bosnic was escorted to a different line than the other travelers passing through the TSA security checkpoint and subjected to enhanced screening.

992. Mr. Bosnic was subjected to an extensive and lengthy screening, an invasive pat down including a search of his groin area, an extensive search of all his personal belongings and chemical residue testing of his person and his belongings in public view at the TSA checkpoint.

993. When Mr. Bosnic arrived at the gate, he was subjected to an additional search, which included a pat down and search of all his personal belongings, despite the fact that he had just cleared security with no issues at the TSA security checkpoint.

994. In August 2017, Mr. Bosnic arrived at Sarajevo International Airport for his return trip to the United States.

995. After presenting himself to the airline representative at the ticket counter, Mr. Bosnic had to wait approximately 40 minutes before the airline representative obtained clearance for Mr. Bosnic to board his flight.

996. The airline representative was only able to print his boarding pass to Vienna, Austria. However, she was unable to print Mr. Bosnic's boarding pass to the United States.

997. When Mr. Bosnic arrived in Austria, after presenting himself to the airline representative at the ticket counter, Mr. Bosnic had to wait approximately 40 minutes before the airline representative obtained clearance for Mr. Bosnic to board his flight.

998. His boarding pass was stamped with the "SSSS" designation, indicating that he was designated as a "known or suspected terrorist."

999. He was subjected to extra screening which included an invasive and lengthy search of his person and belongings.

1000. When Mr. Bosnic arrived at passport control at Dulles International Airport, he was questioned about whether he boarded any flights to the Middle East, whether he went to Syria, Pakistan, Afghanistan, or other Muslim-majority countries, whether he was ever a member of the military, whether he is a member of any movements, and whether he was ever arrested in Bosnia or the United States.

1001. Mr. Bosnic was subjected to an additional searched of his person and belongings at the gate before he was allowed to board his flight to Jacksonville.

1002. His boarding pass was stamped with the "SSSS" designation, indicating that he was designated as a "known or suspected terrorist."

1003. Mr. Bosnic previously filed his claims in the Middle District of Florida; he voluntarily dismissed that action without prejudice on August 17, 2018 in order to consolidate his claims with this case.

1004. Upon information and belief, Mr. Bosnic remains on the federal terror watchlist.

**COUNT I**

**FAILURE TO PROVIDE A HEARING AND PRE-DEPRIVATION NOTICE, OR ALTERNATIVELY, POST-DEPRIVATION NOTICE IN VIOLATION OF THE FIFTH AMENDMENT RIGHT TO PROCEDURAL DUE PROCESS**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

697.1005. The foregoing allegations are realleged and incorporated herein.

698.1006. Defendants have placed Plaintiffs' names in the Terrorist Screening Database.

699.1007.    Defendants have placed Plaintiffs' names in TSA and CBP watchlists generated by high-risk targeting rules, such as the Quiet Skies Selectee List.

700.1008.    Plaintiffs have experienced economic, reputational, and liberty harms due to Defendants' placement of their names on the watchlist.

701.1009.    Each of the Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals learned that he or she was placed on the federal terrorist watchlist subsequent to being added on the federal terrorist watchlist and seek to challenge such placement.

702.1010.    Plaintiffs' experiences are substantially similar to thousands of other Americans and foreign nationals on the No Fly, Selectee, Expanded Selectee, TSDB, and Quiet Skies Selectee, and other rules-based terrorist screening lists.  Plaintiffs experiences are indictive of Defendants' current practices and policies.  Accordingly, Plaintiffs bring this procedural due process challenge both as-applied to themselves, and facially to the category of watchlisted persons who have not been arrested, charged, or convicted of a terrorism-related offense.

703.1011.    Defendants' actions as described above in refusing to provide Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals with any notice of their placement has deprived Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals of constitutionally protected liberty interests.

704.1012.    Defendants' actions in nominating Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals to the federal terrorist watchlist blatantly violate the requirement that "nominations must not be solely based on

race, ethnicity, national origin, religious affiliation, or First Amendment protected activities." 49 U.S.C. § 114(h)(3).

705.1013.    Even when a nomination is not "solely" based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities, Defendants consider and rely on those protected traits as factors supporting placement on federal terrorist watchlists.  Defendants considered and relied upon one or more of these impermissible factors in placing Plaintiffs and similarly American citizens, lawful permanent residents, and foreign nationals on federal terrorist watchlists.

706.1014.    Defendants who contributed to the placement of Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist knew that their actions violated clearly established federal and constitutional law.

707.1015.    Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals have a liberty interest in traveling free from unreasonable burdens within, to, and from the United States, including through land border crossings and over U.S. air space.  Defendants have deprived Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals of their right to travel on equal terms as other travelers.  Defendants have deprived Plaintiffs and other similarly situated American citizens of their liberty interest in traveling free from unreasonable burdens.

708.1016.    Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals have a right to be free from false government stigmatization as individuals who are "known or suspected to be" terrorists, or who are otherwise associated with terrorist activity.  Defendants have officially imposed on Plaintiffs and

similarly situated American citizens, lawful permanent residents, and foreign nationals the stigmatizing label of "known or suspected terrorists" without a constitutionally adequate legal mechanism for doing so. Defendants have ~~them~~then disseminated the stigmatizing label to foreign, state and local government entities and private partners.

~~709.~~1017.    Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals have a liberty interest in nonattainder (~~ie.~~i.e. the interest against being singled out for punishment without trial). Defendants' actions have singled out Plaintiffs and others similarly situated for punishments that include, but are not limited to, inability to travel by air, unreasonable burdens placed upon travel, false association with a list of individuals suspected of terrorism, handcuffing and detention as "prisoners," deprivation of the Second Amendment right to bear arms, unreasonable searches and seizures of electronic devices, and discriminatory targeting on the basis of race, ethnicity, national origin, and religion.

~~710.~~1018.    Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals have been burdened or prevented from boarding ~~on~~ commercial flights, have been burdened or prevented from entering the United States at land border crossings, have had their bank accounts closed, have been prevented from making wire transfers at financial institutions, have had their citizenship applications delayed indefinitely due to an "FBI name check," and have lost lucrative economic opportunities, credentials, and employment. Plaintiffs have suffered from other forms of financial harm.

~~711.~~1019.    All citizens, lawful permanent residents, and foreign nationals adversely affected by the terrorist watchlist are entitled to a constitutionally adequate legal mechanism that affords them full notice of the reasons and bases for their placement and a

meaningful opportunity to contest their continued inclusion. Yet Defendants have failed to provide the most basic ingredients of due process, which is notice and a meaningful opportunity to be heard.

712.1020.    Defendants shield their watchlist decisions from review, and do not provide Plaintiffs or any similarly affected citizens an impartial tribunal which can substantively evaluate the propriety of (a) the Defendants' watchlist inclusion standards, (b) Defendants' adherence to their own standards, (c) the facts purportedly justifying Plaintiffs' placement on the TSDB, classification within the TSDB, or placement on other federal terrorist watchlists, (d) the lack of opportunity to offer any clarification or correction of those facts by Plaintiffs, or (e) the constitutionality of Defendants' nomination or redress processes.

713.1021.    By imposing on Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals the stigmatizing label of "known or suspected terrorists" or "terrorists," and by failing to provide Plaintiffs and others similarly situated with a constitutionally adequate legal mechanism to challenge that designation, Defendants have deprived Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals of their protected liberty interests.

714.1022.    Defendants knew at the time they acted unlawfully that Supreme Court precedent required that, whenever a citizen is deprived of a liberty interest, the federal government must at least provide the deprived with some form of notice that a deprivation occurred.

715.1023.    Defendants have violated the constitutional rights of Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals

without affording them due process of law ~~and,~~ Defendants will continue to do so into the future if Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals are not afforded the relief demanded below.

~~716.~~1024.     By placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist, Defendants have caused them an actual, imminent and irreparable injury that cannot be undone through monetary remedies.

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT II**

**DEPRIVATION OF PROTECTED LIBERTIES IN VIOLATION OF FIFTH AMENDMENT
RIGHT TO SUBSTANTIVE DUE PROCESS
(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

~~717.~~1025.    The foregoing allegations are realleged and incorporated herein.

~~718.~~1026.    Substantive due process protects Americans' freedom from government action which infringes upon their fundamental constitutional rights. Government action which infringes upon these rights cannot be arbitrary and must be narrowly tailored to serve a compelling government interest.

~~719.~~1027.    Defendants have placed Plaintiffs on the watchlist despite lacking any reasonable suspicion that Plaintiffs are known, suspected, or potential terrorists.

~~720.~~1028.    Plaintiffs' experience is substantially similar to thousands of other Americans and foreign nationals on the watchlist and reflects Defendants' current practices and policies.

~~721.~~1029.    Defendants' actions in nominating Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals to the federal terrorist watchlist blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities." 49 U.S.C. § 114(h)(3).

~~722.~~1030.    Even when a nomination is not "solely" based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities, Defendants consider and rely on those protected traits as factors supporting placement on the federal terrorist watchlist.    Defendants considered and relied upon one or more of these

174

impermissible factors in placing Plaintiffs and similarly American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist.

723.1031.    Defendants' consideration of and reliance on the suspect classifications of race, ethnicity, national origin, religious affiliation, as well as First Amendment protected activities, throughout the federal terrorist watchlisting system has placed an undue burden on Plaintiffs' fundamental rights to be free from discrimination.

724.1032.    Defendants' dissemination of the watchlist to the gun market in order to hinder and preclude Plaintiffs' and similarly situated American citizens, lawful permanent residents, and foreign nationals from purchasing guns has placed an undue burden on Plaintiffs' fundamental right to keep and bear arms. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010).

725.1033.    Defendants' policy of subjecting Plaintiffs' and similarly situated watchlisted American citizens, lawful permanent residents, and foreign nationals to has placed an undue burden on Plaintiffs' fundamental right to be free from unreasonable searches and seizures.

726.1034.    By placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist, Defendants have placed an undue burden on their fundamental right to travel domestically.

727.1035.    By placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist, Defendants have placed an undue burden on their fundamental right to travel internationally.

175

728.1036.    By Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist, Defendants have treated Plaintiffs like second-class citizens.

729.1037.    Defendants lack a compelling interest in placing innocent persons, particularly those with no prior terrorism related criminal record and no probable cause for suspicion of terrorism related crimes, on the federal terrorist watchlist.

730.1038.    Defendants' watchlist lacks a compelling interest insofar as their true purpose is to provide law enforcement with a tool to harass and intimidate American Muslims, to track such persons, and coerce American Muslims into becoming informants.

731.1039.    Defendants' watchlists are also not narrowly tailored insofar as the federal terrorist watchlists are entirely and demonstrably ineffectual and obvious alternatives exist. The defendantsDefendants, for example, have never placed a person who committed a violent act of terrorism inside the United States on the No Fly List prior to the terrorist act.

732.1040.    Defendants' actions in placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist, officially imposing on Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals the stigmatizing label of "known or suspected terrorists," and widely disseminating the stigmatizing label to numerous governmental and private partners, are arbitrary and capricious, shock the conscience, violate the decencies of civilized conduct and are so brutal and offensive that they do not comport with the traditional ideas of fair play and decency.

733.1041. Because Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals have not been charged with any violent or terrorism-related crimes and are United States citizens, Plaintiffs challenge their placement and the placement of others similarly situated American citizens on the federal terrorist watchlist on a broad, as-applied basis.

734.1042. Plaintiffs' substantive due process challenge is also facial, as there are no circumstances where their placement or the placement of others similarly situated on the federal terrorist watchlist is narrowly tailored to achieve any compelling government interest.

735.1043. Defendants have thus violated Plaintiffs' constitutional rights and the constitutional rights of other similarly situated American citizens, lawful permanent residents and foreign nationals without affording them due process of law. Defendants will continue to do so into the future if Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals are not afforded the relief demanded below.

736.1044. By placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal watchlist, Defendants have caused them an actual, imminent and irreparable injury that cannot be undone through monetary remedies.

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT III**

**UNLAWFUL AGENCY ACTION IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 702, 706**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

737.1045.    The foregoing allegations are realleged and incorporated herein.

738.1046.    Defendants' placement of Plaintiffs on the terrorist watchlist, placement of Plaintiffs on the Quiet Skies Selectee List and other rules-based terror targeting lists, and subsequent DHS TRIP and TSC determinations regarding Plaintiffs' watchlist status, constitute agency actions.

739.1047.    Plaintiffs and other similarly situated American citizens are not required to exhaust the DHS TRIP process in connection with any watchlist status, under the holding in *Darby v. Cisneros*, 509 U.S. 137 (1993). *See Gulet Mohamed v. Eric R. Holder, Jr., et al.,* Case No. 11-cv-00050, Dkt. 70 at 22 (E.D.V.A. 2011) (Exhibit 7).

740.1048.    Defendants' actions in placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist, officially imposing on Plaintiffs the stigmatizing label of "known or suspected terrorists," disseminating the stigmatizing label to governmental and private partners, and providing no constitutionally adequate avenue for redress, were and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

741.1049.    Defendants' actions in nominating Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals to the federal terrorist watchlist blatantly violate the requirement that "'nominations' must not be solely based on

178

race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."
49 U.S.C. § 114(h)(3).

742.1050.    Even when a nomination is not "solely" based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities, Defendants consider and rely on those protected traits as factors supporting placement on the federal terrorist watchlist.    Defendants considered and relied upon one or more of these impermissible factors in placing Plaintiffs and similarly American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist.

743.1051.    Defendants'Defendants have failed to provide Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals, who have been unreasonably burdened or denied boarding on commercial flights due to their placement on the federal terrorist watchlist, with a constitutionally adequate mechanism that (a) affords them notice of the reasons and bases for their placement on the federal terrorist watchlist and (b) provides a meaningful opportunity to contest their continued inclusion on the federal terrorist watchlist.    Defendants' action is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

744.1052.    Because Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals do not present a security threat to commercial aviation, Defendants' actions as described above in including Plaintiffs and other similarly situated American citizens on the federal terrorist watchlist unreasonably burdens or prevents them from boarding commercial flights or entering the United States across the

179

border, are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

745.1053. By placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal watchlist, Defendants caused them an actual, imminent and irreparable injury that cannot be undone through monetary remedies.

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

Formatted: Normal

## <u>COUNT IV</u>

**VIOLATION OF THE FIFTH AMENDMENT (EQUAL PROTECTION)
TO THE UNITED STATES CONSTITUTION
(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

746.1054. The foregoing allegations are realleged and incorporated herein.

747.1055. Defendants' actions in placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist, officially imposing on Plaintiffs the stigmatizing label of "known or suspected terrorists," disseminating the stigmatizing label to governmental and private partners, and providing no constitutionally adequate avenue for redress, are discriminatory and constitute actions that target individuals for distinctive and adverse treatment on the basis of constitutionally protected traits and activities.

748.1056. As a matter of policy and official practice, Defendants consider at least the following traits of Plaintiffs' and similarly situated American citizens, lawful permanent

residents, and foreign nationals origin as factors for designation as terrorists and inclusion in the TSDB and throughout the watchlisting system: national origination from Muslim-majority countries, ethnic origination as Arab or Middle Eastern, travel to Muslim-majority countries, travel on religious pilgrimages, learning Arabic, attending mosques, zakat donations to Muslim charities, the wearing of typical Muslim dress, the frequency of Muslim prayer, adherence to sharia law, affiliations with Muslim organizations, family relationships to other Muslims, and associations with other Muslims.

749.1057.   Defendants selectively apply and enforce watchlist and screening policies to individuals who appear to be or who are known or suspected to be Muslim or Middle Eastern.

750.1058.   Plaintiffs' experiences are substantially similar to thousands of other Americans and foreign nationals on the watchlist and reflect Defendants' current practices and policies.  Accordingly, Plaintiffs brings this equal protection challenge both as-applied to themselves and facially.

751.1059.   Defendants' actions in nominating Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals to the federal terrorist watchlist blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities." 49 U.S.C. § 114(h)(3).

752.1060.   Even when a nomination is not "solely" based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities, Defendants consider and rely on those protected traits as factors supporting placement on federal terrorist watchlists.   Defendants considered and relied upon one or more of these

181

impermissible factors in placing Plaintiffs and similarly American citizens, lawful permanent residents, and foreign nationals on federal terrorist watchlists.

753.1061.    By placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlistwatchlists, Defendants have treated them like second-class citizens.

1062.  Many of the Watchlisted Plaintiffs have been subjected to interrogations about their religious practices and beliefs, the answers of which, upon information and belief, are factors that were considered in their inclusion to the federal terror watchlist.

754.1063.    Defendants' above-described actions were motivated by the race, ethnicity, national origin, religious affiliation, religious exercise, and gender, and associations of Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals.

755.1064.    Defendants' above-described actions have had a discriminatory effect upon and have disparately impacted Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals who are or who are perceived as Muslim, Arab, Middle Eastern, or otherwise belonging to a racial, ethnic, or national origin class associated with Muslim-majority regions of the world.

756.1065.    Defendants' above-described actions, policies, course of conduct, or pattern of practice that mandate, permit, or consider the above-described discriminatory treatment of Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals does not serve a compelling state interest or a legitimate or public purpose, nor are they the least restrictive means or narrowly tailored to achieve any such interest.

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

<u>COUNT V</u>

**VIOLATION OF THE UNITED STATES CONSTITUTION – FOURTH AMENDMENT**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

~~757.~~1066.    The foregoing allegations are realleged and incorporated herein.

1067.  Plaintiffs assert this Claim against both the official capacity Defendants and against the Unidentified CBP and FBI Agents in their individual capacities who personally directed or carried out the seizure, confiscation, searching, copying, downloading, or uploading of information from Plaintiffs' electronic devices.

~~758.~~1068.    On June 22, 2018, the Supreme Court recognized in *Carpenter v. United States,* 138 S. Ct. 2206, 2214 (2018) that: "The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' The 'basic purpose of this Amendment, our cases have recognized, 'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.' ~~*Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 528 (1967).~~ ...The Founding generation crafted the Fourth Amendment as a 'response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity.' *Riley v. California*, ~~573 U.S. ____,~~ 134 S.Ct. 2473, 2494 (2014) … Likewise in *Riley*, the Court recognized the 'immense storage capacity' of modern cell phones

183

in holding that police officers must generally obtain a warrant before searching the contents of a phone. ~~573 U.S., at ___.",__

759.1069.   As a matter of official policy and practice, and particularly at the border, Defendants seize and confiscate watchlisted individuals' electronic devices.  Defendants routinely do not return the electronic devices to the watchlisted individuals for weeks or months, if not longer.

760.1070.   As a matter of official policy and practice, and particularly at the border, Defendants download and copy the contents of watchlisted individuals' electronic devices onto Defendants' computers and upload those contents to Defendants' watchlisting and intelligence databases.

761.1071.   As a matter of official policy and practice, Defendants' utilize the contents of watchlisted individuals' electronic devices as a source of intelligence. Defendants' utilize the contents and contacts of watchlisted individuals' electronic devices in order to launch investigations into and nominate associates of the watchlisted individual for rules-based terrorist monitoring and inclusion in the federal terrorist watchlist.

762.1072.   ~~Defendants'~~Defendants lack consent, reasonable suspicion, probable cause, or a warrant for their seizures and searches of watchlistees' electronic devices.

763.1073.   Defendants lack reasonable suspicion, probable cause, or arrest warrants related to terrorism crimes that would justify Plaintiffs' and similarly situated American citizens, permanent residents, and foreign ~~nationals~~nationals' inclusion on the federal terrorist watchlist.

764.1074.   Defendants' seizures and searches are unreasonable, unconstitutional, and violate Plaintiffs and other watchlistees' reasonable expectations of privacy.

184

765.1075.    Defendants'Defendants and their officers and agents knew that their seizures and searches were unreasonable, unconstitutional under settled federal and constitutional law, and violated Plaintiffs and other watchlistees' reasonable expectations of privacy at the time they carried out the searches and seizures.

766.1076.    Defendants have confiscated Plaintiffs' electronic devices, copied the devices' contents, and searched and utilized those contents for intelligence and investigations.  Defendants have engaged these seizures and searches solely because Plaintiffs and similarly situated American citizens, permanent residents, and foreign nationals are listed on the federal terrorist watchlist.

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT VI

**VIOLATION OF THE FIRST AMENDMENT**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

767.1077.    The foregoing allegations are realleged and incorporated herein.

768.1078.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble."  U.S. Const. amend. I.  These rights "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference."  *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960).  As the Supreme Court has explained, "associational rights . . . can be abridged even by government actions that do not directly restrict individuals' ability to associate freely." *Lyng v. Int'l Union, UAW*, 485 U.S. 360, 367

n.5 (1988); *see AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) (explaining that compulsory "disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation"); *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6-7 (1971) (explaining that "[w]hen a State seeks to inquire about an individual's beliefs and associations a heavy burden lies upon it to show that the inquiry is necessary to protect a legitimate state interest").

1079. ~~Defendants~~Defendants' policies and practice make watchlisted individuals' associations, including family, coworkers, friends, and religious congregants, the target of increased "known or suspected terrorist" scrutiny. Association alone forms the basis for placement on rules-based terrorist monitoring lists, for subjecting to enhanced terrorist "SSSS" scrutiny at airports, for referring to secondary inspection and detention at land borders, for delaying and denying visa and immigration benefits, for interrogation about the watchlisted individuals' practices, and for nomination to the TSDB.

~~769.~~1080.    Defendants' policies and practices broadly permit suspicionless searches and copying of ~~Plaintiffs~~Plaintiffs' and similarly situated watchlisted ~~individuals~~individuals' electronic devices. Defendants searches and copying are done in pursuit of intelligence and information about Plaintiffs and similarly situated watchlisted individuals' communications, expressions, social media activities, and associations. Defendants intend to use that intelligence and information in order to single out Plaintiffs' and similarly situated watchlisted individuals' families, friends, coworkers, coreligionists, and other associates for investigation as potential terrorists.

~~770.~~1081.    The seizure, search, and copying of Plaintiffs' and similarly situated watchlisted individuals' electronic devices gives the government possession of confidential

lists of Plaintiffs' memberships and associations. Such "[c]ompulsory disclosure ... 'can seriously infringe on privacy of association and belief guaranteed by the First Amendment,' and can 'have ... a profound chilling effect.'" *Buckley v. Valeo*, 424 U.S. 1, 64 (1976); *accord Perry v. Schwarzenegger*, 591 F.3d 1126, 1135 (9th Cir. 2009).

771.1082.   Defendants have placed an undue burden on Plaintiffs' and similarly situated individuals' First Amendment rights to expression and association.

772.1083.   Warrantless seizures and searches of the contents of Plaintiffs' electronic devices, including information about Plaintiffs' associations and affiliations, impose a significant or substantial burden on watchlisted individuals' First Amendment rights to expression and association.

773.1084.   Defendants' actions in burdening Plaintiffs' and similarly situated watchlisted individuals' First Amendment rights to expression and association are not supported by a compelling or legitimate state interest, because Defendants lack reasonable suspicion, probable cause, or a warrant indicating that the watchlisted individuals are terrorist criminals.

774.1085.   Defendants actions in burdening Plaintiffs' and similarly situated watchlisted individuals' First Amendment rights to expression and association are not narrowly tailored, not the least restrictive means, and not in furtherance of an appropriate form of means-end balancing to achieve a government interest.

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT VII

**VIOLATION OF THE UNITED STATES CONSTITUTION – SECOND AMENDMENT**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

~~775.~~1086.    The foregoing allegations are realleged and incorporated herein.

~~776.~~1087.    The Second Amendment protects the fundamental individual right to bear arms.

~~777.~~1088.    Defendants disseminate the federalist terrorist watchlist with the knowledge and intent that law enforcement agencies and providers of background checks will use the watchlist to screen gun purchasers, and thereafter block, hinder, or burden watchlisted individuals in their attempt to obtain guns.

~~778.~~1089.    Even where a watchlisted individual possesses valid permits to possess and carry firearms, their watchlist status is used as a basis to deny the purchase of firearms.

~~779.~~1090.    Multiple states and government entities have adopted or considered laws and policies which bar individuals listed on the federal terrorist watchlist from purchasing firearms.

~~780.~~1091.    As a result of their watchlist status, Plaintiffs and similarly situated individuals have been blocked, hindered, or burdened from exercising their right to bear arms.

~~781.~~1092.    Defendants have placed an undue burden on Plaintiffs' and similarly situated individuals' Second Amendment right to own firearms.

~~782.~~1093.    Defendants' actions in burdening Plaintiffs' and similarly situated watchlisted individuals' Second Amendment right to own firearms are not supported by a compelling or legitimate state interest, because Defendants lack reasonable suspicion, probable cause, or a warrant that watchlisted individuals are terrorist criminals.

783.1094.     Defendants actions in burdening Plaintiffs' and similarly situated watchlisted individuals' Second Amendment right to own firearms are not narrowly tailored, not the least restrictive means, and not in furtherance of an appropriate form of means-end balancing to achieve a government interest.

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

<u>COUNT VIII</u>

**VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

784.1095.     The foregoing allegations are realleged and incorporated as though fully set forth herein.

1096.  This Claim is asserted on behalf of all Plaintiffs against the official capacity Defendants, as well as Unidentified FBI Agents and Unidentified CBP Agents in their individual capacities.

1097.  The Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. 2000bb et. seq., provides that Defendants "shall not substantially burden a person's exercise of religion" unless that burden is the least restrictive means to further a compelling governmental interest.  42 U.S.C. 2000bb01(a) and (b).

1098. An individual's exercise of religion is substantially burdened when the government conducts an intrusive inquiry into a person's religious beliefs as a component of official government action.  Such inquiries place pressure on the person to modify or violate their beliefs, and singles them out for disfavored treatment.  As the Supreme Court once recognized (with an analysis that applies with greater force post-RFRA), "It is not only the

189

conclusions that may be reached by the [Government] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979). A Supreme Court plurality later recognized that government action which requires "inquiry into the recipient's religious views" including details of how "sectarian" those views are "is not only unnecessary but also offensive. It is well established, in numerous other contexts, that courts should refrain from trolling through a person's or institution's religious beliefs." *Mitchell v. Helms,* 530 U.S. 793, 828 (2000).

1099.   Defendants have policies and practices that require intrusive religious inquiry of individuals scooped up in watchlisting surveillance.  Plaintiffs have experienced recurrent inquiry into the details of their religious practices, including how religious they are, which subdivision sects of Islam they adhere to, how often they pray, which mosque they attend, who else worships at the mosque, what Islam-related charities they support, what they think of jihad, whether they follow sharia law, and other intrusive and detailed questions about their faith.  These lines of questioning have been conducted by Unidentified CBP and FBI officers, pursuant to policies and practices promulgated by Defendants.

1100.   Plaintiffs' practice of Islam is substantially burdened by repeated and intrusive Government inquiry into their beliefs, their religious communities, and their religious practices.  Plaintiffs are subjected to this disfavored treatment due to Defendants' policies and practices that use the federal watchlisting system to target Muslim communities and rely, at least in part, on the details of Plaintiffs' adherence to the Muslim faith as factors supporting inclusion on the federal terrorist watchlist.

1101.  Defendants' placement of Plaintiffs on the federal terror watchlist or rules-based lists based upon Plaintiffs' answers to these lines of questions is not narrowly tailored to achieve any compelling governmental interest.

1102.  Defendants' unlawful actions have imposed and are imposing an immediate and ongoing harm on Plaintiffs and have deprived them of constitutional and statutory rights, resulting in damage to their reputations, and material and economic loss.

1103.  Absent injunctive, declaratory, and monetary relief against the Defendants, Plaintiffs and similarly situated individuals have been and will continue to be harmed.

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief, in addition to damages, in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT IX

### VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

### (as to Plaintiffs Farid Sulayman and Faraz Siddiqui, only)

1104.  The foregoing allegations are realleged and incorporated as though fully set forth herein.

1105.  This Claim is asserted on behalf of Plaintiff Farid Sulayman and Plaintiff Faraz Siddiqui only.

785.1106.  The Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. 2000bb *et. seq.*, provides that Defendants "shall not substantially burden a person's exercise

191

of religion" unless that burden is the least restrictive means to further a compelling governmental interest.  42 U.S.C. 2000bb01(a) and(b).

~~786.~~1107.    Plaintiff Farid Sulayman ~~sincerely held~~holds a sincere religious ~~beliefs~~belief that he personally performs Umrah, a religious pilgrimage to Mecca, Saudi Arabia.  As a religious leader, it is also part of his sincerely held religious beliefs that lead Muslim pilgrims who wish to perform Umrah.  Plaintiff Farid Sulayman's compliance with these beliefs is a religious exercise.

~~787.~~1108.    The Defendants' actions in creating and then placing Plaintiff Farid Sulayman on the federal terror watchlist imposes a substantial burden on Plaintiff Farid Sulayman's religious exercise and similarly situated individuals.  Defendants have imposed a burdensome, stigmatizing, and public screening process that is discouraging Plaintiff Farid Sulayman from engaging in Umrah in order to avoid the treatment directed at him by Defendants.  Defendants' actions have also damaged Plaintiff Farid Sulayman's standing in his community thereby jeopardizing his ability to lead congregations in the future.  Plaintiff Farid Sulayman intends to lead Umrah group in order to fulfill his sincerely held religious beliefs.

1109.  Plaintiff Faraz Siddiqui desires to perform the religious pilgrimage of Hajj to Saudi Arabia but has not done so out of fear of the terrorist scrutiny and treatment he would receive by Defendants.

~~788.~~1110.    The federal terror watchlist chills Plaintiff Farid Sulayman's and Plaintiff Faraz Siddiqui's religious exercise.

~~789.~~1111.    The federal terror watchlist is not narrowly tailored to achieve any compelling governmental interest.

790.1112.    The federal terror watchlist is not the least restrictive means of furthering Defendants' stated interests.

1113. The United States government has no compelling interest in restricting Plaintiff Farid ~~Sulayman~~Sulayman's ability to lead pilgrims on a religious rite of passage, Umrah.

791.1114.    The United States government has no compelling interest in restricting Plaintiff Faraz Siddiqui's ability to perform the Hajj pilgrimage.

792.1115.    Defendants' unlawful actions are imposing an immediate and ongoing harm on Plaintiff Farid Sulayman and have caused Plaintiff Farid Sulayman emotional distress, deprivation of his constitutional and statutory rights, damage to his reputation, and material and economic loss.

1116.  Defendants' unlawful actions are imposing an immediate and ongoing harm on Plaintiff Faraz Siddiqui and have caused him emotional distress, deprivation of his constitutional and statutory rights, and damage to his reputation.

793.1117.    Absent injunctive and declaratory relief against the Defendants and the federal terror watchlist, Plaintiff Farid Sulayman, Plaintiff Faraz Siddiqui, and similarly situated individuals have been and will continue to be harmed.  So long as Defendants maintain the federal terror watchlist, Plaintiff Farid Sulayman's and Faraz Siddiqui's exercise of ~~his~~their religious beliefs, including performing Hajj and leading Umrah, will be substantially burdened.

~~WHEREFORE, Plaintiff Farid Sulayman~~WHEREFORE, Plaintiff Farid Sulayman and Plaintiff Faraz Siddiqui requests this Honorable Court grant declaratory and injunctive relief, in addition to damages, in the form described in the Prayer for Relief below, plus all such

other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT X**

**VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT
(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

**(as to Plaintiff John Doe, only)**

1118.  The foregoing allegations are realleged and incorporated as though fully set forth herein.

1119.  This Claim is asserted on behalf of Plaintiff John Doe only, against both the official capacity Defendants and the Unidentified FBI Agents in their individual capacities.

1120.  The Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. 2000bb *et. seq.*, provides that Defendants "shall not substantially burden a person's exercise of religion" unless that burden is the least restrictive means to further a compelling governmental interest.  42 U.S.C. 2000bb01(a) and (b).

1121.  Defendants have placed Plaintiff John Doe on the No Fly List, at least in part, because of his Muslim religious beliefs.  John Doe's presence on the No Fly List has impeded his ability to travel, including to visit his fiancé, and subjected him to repeated and intrusive questioning.   In the course of investigations related to the No Fly List, FBI agents have interrogated Plaintiff John Doe about his Muslim religious beliefs, including his prayer habits and mosque attendance.   FBI agents have pressured Plaintiff John Doe to disclose who else he knows who attends his mosque.  FBI agents have told Plaintiff John Doe that if he agrees to accept money and work as an FBI Informant, his travel issues (including his No Fly watchlist status) will be resolved.

1122. Plaintiff John Doe sincerely believes that accepting the Government's offer of cash and a removal of his travel restriction in order to serve as a mole in his Muslim community violates his religious beliefs. Cultivating honesty, trust, integrity, good faith, and fellowship are crucial to Plaintiff John Doe's practice of Islam. Muslim teachings proscribe bearing false witness against one's neighbor by engaging in relationships and religious practices under false pretenses, and betraying the trust and confidence of one's religious community.

1123. Defendants' placement of Plaintiff John Doe on the No Fly List and recruitment of him as an informant is pressuring him to infiltrate his religious community as a government informant, and to spy and eavesdrop on other Muslims' words and deeds—regardless of whether his religious brothers and sisters are suspected of wrongdoing—and then to report his observations to the FBI.

1124. Defendants have forced Plaintiff John Doe into an impermissible choice between obeying his sincerely held religious beliefs regarding honesty, integrity, trust and community, or continuing to experience Government interrogations related to the Government-imposed punishment of placing him on the No Fly List, which severely restricts his travel including his ability to visit loved ones abroad.

1125. The No Fly List, and related recruitment of John Doe as a government informant against the Muslim community, imposes a substantial burden on and chills his religious exercise.

1126. Defendants' placement of John Doe on the No Fly List, or any subset of the federal terror watchlist, is not narrowly tailored to achieve any compelling governmental interest.

195

1127. Defendants' recruitment of John Doe as an FBI informant is not narrowly tailored to achieve any compelling governmental interest.

1128. Defendants' unlawful actions have imposed and are imposing an immediate and ongoing harm on Plaintiff John Doe and have deprived him of his constitutional and statutory rights, resulting in damage to his reputation, and material and economic loss.

1129. Absent injunctive, declaratory, and monetary relief against the Defendants, Plaintiff John Doe and similarly situated individuals have been and will continue to be harmed

WHEREFORE, Plaintiff John Doe requests this Honorable Court grant declaratory and injunctive relief, in addition to damages, in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT XI**

794. requests this Honorable Court grant declaratory and injunctive relief, in addition to damages, in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT IX**

**VIOLATION OF THE UNITED STATES CONSTITUTION – NON-DELEGATION**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

795.1130. The foregoing allegations are realleged and incorporated herein.

796.1131. Congress has not provided the Executive Branch with intelligible principles from which the Executive can implement its watchlist schemes regarding civil aviation and national security.

797.1132. Congress has not directed the Executive Branch to create either a No Fly List or a Selectee List the watchlisting system, the Quiet Skies initiative or any other rules-based lists.

1133. Congress has not directed the Executive Branch to utilize the watchlisting system, the Quiet Skies initiative or any other rules-based lists to impose consequences upon innocent people, their family members, their colleagues or other associates.

798.1134. Congress has not authorized the Executive Branch to utilize the federal terrorist watchlist watchlisting system to encourage financial institutions to close bank accounts or ban wire transfers, to encourage car dealerships to restrict test drives or purchases block or revoke security or employment credentials, to hinder or bar the purchase

197

of ~~vehicles, or~~guns, to recruit informants, or to instruct state and local law enforcement to detain individuals based on their watchlist status.

~~799.~~1135.    Congress has not authorized the Executive Branch to disseminate the ~~terrorist watchlist~~TSDB to governmental and private partners.

~~800.~~1136.    Homeland Security Presidential Directive 6 is an illegal usurpation of Congress' legislative function and the executive order runs afoul of separation of powers principles.

~~801.~~1137.    The Executive Branch's assignment of the watchlisting function to TSC violates Congress' directive that the TSA should determine who belongs on federal terrorist watchlists and the consequences that flow from being on those lists.

~~802.~~1138.    Congress has not delegated to TSA the authority to create a process that can culminate in the removal of individuals from the TSDB.

~~803.~~1139.    In the alternative, Congress's delegation to TSA to create a redress process is defective because the Executive Branch has allocated watchlist authority in a manner that prevents TSA from creating a meaningful redress process.

1140. Congress has not granted the WLAC or TSC with statutory authority to promulgate decisions regarding all policies, procedures, practices and instructions pertaining to the federal terrorist watchlist, including, but not limited to: (1) watchlist nomination and removal procedures; (2) specific criteria used to nominate persons to the TSDB; (3) redress procedures; (4) vetting of information used to nominate persons to the TSDB; and, (5) dissemination of a person's designation in the TSDB to state and local authorities, courts, foreign governments, private corporations, private contractors, airlines, gun sellers, financial institutions, the captains of sea-faring vessels, and others.

804.1141.   As a result, Defendants have illegally acted beyond their authority.

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**Prayer for Relief**

WHEREFORE, Plaintiffs respectfully ~~requests~~request:

1.      A declaratory judgment that Defendants' policies, practices, and customs related to the federal terrorist watchlisting system violate the First Amendment, Second Amendment, Fourth Amendment, and Fifth Amendment to the United States Constitution, as well as the Religious Freedom Restoration Act and the Administrative Procedure Act;

2.      A declaratory judgment that Defendants' policies, practices, and customs violate the non-delegation doctrine of the United States Constitution;

3.      With respect to Counts V and VI, a declaratory judgment that:

a.      Defendants' policies and practices violate the First and Fourth Amendments by authorizing searches of Plaintiffs' and similarly situated travelers' electronic devices, absent a warrant supported by probable cause that the devices contain contraband or evidence of a violation of immigration or customs laws, and without particularly describing the information to be search;

b.      Defendants violated Plaintiffs' First and Fourth Amendment rights by searching their electronic devices absent a warrant supported by probable cause that the devices contained contraband or evidence of a violation of immigration or customs laws, and without particularity describing the information to be searched;

c.      Defendants' policies and practices violate the Fourth Amendment by authorizing the confiscation of travelers' electronic devices, for the

purpose of effectuating searches of those devices after travelers leave the border, absent probable cause that the devices contain contraband or evidence of a violation of immigration or customs laws; and

d.    Defendants' violated the Fourth Amendment rights of Plaintiffs' by confiscating their electronic devices for a period of unreasonable duration.

3.4.    An injunction that:

a.    requires Defendants to remedy the constitutional and statutory violations identified above, including the removal of Plaintiffs from any watchlist or database that burdens or prevents them from flying or entering the United States across the border; and,

b.    requires Defendants to provide individuals designated on the federal terrorist watchlist with a legal mechanism that affords them notice of the reasons and bases for their placement on the federal terrorist watchlist and a meaningful opportunity to contest their continued inclusion on the federal terrorist watchlist;

5.    With respect to Counts V and VI, an injunction that:

a.    Enjoins Defendants from searching electronic devices absent a warrant supported by probable cause;

b.    Enjoins Defendants (i) from confiscating travelers' electronic devices, to effectuate searches of those devices after travelers leave the border, absent probable cause that the devices contain contraband or evidence

of a violation of immigration or customs laws, and (ii) in such cases, promptly to seek a warrant to search the device;

c.     Enjoins Defendants to return Plaintiff Fadi Suliman's phone or any electronic devices or data Defendants' took from any other Plaintiff; and,

d.     Enjoins Defendants to expunge all information gathered from, or copies made of, the contents of Plaintiffs' electronic devices, and all of Plaintiffs' social media information and device passwords.

4.6.     A trial by jury;

5.7.     An award of attorneys' fees, costs, and expenses of all litigation, pursuant to 28 U.S.C. § 2412;

6.8.     Damages for Defendants' violations of their clearly established rights under the U.S. constitution and federal law; and,

7.9.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

NOW COME Plaintiffs, by and through their undersigned counsel, and hereby demand trial by jury of the above-referenced causes of action.

CAIR LEGAL DEFENSE FUND

BY:   /s/ Lena F. Masri
LENA F. MASRI (20251) ‡
GADEIR I. ABBAS (20257) ‡ *
CAROLYN HOMER (20409) ‡
AHMED M. MOHAMED (LA 36590) *β
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 488-8787

CAIR-FLORIDA

By:   /s/ Thania Diaz Clevenger
THANIA DIAZ CLEVENGER (FL 97301)β
OMAR SALEH (FL 91216)β
8076 N. 56th Street
Tampa, Florida 33617
Phone: (813) 514-1414
Facsimile: (813) 987-2400

CAIR-MICHIGAN

BY:   /s/ Amy Doukoure
AMY DOUKOURE (MI: P80461) β
30201 Orchard Lake Road, Suite 260
Farmington Hills, MI 48334
Phone: (248) 559-2247

CAIR-WASHINGTON

By:   /s/ Amanda Misasi
AMANDA MISASI (WSBA # 53699) βα
815 First Avenue, Suite 204
Seattle, WA 98104
Phone: (206) 367-4081

CAIR-NEW JERSEY

By:   /s/ Birjees Rehman
BIRJEES REHMAN (NJ 136132015) βα
4475 South Clinton Avenue, Suite 202
South Plainfield, NJ 07080
Phone: 908.668.5900
Facsimile: 908-291-1367

203

CAIR-MINNESOTA

By:       /s/ Amir Malik
AMIR MALIK (MN 0327426) β
ELLEN A. LONGFELLOW (MN 160039) β
2511 East Franklin Ave., #100
Minneapolis, MN 55406
Phone: (612) 206-3360
Facsimile: (612) 206-3361

PASTOR & ASSOCIATES, P.C.

BY:       /s/ Caridad Pastor Cardinale
CARIDAD PASTER PATER CARDINALE (20435) ‡
525 E. Big Beaver Road Suite 206
Troy, Michigan 48083
Phone: (248) 619-0065

‡ Admitted to practice in this Court
*Licensed Mr. Abbas is licensed in VA, not in D.C.
Practice limited to federal matters.
*Licensed *Mr. Mohamed is licensed in LA & NY,
not D.C. Practice limited to federal matters.
β Pro Hac Admission Pending
α Admitted Pro Hac

*Attorneys for Plaintiffs*

Dated: August 8 29, 2018

**CERTIFICATE OF SERVICE**

I hereby certify that on August 29, 2018, I electronically filed the foregoing document with the Clerk of the Court for the District of Maryland using the ECF System, which will send notification to the registered participants of the ECF System as listed on the Court's Notice of Electronic Filing.

_____ */s/ Lena Masri* _____

205