# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Greenbelt Division

| | | |
|---|---|---|
| RAMI KHALED EL ALI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 8:18-cv-2415 (PX) |
| | ) | |
| WILLIAM BARR, et al.,[1] | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' RENEWED MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND FOR FAILURE TO STATE A CLAIM

---

[1] Defendants do not list all of the named defendants in the caption. However, they note that Plaintiffs' designation of Tracy Renaud as Deputy Director, U.S. Immigration and Customs Enforcement ("ICE") appears to be in error. Ms. Renaud is not an ICE employee or official. Matthew T. Albence is presently serving as Enforcement and Removal Operations Executive Associate Director and Senior Official Performing the Duties of the Director of ICE.

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 4

    I.    Factual Allegations .................................................................................... 4

    II.    Statutory and Regulatory Background ....................................................... 6

        A.    The Terrorist Screening Database, The No Fly List, and the Selectee List ................ 7

        B.    TSA's Security Measures and Its Use of the TSDB and Other Watchlists to Secure Aviation .................................................................... 9

        C.    Redress Procedures for Travelers Who Allegedly Experience Delayed Boarding .... 11

        D.    Enhanced Redress Procedures for U.S. Persons Who Are Denied Boarding .......... 12

        E.    CBP's Border Search Authorities and Policies ....................................... 13

LEGAL STANDARDS ...................................................................................................... 16

    I.    Federal Rule 12(b)(1) ............................................................................... 16

    II.    Federal Rule 12(b)(6) .............................................................................. 16

ARGUMENT ..................................................................................................................... 17

    I.    Plaintiffs Lack Standing against the Majority of the Putative Defendants. ....................... 17

    II.    Additional Alleged Injuries Are not Properly Before the Court against Any Defendant. ................................................................................. 21

    III.    All Claims Brought by Plaintiff Khaled El Ali and His Son Rami Must Be Dismissed. .... 23

    IV.    Challenges to the Adequacy of DHS TRIP and TSA Enhanced Screening Policies and Procedures Must Be Dismissed for Lack of Jurisdiction. ................... 26

    V.    Several of Plaintiffs' Claims Are Unripe or Barred by the Statute of Limitations. ........... 29

    VI.    Count I (Procedural Due Process) Should Be Dismissed. ................................................ 33

        A.    Travel Delays Are Not A Deprivation of the Right to Travel. ................................ 33

B. The No Fly List Plaintiffs Also Have Not Pled a Deprivation of the Right to Travel. ................................................................................................ 37

C. The Plaintiffs Have Not Pled a Protected Interest in Their Reputations. ............... 38

D. Plaintiffs Fail to Allege a "Plus" Factor. .................................................. 41

E. The Redress Process Is Constitutionally Adequate. ................................. 44

VII. Count II (Substantive Due Process) Should Be Dismissed. ........................... 46

VIII. Count V (Equal Protection) Should Be Dismissed. ..................................... 49

IX. Count III (APA—DHS TRIP) Should Be Dismissed. .................................... 52

X. Count IV (APA—NCIC) Should Be Dismissed. ......................................... 53

A. Plaintiffs Lack Standing to Pursue the Relief They Seek In Count IV. ................... 54

B. Count IV Also Fails to State a Claim. .................................................... 54

XI. Count VI (Fourth Amendment) and Count VIII (Fifth Amendment: Self Incrimination) Should Be Dismissed. ..................................................... 56

A. Plaintiffs Lack Standing To Pursue the Relief They Seek in Counts VI and VIII. .... 57

B. Count VI Also Fails to State a Claim. .................................................... 58

1. Border Searches of Electronic Devices Require Neither a Warrant Nor Probable Cause. ......................................................................... 58

2. *Kolsuz* Does Not Change the Relevant Analysis. .................................. 59

3. Neither *Riley* nor *Carpenter* Warrants a Different Result. ................... 63

C. Count VIII Likewise Fails to State a Claim. ............................................. 65

1. Plaintiffs Have Not Pled Any "Substantial and Real" Threat of Incrimination. ............................................................................ 66

2. The Border Search Exception Permits the Government to Require that Electronic Devices Be Presented in a Manner Allowing for Their Inspection. ................................................................................. 67

3. At Minimum, Biometric Passwords are Not "Testimonial." ..................... 69

XII. Count VII (First Amendment) Should Be Dismissed. .................................. 71

XIII. Plaintiffs' Second Amendment Claim (Count IX) Should Be Dismissed For Lack of Subject Matter Jurisdiction. .......................................................................... 74

    A.    39 Plaintiffs Do Not Allege Any "Particularized" Injury Related to Firearms. ........ 74

    B.    Plaintiff Abdurrashid Also Lacks Standing as to Count IX. .................................... 74

XIV. Counts X, XI, XII, and XIII (RFRA) Should Be Dismissed. ........................................... 77

    A.    Plaintiff Elamin Lacks Standing to Pursue His RFRA Claim (Count XIII). ............ 77

    B.    All RFRA Claims Should Be Dismissed For Failure To State a Claim. ................... 79

        1.    The RFRA Claims Do Not Sufficiently Allege a Substantial Burden............. 79

        2.    Plaintiffs Otherwise Fail to State a RFRA Claim............................................. 84

    C.    RFRA Does Not Waive Sovereign Immunity Against Federal Officials for Damages Claims.................................................................................................... 87

XV.  Count XIV (Non-Delegation) Should Be Dismissed. ..................................................... 88

CONCLUSION ........................................................................................................................ 90

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama,*
   742 F.3d 1023 (D.C. Cir. 2014) ................................................................24

*Abbott Laboratories v. Gardner,*
   387 U.S. 136 (1967) ..............................................................................30

*Abdi v. Wray,*
   No. 2:17-CV-622-DB, 2018 WL 1940411 (D. Utah Apr. 23, 2018) ...........................*passim*

*Abidor v. Johnson,*
   No. 10-cr-4059, 2016 WL 3102017 (E.D.N.Y. June 2, 2016) ................................65

*Adams v. Bain,*
   697 F.2d 1213 (4th Cir. 1982) ................................................................16

*Aguilar v. United Floor Crew, Inc.,*
   No. 14-CIV-61605, 2015 WL 2415421 (S.D. Fla. May 21, 2015) ..............................7, 8

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of,*
   Treas., 686 F.3d 965 (9th Cir. 2012) ........................................................84

*Al-Kidd v. Gonzales,*
   No. 05-093, 2007 WL 4391029 (D. Idaho Dec. 10, 2007) ...................................46

*Alasaad v. Nielsen,*
   No. 17-CV-11730-DJC, 2018 WL 2170323 (D. Mass. May 9, 2018) ..........................63

*Albright v. Oliver,*
   510 U.S. 266 (1994) ..............................................................................16

*Allen v. Wright,*
   468 U.S. 737 (1984) ..........................................................................18, 25

*Almeida-Sanchez v. United States,*
   413 U.S. 266 (1973) ..............................................................................64

*Alvin v. Suzuki,*
   227 F.3d 107 (2d Cir. 2000) ................................................................31

*Americopters, LLC v. FAA,*
   441 F.3d 726 (9th Cir. 2006) ................................................................29

*Andresen v. Maryland,*
    427 U.S. 463 (1976) ............................................................................................ 67, 68

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................ 48

*Athletics, Inc. v. Dep't of Educ.,*
    639 F.3d 91 (4th Cir. 2011) .................................................................................... 49

*Baltimore City Dep't of Soc. Servs. v. Bouknight,*
    493 U.S. 549 (1990) ................................................................................................ 69

*Bassiouni v. CIA,*
    392 F.3d 244 (7th Cir. 2004) .................................................................................. 45

*Bazzi v. Lynch,*
    No. 16-10123, 2016 WL 4525240 (E.D. Mich. Aug. 30, 2016) .......................... *passim*

*Beck v. McDonald,*
    848 F.3d 262 (4th Cir. 2017) .................................................................................. 16

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...................................................................................... 16, 42, 79

*Berry v. Bean,*
    796 F.2d 713 (4th Cir. 1986) .................................................................................. 21

*Beydoun v. Lynch,*
    No. 14-CV-13812, 2016 WL 3753561 (E.D. Mich. July 14, 2016) .................... *passim*

*Beydoun v. Sessions,*
    871 F.3d 459 (6th Cir. 2017) ........................................................... 27, 34, 35, 42

*Blitz v. Napolitano,*
    700 F.3d 733 (4th Cir. 2012) ......................................................................... 8, 33, 37

*Brigham City, Utah v. Stuart,*
    547 U.S. 398 (2006) ................................................................................................ 58

*Brinkley v. Harbour Recreation Club,*
    180 F.3d 598 (4th Cir. 1999) .................................................................................. 52

*Brown v. Socialist Workers '74 Campaign Comm.,*
    459 U.S. 87 (1982) .................................................................................................. 72

*Burwell v. Hobby Lobby Stores, Inc.,*
    134 S. Ct. 2751 (2014) ............................................................................................ 81

v

*Cafeteria and Restaurant Workers Union, Local 473, AFL–CIO v. McElroy,*
  367 U.S. 886 (1961) ..............................................................................................21

*Calcutt v. United States,*
  No. CIV. H-98-2108, 1998 WL 851358 (D. Md. Oct. 30, 1998) ...........................32

*Califano v. Aznavorian,*
  439 U.S. 170 (1978) ..............................................................................................38

*California v. Byers,*
  402 U.S. 424 (1971) ..............................................................................................69

*Calzone v. Hawley,*
  866 F.3d 866 (8th Cir. 2017) .......................................................................... 18, 20

*Carmody v. Bd. of Trustees of the Univ. of Illinois,*
  747 F.3d 470 (7th Cir. 2014) ...............................................................................31

*Carpenter v. United States,*
  138 S. Ct. 2206 (2018) ................................................................................... 63, 64

*Carroll v. United States,*
  267 U.S. 132 (1925) ..............................................................................................41

*Catholic Bishop of Chi.,*
  440 U.S. 490 (1979) ..............................................................................................81

*Centeno v. Shultz,*
  817 F.2d 1212 (5th Cir. 1987) ..............................................................................25

*Chen Zhou Chai v. Carroll,*
  48 F.3d 1331 (4th Cir. 1995) ................................................................................89

*Cherri v. Mueller,*
  951 F. Supp. 2d 918 (E.D. Mich. 2013) ......................................................80, 81, 82

*City of Houston v. FAA,*
  679 F.2d 1184 (5th Cir. 1982) ..............................................................................35

*City of Indianapolis v. Edmond,*
  531 U.S. 32 (2000) ................................................................................................68

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ................................................................................................24

*City of Los Angeles v. Patel,*
  135 S. Ct. 2443 (2015) ................................................................................... 47, 63

*Clancy v. Office of Foreign Assets Control of U.S. Dep't of Treasury*,
  559 F.3d 595 (7th Cir. 2009) ...................................................................................38

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .......................................................................... 54, 57, 74, 75

*Cooksey v. Futrell*,
  721 F.3d 226 (4th Cir. 2013) ...................................................................................30

*Corbett v. United States*,
  458 F. App'x 866 (11th Cir. 2012) .........................................................................28

*Cramer v. Skinner*,
  931 F.2d 1020 (5th Cir. 1991) ............................................................................ 34, 37

*Curcio v. United States*,
  354 U.S. 118 (1957) ........................................................................................... 69, 70

*D.B. v. Cardall*,
  No. 15-1993, 2016 WL 3387884 (4th Cir. June 20, 2016) ....................................47

*Darby v. Cisneros*,
  509 U.S. 137 (1993) ........................................................................................... 52, 53

*Davila v. Gladden*,
  777 F.3d 1198 (11th Cir. 2015) ...............................................................................87

*Dearth v. Holder*,
  641 F.3d 499 (D.C. Cir. 2011) .................................................................................57

*Dearth v. Lynch*,
  791 F.3d 32 (D.C. Cir. 2015) ...................................................................................38

*Doe v. Pryor*,
  344 F.3d 1282 (11th Cir. 2003) ...............................................................................20

*Doe v. United States*,
  487 U.S. 201 (1988) ..................................................................................................69

*Doe v. Virginia Dep't of State Police*,
  713 F.3d 745 (4th Cir. 2013) ...................................................................................25

*E.K. v. Tolleson Union High Sch. Dist.*,
  No. 14-1625, 2015 WL 11118116 (D. Ariz. Jan. 28, 2015) ..................................81

*Ekiu v. United States*,
  142 U.S. 651 (1892) ..................................................................................................41

*Elec. Privacy Info. Ctr. v. DHS*,
   653 F.3d 1 (D.C. Cir. 2011) ............................................................................ 44

*Elhady v. Piehota*,
   303 F. Supp. 3d 453 (E.D. Va. 2017) ....................................................... *passim*

*Evans v. Chalmers*,
   703 F.3d 636 (4th Cir. 2012) ........................................................................ 38

*FAA v. Cooper*,
   566 U.S. 284 (2012) ...................................................................................... 87

*Farhat v. Jopke*,
   370 F.3d 580 (6th Cir. 2004) ........................................................................ 31

*Fields v. Blake*,
   349 F. Supp. 2d 910 (E.D. Pa. 2004) ........................................................... 21

*Fisher v. United States*,
   425 U.S. 391 (1976) ...................................................................................... 65

*Frank Krasner Enters., Ltd. v. Montgomery Cty*,
   401 F.3d 230 (4th Cir. 2005) ........................................................... 17, 77, 78

*Gilbert v. California*,
   388 U.S. 263 (1967) ...................................................................................... 70

*Gilbert v. Homar*,
   520 U.S. 924 (1997) ................................................................................ 33, 44

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) .................................................................................. 54

*Gilmore v. Gonzales*,
   435 F.3d 1125 (9th Cir. 2006) ......................................................... 26, 28, 37

*Goldstein v. FDIC*,
   No. CIV-ELH-11-1604, 2014 WL 69882 (D. Md. Jan. 8, 2014) .................... 7

*Graham v. Connor*,
   490 U.S. 386 (1989) ...................................................................................... 46

*Green v. TSA*,
   351 F. Supp. 2d 1119 (W.D. Wash. 2005) .............................................. *passim*

*Greer v. Spock*,
   424 U.S. 828 (1976) ...................................................................................... 21

*Haig v. Agee,*
  453 U.S. 280 (1981) ............................................................................... 37, 38, 44, 84

*Heap v. Carter,*
  112 F. Supp. 3d 402 (E.D. Va. 2015) ................................................................84

*Hendy v. Bello,*
  555 F. App'x 224 (4th Cir. 2014) .....................................................................87

*HHS v. FLRA,*
  844 F.2d 1087 (4th Cir. 1988) .........................................................................89

*Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.,*
  542 U.S. 177 (2004) .........................................................................................65

*Hoffman v. United States,*
  341 U.S. 479 (1951) .........................................................................................66

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) .............................................................................................84

*Holt v. United States,*
  218 U.S. 245 (1910) .........................................................................................70

*Howard v. City of New York,*
  No. 12 CIV. 933 JMF, 2014 WL 84357 (S.D.N.Y. Jan. 6, 2014), *aff'd,* 602 F. App'x 545
  (2d Cir. 2015) ..................................................................................................51

*Ibrahim v. DHS,*
  538 F.3d 1250 (9th Cir. 2008) .........................................................................28

*In re Grand Jury Subpoena Duces Tecum Dated Mar. 25,*
  2011, 670 F.3d 1335 (11th Cir. 2012) .............................................................70

*In re WP Co. LLC,*
  201 F. Supp. 3d 109 (D.D.C. 2016) .................................................................85

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.,*
  448 U.S. 607 (1980) .........................................................................................89

*Iota Xi Chapter Of Sigma Chi Fraternity v. Patterson,*
  566 F.3d 138 (4th Cir. 2009) ...........................................................................19

*Jackson–Bey v. Hanslmaier,*
  115 F.3d 1091 (2d Cir. 1997) ...........................................................................74

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950) ........................................................................................................23

*Johnson v. Martin,*
    943 F.2d 15 (7th Cir. 1991) ..........................................................................................40

*Johnson v. United States,*
    228 U.S. 457 (1913) ........................................................................................................67

*Jordan v. Fisher,*
    823 F.3d 805 (5th Cir. 2016) ........................................................................................47

*Kadura v. Lynch,*
    No. CV 14-13128, 2017 WL 914249 (E.D. Mich. Mar. 8, 2017) .................... 35, 39, 43, 89

*Kaemmerling v. Lappin,*
    553 F.3d 669 (D.C. Cir. 2008) .............................................................................. 79, 84

*Kendall v. Balcerzak,*
    650 F.3d 515) (4th Cir. 2011).......................................................................................33

*Kerry v. Din,*
    135 S. Ct. 2128 (2015).....................................................................................................24

*Kimberlin v. Quinlan,*
    774 F. Supp. 1 (D.D.C. 1991), *rev'd on other grounds*, 6 F.3d 789 (D.C. Cir. 1993) ............................46

*Kitchen v. Herbert,*
    755 F.3d 1193 (10th Cir. 2014).....................................................................................20

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972) ........................................................................................................24

*Kovac v. Wray,*
    No. 3:18-CV-0110-L, 2019 WL 1057935 (N.D. Tex. Mar. 5, 2019).............................*passim*

*Kremer v. Chem. Constr. Corp.,*
    456 U.S. 461 (1982) ........................................................................................................31

*Laird v. Tatum,*
    408 U.S. 1 (1972) ...........................................................................................................71

*Latif v. Holder,*
    686 F.3d 1122 (9th Cir. 2012).......................................................................................27

*Latif v. Lynch,*
    No. 3:10-cv-00750 (BC), 2016 WL 1239925 (D. Or. Mar. 28, 2016) .............................. 11-12, 28, 45

*Latif v. Sessions*,
   No. 3:10-cv-00750-BR, 2017 WL 1434648 (D. Or. Apr. 21, 2017)........................................26-27, 28

*League of United Latin Am. Citizens v. Bredesen*,
   500 F.3d 523 (6th Cir. 2007) ........................................................................................... 34, 36

*Lewis v Casey*,
   518 U.S. 343 (1996) ..........................................................................................................54

*Liberty Univ., Inc. v. Lew*,
   733 F.3d 72 (4th Cir. 2013) ................................................................................................82

*Ligon v. LaHood*,
   614 F.3d 150 (5th Cir. 2010)........................................................................................ 26, 29

*Livingston Christian Sch. v. Genoa Charter Twp.*,
   858 F.3d 996 (6th Cir. 2017) ..............................................................................................82

*Louhghalam v. Trump*,
   230 F. Supp. 3d 26 (D. Mass 2017) ....................................................................................23

*Love v. Pepersack*,
   47 F.3d 120 (4th Cir. 1995) ................................................................................................47

*Lovelace v. Lee*,
   472 F.3d 174 (4th Cir. 2006) ......................................................................................... 78, 82

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................................*passim*

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ..........................................................................................................54

*Mahon v. Ticor Title Ins. Co.*,
   683 F.3d 59 (2d Cir. 2012) .................................................................................................18

*Marchetti v. United States*,
   390 U.S. 39 (1968) ............................................................................................................66

*Mason v. United States*,
   244 U.S. 362 (1917) ..........................................................................................................66

*Mathews v. Diaz*,
   426 U.S. 67 (1976) ............................................................................................................23

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ..........................................................................................................44

*Matter of Search of [Redacted] Washington, D.C.,*
   317 F. Supp. 3d 523 (D.D.C. 2018) ............................................................70

*Matter of Search Warrant Application for [redacted text],*
   279 F. Supp. 3d 800 (N.D. Ill. 2017) .........................................................70

*McBurney v. Cuccinelli,*
   616 F.3d 393 (4th Cir. 2010) .....................................................................74

*McCarthy v. Madigan,*
   503 U.S. 140 (1992) ...................................................................................30

*Medina v. Dist. of Columbia,*
   517 F. Supp. 2d 272 (D.D.C. 2007) ...........................................................31

*Miller v. Reed,*
   176 F.3d 1202 (9th Cir. 1999) ...................................................................37

*Minnesota v. Diamond,*
   905 N.W.2d 870 (Minn.) .............................................................................70

*Mirant Potomac River, LLC v. EPA,*
   577 F.3d 223 (4th Cir.2009) ......................................................................25

*Mistretta v. United States,*
   488 U.S. 361 (1989) ...................................................................................88

*Mitchell v. Helms,*
   530 U.S. 793 (2000) ...................................................................................81

*Mohamed v. Holder,*
   266 F. Supp. 3d 868 (E.D. Va. 2017) ................................................. 44, 49

*Mohamed v. Holder,*
   995 F. Supp.2d 520 (E.D. Va. 2014) ..........................................................84

*Mohamed v. Holder,*
   No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958 (E.D. Va. July 16, 2015) ...........................27, 37, 45

*Mokdad v. Lynch,*
   804 F.3d 807 (6th Cir. 2015) ............................................... 26, 27, 28, 29

*Moose Lodge No. 107 v. Irvis,*
   407 U.S. 163 (1972) ............................................................................ 19, 73

*Mora v. City of Gaithersburg,*
   519 F.3d 216 (4th Cir. 2008) .....................................................................31

*Morrissey v. Brewer,*
    408 U.S. 471 (1972) ...............................................................................................44

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................................................52

*Myers v. United States,*
    272 U.S. 52 (1926) .................................................................................................90

*NAACP v. Alabama ex rel. Patterson,*
    357 U.S. 449 (1958) ...............................................................................................72

*Nat'l Ass'n for Advancement of Multijurisdiction, v. Howell,*
    851 F.3d 12 (D.C. Cir. 2017) ................................................................................20

*Nat'l Broad. Co. v. United States,*
    319 U.S. 190 (1943) ...............................................................................................89

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ...............................................................................................30

*Nestor Colon Medina & Sucesores, Inc. v. Custodio,*
    964 F.2d 32 (1st Cir. 1992) ...................................................................................46

*New Doe Child #1 v. Cong. of United States,*
    891 F.3d 578 (6th Cir. 2018) .......................................................................... 80, 82

*Oklevueha Native Am. Church of Hawaii, Inc. v. Holder,*
    676 F.3d 829 (9th Cir. 2012) ................................................................................87

*Okpalobi v. Foster,*
    244 F.3d 405 (5th Cir. 2001) ................................................................................20

*Orgain v. City of Salisbury,*
    521 F. Supp. 2d 465 (D. Md. 2007) .....................................................................51

*Ostergren v. Cuccinelli,*
    615 F.3d 263 (4th Cir. 2010) ................................................................................30

*O'Malley v. Brierley,*
    477 F.2d 785 (3d Cir. 1973) .................................................................................83

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ...............................................................................................57

*Papasan v. Allain,*
    478 U.S. 265 (1986) ...............................................................................................16

*Paul v. Davis,*
   424 U.S. 693 (1976) ....................................................................................................38, 41, 43

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.,*
   467 U.S. 717 (1984) ...............................................................................................................52

*Rahman v. Chertoff,*
   530 F.3d 622 (7th Cir. 2008) ..............................................................................................46

*Rasul v. Myers,*
   563 F.3d 527 (D.C. Cir. 2009) ...........................................................................................24

*Reg'l Mgmt. Corp. v. Legal Servs. Corp.,*
   186 F.3d 457 (4th Cir. 1999) ..............................................................................................30

*Reporters' Comm. for Freedom of Press v. AT&T Co.,*
   593 F.2d 1030 (D.C. Cir. 1978) .........................................................................................71

*Reynolds v. United States,*
   132 S. Ct. 975 (2012) ...........................................................................................................34

*Riley v. California,*
   573 U.S. 373 (2014) ...................................................................................................58, 63, 64

*Robbins v. HUD,*
   72 F. Supp. 3d 1 (D.D.C. 2014), *aff'd sub nom. Robbins v. Castro,* No. 14-5298, 2015 WL
   3372527 (D.C. Cir. May 6, 2015) ............................................................................... 18, 26

*Roberts v. Napolitano,*
   792 F. Supp. 2d 67 (D.D.C. 2011) .....................................................................................22

*Rucker v. Harford Cty.,*
   946 F.2d 278 (4th Cir. 1991) ..............................................................................................49

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.,*
   547 U.S. 47 (2006) ...............................................................................................................73

*Ruskai v. Pistole,*
   775 F.3d 61 (1st Cir. 2014)......................................................................................29, 35, 40

*S. Blasting Servs., Inc. v. Wilkes Cty.,*
   288 F.3d 584 (4th Cir. 2002) ..............................................................................................74

*Saavedra Bruno v. Albright,*
   197 F.3d 1153 (D.C. Cir. 1999) .........................................................................................24

*Santosky v. Kramer,*
　455 U.S. 745 (1982) ................................................................................73

*Schattilly v. Daugharty,*
　No. 14-CV-11905, 2015 WL 1412502 (E.D. Mich. Mar. 20, 2015) ................73

*Scherfen v. DHS,*
　No. 3:cv-08-1554, 2010 WL 456784 (M.D. Pa. Feb. 2, 2010) ......... 26, 35, 39, 40

*Schmerber v California,*
　384 U.S. 757 (1966) ............................................................................ 69, 70

*Sec'y of State for Def. v. Trimble Navigation Ltd.,*
　484 F.3d 700 (4th Cir. 2007) ......................................................................17

*Seegmiller v. LaVerkin City,*
　528 F.3d 762 (10th Cir. 2008) ....................................................................47

*Seraji v. Gowadia,*
　No. 8:16-cv-01637, 2017 WL 2628545 (C.D. Cal. Apr. 28, 2017) ................22

*Serrano Medina v. United States,*
　709 F.2d 104 (1st Cir. 1983) ......................................................................21

*Shapiro v. United States.,*
　335 U.S. 1 (1948) ....................................................................................69

*Shearson v. Holder,*
　725 F.3d 588 (6th Cir. 2013) ......................................................................30

*Shirvinksi v. U.S. Coast Guard,*
　673 F.3d 308 (4th Cir. 2012) ................................................................ 33, 38

*Siegert v. Gilley,*
　500 U.S. 226 (1991) ............................................................................ 38, 43

*Simi Inv. Co. v. Harris Cty., Texas,*
　236 F.3d 240 (5th Cir. 2000) ......................................................................47

*Simon v. E. Ky. Welfare Rights Org.,*
　426 U.S. 26 (1976) ........................................................................ 18, 25, 76, 77

*Spannaus v. Dep't of Justice,*
　824 F.2d 52 (D.C. Cir.1987) ......................................................................32

*Speet v. Schuette,*
　726 F.3d 867 (6th Cir. 2013) ......................................................................48

*Spokeo, Inc. v. Robins,*
    136 S.Ct. 1540 (2016) ..................................................................................................18

*Stanley v. Illinois,*
    405 U.S. 645, (1972) ...................................................................................................73

*Stern v. Regency Towers, LLC,*
    886 F. Supp. 2d 317 (S.D.N.Y. 2012) .......................................................................31

*Sutliffe v. Epping Sch. Dist.,*
    584 F.3d 314 (1st Cir. 2009) ......................................................................................57

*Sylvia Dev. Corp. v. Calvert Cty.,*
    48 F.3d 810 (4th Cir. 1995) .................................................................................49, 51

*Tabbaa v. Chertoff,*
    509 F.3d 89 (2d Cir. 2007) ...................................................................................*passim*

*Tarhuni v. Holder,*
    8 F. Supp. 3d 1253 (D. Or. 2014) ..............................................................................39

*Tooley v. Bush,*
    No. 06-306, 2006 WL 3783142 (D.D.C. Dec. 21, 2006) ...........................................45

*Torraco v. Port Auth.,*
    615 F.3d 129 (2d Cir. 2010) .......................................................................................35

*Touby v. United States,*
    500 U.S. 160 (1991) ...............................................................................................88, 89

*Town of Southold v. Town of E. Hampton,*
    477 F.3d 38 (2d Cir. 2007) ....................................................................................35, 37

*Townes v. Jarvis,*
    577 F.3d 543 (4th Cir. 2009) ......................................................................................51

*Tri-Cnty. Paving, Inc. v. Ashe Cnty.,*
    281 F.3d 430 (4th Cir. 2002) ......................................................................................31

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ...........................................................................................25, 54

*Turaani v. Sessions,*
    316 F. Supp. 3d 998 (E.D. Mich. 2018) .....................................................................76

*Udugampola v. Jacobs,*
    795 F. Supp. 2d 96 (D.D.C. 2011) .............................................................................23

xvi

*United States v. Apfelbaum*,
    445 U.S. 115 (1980) ..................................................................................................66

*United States v. Armstrong*,
    517 U.S. 456 (1996) ..................................................................................................50

*United States v. Arnold*,
    533 F.3d 1003 (9th Cir. 2008) ........................................................................... 61, 68

*United States v. Caminos*,
    770 F.2d 361 (3d Cir. 1985) ......................................................................................61

*United States v. Cotterman*,
    709 F.3d 952 (9th Cir. 2013) ....................................................................................61

*United States v. Davis*,
    657 F. Supp. 2d 630 (D. Md. 2009) ..........................................................................84

*United States v. Decastro*,
    682 F.3d 160 (2d Cir. 2012) ......................................................................................74

*United States v. Dennis*,
    183 F.2d 201 (2d. Cir. 1950) .....................................................................................85

*United States v. Dionisio*,
    410 U.S. 1 (1973) ......................................................................................................70

*United States v. Feiten*,
    No. 15-20631, 2016 WL 894452 (E.D. Mich. Mar. 9, 2016) ....................... 62, 65

*United States v. Flores-Montano*,
    541 U.S. 149 (2004) ............................................................................................*passim*

*United States v. Gonzalez*,
    658 F. App'x 867 (9th Cir. 2016) ..............................................................................65

*United States v. Hartwell*,
    436 F.3d 174 (3d Cir. 2006) ......................................................................................40

*United States v. Hernandez*,
    No. 15-cr-2613, 2016 WL 471943 n.2 (S.D. Cal. Feb. 8, 2016).................................65

*United States v. Hubbell*,
    530 U.S. 27 (2000) ............................................................................................. 69, 70

*United States v. Ickes*,
    393 F.3d 501 (4th Cir. 2005) ...............................................................................*passim*

*United States v. Johnson,*
   122 F. Supp. 3d 272 (M.D.N.C. 2015) ................................................................................51

*United States v. Kolsuz,*
   185 F. Supp. 3d 843 (E.D. Va. 2016) ........................................................................... 60, 61

*United States v. Kolsuz,*
   890 F.3d 133 (4th Cir. 2018)..............................................................................*passim*

*United States v. Molina-Isidoro,*
   267 F. Supp. 3d 900 (W.D. Tex. 2016)..............................................................................65

*United States v. Linarez-Delgado,*
   259 F. App'x 506 (3d Cir. 2007)........................................................................................61

*United States v. Lopez,*
   No. 13-cr-2092, 2016 WL 7370030 (S.D. Cal. 2016) ......................................................65

*United States v. Mayer,*
   503 F.3d 740 (9th Cir. 2007) ............................................................................................71

*United States v. McAuley,*
   563 F. Supp. 2d 672 (W.D. Tex. 2008), *aff'd,* 420 F. App'x 400 (5th Cir. 2011) ....................... 62, 67

*United States v. Meixner,*
   128 F. Supp.2d 1070 (E.D. Mich. 2001) ..........................................................................85

*United States v. Mendez,*
   240 F. Supp. 3d 1005 (D. Ariz. 2017)..............................................................................65

*United States v. Mitchell,*
   445 U.S. 535 (1980) ..........................................................................................................87

*United States v. Molina-Gomez,*
   781 F.3d 13 (1st Cir. 2015) ......................................................................................... 59, 61

*United States v. Molina-Isidoro,*
   884 F.3d 287 (5th Cir. 2018) ...................................................................................... 62, 65

*United States v. Montoya de Hernandez,*
   473 U.S. 531 (1985) ..................................................................................... 36, 58, 59, 62

*United States v. Oriakhi,*
   57 F.3d 1290 (4th Cir. 1995) ...................................................................................... 58, 64

*United States v. Ramsey,*
   431 U.S. 606 (1977) ............................................................................ 41, 59, 67, 86

*United States v. Ross,*
    456 U.S. 798 (1982) ...................................................................................................67

*United States v. Saboonchi,*
    990 F. Supp. 2d 536 (D. Md. 2014) ....................................... 60, 62, 64, 67

*United States v. Saboonchi,*
    48 F. Supp. 3d 815 (D. Md. 2014) ............................................... 62, 65

*United States v. Salerno,*
    481 U.S. 739 (1987) ...................................................................................................43

*United States v. Seljan,*
    547 F.3d 993 (9th Cir. 2008) ....................................................................................59

*United States v. Shenandoah,*
    595 F.3d 151 (3d Cir. 2010) ......................................................................................34

*United States v. Silva,*
    715 F.2d 43 (2d Cir. 1983) .........................................................................................80

*United States v. Skipwith,*
    482 F.2d 1272 (5th Cir. 1973) ...................................................................................40

*United States v. Stewart,*
    729 F.3d 517 (6th Cir. 2013) ........................................................................... 61, 62

*United States v. Sullivan,*
    274 U.S. 259 (1927) ...................................................................................................69

*United States v. Touset,*
    890 F.3d 1227 (11th Cir. 2018) .......................................................................58, 59, 64

*United States v. U.S. Dist. Court for E. Dist. Mich.,*
    407 U.S. 297 (1972) ...................................................................................................72

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) ...................................................................................................23

*United States v. Vergara,*
    884 F.3d 1309 (11th Cir. 2018) .......................................................................... 62, 65

*United States v. Wehrli,*
    637 F.2d 408 (5th Cir. 1981) .....................................................................................40

*United States v. Wade,*
    388 U.S. 218 (1967) ...................................................................................................70

*United States v. Wanjiku,*
    919 F.3d 472 (7th Cir. 2019) .......................................................................... 62, 64

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464, (1982) ...................................................................................... 57

*Van Atta v. Def. Intelligence Agency,*
    No. 87-1508, 1988 WL 73856 (D.D.C. July 6, 1988) ........................................ 40

*Veney v. Wyche,*
    293 F.3d 726 (4th Cir. 2002) .......................................................................... 17

*Ventura–Escamilla v. INS,*
    647 F.2d 28 (9th Cir. 1981) ............................................................................ 25

*Virginia v. Baust,*
    89 Va. Cir. 267, 2014 WL 10355635 (Va. Cir. 2014) ...................................... 70

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ...................................................................................... 47

*Wayte v. United States,*
    470 U.S. 598 (1985) ...................................................................................44-45

*Webman v. Fed. Bureau of Prisons,*
    441 F.3d 1022 (D.C. Cir. 2006) ...................................................................... 87

*West v. Lynch,*
    845 F.3d 1228 (D.C. Cir. 2017) ...................................................................... 19

*Whitman v. Am. Trucking Ass'ns,*
    Inc., 531 U.S. 457 (2001) .......................................................................... 88, 89

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ...................................................................................... 54

*Wikimedia Found. v. NSA,*
    857 F.3d 193 (4th Cir. 2017) .......................................................................... 16

*Williams v. Hansen,*
    326 F.3d 569 (4th Cir. 2003) .......................................................................... 49

*Winsness v. Yocom,*
    433 F.3d 727 (10th Cir. 2006) .................................................................20-21, 54

*Zadvydas v. Davis,*
    533 U.S. 678 (2001) ...................................................................................... 23

*Ziglar v. Abbasi,*
  137 S. Ct. 1843 (2017) .................................................................................... 50

*Zinermon v. Burch,*
  494 U.S. 113 (1990) ........................................................................................ 31

## Constitutional Law

U.S. Const. amend. IV ................................................................................... 58

U.S. Const. amend. V .................................................................................... 65

## Statutes

5 U.S.C. § 706(2)(A) ................................................................................ 52, 55

6 U.S.C. § 111(b)(1)(A) .............................................................................. 6, 13

6 U.S.C. § 122(d)(2) ........................................................................................ 15

6 U.S.C. § 211 ...................................................................................... 6, 13, 67

6 U.S.C. § 202(1) ........................................................................................ 6, 13

6 U.S.C. § 236(b)(1) ........................................................................................ 24

8 U.S.C. § 1104(a)(1) ...................................................................................... 24

8 U.S.C. § 1187 ............................................................................................... 23

8 U.S.C. § 1201(i) ............................................................................................ 24

18 U.S.C. § 922 ......................................................................................... 75, 76

18 U.S.C. § 2703(d) ......................................................................................... 63

19 U.S.C. § 482 ................................................................................................. 6

19 U.S.C. § 1455 ............................................................................................... 6

19 U.S.C. § 1459 ............................................................................................... 6

19 U.S.C. § 1461 ......................................................................................... 6, 67

19 U.S.C. § 1467 ............................................................................................... 6

19 U.S.C. § 1499 ......................................................................................... 6, 67

19 U.S.C. § 1581 ..................................................................................................6

19 U.S.C. § 1582 ..................................................................................................6

28 U.S.C. § 533 ...................................................................................................6

28 U.S.C. § 534 ...................................................................................53, 54, 55

28 U.S.C. § 2401(a) .............................................................................................32

42 U.S.C. § 2000bb-1 ...................................................................................79, 88

49 U.S.C. § 114 ............................................................................................*passim*

49 U.S.C. § 44903 ......................................................................................6, 9, 11

49 U.S.C. § 44904(a) ..........................................................................................88

49 U.S.C. § 44917(a) ..........................................................................................10

49 U.S.C. § 44926(a) ....................................................................................11, 89

49 U.S.C. § 46110 .......................................................................................*passim*

**Rules**

Fed. R. Civ. P. 12(b)(1) ......................................................................................28

**Administrative and Exective Materials**

28 C.F.R. Part 20 ........................................................................................53, 56

28 C.F.R. § 0.85 ..........................................................................................6, 55

28 C.F.R. § 20.20 ...............................................................................................56

28 C.F.R. § 20.33 .......................................................................................53, 56

28 C.F.R. § 25.9(a) .............................................................................................76

28 C.F.R. § 25.9 .........................................................................................75, 76

49 C.F.R. Pt. 1515 ..............................................................................................22

49 C.F.R. Pt. 1560 ................................................................................................9

49 C.F.R. Pt. 1572 ..............................................................................................22

49 C.F.R. § 1515.11(h) .......................................................................................................22

49 C.F.R. § 1520.5(b)(9)(ii) ................................................................................................8

49 C.F.R. § 1560.1(b) ..........................................................................................................9

49 C.F.R. § 1560.101(a)(1) ..................................................................................................9

49 C.F.R. § 1560.105(b)(2) ...........................................................................................9, 40

49 C.F.R. § 1560.205 ..........................................................................................................11

49 C.F.R. § 1560.3 ..............................................................................................................10

Secure Flight Program,
    73 Fed. Reg. 64,018 (Oct. 8, 2008) ......................................................................35, 40

# INTRODUCTION

This suit challenges a full range of actions taken by the federal government to protect aviation and border security, including the lawfulness of the Terrorist Screening Database ("TSDB"), which allows U.S. authorities to identify known or suspected terrorists seeking to board aircraft, enter the country, or engage in other potentially threatening activity.

Congress has tasked the Transportation Security Administration ("TSA") with establishing policies and procedures to identify individuals who may be a threat to civil aviation or national security. To this end, TSA relies in part upon the No Fly List and the Selectee List—subsets of the consolidated TSDB maintained by the Terrorist Screening Center ("TSC")—to screen passengers attempting to fly on United States commercial aircraft, or any commercial flight to, from, over, or within the United States. In furtherance of its aviation security mandate, TSA also designates aviation passengers for enhanced security screening for a variety of reasons unrelated to the TSDB. As Congress directed, TSA has in place procedures that allow individuals to seek redress for delayed or denied boarding resulting from TSA's screening program, as well as for complaints regarding Customs and Border Protection ("CBP") programs or programs of other components of the Department of Homeland Security ("DHS"), by filing an inquiry with the Department of Homeland Security's Traveler Redress Inquiry Program ("DHS TRIP").

Plaintiffs are 40 individuals who primarily allege that they are required to undergo secondary security screening or are denied boarding when they attempt to travel by air, or are referred for additional scrutiny when they cross the U.S. border. Some allege this is due to their purported placement on the TSDB and others allege they are not on the TSDB, but are so designated by TSA and CBP due to their familial relationship with individuals on the TSDB. Together, they purport to raise eleven causes of action against 26 official capacity defendants ("Defendants").[2] *See* Second

---

[2] In their Second Amended Complaint, Plaintiffs also name several unidentified "John Doe" defendants, against whom they purport to state individual capacity and/or *Bivens* claims. No such "Individual Capacity

Amended Complaint ("SAC"), ECF No. 48. Plaintiffs challenge, *inter alia*, their purported

placements on the TSDB, TSA and CBP's screening and inspection protocols, the Government's

implementation of the TSDB, and the adequacy of the DHS TRIP redress process.

      As an initial matter, this Court lacks jurisdiction over Plaintiffs' claims brought against the

majority of the Defendants, who have not plausibly caused—nor could they redress—Plaintiffs'

alleged injuries. Even assuming *arguendo* that these injuries occurred as alleged, and otherwise survive

the various legal and other deficiencies that are enumerated throughout this memorandum, the only

Defendants that exercise any direct authority over the terrorist screening enterprise challenged by

Plaintiffs' claims are the Federal Bureau of Investigation ("FBI"), TSC, the National

Counterterrorism Center ("NCTC"), and DHS, including its components TSA, CBP, and U.S.

Immigration and Customs Enforcement ("ICE"). Plaintiffs lack standing to bring any claim against

the remainder of the Defendants, and they should be dismissed from this case.

      Additionally, Plaintiff Khaled El Ali and his son Rami Khaled El Ali's claims must be

dismissed in their entirety: the former is a Belgian national living in Belgium, who cannot invoke any

constitutional rights, and the latter alleges no travel difficulties whatsoever. Several other Plaintiffs

have failed to exhaust their administrative remedies by not availing themselves of the full scope of

the procedures available to them, as necessary to state a procedural due process claim, or have filed

beyond the applicable statute of limitations. And to the extent they challenge the procedural

adequacy of the DHS TRIP process, TSA's rules-based protocols and TSA's screening policies and

procedures for selecting individuals for enhanced security screening or denial of boarding such

claims challenge orders of TSA under 49 U.S.C. § 46110 ("§ 46110"), as to which exclusive

jurisdiction rests with an appropriate Court of Appeals.

      Each of Plaintiffs' claims fails to state a claim as well. With respect to Plaintiffs' procedural

---

Defendants" have, to date, been identified or served, and the undersigned defense counsel represents and
brings the instant motion on behalf of those Defendants named in their official capacities only.

due process claim, Plaintiffs have not identified any constitutionally protected liberty interests; moreover, even if they have, the DHS TRIP redress process is constitutionally adequate. Plaintiffs also fail to allege a plausible substantive due process claim, on either an as applied or facial basis. Plaintiffs' Administrative Procedure Act ("APA") claim challenging the DHS TRIP process (Count III) is coextensive with their procedural due process claim, and should accordingly be dismissed for the same reasons. Their APA claim challenging the sharing of TSDB information through the National Crime Information Center ("NCIC") (Count IV) also fails, where such action is legally authorized, and indeed, required by Executive Order. And their equal protection claim should likewise be dismissed, for failure to plausibly allege that any unequal treatment was the result of discriminatory conduct.

With respect to Plaintiffs' Fourth Amendment and Fifth Amendment "self-incrimination" claims, numerous Plaintiffs make no allegations that any of their electronic devices have ever been the subject of any governmental search, at the border or otherwise—a deficiency that is plainly dispositive to their standing to pursue these claims. The remaining Plaintiffs fail to allege any specific plans or dates for future international travel for which there may be any future border search, and thus fail to establish standing to pursue the prospective relief sought by these claims. But even if one or more Plaintiffs could establish standing to pursue a Fourth Amendment or Fifth Amendment "self-incrimination" claim, Plaintiffs' theory that border searches of electronic devices must be supported by a warrant or the existence of probable cause is precluded by long-standing precedent to the contrary. Likewise, the Fifth Amendment claim fails on the ground that Plaintiffs do not allege that the contents of their electronic devices are potentially incriminating, as required to invoke this right, and also on the independent ground that the border search doctrine permits the Government to require that electronic devices, like all other cargo and merchandise, be presented to customs officials in a manner that allows for their inspection. Plaintiffs' related First Amendment claim must also be dismissed, as Plaintiffs have not shown any impairment of their ability to express

3

their views as a result of Defendants' actions, nor that their speech has been chilled through the search or seizure of their electronic devices. And Plaintiffs' Second Amendment claims must be dismissed as to all Plaintiffs because, *inter alia*, none allege a current inability to bear arms.

Finally, Plaintiffs' Religious Freedom Restoration Act ("RFRA") claims and their non-delegation claims should be dismissed as well. One such claim, Count XIII, fails for lack of standing, where it alleges an injury arising from an action taken by a Maryland state correctional facility that is not a party to this suit. And all of the RFRA claims fail because they do not sufficiently allege a substantial burden on Plaintiffs' exercise of religion—and even assuming, *arguendo*, that they did, the challenged policies constitute the least restrictive means of advancing compelling governmental interests in combatting terrorism and investigating crimes. Plaintiffs' non-delegation claim must be dismissed as well because Congress' directive to TSA includes an "intelligible principle" for how TSA should protect civil aviation industry from terrorist threats.

## BACKGROUND

### I.   Factual Allegations

Plaintiffs allege a variety of injuries, purportedly due to their placement on a terrorist watchlist and/or familial relationship with someone on a terrorist watchlist. Three of the 40 Plaintiffs (John Doe, Mahad Mohallim, and Hashem Nader Sehwail) (the "No Fly List Plaintiffs") allege that they are on the No Fly List and have been denied boarding. SAC ¶¶ 343, 588, 814. An additional Plaintiff, Zijad Bosnic, alleges that in May 2017, he received confirmation from DHS TRIP that he is on the No Fly List, *id.* ¶ 1048, but fails to inform the Court that in January 2018, he was further notified that he had been removed from that list. Defendants' Exhibit ("DEX") A. One other Plaintiff, Hassan Shirwa, also alleges placement on the No Fly List, *id.* ¶ 1432, but has also received official notification that he has been removed from that list. DEX B.[3]

---

[3] Because DEX A and B are dispositive of Bosnic and Shirwa's standing to pursue any prospective relief based on their prior No Fly List status, the Court may properly consider this document in a Rule 12(b)(1) posture. *See infra.*

Thirty-four of the remaining 35 Plaintiffs (Mia Khaled El Ali, Khaled El Ali, Mutasem Jardaneh, Bilal Abdurrashid, Mohammad Paryavi, Hawa Wehelie, Abdirizak Wehelie, Shamsa Hashi Noor, Faatima Wehelie, Moustafa El-Shahat, Farid Sulayman, Fadi Suliman, John Doe 2, Baby Doe, Child Doe, Child Doe 2, Mohamed Albadawi, Hicham Hall, Faatimah Knight, Khalil Thadi, Esmaeel Paryavi, Faraz Siddiqui, Abdu Wakil Cyeef Din, Mirrakhmat Muminov, Anisa Muhanovic, Mohamad Hachem, Ashraf Riad, Mustafa Kamel, Alaa Abunijem, Abdaljalil Hijaz, Abdallah Soueidan, Abedelmoniem Elamin, Imad Kadoumi, and Fadhel Al-Sahlani (together with Bosnic and Shirwa, the "Screening Plaintiffs") allege that they have been selected for additional screening at airports and/or additional inspection at ports of entry when entering the United States. SAC ¶¶ 256-57, 283-89, 307-333, 421-37, 461-478, 492-519, 524-547, 555-57, 644-657, 672-700, 717-734, 741-762, 767-89, 802, 807-809, 843-870, 895-923, 954-961, 968-990, 993-1002, 1068-78, 1107-13, 1129-43, 1167-86, 1210-32, 1248-70, 1282-98, 1320-41, 1355-75, 1385-1403, 1414-18, 1462-66, 1471-81, 1498-1533.

A sub-set of seven of the Screening Plaintiffs (Mia El Ali, Abdirizak Wehelie, Shamsa Hashi Noor, Fatima Wehelie, Baby Doe, Child Doe, and Child Doe 2) (the "Family Member Plaintiffs") allege that they were selected for additional TSA screening not due to any personal TSDB placement, but on account of their relationship to other individuals purportedly on the TSDB. *Id.* ¶¶ 248, 524, 549, 552, 799, 804. A final Plaintiff, Rami Khaled El Ali, does not allege that he has ever been subject to any enhanced screening or inspection in any setting. *See id.* ¶¶ 248-76.

Plaintiffs allege, collectively, a lack of adequate procedures to redress their travel-related difficulties, *id.* ¶¶ 1549-1572, as well as alleged deprivations of, *inter alia*, their substantive due process, equal protection, and First Amendment rights, *id.* ¶¶ 1573-90, 1608-20, 1632-46. Several Plaintiffs also allege that upon their border inspection following international travel, their electronic devices have been subject to warrantless border searches, purportedly in violation of the Fourth and Fifth Amendments. *Id.* ¶¶ 288, 316, 319, 387, 432, 495, 505, 519, 533-34, 562-63, 576, 647-48, 673,

5

680, 761, 777-78, 836, 869, 905, 914, 943-45, 905, 960, 974, 990, 1001, 1104, 1151, 1175, 1219, 1236, 1275, 1312, 1348, 1364, 1378, 1394, 1409, 1470, 1491, 1515-16; *see also id.* ¶¶ 1621-31, 1642-46. Some Plaintiffs allege that the FBI has attempted to recruit them as informants, *id.* ¶¶ 793-95, 935. One Plaintiff alleges that he was denied the purchase of a firearm, and one Plaintiff alleges that a Maryland state correctional facility denied his application to serve as a volunteer chaplain, both allegedly as a result of their watchlist placements, *id.* ¶¶ 450-54, 1423-27.

## II.   Statutory and Regulatory Background

Several different components of the federal government work together to secure the United States and its borders and aviation system from terrorist threats. DHS is charged with "prevent[ing] terrorist attacks within the United States," 6 U.S.C. § 111(b)(1)(A), and "reduc[ing] the vulnerability of the United States to terrorism," *id.* § 111(b)(1)(B); *see also id.* § 202(1) (charging DHS with the responsibility of "[p]reventing the entry of terrorists and the instruments of terrorism into the United States."). Within DHS, TSA is responsible for securing all modes of transportation, with a focus on preventing terrorist attacks against civil aviation and other methods of transportation. *See* 49 U.S.C. § 114(d). TSA is further responsible for day-to-day federal security screening operations for passenger air transportation, 49 U.S.C. § 114(e)(1), and for developing "policies, strategies, and plans for dealing with threats to transportation security," *id.* § 114(f)(3). TSA may "issue . . . such regulations as are necessary to carry out [its] functions," *id.* § 114(l)(1), as well as "prescribe regulations to protect passengers and property on an aircraft," *id.* §44903(b). Also within DHS, CBP has authority to inspect all those who are entering the United States. CBP exercises authority under numerous statutes to search persons and goods at the nation's border. *See, e.g.,* 19 U.S.C. §§ 482, 1455, 1459, 1461, 1467, 1499, 1581, 1582. These authorities include, but are not limited to, inspections for the purpose of preventing terrorist attacks. *See, e.g.,* 6 U.S.C. § 211(g)(3)(a); *Tabbaa v. Chertoff*, 509 F.3d 89, 97 (2d Cir. 2007) (describing antiterrorism mission of CBP and DHS).

The FBI investigates and analyzes intelligence relating to both domestic and international terrorist activities, *see* 28 U.S.C. § 533, 28 C.F.R. § 0.85(l). The FBI also administers the TSC, a multi-agency Executive organization established by Presidential Directive in 2003 and tasked with, *inter alia*, "consolidat[ing] the Government's approach to terrorism screening and provid[ing] for the appropriate and lawful use of Terrorist Information in screening processes." Homeland Security Presidential Directive ("HSPD") 6 (Sept. 16, 2003), https://fas.org/irp/offdocs/nspd/hspd-6.html (last visited Apr. 29, 2019); *see also* "Overview of the U.S. Government's Watchlisting Process and Procedures as of January 2018" ("Watchlisting Overview"), DEX C;[4] Christopher M. Piehota, Statement before the House Homeland Security Committee, Subcommittee on Transportation Security (Sept. 18, 2014), at 1-2 ("Piehota Statement").[5]

**A.      The Terrorist Screening Database, The No Fly List, and the Selectee List**

Inclusion in the TSDB results from a multi-step assessment, based on analysis of available intelligence and investigative information about the individual. DEX C at 3. The FBI "nominates" domestic KSTs for inclusion in the TSDB. NCTC, on behalf of the intelligence community, also "nominates" international KSTs for inclusion in the TSDB. TSC then determines whether those nominations will be accepted. *Id.* In order for a KST nomination to be accepted, it must include enough identifying information to allow screeners to be able to determine whether the individual they are screening is a match to a record in the TSDB, and enough information to satisfy a

---

[4] The Watchlisting Overview document, which was released by the U.S. Government in January 2018 following an inter-agency review process, provides an official, authorized description of watchlisting policies and procedures. The Court may properly take judicial notice of this public document, as well as the remainder of Defendants' exhibits, with the exception of the three declarations which are relevant to jurisdictional arguments only. *See, e.g., Goldstein v. F.D.I.C.*, No. CIV-ELH-11-1604, 2014 WL 69882, at *9 (D. Md. Jan. 8, 2014) ("[A] court may take judicial notice of a public document without converting the motion into one for summary judgment."); *Aguilar v. United Floor Crew, Inc.*, No. 14-CIV-61605, 2015 WL 2415421, at *6 (S.D. Fla. May 21, 2015) ("judicial notice may be taken of public records and government documents available from reliable sources").

[5] *Available at* http://docs.house.gov/meetings/HM/HM07/20140918/102636/HHRG-113-HM07-Wstate-PiehotaC-20140918.pdf (last visited April 29, 2019).

reasonable suspicion that the individual is a KST. *Id.* The "reasonable suspicion" standard for inclusion in the TSDB as a KST is satisfied only where there exists "articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct … in preparation for, in aid or furtherance of, or related to, terrorism and/or terrorist activities." *Id.* at 4.

The No Fly List, the Selectee List, and the Expanded Selectee List are subset lists of the TSDB. Inclusion on either list requires satisfaction of additional criteria distinct from, and over and above, that required for designation as a KST and inclusion in the TSDB generally. *Id.* at 4. To place an individual on the No Fly List, there must be credible information showing the individual presents a threat of committing an act of terrorism with respect to an aircraft, the homeland, U.S. facilities or interests abroad, or is a threat of engaging in or conducting a violent act of terrorism and is operationally capable of doing so. *Id.* For security reasons, the criteria for inclusion on the Selectee List are not public. *Id.* Importantly, and as set forth below, while TSC maintains the TSDB, TSA is responsible for implementing the No Fly, Selectee, and Expanded Selectee subcomponents of this database through its Secure Flight Program.

The Government generally does not disclose whether an individual is in the TSDB. Such status is protected by the law enforcement privilege, and the identities of those on the No Fly and Selectee Lists are protected as Sensitive Security Information ("SSI"). *See* 49 U.S.C. § 114(r); 49 C.F.R. § 1520.5(b)(9)(ii); *Blitz v. Napolitano*, 700 F.3d 733, 737 n.5 (4th Cir. 2012)). However, as described below, such No Fly List status is disclosed to U.S. citizens and lawful permanent residents (collectively, "U.S. persons") who have been denied boarding a commercial aircraft because of their presence on the No Fly List and thereafter properly seek redress through DHS TRIP.

**B.** **TSA's Security Measures and Its Use of the TSDB and Other Watchlists to Secure Aviation**

One of TSA's primary responsibilities is to ensure aviation security, including by implementing the No Fly, Selectee, and Expanded Selectee Lists. Congress has directed TSA to "assess threats to transportation," to "develop policies, strategies, and plans for dealing with threats to transportation security," to "enforce security-related regulations and requirements," and to "oversee the implementation, and ensure the adequacy, of security measures at airports." 49 U.S.C. § 114(f)(2), (3), (7), (11). Congress has further directed TSA to "perform[] . . . the passenger prescreening function of comparing passenger information to the automatic selectee and no fly lists and utilize all appropriate records in the consolidated and integrated terrorist watchlist maintained by the Federal Government in performing that function." *Id.* § 44903(j)(2)(C)(ii). This mandate requires TSA, "in consultation with other appropriate Federal agencies and air carriers," *id.* § 114(h)(3), "to use information from government agencies to identify [travelers] who may be a threat to civil aviation or national security," *id.* § 114(h)(3)(A), and to "prevent [those] individual[s] from boarding an aircraft, or take other appropriate action with respect to that individual," *id.* § 114(h)(3)(B); *id.* § 114(h)(1).

TSA carries out its responsibilities in part through the "Secure Flight" program. *See* 49 C.F.R. Pt. 1560. Under Secure Flight, covered aircraft operators request the full name, gender, date of birth, and other information from passengers, and submit the data to TSA. *Id.* § 1560.101(a)(1), (b). TSA uses the information to identify individuals "on Federal government watchlists who seek to travel by air." *Id.* § 1560.1(b). An aircraft operator may not issue a boarding pass to an individual "until TSA informs the covered aircraft operator of the results of watchlist matching for that passenger," and, if TSA so directs, the aircraft operator "may issue a boarding pass to that individual [but] must identify the individual for enhanced screening, in accordance with procedures approved by TSA." *Id.* § 1560.105(b)(2). TSA prohibits individuals on the No Fly List from boarding flights on U.S. carriers as well as flights into, out of, over, or within U.S. airspace, but permits individuals

9

on the Selectee and Expanded Selectee Lists to enter the sterile area of an airport or board an aircraft only after undergoing enhanced security screening. DEX C at 2.

As recommended in the final report of the National Commission on Terrorist Attacks upon the United States ("9/11 Commission"), TSA is also authorized to use the "larger set of watch lists maintained by the federal government" to implement its pre-flight passenger pre-screening program. 49 C.F.R. § 1560.3. TSA uses several risk-based programs, including Quiet Skies and Silent Partner, to designate passengers for enhanced screening.[6] Under these programs, TSA creates rules and leverages its access to CBP's Automated Targeting System to identify passengers for enhanced screening. *See* DEX D at 8. "Specifically, analysts within the Intelligence and Analysis Division of TSA's Office of Intelligence and Analysis review current intelligence to identify factors that may indicate an elevated risk for a passenger. TSA creates rules based on these factors and provides them to CBP." *Id.* at 13. CBP then uses a tool "to identify passengers who correspond with the rules and provides TSA information on them in the form of a list." *Id.* "Upon receiving the list, TSA creates another rules-based list—a subset of the larger rules-based list—based on additional criteria. Through Secure Flight screening, TSA designates passengers on either rules-based list as selectees for enhanced screening. *Id.*; *see also id.* at 45, fig. 3; *see also* DEX E at 1. TSA also designates passenger for enhanced screening at random. DEX D at 19, fig. 2.

Congress further directed TSA to deploy Federal Air Marshals ("FAMs") on every flight determined to "present high security risks." 49 U.S.C. § 44917(a)(2). By statute, the FAMs are also required to utilize a risk-based strategy (1) "when allocating resources between international and domestic flight coverage, including when initially setting its annual target numbers of average daily international and domestic flights to cover;" (2) "to support domestic allocation decisions;" and (3) "to support international allocation decisions." 49 U.S.C. § 44917(a)(9-11). Congress also directed

---

[6] Specific details of TSA's risk-based rules for screening are protected by statute as SSI. Certain details are also subject to the law enforcement privilege.

TSA to consider its risk-based rules when creating Federal Air Marshal mission schedules.  FAA Reauthorization Act of 2018, § 1949(d)(1).

### C.      Redress Procedures for Travelers Who Allegedly Experience Delayed Boarding

Congress directed TSA to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system." 49 U.S.C. § 44903(j)(2)(C)(iii)(I); *see also id.* §§ 44903(j)(2)(G)(i), 44926(a). As directed by Congress, DHS TRIP is available to individuals who experience travel difficulties related to matching one of TSA's risk-based rules.  FAA Reauthorization Act of 2018, § 1949(a). Under these authorities, TSA has promulgated regulations governing the DHS TRIP process. 49 C.F.R. §§ 1560.201-1560.207. Under these regulations, travelers may initiate this redress process by submitting a redress inquiry form. *Id.* § 1560.205(b).

If the traveler's name is a match or near match with a name on the TSDB, "TSA, in coordination with the TSC and other appropriate Federal law enforcement or intelligence agencies, if necessary, will review all the documentation and information requested from the individual, correct any erroneous information, and provide the individual with a timely written response." 49 C.F.R. § 1560.205(d). This includes a review of TSDB information, as well as information on related U.S. Government information systems. *See* Press Release, FBI, Newly Signed Government-wide Watchlisting Redress MOU (Oct. 24, 2007); *see also* Piehota Statement. At the end of its review, DHS TRIP responds with a determination letter, the contents of which vary based on the circumstances, but which generally advise the traveler of any corrections that may have been made as a result of DHS TRIP's review. For inquiries alleging delayed or denied boarding due to TSA watchlist matching, the determination letter also typically states that it is a "final agency decision, which is reviewable by the United States Court of Appeals under 49 U.S.C. § 46110." *Id.*

### D.       Enhanced Redress Procedures for U.S. Persons Who Are Denied Boarding

In 2015, TSA adopted revised DHS TRIP procedures applicable to any U.S person who is denied boarding due to No Fly status and files a redress inquiry. *See generally Latif v. Lynch*, 3:10-cv-00750 (BC), 2016 WL 1239925, at \*5 (D. Or. Mar. 28, 2016) (describing process, information disclosed, and resulting order issued by TSA Administrator); DEX C at 7-10 (same). If it is determined that a U.S. person who invokes these procedures is appropriately on the No Fly List, DHS TRIP will inform him of such status and of the opportunity to seek additional information. If the individual takes this opportunity, DHS TRIP will provide the individual with the No Fly List criterion or criteria on which his placement was based and, to the extent possible consistent with national security and law enforcement interests, a summary of the factual basis for the No Fly List determination. *See id.* The amount and type of information provided will vary on a case-by-case basis, depending on the facts and circumstances.[7] The individual then has an opportunity to submit to DHS TRIP any information that he considers potentially relevant to his No Fly List status. DHS TRIP, in consultation with relevant TSA offices, will review the submission and provide it to TSC for appropriate action, including potentially removing the individual from the No Fly List. *Id.* at 9.

Where TSC concludes that the individual should remain on the No Fly List, it will provide a recommendation to the TSA Administrator. *Id.* The TSA Administrator reviews the information on the individual's placement, including both TSC's recommendation and any information the individual submitted, and will either issue a final order removing the individual from, or maintaining him on, the No Fly List, or remand the letter back to TSC with a request for additional information or clarification. *Id.* If TSA issues a final order, the order will state (to the extent possible consistent with national security and law enforcement interests) the basis for the decision, and will further notify the individual of the ability to seek judicial review pursuant to 49 U.S.C. § 46110. *Id.*

---

[7] In some circumstances, it may not be possible to provide an unclassified summary when the national security and law enforcement interests at stake are taken into account.

E.      **CBP's Border Search Authorities and Policies**

Several Plaintiffs allege injuries based upon interactions with CBP. As noted above, one of DHS's most important responsibilities is "preventing the entry of terrorists and the instruments of terrorism into the United States." 6 U.S.C. §§ 111(b)(1)(A) & 202(1). CBP, in particular, is responsible for enforcing hundreds of laws and regulations, including, among others, those addressing immigration, currency and financial transactions, customs, commerce and trade, copyrights and trademarks, narcotics, the safety of agricultural products and other goods, and import and export controls on wildlife and plants, chemical and biological weapons, guns, and other items.[8] CBP utilizes these broad authorities in fulfilling its mission responsibilities relating to border security. *See* 6 U.S.C. § 211.

CBP's border security mission includes "deter[ing] and prevent[ing] terrorists and terrorist weapons from entering the United States" and "conduct[ing] inspections at such ports of entry to safeguard the United States from terrorism." *Id.* § 211(g)(3)(A)-(B). In order to carry out these responsibilities, CBP is congressionally directed to "develop and implement screening and targeting capabilities, including the screening, reviewing, identifying, and prioritizing of passengers and cargo across all international modes of transportation." *Id.* § 211(c)(9). Congress further directed CBP to establish "targeting operations within [CBP] to collect and analyze traveler and cargo information in advance of arrival in the United States to identify and address security risks." *Id.* § 211(g)(4)(C)(i). As part of its targeting operations, CBP uses rules which "compare[] existing information about individuals and cargo entering and exiting the country with patterns identified as requiring additional scrutiny." DEX E at 1. The CBP system identifies "persons whose information matches criteria comprising a targeting rule" and such matches are "are reviewed by CBP Officers to confirm continued official interest in the identified person." *Id.* at 3. These rules are "designed to signal to

---

[8] *See generally* Summary of Laws and Regulations Enforced by CBP (last modified March 8, 2014), https://www.cbp.gov/trade/rulings/summary-laws-enforced/us-code (last visited Apr. 29, 2019).

CBP Officers that further inspection of a person, shipment, or conveyance may be warranted, even though an individual may not have been previously associated with a law enforcement action or otherwise be noted as a person of concern to law enforcement." *Id.* at 4.

With respect to Plaintiff's allegations regarding border searches of electronic devices, CBP's guidance and standard operating procedures are set forth in CBP Directive No. 3340-049A, "Border Search of Electronic Devices," issued on January 4, 2018 ("CBP Directive" or "2018 Directive"), DEX F; *see also* Privacy Impact Assessment Update for CPB Border Searches of Electronic Devices, DHS/CBP/PIA-008(a), DEX G. Pursuant to the 2018 Directive, CBP has determined, "as a policy matter … [to] impose[] certain requirements, above and beyond prevailing constitutional and legal requirements, to ensure that the authority for border searches of electronic devices is exercised judiciously, responsibly, and consistent with the public trust." *Id.* p. 4. Specifically, since the issuance of the 2018 Directive, CBP differentiates between "basic" and "advanced" searches, and follows different procedures for each. *Id.* ¶¶ 5.1.3, 5.1.4. A CBP Officer may perform a basic search of an electronic device with or without suspicion. *Id.* ¶¶ 5.1.3. Such searches "may reveal information that is resident upon the device and would ordinarily be visible by scrolling through the phone manually (including contact lists, call logs, calendar entries, text messages, pictures, videos, and audio files)." DEX G p. 6. "Following a basic search, if CBP is satisfied that no further information is needed, the electronic device is returned to the traveler and he or she is free to proceed." *Id.*

An advanced search "is any search in which a[] [CBP] Officer connects external equipment, through a wired or wireless connection, to an electronic device not merely to gain access to the device, but to review, copy, and/or analyze its contents." CBP Directive ¶ 5.1.4. Under the CBP Directive, advanced searches are permissible only where "there is reasonable suspicion of activity in violation of the laws enforced or administered by CBP, or in which there is a national security concern, and with supervisory approval." *Id.* "Many factors may create reasonable suspicion or constitute a national security concern; examples include the existence of a relevant national security-

related lookout in combination with other articulable factors as appropriate, or the presence of an individual on a government-operated and government-vetted terrorist watch list." *Id.*

For both basic and advanced searches, the CBP Directive provides that "[t]he border search will include an examination of only the information that is resident upon the device and accessible through the device's operating system or through other software, tools, or applications." *Id.* ¶ 5.1.2. Accordingly, "[o]fficers may not intentionally use the device to access information that is solely stored remotely. To avoid retrieving or accessing information stored remotely … Officers will either request that the traveler disable connectivity to any network," or will do so themselves. *Id.*

The CBP Directive further recognizes that it is not always possible to complete the search of a traveler's electronic device while he or she waits at the border, not only for operational reasons, but also for the convenience of the traveler. Thus, CBP Officers are permitted, with supervisory approval, to detain an electronic device beyond "the individual's departure from the port or other location of detention." *Id.* ¶ 5.4.1.1. Such detention is authorized only "for a brief, reasonable period of time," as necessary "to perform a thorough border search." *Id.* ¶ 5.4.1. "The search may take place on-site or at an off-site location, and is to be completed as expeditiously as possible"—in the absence of extenuating circumstances, generally no longer than five days. *Id.* Extensions of detentions longer than 15 days must be approved by certain specified high-level supervisors, and may be approved and re-approved in increments of no longer than seven days. *Id.* ¶ 5.4.1.1.

The CBP Directive also contains guidance for obtaining assistance from other law enforcement agencies with respect to border searches of electronic devices. When "there is a national security concern or they have reasonable suspicion of activities in violation of the laws enforced or administered by CBP," CBP Officers may transmit electronic devices or copies of information contained therein to other federal agencies to obtain subject matter assistance to "determine the meaning, context, or value" of information contained in the device. *Id.* ¶ 5.4.2.2. CBP Officers may also seek technical assistance, such as translation or decryption assistance, from

other federal agencies with or without individualized suspicion. *Id.* ¶ 5.4.2.1. Consistent with 6 U.S.C. § 122(d)(2) and other applicable law and policy, CBP will share any terrorism information encountered in the course of a border search with elements of the federal government responsible for analyzing terrorist threat information. *Id.* ¶ 5.5.1.4.

The CBP Directive also describes CBP policy regarding seizure and retention of an electronic device or copies of information from the device. *See generally id.* ¶ 5.4. Without probable cause to seize an electronic device or a copy of the information contained therein, CBP "may retain only information relating to immigration, customs, and other enforcement matters if such retention is consistent with [an] applicable [Privacy Act] systems of records notice." *Id.* ¶ 5.5.1.2.

## LEGAL STANDARDS

### I.      Federal Rule 12(b)(1)

Federal Rule 12(b)(1) permits defendants to challenge the court's subject-matter jurisdiction, including a plaintiff's standing to maintain suit. "A defendant may challenge subject-matter jurisdiction in one of two ways: facially or factually." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). "In a facial challenge, the defendant contends 'that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based,'" *id.* (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)), and "the plaintiff is afforded the same procedural protection that exists on a motion to dismiss" under Rule 12(b)(6), *Wikimedia Found. v. NSA*, 857 F.3d 193, 208 (4th Cir. 2017) (citation omitted). "In a factual challenge, the defendant contends that the jurisdictional allegations of the complaint are not true." *Id.* "In that event, a trial court may look beyond the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations." *Id.*

### II.     Federal Rule 12(b)(6)

A motion to dismiss under Federal Rule 12(b)(6) tests the sufficiency of a complaint. To survive such a motion, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). In assessing a Rule

12(b)(6) motion, the Court must consider all well-pled allegations in a complaint as true and view the complaint in the light most favorable to the plaintiff. *See Albright v. Oliver,* 510 U.S. 266, 268 (1994). However, these principles do not apply to "a legal conclusion couched as a factual allegation," *Papasan v. Allain,* 478 U.S. 265, 286 (1986), nor to "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *Veney v. Wyche,* 293 F.3d 726 (4th Cir. 2002) (citation omitted). In assessing a Rule 12(b)(6) motion, a court may consider documents of which it may take judicial notice, without converting a Rule 12(b)(6) motion into one for summary judgment. *Sec'y of State for Def. v. Trimble Navigation Ltd.,* 484 F.3d 700, 705 (4th Cir. 2007).

## ARGUMENT

### I.     Plaintiffs Lack Standing against the Majority of the Putative Defendants.

As a threshold matter,[9] Plaintiffs lack standing to bring any claim against the majority of the named Defendants, because the requisite "'causal connection between [their alleged] injuries and the conduct complained of'" is entirely absent as to all but a small handful of the Defendants; nor is any of the redress that Plaintiffs seek in their Prayer for Relief even theoretically obtainable through any action by most of the Defendants. *Frank Krasner Enters., Ltd. v. Montgomery Cty*, 401 F.3d 230, 234 (4th Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Specifically, Plaintiffs allege injuries in the form of, variously, being nominated to a terrorist watchlist, the denial of boarding on an aircraft, enhanced screening measures at airports, secondary inspections and/or searches of their electronic devices at the border, a purported lack of adequate redress procedures related to their travel difficulties, recruitment as an FBI informant in alleged violation of religious instruction, and, in one case, the purported denial of a purchase of a firearm. But even assuming *arguendo* that these injuries occurred as alleged, the only Defendants that exercise legal authority in

---

[9] As an additional threshold matter, Defendants object to the Doe Plaintiffs proceeding anonymously without their affirmatively obtaining leave of Court to do so. Moreover, without information regarding the Doe Plaintiffs' true identities, Defendants are prejudiced and potentially lacking information—such as, *inter alia,* the Does' citizenship status, whether they are in fact in the TSDB, and whether they have submitted DHS TRIP inquiries—that may be necessary to defend themselves against the Does' claims.

any of these areas are TSA, FBI, TSC, NCTC, DHS, CBP, and ICE. As against the remaining named Defendants (the "putative Defendants"),[10] Plaintiffs cannot establish standing.

To establish "the 'irreducible constitutional minimum' of standing," Plaintiffs must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 136 S.Ct. 1540, 1547 (2016) (quoting *Lujan,* 504 U.S. at 560). Because Article III does not "permit[ ] suits against non-injurious defendants as long as one of the defendants in the suit injured the plaintiff," standing must be assessed individually against each defendant. *Mahon v. Ticor Title Ins. Co.,* 683 F.3d 59, 62 (2d Cir. 2012); *see also, e.g., Calzone v. Hawley,* 866 F.3d 866, 869 (8th Cir. 2017).

Plaintiffs cannot satisfy these precepts as to a substantial majority of the Defendants they have named in this suit, for the straightforward reason that none of their asserted injuries were either caused, or could even potentially be redressed, by these putative Defendants. The causation and redressability "elements of Article III standing are closely linked … because 'a federal court [can] act only to redress injury that fairly can be traced to the challenged action of the defendant[.]'" *Robbins v. HUD,* 72 F. Supp. 3d 1, 6 (D.D.C. 2014), *aff'd sub nom. Robbins v. Castro,* No. 14-5298, 2015 WL 3372527 (D.C. Cir. May 6, 2015) (quoting *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41-42 (1976)). "[C]ausation focuses on the 'connection between the assertedly unlawful conduct and the

---

[10] Specifically, these official capacity Defendants are: William Barr, Attorney General, U.S. Department of Justice ("DOJ"); John C. Demers, Assistant Attorney General for National Security, DOJ; Beth A. Williams, Assistant Attorney General, Office of Legal Policy, DOJ; Peter A. Winn, Acting Chief Privacy and Civil Liberties Officer, Office of Privacy and Civil Liberties, DOJ; Daniel R. Coats, Director of National Intelligence, Office of the Director of National Intelligence; L. Francis Cissna, Director, U.S. Citizenship and Immigration Services, DHS; Cameron Quinn, Officer, Office for Civil Rights and Civil Liberties, DHS; David J. Glawe, Under Secretary, Office of Intelligence and Analysis, DHS; John Mitnick, General Counsel, DHS; James W. McCament, Deputy Under Secretary, Office of Strategy, Policy, and Plans, DHS; Jonathan R. Cantor, Chief Privacy Officer, Privacy Office, DHS; Mike Pompeo, Secretary of State, U.S. Department of State; Patrick M. Shanahan, Acting Secretary of Defense, U.S. Department of Defense; General Paul M. Nakasone, Commander, U.S. Cyber Command and Director, National Security Agency/Chief, Central Security Service, U.S. Department of Defense; Lieutenant General Robert P. Ashley, Jr., Director, Defense Intelligence Agency; Steven Mnuchin, Secretary of the Treasury, U.S. Department of Treasury; Ken Blanco, Director, Financial Crimes Enforcement Network, U.S. Department of the Treasury; Gina Haspel, Director, Central Intelligence Agency; and the WLAC.

alleged injury,' whereas redressability focuses on the 'connection between the alleged injury and the judicial relief requested.'" *West v. Lynch*, 845 F.3d 1228, 1235-36 (D.C. Cir. 2017) (quoting *Allen v. Wright*, 468 U.S. 737, 753 (1984)). Thus, these elements require a plaintiff to establish "that 'the asserted injury was the consequence of the defendants' actions,'" and the relief requested, if granted as against a particular defendant, "will remove the harm." *Iota Xi Chapter Of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 148 (4th Cir. 2009) (emphasis omitted).

Here, with the sole exception of the paragraphs in which Plaintiffs name the putative Defendants, *see* SAC ¶¶ 57-82, the SAC is completely devoid of any mention of any specific action that Plaintiffs allege any of these Defendants to have taken at any time—much less any theory of how such (non-) action caused any Plaintiff any concrete injury that could be redressed by this Court, as against these Defendants, through any of the remedies sought in their Prayer for Relief.[11] Accordingly, all of the putative Defendants must be dismissed.

To the extent that Plaintiffs rejoin that they possess standing against the putative Defendants because each is a "regular agency attendee" of the Watchlisting Advisory Council ("WLAC"), that argument lacks any merit. According to Plaintiffs the WLAC is, purportedly, a "government agency" that "promulgates decisions regarding all policies, procedures, practices and instructions pertaining to the federal terrorist watchlist[.]" *Id.* ¶ 57; *see also id.* ¶ 82. But as demonstrated by the Declaration of Timothy Groh, Deputy Director of Operations at the TSC, the WLAC is *not* an "agency," and it does not "promulgate" anything. DEX H. To the contrary, the WLAC is simply a forum in which participating agencies gather—voluntarily and pursuant to their own separate and individualized authorities—to discuss and address certain types of watchlisting-related issues. *Id.* ¶ 3. It is an

---

[11] Plaintiffs allege that several of these Defendants "utilize[] the TSDB in order to screen persons against it that [sic] are applying for security clearances or employment to work with [a putative Defendant in order] to deny them employment." SAC ¶ 57; *see id.* ¶¶ 58-82. However, no Plaintiff him- or herself alleges to have suffered any such injury; nor does the Prayer for Relief contain any request related to these non-existent "injuries." Because it is axiomatic that a plaintiff may only establish standing "to seek redress for injuries done to him, [and] may not seek redress for injuries done to others," *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972)), these allegations are wholly irrelevant to the standing analysis.

19

informal body that was not established by any executive order, action, regulation, policy, or document, and does not have a charter. *Id.* The WLAC is convened voluntarily, by the mutual agreement of its members, and does not itself have any statutory or legal authority. *Id.* Thus, the WLAC does not have the authority to approve changes to the WLG, or to take any other action that would create official policy in the area of watchlisting.

But even on Plaintiffs' unfounded theory as to the WLAC, they cannot establish standing as to any claim against any of the putative Defendants (including the WLAC itself); any such claims falter on the well-established rule that "[t]he causation element of standing requires the named defendants to possess authority to enforce the complained-of provision, and the redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute." *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014) (internal citation omitted). Thus, where—as here—the defendant in question lacked any control or enforcement authority over a challenged statute or policy, courts have consistently dismissed plaintiffs' claims for failure to establish causation and/or redressability. *Nat'l Ass'n for Advancement of Multijurisdiction, v. Howell*, 851 F.3d 12, 17 (D.C. Cir. 2017) (dismissing claims on standing, where the plaintiff "failed to identify any role whatsoever" of the defendants "in promulgating or enforcing" the challenged rules); *Calzone*, 866 F.3d at 869 (dismissing on standing grounds claims against various state entities with a lack of any enforcement authority over the challenged provision); *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (*en banc*) ("The requirements of *Lujan* are entirely consistent with the long-standing rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute."); *Doe v. Pryor*, 344 F.3d 1282, 1285 (11th Cir. 2003) (dismissing claims on standing where "[t]he only defendant in this case is the Alabama Attorney General, and the only injuries J.B. has alleged stem from a state court custody proceeding in which the Attorney General played no role. The Attorney General has taken no action to enforce the [challenged policy] against J.B."); *Winsness*

*v. Yocom,* 433 F.3d 727, 737 (10th Cir. 2006) (no standing where "defendants did not issue the [challenged] citation … and are not responsible for maintaining any record of it").

Here, none of the putative Defendants have any control or enforcement authority over any of the alleged policies underlying Plaintiffs' alleged injuries. Accordingly, none of Plaintiffs' purported injuries are plausibly alleged to be caused *by* these Defendants—and nor would the entry of any remedies that Plaintiffs seek provide redress *through* these Defendants. All of the putative Defendants listed in fn. 10, *supra,* including the WLAC itself, should be dismissed.

## II.     Additional Alleged Injuries Are not Properly Before the Court against Any Defendant.

A few Plaintiffs also allege injuries that are simply not cognizable against any Defendant, at least in the context of this lawsuit or in this venue. None of these alleged injuries are relevant to any claim as to which this Court may enter any relief.

*Military Base Access*: First, Farid Sulayman and Khalil Thadi each allege that they were denied access to military bases due to their alleged TSDB statuses. SAC ¶¶ 703-713, 950-53. However, it is well-established that "[c]ivilians have no constitutional right to enter a military base." *Fields v. Blake*, 349 F. Supp. 2d 910, 920-21 (E.D. Pa. 2004) (citing *Greer v. Spock*, 424 U.S. 828 (1976)); *see also*, *e.g.*, *Cafeteria and Restaurant Workers Union, Local 473, AFL–CIO v. McElroy* 367 U.S. 886, 893-94 (1961) (recognizing "the historically unquestioned power of a commanding officer summarily to exclude civilians from the area of his command"); *Serrano Medina v. U.S.,* 709 F.2d 104, 109 (1st Cir. 1983) ("[T]he power to exclude civilians summarily has been acknowledged by almost every court to consider the matter."); *Berry v. Bean,* 796 F.2d 713, 717 (4th Cir. 1986) (similar). Accordingly, even assuming these allegations are true, they do not state any legally cognizable injury against the Department of Defense or any other Defendant.[12]

---

[12] The SAC does not state any claim or seek any relief related to these alleged injuries; nor does either Sulayman or Thadi (or any other Plaintiff) allege any intention to attempt to enter a military base in the future.

*TWIC Credential:* Second, Zijad Bosnic alleges that his Transportation Worker Identification Card ("TWIC"), a biometric credential allowing persons holding the same to have unescorted access to secure areas of port facilities and vessels, was suspended "due to his [alleged] placement on the federal terrorist watch list." SAC ¶¶ 1042-45. However, the SAC does not state any claim or seek any relief related to the suspension of Mr. Bosnic's TWIC—and for good reason: TSA regulations provide for specific administrative appeal procedures by which Mr. Bosnic must challenge the security threat assessment conducted by TSA in conjunction with the TWIC credentialing process. *See* 49 C.F.R. Pt. 1515 (Appeal and Waiver Procedures for Security Threat Assessments for Individuals); 49 C.F.R. Pt. 1572 (establishing regulations for credentialing and security threat assessments for maritime and land transportation workers, including criminal, immigration, and other potential disqualifiers). Further, if TSA's determination at the conclusion of the redress process is that the individual poses a security threat and may not possess a TWIC, judicial review is available exclusively in the federal courts of appeal. 49 C.F.R. § 1515.11(h); 49 U.S.C. § 46110; *see generally Seraji v. Gowadia*, No. 8:16-cv-01637, 2017 WL 2628545 (C.D. Cal. Apr. 28, 2017).

*TSA Pre✓® and Global Entry.* Third, certain Plaintiffs allege that their applications to "travel benefit programs like TSA Pre✓® and Global Entry" were denied, or granted and then later revoked, on the basis of their purported watchlist status. SAC ¶¶ 148, 483-84, 763-64, 978-81, 1203-04, 1535. However, as "Congress committed to [DHS] the sole discretion to determine eligibility guidelines and evaluate applicants" for these programs, *Roberts v. Napolitano*, 792 F. Supp. 2d 67, 73-74 (D.D.C. 2011)—and again, no Plaintiff seeks any relief related to either program—these alleged injuries are likewise wholly irrelevant to any claim as to which this Court may enter any relief.

### III.   All Claims Brought by Plaintiff Khaled El Ali and His Son Rami Must Be Dismissed.

Khaled El Ali is a Belgian national residing in Belgium, who alleges that the government

revoked his Electronic System for Travel Authorization ("ESTA") status[13] and denied him a non-

immigrant visa as a result of his placement on the TSDB. SAC ¶¶ 19, 277-306. He claims that he

suffered travel difficulties whenever he traveled in the past "from 2002 to 2017," SAC ¶ 293, but has

not alleged any more recent travel since he was found ineligible for a visa in March 2017. His son,

Rami Khaled El Ali, is a U.S. citizen living in the United States, who has not alleged a single instance

of heightened screening or inhibited travel.

Initially, Khaled El Ali cannot invoke constitutional protections because he is a Belgian

citizen living abroad. "There is a distinction . . . between the constitutional rights enjoyed by aliens

who have entered the United States and those who are outside of it." *Louhghalam v. Trump*, 230 F.

Supp. 3d 26, 33 (D. Mass 2017); *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("once an alien

enters the country, the legal circumstance changes")); *Johnson v. Eisentrager*, 339 U.S. 763, 783 (1950)

("there is no authority . . . for holding that the Fifth Amendment confers rights upon all persons,

whatever their nationality, wherever they are located."); *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 265

(1990) (recognizing that the Fourth, First, Second, Ninth, and Tenth Amendments only apply to

persons who are part of the national community or who have sufficient connections to the United

States).[14] Mr. El Ali brings constitutional claims that are unavailable to him because they are afforded

---

[13] ESTA is an automated system that constitutes the method by which CBP informs travelers whether they are able to travel under the Visa Waiver Program ("VWP"). The VWP allows certain individuals who are citizens of particular countries to travel as visitors for business or pleasure to travel without a visa where they are agree to waive certain rights. However, a determination that an individual is unable to obtain an ESTA authorization and travel under the VWP is not a determination of the individual's ultimate admissibility, nor is it a determination of whether an individual is eligible for a visa. 8 U.S.C. § 1187(h)(3)(C)(iii). Moreover, the only method to dispute a denial of a waiver under the VWP is to seek a visa. *Id.* § 1187(g). Accordingly, and for the additional reasons explained *infra*, Mr. El Ali's allegations regarding any inability to travel under the VWP do not support any standing argument.

[14] Mr. El Ali does not assert any "substantial connections" of his own to the United States, relying solely on the connections of his children. No case law supports using another person's relationship with the United States to provide the requisite "substantial connections." Indeed, such a result would be anomalous. An alien has no constitutionally protected liberty interest in traveling to the United States, even when the alien has a

to "United States citizens" and "aliens *physically present* in th[is] country." *Udugampola v. Jacobs*, 795 F. Supp. 2d 96, 103-4 (D.D.C. 2011) (citing *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) with respect to the Fifth Amendment). As a noncitizen nonresident, Mr. El Ali cannot assert any constitutional claims because he is not present in the United States.[15]

Second, even if he were present in the United States, Mr. El Ali otherwise has not established standing. His alleged past injuries do not confer him standing for the prospective relief he seeks. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). And the sole ongoing injury about which he complains, his visa denial, is non-justiciable under the doctrine of consular non-reviewability. Congress' authority to regulate the admission of aliens into the United States is exclusive: "[t]he power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, *without judicial intervention*, is settled by our previous adjudications." *Kleindienst*, 408 U.S. at 766 (emphasis added). The doctrine of consular nonreviewability thus "holds that a consular official's decision to issue or withhold a visa is not subject to judicial review, at least unless Congress says otherwise." *Saavedra Bruno*, 197 F.3d 1153, 1159 (D.C. Cir. 1999). And Congress has said, through the provisions of the Immigration and Nationality Act ("INA"), that visa revocations are nonreviewable subject to only very limited exceptions not relevant here, 8 U.S.C. § 1201(i), and judicial review of visa denial is not authorized at all. *See, e.g.,* 6 U.S.C. § 236(b)(1), (c)(1), (f); 8 U.S.C. § 1104(a)(1). This rule against judicial review applies broadly—even where it is alleged that the pertinent regulations are invalid, *see*

---

U.S. citizen spouse. *See Kerry v. Din*, 135 S. Ct. 2128, 2131 (2015) (plurality op.); *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972). An alien cannot access constitutional protections by repackaging the same facts as "substantial connections."

[15] Nor can Mr. El Ali bring any claims under the RFRA, which "do[es] not extend" any protections to "nonresident aliens." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (citing *Rasul v. Myers,* 563 F.3d 527, 532 (D.C. Cir. 2009).

*Ventura–Escamilla v. INS*, 647 F.2d 28 (9th Cir. 1981), or where it is alleged that the decision was based on factual or legal error. *See Centeno v. Shultz*, 817 F.2d 1212, 1213 (5th Cir. 1987).

Mr. El Ali seeks to circumvent this clear authority by not challenging his visa denial directly but by alleging that his visa denial resulted from his alleged unlawful TSDB status. But framing his claim in this manner does not change the fact that the relief he seeks—an injunction to take him off the TSDB—would not redress the sole injury now affecting his travel, which is his lack of a valid visa. A plaintiff does not have standing to pursue incremental relief, where additional and independent obstacles prevent redress of the alleged injury. *See Doe v. Virginia Dep't of State* Police, 713 F.3d 745, 756 (4th Cir. 2013) ("when there exists an unchallenged, independent rule, policy, or decision that would prevent relief even if the court were to render a favorable decision," this presents a problem for traceability and redressability) (citing *Mirant Potomac River, LLC v. EPA,* 577 F.3d 223, 226 (4th Cir.2009); *Simon,* 426 U.S. at 41–42 (1976); *Allen,* 468 U.S. 737. Consequently, both consular non-reviewability and the mismatch between the relief requested and Plaintiff's injury render that injury non-redressable.

Rami El Ali's claims should also be dismissed in full, as he has not alleged any inhibition of travel whatsoever, nor that he is himself on the TSDB. Rather, his sole alleged injury is of a deprivation of a "liberty interest in familial relations," because his father cannot visit him in the United States. Although this may be enough to confer him *standing* under *Trump v. Hawaii*, 138S. Ct. 2392, 2416 (2018) ("a person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury"), that case also recognized that alleged harm from an inability to unite with a family member in the United States, particularly where national security concerns are at stake, should be reviewed narrowly under the "facially legitimate and bona fide" standard of *Mandel. See id.* at 2419. Even construing the allegations with respect to Khaled El Ali as true, nothing in those allegations suggests that his inability to enter the United States is anything less than facially legitimate and bona fide. Rami El Ali's familial claim should be dismissed

in its entirety.

## IV.   Challenges to the Adequacy of DHS TRIP and TSA Enhanced Screening Policies and Procedures Must Be Dismissed for Lack of Jurisdiction.

Challenges to the adequacy of DHS TRIP—which Counts I and III present—must be brought in the Court of Appeals under 49 U.S.C. § 46110. *See Mokdad v. Lynch,* 804 F.3d 807 (6th Cir. 2015). Section 46110 provides for "exclusive" jurisdiction in the courts of appeals to review orders issued "in whole or in part" by TSA.[16]

In *Mohamed v. Holder*, the Fourth Circuit held in an unpublished order that a plaintiff could pursue a constitutional challenge to his purported No Fly List status in district court, including a procedural due process challenge. The Court of Appeals reasoned that it was not clear that Congress intended to channel all claims related to placement on the No Fly List to the Court of Appeals in part because it was an interagency action and judicial review required review of both TSC and TSA actions. *See* Order, *Mohamed v. Holder*, No. 11-1924 (4th Cir. May 28, 2013) (attached hereto as DEX I). This unpublished decision was premised on "the unique character of Mohamed's claims," *id.* at 4, and is not applicable here for several reasons. Section 46110 explicitly directs to the Court of Appeals any order issued "in whole or in part" by TSA, and courts have generally interpreted that to include orders inextricably intertwined with TSA orders. *See Ligon*, 614 F.3d at 154-57. Moreover, unlike Mr. Mohamed at the time of the appeal, Plaintiffs have joined TSA as a party, directly challenge the *procedures* devised and applied by TSA in the redress process, and most Plaintiffs have pursued redress through DHS TRIP. Thus, there is no question that TSA orders are at issue here, which, consistent with *Mokdad*, may exclusively be reviewed in the courts of appeals.[17] *See Latif*, 2017

---

[16] In general, courts have given a broad construction to the term "order" in § 46110 and its predecessor statute. *See e.g. Blitz*, 700 F.3d at 735-36; *Gilmore*, 435 F.3d at 1132. The term "order" has been defined as a "decision which imposes an obligation, denies a right, or fixes some legal relationship." *Gilmore*, 435 F.3d at 1133; *see also Scherfen v. DHS*, No. 3:cv-08-1554, 2010 WL 456784, at *11 (M.D. Pa. Feb. 2, 2010) (TSA letters that reflect a final determination that "fixes some legal relationship" are TSA orders for purposes of § 46110).

[17] The Fourth Circuit in *Mohamed* relied heavily upon the Ninth Circuit's ruling in *Latif v. Holder*, which reasoned in part that "TSA simply passes grievances along to TSC and informs travelers when TSC has made a final determination" and that any "relief must come from TSC—the sole entity with both the classified

WL 1434648 at *9 (D. Or. Apr. 21, 2017) (appeal pending) (holding that the determination to include U.S. persons on the No Fly List is exclusively reviewable in a U.S. Court of Appeals).

As the Sixth Circuit recently recognized, "Congress has specifically directed" TSA to establish a redress process, and "TSA has issued regulations carrying out its responsibilities[.]" *Mokdad*, 804 F.3d at 811; *see* Bkgd. § II.B, *supra*. By extension, the court explained that, to the extent a plaintiff "challenges the adequacy of the redress process, his claims amount to a challenge to a TSA order." *Mokdad*, 804 F.3d at 811; *see also Beydoun v. Lynch*, No. 14-CV-13812, 2016 WL 3753561, at *3-4 (E.D. Mich. July 14, 2016) (dismissing alleged Selectee's claims for failure to join TSA as a necessary party because the Complaint essentially challenged DHS TRIP); *Bazzi v. Lynch*, No. 16-10123, 2016 WL 4525240, at *3-5 (E.D. Mich. Aug. 30, 2016) (same); *both aff'd on other grounds sub nom. Beydoun v. Sessions*, 871 F.3d 459 (6th Cir. 2017).[18] Thus, to the extent that Plaintiffs challenge the adequacy of DHS TRIP redress procedures, they challenge an order of TSA, and must bring any challenge directly in an appropriate Court of Appeals pursuant to § 46110. The SAC alleges the "[i]nadequacy of the DHS [TRIP] [p]rocess," *see* SAC ¶¶ 208-31, and Counts I and III challenge the constitutional adequacy of the procedures, *see id.* ¶¶ 1549-72, 1594, 1597. Moreover, the Prayer for Relief seeks an order requiring Defendants to "provide individuals designated on the federal terrorist

---

intelligence information Plaintiffs want and the authority to remove them from the List." *Latif v. Holder*, 686 F.3d 1122, 1128-29 (9th Cir. 2012). Those conclusions are not applicable to the TSA orders generated by the revised redress process for U.S. persons who are denied boarding. TSA now explicitly makes the final determination and does in fact have the information and the authority to effectuate the relief Plaintiffs are seeking.

Additionally, in *Elhady v. Piehota*, No. 16-cv-375, Dkt. 47 (E.D. Va. Sept. 5, 2017), which Plaintiffs attach to their Amended Complaint, *see* Dkt. 16-5, the district court followed *Mohamed* without significant additional analysis, reasoning that since plaintiffs challenged "interagency" actions, Section 46110 had no effect. *Id.* at 8–9. But the court offered no reason why the mere presence of "interagency" action rendered a clear jurisdictional statutory mandate a nullity, particularly as to a challenge to DHS TRIP procedures, which indisputably is a challenge solely to a TSA order.

[18] The court in *Mokdad* separately held that a challenge to a separate No Fly List determination by the TSC could be brought in the district court because it was not inextricably intertwined with the TSA order. *See* 804 F.3d at 812–15. While the Government disagrees with that aspect of the *Mokdad* decision, the Sixth Circuit recognized that a challenge to the DHS TRIP redress procedures would be a separate challenge to a TSA order subject to review under § 46110. *Id.* at 811.

watchlist with a legal mechanism that affords them notice of the reasons and bases for their placement on the federal terrorist watch list and a meaningful opportunity to contest their continued inclusion on the federal terrorist watch list." Prayer for Relief ¶ 4(b). The redress function has been specifically assigned by Congress to TSA; accordingly, Plaintiffs challenge an order of TSA.

Further, with respect to the No Fly Plaintiffs, the Fourth Circuit's order in *Mohamed* is not controlling in this matter because its ruling only pertains to pre-2015 redress process for individuals on the No Fly List. As described above, in 2015, TSA revised the redress procedures available to U.S. persons who are denied boarding as a result of No Fly status. *See Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *13 (E.D. Va. July 16, 2015); *Latif*, 2016 WL 1239925, at *5. At the conclusion of the revised DHS TRIP process, the TSA Administrator issues an order based on review of the DHS TRIP file, including responses from the traveler and a recommendation from the TSC, either maintaining the traveler on or removing the traveler from the No Fly List. *Latif*, 2016 WL 1239925, at *5. In light of this new process, any claims challenging the adequacy of DHS TRIP for denials of boarding, as well as any claims challenging the propriety of No Fly List placement, must be pursued in the Court of Appeals. *See Mokdad*, 804 F.3d at 811; *Latif*, 2017 WL 1434648, at *1.

Moreover, for much the same reasons, the Court also lacks jurisdiction to consider any challenge to the security measures enacted by TSA in response to its congressional directives detailed above. *See* Fed. R. Civ. P. 12(b)(1); *supra* Bkgd. § II.B. A challenge to particular security measures authorized by Congress and chosen by TSA to ensure aviation security would necessarily implicate TSA orders, as it would involve TSA's statutory authority to establish screening procedures and deny boarding. *See* 49 U.S.C. §§ 114(e), (h). Indeed, the Ninth Circuit has expressly held that § 46110 precludes the Court from reaching an APA claim that challenges TSA's "policies and procedures implementing" the Government's terrorism watchlists because such a claim constitutes a challenge to a TSA order. *Ibrahim v. DHS*, 538 F.3d 1250, 1256–57 (9th Cir. 2008); *see*

28

*Gilmore*, 435 F.3d at 1133 (holding that a TSA Security Directive implementing the agency's airline passenger identification policy is a final order within the meaning of § 46110); *accord Blitz*, 700 F.3d at 735-37; *Corbett v. U.S.*, 458 F. App'x 866, 871 (11th Cir. 2012); *Ruskai v. Pistole*, 775 F.3d 61, 65 (1st Cir. 2014). Thus, the Court lacks jurisdiction to consider the aspects of Plaintiffs' claims that seek to challenge TSA's choice of security measures, including TSA's risk-based rules Quiet Skies and Silent Partner and other security measures requiring passengers to undergo enhanced screening. Indeed, the Family Member Plaintiffs' claims directly challenge TSA's alleged decision to require them to undergo additional TSA screening and the DHS TRIP procedures available to individuals selected for enhanced screening on account of TSA's risk-based rules. *See* SAC ¶ 114 ("TSA's Quiet Skies and Silent Partner programs and/or the TSA's other rules-based programs target family members and traveling companions of TSDB Listees, including Plaintiffs, because of their relationships. These family members and traveling companions are themselves then treated as known or suspected terrorists."); *id.* ¶¶ 208, 218 ("DHS TRIP does not disclose . . . Quiet Skies/Silent Partner Selectee list status."). Such a challenge fall squarely within § 46110.

Finally, *all* claims that are "inescapably intertwined" with orders that fall within § 46110 are subject to the statute's channeling effect, including claims against TSC for alleged placement in the TSDB. *See Americopters, LLC v. FAA*, 441 F.3d 726, 736 (9th Cir. 2006); *Gilmore v. Gonzales¸* 435 F.3d 1125, 1132 (9th Cir. 2006); *see also Ligon v. LaHood*, 614 F.3d 150, 154-57 (5th Cir. 2010) (discussing the "inescapably intertwined" doctrine, giving the term "order" within the meaning of § 46110 "expansive construction," and collecting cases). As a result, Counts I, II, III, V, and XI are all subject to the channeling statute. But at a minimum, any challenges to TSA-provided procedures and TSA security measures must be heard in the Court of Appeals. *Mokdad*, 804 F.3d at 811.

**V.**     **Several of Plaintiffs' Claims Are Unripe or Barred by the Statute of Limitations.**

Additionally, several Plaintiffs have failed to exhaust the congressionally mandated administrative redress process for travel-related difficulties, while two additional Plaintiffs filed suit

after the statute of limitations has already run with respect to their substantive claims. The accompanying Declaration of Deborah Moore, DEX J, details DHS TRIP's searches for any records of inquiries from the Plaintiffs. DHS TRIP found no inquiry for Rami Khaled El Ali, Mia Khaled El Ali, Khaled El Ali, Hawa Wehelie, Fatima Wehelie, Mahad Mohallim, Farid Sulayman, Hashem Nader Sehwail, Mirrakhmat Muminov, Hicham Hall, or Faatimah Knight, Anisa Mujanovic, and Abdaljalil Hijaz. Moore Decl. ¶¶ 3-5, 10, 13, 14, 16, 22, 31, 24, 25, 32, 37. In addition, Plaintiffs Shamsa Hashi Noor, Abdirizak Wehelie, and Abdu Wakil Cyeef Din failed to provide required documentation, resulting in DHS TRIP administratively closing their DHS TRIP inquiries. *Id.* ¶ 11, 12, 26, 30. These plaintiffs should be required to exhaust their administrative remedies.

Ripeness is an aspect of the justiciability analysis, "inextricably linked to [the] standing inquiry," since it is one of the "doctrines that cluster about Article III." *Cooksey v. Futrell*, 721 F.3d 226, 239–40 (4th Cir. 2013). The ripeness doctrine prevents the court from premature adjudication and protects "agencies from judicial interference until an administrative decision has been formalized." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148-49. A case is not ripe when "problems such as the inadequacy of the record . . . or ambiguity in the record . . . will make [the] case unfit for adjudication on the merits." *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010); *Reg'l Mgmt. Corp. v. Legal Servs. Corp.*, 186 F.3d 457, 465 (4th Cir. 1999) (considering the court's interest in "avoiding unnecessary adjudication and in deciding issues in a concrete setting."). Typically, the two primary factors considered by a court in determining ripeness are "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 808 (2003). The exhaustion doctrine, similarly, is premised on "the notion, grounded in deference to Congress' delegation of authority to coordinate branches of Government, that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992). "[E]ven where a controversy survives administrative review, exhaustion of the administrative

procedure may produce a useful record for subsequent judicial consideration, especially in a complex or technical factual context." *Id.* Exhaustion is particularly appropriate where the underlying issue involves the agency's "discretionary power" or "special expertise." *Id.*

Applying these principles, the Sixth Circuit dismissed the claims of a traveler who failed to exhaust her administrative remedies through DHS TRIP. *See Shearson v. Holder*, 725 F.3d 588 (6th Cir. 2013). The Sixth Circuit reasoned that an exhaustion requirement in this context promotes judicial efficiency, encourages administrative accuracy, and creates an administrative record. *See id.* at 594-95. Other courts have required plaintiffs to complete the revised DHS TRIP procedures before conducting judicial review of their TSDB claims. *See Mokdad v. Holder*, No. 13-cv-12038, Order, Dkt. 43 (E.D. Mich. Dec. 16, 2015); *see also Latif v. Holder*, No. 3:10-cv-750-BR, Dkt. No. 152 (D. Or. Oct 3, 2104); *Fikre v. FBI*, No 3:13-cv-899, Dkt. 57 (D. Or. Jan 14, 2015); *Tarhuni v. Holder*, No. 3:13-cv-001, Dkt. 79, 86 (D. Or. Oct. 3, 2014). The same approach should be followed here with respect to the Plaintiffs identified in the Moore Declaration who have not filed for DHS TRIP, or who filed but did not complete the redress process. *See* DEX J.

Additionally, Counts I and III should be dismissed for the separate but related reason that these Plaintiffs have failed to avail themselves of the procedures available to them. It is well established that "in order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him." *Alvin v. Suzuki*, 227 F.3d 107, 116 (2d Cir. 2000)[19] Thus, "[t]he availability of [government] procedures is fatal" to a procedural due process claim where Plaintiffs have not availed themselves of those procedures. *Mora v. City of Gaithersburg*,

___

[19] *See also, e.g., Carmody v. Bd. of Trustees of the Univ. of Illinois*, 747 F.3d 470, 479 (7th Cir. 2014); *Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004); *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 485 (1982) ("The fact that Mr. Kremer failed to avail himself of the full procedures provided by state law does not constitute a sign of their inadequacy."); *Stern v. Regency Towers, LLC*, 886 F. Supp. 2d 317, 324 (S.D.N.Y. 2012); *Medina v. Dist. of Columbia*, 517 F. Supp. 2d 272, 281-82 n. 7 (D.D.C. 2007). In analyzing what process is available, a court "must consult the entire panoply of predeprivation and postdeprivation process provided by the [government]." *Tri-Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 436 (4th Cir. 2002) (internal quotations and citations omitted); *cf. Zinermon v. Burch*, 494 U.S. 113, 126 (1990) (finding that a procedural due process violation "is not complete unless and until the [government] fails to provide due process").

519 F.3d 216, 230 (4th Cir. 2008). Simply put, Plaintiffs "cannot plausibly claim that [the government's] procedures are unfair when [they have] not tried to avail [themselves] of them." *Id.* Here, these Plaintiffs have not availed themselves of the procedures they are challenging, making dismissal of their procedural due process claim and their co-extensive APA claim proper.

In addition, the substantive claims of several plaintiffs, should also be dismissed because they accrued earlier than six years prior to filing this suit. Federal law provides that a "civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). This Court, along with the D.C. Circuit, has found this statute of limitations to create a jurisdictional bar to suit, which may not be equitably tolled. See *Calcutt v. U.S.*, No. CIV. H-98-2108, 1998 WL 851358, at *5 (D. Md. Oct. 30, 1998) (Section 2401(a) "is a jurisdictional condition attached to the government's waiver of sovereign immunity") (citing with approval *Spannaus v. DOJ*, 824 F.2d 52, 55–56 (D.C. Cir.1987)). Mr. Thadi's travel difficulties are alleged to have begun in 2004, SAC ¶ 954, while Mr. Siddiqui first completed a DHS TRIP inquiry form related to a denial of boarding on or about April 11, 2012, DEX J ¶ 28. Mr. Abunijem first submitted a DHS TRIP inquiry in August 2006, and he received a final determination letter that month. *See id.* ¶ 36. Mr. Hachem first submitted a DHS TRIP inquiry on or about March 4, 2011, related to enhanced screening, and received a final determination letter in August 2011. *Id.* ¶ 36. In addition, he alleges that since approximately 2007, every time Mr. Hachem travels by air, his boarding pass is routinely stamped with the "SSSS" designation. SAC ¶ 1167. Mr. Soueidan first submitted a DHS TRIP inquiry on or about December 20, 2010, related to enhanced screening. DEX J ¶ 38. Plaintiff Muminov first signed a DHS TRIP inquiry form on or about February 6, 2013, related to enhanced screening, and alleges he has been subject to extensive searches and lengthy delays while traveling since January 2013. *See* SAC ¶ 1095; DEX J ¶ 31. Mr. Albadawi first submitted a DHS TRIP inquiry on or about December 13, 2012, related to enhanced screening. **DEX J ¶ 23.** Mr. Al-Sahlani alleges that since approximately 2012, his boarding pass has

been routinely stamped with the "SSSS" designation. SAC ¶ 1498. Mr. Kamel alleges he has been subjected to travel delays since 2008. *Id.* ¶ 1248. Mr. Riad alleges that for the past ten years, every time he travels by air, his boarding passes for his flights are routinely stamped with the "SSSS" designation. *Id.* ¶ 1210.

For these plaintiffs, their right of action for their substantive claims (and for Plaintiffs Abunijem and Hachem, their procedural claims as well[20]) accrued when their travel difficulties began, more than six years prior to the filing of this suit (or for the new plaintiffs, the filing of the SAC in March 2019). Those claims are therefore now barred by the statute of limitations.

## VI.    Count I (Procedural Due Process) Should Be Dismissed.

In the alternative, Count I should be dismissed for failure to state a claim upon which relief may be granted, as Plaintiffs have not alleged the deprivation of a cognizable interest at all, and in any event, have received all the process that is due.

In order to state a procedural due process claim, Plaintiffs must show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Shirvinksi v. U.S. Coast Guard*, 673 F.3d 308, 314 (4th Cir. 2012) (quoting *Kendall v. Balcerzak*, 650 F.3d 515, 528) (4th Cir. 2011). "[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). Rather, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.*

### A.    Travel Delays Are Not A Deprivation of the Right to Travel.

The Screening Plaintiffs have not pled a deprivation of the right to travel. Each of these Plaintiffs alleges that he or she is on a watchlist and/or related to someone on a watchlist and, as a result, has been subject to a variety of delays, searches, or inconveniences when traveling by air or

---

[20] Plaintiffs Abunijem and Hachem received DHS TRIP final determination letters outside the statute of limitations window.

crossing the United States border. They further allege that they have a "liberty interest in traveling free from unreasonable burdens[.]" SAC ¶ 1561. Even if true, these allegations do not plead a deprivation of the right to travel.

Multiple courts have held that the right to travel is not implicated by travel delays and inconveniences akin to those alleged here. *See Cramer v. Skinner*, 931 F.2d 1020, 1030 (5th Cir. 1991) (finding no violation of the right to travel where a statutory restriction on airline service "makes travel less convenient" but "does not bar travelers" from using the airport); *U.S. v. Shenandoah*, 595 F.3d 151, 162-63 (3d Cir. 2010) (finding that the right to travel is not offended by a law causing some inconvenience), *abrogated on other grounds by Reynolds v. U.S.*, 132 S. Ct. 975 (2012); *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 535 (6th Cir. 2007) (explaining that a law causing "inconvenience" for the traveler does not amount to a constitutional "denial of the right to travel")*; see also Green v. TSA*, 351 F. Supp. 2d 1119, 1130 (W.D. Wash. 2005) (holding in the context of a challenge to enhanced security screening that "Plaintiffs do not have a right to travel without any impediments whatsoever").

In *Beydoun v. Sessions*, the Sixth Circuit addressed a due process challenge brought by two individuals who alleged they were included on the Selectee List. 871 F.3d 459 (6th Cir. 2017). Similar to the allegations in the present case, the plaintiffs in *Beydoun* alleged that they "missed 'countless flights' after being subjected to lengthy secondary screenings," *id.* at 467, citing "delays ranging from ten minutes to one hour in duration" and contended that they "had been deterred from flying on one occasion," *id.* at 467-68. The court affirmed the dismissal of both plaintiffs' claims, holding that "Plaintiffs did not allege that any protected interest was violated by the[ir] being on the Selectee List." *Id.* at 468. The court reasoned that "Plaintiffs may have been inconvenienced by the extra security hurdles they endured in order to board an airplane," but "these burdens do not amount to a constitutional violation" because "Plaintiffs have not actually been prevented from flying altogether or from traveling by means other than an airplane." *Id.* In addition, the court held, plaintiffs' delays

34

and inconveniences "can only be described as incidental or negligible and therefore do not implicate the right to travel….When Plaintiffs' only allegations amount to delays that many individuals are likely to experience at the airport, it is hard to conclude that the fundamental right to travel has been implicated." *Id.*;[21] *see also Abdi v. Wray*, No. 2:17-CV-622-DB, 2018 WL 1940411, at *3 (D. Utah Apr. 23, 2018), appeal pending (rejecting due process claim based on alleged watchlist status because "Plaintiff has failed to show that the right to movement is a liberty interest that is protected under the Constitution, particularly where, as here, Plaintiff has been able to travel, albeit inconveniently."); *Kovac v. Wray*, No. 3:18-CV-0110-L, 2019 WL 1057935, at *18 (N.D. Tex. Mar. 5, 2019) ("the Screening List Plaintiffs have failed to state a claim that their inclusion in the Screening List caused them to suffer a deprivation of a liberty interest based on their right to travel, as that term is historically understood."); *Kadura v. Lynch*, No. CV 14-13128, 2017 WL 914249, at *6-7 (E.D. Mich. Mar. 8, 2017). Indeed, any passenger may be required to undergo enhanced screening for reasons unrelated to watchlists. *See Scherfen v. DHS*, No. 3:CV-08-1554, 2010 WL 456784, at *7 (M.D. Pa. Feb. 2, 2010) ("Heightened screening at airports and border-crossing points does not necessarily signify inclusion" on a watchlist, as "[t]ravelers may be pulled out of line, searched, and questioned for a variety of reasons, unrelated to watchlists."); 73 Fed. Reg. 64,018, 64,025 (Oct. 8, 2008) ("standard passenger and baggage screening . . . may include additional, random screening"); *id.* at 64,026 ("[Passengers who are not on the Selectee List] will not always avoid enhanced screening.").

Even in the context of interstate travel, the courts have held that travel delays ranging from a few hours up to a full day do not unconstitutionally burden the right to travel. *See, e.g.*, *City of Houston v. FAA*, 679 F.2d 1184, 1186-99 (5th Cir. 1982) (upholding regulation limiting use of airport so that certain passengers must use connecting flights or land at a more distant airport); *Town of Southold v.*

---

[21] The Sixth Circuit decision ("*Beydoun II*") was addressing a substantive due process claim, while affirming two district court decisions that reached similar conclusions on the procedural due process claim: *Beydoun v. Lynch* ("*Beydoun I*"), No. 14-CV-13812, 2016 WL 3753561 (E.D. Mich. July 14, 2016); *Bazzi v. Lynch*, No. 16-10123, 2016 WL 4525240 (E.D. Mich. Aug. 30, 2016).

*Town of E. Hampton*, 477 F.3d 38, 51 (2d Cir. 2007) (upholding law banning certain ferry travel to an island thereby making interstate travel "longer and more expensive"); *Torraco v. Port Auth.*, 615 F.3d 129, 141 (2d Cir. 2010) (holding that a delay of "a little over one day . . . was a minor restriction" that did not deny the right to travel").

The Screening Plaintiffs allege, at most, that they have been required to undergo enhanced security measures prior to boarding commercial flights originating in the United States, or inspection at the border when travelling internationally. Unlike the alleged No Fly List Plaintiffs, these Plaintiffs do not allege that they have been prevented from traveling domestically or internationally through any action of Defendants. As the *Beydoun* court noted, plaintiffs claiming to be on the Selectee List "can still fly after additional screening." *Beydoun*, 2016 WL 3753561, at *5; *Bazzi*, 2016 WL 4525240 at *6-7. Inconvenience, inspections, or delays at the airport or at the border, like those alleged by the Screening Plaintiffs, do not amount to a constitutionally cognizable violation of the right to travel. *See, e.g.*, *League of United Latin Am. Citizens*, 500 F.3d at 535; *Beydoun*, 2016 WL 3753561, at *5; *Bazzi*, 2016 WL 4525240 at *6-7.

To the extent the Screening Plaintiffs are challenging delays at the border, the Supreme Court has held that "delays of one to two hours at international borders are to be expected," *U.S. v. Flores-Montano*, 541 U.S. 149, 155 n.3 (2004), and other courts of appeal have found detentions at the border of four to six hours to be constitutional, *Tabbaa*, 509 F.3d at 100-01. Thus, a law causing "inconvenience" for the traveler, including delays at the border, does not amount to a constitutional "denial of the right to travel." *League of United Latin Am. Citizens*, 500 F.3d at 535. Moreover, the Screening Plaintiffs' allegations about border searches do not support a plausible inference of illegal government action, as the Government has the well-established authority to perform border searches without warrant, probable cause, or reasonable suspicion. *See U.S. v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985); *see infra* Section XI.B.

Significantly, the Screening Plaintiffs bear the burden of alleging the deprivation of a liberty interest in travel. They allege no such deprivation. By their own account, they routinely are able to fly and have done so numerous times since they first experienced travel difficulties. What they allege, rather than a deprivation, is delay resulting from additional screening. Regardless of how regular or predictable those delays may be, they do not constitute a deprivation of a protected liberty interest in travel. *Beydoun*, 2016 WL 3753561, at *5; *Bazzi*, 2016 WL 4525240, at *6-7.[22]

**B.     The No Fly List Plaintiffs Also Have Not Pled a Deprivation of the Right to Travel.**

The No Fly List Plaintiffs also have not alleged a deprivation of the right to travel by virtue of being denied boarding. As an initial matter, the Second, Fifth, and Ninth Circuits have determined that a traveler does not have a constitutional right to the most convenient form of travel, such as traveling by airplane as opposed to car. *See Town of Southold*, 477 F.3d at 54 (holding that there is no constitutional right to the most convenient form of travel); *Gilmore*, 435 F.3d at 1137 (holding that there is no "right to travel by airplane"); *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999) (holding there is no "right to drive" and that "burdens on a single mode of transportation do not implicate the right to interstate travel"); *Cramer*, 931 F.2d at 1031 (holding that "travelers do not have a constitutional right to the most convenient form of travel").[23]

---

[22] The district court's opinion in *Elhady v. Piehota*, which permitted Selectee List claims to survive a Rule 12 motion, is incorrect in multiple respects. 303 F. Supp. 3d 453 (E.D. Va. 2017). While the court concluded that the plaintiffs "adequately alleged a procedurally protected liberty interest," *id.* at 464, the existence of a protected interest in travel is not the question; the question is whether that interest has been *deprived*. And on that question, the court concluded that additional airport screening is "liberty-constraining," and suggested that the plaintiffs were subjectively "deterred from traveling" due to the delays they had experienced. *Id.* at 464. But that is not the standard either; mere deterrence is not deprivation, as several other decisions cited above have recognized. In any event, the court in *Elhady* has not yet finally resolved these issues.

[23] In *Mohamed*, a district court in the Eastern District of Virginia disagreed with those Circuits, holding that a plaintiff who was denied boarding had stated a claim for a procedural due process violation under the then-existing redress procedures, in part because of the burden on international travel. *Mohamed*, 2015 WL 4394958, at *6. At the time the *Mohamed* Complaint was filed, the plaintiff was actually in foreign custody and unable to return home any other way. In any event, the redress process has now changed since that decision and the Government continues to preserve its argument that the lack of access to a single mode of transportation does not deprive these three Plaintiffs of a constitutionally protected liberty interest.

Moreover, the ability to travel by plane is only a limited aspect of an individual's liberty interest in international travel. The Supreme Court has held that "the *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States." *Haig v. Agee*, 453 U.S. 280, 306 (1981). The freedom to travel internationally is "no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment," and is "subordinate to national security . . . considerations." *Id.* at 306-07; *Califano v. Aznavorian*, 439 U.S. 170, 176-77 (1978) (Government action that infringes the right to travel abroad will be upheld unless it is "wholly irrational."); *see also Clancy v. Office of Foreign Assets Control of U.S. Dep't of Treasury*, 559 F.3d 595, 604 (7th Cir. 2009) ("The Supreme Court affords great deference to restrictions on international travel so long as they are justified by a rational foreign policy consideration."); *Dearth v. Lynch*, 791 F.3d 32, 38 n.1 (D.C. Cir. 2015) (claimed violation of right to international travel "trigger[s] nothing more than rational-basis scrutiny"). Accordingly, whether the Plaintiffs here frame their deprivation as a deprivation of the *right* to interstate travel or a deprivation of the *liberty interest* in international travel, Plaintiffs have not identified a liberty interest to support their "right to travel" claim.

**C.     The Plaintiffs Have Not Pled a Protected Interest in Their Reputations.**

In addition to a deprivation of the "right to travel", Plaintiffs allege an infringement of their "right to be free from false government stigmatization as individuals who are 'known or suspected to be' terrorists." SAC ¶¶ 1561-62. Because "injury to reputation by itself [is] not a 'liberty' interest protected under the [Due Process Clause]," *Siegert v. Gilley*, 500 U.S. 226, 233 (1991), the Supreme Court has formulated a standard, known as the "stigma-plus" test, to determine whether alleged reputational harm infringes a liberty interest. *See Paul v. Davis*, 424 U.S. 693, 711 (1976); *Shirvinski*, 673 F.3d at 315; *Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012). Under this test, plaintiffs alleging reputational harm must demonstrate: (1) they suffered a stigma from governmental action; plus (2) they experienced an alteration or extinguishment of "a right or status previously recognized by state law." *Paul*, 424 U.S. at 711; *see also Beydoun*, 2016 WL 3753561, at *5 (rejecting stigma-plus

38

claim in the context of a challenge to alleged watchlist status because plaintiff failed to allege that he was deprived of a right previously held under the law); *Bazzi*, 2016 WL 4525240, at *7 (same); *Green*, 351 F. Supp. 2d at 1129-30 (rejecting a stigma-plus claim in the context of a challenge to enhanced security screening); *Kadura*, 2017 WL 914249, at *7 (Plaintiffs who had alleged widespread TSDB distribution of their names to third party entities "[did] not provide any factual support that they suffered any stigmatization by the disclosure of their names to third parties" and thus had failed to state a stigma-plus claim); *Abdi*, 2018 WL 1940411, at *3 ("Plaintiff's repeated screening at airports, while no doubt frustrating to Plaintiff, do not rise to the level of a change in legal status."); *Kovac*, 2019 WL 1057935, at *20 ("there is no stigma attached to lawful screening and inspection."); *Scherfen*, 2010 WL 456784, at *7 (enhanced screening does not signify inclusion on a watchlist). Like the plaintiffs who received enhanced screening in *Beydoun*, *Bazzi*, *Abdi*, *Kadura*, *Green*, and *Kovac*, Plaintiffs here fail to adequately allege the elements of a stigma-plus claim.

To begin, Plaintiffs' claims fail because they do not allege facts showing public stigmatization. Plaintiffs have not alleged that any Defendant has disclosed to the general public their purported placement on a watchlist, let alone claimed that the Government has otherwise publicly labeled them, as they assert, "individuals who are 'known or suspected to be' terrorists, or who are otherwise associated with terrorist activity[.]" *See* SAC ¶ 1562. In fact, as Plaintiffs allege elsewhere in their SAC—and thus concede—government policy provides that an individual's status with respect to the TSDB or Selectee List cannot be disclosed to the individual, let alone the general public. *Id.* ¶¶ 203, 1011. While Plaintiffs claim (without any apparent basis in fact) that Defendants have revealed their alleged TSDB status to certain third party stakeholders—*e.g.*, "state and local authorities," "foreign governments," "gun sellers," and "the captains of sea-faring vessels," *see*, *e.g.*, *id.* ¶ 182—Plaintiffs do not allege that the Government has disclosed their purported status to the general public. In an analogous case, the district court in *Tarhuni v. Holder* held that an instruction to an airline to deny boarding does "not constitute dissemination of the stigmatizing information in

such a way as to reach the community at large." 8 F. Supp. 3d 1253, 1275 (D. Or. 2014).[24] Other

courts have reached similar conclusions, differentiating between the proper government use of

information and the improper dissemination of potentially stigmatizing information to the public.

*See Johnson v. Martin*, 943 F.2d 15, 17 (7th Cir. 1991) (no public disclosure when statements not

disseminated beyond proper chain of command); *Van Atta v. Def. Intelligence Agency*, No. 87-1508,

1988 WL 73856, at *2-3 (D.D.C. July 6, 1988) (recognizing the "crucial distinction between official

disclosure and public disclosure" in cases where "[t]he government's decision to share information

with a foreign power does not open that information to public scrutiny").

Further, individuals are subjected to enhanced screening for reasons unrelated to a watchlist.

*See Scherfen*, 2010 WL 456784, at *7 ("Heightened screening at airports and border-crossing points

does not necessarily signify inclusion" on a watchlist, as "[t]ravelers may be pulled out of line,

searched, and questioned for a variety of reasons, unrelated to watchlists."); 73 Fed. Reg. 64,018,

64,025 (Oct. 8, 2008) ("standard passenger and baggage screening . . . may include additional,

random screening"); *id.* at 64,026 ("[Passengers who are not on the Selectee List] will not always

avoid enhanced screening."). Thus, several courts have correctly observed that "[s]ince every air

passenger is subjected to a search, there is virtually no 'stigma attached to being subjected to search

at a known, designated airport search point.'" *U.S. v. Hartwell*, 436 F.3d 174, 180 (3d Cir. 2006); *U.S.

v. Skipwith*, 482 F.2d 1272, 1275 (5th Cir. 1973)) (noting "the almost complete absence of any stigma

attached to being subjected to search at a known, designated airport search point"); *accord U.S. v.

Wehrli*, 637 F.2d 408, 409 (5th Cir. 1981) (same).[25] Further, every person entering the United States is

---

[24] Plaintiffs assert that their boarding passes are stamped with the designation "SSSS" purportedly to reflect watchlist status. As explained above, that designation pertains to secondary screening for *any* reason, including random selection. Further, Plaintiffs do not allege that the purported significance of the designation is known to the general public or that the public knows what their passes contain.

[25] Several of the Plaintiffs allege that they are stigmatized because their co-travelers learned of their watchlist status by witnessing searches at airports or the border. *See* SAC ¶¶ 382, 480, 730. However, under applicable regulations, the boarding passes of anyone selected for enhanced screening for any reason are marked to indicate that they are to receive enhanced screening. *See* 49 C.F.R. § 1560.105(b)(2). In addition, individuals can be required to undergo enhanced screening for many reasons unrelated to a watchlist. *See supra* Bkgd. §

subject to inspection by CBP officials. *See infra* Section XI.B; *U.S. v. Ramsey*, 431 U.S. 606, 619 (1977) ("Border searches . . . have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside."); *see also Carroll v. U.S.*, 267 U.S. 132, 154 (1925); *Flores-Montano*, 541 U.S. at 153; *Ekiu v. U.S.*, 142 U.S. 651, 659 (1892). Thus, Plaintiffs' allegations related to border inspections, even if true, do not establish the requisite public dissemination of stigmatizing information to state a valid claim on this basis.[26]

### D.  Plaintiffs Fail to Allege a "Plus" Factor.

Plaintiffs also do not allege a "plus" factor as required to demonstrate a reputational harm amounting to an infringement of the Fifth Amendment. In *Paul v. Davis*, the Supreme Court concluded that reputational harm alone does not implicate a liberty or property interest, and as a result, a claimant must identify a "plus" factor establishing the deprivation of such an interest. *See* 424 U.S. at 701. In *Green v. TSA*, *supra*,[27] a district court held that the allegation of reputational harm should be dismissed because the plaintiffs did "not allege[] any tangible harm to their personal or professional lives that is attributable to their association with the No-Fly List, and which would rise

---

II.B. Given the multitude of possible reasons for such searches, these allegations lack plausibility under the *Iqbal* standard. Likewise, given CBP's significant authorities authorizing the inspection of *all* persons and goods entering the country, *see supra* Bkdg. § II.E and *infra* § XI.B, the fact that a person has been subjected to a border search is not sufficient to plausibly allege inclusion on a terrorist watchlist.

[26] Here again, the *Elhady* opinion misses the mark. The court determined that because plaintiffs alleged that TSDB status may be "disseminated to third parties outside the relevant federal agencies and airlines," such alleged dissemination "may be so widespread that it is tantamount to public disclosure, even if only distributed to other government and private entities that need the information for official objectives." *Elhady*, 303 F. Supp. 3d at 465. But the possibility that dissemination "may" occur is not sufficient for purposes of Rule 12. Moreover, the *Elhady* court itself acknowledged that the alleged information-sharing is not actually public, and the court there failed to consider whether such information-sharing is public in the sense that matters for purposes of reputational injury, *i.e.*, harm to reputation within one's community. *See Paul*, 424 U.S. at 702. Setting aside the lack of factual support for the alleged dissemination at all, Plaintiffs do not allege, for example, that there is a public list of persons to whom guns cannot be sold, or that such lists are posted at gun retailers, or that similar lists exist for use by the captains of "sea-faring vessels" or car dealerships, SAC ¶ 154, or that any such information is otherwise made public by or at the behest of the Government within their community. Again, these issues remain unresolved in *Elhady*.

[27] Plaintiffs in the *Green* case were individuals who alleged that they were regularly subjected to heightened screening at airports because of the fact that they allegedly had similar names to individuals who were on the No Fly List. *See generally* 351 F. Supp. 2d 1119.

to the level of a Constitutional deprivation of a liberty right . . . [or] any injury to a property interest." 351 F. Supp. 2d at 1130. And in *Beydoun*, the Sixth Circuit held that plaintiffs claiming to be on the Selectee List "cannot show that their liberty interest in travel was infringed upon by being subject to relatively minor additional screening." 871 F.3d at 469. In short, there is no right to enter the country or board a plane without being subjected to inspection or search.

The SAC contains a variety of other alleged impacts of the federal watchlist, mostly implausible and not connected to any particular Plaintiff. None are sufficient to establish the plus factor of a stigma-plus claim. For example, the SAC alleges that Plaintiffs' purported watchlist status functions to motivate traffic stops and to prohibit individuals from obtaining a Hazmat license, or from working in the sterile areas of airports. *See* SAC ¶¶ 148, 159, 167. But none of the Plaintiffs contend that they have been subjected to unlawful traffic stops,[28] that they have been unable to obtain a Hazmat license, or that they have been denied any job at an airport, let at all plausibly allege that such events have been based on their alleged watchlist status.

The SAC also states that some Plaintiffs have "had their bank or Western Union accounts closed," have "been prevented from making wire transfers at financial institutions," have "had their citizenship applications delayed indefinitely due to an FBI name check," or have "lost lucrative economic opportunities." SAC ¶ 1565. Only threadbare allegations of such events, however, appear in the SAC. With respect to bank accounts and wire transfers, Albadawi, Siddiqui, Mujanonvic, Hachem, and Hijaz each allege that their bank or Western Union accounts were closed without notice or explanation, without any factual indication that such closures were as a result of their purported watchlist status. *Id.* ¶¶ 880-81, 1007-08, 1161, 1205, 1350. However, their supposition that their accounts were closed based on inappropriate dissemination of the watchlist appears to be based purely on speculation and cannot defeat a motion to dismiss. *Twombly*, 550 U.S. at 555 (stating

---

[28] Khalil Thadi alleges that he has "twice been subjected to irregularly long traffic stops." SAC ¶ 963. But he does not allege that the stops were illegal, or motivated by his watchlist status.

that "[f]actual allegations must be enough to raise a right to relief above the speculative level").[29]

Plaintiffs Soueidan, Jardaneh, Muminov, John Doe, and Hachem allege they lost business opportunities, but any such lost opportunities were the actions of third parties—injuries that flow as a consequence of purportedly stigmatic injuries have been excluded from the stigma-plus doctrine. SAC ¶¶ 337, 340-43, 401-07, 1106, 1192, 1382; *See Seigert v. Gilley*, 500 U.S. 226, 234 (1991) ("Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation. But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a Bivens action.").  Plaintiff Hijaz also alleges that his citizenship application has been delayed since March 2017, although he includes no information to suggest that such a delay is abnormal. *Id.* ¶ 1351. There is thus no factual or legal basis for the claim that Plaintiffs have suffered "tangible harm to their personal or professional lives that is attributable," whether directly or indirectly through a nonexistent publicized stigma, to the No-Fly or Selectee List. *Green*, 351 F. Supp. 2d at 1130; *see also Beydoun*, 2016 WL 3753561, at *5; *Bazzi*, 2016 WL 4525240, at *7 (same); *Kadura*, 2017 WL 914249, at *7; *Abdi*, 2018 WL 1940411, at *3; *Kovac*, 2019 WL 1057935, at *20.

Plaintiffs also assert that they have a liberty interest "in nonattainder (i.e. the interest against being singled out for punishment without trial)." SAC ¶ 1564. But, as the district court held in *Beydoun*, the security precautions described by Plaintiffs amount to permissible regulation as authorized by congressional mandate, not impermissible punishment. *See Beydoun,* 2016 WL 3753561, at *6; *see also U.S. v. Salerno*, 481 U.S. 739, 747 (1987) ("To determine whether a restriction

---

[29] As discussed in Section II, various Plaintiffs allege various additional injuries that, for the reasons set forth *supra*, are not relevant to any claim as to which this Court may enter any relief. However, even if the Court were to consider Plaintiffs' allegations with respect to the denial of entry onto military bases, the revocation of a TWIC credential, and/or the denial or revocation of PreCheck or Global Entry travel benefits, none of these allegations establish the extinguishment of "a right or status previously recognized by state law," as required to plead a "stigma-plus" claim. *Paul*, 424 U.S. at 711. Additionally, one Plaintiff, Bilal Abdurrashid, alleges that due to his purported TSDB status, Defendants blocked his desired purchase of a firearm. SAC ¶¶ 450-54. As explained below, *see infra* Section XIII, this allegation is meritless.

on liberty constitutes impermissible punishment or permissible regulation, we first look to legislative intent."). The relevant statutory authorities expressly provide that DHS's mandate is to protect the public from terrorist threats, not to impose a punishment for a purported crime. *See Elec. Privacy Info. Ctr. v. DHS*, 653 F.3d 1, 10 (D.C. Cir. 2011) (explaining that the "primary goal" of airport screening protocols "is not to determine whether any passenger has committed a crime but rather to protect the public from a terrorist attack").

E.     **The Redress Process Is Constitutionally Adequate.**

Assuming, *arguendo*, that the question is reached, currently existing redress processes are more than adequate for both the Screening Plaintiffs and the alleged No Fly List Plaintiffs. "It is by now well established that 'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert*, 520 U.S. at 930 (citation omitted). Instead, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). In evaluating the adequacy of procedures, the Court should consider: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest," including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. *Homar*, 520 U.S. at 931-32 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Even if Plaintiffs had identified a constitutionally protected interest, then as discussed above, any interest in the most convenient possible travel is quite limited. In contrast, "[t]here is obviously a compelling government interest in preventing terrorist attacks against commercial aviation." *Mohamed v. Holder*, 266 F. Supp. 3d 868, 880 (E.D. Va. 2017); *see also Haig*, 453 U.S. at 307 ("[N]o governmental interest is more compelling than the security of the Nation."); *see also Wayte v. U.S.*,

44

470 U.S. 598, 612 (1985) ("Unless a society has the capability and will to defend itself from the aggressions of others, constitutional protections of any sort have little meaning.").

With respect to the alleged No Fly List Plaintiffs, the process available to these Plaintiffs is adequate. Indeed, the only court to assess the procedural adequacy of the current DHS TRIP procedures for U.S. persons who have been denied boarding on a commercial aircraft has upheld DHS TRIP under the Due Process Clause. *Latif*, 2016 WL 1239925, at *6 (D. Or. Mar. 28, 2016), *appeal filed* Aug. 8, 2017; *see also Mohamed*, 2015 WL 4394958, at *13 (concluding that there is "nothing in the revised DHS TRIP that would preclude an adequate post deprivation process and the creation of an administrative record"); Order, *Latif v. Lynch*, No. 3:10-cv-750-BR, (finding revised redress procedures adequate as applied) (attached hereto as DEX K).

With respect to the Screening Plaintiffs, the process does not permit them to learn their watchlist status, but it is nonetheless adequate to protect against erroneous deprivation, especially given the extremely limited nature of the plaintiffs' interest in being free from screening at the airport. When an individual is placed on the TSDB, that placement decision undergoes several layers of review: (1) a decision by the nominating agency to nominate an individual for placement on the TSDB, (2) a determination by TSC that placement in the TSDB is appropriate; (3) regular reviews and audits of placement, and (4) redress in which the traveler can draw the Government's attention to any possible errors by explaining the difficulties the traveler has encountered and submitting relevant information, and in which the Government conducts a review of available relevant information. *See supra* Bkgd. § II.C; *see also generally* DEX C; Piehota Statement. Providing additional process would not substantially reduce the risk of error but would undermine the Government's efforts to detect terrorists and prevent terrorist attacks. There is substantial authority supporting the Government's interest in withholding watchlist status from the public, because it is operationally valuable information to terrorists. *Bassiouni v. CIA*, 392 F.3d 244, 245-46 (7th Cir. 2004); *Tooley v. Bush*, No. 06-306, 2006 WL 3783142, at *20 (D.D.C. Dec. 21, 2006), *aff'd, Tooley v. Napolitano*, 586

F.3d 1006 (D.C. Cir. 2009) (upholding government's position that confirming or denying records indicating plaintiff's presence on watch lists would reveal [sensitive security information]); *Al-Kidd v. Gonzales*, No. 05-093, 2007 WL 4391029, at *8 (D. Idaho Dec. 10, 2007).

On balance, therefore, the harm to counterterrorism efforts caused by alerting individuals as to whether or not they are on a terrorist watchlist far outweighs the benefits of additional process for people who are merely subject to travel delays. *See Rahman v. Chertoff*, 530 F.3d 622, 627 (7th Cir. 2008) ("Any change that reduces the number of false positives on a terrorist watch list may well increase the number of false negatives."). Because all Plaintiffs have received constitutionally adequate process, their procedural due process claims should be dismissed.

**VII.    Count II (Substantive Due Process) Should Be Dismissed.**

Plaintiffs also bring a substantive due process claim, in which they subsume a number of their other claims, including their equal protection, Second and Fourth Amendment, and procedural due process claims. SAC ¶¶ 1579-82. Initially, where substantive due process claims are coextensive with other constitutional claims, the appropriate legal framework is provided by the more specific constitutional provision. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."); *Kimberlin v. Quinlan*, 774 F. Supp. 1, 8 (D.D.C. 1991) (plaintiff's substantive due process claim depends upon and is coextensive with his First Amendment claim) *rev'd on other grounds*, 6 F.3d 789 (D.C. Cir. 1993); *see also Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 45 (1st Cir. 1992) ("Substantive due process, as a theory for constitutional redress, has in the past fifty years been disfavored, in part because of its virtually standardless reach."). The Court should treat these claims under their respective constitutional frameworks, and dismiss them for the reasons set forth elsewhere in this filing. *See infra* and *supra* §§ VI, VIII, XI, and XIII.

Further, the set of liberty interests protected by substantive due process is much narrower than that protected by procedural due process. *D.B. v. Cardall*, No. 15-1993, 2016 WL 3387884, at *13 (4th Cir. June 20, 2016); *Jordan v. Fisher*, 823 F.3d 805, 812-13 (5th Cir. 2016). A "violation of 'substantive' due process occurs only where the government's actions in depriving a person of life, liberty, or property are so unjust that no amount of fair procedure can rectify them." *Love v. Pepersack*, 47 F.3d 120, 123 (4th Cir. 1995); *see Simi Inv. Co. v. Harris Cty., Texas*, 236 F.3d 240, 249-50 (5th Cir. 2000). The Fourth Circuit has identified "two strands of the substantive due process doctrine." *D.B.*, 2016 WL 3387884, at *13 (citing *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008)). The first protects rights that are "fundamental," whereas the second "protects against the exercise of governmental power that shocks the conscience." *Seegmiller*, 528 F.3d at 767. Due to the heightened protections afforded substantive due process rights, "a careful description of the asserted fundamental liberty interest," and a demonstration that the interest is "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed," is required. *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citation omitted). Thus, substantive due process prohibits "only the most egregious official conduct" and rarely comes into play. *Jordan*, 823 F.3d at 812-13.

Within this framework, Plaintiffs fail to plead any "facial" substantive due process claim. Plaintiffs can succeed on a facial challenge only by "establish[ing] that no set of circumstances exists under which the [Act] would be valid," *i.e.*, that the "law is unconstitutional in all of its applications." *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2450-51 (2015). They would therefore have to establish that there are no circumstances in which the Government's interest in denying boarding or searching an individual who is boarding a commercial aircraft based on his or her status with respect to watchlist status can justify the impairment of that individual's interest in travel. This they cannot do.

Plaintiffs' facial substantive due process challenge consists of a single sentence that essentially recites the "no circumstances" standard. See SAC ¶ 1042. Such a formulaic recitation of

the applicable legal standard, without more, does not plausibly establish a substantive due process claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Plaintiffs assert that there is no need for them to undergo enhanced screening before they board a commercial airplane or inspection when crossing the border, their challenge to a purportedly incorrect government decision does not state a substantive due process claim. *See id.* at 678 (demanding "more than an unadorned, the-defendant-unlawfully-harmed-me accusation") (citation omitted). And regardless, Plaintiffs could not show that inclusion on a watchlist is unconstitutional in all its applications. For example, Plaintiffs cannot demonstrate that the Constitution prohibits TSA from subjecting a person to additional screening, pursuant to congressional directive, where the individual is reasonably suspected of being connected to terrorism. *See* 49 U.S.C. § 114(h)(3)(A), (B) (requiring TSA to identify travelers who may be a threat to civil aviation or national security and to take "appropriate action with respect to that individual"). Even where a plaintiff contends that there is insufficient evidence for him or her to have been so designated, this does not render the list *facially* invalid where, under the applicable criteria, the evidence in a given case would justify screening an individual who poses a terrorist threat and is about to board an aircraft. Likewise, since Plaintiffs cannot show that the denial of boarding would be unlawful in all instances, their facial challenge to the No Fly List necessarily fails.

For similar reasons, Plaintiffs' so-called "broad, as-applied" challenge should be dismissed. See SAC ¶¶ 1581-87. This iteration of Plaintiffs' substantive due process challenge is based on the claim that the watchlist is unconstitutional as applied to U.S. citizens who have not been charged with a crime. *See id.* This is not an "as-applied" claim at all; it is a different (if slightly narrower) facial challenge. Rather than putting at issue any Plaintiff's own specific circumstances, the claim seeks invalidation of the watchlist for all U.S. citizens on the basis that the Government does not expressly link placement to an individual's criminal history. *See Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013) ("In contrast to an as-applied challenge, which argues that a law is unconstitutional as enforced against the plaintiffs before the court, a facial challenge is . . . an effort to leave nothing

48

standing[.]"). Thus, as with Plaintiffs' other facial challenge, the legal question raised by this claim is whether the watchlist may constitutionally be applied in any circumstance to a U.S. citizen who has not been charged with a crime. This theory also fails, as there clearly can exist valid reasons for the Government to place an individual who has not been charged with a crime in the TSDB. For example, the Government may still be in the process of investigating an individual or his associates, developing evidence for an indictment, or choosing not to indict yet in order to protect sources and methods of an ongoing investigation. In no case would such circumstances plausibly bar the Government from undertaking additional screening of a person who may be associated with terrorism before he or she boards an aircraft or enters the country. And it is plain that there might be a sufficiently dangerous person who could not yet be arrested but could be denied boarding. Because placement in the TSDB in advance of any criminal charge is not unconstitutional, Plaintiffs substantive due process claim fails as a matter of law.[30] *See Mohamed,* 266 F. Supp. 3d at 883 (finding that the No Fly List is "necessary and sufficiently narrowly tailored to achieve a compelling government interest and therefore does not violate Plaintiff's substantive due process rights").

**VIII.   Count V (Equal Protection) Should Be Dismissed.**

Plaintiffs' equal protection claims in Count V fare no better. "In order to survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity in Athletics, Inc. v. Dep't of Educ.,* 639 F.3d 91, 108 (4th Cir. 2011) (citation omitted). A showing of disparate impact is insufficient, *see Sylvia Dev. Corp. v. Calvert Cty.,* 48 F.3d 810, 818 (4th Cir. 1995); rather, a plaintiff must set forth "specific, non-conclusory factual allegations that establish improper motive." *Williams v. Hansen,* 326 F.3d 569, 584

---

[30] Plaintiffs' assertion that Defendants' conduct "shock[s] the conscience" is also implausible. Under this "strand" of substantive due process, egregious executive conduct is that which is "unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." *Rucker v. Harford Cty.,* 946 F.2d 278, 281 (4th Cir. 1991). No such action is remotely at issue here.

(4th Cir. 2003). In the context of discriminatory prosecution, the Supreme Court has recognized that Equal Protection claims may "ask[] a court to exercise judicial power over a 'special province' of the Executive"—specifically, the "constitutional responsibility to 'take Care that the Laws be faithfully executed'"—and thereby risk "impair[ing] the performance of a core executive constitutional function." *U.S. v. Armstrong*, 517 U.S. 456, 464-65 (1996). No executive functions is more important than the protection of national security. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) ("courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs") (citation omitted). Moreover, a "presumption of regularity supports" the acts of public officers in carrying out their enforcement duties, and "in the absence of clear evidence to the contrary, courts presume that they have properly discharged" those duties. *Armstrong*, 517 U.S. at 464 (citation omitted).

Plaintiffs' equal protection claim asserts that Defendants improperly consider national origin and religious factors in implementing terrorist watchlist policies. *See* SAC ¶ 1610-11. Plaintiffs allege, without any factual elaboration, that "[t]he disparate treatment between Muslims and non-Muslims is the result of Defendants' intentional and purposeful discrimination." *Id.* ¶ 1612. But far from alleging facts from which one would reasonably infer racial or religious animus, the Complaint acknowledges that discrimination on the basis of religion or race is, in fact, contrary to the Government's policy and practice. *Id.* ¶ 1614. Additionally, the facts alleged by Plaintiffs do not support any claim of discriminatory animus, as necessary to state an equal protection claim. *See Elhady v. Piehota*, 303 F. Supp. 3d 453, 466 (E.D. Va. 2017) (dismissing materially similar claims), *Abdi*, 2018 WL 1940411, at *4 (same); *Kovac*, 2019 WL 1057935, at *24 (same); *Kadura*, 2017 WL 914249, at *9 (same). Plaintiffs' allegations include that Khaled El Ali and John Doe were asked about where they grew up, SAC ¶¶ 287, 792; Mohammad Paryavi, Moustafa El-Shahat, Mirrakhmat Muminov, Mohamed Hachem, and others were asked questions regarding religious practices and national origin, *see e.g., id.* ¶¶ 485, 649-50, 1101, 1191; Fadi Suliman was told that "lately, most of the

people that come into [a secondary screening] room are from your background," *id.* ¶ 759; that Mr. Suliman's only travel companion without the "SSSS" designation was the sole non-Muslim employee traveling with him, *id.* ¶ 722; that Mr. Din. was asked questions about learning Arabic, *id.* ¶ 1071; and that Ms. Mujanovic was told she should remove her *hijab* to avoid travel delays, *id.* ¶ 1148. But these claims, even assumed true, at best plausibly support a showing of disparate impact, not intent—and thus do not support a claim of discriminatory animus. *See, e.g., Townes v. Jarvis*, 577 F.3d 543, 552 (4th Cir. 2009) (rejecting an equal protection claim where plaintiff "never allege[d] that the Board actually did intentionally discriminate against him"); *see also Sylvia Dev. Corp.*, 48 F.3d at 818 (rejecting an equal protection claim where allegedly discriminatory statements could not plausibly be read to show animus).

Likewise, one Plaintiff's allegation that "[o]n one occasion, the TSA agent interrogating Mr. El-Shahat informed him that he is subjected to enhanced screening because he frequently travels to countries in the Middle East, because he travels alone, and because he is a Muslim male," SAC ¶ 659, does not suffice to state an equal protection claim. Initially, neither solo travel nor a propensity to travel to countries in the Middle East implicates any fundamental right or suspect class; additionally, a stray remark by a non-decisionmaker with no authority to set policy does not plausibly allege an equal protection violation. *See, e.g., U.S. v. Johnson*, 122 F. Supp. 3d 272, 350 (M.D.N.C. 2015) (noting that "oral statements of government officials have rarely been held to be express classifications" in the equal protection context, but observing further that an exception—not applicable here—may exist "only ... at the managerial level, when commanders and supervisors acting in accordance with the policy instruct officers to target racially defined groups"); *Howard v. City of New York*, No. 12 CIV. 933 JMF, 2014 WL 84357, at *2 (S.D.N.Y. Jan. 6, 2014), *aff'd*, 602 F. App'x 545 (2d Cir. 2015) ("a single racially motivated comment uttered by a non-decisionmaker" insufficient to state an equal protection claim); *Orgain v. City of Salisbury*, 521 F. Supp. 2d 465 (D. Md. 2007), *aff'd in part sub nom. Orgain v. City of Salisbury, Md.*, 305 F. App'x 90 (4th Cir. 2008) (fair

inference of discrimination was not raised by, *inter alia*, one stray reference by board member to predominant race of club's customers); *cf. Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 608 (4th Cir. 1999) (noting well-established rule in the Title VII context that "to prove discriminatory animus, the derogatory remark cannot be stray or isolated[.]").

Thus, Plaintiffs' equal protection claim should be dismissed.

## IX.    Count III (APA—DHS TRIP) Should Be Dismissed.

Plaintiffs' APA claim challenging the DHS TRIP program is coextensive with their procedural due process claim. They allege that they were stigmatized without a "constitutionally adequate avenue for redress," SAC ¶ 1594; *see id.* ¶ 1597, and also that they do "not present a security threat to commercial aviation," *id.* ¶ 1598. Accordingly, this claim fails for the same reasons the procedural due process claim does, and Plaintiffs cannot separately demonstrate that the DHS TRIP process is arbitrary or capricious in violation of the APA. *See* 5 U.S.C. § 706(2)(A). If the Court were to consider the due process issue as a separate APA claim, the scope of APA review is narrow and deferential, and a court cannot substitute its judgment for that of the agency. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As long as the agency's action being challenged—here the adequacy of the redress process—has a rational basis, it must be affirmed. *See Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984). As set forth above, the contours of the redress process for both the No Fly and the Screening Plaintiffs are plainly reasonable.

Further, inasmuch as Count III purports to challenge Plaintiffs' alleged TSDB designations themselves as arbitrary and capricious agency action, any such claim necessarily fails because, as explained above, numerous Plaintiffs have failed to exhaust the remedial, and mandatory, DHS TRIP procedures that are available to them. *See supra* § V.[31]

---

[31] Plaintiffs' reliance on *Darby v. Cisneros,* 509 U.S. 137 (1993), is misplaced. *See* SAC ¶ 1593. *Darby* explicitly stated that "the exhaustion doctrine continues to exist under the APA to the extent that it is required by statute or by agency rule as a prerequisite to judicial review." 509 U.S. at 153. Here the agency rules establish a

**X.      Count IV (APA—NCIC) Should Be Dismissed.**

In Count IV, Plaintiffs bring a separate APA claim, styled as a challenge to the National Crime Information Center's ("NCIC") inclusion of the Known and Suspected Terrorist File ("KST File"). SAC ¶¶ 1600-07. NCIC is a database established by Congressional directive, 28 U.S.C. § 534, and administered by the Criminal Justice Information Services ("CJIS") Division of the FBI, to enable information-sharing among, *inter alia*, federal, state, and local law enforcement agencies. *See* About NCIC, https://www.fbi.gov/services/cjis/ncic, (last visited Apr. 29, 2019). The NCIC database currently contains 21 files, including, *inter alia*, the National Sex Offender Registry, Missing Person File, Wanted Person File, Foreign Fugitive File, and the Known or Appropriately Suspected Terrorist File ("KST File"), as well as seven stolen property files containing records of, *inter alia*, stolen vehicles, license plates, and guns. *Id.*; *see also* DEX L. Federal regulations permit local law enforcement agencies to access these records, but only for specific law enforcement purposes, and only if they agree in writing to abide by the regulations. 28 C.F.R. § 20.33; *see generally* 28 C.F.R. Part 20. NCIC access is subject to stringent security controls and regular audits, and the applicable federal security policy is set forth in the CJIS Security 2018 Policy. *See* https://www.fbi.gov/file-repository/cjis-security-policy_v5-7_20180816.pdf/view, (last visited Apr. 29, 2019). The information-sharing facilitated by the NCIC aids criminal justice professionals in, *inter alia*, apprehending fugitives, locating missing persons, recovering stolen property, and preventing crime; importantly, it also assists such officials in performing their duties more safely. *See* https://www.fbi.gov/services/cjis/ncic.

As set forth below, Count IV must be dismissed under both Rule 12(b)(1) and 12(b)(6).

---

process by which exhaustion of their DHS TRIP remedies is a required prerequisite to judicial review in the court of appeals. *See* 49 U.S.C. 46110. No plaintiffs have taken advantage of this provision.

A.      **Plaintiffs Lack Standing to Pursue the Relief They Seek In Count IV.**

First, Plaintiffs lack standing to challenge the NCIC's inclusion of the KST File as among the data sets which qualified law enforcement officers may query, for qualified law enforcement purposes. Initially, Plaintiffs have not pled or identified any injury in fact, *i.e.*, any "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," in conjunction with this claim. *Lujan*, 504 U.S. at 560 (citations omitted). Further, the relief that Plaintiffs seek with respect to this claim—an injunction prohibiting the inclusion of the KST File in the NCIC database, *see* Prayer for Relief ¶ 4(h)—is prospective. Accordingly, even assuming, *arguendo*, that one or more Plaintiffs has alleged a past cognizable injury that is plausibly attributable to Defendants' inclusion of the KST File in the NCIC—*but see* § XIV.A, *infra*—it is well-established that in order to establish standing to seek such relief, they must further demonstrate the existence of a future "threatened injury [that is] *certainly impending*." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (emphasis added) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). As no Plaintiff has pled *any* injury to any "legally protected interest" connected to the inclusion of the KST File in the NCIC—much less any "credible threat of future injury" that will result from the same, *Winsness v. Yocom*, 433 F.3d 727, 735 (10th Cir. 2006), Count IV should be dismissed for lack of standing.[32]

B.      **Count IV Also Fails to State a Claim.**

In any event, because the inclusion of the KST File in the NCIC is legally authorized, Count IV must also be dismissed for failure to state a claim. As noted above, the NCIC was created

---

[32] Plaintiffs' requested relief with respect to this claim is also overbroad, and would violate the requirements of Article III, because the requested injunction seeks relief far beyond any "inadequacy that produced the injury in fact" arguably alleged by the SAC. *See Lewis v Casey*, 518 U.S. 343, 357 (1996); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *Trump* v. *Hawaii*, 138 S. Ct. at 2429 (Thomas, J., concurring) ("[U]niversal injunctions are legally and historically dubious."). The requested injunction is inconsistent with ordinary equitable principles as well. *See also, e.g.*, *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 765 (1994) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." (citation omitted)).

pursuant to Congressional mandate—specifically, 28 U.S.C. § 534(a), which provides that the Attorney General "shall," *inter alia*, "acquire, collect, classify, and preserve identification, criminal identification, crime, *and other records*" (emphasis added), and "exchange such records and information with, and for the official use of, authorized officials of the Federal Government, … the States,  … Indian tribes, cities, and penal and other institutions." Thus, while the gravamen of Plaintiffs' theory on Count IV is that the KST File may not properly be included in the NCIC because it consists of "non-criminal information," 28 U.S.C. § 534 contains no such limitation. *See also* 28 C.F.R. § 0.85(f) (providing that the FBI Director, as the Attorney General's delegee, "shall" "[o]perate … a computerized nationwide index of *law enforcement information* under the National Crime Information Center") (emphasis added).

As was noted by the 9/11 Commission, prior to the attacks on September 11, 2001, federal and local law enforcement officials lacked a common operating picture, such that the CIA, for example, might have known an individual had ties to terrorism—but did not know the individual was in the U.S.—while local law enforcement knew the individual was in the U.S.—but did not know the individual had ties to terrorism. *See The 9/11 Commission Report*, § 13.3 (recommending greater information-sharing), § 8.2 (describing what the Commission found to be specific information failures in the months leading up to the 9/11 attacks), available at https://www.9-11commission.gov/report/ (last visited Apr. 29, 2019). Consequently, in establishing the TSC, President Bush directed that it be

> the policy of the United States to (1) develop, integrate, and maintain thorough, accurate, and current information about individuals known or appropriately suspected to be or have been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism (Terrorist Information); and (2) *use that information as appropriate and to the full extent permitted by law to support[,]* [*inter alia*,] Federal, *State, local,* territorial, tribal, foreign-government, and private-sector screening processes.

HSPD-6 (emphasis added). Pursuant to HSPD-6's directive, the KST File is properly included in the NCIC database. Inclusion of this File allows for federal, state, and local law enforcement and

criminal justice agencies to share relevant information necessary to carry out their respective missions in a concerted effort to prevent terrorist attacks, and is by no measure "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

Finally, while Plaintiff's also contend that the inclusion of the KST File in the NCIC further conflicts with 28 C.F.R. § 20.20, this theory is also unavailing. This regulation provides, in relevant part, that "[u]se of information obtained from" either the precursor office to CJIS, or "the FBI/NCIC system[,] shall also be subject to limitations contained in subpart C." 28 C.F.R. § 20.20. Subpart C of 28 C.F.R. Part 20, in turn, includes 28 C.F.R. § 20.33, which sets forth various limitations on the use and dissemination of "criminal history record information." Thus, when the KST File is exported to the NCIC, it does not "become" a criminal record. Rather, it is given the same protections and subject to the same restrictions as criminal records are afforded.

## XI.   Count VI (Fourth Amendment) and Count VIII (Fifth Amendment: Self Incrimination) Should Be Dismissed.

In Count VI, Plaintiffs allege that their electronic devices have been searched and seized at the border "solely because" of their purported TSDB statuses, and in violation of a purported constitutional requirement of "a warrant supported by probable cause" before CBP may conduct *any* search of an electronic device at the border, and/or detain the device for purposes of completing the search. SAC ¶¶ 1621-31, Prayer for Relief ¶ 3(a). In Count VIII, Plaintiffs allege that "after seizing Plaintiffs' electronic devices," Defendants have "forced them to open those devices by providing passwords and by using biometric means such as facial recognition or fingerprints," and that these actions violate Plaintiffs' Fifth Amendment right against self-incrimination. *Id.* ¶¶ 1642-46. As set forth below, Counts VI and VIII must be dismissed under both Rule 12(b)(1) and Rule 12(b)(6).

A.      **Plaintiffs Lack Standing To Pursue the Relief They Seek in Counts VI and VIII.**

First, Plaintiffs cannot establish standing to pursue the injunctive and declaratory relief they seek with respect to Counts VI and VIII. As an initial matter, ten Plaintiffs[33] make *no* allegations that any of their electronic devices have ever been the subject of any governmental search, at the border or otherwise. This deficiency plainly disqualifies these eleven Plaintiffs from establishing standing to pursue either of these claims, where it is axiomatic that a constitutionally sufficient "injury in fact" must be (among other things) "concrete and particularized,"—"mean[ing] that the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1; *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, (1982) ("Art[icle] III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.") (citation omitted). As these ten Plaintiffs do not allege to have "personally suffered" any injury related to the conduct of any border search, they plainly lack standing to pursue any relief under Counts VI and VIII.

Further, even for the remaining Plaintiffs, it is well-established that "past injuries alone are insufficient to establish standing" to seek declaratory or injunctive relief, as Plaintiffs do here. *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011). Instead, Plaintiffs "must show [they are] suffering an ongoing injury or face[] an immediate threat of injury," *id., that is* "certainly impending,'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2103); *see also, e.g.*, *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects."). The remaining Plaintiffs fail to satisfy these standards where no Plaintiff has made a single allegation regarding any specific plans for future international travel—the occurrence of which, of course, is a prerequisite to the occurrence of any future border search (which is itself a prerequisite to Plaintiffs'

---

[33] Mia Khaled El Ali, Rami Khaled El Ali, Mohammad Paryavi, Mohallim, Baby Doe, Child Doe, Child Doe 2, Zijad Bosnic, Abdu Wakil Cyeef Din, and Hassan Shirwa.

purported "self-incrimination" theory).[34] Where it is well-established that allegations of "'[s]ome day' intentions" for future travel will not suffice to establish an Article III injury, *Lujan*, 504 U.S. at 564, *a fortiori*, Plaintiffs' complete lack of even vague or indefinite future plans to travel internationally is fatal to their standing to pursue these claims.

**B.     Count VI Also Fails to State a Claim.**

**1.     Border Searches of Electronic Devices Require Neither a Warrant Nor Probable Cause.**

Even if one or more Plaintiffs could establish standing to pursue Count VI, this claim should still be dismissed under Rule 12(b)(6). Plaintiffs premise this claim on an asserted constitutional requirement of "a warrant supported by probable cause" before CBP may conduct *any* search of an electronic device at the border, and also before CBP may detain any such device for purposes of completing a border search. Prayer for Relief ¶ 3(a), (b), 4(c)-(e). Because it is well-established that "searches at the border of the country 'never' require probable cause or a warrant," *U.S. v. Touset*, 890 F.3d 1227, 1232 (11th Cir. 2018), Count VI must be dismissed.

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated …" U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness,'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006), which "ordinarily … requires the obtaining of a judicial warrant." *Riley v. California*, 573 U.S. 373, 381-82 (2014) (citation omitted). However, there are several important exceptions to this rule, "and one such exception typically covers our nation's borders." *U.S. v. Kolsuz*, 890 F.3d 133, 137 (4th Cir. 2018).

At the border, "[i]t is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *Flores-Montano*,

---

[34] Farid Sulayman alleges that he "intends to lead umrah group," SAC ¶ 1672, and Plaintiffs Siddiqui and Al-Sahlani desire to perform the hajj pilgrimage to Mecca, *id.* ¶ 1540, 1672, but they do not specify any dates or details. *Cf. Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 326 (1st Cir. 2009) ("nebulous 'some day' intentions" are insufficient).

541 U.S. at 153; *see also*, *e.g.*, *U.S. v. Oriakhi*, 57 F.3d 1290, 1296 (4th Cir. 1995) (noting that "inherent in national sovereignty are the overarching rights of a nation to defend itself from outside threats, to act in relation to other nations, and to secure its territory and assets."). Thus, "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior[.]" *Montoya de Hernández,* 473 U.S. at 538. On the one hand, the "Government's interest in preventing the entry of unwanted persons and effects is at its zenith," *Flores-Montano*, 541 U.S. at 152; on the other, "the expectation of privacy [is] less[er]." *Montoya de Hernandez*, 473 U.S. at 539; *U.S. v. Ickes*, 393 F.3d 501, 506 (4th Cir. 2005) ("A greater interest on the side of the government at the border is coupled with a lesser interest on the side of the potential entrant."). Consequently, "the Fourth Amendment balance between the interests of the Government and the privacy rights of the individual is … struck much more favorabl[y] to the Government at the border," *Montoya de Hernández,* 473 U.S. at 540, and "[r]outine searches of the persons and effects of entrants *are not subject to any requirement of reasonable suspicion, probable cause, or warrant*." *U.S. v. Molina-Gomez*, 781 F.3d 13, 18 (1st Cir. 2015) (quoting *Montoya de Hernández*, 473 U.S. at 538) (emphasis added). Rather, these searches "are reasonable simply by virtue of the fact they occur at the border." *Flores–Montano,* 541 U.S. at 152-53; *accord Touset*, 890 F.3d at 1232 (observing that border searches are "different.").

Thus, it is well-established that border searches constitute a categorical "exception to the Fourth Amendment prohibition against warrantless searches without probable cause," *U.S. v. Seljan*, 547 F.3d 993, 999 (9th Cir. 2008) (en banc), such that "searches at the border of the country 'never' require probable cause or a warrant," *Touset*, 890 F.3d at 1232 (quoting *Ramsey*, 431 U.S. at 619). As Plaintiffs' contentions are directly contrary to—and indeed, precluded by—this "longstanding recognition," *Ickes*, 393 F.3d at 505, this claim must necessarily fail.

## 2. *Kolsuz* Does Not Change the Relevant Analysis.

The Fourth Circuit recently held that a "*forensic* search of … cell-phone data qualifies as a nonroutine border search, requiring *some level of particularized suspicion*." *Kolsuz*, 890 F.3d at 144

(emphasis added).[35] In categorizing forensic searches as "nonroutine," *Kolsuz* drew upon and expanded a line of cases that collectively stand for the proposition that "even at the border, individualized suspicion is necessary to justify certain 'highly intrusive searches,' in light of the significance of the individual 'dignity and privacy interests' infringed." *Id.* at 144 (quoting *Flores–Montano*, 541 U.S. at 152, and further noting that "[u]nder that approach, border searches of luggage, outer clothing, and personal effects consistently are treated as routine, while searches that are most invasive of privacy—strip searches, alimentary-canal searches, x-rays, and the like—are deemed nonroutine and permitted only with reasonable suspicion.").

However, *Kolsuz* does not aid Plaintiffs' case, for at least four reasons. First, *Kolsuz* held only that individualized suspicion is required for forensic searches of cell phones at the border, and thus does not support Plaintiffs' claim that a warrant based on probable cause is required for all cell phone border searches. *Cf. U.S. v. Saboonchi* ("*Saboonchi I*"), 990 F. Supp. 2d 536, 545 (D. Md. 2014) (observing that "reasonable, particularized suspicion … is significantly less demanding than the showing of probable cause required to secure a warrant for a domestic search").

Second, *Kolsuz* left undisturbed *Ickes*—another binding Fourth Circuit decision, which, in accordance with the clear weight of precedent from other courts, held that a *non-forensic*, or manual, search of a computer constitutes a routine search requiring no suspicion. 393 F.3d at 505-06; *see Kolsuz*, 890 F.3d at 141, 146 n.5. Thus, *Ickes*, which "clearly stands for the proposition that a manual

---

[35] Because reasonable suspicion was present for the search there at issue, and an "established and uniform body of precedent allow[s for] warrantless border searches of digital devices that are based on at least reasonable suspicion," *Kolsuz* did not reach the issue of whether "some level of particularized suspicion" is satisfied by reasonable suspicion, or requires something "more." 890 F.3d at 148, 144.

Further, although *Kolsuz* is binding on this Court, Defendants respectfully disagree with its conclusion that individualized suspicion is required for forensic searches of cell phones at the border—and further note that the decision is in conflict with another recent Circuit Court decision. *See Touset*, 890 F.3d at 1233 ("We see no reason why the Fourth Amendment would require suspicion for a forensic search of an electronic device when it imposes no such requirement for a search of other personal property."). Accordingly, Defendants reserve the right to challenge this aspect of the *Kolsuz* decision, if appropriate at some later stage of these proceedings.

digital search of an electronic device is a routine border search," *U.S. v. Kolsuz,* 185 F. Supp. 3d 843, 854 (E.D. Va. 2016), *aff'd*, 890 F.3d 133 (4th Cir. 2018), remains the law in this Circuit, precluding this Court from imposing the probable cause or warrant requirement sought by Plaintiffs on non-forensic electronic searches. *See Saboonchi I,* 990 F. Supp. 2d at 554 (noting that "*Ickes* forecloses the possibility that the mere fact that an electronic device may contain massive amounts of personal data, by itself, can change the legal analysis at the border"); *see also id.* at 552 (further noting that "*Ickes* comports with the clear weight of precedent from other courts … [that] have analogized a laptop to a closed container that may be opened and its contents searched at the border") (collecting cases); *U.S. v. Stewart,* 729 F.3d 517, 521, 525 (6th Cir. 2013) (characterizing a "non-forensic examination" of a computer, which involved a forensic analyst "preview[ing] its contents by scrolling through about twenty-five images per page" in search of child pornography, as a "routine border search"); *U.S. v. Linarez-Delgado,* 259 F. App'x 506, 508 (3d Cir. 2007) (citing *Ickes* and holding that viewing of camcorder footage was a lawful border search that did not require reasonable suspicion); *U.S. v. Arnold*, 533 F.3d 1003, 1009 (9th Cir. 2008) (reasonable suspicion not required for manual search of laptop computer at the border).

Third, *Kolsuz* cited CBP's 2018 Directive favorably, noting with approval that under the policy, advanced searches "may be conducted only with reasonable suspicion of activity that violates the customs laws or in cases raising national security concerns." 890 F.3d at 146 (citing the 2018 Directive). *Kolsuz* thus does not support Plaintiffs argument CBP's policy is constitutionally inadequate. Fourth and finally, *Kolsuz* confirms that the same analysis that applies to searching devices also applies to the *detention* of electronic devices, as is necessary in some circumstances "to perform a thorough border search." CBP Directive ¶ 5.4.1. Although the issue was not pressed by the defendant on appeal, *Kolsuz* nonetheless discussed at length and cited with clear approval the district court's holding that "'an off-site forensic search of an electronic device over a long period of time is nonetheless a border search.'" 890 F.3d at 142 (citing *Kolsuz,* 185 F. Supp. 3d at 851-52 (E.D.

Va.)). Thus, "the border exception is not rendered inapplicable because a search initiated at a border ultimately is conducted at some physical or temporal remove." *Kolsuz*, 890 F.3d at 142 (collecting cases); *Molina-Gomez*, 781 F.3d at 21 (physical search of electronics occurring at customs forensics lab 22 days after they were first detained was not unreasonable); *U.S. v. Cotterman*, 709 F.3d 952, 961-62 (9th Cir. 2013) (the search of the computers 170 miles away from where they were detained and done days later did not transform the search into an extended border search requiring a higher level of suspicion); *U.S. v. Caminos*, 770 F.2d 361, 364-65 (3d Cir. 1985) (searching a package eleven days after its arrival did not render it an extended border search). Accordingly, just as probable cause and a warrant are not required for border searches of electronic devices, such a standard does not govern the detention of an electronic device in order to complete the search—and certainly not in the across-the-board manner contemplated by Plaintiffs' Fourth Amendment claim.[36]

In sum, *Kolsuz* does not disturb the well-established proposition that "[a]t the border, the highest standard for a search is reasonable suspicion." *U.S. v. Vergara*, 884 F.3d 1309, 1313 (11th Cir. 2018), *cert denied*, 139 S. Ct. 70 (Oct. 1, 2018). Indeed, as *Kolsuz* itself observed, the overwhelming weight of case law rejects the proposition "that … more [than reasonable suspicion] would be necessary—for a forensic search of a phone at the border or, indeed, for *any* border search, no

---

[36] Apart from having no legal basis, Plaintiffs' theory ignores realities. Border agents may not be able to conduct or complete a search of an electronic device immediately for any number of reasons, such as a lack of proper equipment, *Stewart*, 729 F.3d at 526, difficulty with software, *U.S. v. Feiten*, No. 15-20631, 2016 WL 894452, at *1 (E.D. Mich. Mar. 9, 2016), or password protections, *see* CBP Directive ¶¶ 5.3.1-5.3.3. If accepted, Plaintiffs' argument that, absent probable cause, CBP may not detain electronic devices as necessary to complete a border search would render impossible the effective search of large swaths of electronic devices carried across the border, including, *e.g.*, any password-protected or encrypted device that was not voluntarily unlocked. Such a result is untenable and defies common sense: as another judge in this district has observed, "just as a luggage lock does not render the contents of a suitcase immune from search, a password protected file is not unsearchable on that basis alone." *Saboonchi I*, 990 F. Supp. 2d at 560-61; *see also U.S. v. McAuley*, 563 F. Supp. 2d 672, 678 (W.D. Tex. 2008), *aff'd*, 420 F. App'x 400 (5th Cir. 2011) ("Locks are usually present on luggage and briefcases, yet those items are subject to 'routine' searches at ports of entry all the time.").

Further, "the Supreme Court has 'consistently rejected hard-and-fast time limits' in evaluating the reasonableness of border searches and has stressed that 'common sense and ordinary human experience must govern over rigid criteria.'" *Tabbaa*, 509 F.3d at 100 (quoting *Montoya de Hernandez*, 473 U.S. at 543).

matter how nonroutine or invasive." 890 F.3d at 147 (emphasis in original); *see also United States v. Wanjiku*, 919 F.3d 472, 485 (7th Cir. 2019) (noting that "no circuit court" has ever "required more than reasonable suspicion for a border search of cell phones or electronically-stored data"); *U.S. v. Saboonchi ("Saboonchi II"),* 48 F. Supp. 3d 815, 819 (D. Md. 2014) ("[A]cross the history of the border search doctrine, Defendant has not cited to a single case holding that anything more than reasonable suspicion was required to perform a search of even the most invasive kind at the international border, and I have found none."); *U.S. v. Molina-Isidoro*, 884 F.3d 287, 292 (5th Cir. 2018) (similarly observing that "no court has ever required a warrant to support searches, even nonroutine ones, that occur at the border.").[37] Because Count VI is premised on the theory that a probable cause or warrant requirement is necessary before CBP may conduct a border search of an electronic device (and/or detain the device for purposes of completing the search), it is without legal basis and must be dismissed.

### 3.   Neither *Riley* nor *Carpenter* Warrants a Different Result.

Plaintiffs suggest that the Supreme Court's recent decisions in *Carpenter v. U.S.*, 138 S. Ct. 2206 (2018), and *Riley v. California*, 573 U.S. 373 (2014), require the imposition of an across-the-board warrant and/or probable cause rule for the search and/or detention of electronic devices. SAC ¶ 1623. This contention—which would jettison the border search doctrine, as to any electronic devices carried into or out of the United States—is wholly without merit.

*Riley* involved a different exception to the Fourth Amendment's generalized warrant requirement, namely, the "search incident to arrest" exception. 573 U.S. at 374. In addressing whether the application of this exception to electronic devices that have been seized from an

---

[37] Defendants note that in May 2018, a district court in Massachusetts issued an unpublished opinion denying the Government's motion to dismiss and holding that further factual development of the record was necessary before it could resolve certain claims that, like Count VI, seek the imposition of a probable cause and/or a warrant requirement for electronic devices at the border. *Alasaad v. Nielsen*, No. 17-CV-11730-DJC, 2018 WL 2170323, at *19 (D. Mass. May 9, 2018). For all of the reasons set forth above, the reasoning of *Alasaad* case—which also remains in active litigation—is legally unsound and should not be followed.

individual who has been arrested would "untether the rule" from its underlying justifications, *id.* at 386, *Riley* emphasized the limited purposes of this exception: to locate any weapons that might endanger the arresting officer and to prevent the destruction of evidence by the person being arrested, *id.* at 2483. In light of the relatively attenuated link between these purposes and the type of digital information typically found on cell phones, *Riley* held that the search incident to arrest exception does not authorize warrantless searches of digital information stored on cell phones. *Id.* at 2482-95. Likewise, *Carpenter* is similarly limited, holding only that the use of an order obtained pursuant to the Stored Communications Act, 18 U.S.C. § 2703(d), rather than a warrant, to obtain seven or more days of cell-site records violates the Fourth Amendment rights of the individual cellphone customer to whom those records pertain. 138 S. Ct. at 2221-22.

As the Seventh Circuit recently observed, neither *Riley* nor *Carpenter* "addresses searches at the border where the government's interests are at their zenith, and neither case addresses data stored on other electronic devices such as portable hard drives and laptops." *Wanjiku*, 919 F.3d at 484. To the contrary, *Riley* declined to extend its reasoning to any other warrant exceptions, and expressly stated that "other case-specific exceptions may still justify a warrantless search of a particular phone." *Riley,* 573 U.S. at 401-02.[38] More fundamentally, *Riley*'s rationale was based on the limited and discrete purposes of the search incident to arrest exception. *Id.* at 383. But the border search doctrine serves different and much broader purposes—namely, protecting the nation's core sovereignty in controlling the entry and exit of persons and property in order to protect national security and threats to the citizenry. *See, e.g., Almeida-Sanchez* 413 U.S. at 291; *Oriakhi*, 57 F.3d at 1296-1302; *Ickes*, 393 F.3d at 505.

Unlike with searches incident to arrest, the purposes underlying the border search doctrine apply in full force to searches of electronic media, which can contain contraband or material (such as

---

[38] Although less relevant here given *Carpenter*'s attenuation from the issues presented by this case, *Carpenter* also recognized that "case-specific exceptions may support a warrantless search of an individual's cell-site records under certain circumstances." 138 S. Ct. at 2222.

classified information or malware) that, if illicitly transferred beyond our borders, could pose a direct threat to our national security. And the greater storage capacity of electronic devices enables greater harm through the smuggling of, for example, large amounts of classified or other sensitive or proprietary data. *See, e.g.*, *Saboonchi I*, 990 F. Supp. 2d at 562-63 (noting that border searches of electronic devices have "been indispensable in allowing Customs officers to uncover concealed child pornography, … evidence of drug activities, … [and other] criminal activities") (collecting cases). For these reasons, courts have rejected arguments that *Riley* requires the creation of a warrant and/or probable cause requirement for border searches of electronic devices. *Touset*, 890 F.3d at 1234 ("*Riley*, which involved the search-incident-to-arrest exception, does not apply to searches at the border."); *Vergara*, 884 F.3d at 1312-13 ("Border searches have long been excepted from warrant and probable cause requirements, and the holding of *Riley* does not change this rule."); *U.S. v. Gonzalez*, 658 F. App'x 867, 870 (9th Cir. 2016) (similar).[39] This Court should follow the sound reasoning of these decisions and do the same.

### C. Count VIII Likewise Fails to State a Claim.

As relevant to Count VIII, the Fifth Amendment provides that "[n]o person ... shall be Compelled in any criminal case to be a Witness against himself." U.S. Const. amend V. The right is not absolute; rather, "[t]o qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 189 (2004). As set forth below, even if one or more Plaintiffs could establish standing to pursue Count VIII, this claim should still be dismissed under Rule 12(b)(6).

---

[39] *See also, e.g.*, *Saboonchi II*, 48 F. Supp. 3d at 819 (D. Md. 2014) ("*Riley* did not diminish the Government's interests in protecting the border or the scope of the border search exception.") *U.S. v. Molina-Isidoro*, 267 F. Supp. 3d 900, 907-08 (W.D. Tex. 2016) (collecting cases and holding that "the Court cannot say that [*Riley*] has any application beyond the limited search incident to arrest exception."), *aff'd*, 884 F.3d 287 (5th Cir. 2018); *U.S. v. Mendez*, 240 F. Supp. 3d 1005, 1008 (D. Ariz. 2017) (similar); *U.S. v. Lopez*, No. 13-cr-2092, 2016 WL 7370030, at *5 (S.D. Cal. 2016) (similar); *Abidor v. Johnson*, No. 10-cr-4059, 2016 WL 3102017, at *6 n.* (E.D.N.Y. June 2, 2016) (similar); *Feiten*, No. 15-20631, 2016 WL 894452, at *4-6 (similar); *U.S. v. Hernandez*, No. 15-cr-2613, 2016 WL 471943, at *3 n.2 (S.D. Cal. Feb. 8, 2016) (similar).

1.    **Plaintiffs Have Not Pled Any "Substantial and Real" Threat of Incrimination.**

Initially, Count VIII fails for the straightforward reasons that Plaintiffs have not pled that the contents of their electronic devices are potentially incriminating. As is plain from the Fifth Amendment's reference to "any criminal case," U.S. Const. amend. V., the right against self-incrimination protects *only* against "compelled self-incrimination, not (the disclosure of) private information." *Fisher v. United States*, 425 U.S. 391, 401 (1976) (citation omitted); *see id.* (Fifth Amendment is not "a general protector of privacy"). While the privilege extends not only "to answers that would in themselves support a conviction under a federal criminal statute[,] but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime," it is "confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). Moreover, "[t]he witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified." *Id.* "The central standard for the privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *United States v. Apfelbaum*, 445 U.S. 115, 128 (1980) (quoting *Marchetti v. United States*, 390 U.S. 39, 53 (1968)); *see also Mason v. United States*, 244 U.S. 362, 366 (1917) ("[I]t would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice.").

Thus, Plaintiffs cannot invoke the Fifth Amendment simply to protect a purported privacy interest in the contents of their electronic devices, but must plead a "substantial and real" threat of self-*incrimination*. *Marchetti*, 390 U.S. at 53. Where the SAC is devoid of any such allegations—and, indeed, is insistent that Plaintiffs are wholly "innocent" of any criminal wrong-doing, SAC ¶¶ 1, 15, 170, 201, 1583, 1710—Count VIII must be dismissed in its entirety on this ground alone.

**2.      The Border Search Exception Permits the Government to Require that
Electronic Devices Be Presented in a Manner Allowing for Their Inspection.**

Even if, *arguendo*, Plaintiffs could somehow overcome the above deficiency, Count VIII also

fails on the independent ground that the border search doctrine permits the Government to require

that electronic devices, like all other merchandise and cargo, be presented to customs officials in a

manner that allows for their inspection. The Fifth Amendment does not alter this result, regardless

of whether a particular device is protected with an electronic passcode, for several reasons.

First, a contrary result would produce absurd results. As explained at length in § XI.B, *supra*,

at the border, the "Government's interest in preventing the entry of unwanted persons and effects is

at its zenith." *Flores-Montano*, 541 U.S. at 152. Accordingly, border searches constitute a categorical

exception—one with "a history as old as the Fourth Amendment itself"—to the Fourth

Amendment's generalized prohibition against warrantless searches without probable cause. *Ramsey*,

431 U.S. at 619. Under this doctrine, the Supreme Court has repeatedly upheld customs officials'

authority to search a traveler's cargo, "no matter how great the traveler's desire to conceal the

contents may be." *U.S. v. Ross*, 456 U.S. 798, 823 (1982). Thus, it is beyond cavil that when a traveler

presents himself at the border with luggage or other physical cargo, CBP may lawfully require him to

present the cargo in a manner in which it may be inspected. For example, if a traveler arrives with a

locked container or suitcase, CBP may lawfully require him to unlock the container—and, in the

event that he refuses, CBP is permitted to take action to remove the lock, and is by no means

required to permit the entry of the cargo into the United States until it has ascertained the contents

of the container. *See, e.g.*, 19 U.S.C. §§ 1461, 1462, 1496, 1499, 1582; 6 U.S.C. § 211(k). Put simply,

travelers choose what they bring with them when crossing the border, and they must present *all* of

their cargo for inspection; adding a lock to a piece of luggage or electronic device does not exempt

that item from inspection.

As noted above, *see* p. 62 fn. 39, "[a] password is simply a digital lock," directly analogous to

the locks "present on luggage and briefcases," which "are subject to 'routine' searches at ports of

entry all the time." *McAuley*, 563 F. Supp. 2d at 678; *see also Saboonchi I*, 990 F. Supp. 2d at 560-61.

There is no reason why any different result should obtain—regardless of whether the cargo in

question is a physical container or an electronic device—simply because a particular lock is in

electronic form.[40]

    Second, the Fourth Circuit and other courts have declined to limit the scope of lawful

border searches, even where additional constitutional rights have been implicated. In *Ickes*, the

Fourth Circuit definitively rejected the plaintiff's argument that it should "carv[e] out a First

Amendment exception to the border search doctrine," for "expressive" materials. 393 F.3d at 502.

As the Fourth Circuit explained:

> Ickes suggests that the border search doctrine does not apply when the item being
> searched is something 'expressive.' But this cannot be the case. … Particularly in
> today's world, national security interests may require uncovering terrorist
> communications, which are inherently 'expressive.' Following Ickes's logic would
> create a sanctuary at the border for all expressive material—even for terrorist plans.
> This would undermine the compelling reasons that lie at the very heart of the border
> search doctrine. Ickes's argument, at bottom, proves too much.

*Id.* at 506; *see also Arnold*, 533 F.3d at 1010 (expressly following *Ickes* in reaching the same

conclusion). To the extent there is any arguable tension here between the Fifth and Fourth

Amendments—as there was between the First and Fourth Amendments in *Ickes*—the Court should

---

[40] However, Defendants note that even if granted in full, the relief Plaintiffs seek with respect to Count VIII would not preclude CBP from detaining either physical cargo or an electronic device in order to complete a border search. Under the Fifth Amendment, "'[a] party is privileged from producing the evidence but not from its production.'" *Andresen v. Maryland*, 427 U.S. 463, 473-74 (1976) (quoting *Johnson v. United States*, 228 U.S. 457, 458 (1913) (Holmes, J.)). The principle recognizes that the Fifth Amendment "adheres basically to the person, not to information that may incriminate him." *Id.* at 473 (citation omitted). Thus, even where an individual cannot himself be compelled "to aid in the discovery, production, or authentication of incriminating evidence," there is no similar prohibition on the government seizing the evidence pursuant to a valid search. *Id.* at 474.

It follows that, to the extent the Court were to find—which, for all the reasons set forth above, it should not—that the Fifth Amendment permits travelers to refuse to *themselves* unlock digital locks, such a finding would in no way preclude *CBP* from removing or decrypting the lock, pursuant to its well-established border search authorities. In this scenario, travelers would be presented with a choice that is functionally equivalent to the one about which Plaintiffs now complain: if they decline to voluntarily unlock their devices (or cargo) on Fifth Amendment grounds, CBP would remain authorized to detain the device (or cargo) "pending a determination as to its admissibility, exclusion, or other disposition." CBP Directive § 5.3.3; *cf.* SAC ¶ 1491.

reach an equivalent result, on the similar recognition that "[t]he border search doctrine is justified" by the paramount and "longstanding right of the sovereign to protect itself." *Ickes*, 393 F.3d at 506 (quoting *Flores-Montano*, 541 U.S. at 152).

Third, the Supreme Court has also limited the scope of the Fifth Amendment right against self-incrimination in instances where this right has been in tension with administrative or regulatory searches—another noted exception to the Fourth Amendment's generalized warrant or probable cause requirement. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) ("We have also allowed searches for certain administrative purposes without particularized suspicion of misconduct."); *United States v. Hubbell*, 530 U.S. 27, 35 (2000)("[T]he fact that incriminating evidence may be the byproduct of obedience to a regulatory requirement, such as filing an income tax return [(*United States v. Sullivan*, 274 U.S. 259 (1927))], maintaining required records [(*Shapiro v. United States.*, 335 U.S. 1 (1948)], or reporting an accident [(*California v. Byers*, 402 U.S. 424 (1971))], does not clothe such required conduct with the testimonial privilege."); *Baltimore City Dep't of Soc. Servs. v. Bouknight*, 493 U.S. 549, 556 (1990) ("The Court has on several occasions recognized that the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws.").

In sum, in the centuries-long existence of the border search doctrine, no court has ever held that the Fifth Amendment "protects" an individual's "right" to evade an otherwise lawful border search. *Cf. Schmerber v California*, 384 U.S. 757, 764 (1966) (noting "the principle that the protection of the [Fifth Amendment] privilege is as broad as the mischief against which it seeks to guard."). For all of the reasons given above, this Court should not be the first to do so here.

### 3.   At Minimum, Biometric Passwords are Not "Testimonial."

Finally, although the Court need not reach this issue, the provision of a biometric password—such as a fingerprint or voice or facial recognition—cannot violate the Fifth Amendment, because such information is not "testimonial" in nature. The Fifth Amendment is

intended to protect an accused "from having to reveal, directly or indirectly, his knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government." *Doe v. United States*, 487 U.S. 201, 213 (1988). The Supreme Court has thus held that "[t]he word 'witness' in the constitutional text limits the relevant category of compelled incriminating communications to those that are 'testimonial' in character." *Hubbell*, 530 U.S. at 34. The touchstone of this analysis is whether the governmental action requires the individual to use "the contents of his own mind." *Id.* at 43 (quoting *Curcio v. United States*, 354 U.S. 118, 128 (1957)). In contrast, "a simple physical act" does not so qualify. *Id.*; *see also*, *e.g.*, *Matter of Search Warrant Application for [redacted text]*, 279 F. Supp. 3d 800, 803 (N.D. Ill. 2017) ("[T]he Supreme Court has distinguished between compelling a communication versus compelling a person to do something that, in turn, displays a physical characteristic that might be incriminating." (citing *Hubbell*, 530 U.S. at 35)).[41]

At minimum, the provision of a biometric password—such as a fingerprint or voice or facial recognition—does not satisfy this test. As multiple courts have explained, the use of an individual's biometric features cannot, by definition, implicate any "revelation of the contents of [an individual's] mind," and thus is "far more akin to the surrender of a safe's key than its combination." *Matter of Search of [Redacted] Washington, D.C.*, 317 F. Supp. 3d 523, 535-36 (D.D.C. 2018); *see also*, *e.g.*, *Matter of Search Warrant Application for [redacted text]*, 279 F. Supp. 3d at 803-04 ("The application of the fingerprint to the sensor is simply the seizure of a physical characteristic, and the fingerprint by *itself* does not communicate anything."); *Minnesota v. Diamond*, 905 N.W.2d 870, 877-78 (Minn.), *cert. denied*, 138 S. Ct. 2003 (2018) ("Because the compelled act merely demonstrated Diamond's physical characteristics and did not communicate assertions of fact from Diamond's mind, we hold that Diamond's act of providing a fingerprint to the police to unlock a cellphone was not a testimonial

---

[41] *See U.S. v. Dionisio*, 410 U.S. 1, 7 (1973) (provision of a voice exemplar not testimonial); *Gilbert v. Cal.,* 388 U.S. 263, 266 (1967) (provision of handwriting exemplar not testimonial); *United States v. Wade,* 388 U.S. 218, 222-23 (1967) (participation in a lineup not testimonial); *Schmerber v. Cal.,* 384 U.S. 757, 765 (1966) (furnishment of a blood sample not testimonial); *Holt v. United States,* 218 U.S. 245, 252-53 (1910) (wearing particular clothing not testimonial).

communication[.]"); *Virginia v. Baust*, 89 Va. Cir. 267, 2014 WL 10355635, at *4 (Va. Cir. 2014)

("The fingerprint, like a key … does not require the witness to divulge anything through his mental

processes."); *cf. In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1345 (11th

Cir. 2012) ("[T]he Fifth Amendment privilege is not triggered where the Government merely

compels some physical act, *i.e.* where the individual is not called upon to make use of the contents of

his or her mind.").

## XII.   Count VII (First Amendment) Should Be Dismissed.

Plaintiffs' First Amendment allegations relate to the search and seizure of electronic devices,

which they contend leads to a "significant or substantial burden on watchlisted individuals' First

Amendment rights to expression and association." SAC ¶ 1635. Specifically, they allege that

"Defendants' searches and copying are done in pursuit of intelligence and information about

Plaintiffs and similarly situated watchlisted individuals' communications, expressions, social media

activities, and associations" and that Defendants "intend to use that intelligence and information" to

single out Plaintiffs' associations for investigation. *See id.* ¶ 1634-36. These allegations do not

properly assert a First Amendment claim, because they have not shown any chilling effect of the

alleged compelled disclosure of their speech. Because Plaintiffs have not pled facts to support the

allegation that their speech has actually been chilled as a result of compelled disclosure of their

associations, they may not request prospective relief based simply on an alleged subjective chill of

their speech. *See Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not

an adequate substitute for a claim of specific present objective harm or a threat of specific future

harm."). Although Plaintiffs believe that the Government has targeted the content of their speech,

they have not alleged any *effect* of these searches on their First Amendment protected activities.

Without any such allegations, their claim must fail.

But even if Plaintiffs did have standing to bring a First Amendment claim, it still must be

dismissed. Government investigative activities that are conducted in good faith—that is, not "for the

purpose of abridging First Amendment freedoms"—do not violate the First Amendment. *U.S. v. Mayer*, 503 F.3d 740, 751 (9th Cir. 2007); *see also Reporters' Comm. for Freedom of Press v. AT&T Co.*, 593 F.2d 1030, 1051-53 (D.C. Cir. 1978). Plaintiff's cursory assertion that the abridgment of First Amendment freedoms is the purpose of the Government's searches does not change this fact. *See* SAC ¶ 1637. Moreover, "the First Amendment offers no procedural or substantive protections against good faith criminal investigative activity beyond that afforded by the Fourth and Fifth Amendments." *Reporters' Comm.* at 1054. In the context of national security investigative activities, particularly those at the border, this interest is further heightened. *See U.S. v. U.S. Dist. Court for E. Dist. Mich.*, 407 U.S. 297, 313 (1972) (recognizing that the investigative duty and purpose of the executive branch is stronger in national security cases than "in cases of ordinary crime"); *Flores-Montano*, 541 U.S. at 152 (recognizing "the longstanding right of the sovereign to protect itself by topping and examining persons and property crossing into this country").

Moreover, the Fourth Circuit has declined to "carve out a First Amendment exception to the border search doctrine," *Ickes*, 393 F.3d at 506, noting that "the ramifications . . . would be quite staggering." *Id.* And finally, Plaintiffs cannot plausibly draw parallels between this case and the compelled disclosure cases where courts have applied exacting scrutiny to government conduct. In *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), the Alabama courts had ordered the NAACP to produce local membership lists with names and addresses of all members, in connection with litigation to oust it from the state as an unregistered corporation. *Id.* at 451-53. The Supreme Court held that Alabama could not compel the NAACP to disclose its lists because it "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.* at 462. "Under these circumstances," the Court found it "apparent that compelled disclosure of [NAACP]'s Alabama membership" entailed a "substantial restraint" on the organization's freedom of association. *Id.*; *see also, e.g., Brown v. Socialist*

*Workers '74 Campaign Comm.*, 459 U.S. 87, 98–99 (1982). Although Plaintiffs allege a "significant or substantial burden" on their right to expressive association, *see* SAC ¶ 1635, they provide no facts to bolster this allegation—they do not allege that their purported placement on the watchlist, or association with persons on the watchlist, subjects them to the same level of social and economic reprisal faced by the members in *NAACP v. Alabama.*

Finally, Plaintiffs assert that Defendants' electronic device search practices "make watchlisted individuals' associations, including family, coworkers, friends, and religious congregants, the target of increased 'known or suspected terrorist' scrutiny." SAC ¶ 1639. However, Plaintiffs "may not seek redress for injuries done to others." *Moose Lodge No. 107*, 407 U.S. at 166. To the extent that Plaintiffs may intend this allegation to apply only to harms allegedly suffered by Plaintiffs Rami El Ali, Mia El Ali, Abdirizak Wehelie, Shamsa Hashi Noor, Fatima Wehelie, Baby Doe, Child Doe, and Child Doe 2[42]—those Plaintiffs who believe they are *not* on the watchlist, but who allege harms based on their familial relationship with those who are alleged to be on the watchlist,[43] they still fail to state a valid First Amendment claim because the First Amendment protects a right to "expressive association," that is, a "right to associate for the purpose of speaking," *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 68 (2006), not a right to associate unimpeded while traveling, or to family integrity. "The right to family integrity rests not within the First Amendment but within the Fourteenth Amendment's Substantive Due Process guarantees." *Schattilly v. Daugharty*, No. 14-CV-11905, 2015 WL 1412502, at *10 (E.D. Mich. Mar. 20, 2015) (citing *Stanley v. Illinois*, 405 U.S. 645, 651, (1972); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). Plaintiffs allege travel

---

[42] As discussed, *supra* § IV, these Plaintiffs are those for whom the Court does not have jurisdiction under 49 U.S.C. § 46110 to the extent they challenge the alleged decision of TSA to require them to undergo enhanced screening as a result of their alleged association with individuals on the TSDB.

[43] Notably, Plaintiffs Prayer for Relief does not address this First Amendment theory at all—so even if the theory were viable, the requested relief would not redress it. *See* SAC ¶¶ 226-28.

impairments, but identify no inhibition of their right to express particular viewpoints through their association—for this reason, this purported theory fails to state a valid claim, and must be dismissed.

For this reason, and the foregoing, Plaintiffs fail to state a First Amendment claim. Count VII should be dismissed under Rule 12(b)(6).

## XIII. Plaintiffs' Second Amendment Claim (Count IX) Should Be Dismissed For Lack of Subject Matter Jurisdiction.

Because no Plaintiff can establish standing to pursue any claim grounded in the Second Amendment, Count IX must be dismissed in its entirety.

### A. 39 Plaintiffs Do Not Allege Any "Particularized" Injury Related to Firearms.

Initially, of the 40 Plaintiffs, only one, Bilal Abdurrashid, alleges any attempt to purchase a firearm. Plainly, as to the remaining 39 Plaintiffs, their failure to allege a "particularized" Second Amendment injury "affecting [them] in a personal and individual way," *Lujan*, 504 U.S. at 560 n.1, is fatal to their ability to establish standing as to Count IX. *See supra* § X.A.[44]

### B. Plaintiff Abdurrashid Also Lacks Standing as to Count IX.

The sole allegations in the SAC that relate to any firearm purchase or issue are from Plaintiff Bilal Abdurrashid, who asserts that in February 2018, he attempted to purchase a firearm from an federal firearm licensee ("FFL") in Florida, but "[a]fter a three-day delay, the local gun dealer … informed him that his … [a]pplication was denied." SAC ¶ 451. According to Abdurrashid, when he contacted the Florida Department of Law Enforcement, the Florida "point of contact" ("POC") agency, and requested the reason for the denial of his application, the state representative informed him that "he could not inform him why his application was denied but that he would inform Mr.

---

[44] Standing as to these Plaintiffs also fails for the related reason that "to challenge an allegedly unconstitutional policy" regarding the granting of a permit or benefit "a plaintiff must submit to the challenged policy." *Jackson–Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997); *see also*, *e.g.*, *S. Blasting Servs., Inc. v. Wilkes Cty.*, 288 F.3d 584, 595 (4th Cir. 2002) (plaintiffs did not suffer any injury where they had "never even applied for [the] permit [in question], much less been denied one"); *U.S. v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012) *("[B]ecause Decastro failed to apply for a gun license in New York, he lacks standing to challenge the licensing laws of the state."*) (emphasis added).

Abdurrashid if Mr. Abdurrashid was able to guess the reason for his application's denial." *Id.* ¶ 452. Notwithstanding that Abdurrashid was unable to correctly guess the reason for the denial, he further alleges that "[u]pon information and belief," the denial was "because of his status on Defendants' federal terror watchlist." *Id.* ¶ 454.

These allegations are insufficient to establish Mr. Abdurrashid's standing to pursue any Second Amendment claim, for several reasons. Initially, because he seeks injunctive and declaratory relief, he must do more than simply allege a past injury; instead, he must demonstrate the existence of either an "ongoing injury," *McBurney v. Cuccinelli*, 616 F.3d 393, 410-11 (4th Cir. 2010), or a future "'threatened injury [that is] certainly impending,'" *Clapper*, 568 U.S. at 401. Here, Mr. Abdurrashid's asserted injury is that on a sole occasion in February 2018, an FFL denied a desired purchase of a particular firearm, for the stated reason that *the Florida POC agency* had allegedly disallowed the transaction. SAC ¶ 451. However, Mr. Abdurrashid does not allege that he has experienced any other denials of firearms purchases; indeed, to the contrary, he alleges that he possesses "several guns" as well as a Florida Concealed Carry Permit, and that in order to obtain the permit he was "required to submit fingerprints that were checked against" numerous databases "for disqualifying offenses." *Id.* ¶¶ 414-15. Further, as set forth in the Declaration of Brian A. Barker, the National Instant Criminal Background Check System ("NICS") Section of the FBI recently conducted an audit to determine if any record exists in the databases searched for a NICS check, demonstrating that Mr. Abdurrashid is prohibited from receiving or possessing a firearm under 18 U.S.C. § 922(g) or (n) or state law. DEX M at 12. As of December 5, 2018 none of these three systems held any records indicating Abdurrashid is prohibited from receiving a firearm. *Id.* ¶ 14. In these circumstances, an allegation of one isolated injury in the past simply does not credibly support a finding that Mr. Abdurrashid faces any ongoing or impending future injury, as necessary for him to maintain standing. *Clapper*, 568 U.S. at 401.

Nor can Mr. Abdurrashid demonstrate that his injury was caused by any of the Defendants, or would be redressable through the declaratory and injunctive relief he seeks. *See* Prayer for Relief ¶¶ 1, 4(a). As explained in the Barker Declaration, the retention of federal records generated in the background check process is tightly controlled by statute and regulation. DEX M ¶ 11. When a firearm transfer is cleared to proceed, all records related to the background check, except its unique identifying number and date, are destroyed within 24 hours. 18 U.S.C. § 922(t)(2)(C); 28 C.F.R. § 25.9(b)(1)(iii). If, after three days, the background check results in neither a proceed nor a deny response, the FFL has discretion whether to proceed with the sale. Records related to these "delayed" background checks "will be destroyed after not more than 90 days from the date of inquiry." 28 C.F.R. § 25.9(b)(1)(iii). Records related to a background check are kept indefinitely only if the purchase is denied because the prospective purchaser is determined to be a prohibited person. *Id.* § 25.9(a). The NICS complies with these record retention requirements regardless of whether the check results in a potential match with the KST File. DEX M ¶ 11.

Here, NICS has conducted an audit pursuant to 28 C.F.R §§ 25.9(2) and 25.11 of the NICS system, and has determined that there are no transactions in the NICS Audit Log associated with the name "Bilal Abdurrashid." *Id.* ¶ 12. Per the regulatory scheme set forth above, this absence is dispositive of Mr. Abdurrashid's ability to establish causation and redressability: if a Florida FFL had requested a NICS check, and the Florida POC had determined Mr. Abdurrashid was a prohibited individual and, in fact, directed the FFL to deny the purchase, a record of the denial would have been maintained indefinitely in the NICS system. 28 C.F.R. § 25.9(a). Thus, the lack of any relevant, extant record documenting a "deny" response demonstrates, definitively, that NICS did not provide the FFL with a "deny" response. As it is well-established that "a federal court [can] act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party," *Simon*, 426 U.S. at 41-42—and the challenged

action here is manifestly the product of an action by some third party—the Court lacks jurisdiction over Mr. Aburrashid's Second Amendment claim on this independent ground as well.[45]

## XIV.   Counts X, XI, XII, and XIII (RFRA) Should Be Dismissed.

Counts X, XI, XII, and XIII allege violations of the RFRA for, respectively, the FBI and CBP's purported policy of "intrusive religious inquiry of individuals scooped up in watchlisting surveillance," SAC ¶ 1661 (Count X); the alleged "chill[ing]" effect of the "federal terrorist watchlist" on Farid Sulayman and Faraz Siddiqui's performance of Umrah and Hajj, respectively, *id.* ¶¶ 1667-80 (Count XI); the FBI's alleged recruitment of John Doe 2 and Hicham Hall as informants, *id.* ¶¶ 1682-93 (Count XII); and Jessup Correctional Institution's denial of Abdelmoniem Elamin's application to work a volunteer, *id.* ¶¶ 1695-1706. Each of these claims should also be dismissed, for the reasons set forth in detail below.

### A.   Plaintiff Elamin Lacks Standing to Pursue His RFRA Claim (Count XIII).

Initially, Count XIII—which alleges that a Maryland state correctional facility, not party to this suit—denied Plaintiff Elamin's application to serve as a volunteer within the facility, *see id*—must be dismissed for lack of standing.

As explained, "a federal court [can] act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon*, 426 U.S. at 41-42; *see supra* § I. Thus, where an intermediary

---

[45] Indeed, a district court in Michigan recently dismissed a roughly analogous case on similar standing grounds. *See Turaani v. Sessions*, 316 F. Supp. 3d 998, 1005 (E.D. Mich. 2018), *reconsideration denied*, No. 17-CV-14112, 2018 WL 3968614 (E.D. Mich. Aug. 20, 2018). The Plaintiff in *Turaani* alleged that after he initiated a firearm purchase through an FFL, an FBI agent "called the store clerk … [and] informed him that Turaani was the subject of an FBI investigation, and instructed him to delay the transaction." *Id.* at 1005. On Turaani's theory, he was "constructively denied" the firearms purchase "through the store clerk's decision to halt the transaction until the FBI has confirmed that Turaani is not, or never was, the subject of an FBI investigation." *Id.* at 1008. Observing that "no law prohibit[ed]" Mr. Turaani from purchasing a firearm, and that "the store clerk's voluntary and independent actions … not [the] Government[s] conduct," were the cause of his injury, the court dismissed the claim for lack of standing. *Id.* While there is no analogous allegation of any disclosure on the part of any FBI or NICS employee in this matter (and the allegations was never proven in *Turaani*), *Turaani*'s core reasoning—that the independent actions of a third party do no confer standing as against the FBI—applies with equal force here.

"st[ands] between the plaintiff and the challenged action[]," standing is lacking. *Frank Krasner Enters., Ltd. v. Montgomery Cty. Md.*, 401 F.3d 230, 235 (4th Cir. 2005). "This is so because[] 'the existence of one or more of the essential elements of standing 'depends on the *unfettered choices made by independent actors not before the courts* and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'" *Id.* (quoting *Lujan*, 504 U.S. at 562).

These well-established principles, affirmed by the Fourth Circuit in *Frank Krasner Enters.*, 401 F.3d 230, require the dismissal of Count XIII. Simply put, the injury alleged—the determination by Jessup Correctional Institution to deny Elamin's reapplication to serve as a volunteer chaplain—is, plainly, an "independent action of [a] third party not before the court," *Simon*, 426 U.S. at 41-42. Even assuming, *arguendo* and for purposes of this motion only, the accuracy of Elamin's allegation that this determination was made "based on … information that Jessup officials obtained in connection with Mr. Elamin from the TSDB," SAC ¶ 1427, there is no allegation that any federal policy *required* this result. Under *Frank Krasner Enters.,* this deficiency is dispositive. There, a company that had routinely used a private convention space to put on gun shows sued Montgomery County, Maryland, after the County passed a law prohibiting the use of "financial or in-kind support to any organization that allow[ed] the display and sale of guns" at its facilities. 401 F.3d at 232. The convention center, which had received substantial financial support from the County, informed the plaintiff, in terms that "made clear that [its] decision was a result of the County's funding restriction," that it would no longer host its gun shows. *Id.* at 232-33. Even accepting that the County's action was a "deal-breaker" for the convention center, the Fourth Circuit held that the plaintiff's injury was "not directly linked to the challenged law because an intermediary … [stood] directly between . . . the challenged conduct in a way that breaks the causal chain." *Id.* at 236.

So, too, here, where a Maryland state entity not before the Court, indisputably took the injurious action challenged by Count XIII. Where there is no allegation that Defendants determine the volunteer eligibility policy for Jessup Correctional Institution, or possess any authority or ability

78

to require Jessup officials to allow Elamin to serve as a volunteer—and the Court may not order any such relief against a non-party to this suit—this claim must be dismissed for lack of standing.

**B.**      **All RFRA Claims Should Be Dismissed For Failure To State a Claim.**

The RFRA provides that the "Government shall not substantially burden a person's exercise of religion" unless the challenged conduct is (1) "in furtherance of a compelling government interest;" and (2) "the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1. A substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs . . . or one that forces a person to choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand." *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (internal quotations and citations omitted). A bare allegation that government conduct substantially burdens a person's religious exercise is a legal conclusion that is not entitled to an assumption of truth. *Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008). Instead, a plaintiff must allege sufficient *facts* from which a court can plausibly conclude that a substantial burden on religious exercise exists. *Id.*; *see also*, *e.g.*, *Twombly*, 550 U.S. at 555, 557.

**1.**      **The RFRA Claims Do Not Sufficiently Allege a Substantial Burden.**

First, each of the RFRA claims fails to adequately allege a "substantial burden."

Count X broadly alleges that "Plaintiffs have experienced recurrent inquiry into the details of their religious practices[.]" SAC ¶ 1661. However, a review of the SAC—which goes to great lengths to detail each Plaintiff's interactions with law enforcement—fails to substantiate this generalized allegation. First, seven Plaintiffs[46] make *no* allegations regarding questioning by law enforcement at

---

[46] Plaintiffs Rami Khaled El Ali, Mia Khaled El Ali, Baby Doe, Child Doe, Child Doe 2, Shamsa Hashi Noor, and Hassan Shirwa. These Plaintiffs have not only failed to allege a substantial burden, they have failed to allege any "particularized" injury "affecting [them] in a personal and individual way," as required to maintain standing to pursue any RFRA claim. *Lujan*, 504 U.S. at 560 n.1.

all, and thus plainly fail to state any RFRA claim based on this theory. An additional 23 Plaintiffs[47] either do not allege the topics of their questioning at all, or allege only that they were questioned regarding *non*-religious topics such as their backgrounds, occupations, studies, travel plans, and views on various political subjects, generally upon reentry into the United States.[48] Such wholly secular lines of questioning cannot plausibly implicate any burden on religious practice. Further, questioning on such subjects is both wholly routine—both at the border, *see* § XI.B, *supra*, and also in the course of law enforcement investigative activities—and constitutes, at most, a "mere inconvenience" to the traveler, the imposition of which does not and cannot create a "substantial burden" within the meaning of the RFRA. *New Doe Child #1 v. Cong. of United States*, 891 F.3d 578, 590 (6th Cir. 2018).

---

[47] Plaintiffs Khaled El Ali, Mutasem Jardaneh, Bilal Abdurrashid, Abdirizak Wehelie, Fatima Wehelie, Mahad Mohallim, Farid Sulayman, Fadi Suliman, John Doe 2, Hashem Nader Sehwail, Mohamad Albadawi, Hicham Hall, Faatimah Knight, Khalil Thadi, Esmaeel Paryavi, Faraz Siddiqui, Zijad Bosnic, Abdu Wakil Cyeef Din, Anisa Mujanovic, Mustafa Kamel, Alaa Abunijem, Abdallah Soueidan, and Imad Kadoumi. *See* SAC ¶¶ 287, 313, 433, 526, 529, 538, 560, 568, 635, 675, 688, 699, 759, 774, 779-81, 784, 787, 835, 855, 870, 873, 912, 941, 962, 975-76, 989, 1002, 1063, 1071, 1147, 1274, 1279, 1211, 1378, 1487.

[48] Among these Plaintiffs, five allege that they were questioned about their studies or work-related activities, in ways that happened to intersect or overlap with their religious beliefs, *See* SAC ¶¶ 671, 675, 688 (Farid Sulayman, alleging he was interrogated twice about his studies, which presumably included his religious beliefs as he is an Imam); *id.* ¶ 873 (Mohamed Albadawi, alleging that he was questioned about "Muslim religious leaders that [sic] he invited to participate in a convention that he organized"); *id.* ¶¶ 780-81 (John Doe 2, alleging he was interrogated once about "his job managing an Islamic center" and a prayer book found in his personal belongings); *id.* ¶ 941 (Faatima Knight, alleging that she was questioned regarding numerous aspects of her trip to Tunisia, including, *inter alia*, "why she chose to study Arabic in Tunisia, [and] what she was studying regarding religion"); *id.* ¶ 1487 (Imad Kadoumi, alleging questioning about, *inter alia*, the "sources of donations for Mr. Kadoumi's local mosque, [and] his specific duties at the mosque"). Thus, for these Plaintiffs, any routine background questions about their work-related and/or educational activities would necessarily have involved some aspects of their religious life. *cf. Tabbaa*, 509 F.3d at 98-99 ("But these questions are not materially different than the types of questions border officers typically ask prospective entrants in an effort to determine the places they have visited and the purpose and duration of their trip."); *U.S. v. Silva*, 715 F.2d 43, 47 (2d Cir. 1983) (noting that questions about personal belongings possibly acquired abroad are routine).

However, even if the Court were to determine that these five Plaintiffs' allegations are more appropriately grouped with those of the remaining four Plaintiffs discussed *infra*, their claims still fails for the reasons discussed below.

Otherwise, only ten Plaintiffs specifically allege they were questioned about their religious beliefs by law enforcement, generally upon their reentry into the United States after foreign travel.[49] Even these allegations, however, simply do not amount to alleging a substantial burden on religion. Indeed, in *Cherri v. Mueller*, 951 F. Supp. 2d 918, 922, 926 (E.D. Mich. 2013), the plaintiffs alleged they were profiled and subjected to frequent interrogations at the border about their Muslim faith, including questions about Islamic religious philosophy and views, practices, locations where they worshiped, extremism, and terrorism. Where—as here—such questioning did not render the plaintiffs "unable to attend their respective places of worship or otherwise freely exercise their Islamic practices and beliefs," *id.* at 935, the court found the plaintiffs failed to sufficiently allege a substantial burden. As *Cherri* further explained:

> Plaintiffs have not alleged that such questioning requires them to affirm or deny a belief that is contrary to their faith, or to choose between following tenets of their faith and receiving an important government benefit. Nor have plaintiffs alleged that the Government has sought to impose civil or criminal sanctions on religiously motivated conduct.

*Id.* at 935. Thus, the court concluded that, at best, the plaintiffs had alleged a burden on their ability to cross the border quickly, but not to practice their faith. *Id.* Given that the *Cherri* plaintiffs were subjected to multiple interrogations and here, the only four Plaintiffs to make any particularized allegations have each alleged a single instance where they were asked about their religious beliefs for an undetermined amount of time, this conclusion applies *a fortiori* here as well. *See also E.K. v. Tolleson Union High Sch. Dist.*, No. 14-1625, 2015 WL 11118116, at *5 (D. Ariz. Jan. 28, 2015) ("merely questioning [plaintiff] about his religion" does not substantially burden religious exercise).

Plaintiffs cite two cases—*NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490 (1979) and *Mitchell v. Helms*, 530 U.S. 793 (2000)—to suggest that any inquiry into a person's religious beliefs for any reason regardless of investigative relevance amounts to a substantial burden on religious exercise. *See*

---

[49] Plaintiffs John Doe, Mohammad Paryavi, Hawa Whelie, Moustafa El-Shahat, Mirrakhmat Mumivov, Mohamad Hachem Ashraf Riad, Abdaljalil Hijaz, Abdelmonimem Elamin, Fadhel Al-Sahlani. *See* SAC ¶¶ 380, 485, 504, 650, 1101, 1191, 1238, 1347, 1411, 1518-19.

SAC ¶ 1661. Neither case stands for such a broad proposition. *Mitchell* held only that inquiries into the religious practices of institutions as part of a legal determination such as whether funding may be given can, potentially, run afoul of the Establishment Clause, 530 U.S. at 828—but Plaintiffs allege no such practices here, nor do they bring any Establishment Clause challenge. And *Catholic Bishop*, which adopted a narrowing construction of a statute to avoid a constitutional question, is likewise irrelevant to the questions before this Court. Thus, neither case so much as suggests that nonobtrusive questions about a person's religion, asked for lawful secular purposes, can impose a "substantial burden" on the exercise of religion.[50]

The allegations in Count IX fare no better. There, Farid Sulayman and Faraz Siddiqui claim that their alleged placement on a "federal terror watchlist" and subsequent treatment while traveling discourages them from travelling abroad to perform religious pilgrimages—which, allegedly, "chills" their religious exercise. *See* SAC ¶ 1673. However, nothing alleged in the SAC has prevented or will prevent Sulayman or Siddiqui from travelling abroad to perform religious pilgrimages or from participating in any religious exercise. Indeed, Sulayman alleges that "he travels *frequently* with large groups for umrah," *id.* ¶ 715 (emphasis added), and Siddiqui similarly alleges having taken "many" trips," *id.* ¶ 1003. While the SAC can be plausibly read to allege that delays associated with those trips might have slightly burdened their ability to travel quickly and without inconvenience, there is no plausible allegation that either's ability to practice his faith was burdened; certainly, the delays did

---

[50] Indeed, the RFRA (which was not implicated by either of these decisions) *itself* contemplates an inquiry into the nature and sincerity of an RFRA claimant's religious beliefs, in order to establish a RFRA claim. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014) (a court's "function" in assessing a RFRA claim properly includes a determination of whether the claimed belief "reflects an honest conviction") (internal citation omitted).

Further, insofar as Plaintiffs cite these cases for the proposition that governmental inquiry into the sincerity of one's religious beliefs may create a substantial burden, no Plaintiff makes any allegation that any federal officer ever questioned the sincerity of his or her beliefs, or required any demonstration or proof of the same, towards any end or purpose. Instead, four Plaintiffs allege only that on a single occasion, they were each asked about certain aspects of their religious beliefs, generally as part of their inspection at the border following international travel.

not require either to "abandon" any "precept of [his] religion," *Lovelace*, 472 F.3d at 187, or to "modify his behavior" in a manner that would "violate his beliefs," *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 99-100 (4th Cir. 2013); *see also Cherri*, 951 F. Supp. 2d at 937 ("That Plaintiffs do not cross the border anymore so that they can avoid religious questioning is not the equivalent of ceasing their participation in the tenets of their religion."). "[M]ere inconvenience[s]"—such as the alleged travel delays—simply do not rise to the level of "substantial burdens," *New Doe Child #1*, 891 F.3d at 590; *see also, e.g., Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996 (6th Cir. 2017) (holding as a matter of law that requiring students to travel an additional 12.1 miles was an inconvenience, not a substantial burden).

        In Count XII, Plaintiffs John Doe 2 and Hicham Hall claim that alleged offers by unnamed FBI agents to serve as FBI informants violates their religious beliefs. SAC ¶¶ 1681-93. Specifically, John Doe 2 and Hall allege that unnamed agents told them that if they agreed to work as an FBI informant, their travel issues would be resolved, *id.* ¶¶ 795, 935, but that their religious beliefs, which restrict bearing false witness and betraying the trust of their religious community, barred them from accepting this offer, *id.* ¶ 1686-87.[51] Initially, this claims is not internally consistent with the other allegations in the SAC: although Count XII alleges that John Doe 2 is on the No Fly List, *id.* ¶ 1684, the SAC is devoid of any other allegation of Joe 2's purported No Fly List Status or any instance in which he was denied boarding; to the contrary, it alleges that "[s]ince approximately 2013, *every time John Doe 2 travels by air*," his boarding pass is marked "SSSS." *Id.* ¶ 767 (emphasis added); *see generally id.* ¶¶ 768-98. Further, there is no extant legal authority for the proposition that, even if a plaintiff sincerely believes that serving as an informant would encroach on his religion, the government burdens such religious beliefs or practices merely by *asking* for such assistance, on a voluntary

---

[51] Notably, neither Doe 2 nor Hall allege that they at any time informed the FBI officers of this particular religious belief, much less that they continued to press the issue after being so informed.

basis.[52] Finally, even assuming *arguendo* that Elamin possesses standing to pursue Count XIII, "there is no principle in the law granting to clerics an absolute right to enter a prison," and any claimed "right" to "practice [one's] religious profession within the penitentiary walls … [is] nonexistent." *O'Malley v. Brierley*, 477 F.2d 785, 793-94 (3d Cir. 1973); *see also Heap v. Carter*, 112 F. Supp. 3d 402, 422 (E.D. Va. 2015) (rejecting RFRA claim premised on the plaintiff's rejected application to serve as a Navy chaplain, and explaining that "Dr. Heap has not shown that becoming a Humanist Navy chaplain is dictated by the tenets of Humanism or that by not becoming a Navy chaplain he is somehow in violation of the tenets of Humanism. Rejecting Heap from the Navy chaplaincy does not put substantial pressure on Dr. Heap to modify his behavior and violate his beliefs.").

Accordingly, this Court should dismiss each of Counts X, XII, XII, and XIII for failing to sufficiently allege a substantial burden on religious exercise.

### 2.      Plaintiffs Otherwise Fail to State a RFRA Claim.

Even if Plaintiffs' religious exercise were somehow substantially burdened, the challenged actions are the least restrictive means of achieving a compelling government interest. There is no dispute that the Government has a compelling interest in protecting its borders and preventing and investigating potential acts of terrorism. *See Haig*, 453 U.S. at 307 ("It is obvious and inarguable that no governmental interest is more compelling than the security of the Nation."); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) ("Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order."); *Flores-Montano*, 541 U.S. at 152 ("The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border."); *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treas.*, 686 F.3d 965, 980 (9th Cir. 2012) ("[T]he government's interest in national security cannot be understated."); *Tabbaa*,

---

[52] Further, given the clear criteria and multi-leveled process for placement on (and/or removal from) the TSDB, it is not plausible that someone would be retained on the TSDB solely based on his or her lack of cooperation with law enforcement. In any event, any such allegation, *see* SAC ¶ 133-34, constitutes a challenge to watchlisting itself, as opposed to an RFRA claim, and fails for all of the same reasons set forth in §§ IV,VI, VII, VIII, and IX, *supra*.

509 F.3d at 103 ("It is undisputed that the government's interest in protecting the nation from terrorism constitutes a compelling state interest unrelated to the suppression of ideas."). Indeed, as a district court in the Eastern District of Virginia has observed:

> It is among the most compelling of governmental duties to protect our country from its enemies, foreign and domestic. Today, we are at war with those who would, if possible, use a commercial aircraft as an instrument of mass murder. There can be no doubt that the government has the right and obligation to identify, investigate and stop those who present such a threat; and for that purpose, the government must collect and act on intelligence information concerning possible terrorists, while protecting its sources and methods. It is a task of the highest national priority, performed by dedicated Americans whose mission is to protect this country and its citizens.

*Mohamed v. Holder*, 995 F. Supp.2d 520, 527 (E.D. Va. 2014).

Similarly, nor is there any dispute that the government also has a compelling interest in accurately and expeditiously solving crime—or that the use of informants constitutes a crucial and well-established law enforcement technique. *See Kaemmerling*, 553 F.3d at 682; *see also U.S. v. Davis*, 657 F. Supp. 2d 630, 652 (D. Md. 2009) ("It should go without saying that the government has a powerful and compelling interest in apprehending and prosecuting those who have committed violent crimes."); *U.S. v. Meixner*, 128 F. Supp.2d 1070, 1075 (E.D. Mich. 2001) ("It is beyond question that the state has a compelling interest to protect its citizens and investigate crimes."); *U.S. v. Dennis*, 183 F.2d 201, 224 (2d. Cir. 1950) ("Courts have countenanced the use of informers  from time immemorial."); *In re WP Co. LLC*, 201 F. Supp. 3d 109, 127 (D.D.C. 2016) ("For obvious reasons, ensuring that investigators are able obtain information and assistance from individuals with direct knowledge of criminal conduct is critical to law enforcement efforts and the government's compelling interest in protecting the public."). Likewise, as explained in § X, *supra*, the information-sharing facilitated by the NCIC aids criminal justice professionals in, *inter alia*, apprehending fugitives, locating missing persons, recovering stolen property, and preventing crime; importantly, it also assists such officials in performing their duties more safely. And, with respect to the specific inclusion of the KST File in the NCIC, the Government has a strong interest in facilitating such

information sharing—and thus cooperation—among federal, state, and local law enforcement agencies, so that they can carry out their respective missions in a manner maximally likely to prevent terrorist attacks. *Cf. The 9/11 Commission Report*, § 13.3 (recommending greater information-sharing), § 8.2 (describing what the Commission found to be specific information failures in the months leading up to the 9/11 attacks). Each of these same compelling government interests apply here, with respect to the alleged RFRA claims.

Finally, in the specific context of travel and border related screening and inspection, the screening and questioning that Plaintiffs generally challenge are the least restrictive means of advancing these compelling government interests. Initially, courts have already upheld the watchlisting process and the resulting enhanced screening process at airports under similar strict scrutiny analyses. *See Mohamed*, 266 F. Supp. 3d at 88 ("[The] Court finds that the [No Fly] List is necessary and sufficiently narrowly tailored to achieve a compelling government interest and therefore does not violate Plaintiff's substantive due process rights."); *see also Elhady*, 303 F. Supp. 3d at 466 (dismissing materially similar claims), *Abdi*, 2018 WL 1940411, at *3 (same); *Kovac*, 2019 WL 1057935, at *24 (same).

Further, with respect to the questioning of individuals at the border, as discussed in § XI.B, *supra*, pursuant to the "long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country," *Ramsey*, 431 U.S. at 616, CBP has substantial authority to question travelers upon reentry into the United States. Thus, it bears emphasizing that Plaintiffs are not entitled to any special exemption from the exercise of these authorities. Additionally, courts have similarly upheld even questions related to a person's religious beliefs under the least restrictive means analysis. For example, in *Tabbaa*, the plaintiffs alleged that the government had a policy of detaining Muslims for hours, questioning them, patting them down, fingerprinting them, and photographing them upon their return into the United States from a particular Islamic conference in Canada. 509 F.3d at 92. The detained individuals had no criminal

records and the government had no individualized suspicion that they were associated with terrorism. *Id.* After recognizing that there could be no dispute the government has a compelling interest in preventing terrorism, *id.* at 103, 106-07, the Second Circuit held that the detentions and interrogations were the least restrictive means of furthering that important interest, as the challenged tactics were carefully circumscribed to only those who attended the conference, involved routine screening procedures, and were applied irrespective of religion. *Id.*

Likewise here, the alleged enhanced security measures are limited to allegedly "watchlisted" individuals and their families. Additionally, the types of enhanced screening methods alleged here— pat-down searches, examinations, intrusive questioning, delays for up to several hours—have all been deemed "routine." *See Tabbaa*, 509 F.3d at 100 ("[C]ommon sense and ordinary human experience suggest that it may take up to six hours for CBP to complete the various steps at issue here, including vehicle searches, questioning, and identity verification, all of which we have already found to be routine.") (internal quotations and citation omitted).

For the foregoing reasons, this Court should dismiss all RFRA claims.

## C.  RFRA Does Not Waive Sovereign Immunity Against Federal Officials for Damages Claims.

Further, insofar as any of Counts X, XI, XII, and XIII purport to plead damages claims against the Official Capacity Defendants,[53] these claims must be dismissed for lack of subject matter jurisdiction, as RFRA does not waive the sovereign immunity of the United States for such relief. Under sovereign immunity, the United States "is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *U.S. v. Mitchell*, 445 U.S. 535, 538 (1980) (internal citations omitted). "[A] waiver of sovereign

---

[53] Counts X and XII each specify that they are brought "against the official capacity Defendants as well as Unidentified FBI Agents and Unidentified CBP Agents in their individual capacities." SAC ¶¶ 1658, 1682. Counts XI and XIII are silent on this issue. All three claims seek, *inter alia*, monetary damages, without specifying whether such damages are sought from the Individual Capacity Defendants, the Official Capacity Defendants, or both.

immunity must be 'unequivocally expressed' in statutory text," *FAA v. Cooper*, 566 U.S. 284, 290

(2012), and "[a]ny ambiguities in the statutory language are to be construed in favor of immunity,"

*id.* Further, because "[a] suit against a government officer in her official capacity is really 'a suit

against the official's office,' … officers acting within their authority generally also receive sovereign

immunity." *Hendy v. Bello*, 555 F. App'x 224, 226 (4th Cir. 2014).

The RFRA provides, in relevant part, that an individual may "obtain appropriate relief

against a government" when his "religious exercise has been burdened in violation" of the terms of

that statute. 42 U.S.C. § 2000bb-1(c). But as every federal appellate court that has addressed the issue

has correctly recognized, because the term "appropriate relief" does not unequivocally encompass

monetary damages, "RFRA does not unambiguously waive sovereign immunity to authorize money

damages" for official capacity claims. *Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d

829, 840 (9th Cir. 2012); *see also Davila v. Gladden*, 777 F.3d 1198, 1210 (11th Cir. 2015); *Webman v.*

*Fed. Bureau of Prisons*, 441 F.3d 1022, 1026 (D.C. Cir. 2006). Accordingly, insofar as the SAC purports

to plead RFRA damages claims against the Official Capacity Defendants, the Court must dismiss the

same for lack of subject matter jurisdiction.

## XV.    Count XIV (Non-Delegation) Should Be Dismissed.

Finally, Count XIV fails to state a claim of unconstitutional delegation. The non-delegation

doctrine provides "that Congress may not constitutionally delegate its legislative power to another

branch of Government." *Touby v. U.S.*, 500 U.S. 160, 165 (1991). But when Congress "lay[s] down

by legislative act an intelligible principle to which the person or body authorized to [act] is directed

to conform, such legislative action is not a forbidden delegation of legislative power.'" *Mistretta v.*

*U.S.*, 488 U.S. 361, 372 (1989) (citation omitted). In fact, the Court has "almost never felt qualified

to second-guess Congress regarding the permissible degree of policy judgment that can be left to

those executing or applying the law." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 474-75

(2001). To set forth a constitutionally permissible "intelligible principle" while delegating authority,

Congress need only "'clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.'" *Mistretta*, 488 U.S. at 372-73.

The statutory scheme underlying the Government's watchlisting programs easily meets these requirements. Congress has charged TSA with overall responsibility for airline security. *See* 49 U.S.C. § 114(d). Together with the FBI, TSA must "assess current and potential threats to the domestic air transportation system," and "decide on and carry out the most effective method for continuous analysis and monitoring of security threats to that system." 49 U.S.C. § 44904(a). Moreover, in consultation with other federal agencies, TSA must "establish policies and procedures requiring air carriers [to] … prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual." 49 U.S.C. § 114(h)(1)-(3). This delegation of authority reflects a clearly delineated general policy" that is no broader in scope nor less intelligible in principle than any number of congressional directives that have withstood non-delegation challenges.[54] *See Elhady*, 303 F. Supp. 3d at 467-68 (rejecting identical non-delegation claim). *Kadura*, 2017 WL 914249, at *9-10 (same); *Abdi*, 2018 WL 1940411, at *4 (same); *Kovac*, 2019 WL 1057935, at *26 (same). Specifically, the statutory authority detailed above quite clearly authorizes the TSA to "develop policies, strategies, and plans for dealing with threats to transportation security," 49 U.S.C. § 114(f)(3); to work with and use information from other government agencies, 49 U.S.C. § 114(h)(3); to prevent individuals from boarding an aircraft or to "take other appropriate action with respect to that individual," 49 U.S.C. § 114(h)(3)(B); to "perform[] . . . the passenger prescreening function of comparing passenger information to the automatic selectee and no fly lists . . . ," 49 U.S.C. § 44903(j)(2)(C)(ii); and to "establish a procedure to enable airline passengers, who are delayed or

---

[54] *See, e.g., Whitman*, 531 U.S. at 473, 476 (upholding air quality standards at a level "requisite to protect public health"); *Touby*, 500 U.S. at 163 (upholding restriction on controlled substance if "necessary to avoid an imminent hazard to the public safety"); *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 689 (1980) (upholding promulgation of regulatory safety standards that "most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health"); *Nat'l Broad. Co. v. U.S.*, 319 U.S. 190, 225-26 (1943) (upholding regulation of broadcast licensing in the "public interest").

89

prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system." 49 U.S.C. § 44903(j)(2)(C)(iii)(I); *see also id.* §§ 44903(j)(2)(G)(i), 44926(a). The notion that there is any lack of clearly delegated authority to TSA, working with TSC, in the watchlisting and redress process is plainly meritless.

Plaintiffs further allege that HSPD-6 "is an illegal usurpation of Congress' legislative function and … runs afoul of separation of powers principles." SAC ¶ 1713. As discussed above, HSPD-6 directed the Attorney General to "establish" the TSC in order to "to consolidate the Government's approach to terrorism screening and provide for the appropriate and lawful use of Terrorist Information in screening processes." HSPD-6 ¶ 2. This argument is likewise baseless. On its face, HSPD-6 is a statement of Executive branch "policy" with respect to terrorist watchlisting. It "*does not alter existing authorities or responsibilities of department and agency heads to carry out operational activities or provide or receive information,*" and "*is intended only to improve the internal management of the executive branch* …." HSPD-6 (emphasis added). It was issued neither "pursuant to statutory mandate [n]or a delegation from Congress of lawmaking authority," and as such does not "have the force and effect of law," *HHS v. FLRA*, 844 F.2d 1087, 1096 (4th Cir. 1988). Thus, in keeping with separation of powers principles, HSPD-6 is simply a "management directive," the source of authority for which is "the President's general constitutional powers to direct the exercise of powers statutorily delegated to executive branch officials." *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1339 (4th Cir. 1995) (citing *Myers v. U.S.*, 272 U.S. 52 (1926)).

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Complaint should be dismissed in its entirety for lack of subject matter jurisdiction, or alternatively, for failure to state a claim.

Respectfully submitted,


JOSEPH H. HUNT
Assistant Attorney General
Civil Division

ROBERT K. HUR
United States Attorney

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

_____/s/_____
Antonia Konkoly
Christopher Healy
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, Room 11110
Washington, DC 20005
(202) 514-2395 (direct)
(202) 616-8470
antonia.konkoly@usdoj.gov
christopher.healy@usdoj.gov

*Counsel for the Official Capacity Defendants*

DATED: April 29, 2019

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 29, 2019, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification to all

counsel of record.

_____/s/_____

Antonia Konkoly
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, Room 11110
Washington, DC 20005
(202) 514-2395 (direct)
(202) 616-8470
antonia.konkoly@usdoj.gov
