IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

---

RAMI KHALED EL ALI, et al.,                    )
                                               )
          Plaintiffs,                          )          Case No. 8:18-cv-2415 (PX)
                                               )
    v.                                         )
                                               )
WILLIAM BARR, et al.,                          )
                                               )
          Defendants.                          )

---

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ........................................................................................................... 1

ARGUMENT ..................................................................................................................... 3

I.     PLAINTIFFS HAVE STANDING TO CHALLENGE THE WATCHLIST ...................... 3

    A.   At Least One Plaintiff Has Standing to Pursue Each Claim ................................ 3

    B.   Plaintiffs have Standing Against WLAC Defendants ......................................... 4

    C.   Khaled El-Ali Has Standing.................................................................................. 6

    D.   Rami El-Ali Has Standing .................................................................................... 8

    E.   Plaintiffs Are Not Challenging Military Base Access, TWIC, and TSA Precheck and Global Entry Directly ........................................................................................................... 8

II.    THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS ........................... 9

III.   PLAINTIFFS' CLAIMS ARE RIPE AND TIMELY ................................................... 12

    A.   Plaintiffs' Claims Are Ripe ................................................................................ 12

    B.   Plaintiffs' Claims Are Timely ............................................................................ 15

IV.    PLAINTIFFS STATE A PROCEDURAL DUE PROCESS CLAIM (COUNT I) ............ 16

    A.   Plaintiffs Have a Movement-Related Liberty Interest ...................................... 16

    B.   Plaintiffs Have Suffered a Cognizable Stigma-Plus Due Process Injury ......... 21

    C.   DHS TRIP Does Not Eliminate Plaintiffs' Due Process Claim ....................... 25

V.     PLAINTIFFS STATE A SUBSTANTIVE DUE PROCESS CLAIM (COUNT II) ............ 25

    A.   History Reflects a Right of Movement Inherent to the Due Process Clause .......... 26

    B.   Both the U.S. Constitutional Text and the Bill of Rights' Penumbras Reflect a Right of Movement Inherent to the Due Process Clause ........................................................ 28

    C.   International Law Supports a Right of Movement Embedded within the Due Process Clause .................................................................................................................. 31

    D.   Operation of the Watchlist Impinges Upon Plaintiffs' Fundamental Right to Movement ...... 32

VI.    PLAINTIFFS STATE AN APA CLAIM REGARDING DHS TRIP (COUNT III) ........... 33

VII.    PLAINTIFFS STATE AN APA CLAIM REGARDING THE NCIC (COUNT IV) ........ 34

    A.    The Government's NCIC Information Sharing Is Beyond Legal and Statutory Authority ................................................................................................................ 34

    B.    Plaintiffs Have Standing to Challenge NCIC Database Information Sharing ........................ 37

VIII.   PLAINTIFFS STATE AN EQUAL PROTECTION CLAIM (COUNT V) ........................ 37

IX.     PLAINTIFFS STATE A FOURTH AMENDMENT CLAIM (COUNT VI) ..................... 43

    A.    Plaintiffs Have Standing to Bring their Fourth Amendment Claim ................................. 43

    B.    Plaintiffs Have Alleged Watchlist Electronic Searches Violate the Fourth Amendment under any Standard .......................................................................... 44

X.      PLAINTIFFS STATE A FIRST AMENDMENT FREE ASSOCIATION CLAIM (COUNT VII) ................................................................................................................ 48

XI.     FIFTH AMENDMENT SELF-INCRIMINATION (COUNT VIII) ..................................... 52

    A.    Plaintiffs Have Standing to Bring a Fifth Amendment Self-Incrimination Claim ................... 52

    B.    Plaintiffs State a Fifth Amendment Self-Incrimination Claim ........................................ 52

XII.    PLAINTIFFS VOLUNTARILY DISMISS THEIR SECOND AMENDMENT CLAIM (COUNT IX) ................................................................................................................ 56

XIII.   THE GOVERNMENT HAS SUBSTANTIALLY BURDENED PLAINTIFFS' RELIGIOUS EXERCISE IN VIOLATION OF RFRA (COUNTS X-XIII) ........................ 56

    A.    Religious Questioning Burdens Plaintiffs' Exercise of Religion (Count X) .............................. 56

    B.    Burdening Plaintiffs' Umrah, Hajj, and Religious Leadership Restricts Plaintiffs' Exercise of Religion  (Count XI) ...................................................................... 58

    C.    Watchlisting Plaintiffs to Coerce them to Become Government Informants Burdens Plaintiffs' Exercise of Religion (Count XII) .......................................................... 59

    D.    Providing Jessup Prison Elamin's Watchlist Status with the Intent to Bar Elamin from Volunteering as a Chaplain Burdens Elamin's Religion (Count XIII) ........................ 60

    E.    The Government Cannot Show at the Motion to Dismiss Stage a Compelling Interest or Least Restrictive Means ...................................................................... 62

XIV.    THE GOVERNMENT HAS NO CONGRESSIONALLY-DELEGATED AUTHORITY FOR THE WATCHLIST (COUNT XIV) ...................................................................... 63

CONCLUSION ..................................................................................................................... 65

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abdi v. Wray*,
    2018 WL 1940411 (D. Utah Apr. 23, 2018) ....................................................................19, 20, 24, 42

*Abdullahi v. Pfizer, Inc.*,
    562 F.3d 163 (2d Cir. 2009)................................................................................................... 31

*Afroyim v. Rusk*,
    387 U.S. 253 (1967) ................................................................................................................ 29

*Alasaad v. Nielsen*,
    17-cv-11730, 2018 WL 2170323 (D. Mass. May 9, 2018).......................................... 43, 47, 48

*Albright v. Oliver*,
    510 U.S. 266 (1994) ............................................................................................................25, 26

*Aptheker v. Secretary of State*,
    378 U.S. 500 (1964) ................................................................................................................ 32

*Arjmand v. U.S. Dep't of Homeland Sec.*,
    No. 14-cv-07960, 2018 WL 1755428 (C.D. Cal. Feb. 9, 2018)............................................. 18

*Arjmand v. U.S. Dep't of Homeland Sec.*,
    745 F.3d 1300 (9th Cir. 2014) ...........................................................................................10, 11

*Baltimore City Dept. of Social Servs. v. Bouknight*,
    493 U.S. 549 (1990) ............................................................................................................54, 55

*Bazzi v. Lynch*,
    No. 16-cv-10123, 2016 WL 4525240 (E.D. Mich. Aug. 30, 2016).......................................... 24

*Beydoun v. Lynch*,
    No. 14-cv-13812, 2016 WL 3753561 (E.D. Mich. July 14, 2016) ........................................ 23

*Beydoun v. Sessions*,
    871 F.3d 459 (6th Cir. 2017) ................................................................................................. 19

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996) ................................................................................................................ 36

*Bostic v. Schaefer*,
    760 F.3d 352 (4th Cir. 2014) ................................................................................................... 4

*Brogan v. United States*,
    522 U.S. 398 (1998) ................................................................................................................ 52

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014) ......................................................................................... 56, 58, 62

*Cherri v. Mueller,*
  951 F. Supp. 2d 918 (E.D. Mich. 2013) ............................................................... 39, 42, 57

*Conset Corporation v. CSA,*
  655 F.2d 1291 (D.C. Cir.1981) ............................................................................. 22

*Cramer v. Skinner,*
  931 F.2d 1020 (5th Cir. 1991) ............................................................................. 18

*Crooker v. TSA,*
  323 F. Supp. 3d 148 (D. Mass. 2018) ................................................................. 13

*CSX Transp., Inc. v. Alabama Dept. of Revenue,*
  562 U.S. 277 (2011) ............................................................................................ 35

*Darby v. Cisneros,*
  509 U.S. 137 (1993) ............................................................................................ 12

*Doe v. U.S. Dep't of Justice,*
  753 F.2d 1092 (D.C. Cir. 1985) ........................................................................... 22

*Doe v. Virginia Dep't of State Police,*
  713 F.3d 745 (4th Cir. 2013) ............................................................................... 7, 8

*Ege v. U.S. Dep't of Homeland Sec.,*
  784 F.3d 791 (D.C. Cir. 2015) ............................................................................. 11

*Elhady v. Pew,*
  370 F. Supp. 3d 757 (E.D. Mich. 2019) .............................................................. 18

*Elhady v. Piehota,*
  303 F. Supp. 3d 453 (E.D. Va. 2017) ................................................................. passim

*Employment Div., Dep't of Human Res. of Oregon v. Smith,*
  494 U.S. 872 (1990) ............................................................................................ 56, 58

*Equity in Athletics, Inc. v. U.S. Dep't of Educ.,*
  639 F.3d 91 (4th Cir. 2011) ................................................................................. 39

*Fikre v. FBI,*
  904 F.3d 1033 (9th Cir. 2018) ............................................................................. 3

*Fikre v. FBI,*
  No 3:13-cv-899, Dkt. 57 (D. Or. Jan 14, 2015) ................................................... 14

*Filártiga v. Pena-Irala,*
    630 F.2d 876 (2d Cir. 1980) ............................................................................ 31

*Frank Krasner Enterprisess. Montgomery County,*
    401 F.3d 230 (4th Cir. 2005) ........................................................................... 61

*Goad v. Mitchell,*
    297 F.3d 497 (6th Cir. 2002) ........................................................................... 39

*Green v. TSA,*
    351 F.Supp.2d 1119 (W.D. Wash. 2005) ................................................... 11, 19

*Griswold v. Connecticut,*
    381 U.S. 479 (1965). ...................................................................................... 28

*Heap v. Carter,*
    112 F. Supp. 3d 402 (E.D. Va. 2015) ............................................................. 61

*Hurtado v. California,*
    110 U.S. 516 (1884) ....................................................................................... 26

*Ibrahim v. U.S. Dep't of Homeland Sec.,*
    538 F.3d 1250 (9th Cir. 2008) ................................................................... 11, 20

*Ibrahim v. U.S. Dep't of Homeland Sec.,*
    669 F.3d 983 (9th Cir. 2012) ....................................................................... 7, 20

*In Matter of Search of Info. Associated with Facebook Account Identified by Username Aaron.Alexis that is Stored at Premises Controlled by Facebook, Inc.,*
    21 F. Supp. 3d 1 (D.D.C. 2013) ..................................................................... 49

*In re Application for a Search Warrant,*
    236 F. Supp. 3d 1066 (N.D. Ill. 2017) ............................................................ 55

*In re Grand Jury Proceeding,*
    842 F.2d 1229 (11th Cir. 1988) ...................................................................... 50

*In Re Search of white Google Pixel 3 XL cellphone in a black Incipio case,*
    No. 1:19-MJ-10441, 2019 WL 2082709 (D. Idaho May 8, 2019) ...................... 55

*In re Winship,*
    397 U.S. 358 (1970) ....................................................................................... 36

*Indianapolis v. Edmond,*
    531 U.S. 32 (2000) ......................................................................................... 54

*Int'l Bd. of Teamsters v. United States,*
    431 U.S. 324 (1977) ....................................................................................... 40

*Int'l Refugee Assistance Project v. Trump,*
    17-cv-361, 373 F. Supp. 3d 650 (D. Md. May 2, 2019) ........................................................ 7, 40

*Int'l Refugee Assistance Project v. Trump,*
    265 F. Supp. 3d 570 (D. Md. 2017) ............................................................................................. 7

*Isakhanova v. Muniz,*
    No. 15-cv-03759, 2016 WL 1640649 (N.D. Cal. Apr. 26, 2016) .......................................... 57

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950) ........................................................................................................................ 6

*Kadura v. Lynch,*
    No. 14-cv-13128, 2017 WL 914249 (E.D. Mich. Mar. 8, 2017) ....................... 19, 20, 24, 42

*Kent v. Dulles,*
    357 U.S. 116 (1958) ................................................................................................................. 25, 27

*Koenig v. Maryland,*
    09-cv-3488, 2010 WL 148706 (D. Md. Jan. 13, 2010) ........................................................... 49

*Kovac v. Wray,*
    363 F. Supp. 3d 721 (N.D. Tex. 2019) ............................................................................. passim

*Latif v. Holder,*
    686 F.3d 1122 (9th Cir. 2012) ..................................................................................................... 10

*Latif v. Holder,*
    969 F. Supp. 2d 1293 (D. Or. 2013) ......................................................................................... 20

*Latif v. Holder,*
    28 F. Supp. 3d 1134 (D. Or. 2014) ........................................................................................... 20

*Latif v. Holder,*
    No. 10-cv-750, Dkt. 152 (D. Or. Oct. 3, 2014) ...................................................................... 14

*Latif v. Lynch,*
    10-cv-00750, 2016 WL 1239925 (D. Or. Mar. 28, 2016) ...................................................... 24

*League of United Latin Am. Citizens v. Bredesen,*
    500 F.3d 523 (6th Cir. 2007) ....................................................................................................... 19

*Legatus v. Sebelius,*
    901 F. Supp. 2d 980 (E.D. Mich. 2012) .............................................................................. 56, 58

*Ligon v. LaHood,*
    614 F.3d 150 (5th Cir. 2010) ....................................................................................................... 10

*Louhghalam v. Trump*,
   230 F. Supp. 3d 26 (D. Mass. 2017)........................................................................... 6

*Mack v. Warden Loretto FCI*,
   839 F.3d 286 (3d Cir. 2016)..................................................................................... 60

*Marchetti v. United States*,
   390 U.S. 39 (1968)................................................................................................... 52

*Mathews v. Diaz*,
   426 U.S. 67 (1976)..................................................................................................... 7

*Matter of Residence in Oakland, California*,
   354 F. Supp. 3d 1010 (N.D. Cal. 2019) ............................................................53, 55

*Michael H. v Gerald D.*,
   491 U.S. 110 (1989)................................................................................................ 25

*Mireles v. United States*,
   No. 13-cv-197, 2016 WL 4992026 (S.D. Tex. July 29, 2016)................................ 17

*Mitchell v. Helms*,
   530 U.S. 793 (2000) ................................................................................................ 56

*Mohamed v. Holder*,
   11-1924 (4th Cir. May 28, 2013) .......................................................................10, 13

*Mohamed v. Holder*,
   266 F. Supp. 3d 868 (E.D. Va. 2017)........................................................... 16, 20, 44

*Mohamed v. Holder*,
   No. 11-cv-50, 2015 WL 4394958 (E.D. Va. July 16, 2015)....................... 20, 21, 24

*Mokdad v. Lynch*,
   804 F.3d 807 (6th Cir. 2015) ........................................................................ 10, 11, 14

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958) ................................................................................................ 49

*Nasim v. Warden, Maryland House of Correction*,
   64 F.3d 951 (4th Cir. 1995) ..................................................................................... 15

*Nat'l Ass'n for Advancement of Multijurisdiction, v. Howell*,
   851 F.3d 12 (D.C. Cir. 2017)..................................................................................... 5

*Nat'l Council of Resistance of Iran v. U.S. Dep't of State*,
   251 F.3d 192 (D.C. Cir. 2001).................................................................................. 22

*O'Malley v. Brierley,*
    477 F.2d 785 (3d Cir. 1973) ................................................................................................ 61

*Ohio v. Reiner,*
    532 U.S. 17 (2001) .................................................................................................. 52, 53

*Paul v. Davis,*
    424 U.S. 693 (1976) ............................................................................................... 21, 22

*Peltier v. Charter Day Sch., Inc.,*
    16-cv-30, 2017 WL 1194460 (E.D.N.C. Mar. 30, 2017) ........................................ 15

*Planned Parenthood of Metro. Washington, D.C., Inc. v. Horner,*
    694 F. Supp. 970 (D.D.C. 1986) .............................................................................. 6

*Poe v. Lynchburg Training Sch. & Hosp.,*
    518 F. Supp. 789 (W.D. Va. 1981) .......................................................................... 15

*Presault v. United States,*
    100 F.3d 1525 (Fed. Cir. 1996) .............................................................................. 61

*Reporters Comm. for Freedom of Press v. Am. Tel. & Tel. Co.,*
    593 F.2d 1030 (D.C. Cir. 1978) ........................................................................ 50, 51

*Richmond Black Police Officers Ass'n v. City of Richmond, Va.,*
    548 F.2d 123 (4th Cir. 1977) .................................................................................. 35

*Riley v. California,*
    573 U.S. 373 (2014) ........................................................................... 46, 47, 50

*Saenz v. Roe,*
    526 U.S. 489 (1999) ................................................................................................ 29

*Santos v. Frederick Cty. Bd. of Comm'rs,*
    725 F.3d 451 (4th Cir. 2013) .................................................................................. 34

*Scherfen v. DHS,*
    2010 WL 456784 (M.D. Pa. 2010) .................................................................... 11, 21

*Sessions v. Dimaya,*
    138 S. Ct. 1204 (2018) ............................................................................................ 36

*Shapiro v. Thompson,*
    394 U.S. 618 (1969) ................................................................................................ 25

*Shearson v. Holder,*
    725 F.3d 588 (6th Cir. 2013) .................................................................................. 12

*Sherbert v. Verner,*
   374 U.S. 398 (1963) ......................................................................................... 59

*Shirvinski v. U.S. Coast Guard,*
   673 F.3d 308 (4th Cir. 2012) ............................................................................ 22

*Slochower v. Board of Education,*
   350 U.S. 551 (1956) ......................................................................................... 53

*St. John's United Church of Christ v. City of Chicago,*
   502 F.3d 616 (7th Cir. 2007) ............................................................................ 62

*Suhre v. Haywood Cty.,*
   131 F.3d 1083 (4th Cir. 1997) .......................................................................... 44

*Sylvia Development Corp. v. Calvert County,*
   48 F.3d 810 (4th Cir. 1995) ........................................................................40, 41

*Tabbaa v. Chertoff,*
   509 F.3d 89 (2d Cir. 2007) ...................................................................17, 18, 20

*Tanvir v. Tanzin,*
   894 F.3d 449 (2d Cir. 2018) ............................................................................. 60

*Tarhuni v. Holder,*
   8 F. Supp. 3d 1253 (D. Or. 2014) ...............................................................20, 21

*Tarhuni v. Holder,*
   No. 3:13-cv-001, Dkt. 79, 86 (D. Or. Oct. 3, 2014) ........................................ 14

*Tarhuni v. Sessions,*
   692 F. App'x 477 (9th Cir. 2017) ....................................................................... 3

*The Paquete Habana,*
   175 U.S. 677 (1900) ......................................................................................... 30

*Thomas v. Cty. of L.A.,*
   978 F.2d 504 (9th Cir. 1992) ............................................................................ 44

*Thomas v. Review Bd. of Indiana Employment Sec. Div.,*
   450 U.S. 707 (1981) ......................................................................................... 59

*Trulock v. Freeh,*
   275 F.3d 391 (4th Cir. 2001) ............................................................................ 39

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ...................................................................................8, 40

*U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press,*
  489 U.S. 749 (1989) ................................................................................................ 37

*Udugampola v. Jacobs,*
  795 F. Supp. 2d 96 (D.D.C. 2011) .................................................................... 6, 7

*United States v. Adams,*
  1 F.3d 1566 (11th Cir. 1993) ............................................................................ 54

*United States v. Aguilar,*
  883 F.2d 662 (9th Cir. 1989) ............................................................................ 51

*United States v. Apfelbaum,*
  445 U.S. 115 (1980). .......................................................................................... 52

*United States v. Armstrong,*
  517 U.S. 456 (1996) ............................................................................................ 39

*United States v. Christie,*
  825 F.3d 1048 (9th Cir. 2016) .......................................................................... 60

*United States v. Citizens State Bank,*
  612 F.2d 1091 (8th Cir. 1980) .......................................................................... 49

*United States v. Cortez,*
  449 U.S. 411 (1981) ............................................................................................ 45

*United States v. Cotterman,*
  709 F.3d 952 (9th Cir. 2013) ............................................................................ 48

*United States v. Flores-Montano,*
  541 U.S. 149 (2004) .............................................................................. 17, 18, 20

*United States v. FNU LNU,*
  653 F.3d 144 (2d Cir. 2011) .............................................................................. 54

*United States v. Guest,*
  383 U.S. 745 (1966) ............................................................................................ 26

*United States v. Gupta,*
  183 F.3d 615 (7th Cir. 1999) ............................................................................ 54

*United States v. Hanon,*
  428 F.2d 101 (8th Cir. 1970) ............................................................................ 53

*United States v. Hartwell,*
  436 F.3d 174 (3d Cir. 2006) .............................................................................. 21

*United States v. Hubbell,*
   530 U.S. 27 (2000)..................................................................................................... 54

*United States v. Ickes,*
   393 F.3d 501 (4th Cir. 2005) ...............................................................................46, 50

*United States v. Kim,*
   103 F. Supp. 3d 32 (D.D.C. 2015)............................................................................. 47

*United States v. Kolsuz,*
   185 F. Supp. 3d 843 (E.D. Va. 2016)....................................................................44, 45

*United States v. Kolsuz,*
   890 F.3d 133 (4th Cir. 2018) ...................................................................45, 46, 47, 48

*United States v. Lueck,*
   678 F.2d 895 (11th Cir. 1982) ................................................................................... 54

*United States v. McAuley,*
   563 F. Supp. 2d 672 (W.D. Tex. 2008)...................................................................... 47

*United States v. Pineda,*
   No.09-cr-2542, 2010 WL 3034514 (D. Ariz. July 19, 2010)...................................... 54

*United States v. Ramon,*
   89 F. Supp. 2d 665 (Feb. 25, 2000) ........................................................................... 57

*United States v. Saboonchi,*
   48 F. Supp. 3d 815 (D. Md. 2014).............................................................................. 48

*United States v. Shenandoah,*
   595 F.3d 151 (3d Cir. 2010)........................................................................................ 19

*United States v. Sigmond-Ballesteros,*
   285 F.3d 1117 (9th Cir. 2002) .................................................................................... 46

*United States v. Sweeney,*
   914 F.2d 1260 (9th Cir. 1990) .................................................................................... 34

*United States v. Verdugo-Urquidez,*
   494 U.S. 259 (1990) ..................................................................................................... 6

*United States v. Wanjiku,*
   No. 16-cr-296, 2017 WL 1304087 (N.D. Ill. Apr. 6, 2017) ...................................... 47

*Valmonte v. Bane,*
   18 F.3d 992 (2d Cir. 1994).......................................................................................... 22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ................................................................................ 40

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
   455 U.S. 489 (1982) ................................................................................ 36

*Virginia Hosp. Ass'n v. Baliles,*
   868 F.2d 653 (4th Cir. 1989) .................................................................. 15

*Washington State Dept. of Social and Health Servs. v. Guardianship Estate of Keffeler,*
   537 U.S. 371 (2003) ................................................................................ 35

*Washington v. Glucksberg,*
   521 U.S. 702 (1997) .................................................................. 25, 26, 27

*Williams v. Hansen,*
   326 F.3d 569 (4th Cir. 2003) .................................................... 39, 41, 42

*Williams v. Norfolk and Western Railway Company,*
   530 F.2d 539 (4th Cir. 1975) .................................................................. 15

*Wilwal v. Nielsen,*
   346 F. Supp. 3d 1290 (D. Minn. 2018) .............................. 11, 18, 43, 44

*Worthy v. United States,*
   328 F.2d 386 (5th Cir. 1964) .................................................................. 29

*Wright v. North Carolina,*
   787 F.3d 256 (4th Cir. 2015) .................................................................. 39

*Yates v. United States,*
   135 S. Ct. 1074 (2015) ............................................................................ 35

*Yick Wo v. Hopkins,*
   118 U.S. 356 (1886) ................................................................................ 41

*Ziglar v. Abbasi,*
   137 S. Ct. 1843 (2017) ............................................................................ 39

**Statutes & Regulations**

5 U.S.C. § 706 .............................................................................................. 29, 30

6 U.S.C. § 621 .................................................................................................... 57

6 U.S.C. § 488 .................................................................................................... 58

28 U.S.C. § 534 ............................................................................................. 30, 31

42 U.S.C. § 2000 ........................................................................................... 51, 55

46 U.S.C. § 70101 .............................................................................................................. 57

49 U.S.C § 44903 ........................................................................................................... 56, 57

49 U.S.C. § 114 ................................................................................................................. 56

49 U.S.C. § 44909 ............................................................................................................. 57

49 U.S.C. § 46110 ................................................................................................. 12, 13, 14

28 C.F.R. § 0.85 ................................................................................................................ 31

28 C.F.R. § 20.20 .............................................................................................................. 30

28 C.F.R. § 20.33 .............................................................................................................. 36

## INTRODUCTION

Plaintiffs' Second Amended Complaint is 1718 paragraphs and 268 pages because the Government's Watchlisting System, a vast set of interlocking programs and joint ventures, has sprawled beyond constitutional limits.[1]  Through the federal terrorist watchlist, the Government has extrajudicially branded Plaintiffs and thousands of innocent American Muslims as suspicious. Through this Watchlisting System, the Government has extrajudicially assigned Plaintiffs and thousands of innocent American Muslims a kind of second-class status.

Targets of the Watchlisting System including all 40 Plaintiffs struggle through an unending set of adverse consequences that becomes life-defining.  Children are separated from their parents, and innocent people—U.S. citizens who have never been charged, arrested, or convicted of violent crimes—are denied the ability to attend weddings and funerals and otherwise access modern transportation.  Each Plaintiff has been branded as a "known or suspected terrorist," then had that label disseminated throughout local, state, federal and foreign governments.  After misleading the public and courts for years, the Government was even recently forced to admit it makes watchlist information to hundreds of private entities.  It is a cavalier dissemination—the full extent still unknown—done without thought or reason.

Watchlist deprivations extend far beyond travel.  Plaintiffs are also separated from their families, denied employment opportunities, and denied or delayed visas and immigration benefits. They are constrained in their right to purchase firearms, to obtain passports, and to wire money and keep bank accounts.  Plaintiffs are asked to spy on their religious communities and prevented from making religious pilgrimages.  Plaintiffs' family members, friends, coreligionists, and other associates become ensnared by the Watchlisting System based on their connections to Plaintiffs.  To make

---

[1] Plaintiffs' Second Amended Complaint ("2AC"), Dkt. 48, is inadvertently titled "First Amended Complaint" on the cover page.

1

matters worse, the Government broadcasts to every law enforcement agency in the country, every part of the federal government, more than 60 foreign countries, an unknown number of private companies, and other third parties, that the United States considers Plaintiffs to be dangerous.  The watchlist places Plaintiffs' lives at risk.

Plaintiffs have never been charged or accused of a violent offense.  The Government has not provided Plaintiffs with notice of their watchlist status, nor any process or opportunity to rebut the secret evidence upon which Plaintiffs have been effectively convicted.  Plaintiffs are tangled in a Watchlisting System sewn with anti-Muslim discrimination, yet the watchlist has never prevented an act of domestic terrorism.

As a result, the Government's uncodified Watchlisting System violates the First and Fourth Amendments, as well as the Fifth Amendment's Procedural Due Process, Substantive Due Process, Equal Protection, and Self-Incrimination Clauses.  It burdens Plaintiffs' rights under the Religious Freedom Restoration Act and runs afoul of the Administrative Procedures Act.

The Government's scattershot Motion to Dismiss attempts to deny Plaintiffs their constitutional rights by making various arguments about standing, pleading burdens, and other legal arguments.  For the reasons explained in this Opposition, the Government's arguments all fail.  The Court should deny the Government's Motion to Dismiss and subject the federal terrorist watchlisting enterprise to judicial review.

## ARGUMENT

**I.  PLAINTIFFS HAVE STANDING TO CHALLENGE THE WATCHLIST**[2]

### A.    At Least One Plaintiff Has Standing to Pursue Each Claim

This case involves 37 American citizens and 3 foreigners challenging the Government's decision to place them on a secret terrorism watchlist, and thereby impose major, sometimes life-threatening consequences on them and other watchlisted individuals.  As explained in detail in response to the various motion to dismiss claims below, Plaintiffs have suffered a variety of watchlist-related injuries.  Highlights include:

*Travel related injuries from being placed on the No Fly List*: Mr. Mohallim, a United States citizen, and his mother were both stranded abroad because of his placement on a No Fly List.  2AC ¶ 617. *See* Counts I-III and XIV.

*Travel related injuries from being placed on the TSDB*: John Doe was regularly detained for up to ten hours when entering the country, handcuffed, 2AC ¶¶ 374-382. Mr. Muminov was detained at gunpoint in a cold cell for over six hours, including four hours of interrogation, 2AC ¶¶ 1096-1102. And Imam Sulayman has suffered travel consequences that have injured both his ability to perform religious travel and his ability to lead his congregation, 2AC ¶ 1671. *See* Counts I-III, V, XI, and XIV.

---

[2] In a generalized "Factual Allegations" portion, the Government claims (MTD, Dkt. 49-1 at 4) that Plaintiffs Bosnic and Shirwa were removed from the No Fly List. The Government appears to believe this is relevant to the arguments they make, because they state in a footnote that their removal is "dispositive of Bosnic and Shirwa's standing to pursue any prospective relief." *Id.* at 4 n.3.  But the Government never argues that removal of a No Fly designation – which does *not* constitute removal from the broader watchlist (2AC ¶ 214) – moots Plaintiff Bosnic's and Shirwa's claims anywhere in the Motion to Dismiss.  Their claims are not moot.  *See Fikre v. FBI*, 904 F.3d 1033, 1039-40 (9th Cir. 2018) (removal of individual from No Fly List did not moot case due to both the "voluntary cessation" doctrine and other harms of placement); *see also Tarhuni v. Sessions*, 692 Fed. App'x 477, 478 (9th Cir. 2017) (unpublished opinion).

*Non-travel-related stigma-plus harms*: Mr. Abdurrashid's status on the watchlist has caused him to be denied an application to purchase a gun, 2AC ¶ 454, even though he was a former executive at Lockheed Martin with secret clearance, *id.* at 412. *See* Counts I-V and XIV.[3]

*Unlawful searches and seizures of electronics*: The Wehelie family had electronics searched and confiscated from them, 2AC ¶¶ 495, 518-19, 534, 562-63, 576-78. *See* Counts VI-VIII.

*Unlawful religious questioning*: Mr. El-Shahat was interrogated about his views on religious concepts of jihad, his mosque, how religious he is, and whether he teaches religion, 2AC ¶ 650.  *See* Count X.

*Informant pressure*: Plaintiffs Hall and John Doe 2 were both asked to act as an informant in their religious community against their religious beliefs, and both were punished by maintaining their watchlist status when they refused.  2AC ¶¶ 83, 376, 794-96, 935-36. *See* Count XII.

*Inability to volunteer*: Plaintiff Elamin was denied the ability to volunteer at a local jail because of his watchlist status, 2AC ¶¶ 1423-26. *See* Count XIII.

For purposes of demonstrating standing, it is enough for this Court to conclude that at least one Plaintiff has standing to challenge the watchlist.  *See Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014). Far from at least one Plaintiff with standing, each and every Plaintiff has experienced a variety of watchlist-related harms.  Each and every Plaintiff has standing to challenge the watchlist and the harms resulting from it, as set forth in more detail below.

### B.    Plaintiffs have Standing Against WLAC Defendants

The Government claims that the Watchlisting Advisory Council ("WLAC") is a mere advisory committee with no real power.  Motion to Dismiss ("MTD"), Dkt. 49-1 at 19-20.  But the WLAC in fact "promulgates decisions regarding all policies, procedures, practices and instructions pertaining to the federal terrorist watchlist." Plaintiffs' Second Amended Complaint ("2AC") Dkt.

---

[3] Plaintiffs are dismissing their Second Amendment (Count IX) Claims without prejudice.

48 ¶ 82.  Each member of the WLAC, meanwhile, has "veto power over" these decisions.  *See, e.g.,*

*id.* ¶ 57.  As the Government conceded in a related case, the WLAC, working with the National

Security Council, can order agencies like TSC what to do. *See* PEX 1, *Elhady v. Kable*, TSC Groh

Dep. Tr. at 45:2-22.[4] The National Security Council formally implements the WLAC regulations, but

only as a rubber stamp, *see* PEX 2, Email from Powell to Abbas RE: Meet/Confer Request re NSC

Approval of WLG (Oct. 11, 2018). This is likely because, as explained in Section XIV, below, the

WLAC does not formally exist, and so probably cannot promulgate regulations on its own. And,

because of this relationship, agencies such as the TSC have claimed they have been powerless to

change the unconstitutional conduct alleged in this Complaint.  *See, e.g.*, PEX 1, TSC Groh Dep. Tr.

at 67:16-68:8; 112:21-113:18; 156:6-17; 196:1-197:8; 221:2-111; 227:14-230:16.  So it was the WLAC

that created the inclusion standard for being placed on a watchlist, *Id.* at 73:19-74:4.  Plaintiffs allege

that the WLAC's own regulations are made in violation of law, *see* 2AC at Counts III, IV, and XIV.

That injury is caused by the WLAC and can be redressed by the WLAC.

In seeking to dismiss the WLAC Defendants, the Government relies (MTD at 20) on *Nat'l*

*Ass'n for Advancement of Multijurisdiction, v. Howell*, 851 F.3d 12, 17 (D.C. Cir. 2017).  But, as the

Government's own quote indicates, that case stands for the proposition that a defendant must be

dismissed when a plaintiff is challenging regulations that the defendant did not have "any role

whatsoever … in promulgating or enforcing."  Here, the WLAC and its members were the parties

that promulgated the rules being challenged.  There can be no more direct role than that.

---

[4] Plaintiffs recognize that reliance on matters outside of the pleading subjects a Motion to
Dismiss to conversion to a Motion for Summary Judgment. Fed. R. Civ. P. 12(d).  Plaintiffs do not
rely on the two attached Exhibits to prove or disprove anything, and the Court need not rely on
these documents in order to decide the Motion to Dismiss.  Instead, Plaintiffs are merely providing
this material as illustrative, so as to help the Court understand the context of the Plaintiffs'
Complaint and to rebut certain implied claims made by the Government in its Motion designed to
improperly make Plaintiffs' allegations seem implausible.

The Government claims (MTD at 19) that a Declaration from a Terrorist Screening Center official (MTD DEX G, Dkt. 49-8, Groh Decl.) shows that the WLAC does not promulgate policy. The Declaration is not so absolute.  Instead, the Declaration admits that it "drafts proposed language" for the Watchlisting Guidance that is being challenged by this case and then publishes the Guidance as official "US Government policy." MTD DEX G, Groh Decl. ¶¶ 6-7.  The Declaration correctly states that the WLAC is "not established by any executive order, action, regulation, policy, or document, and does not have a charter," and that the WLAC "does not itself have any statutory or legal authority." *Id.* at ¶ 3.  But these are admissions that the WLAC is promulgating "US Government policy" unlawfully, *see § XIV, below*, not a defense to the claim it is promulgating the challenged policy (particularly at the Motion to Dismiss stage). *See Planned Parenthood of Metro. Washington, D.C., Inc. v. Horner*, 694 F. Supp. 970, 973 (D.D.C. 1986) ("OPM is not free to do through formal or informal policy that which it is prohibited from doing by regulation").

### C.     Khaled El-Ali Has Standing

The Government claims (MTD at 23-25) that El Ali does not have standing because he is not a United States citizen and is not present in the country.  The Government relies (MTD at 23) on a series of cases that explain that aliens outside of the United States are restricted in making certain claims, such as a right to a visa, *Louhghalam v. Trump*, 230 F. Supp. 3d 26, 31 (D. Mass. 2017), to habeas corpus, *Johnson v. Eisentrager*, 339 U.S. 763 (1950), or a right to privacy in a foreign residence, *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990). But none of these relate to El Ali's Procedural Due Process rights to challenge a government database maintained in the United States by United States agents. The Government claims (MTD at 23-24) that *Udugampola v. Jacobs*, 795 F. Supp. 2d 96, 103–04 (D.D.C. 2011), stands for the proposition that an alien abroad is unprotected by the Fifth Amendment.  But a quick reading of *Udugampola* shows that the case held only that "[t]he Due Process Clause protects not only United States citizens, but also aliens physically present

in the country." *Id.*  It says nothing about individuals outside the country. *Mathews v. Diaz,* 426 U.S. 67, 78 (1976), *see* MTD at 24, likewise holds that aliens within the United States have Due Process rights and is likewise silent about the contrapositive. The Government basically concedes as much, noting that *Verdugo-Urquidez*'s restrictions on constitutional rights to out-of-country aliens only applies to "the Fourth, First, Second, Ninth, and Tenth Amendments." MTD at 23.  El Ali, like other aliens challenging the watchlist status which prevented them from entering the country, has standing to challenge that status.  *See Ibrahim v. DHS*, 669 F.3d 983, 992-93 (9th Cir. 2012).

The Government claims (MTD at 24-25) that El Ali lacks standing because of the doctrine of consular non-reviewability.  But, as the Government itself concedes (MTD at 25), El-Ali is not challenging the denial of his visa.  He is challenging the unconstitutional watchlist program, which ultimately resulted in the denial of his visa. 2AC ¶ 304. And he does so as part of a larger group of Plaintiffs challenging the watchlist's operation.  Where Plaintiffs include U.S. citizens asserting statutory and constitutional claims challenging a broader policy as opposed to individual consular determinations, the doctrine of consular nonreviewability is not applicable. *Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570, 603 (D. Md. 2017) (citations omitted), *aff'd*, 883 F.3d 233 (4th Cir. 2018), *as amended* (Feb. 28, 2018), *cert. granted, judgment vacated on other grounds*, 138 S. Ct. 2710 (2018), *reconfirmed on remand*, --- F. Supp. 3d -----, 2019 WL 1981884, at *7 (noting that the district court's original analysis was approved of by a majority of the 4th Circuit panel and left undisturbed by the Supreme Court); *see also Ibrahim v. DHS,* 669 F.3d at 993 (rejecting consular nonreviewability argument in the context of an alien challenging her placement on the No Fly List which led to revocation of her visa).

The Government suggests (MTD at 25) that El Ali is nevertheless barred from challenging the TSDB under the independent obstacle exception to redressability discussed in *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 756 (4th Cir. 2013).  But the Government's argument here was

rejected in *Doe* itself.  *Doe* was challenging her right to challenge her sexual offender registry reclassification, rather than the reclassification itself.  *Id.* at 757.  The Fourth Circuit held that the government's defense that she might not be reclassified anyway was not a barrier to redressability. *Id.*.  Likewise, El Ali is challenging his right to challenge his TSDB status, not his visa denial itself. Should El Ali successfully challenge the unconstitutional restrictions placed upon him by the TSDB watchlist, he would then have an ability to apply for a visa waiver free of the "injury to [his] procedural due process." *See id.* at 758. Whether El Ali would ultimately succeed in that challenge may be nonreviewable, but like Doe's challenge to her reclassification itself, this is not the issue before the Court.

### D.      Rami El-Ali Has Standing

The Government makes hopeful arguments that Khaled's son Rami (but not his daughter Mia) should also be dismissed for lack of standing. MTD at 25-26.  The Government concedes this precise argument was rejected by *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018).  The Government suggests that *Hawaii* does not apply because "nothing in those allegations suggests that [Khaled El-Ali's] inability to enter the United States is anything less than facially legitimate and bona fide." 138 S. Ct. at 2419. Putting aside that this is a merits, rather than standing, argument, the Government is wrong.  Rami alleges that TSDB placement is not "facially legitimate and bona fide" and has directly resulted in Khaled's denial of entry.  2AC ¶ 276; *see also id.* at ¶¶ 303-04.

### E.      Plaintiffs Are Not Challenging Military Base Access, TWIC, and TSA Precheck and Global Entry Directly

The Government claims (MTD at 21-22) Plaintiffs' claims must be dismissed to the extent they challenge experienced denials of Military Base Access, Transportation Worker Identity Credentials ("TWIC"), and TSA Precheck and Global Entry.  This is wrong for the same reason the doctrine of consular non-reviewability is inapplicable as described in Section C, above.  None of the Plaintiffs are asserting an affirmative right to military base access, TWIC credentials, or approval for

TSA Precheck and Global Entry. Rather, they are challenging the Government watchlist generally, and noting that among the harms caused by the watchlist are an inability to access these benefits. If Plaintiffs' challenge to the watchlist and their watchlist status is successful, they will again be able to seek the benefits of military base access, TWIC credentials, or TSA Precheck and Global Entry, on equal terms with other Americans and free from the unlawful prejudice caused by the watchlist. If, at that point, these benefits are still denied certain Plaintiffs, then it is possible at that point those Plaintiffs would not have any additional recourse. But that is not this case, and that question is not before this Court.

## II.     THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS

The Government claims (MTD at 26-29) that 49 U.S.C. § 46110 bars the district court from hearing challenges to "the adequacy of DHS TRIP."

First off, the Government is wrong that Count I (Procedural Due Process) and Count III (APA) challenge the adequacy of DHS TRIP. Instead, those two counts challenge the procedural legality of watchlist placement generally. Plaintiffs were not placed on the watchlist by DHS TRIP or by TSA, but by TSC and other Defendants prior to any invocation of DHS TRIP. *See* 2AC ¶¶ 124, 185. DHS TRIP exclusively deals with grievances because of problems with TSA involving screening or boarding at airports. 2AC ¶¶ 210-11. Plaintiffs injuries go well beyond airport harms. For example, Plaintiffs allege detainment at the border as well as unlawful questioning, searches and seizures. 2AC ¶¶ 286-89; 313-19; 381-88; 396; 482; 495; 505; *see also* §§ IV(B), IX-XI, and XIII(A), below. Plaintiffs also allege inappropriate dissemination and sharing of their names and purported "terrorist" and "armed and dangerous" status. 2AC ¶¶258, 379, 449, 510, 667; *see also* § IV(B). Plaintiffs also allege a litany of non-travel harms caused by watchlist placement. 2AC ¶¶ 253, 262-67, 302, 305, 389, 392, 394-95, 712, 1192; *see also* §§ IV(B) and XIII(D). For these reasons, the Government's jurisdictional argument must fail.

In any event, as the Government concedes (MTD at 26), the Fourth Circuit already held in *Mohamed v. Holder*, 11-1924, Dkt. 45 (4th Cir. May 28, 2013)[5] that 49 U.S.C. § 46110, "does not evidence Congress' intent to exclude Mohamed's challenge to past and future restrictions on his ability to travel from consideration in the district court." *Id.* at 6.  As explained by the Court of Appeals, "this is not a situation in which Congress has painstakingly constructed an administrative process for resolving claims like Mohamed's." *Id.*

The Government suggests (MTD at 26-28) a number of arbitrary distinctions between this case and *Mohamed*. These proffered distinctions include that *Mohamed* was an "unpublished decision" premised on "the unique character of Mohamed's claims;" that the TSA is a party here but was not in *Mohamed*, citing *Ligon v. LaHood*, 614 F.3d 150, 154 (5th Cir. 2010); and that "TSA revised the redress procedures" in No Fly List cases as a result of losing the *Latif* case.  None of these arbitrary distinctions have any effect on *Mohamed's* legal applicability here.  The "unique" claims of Mohamed are the same here—that the watchlist and Plaintiffs' placement on it are unlawful and unconstitutional; *see Arjmand v. U.S. Dep't of Homeland Sec.,* 745 F.3d 1300, 1302 (9th Cir. 2014); the issue in *Ligon* was whether the plaintiffs were challenging a specific administrative order, 614 F.3d at 154, and here Plaintiffs are not, and it is unclear how a slight modification to the DHS TRIP procedures for only some of the Plaintiffs (telling those Plaintiffs whether or not they are on a No Fly List) would change the Congressional-intent-based analysis of the Fourth Circuit; *see Elhady v. Piehota*, 303 F. Supp. 3d 453, 461 (E.D. Va. 2017) (rejecting distinction);  *Arjmand*, 745 F.3d at 1302-03 (noting difference in remedy sought creates no distinction from *Latif v. Holder*, 686 F.3d 1122 (9th Cir. 2012)).

Despite the Fourth Circuit's binding *Mohamed* decision, the Government asks this Court to conclude it lacks jurisdiction under 49 U.S.C. § 46110.  The Government mistakenly relies on

---

[5] Available at https://www.clearinghouse.net/chDocs/public/NS-VA-0004-0004.pdf.

*Mokdad v. Lynch*, 804 F.3d 807 (6th Cir. 2015) for that proposition.  But there the Sixth Circuit expressly rejected the Government's claim that 49 U.S.C. § 46110 combined with the DHS TRIP process barred plaintiffs from challenging "another agency's order," i.e., the Terrorist Screening Center's "order placing [plaintiff] on the No Fly List" in the first instance.  804 F.3d at 814.  The Sixth Circuit concluded that stripping the district court of jurisdiction due to the TSC (not TSA's) actions "would be an unprecedented departure from the doctrine of inescapable intertwinement as applied in other circuits."  *Id.*

Unsurprisingly, then, the Government's 49 U.S.C. § 46110 exclusive jurisdiction claim has been rejected nearly every time the Government has raised it in an attempt to avoid a challenge to its watchlisting system.  *See, e.g., Ibrahim v. DHS*, 538 F.3d 1250, 1254–57 (9th Cir. 2008); *Arjmand v. U.S. Dep't of Homeland Sec.*, 745 F.3d 1300, 1302 (9th Cir. 2014); *Kovac v. Wray*, 363 F. Supp. 3d 721, 743 (N.D. Tex. 2019); *Wilwal v. Nielsen*, 346 F. Supp. 3d 1290, 1303 (D. Minn. 2018); *cf. Ege v. DHS*, 784 F.3d 791, 795 (D.C. Cir. 2015) (rejecting plaintiff's 49 U.S.C. § 46110 lawsuit for similar reasons). The only decisions to the contrary are *Scherfen v. DHS*, 2010 WL 456784, at *11 (M.D. Pa. 2010); and *Green v. TSA*, 351 F.Supp.2d 1119, 1127-28 (W.D. Wash. 2005). These decisions were "decided many years prior to the Sixth Circuit's decision in *Mokdad*," and thus have little persuasive value. *Kovac*, 363 F. Supp. 3d at 744 n.7. And *Green*, as a 2005 district court case within the Ninth Circuit, would not be valid as applied to watchlist challenges in light of the Ninth Circuit's precedential decisions in *Ibrahim*, *Arjmand*, and *Latif*.

The Sixth Circuit in *Mokdad* separately "dismiss[ed] without prejudice" the plaintiffs' "challenges to the adequacy of the redress process," not because of 49 U.S.C. § 46110, but "because he failed to join TSA as a defendant." 804 F.3d at 815. The Court "decline[d] to opine" whether "§ 46110 would deprive the district court of subject-matter jurisdiction over" the Court once that defect was cured.  *Id.* at 812; *but see Wilwal*, 346 F. Supp. 3d at 1303-04 (reaching issue and finding 49

U.S.C. § 46110 not a bar). The Government's citation to a series of cases (on 27) that, following *Mokdad*, also dismissed plaintiffs' claims for failing to join TSA as a defendant are irrelevant as well. TSA is named as a Defendant here.  2AC ¶ 67.

## III.   PLAINTIFFS' CLAIMS ARE RIPE AND TIMELY

### A.   Plaintiffs' Claims Are Ripe

The Government claims (MTD at 30) that several of Plaintiffs' claims are "unripe" because they have failed to "exhaust their administrative remedies" by undergoing the DHS TRIP process. But a federal court cannot require a plaintiff to exhaust administrative remedies before seeking judicial review of a final agency action under the APA where neither the relevant statute nor an agency rule imposes such a requirement.  *See Darby v. Cisneros*, 509 U.S. 137 (1993).  No statue or rule requires exhaustion when Plaintiffs seek relief from secret watchlist designations the Government refuses to acknowledge or reveal.

Only one court—the Sixth Circuit—has held that DHS TRIP could constitute an administrative process that must be exhausted.  *Shearson v. Holder*, 725 F.3d 588, 594 (6th Cir. 2013). Contrary to the Government's assertion, *Shearson* did not hold that a plaintiff must "exhaust her administrative remedies through DHS TRIP," (MTD at 31) generally.  Instead, *Shearson* limited its holding to the particular facts of that plaintiff in that case.  *Id.* at 594 ("making Shearson submit a Traveler Redress inquiry is reasonable to promote judicial efficiency and allow the agencies involved an opportunity to resolve problems with their procedures"); *see also Kovac v. Wray*, 363 F. Supp. 3d 721, 747 (N.D. Tex. 2019) ("the Sixth Circuit, while recognizing that exhaustion is not mandatory in this context, affirmed a district court's decision requiring a plaintiff challenging the adequacy of the redress program to exhaust her administrative remedies").  At the time the Sixth Circuit believed that DHS TRIP might result in an individual's removal from the TSDB; the Sixth Circuit thought

the administrative review process would create a record to help the Court resolve the case. *Id.* at 594-95.

*Shearson* has not been followed in more recent cases as facts have developed about the watchlist and the watchlist process. We now know that the DHS TRIP process only reveals No Fly List status (not any other TSDB status), and only resolves air travel consequences; there is no evidence that DHS TRIP is even capable of resolving Plaintiffs' other injuries related to the watchlist. *See* 2AC ¶¶ 15, 211, 214, 215. We also now know the DHS TRIP process is futile, as "the TSA Administrator had taken no action regarding the removal of TSDB Listees in two years." 2AC ¶ 213.

In *Mohamed v. Holder*, 995 F. Supp. 2d 520 (E.D. Va. 2014), another court in this Circuit found that requiring exhaustion was inappropriate. "Congress has not mandated exhaustion of the DHS TRIP process," "and there are no regulations regarding DHS TRIP that mandate exhaustion." *Id.* at 534. The DHS TRIP process would not assist the Court here because (1) Plaintiffs would not have access to the Government's evidence, or even the fact of their placement status, (2) Plaintiffs could not respond to the factual allegations that supposedly justify their treatment, (3) Plaintiffs could not present their constitutional challenges, and (4) contrary to the Sixth Circuit's then-existing belief in *Sherman*, no substantial record is created by the DHS TRIP process. *Id.* at 534-35. *Kovac*, 363 F. Supp. 3d at 746, came to the same conclusion for similar reasons. *Crooker v. TSA*, 323 F. Supp. 3d 148, 157 (D. Mass. 2018), coming to the same conclusion as *Mohamed* and *Kovac*, further noted that the DHS TRIP's flaws and lack of pre-deprivation process would make exhaustion "a Kafkaesque situation."

Similarly, the Fourth Circuit in *Mohamed v. Holder* found that the DHS TRIP administrative process, which requires a direct appeal to the Court of Appeals, 49 U.S.C. § 46110, "does not evidence Congress' intent to exclude Mohamed's challenge to past and future restrictions on his

ability to travel from consideration in the district court." 11-1924, Dkt. 45 at 6 (4th Cir. May 28, 2013) (unpublished opinion)[6]; *see also id.* at 5 ("this is not a situation in which Congress has painstakingly constructed an administrative process for resolving claims like Mohamed's") (cleaned up); *see generally* Section II, above.[7]

The Government does not address *Kovac*, *Crooker*, or the Fourth Circuit decision in *Mohamed*.

Nor are the line of unpublished district court cases the Government cites relevant. The referenced orders in *Latif v. Holder*, No. 3:10-cv-750, Dkt. No. 152 (D. Or. Oct. 3, 2014), *Tarhuni v. Holder*, No. 3:13-cv-001, Dkt. 79, 86 (D. Or. Oct. 3, 2014), and *Fikre v. FBI*, No, 3:13-cv-899, Dkt. 57 (D. Or. Jan 14, 2015), all issued by Judge Brown, said nothing about exhaustion. Those orders merely required Defendants to "complet[e] their final substantive reconsideration of all remaining Plaintiffs' DHS TRIP redress inquiries." In *Mokdad v. Lynch*, the Government had already "conceded," Mokdad "has exhausted his administrative remedies," *Mokdad v. Lynch*, 804 F.3d 807, 815 (6th Cir. 2015), and on remand the district court merely required the Government to "immediately reopen Plaintiff's Department of Homeland Security Traveler Redress Inquiry Program request" and "[i]ssue a letter to Plaintiff and the Court, stating whether or not he is on the No Fly List." No. 13-cv-12038, Order, Dkt. 43 (E.D. Mich. Dec. 16, 2015).

The Government's "related" argument for dismissal of Plaintiffs' Procedural Due Process (Count I) and APA (Count III) claims fails for the same reasons. None of the cases the Government cites stands for the proposition that there is any other exhaustion requirement for an APA claim, *see* 2AC at Counts III and IV, other than administrative exhaustion.

---

[6] *Available at* https://www.clearinghouse.net/chDocs/public/NS-VA-0004-0004.pdf.

[7] To be sure, the Fourth Circuit "offer[ed] no opinion as to whether the district court's jurisdiction is otherwise proper." *Id.* at 6 n.2.

### B.     Plaintiffs' Claims Are Timely

The Government alleges (MTD at 32-33) the statute of limitations bars the "substantive claims of several plaintiffs" who allege travel-related issues starting more than six years prior to filing suit.  The Government does not make clear what it means by "substantive claims."  As it relates to the Government Defendants, Plaintiffs' claims challenge the entire watchlist system, including the Government's maintenance of Plaintiffs on the TSDB in violation of their procedural and substantive rights to due process, as well as the continuing unconstitutional effects of being put on the watchlist, including, for instance, continued unlawful searches and seizures of Plaintiffs' electronic devices, *see, e.g.,* 2AC ¶¶ 1621-46.

Plaintiffs' claims are not time-barred because their injuries are ongoing.  There is no statute of limitations for maintaining a claim of continuing deprivation when a party seeks prospective injunctive relief. *Poe v. Lynchburg Training Sch. & Hosp.*, 518 F. Supp. 789, 793 (W.D. Va. 1981) (citing *Williams v. Norfolk and Western Railway Company*, 530 F.2d 539, 542 (4th Cir. 1975)); *Peltier v. Charter Day Sch., Inc.*, 16-cv-30, 2017 WL 1194460, at *4 (E.D.N.C. Mar. 30, 2017) (citing  *Virginia Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989)).  Any other result would mean that the Government could permanently violate the constitutional rights of individuals who it places on a watchlist, so long as the person failed to bring a suit within six years of beginning to face travel difficulties.  The law does not support the idea of exposing an individual who has failed to bring a suit to ongoing constitutional violations.

Even if the six-year statute of limitations applied, the Government's suggestion that Plaintiffs knew or should have known to bring a watchlist-related claim, *see Nasim v. Warden, Maryland House of Correction*, 64 F.3d 951, 955 (4th Cir. 1995), is contradicted by the Government's own suggestion that one should not reasonably know that they are on a Government watchlist merely because of single incidents of travel-related issues.  *See* MTD at 39-41 and nn. 24-25; *see also*

*id.* at 45  (DHS TRIP process "does not permit [Plaintiffs] to learn their watchlist status"). Plaintiffs allege they know they are on the watchlist and not targeted by some other program precisely because their travel difficulties are repeated, continuous, and ongoing – a pattern indicative of a permanent Government-imposed watchlist status as opposed to random screenings.  *See, e.g.,* 2AC ¶¶ 363, 472, 653, 741, 767, 843, 895, 954, 993, 1072, 1129, 1167, 1210, 1249, 1283, 1320, 1355, 1386, 1462.

Finally, in order for the Government to meet its burden of dismissing Plaintiffs on a statute-of-limitations theory, the Government would need to disclose the point at which it added Plaintiffs to the watchlist.  The Government cannot prove those state dates based on the allegations in the Complaint alone, and is thus not entitled to dismissal.

## IV.     PLAINTIFFS STATE A PROCEDURAL DUE PROCESS CLAIM (COUNT I)

### A.     Plaintiffs Have a Movement-Related Liberty Interest

"Plaintiffs' movement-related liberty interests involve the right to travel by airplane or reenter the United States without being detained for additional screening." *Elhady*, 303 F. Supp. 3d at 463 (E.D. Va. 2017). Whatever the precise standard for determining when a movement-related deprivation is sufficient to require due process, that standard is met by "invasive additional screening and other liberty-constraining activities when they fly or reenter the country at a land border or port," including being "detained for hours," and the result "has caused them to avoid travel." *Id.* at 464 (noting conflicting decisions about when travel-related deprivations constitute constitutional harm but that the above allegations establish standing regardless of what test is used); *see also Mohamed v. Holder*, 266 F. Supp. 3d 868, 875 (E.D. Va. 2017) ("Plaintiff's decision not to engage in international travel because of the difficulties he reasonably expects to encounter upon return to the United States is sufficient to demonstrate standing") (stringcite omitted).

Here, Plaintiffs have alleged delays of up to eight or ten hours on a regular basis.  2AC ¶¶ 289, 313, 370, 372, 381-85, 390, 506, 531, 564, 574, 631, 649, 674, 700, 757, 762, 863, 989, 1101,

1242, 1314, 1407, 1412, 1514. They have alleged detention, sometimes at gunpoint, handcuffing, the search and seizure of their electronics, invasive religious interrogation, and public humiliation. 2AC ¶¶ 171, 318, 380, 382, 390-91, 445, 485, 495, 504, 506, 526, 595, 650, 658, 675, 677, 701, 705, 773, 873, 876, 941, 965, 1099, 1101, 1191, 1193, 1238, 1279, 1411. This has caused missed flights, monetary losses, and lost business opportunities. 2AC ¶¶ 241, 337, 340, 403-404, 506-07, 564, 663, 731, 858, 860, 863, 866, 868, 908, 961, 953, 1106, 1192, 1380, 1382, 1406, 1412, 1554. As a result, Plaintiffs have declined to or have been discouraged from travel, or have travelled by other means at great expense, inconvenience, and time. Some Plaintiffs now refuse to travel by air. *See* 2AC ¶¶ 364, 664, 840, 1121. Others refuse to travel internationally. 2AC ¶¶ 244, 445, 664, 965. Plaintiffs have declined opportunities to go on religious pilgrimages, missed weddings and vacations, avoided connecting with family, and have even fled the country entirely. 2AC ¶¶ 398, 736, 1013, 1244. One even moved to Canada and applied for asylum from the United States. 2AC ¶¶ 336, 445-448.

The Government (MTD at 33-37) cites *U.S. v. Flores-Montano*, 541 U.S. 149 (2004) and *Tabbaa v. Chertoff,* 509 F.3d 89 (2d Cir. 2007), claiming that severe restrictions on Plaintiffs' travel-related interests are mere inconveniences that do not infringe on any constitutionally-protected rights. But *Flores-Montano* holds that a delay of "one to two hours" at a land border is a routine search that does not require probable cause. 541 U.S. at 155 n.3. No detention was described or approved in that case. And *Tabbaa*, whose extension of *Flores-Montano* has never been adopted by any court in this Circuit, allowed a four-to-six hour delay at a land border. 509 F.3d at 100. The four-to-six hour delay was only permitted in *Tabbaa* because it was the time necessary to perform the vehicle searches, basic questioning, and identity verification necessary there. *Id.* at 100; *see also id.* at 101 n.3 (noting but not relying on the fact that the four-to-six hour time was required to correct the Government's administrative mistakes). The Court specifically disclaimed that its approval would extend to situations where the border search was "non-routine," *id.* at 100-101. And, like in *Flores-*

*Montano*, there was no detention involved.  In other words, *Tabbaa* only countenanced a delay occasioned by elements of a routine border search, such as questioning, pat-downs, fingerprinting, and photographs. *Id.* at 92.

*Tabbaa* has been distinguished in cases where individuals have been handcuffed or otherwise treated in a manner akin to a formal arrest. *E.g.*, *Mireles v. U.S.*, No. 13-cv-197, 2016 WL 4992026, at *9 (S.D. Tex. July 29, 2016), *report and recommendation adopted*, No. B-13-197, 2016 WL 5080448 (S.D. Tex. Sept. 15, 2016); *see also Arjmand v. U.S. Dep't of Homeland Sec.*, No. 14-cv-07960, 2018 WL 1755428, at *6 (C.D. Cal. Feb. 9, 2018) ("most of these searches were permitted under the well-established border search doctrine because none was sufficiently destructive, particularly offensive, or overly intrusive").  This is because in order to determine whether a seizure giving rise to constitutional rights has occurred, one must look at the totality of the circumstances, including the duration, force involved, fear, and humiliation. *Wilwal*, 346 F. Supp. 3d at 1305 (alleging seizure under Fourth Amendment); *see also id.* 1306-07 (same test for Procedural Due Process liberty interest).

The situations approved in *Flores-Montano* and *Tabbaa* are not illustrative of Plaintiffs' non-routine, extraordinary travel-related deprivations. As discussed in detail in Section 1 above, Plaintiffs crossing land borders have been detained, handcuffed, 2AC ¶¶ 318, 382, 390-91, 705, 1099, often at gunpoint, *see* 2AC ¶ 1098, on a regular and repeated basis. They are then placed in a holding cell, often still handcuffed and often in cold, dangerous conditions, without their shoes. *See Elhady v. Piw*, 370 F. Supp. 3d 757, 761 (E.D. Mich. 2019) (describing conditions of border detention). The process is humiliating.  *See, e.g.*, 2AC ¶¶ 317, 320, 382, 539, 677, 1243. The delays Plaintiffs have suffered are was above the outlier *Tabbaa* case. Plaintiffs experience four-to-six-hour delays as a standard minimum, 2AC ¶¶ 313, 381-85, 390, 674-700, 989, 1099-1102, 1242 not as an unusual one-time occurrence related to their placement in line for completion of routine border searches for a

large group of people. Some of Plaintiffs' detentions have lasted eight or even ten hours. 2AC ¶ 381, 385, 390.  Meanwhile, other delays occurred at airports, where as a result flights were missed, causing Plaintiffs to be stranded overnight. 2AC ¶¶ 506, 564, 663, 731, 735-37, 762, 788, 857-58, 860, 863, 866, 868, 908, 961, 1380, 1406, 1412.

None of the other cases cited by the Government (MTD at 34-35) approach the same situation. *Cramer v. Skinner*, 931 F.2d 1020 (5th Cir. 1991), challenged a uniform restriction on an airline offering transportation to points outside the airport's service area.  *U.S. v. Shenandoah*, 595 F.3d 151, 162-63 (3d Cir. 2010), concerned sex offender reporting requirements. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 535 (6th Cir. 2007), concerned giving certificates of driving instead of driver's licenses to certain individuals, which required them to also carry separate personal identification.

*Green v. TSA*, 351 F. Supp. 2d 1119 (W.D. Wash. 2005), and *Beydoun v. Sessions,* 871 F.3d 459 (6th Cir. 2017), did involve the terrorist watchlist, but that is where the similarities end.  In *Green*, plaintiffs were not on the TSDB list but merely had names similar to those who had, and alleged only stigma-plus injury as a result.  351 F. Supp. 2d at 1128-29. In *Beydoun*, the Court's only reason for finding a lack of travel-related standing as to one plaintiff was insufficient detail, noting that "Beydoun has not attempted to provide any information about when those delays occurred, how long the delays were, what type of enhanced screening he was subjected to, or indeed any information beyond general allegations that he has been prevented from traveling." 871 F.3d at 467. As to the other *Beydoun* plaintiff, he merely alleged "instances when he has been delayed or subjected to additional screening, with delays ranging from ten minutes to one hour in duration." *Id.* These delays, with no allegations of detention, are akin to the ones rejected as insufficient in *Flores-Montano*. The far more substantial delays suffered by Plaintiffs, which have been combined with detention and other deprivations of liberty, are far more substantial.

There likewise is no discussion of similar, substantial information about the length, use of force, and other attributes of detention and delay in *Abdi v. Wray*, 2018 WL 1940411, at \*4 (D. Utah Apr. 23, 2018), *Kovac*, 363 F. Supp. 3d at 762[8]; and *Kadura v. Lynch*, No. CV 14-13128, 2017 WL 914249, at \*6 (E.D. Mich. Mar. 8, 2017).  Thus, those opinions merely stand for the proposition that those plaintiffs "have not sufficiently alleged" a travel-related liberty deprivation, *Kadura*, 2017 WL 914249 at \*6, rather than for the proposition that placement on the watchlist does not rise to a travel-related liberty deprivation as a matter of law.

So regardless of *Flores-Montano, Tabbaa*, *Abdi¸ Kovac,* and *Kadura*, the harms suffered by Plaintiffs were anything but routine delay or inconvenience. They instead constitute cognizable constitutional injury.

The Government then extends its argument even further, asserting that even the complete denial of boarding to a No Fly List Plaintiff *still* does not implicate a liberty interest in travel. MTD at 37-38.  This argument cannot survive the standard in *Elhady,* 303 F. Supp. 3d at 463, and *Mohamed*, 266 F. Supp. 3d at 875, which finds a liberty interest deprived by the mere deterrence on travel. The argument has also been rejected in a variety of contexts where courts have permitted due process challenges to the No Fly List. *Latif v. Holder*, 969 F. Supp. 2d 1293, 1302 (D. Or. 2013); *Mohamed*, 995 F. Supp. 2d 520, 538 n.22 (E.D. Va. 2014); *Shearson v. Holder*, 725 F.3d at 493; *Ibrahim*, 669 F.3d at 993; *Tarhuni v. Holder*, 8 F. Supp. 3d 1253, 1271 (D. Or. 2014).  As these cases all establish, being placed on a No Fly List, at minimum, is a significant practical barrier to international travel. *Mohamed*, 995 F. Supp. 2d at 537; *Mohamed v. Holder*, No. 1:11-cv-50, 2015 WL 4394958, at \*6 (E.D. Va. July 16, 2015); *Latif*, 969 F. Supp. at 1303-4; *Latif v. Holder*, 28 F. Supp. 3d 1134, 1149 (D. Or. 2014). In contrast, none of the cases the Government cites (MTD at 37-38) stand for the novel

---

[8] To the extent *Kovac*, 363 F. Supp. 3d at 752, interpreted *Beydoun* as holding that only the No Fly List (and not the broader watchlist) deprives individuals of constitutionally-protected liberty interests, it misinterpreted *Beydoun*'s holding.

proposition that the Government can outright prohibit an individual from flying without any due process concerns. *See, e.g.*, *Ibrahim*, 538 F.3d at 1255 (distinguishing *Gilmore* because *Gilmore* was not on the No Fly List); *Latif v. Holder*, 969 F. Supp. 2d at 1303 (distinguishing *Green, Gilmore, Miller, Southold, and Cramer*).

**B.      Plaintiffs Have Suffered a Cognizable Stigma-Plus Due Process Injury**

Plaintiffs also have a cognizable due process interest under the "stigma-plus" test. That test finds that suffering stigma from governmental action plus a negative impact on legally-recognized right or status constitutes constitutional injury. *Paul v. Davis*, 424 U.S. 693, 711 (1976). The Government claims Plaintiffs fail both prongs of this test.

First, relying on *Tarhuni v. Holder*, 8 F.Supp.3d 1253, 1275 (D. Or. 2014), the Government claims (MTD at 39-40) that being designated by the government as a "known or suspected" terrorist is not stigmatizing because it is not disseminated to the general public. *See also Kovac*, 363 F. Supp. 3d 721 at 753 (similar). But as explained in *Mohamed*, 2015 WL 4394958, at *6, "a person's placement on the No Fly List would likely become known over time to persons beyond government agencies or the airlines, with accompanying adverse consequences visited upon a restricted person." The Complaint is replete with allegations that Plaintiffs' TSDB status became known to relatives, friends, and business associates, sometimes in humiliating ways. *See, e.g.*, 2AC ¶¶ 110, 172, 307, 335, 346, 361, 382, 398-400, 417, 445, 458, 479-80, 492, 528, 536, 597, 601, 628, 681, 718, 837, 848, 875-78, 883-87, 897, 925-32, 971, 988, 1003-05, 1078-79, 1134, 1156, 1177, 1185, 1194, 1216, 1253, 1298-1300, 1381, 1390, 1396, 1466, 1478, 1510-12. The stigma of the TSDB has caused a loss of jobs, dissociation from friends and family, and even divorce. *Id.*

The Government suggests there is no stigma to being searched at an airport but tellingly relies almost exclusively on cases that predate the watchlist itself. MTD at 40. The two post-watchlist cases, *Scherfen*, 2010 WL 456784, at *11, and *U.S. v. Hartwell*, 436 F.3d 174, 176 (3d Cir.

2006), have nothing to do with the stigma-plus test. Separately, in *Tarhuni*, the only disclosure alleged was to Air France and Alaska Airlines, 8 F. Supp. 3d at 1274.  But here, Plaintiffs allege—based on since-discovered information—that the Government discloses Plaintiffs' TSDB status "to federal, state, local, and foreign authorities, as well as private employees of airports, airlines, and other transportation employees, to private corporations and contractors, gun sellers, financial institutions, hospitals, universities, airlines, aircraft and airport companies, private security and correctional entities, and the captains of sea-faring vessels."  2AC ¶¶149, 151, 153-54, 173. The Government retorts that these allegations are "without any apparent basis in fact." MTD at 39. The Government's factual challenge to this well-pleaded assertion is inappropriate at the motion to dismiss stage.

Additionally, because the Watchlisting System targets Plaintiffs in public settings—e.g. at land borders, ports of entry, and airports—Defendants cannot credibly assert that TSDB status is a well-kept Government secret. When Listees are yanked out of their vehicles at gunpoint, when they are denied boarding on flights, when their coworkers are subjected to enhanced screenings, when they are stranded overseas by a flight ban—their families and friends learn about a person's "known or suspected terrorist" status. The Court should acknowledge what all Plaintiffs know: it is impossible to bear, in private, the burden of their TSDB status.

Second, the Government alleges (MTD at 41-44) that Plaintiffs have not pled sufficient "plus" factors. But all Plaintiffs must show for a plus factor is "some tangible change of status." *Doe v. DOJ*, 753 F.2d 1092, 1108 (D.C. Cir. 1985). This includes any "deprivation of" an "opportunity" which is "caused by a statutory impediment." *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994).

For example, courts have held that "statutory impediments to buying alcohol, opening or maintaining bank accounts, or receiving material support from other people," qualify. *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001). Also qualifying is a "loss of tax

exemption." *Paul*, 424 U.S. at 705. Likewise, the right to be considered for government contracts qualifies. *Doe*, 753 F.2d at 1109 (citing *Conset Corporation v. CSA*, 655 F.2d 1291 (D.C. Cir.1981)); *see also Shirvinski v. U.S. Coast Guard,* 673 F.3d 308, 316 (4th Cir. 2012).

Here, the Government's defaming of Plaintiffs by labeling them as terrorists or suspected terrorists cause myriad changes to their status.  It makes them subject to more significant border searches and seizures.  2AC ¶¶ 105, 117, and 171; *see* §§ IX-XI, below. It makes them ineligible for certain government benefits, such as TWIC credentials, Hazmat licenses, TSA PreCheck and Global Entry, and FAA licenses. *Id.* at ¶ 148, 164-66. It impedes their constitutional right to purchase a gun. 162-63; *see* § XII, below. It changes their status in terms of how law enforcement interacts with Plaintiffs, making such encounters far more dangerous. *Id.* at ¶¶ 104, 106-07, 161. It negatively impacts their access to immigration benefits.  *Id.* at ¶ 152. It denies them access to certain foreign countries. *Id.* at ¶ 157.  It prevents them from being eligible for bail.  *Id.* at ¶ 169.  It makes them subject to unlawful religious questioning, *see* § XIII(A), below. And it makes them ineligible to access prisons, *see* § XIII(D), below, military bases, 2AC ¶¶ 76-78, 703-704, and 1569, and certain areas of an airport, 2AC ¶ 165, 1042-45.  It also interferes with their ability to use financial institutions.  2AC ¶ 151.

As a result, the Plaintiffs here have suffered both "stigma" and "plus."  Khaled El Ali had his ESTA Travel Authorization and visa privileges revoked. *Id.* at ¶¶ 291 and 300. John Doe was detained in Mexico, *id.* at ¶ 380, had his electronics confiscated, *id.* at ¶ 387, and lost employment opportunities due to his inability to get credentials, *id.* at ¶ 407. Abdurrashid could not purchase a gun. *Id.* at ¶ 451. The Paryavis were both denied TSA Precheck and Global Entry. *Id.* at ¶483, 978-81, as was Hachem, *id.* at ¶ 1203, and Al-Sahlani, *id.* at ¶ 1535. The Wehelie family had electronics searched and confiscated from them, *id.* at ¶¶ 495, 518-19, 534, 562-63, 576-78, as did Suliman, *id.* at ¶ 761, John Doe 2, *id.* at ¶¶ 777-78, Albadawi,  *id.* at ¶ 871, Hall, *id.* at ¶¶ 914, 943-45, Siddiqui, *id.* at

¶ 1001, Muminov, *id.* at ¶¶ 1105-06, Ms. Mujanovic and her husband, *id.* at ¶ 1151, Hachem, *id.* at ¶ 1175, Riad, *id.* at ¶¶ 1219, 1236, Soueidan, *id.* at ¶¶ 1364 and 1379, Elamin, *id.* at ¶ 1409, Kadoumi, *id.* at ¶¶ 1470, 1492, Al-Sahlani, *id.* at ¶¶ 1515-17, and even Mr. Mohallim's mother, *id.* at ¶ 636. Sulayman and Thadi were denied access to a military installation as part of their jobs, *id.* at ¶¶ 704, 950-53. Albadawi, Siddiqui (and his family), Hachem, and Hijaz, have had bank accounts terminated. *Id.* at ¶¶ 881, 1008-09, 1205-06, 1350. Bosnic lost his TWIC credentials necessary for his job. *Id.* at ¶¶ 1043-46. Muminov's mother had her visa revoked. *Id.* at ¶¶ 1124-25. Hijaz's citizenship application has been stalled. *Id.* at ¶ 1351. Elamin cannot volunteer as a chaplain at a local prison. *Id.* at ¶ 1423.

The extensive record here distinguishes this case from the ones the Government cites where no "plus" factor was found. *Green,* 351 F. Supp. 2d at 1130 ("Plaintiffs have not alleged any tangible harm to their personal or professional lives that is attributable to their association with the No-Fly List"); *Beydoun v. Lynch*, No. 14-cv-13812, 2016 WL 3753561, at *5 (E.D. Mich. July 14, 2016) (only allegation was that he had to undergo enhanced screening); *Bazzi v. Lynch*, No. 16-cv-10123, 2016 WL 4525240, at *7 (E.D. Mich. Aug. 30, 2016) (same); *Abdi,* 2018 WL 1940411, at *3 (same), *Kadura,* 2017 WL 914249, at *7 (noting closure of bank accounts would qualify as a plus but plaintiffs did not allege they themselves had bank accounts closed).

Finally, the Government does not challenge that Plaintiffs "have a liberty interest 'in nonattainder,'" but claims that liberty interest is not violated here because watchlist placement is, in the Government's view, solely designed to protect and not designed to punish. MTD at 43-44. But this is belied by the punitive allegations made specifically in the Complaint. *See* 2AC ¶ 1584 (Government's "true purpose is to provide law enforcement with a tool to harass and intimidate American Muslims, to track such persons, and coerce American Muslims into becoming informants"); *see also id.* at ¶ 204. If watchlist placement was actually necessary for security reasons,

the Government would not so willingly trade it for Plaintiffs, such as John Doe 2 and Hall, to act as informants and spies. *See* 2AC ¶¶ 205, 376, 795, 935. Instead, it uses these punishments as leverage, in the same way prosecutors do with inarguably-punitive criminal sentences.

### C.      DHS TRIP Does Not Eliminate Plaintiffs' Due Process Claim

The Government's argument that the DHS TRIP is all that is constitutionally required (MTD at 44-46) tries to inject a factual conclusion into a Motion to Dismiss.  It relies on conclusions based on two cases involving summary judgment on fully-developed records. In one of the two cases, the Government lost on this issue, *Mohamed*, 2015 WL 4394958, at *2. In the other, *Latif v. Lynch*, the Court found that while the revised DHS TRIP facially satisfied "in principle most of the procedural due-process requirements that the Court set out in its June 2014 Opinion," the record in that case was "not sufficient to resolve whether such procedures were, in fact, constitutionally sufficient." 10-cv-00750, 2016 WL 1239925, at *2 (D. Or. Mar. 28, 2016).

Here, of course, there is no record yet.  Instead, as the Courts in *Elhady* and *Mohamed* found at the motion to dismiss stage, "the ultimate merits of that claim are tethered to the *Mathews* factors, which are 'fact-intensive consideration[s],' which 'when considered within the context of [these] allegations, necessarily require an evidentiary record beyond that presented to the Court in connection with the defendants' motion to dismiss." *Elhady v. Piehota*, 303 F. Supp. at 465-66 (quoting *Mohamed*, 995 F.Supp.2d 520 at 538-39).

## V.      PLAINTIFFS STATE A SUBSTANTIVE DUE PROCESS CLAIM (COUNT II)

Substantive due process "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720, (1997).  Those rights are "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."

*Id.* at 721 (internal quotation marks and citations omitted). Those rights extend beyond the guarantees enumerated in the Bill of Rights. *See, e.g., Albright v. Oliver*, 510 U.S. 266, 273 (1994).

The rights to domestic and international travel – collectively, the "right of movement" – are protected by the Fifth Amendment's due process guarantee. This is because "[f]reedom of movement is basic to our scheme of values." *Kent v. Dulles*, 357 U.S. 116, 126 (1958). "[T]he nature of our federal union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969). This language is unequivocal.

The "established method of substantive-due-process analysis" has "two primary features." *Glucksberg*, 521 U.S. at 721. The first step is to "carefully formulat[e] the interest at stake." *Id.* at 722. The formulation of the interest at stake requires this Court to determine "the most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified." *Michael H. v Gerald D.,* 491 U.S. 110, 127 (1989). The second step is to determine whether the freedom in dispute is among those "fundamental rights and liberties" rooted in our country's history. *Glucksberg*, 521 U.S. at 720-721. Plaintiffs' rights to travel and movement trace the analytical steps of *Glucksberg*. They are protected by the Constitution, and thus infringed upon by operation of the federal terrorist watchlist.

A.      **History Reflects a Right of Movement Inherent to the Due Process Clause**

Historical evaluation of substantive due process rights is necessarily broad. In *Glucksberg*, the Supreme Court analyzed the present and past laws of the fifty states, as well as the laws of other countries, to frame its historical examination of an alleged right to assist suicide. 521 U.S. at 710-711. *Glucksberg* also analyzed centuries-old historical treatises, social attitudes, and changes in the law between the present day and the founding of the colonies. *Id.* at 711-715.

The history of the right to interstate and international travel establishes the constitutional right to movement. The right derives from the Constitution's historical lineage, including the Magna Carta and the Articles of Confederation. *See Hurtado v. California*, 110 U.S. 516, 521 (1884) (explaining how the Due Process Clause stems from the Magna Carta); *United States v. Guest*, 383 U.S. 745, 758 (1966) (same for Articles of Confederation, at least as it relates to right of movement).

An examination of America's traditions conducted in accordance with *Glucksberg* reveals that the right of movement is firmly embedded. Article IV of the Articles of Confederation contained an explicit right of interstate travel: "the people of each state shall have free ingress and regress to and from any other state." The international travel component of the right of movement likewise has ancient roots dating back to the Magna Carta: "it shall be lawful for any man to leave and return to our kingdom unharmed and without fear, by land or water." Magna Carta (June 15, 2015), ¶ 42. The Supreme Court often looks to the Magna Carta when interpreting our Constitution. *See, e.g., Albright v. Oliver*, 510 U.S. 266, 315 (1994) (noting, in determining the contours of a constitutional right, that its historical origin "dates back to the Magna Carta").

But *Glucksberg* requires more than an analysis of historical documents, like the Articles of Confederation and the Magna Carta, to establish a substantive constitutional right. It requires an analysis of United States history itself. The history of the United States begins with our colonist forebears embarking on the treacherous journey from Europe to the New World, motivated by "[t]he unhappiness and frustration caused by the various restrictions on freedom of movement in England." Zechariah Chafee, Jr., *Three Human Rights in the Constitution of 1787* (1956) (relied on in *Kent*, 357 U.S. at 125-126).

. While in England, these same colonists could only move from town to town with permission from various authorities. *Id.* at 164. Religious discrimination in England also motivated some colonists and amplified the deleterious effect of movement restrictions. *Id.* at 175.

The willingness of English authorities to protect colonists' right of movement aided the emergence of English authority in what would become the United States, rather than Spanish or French. Within areas administered by Spanish and French colonial administrations, bureaucratic examinations, licensing, and restrictions on the religious and political affiliations of colonists were widespread. *Id.* at 167-170. These various limitations obstructed mass colonization and economic development of territory in North America claimed by Spanish and French authorities. *Id.* The charters of the English colonies on the other hand required or contained "no examination, no licenses, no mention of religion." *Id.* at 173.

As a general matter, this enlightened attitude toward the right of movement prevailed between the English colonies of the New World as well. Men were free to move "across boundaries wherever their work called them." *Id.* at 181. As mentioned earlier, the newly-independent colonies codified the right of movement within the Articles of Confederation. *Id.* at 185. "[T]he free inhabitants of each of these States…shall [have] free ingress and regress to and from any other State." Articles of Confederation, Article IV. While the right of movement was not expressly enumerated in the Constitution, this is because the Founders saw that the right "was already embodied elsewhere" in the text. Chafee, *Three Human Rights in the Constitution of 1787* at 185. The right of movement saturates the text of the Constitution and Bill of Rights, as established below.

**B.    Both the U.S. Constitutional Text and the Bill of Rights' Penumbras Reflect a Right of Movement Inherent to the Due Process Clause**

The Constitution protects freedoms not specifically enumerated.  In *Griswold v. Connecticut*, for example, the Supreme Court recognized an unenumerated fundamental right to privacy. 381 U.S. 479, 481-86 (1965). *Griswold* arrived at this inferred recognition by examining the country's history, traditions, and Constitutional text.  *Id.* at 482-484.  The right of privacy came from the "penumbras" of the Bill of Rights, which protected fundamental rights included by implication or necessity. *Id.* For example, the Court analyzed several First Amendment cases dealing with "the freedom to

associate and privacy in one's associations." *Id.* at 483. That right did not appear explicitly in the First Amendment, but still existed as a "peripheral First Amendment right." *Id.* at 483.

The Court mentioned other explicit constitutional guarantees which arguably include a privacy component: the Third Amendment, prohibiting quartering of soldiers, the Fourth Amendment, prohibiting searches and seizures, the Fifth Amendment prohibiting self-incrimination, and the Ninth Amendment reserving unenumerated rights to the People. *Id.* at 484. These amendments, along with the freedom to associate found in the First Amendment, create "zones of privacy." *Id.* These "zones of privacy" point to the existence of a more fundamental and basic right of privacy, a right which itself gives "life and substance" to the Constitution's explicit guarantees. *Id.*

Like the right of privacy in *Griswold*, Plaintiffs' asserted right of movement, grounded in the rights to domestic and international travel, is necessary to the practicing of democracy and the functioning of a healthy society. Just as the Supreme Court in *Griswold* recognized "zones of privacy" in threading together various constitutional guarantees, penumbral "zones of movement" emanate from various Constitutional guarantees.

Article IV of the U.S. Constitution entitles citizens of one state to the privileges and immunities of all the states. Article IV recognizes a zone of movement because it guarantees equal treatment for citizens moving from one state to another state, a guarantee that would be unnecessary if the Founders did not consider such movement essential to the healthy functioning of the United States. As the Supreme Court has repeatedly held, "the constitutional right to travel from one State to another is firmly embedded in our jurisprudence" and assertable against "government action" to impair it. *Saenz v. Roe*, 526 U.S. 489, 498-504 (1999) (collecting cases).

The Citizenship Clause of the Fourteenth Amendment implies a zone of movement, particularly related to international travel. The purpose of the Citizenship Clause was to "put

citizenship beyond the power of any governmental unit to destroy." *Afroyim v. Rusk,* 387 U.S. 253, 263 (1967).  U.S. citizens have an absolute right to reenter the country.  *Worthy v. United States*, 328 F.2d 386, 394 (5th Cir. 1964) ("[I]t is inherent in the concept of citizenship that the citizen, when absent from the country to which he owes allegiance, has a right to return, again to set foot on its soil.").  The Citizenship Clause implies the right to leave the United States for international travel and still return.

Article I Section 8 of the Constitution confers upon Congress the ability to regulate both interstate commerce and commerce with foreign states. This authorization likewise anticipates a zone of movement of goods and people between states and countries.

The First Amendment, which guarantees the right to assemble, implies a zone of movement: citizens must move between states, and from other countries to this country, to freely assemble. The First Amendment also guarantees the right to free exercise of religion.  That right stems from colonial immigrants who fled religious persecution, and for many citizens still today movement is a necessary component of free exercise. In addition to congregating regularly for worship, many religions encourage pilgrimage to foreign countries. For example, Catholics travel to the Vatican, Jews to Israel, and Muslims to Mecca.

The Fourth Amendment protects against unreasonable searches and seizures. This protection recognizes a zone of movement: citizens who have not been lawfully stopped or arrested must be released from custody and are free to move as they please. Similarly, citizens are not required to consent to searches, and may move themselves or their possessions, unless a warrant issues.  As federal law elsewhere provides, "No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress."  18 U.S.C. § 4001.

The historical record makes clear the right of movement is so fundamental and basic that it was not necessary to dedicate explicit text to the right. Indeed, our constitutional scheme—from the

Commerce Clause to the Bill of Rights, from federalism to the Citizenship Clause—presupposes the existence of a right of movement.  These various and explicit constitutional guarantees point to an underlying right: the right of movement. The zones of movement found within these guarantees extend from that underlying right. The zones of movement, when considered in tandem with our nation's constitutional scheme and history, provide clear evidence of the Founders' intent to enshrine the right of movement as a part of the Constitution.

### C.   International Law Supports a Right of Movement Embedded within the Due Process Clause

It is not only the history of the United States and the text of its Constitution that reveal a right of movement, international law does so as well.  As explained in *The Paquete Habana,* "[customary] [i]nternational law is part of our law" and "must be ascertained…as often as questions of right depending upon it are duly presented for their determination." *The Paquete Habana,* 175 U.S. 677, 700 (1900).  So, in determining what freedoms are protected by customary international law, the Second Circuit relied on the contents of the Universal Declaration on Human Rights.  *Filártiga v. Pena-Irala*, 630 F.2d 876, 883 (2d Cir. 1980). UN declarations are particularly useful articulations of international law "because they specify with great precision the obligations of member nations under the Charter." *Id.*  Likewise, the Second Circuit has found that even international agreements that are not self-executing, such as the International Covenant on Civil and Political Rights, "are appropriately considered evidence of the current state of customary international law." *Abdullahi v. Pfizer, Inc.,* 562 F.3d 163, 176 (2d Cir. 2009).

Both of these two referenced international agreements—the Universal Declaration on Human Rights and the International Covenant on Civil and Political Rights—include an explicit right of movement. The Universal Declaration conceives of the right without equivocation: all people have "the right to freedom of movement… [as well as] the right to leave any country, including his own, and to return to his country."  Universal Declaration on Human Rights, Article

13.  The Covenant's articulation of the right of movement is essentially the same. Everyone has the "right to liberty of movement…[and] shall be free to leave any country, including his own…[and] shall not be arbitrarily deprived of the right to enter his own country." International Covenant on Civil and Political Rights, Article 12.1–12.4. The fact that the right of movement is enumerated in two of the cornerstone agreements of customary international law further confirms the revered status of the right to both domestic and international travel within our own legal traditions, which reflect and incorporate international law.

> **D.   Operation of the Watchlist Impinges Upon Plaintiffs' Fundamental Right to Movement**

Relying on the history of substantive due process rights to domestic and international travel, the court in *Mohamed* recognized that the No Fly List strands U.S. citizens abroad and effectively prevents them from returning home.  *See Mohamed*, 995 F. Supp. 2d at 536. *Mohamed* explained "that a U.S. citizen's right to reenter the United States entails more than simply the right to step over the border after having arrived there." *Id.* An uncharged United States citizen's inability to fly places an impossible burden on his right to international travel. *Id.* And because "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms," *Aptheker v. Secretary of State*, 378 U.S. 500, 508 (1964) (citation omitted), the restrictions facing the No Fly List Plaintiffs plausibly violate the Substantive Due Process clause as a matter of law.  *See also Kovac*, 363 F. Supp. 3d at 752 n.9 (noting that while *Mohamed* ultimately lost his Substantive Due Process claim at the summary judgment stage, the district court correctly found the allegations were sufficient to survive a motion to dismiss).  Plaintiffs' substantive due process right of movement is violated by placement on the No Fly List component of the watchlist.  *See* 2AC ¶¶ 617, 818, 1041, 1459.

Plaintiffs' substantive due process right of movement is further violated by the severe limitations on border crossings and domestic travel imposed by their watchlist designations.  As Plaintiffs extensively document, their ability to fly, to drive, to sail, and to generally travel by any means is crippled by their watchlist status.  *See*, *e.g.,* 2AC ¶¶ 153, 161, 382, 703-706, 862-868, 1096-1100. Plaintiffs have been burdened from performing religious ministry and traveling for religious pilgrimages due to the watchlist. *See* 2AC, Counts XI, XIII.   Plaintiffs suffer these harms from a watchlist enterprise that performs no better than random at deterring terrorism.  *See* 2AC ¶¶ 177-190.

While the Government may sometimes be able to satisfy strict scrutiny regarding criminal-penalty restrictions on the fundamental right to movement, that burden cannot be met at the motion to dismiss stage.   Particularly not against innocent Plaintiffs whose travel has been severely hampered based on speculative civil watchlist designations.

## VI.    PLAINTIFFS STATE AN APA CLAIM REGARDING DHS TRIP (COUNT III)

The Government asks the Court to dismiss Count III, which Plaintiffs have referred to as "APA-DHS TRIP" to distinguish it from a narrower APA claim (Count IV, APA-NCIC).

Plaintiffs allege that TSDB placement and removal violates the APA for the same reason that it violates the Constitution, 2AC ¶¶ 1594-97.  Plaintiffs also allege that TSDB placement violates the TSDB due to the impermissible burdens the Government imposes, *id.* at ¶ 1598.  Plaintiffs also allege that TSDB placement is "not in accordance with law," *id.* at ¶ 1594, a problem which is further elaborated in Paragraphs 1707-18.  *See also* § XIV, below.

The Government counters that Plaintiffs' APA "claim fails for the same reasons the procedural due process claim does, and Plaintiffs cannot separately demonstrate that the DHS TRIP process is arbitrary or capricious in violation of the APA."  MTD at 52.  But the Government construes the APA claim too narrowly.  Plaintiffs' APA claims should survive so long as any of its

constitutional claims (not just due process) survive.  *See* 5 U.S.C. §§ 706(2)(A) (agency action may be set aside when "not in accordance with law") 706(2)(B) (same when "contrary to constitutional right, power, privilege, or immunity") and 706(2)(D) (same when "without observance of procedure required by law").  Likewise, the APA claim should survive to the extent there is no statutory support for the watchlist.  *See* 5 U.S.C. § 706(2)(C) ("in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

## VII.    PLAINTIFFS STATE AN APA CLAIM REGARDING THE NCIC (COUNT IV)

In Count IV, Plaintiffs allege that the Government shares information stigmatizing and injuring them, *see* § IV(B), above, via the National Criminal Information Center ("NCIC"). 2AC ¶ 1601.  The Government's only purported authority for doing so is  28 C.F.R. § 20.20 and 28 U.S.C. § 534. *Id.*

### A.    The Government's NCIC Information Sharing Is Beyond Legal and Statutory Authority

28 U.S.C. § 534(a)(1) allows the Attorney General to "acquire, collect, classify, and preserve identification, criminal identification, crime, and other records." That information may be shared for missing persons cases, *id.* at § (a)(3), and with the federal government for sentencing and penal purposes, *id.* at § (a)(4).  Nothing in 28 U.S.C. § 534 permits the sharing of non-criminal information other than mere identification records.  This is why information may only be shared with certain "authorized" officials of the Federal Government, including the United States Sentencing Commission, the States, including State sentencing commissions, Indian tribes, cities, and penal and other institutions that "have arrest powers," *id.* at §§ (a)(4) and (e).  Civil information may not be shared just because it may serve another national security or law enforcement purposes. *See, e.g., U.S. v. Sweeney*, 914 F.2d 1260, 1263–64 (9th Cir. 1990) (28 U.S.C. § 534 authorizes Government "to collect criminal records data and make it available to law enforcement agencies throughout the country"); *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 467 (4th Cir. 2013) ("[w]e agree with

the defendants that there is a good argument that Section 534(a)(1), which directs the Attorney General to 'acquire, collect, classify, and preserve identification, criminal identification, crime, and other records,' does not authorize inclusion of civil immigration records in the NCIC database").

In conformity with this plain reading of 28 U.S.C. § 534, 28 C.F.R. § 20.20(a) permits disseminating only certain "criminal history record information." The watchlist is a civil, rather than criminal, record.[9] So the sharing of information through the NCIC is beyond statutory and regulatory authority.

The Government's primary response argument is that 28 U.S.C. § 534's reference to "other records" is open-ended and may apply to any civil record. This argument would render the limitations of 28 U.S.C. § 534 irrelevant, and conflict with the canons of *ejusdem generis* and *noscitur a socii. CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277, 295 (2011) ("We typically use *ejusdem generis* to ensure that a general word will not render specific words meaningless."); *Washington State Dept. of Social and Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384, (2003) ("[G]eneral words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."). *See also Yates v. U.S.*, 135 S. Ct. 1074, 1086 (2015).

The Government suggests (MTD at 55) that its dissemination of watchlist information is justified by 28 C.F.R. § 0.85(f), which states that the NCIC is "a computerized nationwide index of law enforcement information." Ignoring the separate issue of the lack of any Congressional authority, this language neither provides any authorization to share civil records nor alters 28 C.F.R. § 20.20(a)'s use of the phrase "criminal history record information." Instead, it makes the Government's lack of authority more apparent. The Government knew how to use the broader

---

[9] No definition of criminal record that Plaintiffs are aware of covers anything other than convictions or pending criminal charges, all of which require at least probable cause. *Compare with* 2AC ¶¶ 94, 108, 125, 127, and 1567 (watchlist placement requires merely watered-down form of reasonable suspicion).

"law enforcement information" phrase when it wanted that broader effect. That the NCIC is limited to "criminal" information settles the question.

Finally, the Government suggests (MTD at 56) that Plaintiffs' placement on a watchlist is, in fact, a "criminal record," and part of the Plaintiffs' "criminal history." It is true that TSDB placement does come with punitive effects that should only be permissible upon a criminal conviction. But all that needs to be said is that if TSDB placement has the effect of a criminal record, *Richmond Black Police Officers Ass'n v. City of Richmond, Va.*, 548 F.2d 123, 129 (4th Cir. 1977) (criminal conviction not moot because it would subject individual to 28 U.S.C. § 534), then the process required for placement must satisfy criminal due process.

TSDB placement simply cannot meet criminal due process standards.[10]  There is, for instance, no grand or petit jury, *see* U.S. CONST., Amend. VII & VIII, no right of confrontation, *id.* at Amend. VIII, and no requirement of guilt beyond a reasonable doubt, *In re Winship*, 397 U.S. 358, 364 (1970) ("the reasonable-doubt standard is indispensable" to establish guilt in criminal cases). Nor is there any fair notice of the particular conduct which gives rise to criminal liability. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 500 (1982). And without providing the required due process attendant to criminal law, the Government may not impose criminal consequences. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1217 (2018); *Hoffman*, 455 U.S. at 499-500; *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996) ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the

---

[10] To the extent the Government is instead suggesting that under 28 C.F.R. § 20.33, the watchlist information is not a criminal record but "is given the same protections and subject to the same restrictions as criminal records are afforded," MTD at 56, the Government is imagining a different regulatory system. 28 C.F.R. § 20.33, like 28 C.F.R. § 20.20, on its face only applies to "criminal history record information." That the Government would apply it to non-criminal records is showing that the Government recognizes it is acting outside of the law. The Government's voluntary application of standards that likely *would* apply if the information being shared was allowed to be shared in the first instance is simply designed to mask the unlawfulness.

conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.").

Other than its regulatory citations, the Government waxes poetic about the 9/11 Commission and HSPD-6 policy goals, suggesting that information sharing about terrorism is within the Government's interest. But even if Congress or the Attorney General could have authorized the sharing of Plaintiffs' personal information as having some unknown "connection" to terrorism, and even if the Attorney General could or should have promulgated regulations under that authority allowing the sharing, that does not mean either Congress or the Attorney General has in fact done so. The statutory and regulatory authority to disseminate watchlist status as criminal information does not exist.

### B.     Plaintiffs Have Standing to Challenge NCIC Database Information Sharing

The Government argues Plaintiffs lack standing to challenge the Government's unauthorized actions. According to the Government, Plaintiffs do not have any "legally protected" interests in the wrongful sharing of their information on the NCIC database. The Government cites no case that directly stands for this proposition, and that is because the Supreme Court has effectively foreclosed it, noting that 28 U.S.C. § 534's limitations directly protect the rights of "personal privacy." *U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 765 (1989).

## VIII.   PLAINTIFFS STATE AN EQUAL PROTECTION CLAIM (COUNT V)

The Government claims that Plaintiffs' Equal Protection argument must be dismissed because Plaintiffs failed to "alleg[e] facts from which one would reasonably infer racial or religious animus." MTD at 50. But the Plaintiffs' claims of intentional discrimination against Muslims, Arabs, and Asians from Majority-Muslim countries is well pled. For instance, the Second Amended Complaint (Dkt. 48) notes that "Defendants, knowingly, intentionally, and purposefully use

impermissible and inaccurate religious profiles to nominate, accept, disseminate, and deploy the federal terrorist watchlist against American Muslims in a manner that is different from other faith backgrounds." 2AC ¶ 194. The Complaint also alleges that "Defendants consider origin from Muslim-majority countries, travel to Muslim-majority countries, travel on religious pilgrimages, learning Arabic, attending mosques, zakat donations to Muslim charities, the wearing of typical Muslim dress, the frequency of Muslim prayer, adherence to Islamic religious practices, affiliations with Muslim organizations, and associations with other Muslims as suspicious factors supporting inclusion in the TSDB, on the Quiet Skies/Silent Partner Selectee List(s), and on other high-risk-potential-terrorist watchlists." *Id.* at ¶ 195. "[W]hile travel to Muslim-majority countries is more likely to land a Muslim on the watchlist, the same is not true of a non-Muslim." *Id.* at ¶ 196 *see also id. at* ¶ 203. And "when Defendants review lists of social networks and known associates of a currently watchlisted individual, they routinely chose to nominate Arab or Muslim names that cross their desk on the stereotyped basis of race, religion, or national origin alone. Meanwhile, Defendants gloss over any stereotypically white, Christian, English, or Western-European names that may appear in the same network lists, such as classmates or colleagues. This is true even when the only distinction between a nominated person and a non-nominated person are improper race, religion, or national origin criteria." *Id.* at ¶ 198.

Then, once a Plaintiff's or Muslim's name appears on the list, the Government engages in all sorts of interference with Plaintiffs' religion.  These interferences include intrusive religious questioning, searching and seizing their private electronic data, and demanding that Plaintiffs infiltrate their mosques and religious communities on behalf of the FBI in return for relief from the harm caused by the Government-imposed watchlist status. *See, e.g., id.* at ¶¶ 2, 83-84, 105, 171, 204-06, 1634-41,1661, 1685, 1711.

The heart of Plaintiffs' Equal Protection argument is that although the TSDB is nominally a "terrorism" database, the Government has—purposefully and intentionally—treated it as either exclusively or almost exclusively an "Islamic terrorism" database. Even terrorist threats that unquestionably meet the standard for inclusion, such as those stemming from white nationalist Christopher Hassan, do not result in white nationalists ending up on the watchlist. 2AC ¶ 202. Plaintiffs' contention is that if Hassan were Muslim, the Government would not only have put Hassan on the watchlist, they would have also put his friends and family on the watchlist as well. *Id.*; *see also id.* at ¶¶ 128, 193, 201. The watchlist acts as a tool for impermissible ends that target specifically the Muslim community. *See id.* at ¶ 204. Given that most terrorist threats are not Muslim, this singling out of Muslims cannot survive strict scrutiny. *See id.* at ¶ 199.

Plaintiffs have thus alleged that the Government's conduct has "had a discriminatory effect upon and ha[s] disparately impacted Muslim American travelers, and not travelers of other faiths." *Cherri v. Mueller*, 951 F. Supp. 2d 918, 937 (E.D. Mich. 2013). "Indeed, central to Plaintiffs' [Complaint] is that the policy, custom and practice is only applied against Muslims, and not travelers of other faiths." *Id.* And "Plaintiffs have sufficiently alleged that such policy, practice and custom targets a suspect class and has no rational basis." *Id.* "At this stage in the case, Plaintiffs' allegations are sufficient." *Id.*

The Government, relying on *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003), alleges Plaintiffs "must set forth 'specific, non-conclusory factual allegations that establish improper motive.'" MTD at 49-50. Even if Plaintiffs had not met that standard through the above allegations, *Williams* was decided on summary judgment. Plaintiffs are entitled to discovery before having to reach such level of specificity. At this stage, the mere plausibility standard of *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011) (citation omitted), applies. Likewise, whatever the import of *U.S. v. Armstrong*, 517 U.S. 456, 464-65 (1996) (a criminal case) and *Ziglar v. Abbasi*, 137 S.

Ct. 1843, 1861 (2017) (a case about extending *Bivens* remedies), neither "executive function" nor the "presumption of regularity" alters the pleading standard at the motion to dismiss.  *See Goad v. Mitchell,* 297 F.3d 497, 501 (6th Cir. 2002) (collecting cases explaining there is no heightened pleading standard for showing the Government acted with "improper motive"); *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001).  Thus all that needs to be alleged are facts sufficient to show plausibility. Plaintiffs do not need to show a smoking gun admission of obvious unconstitutional intent. *Wright v. North Carolina*, 787 F.3d 256, 267 (4th Cir. 2015).

Assuming Plaintiffs' allegations are true, it is plausible that the Government watchlist has purposefully discriminated against Muslims and individuals from Muslim-majority countries.  After all, the Government recently implemented "a policy first advertised openly and unequivocally as a 'total and complete shutdown of Muslims entering the United States'" that "now masquerades behind a facade of national-security concerns."  *Trump v. Hawaii*, 138 S. Ct. 2392, 2433 (2018) (Sotomayor, J., dissenting).[11]  Plaintiffs' significant allegations of vastly unequal impact and treatment against the American Muslim community, *see* 2AC ¶¶ 191-98, are the expected result of executive policies of discriminatory intent, *see id.* at ¶¶ 194-96, 198, 199, 204.

Indeed, "proof of discriminatory intent … can in some situations be inferred from the mere fact of differences in treatment."  *Int'l Bd. of Teamsters v. U.S.*, 431 U.S. 324, 335 (1977).  Thus, when "a clear pattern, unexplainable" through proper motives, "emerges," disparate treatment or impact suffices. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). The Government claims that *Sylvia Development Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir. 1995), states that a showing "of disparate impact is insufficient," but *Sylvia Development* simply incorporates the standard of *Arlington Heights*, *id.* at 819, which in turn notes that a "stark" pattern alone may be

---

[11] *Hawaii* was not decided on a motion to dismiss and did not contain Equal Protection claims. The Muslim Ban cases themselves have now survived a motion to dismiss before this Court. *See Int'l Refugee Assistance Project v. Trump,* 17-cv-361, 373 F. Supp. 3d 650 (D. Md. May 2, 2019).

"determinative." 429 U.S. at 266. Here, Plaintiffs have alleged stark pattersn of discrimination against Muslims.  2AC ¶¶ 191-93, 197, 199.   This cannot be explained through any non-discriminatory purpose, given the Government's refusal to treat similarly situated white nationalists suspected of terrorism the same way. 2AC ¶¶ 201-02. Plaintiffs can futher buttress their claims of discriminatory motive (*see* 2AC ¶¶ 11, 194, 204,1615) and intentional discriminatory treatment (2AC ¶¶ 195-96 and 201-03) with a "consistent pattern" of targeting Muslims, 2AC ¶¶ 195 & 198.  The "historical background" of the watchlist as a response to perceived threats from Muslims lends further support. *See* Richard F. Grimmett, *9/11 Commission Recommendations: Implementation Status* Congressional Research Service (Dec. 4, 2006)[12], at 1, 19, 21, and 31-33 (TSDB was a response to 9/11 Commission, which was aimed at "counter[ing] Islamic terrorism"); *Sylvia Development*, 48 F.3d at 819 (stating that these are "probative factors" for finding "discriminatory intent").  As does the watchlist's lack of Congressional authorization. *See* § XIV, below.

Thus, Plaintiffs have cruised through the plausibility standard of *Equity in Athletics*. Even if the standard were the *Williams* summary judgment standard requiring "specific, non-conclusory factual allegations that establish improper motive," 326 F.3d at 584, Plaintiffs satisfy that burden.

The Government suggests that Plaintiffs' equal protection claim must be dismissed because "discrimination on the basis of religion or race is, in fact, contrary to the Government's policy and practice." MTD at 50.  But the Government is wrong in both claiming that it has an official policy against unlawful discrimination or that such an official policy defeats Plaintiffs' claims.  As the Second Amended Complaint alleges, the official policy simply states that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities." *See* 2AC ¶ 1614.  Although the Government "blatantly violate[s]" even this policy," *id.*, the policy expressly allows the Government to "consider and rely on those protected traits as factors

---

[12] https://fas.org/sgp/crs/homesec/RL33742.pdf.

supporting placement on federal terrorist watchlists." 2AC ¶ 1615; *see also id.* at ¶ 11, 194-95; *see also id.* Ex. 5 (stating expressly that nominations are impermissible when they are based "solely" on protected categories). And even if the Government did have a facial policy of neutrality, that would not defeat Plaintiffs' claim. Even when a law is "fair on its face, and impartial in appearance" it is unconstitutional "if it is applied … with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances." *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886). Thus, in order to show an Equal Protection violation, "a plaintiff can identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner." *Williams*, 326 F.3d at 584; *see also Cherri*, 951 F. Supp. 2d at 933-34 (explaining, on far less detailed evidence regarding the Government's official policies, that "Plaintiffs have alleged sufficient facts to show that their alleged treatment at the border was pursuant to an official policy, custom and practice"). As seen in significant detail above, Plaintiffs have alleged the watchlist policies have "been applied in an intentionally discriminatory manner" against Muslims and those originating from Muslim-majority countries.

The Government cites a handful of district court opinions that have dismissed Equal Protection claims in other watchlist cases. MTD at 49-50. But even if those decisions controlled, they turned on the specific allegations and arguments of those cases. For instance, at the time *Elhady* was decided, "[t]he publicly disclosed criteria used in connection with the Watch List [we]re facially neutral." *Elhady*, 303 F. Supp. 3d at 467 (citation omitted). The plaintiffs there rested entirely on allegations of disparate impact. *Id.* The Equal Protection claim was thus dismissed due to lack of sufficient allegations of intentional discrimination. *Id.* *Abdi* is similar. 2018 WL 1940411, at *4. *Kadura* was decided based on the complaint's "threadbare recitals" of the elements without any supporting factual allegations. 2017 WL 914249, at *9. Meanwhile, *Kovac* was decided on more narrow grounds, that "Defendants that Plaintiffs have not alleged a plausible comparison to similarly

situated groups," and the Court gave Plaintiffs an opportunity to replead; that case is ongoing. 363 F. Supp. 3d at 760. Here, Plaintiffs specifically note that some of the criteria on which a determination may apply is *not* facially neutral. 2AC ¶¶ 193-95. Plaintiffs have met the burden offered in *Kovac* by comparing the treatment of Muslims to even known terrorists when those terrorists are Christians engaged in white nationalist terrorism. *Id.* at ¶ 202; *see also id.* at ¶¶ 128, 193, 201. Plaintiffs' Equal Protection claim survives.

## IX.   PLAINTIFFS STATE A FOURTH AMENDMENT CLAIM (COUNT VI)

### A.   Plaintiffs Have Standing to Bring their Fourth Amendment Claim

The Government claims (MTD at 57-58) that Plaintiffs cannot bring either their Fourth Amendment or Fifth Amendment Self-Incrimination claims because "no Plaintiff has made a single allegation regarding any specific plans for future international travel." Of course, by the time any Plaintiff alleges a specific future trip that Plaintiff booked, the date and travel would come and go before resolution, and the Government would then claim the dispute is moot. What the Government is really arguing is that no Plaintiffs can ever challenge the Government's Fourth and Fifth Amendment violations, even though those violations repeatedly take place pursuant to specific Government policies.

The Government, naturally, cites no case stating that a specific alleged itinerary is necessary to make such challenges. Every case that has addressed these allegations have rejected the Government's arguments. In *Wilwal*, for instance, the Court explained that "Courts do not require plaintiffs to engage in international travel when they have experienced difficulties at the border and reasonably expect the same difficulties when returning to the United States from future travel." 346 F. Supp. 3d at 1302 (stringcite omitted).[13]   Similarly, the court in *Alasaad v. Nielsen* reminded the

_____

[13] *Wilwal* only involved Fourth Amendment seizure and excessive force challenges to the watchlist, but the Government does not explain why this would make a difference. Indeed, the

Government that "Plaintiffs' allegations of future harm are no less concrete because they omit specific plans or dates of future travel."  17-cv-11730, 2018 WL 2170323, at *10 (D. Mass. May 9, 2018). Each of these cases also cite numerous authorities over a variety of jurisdictions for the well-established proposition that the "possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." *Id.* (quoting *Thomas v. Cty. of L.A.*, 978 F.2d 504, 507 (9th Cir. 1992)); *see also Wilwal*, 346 F. Supp. 3d at 1302 (citing *Suhre v. Haywood Cty.*, 131 F.3d 1083, 1088 (4th Cir. 1997) ("[P]ast injury [i]s probative of likely future injury")); *Mohamed*, 266 F. Supp. 3d at 875 (same).

### B.     Plaintiffs Have Alleged Watchlist Electronic Searches Violate the Fourth Amendment under any Standard

The Government first asserts that Plaintiffs' Fourth Amendment Claim is premised "on an asserted constitutional requirement of 'a warrant supported by probable cause' before CBP may conduct any search of an electronic device at the border."  MTD at 58. Plaintiffs do believe that probable cause is the proper legal standard, but their Fourth Amendment claim as pled is much broader; Plaintiffs contend that under *any* legal standard the Government's electronic device searches are not constitutionally authorized. Plaintiffs allege "Defendants lack consent, reasonable suspicion, probable cause, or a warrant for their seizures and searches of watchlisted individuals' electronic devices." 2AC ¶ 1627; *see also id.* at ¶ 1628.  Plaintiffs specifically cite *U.S. v. Kolsuz*, 185 F. Supp. 3d 843, 853 (E.D. Va. 2016) for the proposition that a "forensic search of computer is [a] border search requiring reasonable suspicion." 2AC ¶ 1627.

The Government cannot escape its own policy position that *none* of those standards are required. The Government places people on the watchlist based on a modified and watered down "reasonable suspicion" test.   2AC ¶ 127. That test determines whether there is "a reasonable

Government does not even explain why its argument, if adopted, would apply to all of Plaintiffs' travel-related claims.

suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." *Id.* But as explained by this Court in *Mohamed*, 995 F. Supp. 2d at 531, conduct that can constitute being "related to" or "in aid" of terrorism sufficient to place an individual on the watchlist "is not necessarily related to any unlawful conduct." Yet, once the Government decides this person meets this "reasonable suspicion" of being suspected of something vaguely related to terrorism test, the Government—as a matter of policy—asserts that this establishes the "reasonable suspicion" that is required, under Fourth Amendment law, for electronic searches. 2AC ¶ 105 and Exhibit 6. This is an unconstitutionally permissive standard, since the law requires "reasonable suspicion" of "criminal activity." *U.S. v. Cortez*, 449 U.S. 411, 417 (1981). Further, that criminal activity must be "ongoing or imminent." *Kolsuz*, 185 F. Supp. 3d at 859 (citing *Cortez*, 449 U.S. at 417) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). Placement on a watchlist does not satisfy this standard.

Searching the electronics of individuals suspected of having some relationship to terrorism is squarely evidentiary and intelligence-gathering; it is not a search for contraband or firearms that justifies a warrant exception at the border. *U.S. v. Kolsuz*, 890 F.3d 133, 143 (4th Cir. 2018) (noting "the scope of a warrant exception should be defined by its justifications" and warning that a border warrant exception would not apply in a situation where "the government invokes the border exception on behalf of its generalized interest in law enforcement and combatting crime") (citations omitted).

The Government states  (MTD at 61) that *Kolsuz*, 890 F.3d at 146 cited CBP's 2018 Directive favorably, noting with approval that under the policy, advanced searches 'may be conducted only with reasonable suspicion of activity that violates the customs laws or in cases raising national security concerns.'" But the issue of whether the watchlist inclusion standard meets

constitutional requirements was not at issue in *Kolsuz*. The Fourth Circuit in *Kolsuz* was merely citing favorably the Government's quasi-admission that heightened standards were necessary. *Id.* Plaintiffs squarely challenge that 2018 CBP directive because it makes a "watchlist" exception to the heightened requirements otherwise imposed.  2AC ¶ 105.

Separately, the Government fails to meet the Fourth Amendment's "reasonable suspicion" test because reasonable suspicion cannot be met "based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *U.S. v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (citations omitted).  And, as the rest of Plaintiffs' allegations show, the Government puts individuals on the watchlist based on broad profiles which cast suspicion on entire categories of people.  *See* 2AC ¶ 191-201.

The manual searches also require actual reasonable suspicion (at minimum) and are thus also unconstitutional for the same reasons.  The Government claims (MTD at 60-61) that "a non-forensic, or manual" search of electronics at the border does not implicate the Fourth Amendment at all.  It relies on *U.S. v. Ickes*, 393 F.3d 501, 507 (4th Cir. 2005), a case that merely held that "the border search doctrine is not subject to a First Amendment exception."  The issue of whether reasonable suspicion was necessary was not at issue in that case, because "[t]he agents did not inspect the contents of Ickes's computer until they had already discovered marijuana paraphernalia, photo albums of child pornography, a disturbing video focused on a young ball boy, and an outstanding warrant for Ickes's arrest."  *Id.* Thus, the computer search was justified because "reasonable suspicions will give rise to more intrusive searches," a point so modest that the Fourth Circuit noted that it was "a far cry from enthroning this notion as a matter of constitutional law." *Id.* *Kolsuz* did not treat with skepticism the Government's position that the case "treated a search of a computer as a routine border search, requiring no individualized suspicion for the search," 890 F.3d at 146 n.5, only because the issue of manual searches were not before the court, *id.*

While *Riley v. California*, 573 U.S. 373 (2014), was not a border search, it placed stored electronic information on a separate plane from material objects. *See id.* at 393 ("[c]ell phones [and other "minicomputer"] differ in both a quantitative and a qualitative sense from other objects"). Yet, to the extent *Ickes* or other courts have suggested that a manual search of a phone is permissible, it is because those courts have assumed a manual search of a phone as having no more intrusive effect, constitutionally, than a search of any other object. *See Ickes*, 393 F.3d at 504 ("We are unpersuaded that these particular transported goods are somehow exempt from the ordinary definition of 'cargo.'"). As *U.S. v. Kim*, 103 F. Supp. 3d 32, 54 (D.D.C. 2015), explained, those assumptions are no longer valid after *Riley*, so the reasoning of those cases is no longer valid either. *See also Alasaad*, 2018 WL 2170323, at *18 ("[t]he border search slate, however, is not unlike the one on which the Supreme Court wrote in *Riley*"); *U.S. v. Wanjiku*, No. 16-cr-296, 2017 WL 1304087, at *5 (N.D. Ill. Apr. 6, 2017), ("inclined to agree" but not reaching the issue), *aff'd* 919 F.3d 472 (7th Cir. 2019) (requiring "reasonable suspicion" for manual search with password demand, but finding standard met in facts of case).

Even if a manual search *were* permitted without even reasonable suspicion, a simple manual search is not what is being alleged. *See Kolsuz*, 890 F.3d at 139 (manual search "involved using the iPhone's touch screen, which was not password protected, to scroll through Kolsuz's recent calls and text messages"). Instead, the Government is forcing Plaintiffs to provide passwords or biometric access. As seen in both the Complaint, *see* 2AC ¶¶105, 288, 316, 387-88, 432, 495, 505, 519, 533, 562-63, 576, 636, 647, 673, 680, 761, 777-78, 836, 871, 905, 914, 974, 990, 1001, 1104, 1151, 1175, 1219, 1236, 1275, 1328, 1348, 1364, 1379, 1394, 1470, 1491-92, 1515-16, and section § XI, below, this violates the Fifth Amendment. Since these searches are ones that only can take place in violation of the Fifth Amendment, they cannot be deemed "routine" under the Fourth Amendment.

Notwithstanding the Fifth Amendment violation, the Government asserts (MTD at 67-68), adopting language from *U.S. v. McAuley*, 563 F. Supp. 2d 672, 678 (W.D. Tex. 2008), that a password is a "digital lock" that border agents can require opened like any other object. Again, this assumption violates the Supreme Court's rule in *Riley* that electronic data is different in nature than routine objects. 573 U.S. at 393. It thus requires a higher burden to justify a search. *Id.* Thus, the district court in *Alasaad*, 2018 WL 2170323, at *20, refused to dismiss a Fourth Amendment claim against border searches where, like here, *see, e.g.*, 2AC ¶¶ 562, 636, 1150, 1491, 1515, 1644, the allegations involved demands that passwords be provided to unlock devices.

Similarly, the Government's argument that demanding passwords or biometric information does not alter the nature of a routine manual search flies in the face of cases that explain why a forensic search does require heightened suspicion. As explained in *U.S. v. Cotterman*, a forensic search is problematic because it gave "the examiner access to far more data, including password-protected, hidden or encrypted, and deleted files, than a manual user could access." 709 F.3d 952, 963 n.9 (9th Cir. 2013); *see also U.S. v. Saboonchi*, 48 F. Supp. 3d 815, 817 (D. Md. 2014); *Kolsuz*, 185 F. Supp. 3d at 856; *Kolsuz*, 890 F.3d at 140. The reason for a heightened standard is not because of the manner in which the government searches the information but the nature of the information, whose privacy an individual shows a reasonable expectation in by locking it with a password. Changing the way the Government overcomes the password does not eliminate the Fourth Amendment violation.

## X.   PLAINTIFFS STATE A FIRST AMENDMENT FREE ASSOCIATION CLAIM (COUNT VII)

The Government's searches and copying are done in pursuit of intelligence and information about Plaintiffs' and similarly situated watchlisted individuals' communications, expressions, social media activities, and associations. Its searches through Plaintiffs' phones specifically sought

information about Plaintiffs' expressed speech and personal associations, which are protected by the First Amendment. This was the district court's holding in the landmark decision relating to the watchlist, *Alasaad*, 2018 WL 2170323, at *23 (watchlisted plaintiffs properly asserted First Amendment claim related to border searches of phones for associational or expressive content). As explained in *Alasaad*, the searches themselves violate Plaintiffs' right to free association. 2018 WL 2170323 at *22-23. No different result should occur here.

The Government suggests (MTD at 71) "Plaintiffs have not pled facts to support the allegation that their speech has actually been chilled as a result of compelled disclosure of their associations, they may not request prospective relief based simply on an alleged subjective chill of their speech." This confuses the Free Speech component of the First Amendment from the Freedom of Association component under which Plaintiffs bring their claims. There has and will continue to be a chilling effect on Plaintiffs' right to association. As explained by the Complaint, the Government takes the data they obtain from private searches and use it to nominate the friends and relatives of Plaintiffs to the watchlist as well. 2AC ¶¶ 84, 105, 128.

The Government separately suggests that Plaintiffs claims must fail to the extent they are alleging injury to others, as Defendants' electronic device search practices "make watchlisted individuals' associations, including family, coworkers, friends, and religious congregants, the target of increased 'known or suspected terrorist' scrutiny." MTD at 73 (quoting 2AC ¶ 1639). This again ignores that Plaintiffs are bringing a Free Association claim, not a speech claim. By illegally obtaining information about Plaintiffs' associates, the Government directly interferes with the Plaintiff's ability to freely associate with those individuals. This violates Plaintiffs' rights and is not a third-party claim. *U.S. v. Citizens State Bank*, 612 F.2d 1091, 1093 (8th Cir. 1980) (accepting appellants' argument that disclosure of third party information would discourage third parties from associating with appellant, and gave appellants standing for Free Association claim); *In re Search of*

*Facebook Username Aaron.Alexis*, 21 F. Supp. 3d 1, 7 (D.D.C. 2013). And even if this were not the case, a third party has standing to avoid the forced disclosure of its third-party associates because the third-party associates could not file suit without disclosing the association. *Koenig v. Maryland*, 09-cv-3488, 2010 WL 148706, at *1 n.1 (D. Md. Jan. 13, 2010) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 458–60 (1958)).

The Government then suggests that under *Ickes*, 393 F.3d at 506, there can be no First Amendment protection for border searches. *Ickes* was focused on a carve out for "expressive" material, whereas Plaintiffs here are alleging a violation of their associational rights. *Id.* Further, *Ickes* was decided before, and its effect must be limited by, *Riley v. California*, 573 U.S. 373 (2014). *Ickes* was concerned about the procedural "headache" entailed in a "First Amendment" exception, but *Riley* explains the warrant requirement is a suitable requirement given the interests at stake. *Riley*, 573 U.S. at 392; *see also Kolusz*, 890 F.3d at 146 (conceding that *Ickes*' failure to consider the privacy interests inherent in digital phones does not survive *Riley*); *Kim*, 103 F. Supp. 3d at 54 (suggesting same).

Finally, the Government suggests that Plaintiffs' First Amendment claim cannot survive in light of the Government's supposed "good faith" investigation. The Government, relying on *Reporters Committee for Freedom of Press v. AT&T*, 593 F.2d 1030, 1054 (D.C. Cir. 1978), alleges that "the First Amendment offers no procedural or substantive protections against good faith criminal investigative activity beyond that afforded by the Fourth and Fifth Amendments." MTD at 72. But that part of Judge Wilkey's opinion was a concurring opinion not joined by any other judge. *See id.* at 1071 n.4 (Spottswood, J., declining to join Part IV(A)(1)(b) of Judge Wiley's opinion specifically because the First and Fourth Amendment analysis "may not always coincide"), and 1079 (Skelly Wright, J., dissenting). Wilkey's reasoning has been rejected by other courts. *See In re Grand Jury Proceeding*, 842 F.2d 1229, 1233 (11th Cir. 1988) (joining the Second, Eighth, Ninth, and Tenth Circuits in expressly rejecting Wilkey's Part IV(A)(1)(b) analysis). As far as Plaintiffs are aware, it is

not the law anywhere. Watchlist designations aren't "criminal" information in any event. *See* Section VII(A), above.

Even if the "good faith exception" rule proposed by the Government were the law, *AT&T* defines "good faith investigation" very narrowly, as "good faith criminal investigation" of "felony" conduct, 593 F.2d at 1062. This is important because the "probable cause" for the investigation provides the constitutional protection. *See id.* at 1055 ("where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude'" *Id.* (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978), and *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).

Here in contrast, Plaintiffs' allegations are that the Government is searching through their phones and electronic devices neither part of any criminal investigation supported by probable cause, but by a desire to intrude on Plaintiffs' associations and punish them. The Government acts is both for the sake of a generalized interest in intelligence and surveillance and as leverage to force Plaintiffs to act as informants against their communities, often in violation of their religious beliefs. 2AC ¶¶ 83, 376, 794-96, 935-36. "Good faith" does not mean "anything the Government argues is in the public interest." It has a very narrow definition, and the Government cannot meet it here.

The Government (MTD at 72) also relies on *U.S. v. Meyer*, 503 F.3d 740, 751-753 (9th Cir. 2007). That case involves very different interests—private, consensual infiltration—and criminal procedural, rather than civil, remedies. It does not apply in the context here. In light of that entirely different context, *Meyer* uses a balancing test where there is a "legitimate law enforcement purpose that outweighs any harm to First Amendment interests." 503 F.3d at 753. There is a world of difference between saying that there is no First Amendment violation and saying that given competing interests the remedy of exclusion is improper. *Meyer* also relies on *U.S. v. Aguilar*, which again points to the existence of probable cause as protecting the First Amendment interest, 883 F.2d

51

662, 705 (9th Cir. 1989), except in the cases of undercover investigations, which the Court distinguishes as a different animal entirely, *id.*

## XI.  FIFTH AMENDMENT SELF-INCRIMINATION (COUNT VIII)

### A.  Plaintiffs Have Standing to Bring a Fifth Amendment Self-Incrimination Claim

Plaintiffs have standing to bring their Fourth Amendment Claims for the same reason they have standing to bring their Fifth Amendment Claims.  *See* § IX(a), above.

### B.  Plaintiffs State a Fifth Amendment Self-Incrimination Claim

Plaintiffs allege that the Government's forcing of Plaintiffs to open electronic devices by providing passwords and biometric data "such as facial recognition or fingerprints" violates Plaintiffs' Fifth Amendment rights against self-incrimination.

#### 1.  Plaintiffs Have a non-Trifling Fear of Prosecution

The Government (MTD at 66) first raises the old trope that because Plaintiffs insist they are "wholly 'innocent'" of criminal wrongdoing, they cannot invoke the protections of the Fifth Amendment.  *Ohio v. Reiner*, 532 U.S. 17, 21 (2001) ("we have never held, as the Supreme Court of Ohio did, that the privilege is unavailable to those who claim innocence"). The Government relies primarily on *U.S. v. Apfelbaum*, 445 U.S. 115, 128 (1980).  That case only held that one does not have a Fifth Amendment protection from giving immunized testimony based on the mere risk of perjuring themselves with that testimony.  *Id.; see also Brogan v. U.S.*, 522 U.S. 398, 404 (1998) ("neither the text nor the spirit of the Fifth Amendment confers a privilege to lie").

*Marchetti v. U.S.*, 390 U.S. 39, 54 (1968), which provides the test approved of by *Apfelbaum*, explains that the Fifth Amendment applies whenever the "hazards of incrimination" created by compulsion to testify "are not trifling or imaginary." Here, the Government has placed every Plaintiff on a watchlist, indicating the Government believes there is "reasonable suspicion that the

individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." 2AC ¶ 94.  Given this placement, the risk that the Government may be seeking information to charge them criminally is not "trifling or imaginary." *See Reiner*, 532 U.S. at 21 ("one of the Fifth Amendment's basic functions is to protect *innocent* men who otherwise might be ensnared by ambiguous circumstances") (cleaned up) (emphasis original); *see also Slochower v. Board of Education*, 350 U.S. 551, 557 (1956) ("a witness may have a reasonable fear of prosecution and yet be innocent of any wrongdoing").

Indeed, it is the Government who seeks to have it both ways.  It justifies the various harms it imposes on Plaintiffs because—for reasons the Government cannot disclose, even to this Court— these individuals pose a significant threat of terrorism.  But, the Government claims simultaneously, the Government has no reason rising even to a "trifling" possibility to justify these individuals worry that the Government considers them guilty of a crime.  If the Government acknowledges there is no risk of prosecution to these innocent Plaintiffs, then the Government must stop inflicting injury on them immediately.  Otherwise, the Government's Catch-22 argument that Plaintiffs can have no Fifth Amendment rights unless they admit to being guilty of something must be rejected.

### 2. There Is No Border Search Exception to the Fifth Amendment Right Against Self-Incrimination

The Government then claims (MTD at 67-69) that the border search exception to the Fourth Amendment justifies violating Plaintiffs' Fifth Amendment rights.  Even assuming the Government's search of Plaintiffs' devices are legal in the first place, *but see* § IX, above, the legality of the search does not justify violating the Fifth Amendment, even incidentally. *U.S. v. Hanon*, 428 F.2d 101, 105 (8th Cir. 1970) ("issue of the legality of the search under the Fourth Amendment is separate and distinct from the issue of whether the evidence seized is self-incriminating"); *Matter of Residence in Oakland, California*, 354 F. Supp. 3d 1010, 1014 (N.D. Cal. 2019) ("[e]ven if probable cause exists to seize devices located during a lawful search based on a reasonable belief that they

belong to a suspect, probable cause does not permit the Government to compel a suspect to waive rights otherwise afforded by the Constitution, including the Fifth Amendment right against self-incrimination").

There is simply no applicable border exception to the Fifth Amendment.  *U.S. v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011); *U.S. v. Pineda*, No. 09-cr-2542, 2010 WL 3034514, at *6 (D. Ariz. July 19, 2010), ("Fifth Amendment right to be free from self-incrimination does not cease to exist at the border") *report and recommendation adopted*, No. 09-cr-2542, 2010 WL 3038723 (Aug. 3, 2010). The only border exception to the Fifth Amendment involves the application of *Miranda* to routine questioning, *U.S. v. Lueck*, 678 F.2d 895, 899 (11th Cir. 1982); *see also U.S. v. Gupta,* 183 F.3d 615, 617 (7th Cir. 1999) (describing routine information as "identity, nationality, business, and claim of entitlement to enter"), when that questioning is not part of a custodial interrogation, *U.S. v. Adams*, 1 F.3d 1566, 1575 (11th Cir. 1993); *Gupta*, 183 F.3d at 617.

Other than citing certain strictly-Fourth Amendment cases inapplicable to the Fifth Amendment, the Government relies (MTD at 69) on cases which purportedly stand for the proposition that "the Supreme Court has also limited the scope of the Fifth Amendment right against self-incrimination in instances where this right has been in tension with administrative or regulatory searches."  The Supreme Court has done nothing of the kind. The primary case the Government cites, *Indianapolis v. Edmond*, 531 U.S. 32, 36 (2000), is a Fourth Amendment case that does not discuss the Fifth Amendment at all.  The other case the Government cites, *U.S. v. Hubbell*, specifically rejected this argument, finding that required compliance with the subpoena at issue violated the Fifth Amendment precisely because it was testimonial in nature.  530 U.S. 27, 35-36 (2000).  Yes, the Supreme Court explained, providing documents that are the "byproduct of obedience to a regulatory requirement" does not violate the Fifth Amendment, although only "to effect the State's public purposes unrelated to the enforcement of its criminal laws."  *Id.* at 35 and

n.17 (quoting in part *Baltimore City Dept. of Social Servs. v. Bouknight*, 493 U.S. 549, 556 (1990)). But there is an exception to that exception when what is being sought requires the communication of testimonial evidence. *Id.* at 36. Here, the Government is not seeking passwords or biometric data as merely the byproduct of a regulatory requirement. Rather, its asserted interest is "related to the enforcement of its criminal laws," and what it seeks is specifically testimonial evidence. *See* § 3, below (the Government does not even deign to argue that providing a password is not testimonial).

The Government sums up its Fifth Amendment argument (MTD at 69) by again conflating the issue presented by the Fifth Amendment with the ones presented by the Fourth Amendment. The Government claims "no court has ever held that the Fifth Amendment 'protects' an individual's 'right' to evade an otherwise lawful border search." *Id.* at 69. But this overreads Plaintiffs' Fifth Amendment claim. Unlike with the Fourth Amendment, the Plaintiffs are not arguing the Fifth Amendment bars the Government from searching the electronic devices. It simply cannot compel testimonial assistance from the Plaintiffs.

### 3.   Biometric Passwords Are Testimonial

Finally, the Government (MTD at 69-70) claims that biometric passwords are not testimonial. This is false. As explained by several courts, this is in large (but not only) part because using biometric information to unlock a cell phone constitutes an admission of "possession, custody, or control" over the device. *In Re Search of white Google Pixel 3 XL cellphone in a black Incipio case*, No. 1:19-MJ-10441-REB, 2019 WL 2082709, at *4 (D. Idaho May 8, 2019); *see also In re Application for a Search Warrant*, 236 F. Supp. 3d 1066, 1073 (N.D. Ill. 2017) ("[w]ith a touch of a finger, a suspect is testifying that he or she has accessed the phone before, at a minimum, to set up the fingerprint password capabilities, and that he or she currently has some level of control over or relatively significant connection to the phone and its contents"); *Matter of Residence in Oakland, California*, 354 F. Supp. at 1016.

XII.   **PLAINTIFFS VOLUNTARILY DISMISS THEIR SECOND AMENDMENT CLAIM (COUNT IX)**

Under Federal Rule of Civil Procedure 41(a)(1)(A)(i), Plaintiffs dismiss their Second Amendment claim without prejudice.

XIII.   **THE GOVERNMENT HAS SUBSTANTIALLY BURDENED PLAINTIFFS' RELIGIOUS EXERCISE IN VIOLATION OF RFRA (COUNTS X-XIII)**

A.   **Religious Questioning Burdens Plaintiffs' Exercise of Religion (Count X)**

"RFRA prohibits the 'Government [from] substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 695 (2014) (quoting 42 U.S.C. §§2000bb–1(a), (b) (emphasis removed).

As the Supreme Court explained in *Hobby Lobby*, whether a practice constitutes a substantial burden is determined solely by looking at whether a RFRA plaintiff believes the practice at issue constitutes a burden on their religion.  *Id.* at 724.  It is not up to the Court to "tell the plaintiffs that their beliefs are flawed," *id.* or "presume to determine ... the plausibility of a religious claim," *id.* (quoting *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990)). So "courts often simply assume that a law substantially burdens a person's exercise of religion when that person so claims." *Legatus v. Sebelius*, 901 F. Supp. 2d 980, 991 (E.D. Mich. 2012) (stringcite omitted).

Asking sectarian questions of individuals as punishment for crossing a border constitutes a substantial burden of Plaintiffs' religion.  *See* 2AC ¶¶ 391, 433, 485, 518, 635, 675, 715, 1034, 1012, 1147-48, 1155, 1238, 1279, 1519. The "inquiry into" an individual's "religious views … is not only unnecessary but also offensive." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (Thomas, J., plurality opinion). And, here, the questioning was hardly neutral, but "disapproving" of religion, making the

questioning a further burden. "A government practice has the effect of impermissibly disapproving of religion if it is 'sufficiently likely to be perceived by nonadherents of the controlling denomination as a disapproval of their individual religious choices." *Isakhanova v. Muniz*, No. 15-cv-03759, 2016 WL 1640649, at *6 (N.D. Cal. Apr. 26, 2016) (cleaned up); *see also U.S. v. Ramon*, 86 F. Supp. 2d 665, 667 (W.D. Tex. 2000) (border patrol's targeting of individuals based on their display of religious beliefs "imposes a substantial burden upon the faithful who wish to proclaim their beliefs" and "casts too wide a net, and the Court urges the Border Patrol to concentrate on other factors more strongly corroborative of criminal activity").

The Government relies on *Cherri*, 951 F. Supp. 2d at 922 and 926. Plaintiffs believe *Cherri*— which has yet to be appealed to the Sixth Circuit due to the Court allowing the equal protection claim to proceed, *id.* at 937—was wrongly decided as it relates to religious freedom. *See* Allison Hugi, *A Borderline Case: The Establishment Clause Implications of Religious Questioning by Government Officials*, 85 U. Chi. L. Rev. 193, 223 (2018). But that is of no moment. As the Government has helpfully blockquoted (MTD at 81), *Cherri*'s substantial burden analysis turned on specific pleading deficiencies in that case not present here:

> Plaintiffs have not alleged that such questioning requires them to affirm or deny a belief that is contrary to their faith, or to choose between following tenets of their faith and receiving an important government benefit. Nor have plaintiffs alleged that the Government has sought to impose civil or criminal sanctions on religiously motivated conduct.

951 F. Supp. 2d at 935.  The Plaintiffs here, in contrast, have alleged that such questioning requires them to affirm or deny a belief that is contrary to their faith, or to choose between following tenets of their faith and receiving an important government benefit.  2AC ¶¶ 1663.  Plaintiffs have also alleged "that the Government has sought to impose civil or criminal sanctions on religiously motivated conduct.  2AC ¶ 1662. So even under *Cherri*, Plaintiffs' RFRA claim survives.

**B.  Burdening Plaintiffs' Umrah, Hajj, and Religious Leadership Restricts Plaintiffs' Exercise of Religion  (Count XI)**

Count XI, on behalf of Plaintiffs Sulayman and Siddiqui only, alleges that their travel restrictions due to the watchlist substantially burdens their religious practice. *See* 2AC ¶ 1671. Plaintiff Sulayman, a local imam (religious leader) separately alleges that "Defendants' actions have also damaged [his] standing in his community thereby jeopardizing his ability to lead congregations in the future." *Id.*

The Government contends that putting someone on a watchlist in a manner that burdens their religious travel does not constitute a RFRA violation.  MTD at 82-83. For the most part, this is a repeat of the Government's claim that Plaintiffs have not asserted infringement on travel-related liberty and should be denied for the same reasons.  *See* § IV(A), above. Except, unlike the travel-related liberty inquiry, the Court's inquiry into the existence of a substantial burden is extremely deferential to Plaintiffs' subjective opinion that the challenged practice constitutes a substantial burden onPlaintiffs' sincere religious beliefs.  All RFRA requires is a substantial burden on religious exercise.  *Hobby Lobby*, 573 U.S. at 724; *Smith*, 494 U.S. at 887; *Legatus*, 901 F. Supp. 2d at 991; *see* § A, above.

Thus, it is enough that Sulayman has alleged that the Government's "burdensome, stigmatizing, and public screening process … is discouraging [him] from engaging in umrah." 2AC ¶ 1671. It is also enough that Saddiqui alleges that he "desires to perform hajj" for religious reasons but has been dissuaded not to "out of fear of the terrorist scrutiny and treatment he would receive by Defendants." 2AC ¶ 1672.  The Government may scoff, suggesting Siddiqui and Sulayman's fears of travel are belied by their willingness to travel for other reasons, but RFRA does not require the Government to prohibit religious exercise, merely burden it.  Once again, "[i]t is not up to the Court to "tell the plaintiffs that their beliefs are flawed," *Hobby Lobby*, 573 U.S. at 724 or "presume to determine ... the plausibility of a religious claim," *Smith*, 494 U.S. at 887. At most, the Government's

querying into the factual accuracy of the substantial burden allegations is premature at the Motion to Dismiss stage.

The Government does not directly address Sulayman's separate allegation that his watchlist status has burdened his ability to act as an imam. To the extent the Government questions whether being on a government watchlist seriously affects his ability to be a religious leader, that challenge to the substantial burden's "plausibility" has been foreclosed by *Hobby Lobby* and *Smith*. And of course, the allegation is plausible, as the community has become aware of Sulayman's watchlist status, 2AC ¶¶681, 686-89, 693, 697, which causes a stigmatizing effect, 2AC ¶ 715, particularly as his congregation fears what a religious relationship with Sulayman might mean for their freedom and privacy, *id.*

### C.   Watchlisting Plaintiffs to Coerce them to Become Government Informants Burdens Plaintiffs' Exercise of Religion (Count XII)

The Government separately alleges that Plaintiffs Hall and JD2 cannot show RFRA violations based on informant pressure.  MTD at 83-84. According to the Government, since acting as an informant was "voluntary," *id.*, Plaintiffs' refusal to do so does not affect their religious beliefs. But as the Complaint made clear, Hall and JD2 refused to do so because of their religious beliefs. 2AC ¶¶ 1686-87.  When the state puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs," the government substantially burdens the adherent's religion. *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981). The "imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." *Sherbert v. Verner*, 374 U.S. 398, 404 (1963).

That the Government was willing to trade Plaintiffs' status on the watchlist for him becoming a government informant constitutes punishment to the extent, as Plaintiffs alleges, the Government did not have a right to put him on the list in the first instance.  *See* 2AC at Counts I-III and XIV. And Plaintiffs alleges that the Government in fact uses TSDB and No Fly List placement

as a pretext to coerce adherents to act as an informant.  2AC ¶¶ 83, 376, 794-96, 935-36.  This pressure constitutes an undue burden on Plaintiffs' religion, and thus violates RFRA.  Whether Plaintiff submitted to this pressure or not does not affect the RFRA violation.  *See generally Tanvir v. Tanzin*, 894 F.3d 449 (2d Cir. 2018) (finding Plaintiffs' RFRA damages claim for keeping plaintiffs on watchlist in retaliation for not acting as RFRA proper, subject to potential qualified immunity); *Mack v. Warden Loretto FCI*, 839 F.3d 286, 301 (3d Cir. 2016) (plaintiff stated RFRA claim for officers' punishing and harassing him for his religious practice); *United States v. Christie*, 825 F.3d 1048, 1055 (9th Cir. 2016) ("If a person has a sufficiently realistic fear that the government is going to punish him for exercising his religious beliefs in defiance of the law, he may unsheathe RFRA and file a preemptive strike in an effort to subdue the government before it treads further").

### D.   Providing Jessup Prison Elamin's Watchlist Status with the Intent to Bar Elamin from Volunteering as a Chaplain Burdens Elamin's Religion (Count XIII)

The Government has substantially burdened Plaintiff Elamin's religious rights to proselytize by placing him on the watchlist and making him ineligible to volunteer as a chaplain at Jessup Correctional Institution.  2AC ¶¶ 1423-26.  According to the complaint, the Government purposely disclosed Elamin's watchlist status to Jessup Prison for the purpose of denying him access to Jessup in order to act as a Chaplain.  2AC ¶¶ 1699.  For the reasons explained in Sections A-C, *above*, this substantially burdens Elamin's RFRA-protected rights.

The Government makes two arguments against Elamin's RFRA claim.

The first argument made by the Government (MTD at 77-79), is that no federal policy "required" Maryland to bar Plaintiff from volunteering at Jessup Correctional Institution.  But the Complaint alleges that the Government's watchlist-related disclosures contributed to Plaintiff's denial of access, as intended.  2AC ¶¶ 1423-26 and 1699.  After all, it is for the specific reason of denying Elamin access that the federal government shares the TSDB information with correctional

facilities. *Cf. Presault v. U.S.*, 100 F.3d 1525, 1551 (Fed. Cir. 1996) (en banc) ("when the Federal Government puts into play a series of events which result in a taking of private property, the fact that the Government acts through a state agent does not absolve it from the responsibility, and the consequences, of its actions"). This contribution constitutes a substantial burden on Plaintiff Elamin's religious exercise of acting as a prison chaplain.

The Government cites one case in support of its no-responsibility argument, *Frank Krasner Enterprises. Montgomery County*, 401 F.3d 230, 234 (4th Cir. 2005). But that case was not a RFRA case, and the question was whether the Government caused a specific constitutional injury. Here, the question is only whether the Government's actions "substantially burdened" Plaintiffs' rights. Allowing the Government to avoid liability by pointing its finger at Maryland—when, if sued, Maryland would simply point the finger right back to federal watchlist instructions—is a guess-which-hand-the-coin-is-in parlor trick that the law does not permit. *Presault*, 100 F.3d at 1551 ("It would be absurd to deny the Presaults their Constitutional rights on the grounds that the State has concluded it was the Federal Government who did it, and the Federal Government has concluded it was the State. In sum, the Government cannot now point its finger at the State and say 'they did it, not us.'").

The second argument made by the Government (MTD at 83-84) is that the Government has a compelling justification to substantially burden Elamin's religion by barring him from volunteering as a chaplain. But, as explained in Section E, below, the Government's compelling interest defense is an affirmative defense, not appropriate for resolution at the motion to dismiss stage. The cases the Government cites, *O'Malley v. Brierley*, 477 F.2d 785, 793-94 (3d Cir. 1973) (a pre-RFRA case), and *Heap v. Carter*, 112 F. Supp. 3d 402, 422 (E.D. Va. 2015), were decided at the summary judgment stage based on the facts of those cases. The Government will have to wait until summary judgment

here, as well, to argue that the ineffective watchlist provides a compelling need to specifically bar Elamin from his religious duties.

### E.   The Government Cannot Show at the Motion to Dismiss Stage a Compelling Interest or Least Restrictive Means

As explained by the Supreme Court, "RFRA prohibits the 'Government [from] substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability' unless the Government 'demonstrates that application of the burden to *the person*— (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Hobby Lobby,* 573 U.S. at 705 (quoting 42 U.S.C. §§ 2000bb–1(a), (b)) (emphasis original).   If there is any "viable" less restrictive manner of accomplishing the same end, the Government cannot meet its burden. *Id. at* 728.   Nor do higher costs or inconveniences to the Government show that a less restrictive alternative is not viable.  *Id.* at 729. Indeed, even an alternative that will require the creation of an entirely new Government program remains viable.  *Id.*

The Government alleges (MTD at 84-86) that, for national security reasons, it has a compelling interest in the watchlisting system as currently enacted, and that the system uses the least restrictive means.  This is an extremely high burden to meet.  *Hobby Lobby,* 573 U.S. at 705.  The Government would have to establish not only a compelling interest in a watchlist that is entirely ineffective in promoting national security, *see* 2AC ¶¶ 177-190, but that every component of the watchlisting system is narrowly tailored to do the least amount of harm and interference to each individual Plaintiffs' religious beliefs.  Even if the Government could make this showing at trial, it cannot do so at the motion to dismiss stage.  *St. John's United Church of Christ v. Chicago*, 502 F.3d 616, 646 (7th Cir. 2007) ("accepting the City's [narrowly-tailored-to-meet-a-compelling-interest] assertions at this stage in the litigation is inconsistent with our obligation when reviewing a motion to dismiss").

The Government also states that it has not waived sovereign immunity under RFRA for damages claims against officers in their official capacity.  MTD at 88.  Plaintiffs do not assert damages claims under RFRA against any of the Defendants in their official capacity.

## XIV.  THE GOVERNMENT HAS NO CONGRESSIONALLY-DELEGATED AUTHORITY FOR THE WATCHLIST (COUNT XIV)

Plaintiffs also bring a nondelegation claim. 2AC ¶¶ 1707-18. To be fair, this is not a typical nondelegation claim, in which there is a statute authorizing the creation of a massive, far-reaching, and highly-consequential terrorist watchlist, but did not provide an intelligible principle. Instead, Congress has not authorized the TSDB at all. *Id.* at ¶ 1709. In that sense, the nondelegation claim dovetails with Plaintiffs' APA claim, *id.* at ¶ 1594, *see also* § VI, above, in that the watchlist (regardless of whether it is otherwise constitutional) and its impact was legislatively enacted by the executive without statutory authority

The Government (MTD at 88-90) cites to several statutory provisions passed by Congress that assumes the existence of a national terrorism database. *See, e.g.*, 49 U.S.C. § 114(h)(1); 49 U.S.C § 44903(j)(2)(C)(ii). But the Government does not cite to—and Plaintiffs are not aware of—any legislative authority for the Government to create the watchlist in the first place.  Thus except for two specific circumstances inapplicable to any of Plaintiffs' allegations,[14] Congress has provided the Executive with neither statutory authorization for creating the watchlist nor intelligible principles on how to develop the watchlist. Congress provided no instructions as to what constitutes a sufficient risk to national security to justify the deprivation of rights the TSDB causes, what standards should

---

[14]  *See* 49 U.S.C § 44903(j)(2)(C)(v) ("The Administrator, in coordination with the Terrorist Screening Center, shall include on the No Fly List any individual who was a detainee held at the Naval Station, Guantanamo Bay, Cuba, unless the President certifies in writing to Congress that the detainee poses no threat to the United States, its citizens, or its allies."); *see also* 46 U.S.C. § 70101, note (DHS instructed, in context of cruise ships only, to "develop guidelines, policies, and operating procedures for the collection, removal, and updating of data maintained, or to be maintained, in the 'no transport' and 'automatic selectee' lists described in subsection (a)(1) that are designed to ensure the accuracy and integrity of the lists.")

govern factual determinations placing a person on the list, whether it is appropriate to discriminate specifically against Muslims and focus exclusively on so-called "Islamic terrorism" in compiling the list, or what procedural processes should be put in place in order to protect the rights of individuals nominated to the list, including, as this case shows, United States citizens. Indeed, in the Intelligence Reform and Terrorism Prevention Act of 2004, PL 108–458, December 17, 2004, Congress asked DHS to provide this information *to Congress*, demanding "(A) the criteria for placing the name of an individual on the watch list, (B) the minimum standards for reliability and accuracy of identifying information, (C) the degree of information certainty and the range of threat levels that are to be identified for an individual; and (D) the range of applicable consequences that are to apply to an individual, if located."  49 U.S.C. § 44909(c)(2).

Other than the two inapplicable provisions in 49 U.S.C § 44903(j)(2)(C)(v) and *also* 46 U.S.C. § 70101 that are described in footnote 14 above, the Terrorist Screening Center (*see* 2AC ¶¶ 59, 93, 120, 124-25, 141-46, 185, 209, 212, 226) appears in only one other place in the entirety of the (unannotated) United States Code.  In 6 U.S.C. § 621(10), a provision providing for definitions for Chemical Facility Anti-Terrorism Standards, Congress defines "terrorist screening database" as meaning "the terrorist screening database maintained by the Federal Government Terrorist Screening Center or its successor." Nothing else in Title VI—or elsewhere—provides for creation of the "terrorist screening database" or sets standards to guide its contours.  Instead, the only two relevant instances of that term merely require vetting against the database.  *See* 6 U.S.C. §§ 488a and 622. The Terrorist Screening Center itself has never been authorized by Congress, either.

The Watchlist Advisory Council has also not been authorized by Congress.  (see 2AC ¶¶ 57, 82, 106, 118 and Ex. 1). Indeed, the Watchlist Advisory Council is not mentioned *anywhere* in the United States Code. It was created by the Executive Branch because Congress, having not created the watchlist, neither assigned its responsibility to any of the number of agencies its tentacles have

come to reach nor created any standards for its operation.  Instead, the various executive branch power brokers have come together to sort this whole thing out on by consensus.  This is exactly the type of legislating authority the Constitution restricted to Congress under Article I.

So while Congress may have acknowledged the existence of the Terrorist Screening Center and the TSDB, it has never authorized them. As far as Plaintiffs are aware, Congress has also not authorized its extensive and damaging use at land borders, where CBP justifies placement on the list as grounds for detentions for up to ten hours, as well as the searching and seizing of phones and other electronics.  *See* §§ IV(A) and IX-XI, above.  This whole watchlisting enterprise has been invented out of whole cloth by the Executive Branch.  Congress cannot have provided the Government with any intelligible principle to guide this invented endeavor. This lack of delegation separately constitutes a violation of the Administrative Procedures Act, in that the TSDB—as well as many of its components, including the CBP's usage and participation—are wholly without any statutory authorization.  2AC ¶ 1594 and Count III; *see also* § VI, above.

## CONCLUSION

The Government's Motion to Dismiss should be denied.

June 13, 2019

CAIR LEGAL DEFENSE FUND

BY:    */s/ Lena F. Masri*
LENA F. MASRI (20251) ‡
GADEIR I. ABBAS (20257) ‡ *
JUSTIN SADOWSKY (DC: 977642) #
CAROLYN M. HOMER (20409) ‡
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 488-8787

CAIR-FLORIDA
THANIA DIAZ CLEVENGER (FL # 97301) α
OMAR SALEH (FL # 91216) α
8076 N. 56th Street
Tampa, FL 33617

Phone: (813) 514-1414

CAIR-MICHIGAN
AMY DOUKOURE (MI # P80461) α
30201 Orchard Lake Road, Suite 260
Farmington Hills, MI 48334
Phone: (248) 559-2247

CAIR-NEW YORK
AHMED MOHAMED (NY # 5536701)  α
46-01 20th Avenue
Queens, NY 11105
Phone: (646) 665-7599

PASTOR & ASSOCIATES, P.C.
CARIDAD PASTOR CARDINALE (20435) ‡
525 E. Big Beaver Road Suite 206
Troy, Michigan 48083
Phone: (248) 619-0065

‡ Admitted to practice in this Court

# Admission to this Court pending

α Admitted *Pro Hac Vice*

*Mr. Abbas is licensed in VA, not in D.C. Practice
limited to federal matters.

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 13, 2019, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification to all counsel of record.

*/s/ Lena F. Masri*