**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division**

| | | |
|---|---|---|
| RAMI KHALED EL ALI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 8:18-cv-2415 (PX) |
| | ) | |
| WILLIAM BARR, et al.,[1] | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' RENEWED MOTION
TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION
AND FOR FAILURE TO STATE A CLAIM**

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Defendants substitute Kenneth T. Cuccinelli as Acting Director of U.S. Citizenship and Immigration Services; Kevin K. McAleenan as Acting Secretary of the U.S. Department of Homeland Security; and Matthew T. Albence as Acting Director of U.S. Immigration and Customs Enforcement.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

ARGUMENT ..............................................................................................................................1

I.      Plaintiffs Lack Standing against the Majority of the Putative Defendants. ..................1

II.     All Claims Brought by Plaintiff Khaled El Ali and His Son Rami Must Be Dismissed. ...........2

III.    Plaintiffs Lack Standing to Pursue Any Relief As to Several Purported Harms........................4

        A.      Military Base Access, TWIC Credentials, and TSA Travel Benefits .............................4

        B.      Firearm Purchases ...........................................................................................5

IV.     Challenges to the Adequacy of DHS TRIP and TSA Enhanced Screening Policies and Procedures Must Be Dismissed for Lack of Jurisdiction. ............................................5

V.      Numerous Plaintiffs' Claims are Unripe or Untimely..............................................7

VI.     Count I (Procedural Due Process) Should Be Dismissed............................................8

        A.      Travel Delays Are Not A Deprivation of the Right to Travel......................................8

        B.      The No Fly List Plaintiffs Have Not Pled a Deprivation of the Right to Travel. ......12

        C.      Plaintiffs Have Failed to Plead a Stigma-Plus Claim......................................13

        D.      The Redress Process is Constitutionally Adequate..........................................18

VII.    Count II (Substantive Due Process) Should Be Dismissed. ......................................18

VIII.   Count V (Equal Protection) Should Be Dismissed.....................................................20

IX.     Count III (APA-DHS TRIP) Should Be Dismissed.....................................................21

X.      Count IV (APA-NCIC) Should Be Dismissed. .............................................................22

        A.      Plaintiffs Lack Standing to Pursue the Relief They Seek in Count IV. ......................22

        B.      The Inclusion of the KST File in the NCIC Is Lawful......................................23

i

XI.    Count VI (Fourth Amendment) and Count VIII (Fifth Amendment: Self-Incrimination) Should be Dismissed.................................................................................................25

    A.    Plaintiffs Lack Standing to Pursue Injunctive Relief as to Either Claim.....................25

    B.    Count VI Also Fails to State a Claim..........................................................................26

        1.    Plaintiffs Have Abandoned Any Argument that a Warrant or Probable Cause Is Required to Conduct a Border Search. .............................26

        2.    Manual Searches Are Routine Searches Requiring No Suspicion...................27

        3.    The CBP Directive Complies with *Kolsuz.* .........................................................28

    C.    Count VIII Likewise Fails to State a Claim..................................................................33

        1.    Plaintiffs Have Not Pled Any "Substantial and Real" Threat of Incrimination. .................................................................................................33

        2.    The Border Search Exception Permits the Government to Require that Electronic Devices Be Presented in a Manner Allowing for Their Inspection...........................................................................................................34

        3.    At Minimum, Biometric Passwords are Not "Testimonial."..........................35

XII.    Count VII (First Amendment) Should Be Dismissed. ..................................................35

XIII.    All RFRA Claims (Counts X, XI, XII, and XIII) Should Be Dismissed. ...................38

    A.    Plaintiff Elamin Lacks Standing to Pursue His RFRA Claim (Count XIII). ...............38

    B.    All RFRA Claims Should Be Dismissed for Failure to State a Claim..........................38

        1.    None of the RFRA Claims Adequately Allege a Substantial Burden.............38

        2.    Plaintiffs Otherwise Fail to State a RFRA Claim. ...............................................43

XIV.    Count XIV (Non-Delegation/Ultra Vires) Should Be Dismissed..............................43

CONCLUSION...................................................................................................................45

## INTRODUCTION

The 9/11 Commission identified the Government's information-sharing as a key failure in the months leading up to the catastrophic terrorist attacks and recommended sweeping changes to how the Government handles terrorism information. The President directed the establishment of the Terrorist Screening Center ("TSC"), and authorized the consolidation of existing watchlists into the Terrorist Screening Database ("TSDB"), and Congress has specifically required the screening of air passengers against the TSDB. The judgment of the Executive Branch, consistent with the mandate of Congress, is that the watchlisting system is appropriately calibrated to detect, track, deter, and disrupt terrorist activities, while protecting civil liberties. For the reasons set forth in detail in Defendants' opening memorandum, Dkt. No. 49-1 ("MTD"), and again below, the overwhelming weight of authority in the watchlisting area favors dismissal of each of the constitutional and statutory challenges raised here. Accordingly, the Court should dismiss the Amended Complaint in its entirety.

## ARGUMENT

I.  **Plaintiffs Lack Standing against the Majority of the Putative Defendants.**

As a preliminary but highly significant matter, Plaintiffs have improperly named numerous putative Defendants against whom they patently lack standing to pursue any claim. The only Defendants properly before this Court on the claims alleged are TSA, FBI, TSC, NCTC, DHS, CBP, and ICE. All remaining named Defendants (the "putative Defendants")[2] should be dismissed from this suit, as the injuries that Plaintiffs allege were neither caused *by* these Defendants, nor may their alleged injuries be redressed *through* these Defendants.

Plaintiffs' theory of standing as to the putative Defendants is premised solely on their participation in the Watchlisting Advisory Council ("WLAC"). But the WLAC is not, as Plaintiffs speculate, an "agency," nor does it "promulgate" anything. Defendants' Exhibit ("DEX") H, Declaration of Timothy Groh ("Groh Decl.") ¶ 3. To the contrary, the WLAC is simply a forum, in which participating agencies gather to discuss and address watchlisting-related issues. *Id.. See* MTD p.

---

[2] *See* MTD p. 18 fn. 10 for a complete list of the putative Defendants.

1

19-20; Groh Decl. ¶¶ 6-7 (explaining that after review by the National Security Council, the Watchlisting Guidance "becomes US Government policy by operation of WLAC members agreeing, pursuant to their individual legal authorities, to follow the guidance and instructions set forth therein"). Thus, no WLAC member possesses any "veto" power over any other agency's choices and actions; nor do any of the putative Defendants have "authority to enforce" the policies underlying Plaintiffs' alleged injuries, as necessary for Plaintiffs to establish standing. *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014); *see* MTD p. 20-21.

Further, although Plaintiffs disclaim reliance on their own exhibits, *see* Plaintiffs' Opposition, Dkt. No. 52 ("Opp.") p. 5 n.4, these documents do not, in any event, alter the above analysis. According to Plaintiffs, the cited deposition testimony establishes that "the WLAC, working with the National Security Council, can order agencies like the TSC what to do." *Id.* p. 5. Mr. Groh's testimony stated no such thing. Indeed, when asked whether the WLAC could "tell the [TSC] what to do," Mr. Groh explained that, in the event that the WLAC agencies cannot reach consensus, any such disagreements "would be resolved through the National Security Council," pursuant to the process set forth in National Security Presidential Memorandum 4 ("NSPM-4," *available at* https://www.whitehouse.gov/presidential-actions/national-security-presidential-memorandum-4/ (last visited July 11, 2019); DEX N (additional excerpts of Groh testimony) at 43:20-45:22. Thus, far from bolstering Plaintiffs' case, the cited testimony only serves to disprove Plaintiffs' unfounded allegations regarding the "veto" power purportedly exercised by each WLAC agency over the others. In such circumstances, Plaintiffs cannot establish any lines of causation or redressability to any of the putative Defendants, each of whom should be dismissed from this suit for lack of standing.

## II.     **All Claims Brought by Plaintiff Khaled El Ali and His Son Rami Must Be Dismissed.**

Plaintiff Khaled El Ali and his son Rami Khaled El Ali's claims must be dismissed in their entirety: the former is a Belgian national living in Belgium, who cannot invoke any constitutional rights, and the latter alleges no travel difficulties whatsoever.

Plaintiffs argue that Khaled El-Ali has standing to bring his claims, even though he is an alien living abroad whose only ongoing injury is the denial of a visa. *See* Opp. p. 6-7. But the Supreme Court has "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (citing *Johnson v. Eisentrager*, 339 U.S. 763 (1950)). Indeed, the Court found that "our rejection of extraterritorial application of the Fifth Amendment was emphatic." *Id.*; *see also Rafeedie v. I.N.S.*, 880 F.2d 506, 522 (D.C. Cir. 1989) ("[I]n defining an alien's right to due process, the Supreme Court is concerned with whether he is a permanent resident").

Moreover, Khaled El-Ali's only ongoing injury is the denial of his visa. Article III bars him from seeking redress that would not remedy this injury, and the law is clear that he may not seek review of the denial of his visa. *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999). Plaintiffs aver that consular nonreviewability does not apply here because this is a challenge to the TSDB policy as a whole, not a challenge to an individual consular determination. *See* Opp. p. 7. But Plaintiff cannot evade non-reviewability by purporting to challenge broader policy when his only ongoing injury is his visa denial.  *See Matushkina v. Nielsen*, 877 F.3d 289, 295 (7th Cir. 2017) ("Courts have applied the doctrine of consular nonreviewability even to suits where a plaintiff seeks to challenge a visa decision indirectly."). Plaintiffs also misread *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 757 (4th Cir. 2013), which found that the plaintiff's claim *was not* redressable, because redress would rely on independent actions of a third party. *See id.* at 757 (procedural due process challenge of convicted sex offender was not redressable because even if the court ordered the school board to implement new procedures, state law still required her to petition a Virginia state court for entrance onto school grounds). Similarly here, redress for Khaled El-Ali relies on the independent action of the consular officer who refused his visa application, over which this court does not have jurisdiction. This Court must therefore dismiss his claims.

Nor may Khaled El-Ali remain in this suit on the basis of any *other* Plaintiff establishing standing, as Plaintiffs appear to contend. *See* Opp. p. 4. "[S]tanding is not dispensed in gross," and "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). Thus, "the standing inquiry requires careful judicial examination of ... whether the *particular plaintiff* is entitled to an adjudication of the *particular claims* asserted," *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 556 (S.D.N.Y. 2018) (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984) (emphasis in original), *judgment aff'd*, --- F.3d ---, 2019 WL 2932440 (2d. Cir. July. 9, 2019); *see also*, *e.g.*, *Pagan v. Calderon*, 448 F.3d 16, 26 (1st Cir. 2006). In accord with these well-established principles, dismissal of Khaled Ali from this suit is required.

In addition, all claims of Rami El-Ali must also be dismissed. He has no standing to bring his own travel-related claims because he has not alleged any travel difficulty whatsoever.  Moreover, his father's allegations do not allow him to *state a claim*, because has not alleged any facts that would suggest that the reason for Khaled El-Ali's visa denial was anything less than "facially legitimate and bona fide." *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 591 (4th Cir.), *vacated and remanded sub nom. Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017).  Indeed, even the vacated *International Refugee Project v. Trump* case, upon which Plaintiffs rely, recognized that plaintiffs must "have seriously called into question whether the stated reason for the challenged action was provided in good faith" for review to proceed. *Id.* Thus, even under that vacated case's rubric, Rami Ali has not stated a claim.

III.   <u>**Plaintiffs Lack Standing to Pursue Any Relief As to Several Purported Harms**</u>.

A.   <u>**Military Base Access, TWIC Credentials, and Trusted Traveler Status**</u>

Plaintiffs concede that several of their alleged injuries are not legally cognizable. Specifically, they clarify that "[n]one of the Plaintiffs are asserting an affirmative right"—because none, concededly, exists—"to military base access, TWIC credentials, or approval for TSA Precheck [or] Global Entry." Opp. p. 8-9; *see* MTD p. 21-22. Plaintiffs nonetheless assert, without explanation, that their allegations on these subjects somehow remain relevant to their "challeng[e] to the Government

4

watchlist generally." *Id.* p. 9. To the contrary, because this Court lacks authority to redress these alleged injuries, it necessarily follows that Plaintiffs lack standing to pursue any claim for relief premised (either in whole or in part) on these purported harms.

**B.**   **Firearm Purchases**

Plaintiff Abdurrashid is the only party to make any allegation respecting firearm purchases and Plaintiffs have voluntarily dismissed the Second Amendment claim (Count IX). Opp. p. 56. Notwithstanding this dismissal, Plaintiffs' Opposition is replete with references to Plaintiffs' purportedly "constrain[ed]" "right to purchase firearms[.]" *Id.* p. 1; *see also id.* p. 4, 22, 23. Where Plaintiffs have affirmatively withdrawn their Second Amendment claim, any vestigial allegations regarding firearms cannot be entertained by the Court.

**IV.**   **Challenges to the Adequacy of DHS TRIP and TSA Enhanced Screening Policies and Procedures Must Be Dismissed for Lack of Jurisdiction.**

As Defendants have explained, *see* MTD p. 26-29, three categories of Plaintiffs' claims are jurisdictionally barred by 49 U.S.C. § 46110 ("Section 46110"): (1) their procedural due process challenge to the adequacy of DHS TRIP (Counts I and III), (2) any claim(s) challenging particular security measures authorized by Congress and chosen by TSA to ensure aviation security (including, but not limited to, the claims of the Family Member Plaintiffs challenging the Quiet Skies and Silent Partner programs);[3] and (3) all claims that are "inescapably intertwined" with orders that fall within Section 46110's jurisdictional bar (Counts I, II, III, V, and XI).

Plaintiffs attempt to evade Section 46110's channeling by arguing that Counts I and III do not challenge the adequacy of DHS TRIP but rather alleged placement on a watchlist by TSC. Opp. p. 9. This argument confuses Plaintiffs' procedural due process claim with their separate substantive due process claim.[4] "In procedural due process claims, the deprivation by state action of a constitutionally

---

[3] Indeed, Plaintiffs do not even raise any arguments as to this second category, making dismissal of all Family Member Plaintiffs appropriate for failure to bring their claims in an appropriate U.S. Court of Appeals.

[4] *See, e.g., Michael H. v. Gerald D.,* 491 U.S. 110, 119-21 (1989) (rejecting the plaintiff's procedural due process argument that he was entitled to a hearing to demonstrate his paternity before he could be denied parental status pursuant to a state statute because he was really challenging the fairness of the law's substantive standard, "not the adequacy of procedures" provided); *Reno v. Flores,* 507 U.S. 292, 308 (1993) (plaintiffs' argument that an

protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon v. Burch,* 494 U.S. 113, 125 (1990) (emphasis in original). In contrast, a "violation of 'substantive' due process occurs only where the government's actions in depriving a person of life, liberty, or property are so unjust that no amount of fair procedure can rectify them." *Love v. Pepersack*, 47 F.3d 120, 123 (4th Cir. 1995). Because Plaintiffs' procedural due process claims, by definition, challenge the adequacy of the available redress *procedures*, which have been established by TSA regulation, this claim constitutes "a challenge to a TSA order." *Mokdad v. Lynch,* 804 F.3d 807, 811 (6th Cir. 2015). Accordingly, Section 46110 channels exclusive jurisdiction over the procedural due process claim to the Courts of Appeals. *See Latif v. Sessions*, No. 3:10-cv-750-BR, 2017 WL 1434648, at *6-9 (D. Or. April 21, 2017), *appeal filed sub nom Kariye v. Whitaker*, 2017 WL 143648 (9th Cir. Aug. 8, 2017); *Kadura v. Lynch*, No. 14-13128, 2017 WL 914249, at *5 (E.D. Mich. Mar. 8, 2017) ("Any challenge to the DHS TRIP redress process should be raised with the appropriate appellate court pursuant to 49 U.S.C. § 46110.").

In resisting the controlling effect of Section 46110, Plaintiffs rely principally on *Mohamed v. Holder*, No. 11-1924 (4th Cir. May 28, 2013) (DEX I), where the Fourth Circuit, in an unpublished order, held that an action seeking removal from the No Fly List and challenging the adequacy of redress procedures was properly before the district court, because a remedy would involve both TSA and the TSC. Because this decision was unpublished, it is not, as Plaintiffs assert, "binding" on this Court. But in any event, as Defendants have explained, unlike Mr. Mohamed at the time of the appeal, Plaintiffs have joined TSA as a party, directly challenge the *procedures* devised and applied by TSA in the redress process, and most Plaintiffs have pursued redress through DHS TRIP. Additionally, with respect to the No Fly Plaintiffs, the *Mohamed* order is inapposite because it only pertains to the *former* redress process for individuals on the No Fly List, which have since been substantially revised.

---

immigration procedure was "unconstitutional because it does not require [a] ... determin[ation] in the case of each individual alien juvenile that detention in [government] custody would better serve [the alien's] interests than release to some other 'responsible adult[ ]' ... is just [a] 'substantive due process' argument recast in 'procedural due process' terms").

**V.      Numerous Plaintiffs' Claims are Unripe or Untimely.**

As numerous Courts have held in analogous circumstances, Plaintiffs should be required to go through the redress process available to them before they challenge its adequacy.[5] *See Shearson v. Holder*, 725 F.3d 588 (6th Cir. 2013); *Amiri v. Nielsen*, 328 F. Supp. 3d 761, 769 (E.D. Mich. 2018); *Mokdad v. Holder*, No. 13-cv-12038, Order, Dkt. 43 (E.D. Mich. Dec. 16, 2015); *see also Latif v. Holder*, No. 3:10-cv-750-BR, Dkt. No. 152 (D. Or. Oct 3, 2014); *Fikre v. FBI*, No 3:13-cv-899, Dkt. 57 (D. Or. Jan 14, 2015); *Tarhuni v. Holder*, No. 3:13-cv-001, Dkt. 79, 86 (D. Or. Oct. 3, 2014).[6]

Particularly in the circumstances of this case, requiring exhaustion would serve the "twin purposes of protecting administrative agency authority and promoting judicial efficiency" that the ripeness doctrine is meant to support. *McCarthy v. Madigan*, 503 U.S. 140, 144-45 (1992), *superseded by statute on other grounds, as recognized in Garrett v. Hawk*, 127 F.3d 1263 (10th Cir. 1997). First, requiring exhaustion would provide the agency with the opportunity to redress the very harms about which Plaintiffs complain without the need for judicial intervention. *See* MTD p. 11-12 (describing redress through DHS TRIP). Second, dismissal for exhaustion purposes presents no harm to those Plaintiffs because the dismissal of their claims would be without prejudice. Third, completing the redress process may create a record for judicial review of the adequacy of the redress process. *See, e.g.*, DEX K, Order, *Latif v. Lynch*, No. 3:10-cv-750-BR (reviewing *ex parte in camera* record from DHS TRIP and determining that the revised redress procedures were adequate as applied). Given the large number of Plaintiffs in this suit, each with different factual allegations and alleged harms, dismissing those Plaintiffs who have not availed themselves of the DHS TRIP process is appropriate.[7]

---

[5] In addition, failure to avail oneself of available procedures is fatal to a procedural due process claim, so as to these plaintiffs, that claim should be dismissed. See *Mora v. City of Gaithersburg*, 519 F.3d 216, 230 (4th Cir. 2008).

[6] Plaintiffs' attempt to discount these holdings by claiming that they were not actually decisions requiring exhaustion, *see* Opp. p. 14, is meritless. That the courts in *Latif*, *Tarhuni*, *Fikre* and *Mokdad* required Defendants to complete their consideration of redress inquiries that plaintiffs initiated underscores that these courts insisted upon completion of the process before judicial review.

[7] Cases cited by Plaintiffs do not compel a different result. In *Kovac v. Wray*, the plaintiff had already filed for DHS TRIP and had been told he was on the No Fly List. *See* 363 F. Supp. 3d 721, 745 (N.D. Tex. 2019). The courts in *Crooker* and *Mohamed* declined to require exhaustion in unique circumstances not applicable here. *See Crooker v. TSA*, 323 F. Supp. 3d 148, 157 (D. Mass. 2018) (*pro se* plaintiff not required to exhaust where he was

Plaintiffs also contend that the claims of all Plaintiffs are timely even though there are Plaintiffs whose claims accrued longer than six years before filing this suit. Opp. p. 15-16. But federal law provides that a "civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). Plaintiffs contend that because they have stated a "continuing deprivation," they may ignore this statutory mandate. But none of the cases they cite in support of this proposition were brought against the federal government, and therefore do not implicate this statutory provision at all. This statute applies a jurisdictional prerequisite to suit. *See Calcutt v. U.S.*, No. CIV. H-98-2108, 1998 WL 851358, at *5 (D. Md. Oct. 30, 1998). Plaintiffs further argue that they only could have known that their claims accrued after "repeated, continuous, and ongoing" issues, and that for this reason, the statute of limitations should not apply. But all that matters is when the "right of action first accrues." Plaintiffs themselves recognize that they have had more than six years of purported travel issues, during which they could have filed suit challenging actions that had occurred before six years expired.  But the time to do so has now expired. Thus the substantive claims[8] of Plaintiffs Riad, Kamel, Al-Sahlani, Albadawi, Muminov, Soueidan, Hachem, Abunijem, Siddiqui, and Thadi must be dismissed.

## VI.   Count I (Procedural Due Process) Should Be Dismissed.

### A.   Travel Delays Are Not A Deprivation of the Right to Travel.

The Screening Plaintiffs mistakenly argue that they have been deprived of a right to travel as a result of TSA screening at airports and CBP inspections at the border. At most, their allegations reflect that some of these Plaintiffs have experienced modest delays while traveling, not that they were unable to travel. These Plaintiffs have no "legitimate claim of entitlement" to not being screened at airports

---

allegedly told by local governmental official he was on watchlist). *Mohamed v. Holder*, 995 F. Supp. 2d 520, 534 (E.D. Va. 2014) (exhaustion of administrative process not required before due process claim adjudicated to avoid piecemeal litigation in a case involving a single plaintiff).

[8] This dismissal would not apply to claims challenging the redress procedures, for which the right of action would first accrue after the Plaintiffs had completed the DHS TRIP process.

or inspected at the border, *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citation omitted), and, even accepting *arguendo* all of their allegations as true, their ability to travel is not impaired.

The Due Process Clause protects only against "statutes, rules, or regulations which *unreasonably* burden or restrict" the right to travel. *Saenz* v. *Roe*, 526 U.S. 489, 499 (1999) (emphasis added). The right to travel is not violated by "minor burdens," *Miller* v. *Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999), or "[m]inor restrictions," *Cramer* v. *Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991). *See League of United Latin Am. Citizens* v. *Bredesen* ("*LULAC*"), 500 F.3d 523, 535 (6th Cir. 2007) ("To the extent this inconvenience burdens exercise of the right to travel at all, the burden is incidental and negligible, insufficient to implicate denial of the right to travel."); *Green* v. *TSA*, 351 F. Supp. 2d 1119, 1122, 1130 (W.D. Wash. 2005) (plaintiffs who "allege [they are] subjected … to enhanced security screening … do not have a right to travel without any impediments whatsoever"). Thus, as a substantial consensus of courts to have considered this issue has agreed, the type of travel-related delays alleged by the Screening Plaintiffs simply do not constitute a deprivation of a protected liberty interest in travel. *See* MTD p. 34-35 (listing cases). Likewise, the Supreme Court has held that "delays of one to two hours at international borders are to be expected," *U.S. v. Flores-Montano*, 541 U.S. 149, 155 (2004), and other courts of appeals have found detentions at the border of four to six hours to be constitutional, *Tabbaa v. Chertoff*, 509 F.3d 89, 100-01 (2d Cir. 2007). The right to travel across the border is highly qualified and certainly does not include a right to travel across the border without delay or inspection.

Plaintiffs attempt to avoid the weight of this authority by, first, misrepresenting the actual allegations contained in their pleading. Specifically, they claim that they "have alleged delays of up to eight or ten hours on a regular basis," Opp. p. 16, and that they "experience four-to-six hour delays as a standard minimum," *id.* p. 18. These assertions are not borne out by the actual allegations in the SAC. The only two Plaintiff who allege that they have ever been delayed by six or more hours are John Doe, who is among the No Fly List Plaintiffs, SAC ¶¶ 343-411, and Kamel, who alleges one instance of a 15-hour delay in obtaining a boarding pass to fly from one foreign airport to another, *id.*

¶ 1170. These allegations constitute extreme outliers among the Plaintiffs—and given Doe's alleged status, his allegations are irrelevant to whether the screening experienced by the Screening Plaintiffs rises to the level of a deprivation of a constitutionally protected liberty interest. What the SAC actually alleges on behalf of these Plaintiffs is that they have experienced: (1) screening-related airport delays of either unspecified length, or a maximum of two hours, as well as (2) secondary inspections by CBP, also often of unspecified length, or—when specified—ranging from two to a maximum of 4.5 hours.[9]

Second, Plaintiffs' attempt to distinguish their claims factually from cases that have rejected their legal theory is entirely unpersuasive. For example, with respect to airport screening, Plaintiffs attempt to distinguish *Beydoun v. Sessions*, 871 F.3d 459 (6th Cir. 2017), on the grounds that the plaintiffs there supplied "insufficient detail" and alleged less intrusive and lengthy searches than the

---

[9] *See* SAC ¶¶ 256, 279, 438-43, 472-78, 653-57, 725-47, 767-72, 801, 804, 848-49, 854, 863-65, 897-901, 906-07, 915-23, 954-57, 968-71, 993-98, 1072-89, 1107-13, 1129-34, 1136-43, 1167-72, 1210-15, 1220-30, 1249-62, 1282-98, 1320-25, 1329-39, 1355-60, 1365-74, 1385-90, 1395-1406, 1441-49, 1462-66, 1472-80, 1498-1510, 1522-34 (allegations by, Khaled El Ali, Mia El Ali, Abdurrashid, Mohamed Paryavi, El-Shahat, Suliman, Doe 2, Baby Doe, Child Doe, Child Doe 2, Albadawi, Hall, Knight, Thadi, Esmaeel Paryavi, Siddiqui, Din, Muminov, Mujanovic, Hachem, Riad, Kamel, Abunijem, Hijaz, Soueidan, Elamin, Shirwa, Kadoumi, and Al-Sahlani, of airport screening of unspecified length); 516-19, 775-76, 1145-46, 1194-1200, 1272-79, 1376-79, 1482-92 (allegations by, respectively, Hawa and Abdirizak Wehelie, Noor, Doe 2, Mujanovic, Hachem, Kamel, Soueidan, and Kadoumi, of secondary border inspection of unspecified length); 313, 325-31 (Jardeneh, alleging secondary border inspection of "over four hours," and a delay of an hour in obtaining his boarding pass, plus additional screening of unspecified length); 506 (Hawa and Fatima Wehelie, alleging secondary border inspection of "nearly four hours"); 531, 543-47 (Abdirizak Wehelie, alleging secondary border inspection of two hours, and 45-minute delay in obtaining boarding pass, plus additional screening of unspecified length); 649 (El-Shahat, alleging secondary border inspection of 3.5 hours); 674-76, 679, 695-700 (Sulayman, alleging secondary border inspections of 3.75 hours and of unspecified length, as well as two delays of 45 minutes each, in obtaining boarding passes, plus a secondary border inspection of 4.5 hours); 757, 762 (Suliman, alleging additional airport screening lasting two hours, and secondary border inspection of two hours); 858 (Albadawi, alleging delay of "more than an hour" to obtain boarding pass); 973-77, 988-90 (Esmaeel Paryavi, alleging secondary border inspections of one hour and another of unspecified length that commenced after "two hours of waiting in the car"); 1096-1104 (Muminov, alleging secondary border inspection of "over four hours"); 1176-86 (Hachem, alleging delay of 90 minutes in obtaining boarding pass, plus additional airport screening of "approximately 60-90 minutes"); 1233-42 (Riad, alleging two secondary border inspections of unspecified length, as well as third such inspection lasting "approximately four or five hours"); 1302-03, 1309-14 (Abunijem, alleging delay of 90 minutes in obtaining boarding pass, and a secondary border inspection of "over two hours"); 1345-48 (Hijaz, alleging secondary border inspection of "approximately two to three hours"); 1407-12 (Elamin, alleging two secondary border inspections of approximately two hours); 1440 (Shirwa, alleging secondary border inspection of one hour); 1509-18 (Al-Sahlani, alleging secondary border inspection of "two to three hours"). Defendants also note, again, that Rami El Ali has not made any allegations of even a single instance of any enhanced screening. *See id.* ¶¶ 248-76.

Plaintiffs here. Opp. p. 19. But an examination of the *Beydoun* Complaint, DEX O, hereto—belies this contention. In that case, Mr. Beydoun alleged, *inter alia*, that he had "made several attempts to board flights and to check into flights within the United States, but has been permitted to do so only after long, exhaustive screening, and secondary screenings, apparently due to [TSA's] representation that he is on the Selectee List," *id.* ¶ 4, and that he had "missed countless flights because of delays caused by the extra, unwarranted scrutiny," *id.* ¶ 36; *see also id.* ¶ 3 (alleging that Mr. Beydoun "was, and continues to be, selected for secondary and additional screening at different domestic airports in the United States, and subjected to unwarranted and excessive delays at airports. This screening is long and grueling, and poses a great burden on the Plaintiff, resulting in great delays in travel[.]"); ¶¶ 34-35 (similar). Thus, contrary to Plaintiffs' assertions, Mr. Beydoun's allegations bear a striking similarity to those that are advanced by the Screening Plaintiffs here—and a similar result should obtain.

Plaintiffs also attempt to evade the border search authorities cited by Defendants by arguing that their allegations are, as a factual matter, more severe than those that are routinely upheld by courts as reasonable. *See* Opp. p. 17-18. Again, this contention is belied by the actual allegations contained within the SAC. As explained above, the Screening Plaintiffs have experienced border inspections by CBP of (most commonly) either unspecified length, or ranging from one to two hours, *see supra* fn. 9, to at most (and in only three instances) 4.5, "over four," or "approximately four or five" hours, *see* SAC ¶¶ 700, 1102, 1242. Thus, the Screening Plaintiffs' detentions at the border have been generally less—and in not even a single instance more—than the four to six hours that were deemed "routine in the border context" by *Tabbaa*. 509 F.3d at 99; *see also U.S. v. Montoya de Hernandez*, 473 U.S. 531, 543 (1985) ("[W]e have … consistently rejected hard-and-fast time limits" on how long a reasonable border search may extend); *Flores-Montano*, 541 U.S. at 155 n.3 ("[N]o cases indicat[e] [that] the Fourth Amendment shields entrants from inconvenience or delay at the international border.").

Nor do the allegations by some of the Plaintiffs that they have been deterred from travel state a claim. *See*, *e.g.*, SAC ¶¶ 445-48, 664, 965, 1122, 1244. Mere deterrence, especially deterrence based on

a subjective chilling effect on some individuals' decision to travel, is not a deprivation of the right to travel—nor, indeed, even sufficient to establish an injury cognizable under Article III. For example, people might avoid travel because they dislike showing identification to government officials, being subjected to screening lines and searches, flying without a weapon, or because they oppose vaccination requirements necessary to fly to certain locations. Any self-inflicted "injury" resulting from such a choice neither suffices to establish standing, nor transforms such requirements for air travel into any deprivation of a liberty interest in travel. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415-16 (2013) (voluntary, self-inflicted measures—even when "costly and burdensome," and undertaken as "a reasonable reaction to a risk of harm"—are insufficient to establish standing); *Afifi v. Lynch*, 101 F. Supp. 3d 90, 110 (D.D.C. 2015) ("[I]t is well-settled … that self-inflicted injuries—injuries that are substantially caused by the plaintiff's own conduct—sever the causal nexus needed to establish standing."); *Abdi v. Wray*, No. 2:17-cv-622-DB, 2018 WL 1940411, at *3 (D. Utah Apr. 23, 2018), *appeal filed,* No. 18-4078 (10th Cir. May 29, 2018).[10]

**B.**   **The No Fly List Plaintiffs Have Not Pled a Deprivation of the Right to Travel.**

The No Fly List Plaintiffs also have not alleged a deprivation of the right to travel by virtue of being denied boarding. To the extent their claim focuses on the right to interstate travel, there can be no plausible deprivation, because a traveler does not have a constitutional right to the most convenient form of travel, such as traveling by airplane as opposed to car. *See Town of Southold v. Town of South Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) (holding that there is no constitutional right to the most convenient form of travel); *Cramer*, 931 F.2d at 1031 (same). And to the extent they are claiming that

---

[10] Plaintiffs also contend that the miscellaneous allegations of "handcuffing, the search and seizure of their electronics, invasive religious interrogation, and public humiliation" brought by some (though by no means all) of them constitute a deprivation of a liberty interest in travel. Opp. p. 17. Defendants address these allegations in §§ VI.C (stigma-plus), XI.B (Fourth Amendment) and XIII.B.1 (RFRA—religious questioning), respectively. But with respect to the allegations of handcuffing in particular, Defendants note that only two of the Screening Plaintiffs make any such allegation in the context of a border search. SAC ¶ 318 (Jardeneh); *id.* ¶ 1099 (Muminov). An additional Plaintiff in this group, Sulayman, alleges handcuffing at the checkpoint to a military base, *id.* ¶ 705; however, as Defendants have explained, there is no right to access a military base, and no conceivable relevance of this allegation to Plaintiffs' liberty interest in travel.

the No Fly List interferes with international travel, the Supreme Court has distinguished between "the *freedom* to travel outside the United States" and "the *right* to travel within the United States," *Haig v. Agee*, 453 U.S. 280, 306 (1981), the former being "no more than an aspect of the 'liberty' protected by the Due Process Clause," and "subordinate to national security … considerations." *Id.* at 306-07; *Califano v. Aznavorian*, 439 U.S. 170, 176-77 (1978). *See* MTD p. 33-37.

**C.      Plaintiffs Have Failed to Plead a Stigma-Plus Claim.**

Plaintiffs have not sufficiently pled the deprivation of a liberty interest in their reputations: they have not shown they have been publicly stigmatized by the Government, or that there was a deprivation of some "plus" factor. *See* Opp. p. 21-25. To prevail on a stigma-plus claim, a plaintiff must show that they have been stigmatized through public dissemination of a defamatory statement, and that, as a result of the defamation, "a right or status previously recognized by state law was distinctly altered or extinguished." *Paul v. Davis*, 424 U.S. 693, 711 (1976). Importantly, "[t]o merit relief, the change in status must be 'significant.'" *Al-Turki v. Tomsic*, 926 F.3d 610, 617 (10th Cir. 2019).

With respect to dissemination, Plaintiffs suggest that this case is different from *Tarhuni* because, purportedly, "since-discovered information" has shown that the government shares information with certain third party stakeholders such as "state, local and foreign authorities," "gun sellers," and "the captains of sea-faring vessels." *See* Opp. p. 22.[11] But as explained, these entities only receive TSDB information in particular authorized circumstances, in furtherance of legitimate law enforcement purposes. MTD p. 53. Under no circumstance does the Government disseminate TSDB information to the public at large. Numerous courts have recognized this distinction: duly authorized and protected government information sharing does not constitute improper public dissemination. *See Johnson v. Martin*, 943 F.2d 15, 17 (7th Cir. 1991) (no public disclosure when statements not disseminated beyond proper chain of command); *Van Atta v. Def. Intelligence Agency*, No. 87-1508, 1988

---

[11] Plaintiffs also attempt to distinguish *Tarhuni* by claiming that the only disclosure in that case "was to Air France and Alaska Airlines." Opp. p. 22. To the contrary, the allegations there included that the announcement of the denial of boarding was in view of other passengers. *See Tarhuni*, 8 F. Supp. 3d 1253, 1274 (D. Or. 2014).

WL 73856, at *2–3 (D.D.C. July 6, 1988) (recognizing the "crucial distinction between official disclosure and public disclosure"); *Al-Turki*, 926 F.3d at 618 (noting that the Supreme Court had "indicated [its] strict view of the limitations of the [stigma-plus] doctrine"); *Abdi*, 2018 WL 1940411, at *3; *Mohamed v. Holder*,[12] No. 1:11-cv-50, 2015 WL 4394958 at *6 (E.D. Va. July 16, 2015) ("There is also a substantial question whether the dissemination of the No Fly List within or among government agencies or to airlines, standing alone, would satisfy the public disclosure prong of a stigma-plus claim"); *Kadura*, 2017 WL 914249, at *7; *cf. Elhady v. Piehota*, 303 F. Supp. 3d 453, 465 (E.D. Va. 2017).

Plaintiffs have also failed to allege a "plus" factor sufficient to demonstrate an infringement of the Fifth Amendment. The Supreme Court in *Paul v. Davis* created the stigma-plus test precisely to make sure that there were tangible government deprivations attached to cognizable stigmatic injury, not just extraneous consequences that flow from the injury itself. *See Siegert v. Gilley*, 500 U.S. 226, 234 (1991). Moreover, where a right is not a "protectable legal status,"—such as where an administrator has discretion whether to award or deny a privilege or benefit—a plus factor is not established. *See Al-Turki*, 926 F.3d at 619 (citing *Behrens v. Regier*, 422 F.3d 1255, 1256 (11th Cir. 2005), in which state law "did not confer any adoption right of which the plaintiff was deprived" because "the decision to place a child in a prospective home is a discretionary one"). Thus, the stigma-plus test can only be satisfied "if a plaintiff shows that the injury to reputation was inflicted 'in connection with' the deprivation of a federally protected right; or plaintiff shows that the injury to reputation 'caused' the denial of a federally protected right." *Boyd v. Lake Cty.*, No. 04-3095-PA, 2007 WL 1598086, at *5 (D. Or. June 1, 2007) (citing *Hart v. Parks*, 450 F.3d 1059, 1070 (9th Cir. 2006)).

Plaintiffs list numerous potential "plus" factors, most of which only apply to one Plaintiff, a handful of Plaintiffs, or no Plaintiff at all. *See* Opp. p. 23-24. Their Opposition aggregates each of

---

[12] *Mohamed* found that No Fly status might become known by those who witnessed a boarding denial, or among those who required plaintiffs to fly for employment, family, or social reasons. 2015 WL 4394958, at *6. Even so, the court recognized that "a person's listing on the No Fly List, in itself, does not infringe any protected liberty interest," and expressed doubt that "dissemination of the No Fly List within or among government agencies or to airlines, standing alone, would satisfy the public disclosure prong of a stigma-plus claim." *Id.*

these as though they apply to all Plaintiffs, notwithstanding that courts must assess the matter for each Plaintiff individually. *See* § II, *supra*. Numerous of these purported "plus" factors are interests for which Plaintiffs cannot state a due process claim at all, let alone ones that constitute a change to a protectable legal status sufficient for constitutional purposes. Defendants address each *seriatim* below.

- **Hazmat licenses, FAA licenses, bail, and firearms.** No Plaintiff alleges any injury related to a Hazmat license, an FAA license, the denial of bail; additionally, the sole Plaintiff to allege an injury related to an attempted firearm purchase has withdrawn his Second Amendment claim, as unsupportable. None of these generalized allegations constitute a plus factor.

- **TSA PreCheck and Global Entry.** Four Plaintiffs contend that they have been denied PreCheck and Global Entry. *See* SAC ¶¶ 483-84, 763-64, 978-81, 1203-04, 1535. Because "Congress committed to [DHS] the sole discretion to determine eligibility guidelines and evaluate applicants" for these programs, *Roberts v. Napolitano*, 792 F. Supp. 2d 67, 73-74 (D.D.C. 2011), they are the kinds of discretionary benefits that cannot support a stigma plus claim. *See Al-Turki*, 926 F.3d at 619.

- **TWIC credentials.** Only Plaintiff Bosnic contends that he lost TWIC credentials as a result of his purported TSDB status, and he does not allege that he lost his job as a result. *See* SAC ¶¶ 1043-46. Bosnic has no legitimate claim of entitlement to a TWIC credential, because the statutory mandate to make credentialing determinations about security risks renders a TWIC decision highly discretionary and contingent, rather than a mandatory benefit to which Plaintiff is entitled. *See Al-Turki*, 926 F.3d at 619. Moreover, the loss of a TWIC credential has an entirely separate redress process, which is not challenged in this suit. *See* 49 C.F.R. Pt. 1515 (Appeal and Waiver Procedures for Security Threat Assessments for Individuals); 49 C.F.R. Pt. 1572 (regulations for credentialing and security threat assessments for maritime and land transportation workers); 49 C.F.R. § 1515.11(h); 49 U.S.C. § 46110; *see generally Seraji v. Gowadia*, No. 8:16-cv-01637, 2017 WL 2628545 (C.D. Cal. Apr. 28, 2017) (discussing judicial review of TWIC denial). He cannot claim a "plus" injury to obtain more process under DHS TRIP, where he has a separate redress process available for his TWIC credential.

- **Military base access.** Two Plaintiffs allege that they were denied military base access, although they claim no intent to seek entry to a military base in the future. SAC ¶¶ 703-713, 950-53. Denial of access to a military base is based upon the sole discretion of the commanding officer, not a protectable legal status that has been deprived. *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy* 367 U.S. 886, 893-94 (1961) (recognizing "the historically unquestioned power of a commanding officer summarily to exclude civilians from the area of his command").

- **Prison Access.** Only Plaintiff Elamin contends that he was denied access to volunteer as a prison chaplain. *See* SAC ¶¶ 1423-25. "[T]here is no principle in the law granting to clerics an absolute right to enter a prison," and any claimed "right" to "practice [one's] religious profession within the penitentiary walls … [is] nonexistent." *O'Malley v. Brierley*, 477 F.2d 785, 793-94 (3d Cir. 1973). The denial of Elamin to access a prison is not a tangible change in his legal status.

- **Immigration.** Only two Plaintiffs alleged any issues related to immigration applications, although they allege nothing to suggest that these issues have been outside the norm or related to the TSDB. *See* Opp. p. 24. They point to no change to a protectable legal status related to immigration that would suffice to confer a "plus" right.

- **Denial of access to certain foreign countries.** It is unclear what plaintiffs mean by denial of access to "certain foreign countries." Opp. p. 23. To the extent that this refers to the No Fly List, only three Plaintiffs allege that they have been denied boarding on a plane. MTD p. 4 (identifying No Fly List plaintiffs). As explained, those Plaintiffs have not adequately pled a deprivation of their liberty interest in international travel—and they may not separately rely on their denial of boarding to support their stigma-plus claim. *See*, *e.g.*, *Green*, 351 F. Supp. 2d at 1130.

- **Purportedly unlawful religious questioning.** Ten Plaintiffs contend that they were subjected to questioning regarding religion. As explained, such questioning is not unlawful—Plaintiffs do not explain why it would count as a transformation of legal status. *See Paul*, 424, U.S. at 711.

- **Bank account closures.** Four plaintiffs allege that they had bank accounts closed. *See* Opp p. 24; SAC ¶¶ 880, 1007, 1205-06, 1350. But Plaintiffs do not plausibly allege that these bank account closures had anything to do with their purported TSDB status. Moreover, injuries that flow as a consequence of purportedly stigmatic injuries as a result of the actions of third parties have been excluded from the stigma-plus doctrine. *See Seigert*, 500 U.S. at 234.

- **Loss of employment opportunities.** Five Plaintiffs allege the loss of business opportunities. *See* MTD p. 43; SAC ¶¶ 337, 340-43, 401-07, 1106, 1192, 1382. But even assuming this was related to alleged TSDB status, then as with alleged bank account closures, the independent actions of third parties that flow as a consequence of purported stigmatic injuries by the government are excluded from stigma-plus. *See Seigert*, 500 U.S. at 234.

- **ESTA travel authorization and visa revocation.** Only Plaintiff Khaled El-Ali alleges a revocation of ESTA travel authorization. As explained, Khaled El-Ali cannot support his claims because he does not have standing as a non-resident alien. *See supra* Part II. Moreover, a determination that an individual is unable to obtain an ESTA authorization and travel under the VWP is not a determination of the individual's ultimate admissibility, nor is it a determination of whether an individual is eligible for a visa. 8 U.S.C. § 1187(h)(3)(C)(iii). Thus, it is not a tangible legal status that could be a "plus" factor. Finally, the adjudication of a visa application is protected from review under consular non-reviewability—it is not a right to which Khaled El-Ali is entitled as a "plus" factor.

- **Border Searches of Electronic Devices.** Fewer than half of the Plaintiffs contend that they have had their electronic devices searched. CBP border searches of electronic devices do not alter any legal status, because they do not violate the law. *See* MTD p. 58-65; *infra* § XI.B.

- **Nonattainder.** Nonattainder cannot be a "plus" factor because the Bill of Attainder Clause is properly restricted to legislative enactments—it does not apply to regulatory actions of administrative agencies, which routinely make decisions, such as those challenged here, concerning specific individuals. *See Paradissiotis v. Rubin*, 171 F.3d 983, 988-89 (5th Cir. 1999) (collecting cases). Even if it

did apply however, the watch list is not a bill of attainder. A system that results in additional screening of persons during travel designed to protect the public from terrorist threats does not constitute punishment for a purported crime. *See Beydoun v. Lynch*, No. 14-cv-13812*, 2016 WL 3753561, at \*5-6 (E.D. Mich. July 14, 2016) (rejecting non-attainder argument with respect to the TSDB); *Kadura*, 2017 WL 914249, at \*8 (same).[13] For the above reasons, Plaintiffs' stigma-plus claim should be dismissed.

     **D.**     **The Redress Process is Constitutionally Adequate.**

     Assuming *arguendo* that the Court finds that the deprivation of a liberty interest is at issue,  the currently existing redress procedures are more than adequate for all Plaintiffs. Plaintiffs do not dispute any of Defendants' arguments on the merits, and instead appear to contend that a mere attempt to plead a Procedural Due Process claim automatically entitles them to discovery. Opp. p. 25. While the *Latif* and *Elhady* considered related procedural due process claims at the summary judgment stage, Plaintiffs fail to identify or explain what further information the Court presently lacks, that it would require in order to assess this issue. The Court has before it the Watchlisting Overview document, of which it may properly take judicial notice, and which describes in detail the relevant procedures available through DHS TRIP. DEX C p. 7-10; *see* MTD p. 7 fn. 4. Courts routinely apply the *Mathews* framework and dismiss procedural due process claims at the Rule 12 stage,[14] and there is no reason why the Court cannot do the same here. And, because Defendants have demonstrated the procedural adequacy of DHS TRIP, to which Plaintiffs have not responded, the Court should dismiss Count I.

**VII.**     **Count II (Substantive Due Process) Should Be Dismissed.**

     Plaintiffs' substantive due process claim should also be dismissed. Initially, it ignores the Supreme Court's repeated instruction—recently reiterated by the Fourth Circuit—that the substantive

---

[13] In addition, Plaintiffs include two more purported plus factors that are very vague. They contend that (1) Plaintiffs are "subject to more significant border searches and seizures," and (2) that being on the TSDB "changes their status in terms of how law enforcement interacts with Plaintiffs." Opp. p. 23. These cannot be plus factors either because they are vague descriptions of purported harm, not tangible legal statuses.

[14] To cite but a few recent examples from this Circuit, *see, e.g., Reyna v. Hott*, No. 1:17-cv-01192, 2018 WL 3551558, at \*5 (E.D. Va. Mar. 20, 2018), *aff'd* 921 F.3d 204 (4th Cir. 2019); *Retfalvi v. U.S.*, 335 F. Supp. 3d 791, 801 (E.D.N.C. 2018); *Bloch v. Exec. Office of the President*, 164 F. Supp. 3d 841, 850 (E.D. Va. 2016).

due process inquiry "must begin with a careful description of the asserted right." *Flores*, 507 U.S. at 302; *see also Reyna as next friend of J.F.G.*, 921 F.3d at 211 ("[W]e are hardly free to create a new substantive due process right in view of Supreme Court decisions cautioning courts from innovating in this area.") (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). Refusing to heed this caution, Plaintiffs insist that their alleged travel burdens violate a broad, fundamental right of "movement." This invites the Court to do precisely what the Supreme Court and the Fourth Circuit have cautioned against—expanding substantive due process by framing the asserted right in sweeping terms. While the Supreme Court has at times discussed a person's freedom of movement, it has done so in the course of addressing specific protected interests in interstate and international travel. *See, e.g., Kent v. Dulles*, 357 U.S. 116, 126 (1958) (discussing "[f]reedom of movement" in the context of finding protected interest in international travel); *U.S. v. Guest*, 383 U.S. 745, 759 (1966) (discussing "free movement" in the context of interstate travel). The Court has never held that the freedom to travel from state to state or across national borders connotes a broader "right to movement," and it certainly has never suggested that such a broader right, if it did exist, would meet substantive due process's rigorous "fundamental" standard.

On the contrary, the origins of the right to interstate travel "reflect a concern over state discrimination against outsiders rather than concerns over a general ability to move about." *Hutchins v. Dist. of Columbia*, 188 F.3d 531, 536 (D.C. Cir. 1999); *see also id.* at 537 ("Since the right to free movement would cover both interstate and international travel, [*Haig v. Agee*] at least implies that the right recognized by the Court is decidedly more narrow."); *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902 (1986) (referring to the "right of free interstate migration"); *Doe v. City of Lafayette*, 377 F.3d 757, 769 (7th Cir. 2004) ("It is much too broad … to characterize [the] liberty interest as involving a generalized right to movement."). Thus, there is no basis in the Constitution for Plaintiffs' proposed generalized "right of movement." Rather, as explained above, there is a fundamental right to interstate travel and a lesser interest in international travel, subject to deferential review.

19

Plaintiffs then disregard relevant case law addressing similar scenarios and interpreting specific constitutional provisions, and instead attempt to find "zones of movement" "emanating" from historical practice and in unrelated provisions of international law about the ability to reenter one's country of citizenship. Opp. p. 29, 31. Suffice to say, none of the cited text suggests an unlimited "freedom of movement" deeply ingrained in our constitutional structure, history, and tradition. Thus, Plaintiffs have failed to plausibly allege the deprivation of a protected liberty interest giving rise to procedural due process protections, let alone the deprivation of a *fundamental* right protected by substantive due process. *See, e.g.*, *Beydoun*, 871 F.3d at 468.

But even if the Court could identify a fundamental right at stake, watchlisting would still pass scrutiny. *See Mohamed v. Holder*, 266 F. Supp. 3d 868 (E.D. Va. 2017) (rejecting substantive due process challenge to No Fly List). Heightened screening and inspection and the denial of boarding bear a close relationship to the aim of preventing terrorism, while protecting valuable intelligence and law enforcement reporting that powers the watchlisting enterprise, and Plaintiffs' objections to the No Fly and Selectee List are baseless. To whatever extent a denial of boarding leads individuals to speculate that they may be of concern to the Government, it is far more harmful to public safety to allow boarding to a person counterterrorism officials have judged presents a risk of terrorism.

## VIII.   Count V (Equal Protection) Should Be Dismissed.

Plaintiffs also fail to state a claim under the Equal Protection Clause. As Plaintiffs concede, they must allege facts sufficient, if proven, to support a finding of improper motive. *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011); *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995). Plaintiffs' allegations, which do no more than describe in conclusory terms how Plaintiffs imagine the watchlist operates, do not meet this threshold. For example, they allege that Defendants "deploy the federal terrorist watchlist against American Muslims in a manner that is different from other faith backgrounds," and that "travel to Muslim-majority countries is more likely to land a Muslim on the watchlist, [but] the same is not true of a non-Muslim," Opp. p. 38, but they

do not support these conclusory allegations with any supporting facts. They further claim that their allegations are buttressed by "a consistent pattern" of targeting Muslims, *id.* p. 41, but the SAC likewise evinces no facts supporting such a pattern. These are conclusions, not factual allegations.

Plaintiffs attempt to rely on *Trulock* and *Wright* for the proposition that they need not "show a smoking gun admission of obvious unconstitutional intent" in order to survive a motion to dismiss. *See Trulock v. Freeh,* 275 F.3d 391 (4th Cir. 2001); *Wright v. North Carolina*, 787 F.3d 256 (4th Cir. 2015). But in both of those cases, the plaintiffs alleged specific facts that backed up their claims to the point of plausibility. In *Trulock*, a reporter had sufficiently alleged facts that supported a First Amendment retaliation claim—he alleged that the FBI initiated an investigation without a criminal referral mere days after the reporter had written an unflattering magazine article about the FBI. *Trulock,* 275 F.3d at 405. And in *Wright*, Plaintiffs alleged purportedly unconstitutional redistricting in North Carolina through detailed statistics that showed high levels of political deviation among the population in particular districts. *See* 787 F.3d at 265. There is no comparable allegation in this case.[15]

On its face, watchlisting is focused on concerns related to terrorist conduct, and an "obvious alternative explanation" is that the Government is focused on detecting persons who have ties to terrorist activities or organizations, including those located in and emanating from particular countries. *Ashcroft v. Iqbal*, 556 U.S. 662, 682-83 (2009). Plaintiffs' allegations are not sufficient "factual content to nudge" their equal protection claim "across the line from conceivable to plausible." *Id.* at 683.

## IX.   Count III (APA-DHS TRIP) Should Be Dismissed.

Plaintiffs' APA claim challenging the DHS TRIP program is coextensive with their procedural due process claim, and should be dismissed for the same reasons. Plaintiffs counter first that this claim should survive if "any of [Plaintiffs'] constitutional claims (not just due process) survive," Opp. p. 33-34, which only demonstrates that it is a co-extensive claim. Plaintiffs add that this claim "should

---

[15] Plaintiffs also insert an inapposite paragraph about *Trump v. Hawaii*, while recognizing that it did not contain an Equal Protection claim at all. *See* Opp. p. 40. The TSDB policies challenged in this case have existed since long before the administration's travel ban policy—nothing about that policy has anything to do with the Equal Protection claim in this case, nor should it be considered here.

survive to the extent there is no statutory support for the watchlist." Opp. p. 33-34. To the extent Plaintiffs purport to challenge the watchlisting enterprise as a "generalized" matter through this claim, their efforts run afoul of the well-established "prohibition on programmatic challenges"—as opposed to challenges to specific, identified final agency actions—through the APA. *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)). Additionally, to the extent this claim purports to duplicate Plaintiffs' "nondelegation" claim as well as the procedural due process claim, it also fails for the same reasons as set forth *infra* in Section XIV.

**X.**     **Count IV (APA-NCIC) Should Be Dismissed.**

Count IV purports to challenge, also under the auspices of the APA, the inclusion of the Known or Appropriately Suspected Terrorist File ("KST File") in the National Crime Information Center ("NCIC"). *See* 28 U.S.C. § 534 ("Section 534") (directing the establishment of this database). This claim should be dismissed under both Rule 12(b)(1) and Rule 12(b)(6).

**A.**     **Plaintiffs Lack Standing to Pursue the Relief They Seek in Count IV.**

Initially, Count IV should be dismissed for lack of Article III jurisdiction, as Plaintiffs uniformly lack standing to pursue the injunctive relief they seek with respect to this claim. Because this claim seeks prospective relief, in order to establish standing to pursue the same, Plaintiffs must establish a credible threat of a "concrete and particularized" injury, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), that is "certainly impending," *Clapper*, 568 U.S. at 401; *see generally* MTD p. 54.

Plaintiffs dispute neither this bedrock legal principle, nor Defendants' assertion that no Plaintiff has established the requisite threat of any relevant future injury related to the inclusion of the KST File in the NCIC. Instead, they contend only that "28 U.S.C. § 534's limitations directly protect the rights of 'personal privacy.'" Opp. p. 37 (quoting *DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 765 (1989) ("*Reporters Committee*")). But Plaintiffs make no attempt to explain how this assertion, even if true, alters the relevant standing analysis—and indeed, it does not. *Reporters Committee* was a Freedom of Information Act ("FOIA") suit, and held only that certain specific information

within the purview of Section 534—there, a criminal defendant's consolidated history of arrests, charges, convictions, and incarcerations, or "rap sheet"—is exempt from disclosure *to the public* under FOIA. 489 U.S. at 765. Thus, *Reporters Committee* stands for the proposition that information shared with appropriate authorities through the NCIC is strictly controlled.[16] It is not publically available through FOIA and there is no allegation that Defendants are improperly making the NCIC database available to the public, through FOIA or otherwise. No Plaintiff has even attempted to explain how he or she possesses standing as to Count IV, and this claim must be dismissed.

**B.**      **The Inclusion of the KST File in the NCIC Is Lawful.**

Count IV should also independently be dismissed under Rule 12(b)(6). In their Opposition, Plaintiffs offer three arguments to the contrary, none of which withstands scrutiny. First, Plaintiffs contend that Section 534 and its implementing regulations "permit[] disseminating only certain 'criminal history record information,'" a category that necessarily excludes the KST File, which is civil in nature. Opp. p. 35 (quoting 28 C.F.R. § 20.20(a)). But Section 534 contains no such limiting principle that would *per se* exclude any civil information—to the contrary, it expressly authorizes the entry in the NCIC of civil "protection orders," 28 U.S.C. § 534(f)(1),[17] as well as other types of information that are not necessarily criminal in nature, such as "any information which would assist in the identification of any deceased individual … [or] the location of any missing person," *id.* § 534 (a)(2)-(3). Thus, Plaintiffs' cramped construction is belied by the plain terms of Section 534.

Further, Plaintiffs' proposed construction would also run afoul of the well-established "doctrine that legislative enactments should not be construed to render their provisions mere

---

[16] 28 U.S.C. § 534(b) ("The exchange of records and information authorized by [Section 534] is subject to cancellation if dissemination is made outside the receiving departments or related agencies."); CJIS Security 2018 Policy, *available at* https://www.fbi.gov/file-repository/cjis-security-policy_v5-7_20180816.pdf/view (last visited July 11, 2019); *see also, e.g., Vasquez v. DOJ*, 887 F. Supp. 2d 114, 118 (D.D.C. 2012) (upholding a *Glomar* assertion as to a request for NCIC records concerning the plaintiff, on the grounds that "persons knowing that they are being investigated by a law enforcement entity, which the requested information would reveal, could reasonably be expected to use the information to circumvent the law").

[17] *See also id.* § 534(f)(3)(B)(i)-(ii) (defining "protection orders" to include, *inter alia*, an "order issued by a *civil or criminal* court for the purpose of preventing violent or threatening acts …," or "any support, child custody or visitation provisions, orders, remedies, or relief issued as part of a protection order . . .") (emphasis added).

surplusage." *Dunn v. CFTC*, 519 U.S. 465, 472 (1997). Section 534(a)(1) directs the Attorney General to "acquire, collect, classify, and preserve identification, criminal identification, crime, and other records." 28 U.S.C. § 534(a)(1). By authorizing the collection of both "identification" and "criminal identification" records, Congress clearly intended to permit the DOJ to acquire and disseminate non-criminal law enforcement information. A contrary interpretation must ignore the textual contrast between "identification" and "criminal identification" records, rendering the former term inoperative. And the same is true for the statutory distinction between "crime" and "other" records, also embedded in Section 534(a)(1). If "other" records were themselves "crime" records, there would be no meaningful distinction between these statutory terms. Section 534 thus permits the DOJ to include in the NCIC at least some non-criminal information for the official use of law enforcement officials.

Second, characterizing Defendants' position as one which would allow for the inclusion of "any civil record" in the NCIC, Plaintiffs posit that such an interpretation would "conflict with the canons of *ejusdem generis* and *noscitur a socii[s]*." Opp. p. 35. But Defendants have not argued that Section 534 provides for the inclusion of *any* civil record in the NCIC, but rather only that it is sufficiently capacious to encompasses those civil records—such as the KST File—that contain "'law enforcement information.'" MTD p. 55 (quoting 28 C.F.R. § 0.85(f)). As explained, Section 534 is not ambiguous, it is broad. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 (2001) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth."). And in any event, when courts apply the *ejusdem generis* and *noscitur a sociis* canons, they attempt to discern "the same characteristic of discreteness shared by all the preceding items." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004). Section 534(a)(1) contains three items preceding the general term: identification records, criminal identification records, and crime records. The "characteristic of discreteness" shared by the terms preceding "other" is that they are all

law enforcement information. Thus, it is Defendants' interpretation that is consistent with settled rules of statutory interpretation.[18]

Finally, Plaintiffs state that "the Government suggests … that Plaintiffs' placement on the watchlist is, in fact, a 'criminal record,' and part of Plaintiffs' 'criminal history.'" Opp. p. 36. Defendants have made no such argument, but to the contrary have explained that "when the KST File is exported to the NCIC, *it does not 'become' a criminal record*. Rather, it is given the same protections and is subject to the same restrictions as criminal records are afforded." MTD p. 56 (emphasis added) (citing 28 C.F.R. §§ 20.20, 20.33).[19]

## XI.   Count VI (Fourth Amendment) and Count VIII (Fifth Amendment: Self-Incrimination) Should be Dismissed

### A.   Plaintiffs Lack Standing to Pursue Injunctive Relief as to Either Claim.

Counts VI and VIII should both be dismissed for lack of standing. Initially, ten Plaintiffs[20] make *no* allegations that any of their electronic devices have ever been the subject of any governmental search. These Plaintiffs have no arguable standing to pursue these claims, and they do not contend otherwise. The remaining Plaintiffs also lack standing; although they each allege at least one past electronic device search, it is well-established that "past injuries alone are insufficient to establish standing" to seek prospective relief. *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011). Instead, a

---

[18] Plaintiffs cite *Santos v. Federick County Bd. of Comm'rs*, 725 F.3d 451, 467 (4th Cir. 2013), for the proposition that there is a "good argument" that Section 534(a)(1) "does not authorize inclusion of civil immigration records in the NCIC database." Opp. p. 34-35. But *Santos* did not even reach that issue—because it was not presented—much less the distinct of whether the KST File may be lawfully included in the NCIC.

[19] Because Defendants do not advance any argument that the records in the KST File constitute criminal records, the remainder of Plaintiffs' arguments regarding "criminal due process standards," *see* Opp. p. 36-37, are irrelevant. However, the implicit premise of these arguments—*i.e.*, that only after a person is convicted in a court of law, pursuant to the full panoply of constitutional safeguards afforded to criminal defendants, may any record concerning such an individual be entered in NCIC—is unfounded. *McCloud v. U.S.*, 917 F.2d 28 (9th Cir. 1990) (Table) ("[t]here is no constitutional violation in maintaining and disbursing records of arrests which do not result in convictions."); *see also, e.g.*, *Swanson v. San Joaquin Cty.*, No. 2:11-cv-02765-GEB, 2012 WL 170193, at *2 (E.D. Cal. Jan. 19, 2012) (noting that "courts have found no violation of the federal Constitution in cases in which the plaintiff attacks the maintenance and dissemination of arrest records for persons who were never adjudged guilty of a criminal charge arising from the conduct for which they were arrested.").

[20] Mia Khaled El Ali, Rami Khaled El Ali, Mohammad Paryavi, Mohallim, Baby Doe, Child Doe, Child Doe 2, Bosnic, Din, and Shirwa.

plaintiff who seeks such relief "must show [he is] suffering an ongoing injury or face[] an immediate threat of injury," *id.,* that is "certainly impending," *Clapper*, 568 U.S. at 401; *see also Lujan*, 504 U.S. at 564 (rejecting vague "'[s]ome day' intentions" to return to wilderness locations the plaintiffs had visited in the past as insufficient to establish injury related to environmental harm to such areas).

In response, Plaintiffs do not deny that none have alleged any prospective international travel, but instead rejoin that the "'possibility of recurring injury ceases to be speculative when actual repeated incidents are documented.'" Opp. p. 44 (quoting *Alasaad v. Nielsen*, No. 17-cv-11730-DJC, 2018 WL 2170323, at \*10 (D. Mass. May 9, 2018). But even if Plaintiffs' future international travel could somehow be assumed for purposes of this inquiry, *only four* of the 40 Plaintiffs have alleged, with any specificity, multiple prior electronic device searches. *See* SAC ¶¶ 495, 519 (H. Wehelie); 672-73 (Sulayman); 914, 943-45 (Hall); 974, 990 (Esmaeel Paryavi). In addition to the ten Plaintiffs who have *never* experienced such a search, 21 more allege only one specific electronic device search,[21] and the remaining five allege only that their devices are searched "whenever" they cross the border, without substantiating that allegation with any description of even *a single instance* in which such a search has in fact occurred.[22] Thus, at most, even under Plaintiffs' own rubric of "repeated incidents" sufficing— which they do not—only four of the Plaintiffs could possibly have standing as to this claim.

    **B.**    <u>Count VI Also Fails to State a Claim.</u>

        **1.**    <u>Plaintiffs Have Abandoned Any Argument that a Warrant or Probable Cause Is Required to Conduct a Border Search.</u>

---

[21] Khaled El Ali, Jardeneh, Doe, Abdurrashid, Abdirizak Wehelie, Noor, Fatima Wehelie, El-Shahat, Suliman, Doe 2, Sehwail, Mumivov, Mujanovic, Riad, Kamel, Abunijem, Hijaz, Soueidan, Elamin, Kadoumi, and Al-Sahlani. *See* SAC ¶¶ 288, 316, 387, 432, 533-34, 576-78, 562-63, 647-48, 761, 778, 836, 1104, 1151, 1236, 1275, 1312, 1348, 1379, 1409, 1491, 1515-16. Defendants further note that although some (but by no means all) of the Plaintiffs in this group additionally allege that their electronic devices are searched "every time" they cross the border, they do not substantiate this vague allegation with any specific details. Defendants respectfully submit that such generic allegations cannot suffice to establish a "real and immediate" threat of future injury, because there are no further factual details regarding when or how often these Plaintiffs have traveled internationally, how recently the alleged harms occurred, whether they may still be occurring, or what specific actions occurred.

[22] Albadawi, Knight, Thadi, Siddiqui, and Hachem. *See* SAC ¶¶ 871, 905, 960, 1001, 1175.

Initially, Plaintiffs have considerably narrowed the Fourth Amendment claim they pursue. As pled in the SAC, Count VI unequivocally seeks declaratory and injunctive relief that would impose a requirement of "a warrant supported by probable cause" as a condition precedent to *any* border search (no matter how brief or minimal) of *any* electronic device. Prayer for Relief ¶¶ 3(a), (b), (c); 4(c), (d). Accordingly, in their Motion to Dismiss, Defendants explained at length the "longstanding recognition," "as old as the Fourth Amendment itself," that "searches at our borders without probable cause and without a warrant are nonetheless 'reasonable,'" simply by virtue of the fact that they occur at the border." *U.S. v. Ramsey*, 431 U.S. 606, 619 (1977); *see also, e.g., U.S. v. Molina-Isidoro*, 884 F.3d 287, 292 (5th Cir. 2018) (observing that "no court has ever required a warrant to support searches, even nonroutine ones, that occur at the border") (collecting cases); *see generally* MTD p. 58-59.

Notwithstanding that Plaintiffs insist that "their Fourth Amendment claim as pled is much broader," Opp. p. 44, they have in fact *narrowed* their claim to the modest theory that such searches must be supported by reasonable suspicion. *See id.* p. 44-48.[23] Accordingly, Defendants will not revisit their arguments regarding why "searches at the border of the country 'never' require probable cause or a warrant," *U.S. v. Touset*, 890 F.3d 1227, 1232 (11th Cir. 2018), but instead explain below why Count VI otherwise fails to state a claim.

### 2.   Manual Searches Are Routine Searches Requiring No Suspicion.

Plaintiffs first advance the remarkable assertion that even "manual," or basic, searches of electronic devices at the border "require actual reasonable suspicion." Opp. p. 46. This contention is meritless, and unsupported. As the Fourth Circuit explained in the recent *Kolsuz* decision discussed at length in Defendants' opening memorandum, "[a]t a border … government agents may conduct 'routine' searches and seizures of persons and property without a warrant or any individualized

---

[23] Because Plaintiffs have not responded to Defendants' arguments as to why probable cause or a warrant is not required for any search conducted at the border, they have thus have waived any claim premised on such a theory, as well as any entitlement to the relief sought in Paragraphs 3(a), (b), and (c), and 4(c) and (d), in their Prayer for Relief. *See, e.g., Ferdinand-Davenport v. Children's Guild,* 742 F. Supp. 2d 772, 777 (D. Md. 2010); *Rocafort v. IBM Corp.*, 334 F.3d 115, 121 (1st Cir. 2003) ("[P]assing reference to legal phrases and case citation without developed argument is not sufficient to defeat waiver.").

suspicion." *U.S. v. Kolsuz*, 890 F.3d 133, 137 (4th Cir. 2018), *as amended* (May 18, 2018); *see* MTD p. 59-63. However, the Court "also has recognized a category of 'nonroutine' border searches that are constitutionally reasonable only if based on individualized suspicion." *Kolsuz*, 890 F.3d at 138 (citing *Montoya de Hernandez*, 473 U.S. at 541). "Such nonroutine border searches, the [Supreme] Court has suggested, include 'highly intrusive searches' that implicate especially significant 'dignity and privacy interests,' as well as destructive searches of property and searches carried out in 'particularly offensive' manners." *Id.* (quoting *Flores–Montano*, 541 U.S. at 152, 154 & n.2).

Although *Kolsuz* held that a "forensic search of … cell-phone data qualifies as a nonroutine border search, requiring some level of particularized suspicion," *id.* at 144, it left wholly intact *U.S. v. Ickes*, 393 F.3d 501, 505-06 (4th Cir. 2005), an earlier decision that held that a non-forensic, or manual, search of a computer requires no suspicion. *See id.* at 146 n.5. Plaintiffs attempt to downplay the breadth of *Ickes*, positing that the "issue of whether reasonable suspicion was necessary [for a manual computer search] was not at issue in that case." Opp. p. 46. But Plaintiffs' reading of *Ickes* is simply incorrect: as *Kolsuz* itself described, *Ickes* "treated … as a *routine border search, requiring no individualized suspicion* … a manual, on-site inspection of computer contents that would be accessible to any user[.]" *Kolsuz*, 890 F.3d at 146 n.5 (emphasis added).[24] Thus, *Ickes* remains binding law in this Circuit and precludes the imposition of any requirement of any quantum of individualized suspicion on manual or basic border searches of electronic devices.

### 3. The CBP Directive Complies with *Kolsuz*.

*Kolsuz* reached a different conclusion as to "forensic" searches of electronic devices, holding that such searches "qualif[y] as … nonroutine border search[es], requiring some level of particularized

---

[24] *See also U.S. v. Kolsuz*, 185 F. Supp. 3d 843, 854 (E.D. Va. 2016), *aff'd*, 890 F.3d 133 (*Ickes* "clearly stands for the proposition that a manual digital search of an electronic device is a routine border search"); *U.S. v. Saboonchi*, 990 F. Supp. 2d 536, 552 (D. Md. 2014) ("*Ickes* comports with the clear weight of precedent from other courts … [that] have analogized a laptop to a closed container that may be opened and its contents searched at the border") (collecting cases).

suspicion." 890 F.3d at 144. But while Defendants respectfully disagree with this aspect of *Kolsuz*,[25] the relevant CBP policies, set forth in CBP Directive No. 3340-049A, "Border Search of Electronic Devices" ("CBP Directive" or "2018 Directive"), DEX F, are fully in compliance with this decision.

Pursuant to the 2018 Directive, CBP defines an "advanced search" as "any search in which a[] [CBP] Officer connects external equipment, through a wired or wireless connection, to an electronic device not merely to gain access to the device, but to review, copy, and/or analyze its contents." CBP Directive ¶ 5.1.4. Notably, this definition encompasses a broader range of searches than the kind of search described in *Kolsuz*. CBP will conduct an advanced search only where "there is reasonable suspicion of activity in violation of the laws enforced or administered by CBP, or in which there is a national security concern, and with supervisory approval." *Id.* "Many factors may create reasonable suspicion or constitute a national security concern; examples include the existence of a relevant national security-related lookout in combination with other articulable factors as appropriate, or the presence of an individual on a government-operated and government-vetted terrorist watch list." *Id.*

As Defendants have pointed out, *see* MTD p. 61, there is no reason to read *Kolsuz* as at odds with any aspect of this policy. Indeed, very much to the contrary, *Kolsuz* expressly discussed the CBP Directive in favorable terms, noting with broad approval that under the policy, advanced searches "may be conducted only with reasonable suspicion of activity that violates the customs laws or in cases raising national security concerns." 890 F.3d at 146 (citing the 2018 Directive).

Plaintiffs counter that the "reasonable suspicion" standard for inclusion in the TSDB as a KST is a purportedly "watered down" test that, because it does not necessarily require articulable suspicion of "ongoing or imminent" "criminal activity," cannot satisfy *Kolsuz*. Opp. p. 44, 45.[26] But it is well-

---

[25] *See* MTD p. 60 fn. 35. Defendants reserve the right, if appropriate at some later stage of these proceedings, to challenge this holding, but recognize that it is binding here.

[26] Plaintiffs also argue that the TSDB KST standard runs afoul of the rule that reasonable suspicion "cannot be met 'based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped.'" Opp. p. 46 (quoting *U.S. v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002)). As the TSDB KST inclusion standard plainly contemplates no such thing, and for all of the additional reasons set forth in § VII, *supra*, addressing the equal protection claim, this argument fails.

established that "[t]he question of what constitutes 'particularized' for the purposes of a reasonable suspicion inquiry does not reduce to a rigid definition … because reasonable suspicion is," of necessity, "a flexible standard" that is dependent upon the particular context in which it is applied. *U.S. v. Ramos*, 443 F.3d 304, 309 (3d Cir. 2006); *see also*, *e.g.*, *U.S. v. Sokolow*, 490 U.S. 1, 7 (1989) ("The concept of reasonable suspicion … is not readily, or even usefully, reduced to a neat set of legal rules.") (internal citation omitted); *U.S. v. Perkins*, 363 F.3d 317, 325 (4th Cir. 2004) (noting the "flexible nature of reasonable suspicion analysis"). Thus, for example, where the question is whether reasonable suspicion exists to conduct a so-called *Terry* stop, the standard "requires a reasonable suspicion *that a crime or other infraction has been or is being committed*"; in contrast, in order to conduct a frisk, there must be "both a lawful investigatory stop and a reasonable suspicion *that the person stopped is armed and dangerous*." *U.S. v. Robinson*, 846 F.3d 694, 698 (4th Cir. 2017) (emphasis in original). In any context, however, the Government "must do more than simply label a behavior as 'suspicious' to make it so. The Government must also be able to articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *U.S. v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011) (internal citation omitted).

The "reasonable suspicion" standard for inclusion in the TSDB as a KST is adapted to its context—while also fully comporting with the baseline requirement that the suspicion be based on "articula[ble]" facts and a "logical[]" explanation of why those facts support an inference of suspicion. *Id.* Specifically, it is satisfied only where there exists "articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct … in preparation for, in aid or furtherance of, or related to, terrorism and/or terrorist activities." DEX C at 4.

In assessing the inspection of individuals meeting this standard in the border search doctrine context, two important principles bear emphasizing. The first is that the border search doctrine has from its inception been an aspect of national sovereignty and a vital tool for the protection of national security and territorial integrity. *See*, *e.g.*, *U.S. v. Oriakhi*, 57 F.3d 1290, 1296 (4th Cir. 1995) (noting that "inherent in national sovereignty are the overarching rights of a nation to defend itself from outside threats, to act in relation to other nations, and to secure its territory and assets."). Importantly, this "realization that important national security interests are at stake has resulted in courts giving the broadest interpretation compatible with our constitutional principles in construing the statutory powers of customs officials." *Ickes*, 393 F.3d at 505; *cf.* 6 U.S.C. § 211(g)(3)(A)-(B) (charging CBP with the mission of "deter[ing] and prevent[ing] terrorists and terrorist weapons from entering the United States" and "conduct[ing] inspections at such ports of entry to safeguard the United States from terrorism.").

Second, as explained in Defendants' opening memorandum, CBP is charged with enforcing and administering *hundreds* of laws and regulations, including, among others, those addressing immigration, currency and financial transactions, customs, commerce and trade, copyrights and trademarks, narcotics, the safety of agricultural products and other goods, and import and export controls on wildlife and plants, chemical and biological weapons, guns, and other items.[27] CBP utilizes its broad authorities—which are both civil and criminal in nature—in fulfilling its mission responsibilities relating to border security. *See* 6 U.S.C. § 211.

Against this backdrop, to the extent that CBP conducts at least some advanced electronic device searches on the basis of the "presence of an individual on a government-operated and government-vetted terrorist watch list," CBP Directive ¶ 5.1.4, such conduct is in full comportment with the border search doctrine generally, as well as *Kolsuz* specifically. As explained, *Kolsuz* held that a "forensic search of … cell-phone data qualifies as a nonroutine border search, requiring *some level* of

---

[27] *See generally* Summary of Laws and Regulations Enforced by CBP (last modified March 8, 2014), https://www.cbp.gov/trade/rulings/summary-laws-enforced/us-code (last visited July 11, 2019).

particularized suspicion," 890 F.3d at 144 (emphasis added). In the context of CBP's broad mandate to protect national security, the reasonable suspicion standard for inclusion in the TSDB satisfies this standard. *See id.* at 146 (citing with approval the 2018 Directive's policy of allowing for advanced searches "in cases raising national security concerns."); *Ickes*, 393 F.3d at 506 (observing that "[t]he border search doctrine is justified by the 'longstanding right of the sovereign to protect itself.' … Particularly in today's world, national security interests may require uncovering terrorist communications …'") (quoting *Ramsey,* 431 U.S. at 616).

Further, Plaintiffs' proposed standard that reasonable suspicion can only exist, even at the border, where there is an indication of "ongoing or imminent" "*criminal* activity," Opp. p. 44, 45, would effectively mean that CBP could *never* conduct an advanced search of any electronic device in furtherance of its civil and administrative law enforcement obligations, including, *inter alia*, immigration laws under Title 8, customs laws under Title 19, certain laws regarding intellectual property rights and other civil and administrative legal requirements. Plaintiffs provide no justification for such a sweeping result, which would be antithetical to the "broadest interpretation compatible with our constitutional principles" that the "statutory powers of customs officials" have traditionally been afforded. *Ickes*, 393 F.3d at 505; *cf.* CBP Directive ¶ 5.1.4 (authorizing advanced searches where "there is reasonable suspicion of activity in violation of the laws enforced or administered by CBP").

Finally, Plaintiffs argue that the reason this Court should impose a "heightened standard" on searches of electronic devices "is not because of the manner in which the government searches the information but the nature of the information, whose privacy an individual shows a reasonable expectation in by locking it with a password." Opp. p. 48. Of course, if all that were required to evade a border search was for a traveler or importer of goods to lock his suitcase or cargo container "with a password," or some type of physical lock requiring the same, CBP's border search authorities, in their entirety, would be quickly rendered a nullity. *See U.S. v. Ross*, 456 U.S. 798, 823 (1982) (customs officials have authority to search a traveler's cargo, "no matter how great the traveler's desire to

conceal the contents may be."). As Plaintiffs offer no coherent reason in support of this theory, this argument should be rejected.

**C.**    **Count VIII Likewise Fails to State a Claim.**

**1.**    **Plaintiffs Have Not Pled Any "Substantial and Real" Threat of Incrimination.**

Plaintiffs persist in their attempt to have this Court transform the right against self-*incrimination* into a constitutional shield to protect—from an *otherwise constitutional* border search—any information they subjectively deem private, and thus exempt from a border search. *See generally* SAC ¶¶ 1632-41 (Plaintiffs' First Amendment claim, which makes clear that their objection to the Government conducting border searches of their electronic devices is not that they reasonably fear the information on those devices may be self-incriminating, but rather that the information is private). As Defendants have explained, the right against self-incrimination protects *only* against "compelled self-incrimination, not (the disclosure of) private information." *Fisher v. U.S.*, 425 U.S. 391, 401 (1976) (citation omitted); *see id.* (Fifth Amendment is not "a general protector of privacy"). Further, and as Plaintiffs elsewhere in their Opposition at least implicitly acknowledge, the purpose of watchlisting is not to investigate or punish criminal conduct, but rather to identify—to the extent possible in a dynamic, ever-evolving threat environment—individuals who *may* pose a threat to national security, 49 U.S.C. § 114(h)(3)(A), and to take "appropriate action with respect to that individual," *id.* § 114(h)(3)(B). *See Latif v. Lynch*, No. 3:10-cv-750-BR, 2016 WL 1239925, at *12 (D. Or. Mar. 28, 2016); Opp. p. 51 ("Watchlist designations aren't 'criminal' information in any event.").

*Ohio v. Reiner*, 532 U.S. 17 (2001), cited by Plaintiffs, is not to the contrary. That case stands for the proposition that the self-incrimination privilege is available "to those who claim innocence," *id.* at 21, but that principle is not at odds with the rule that in order to invoke the privilege, a person must establish a threat of incrimination that is "substantial and 'real,' and not merely trifling or imaginary," *U.S. v. Apfelbaum*, 445 U.S. 115, 128 (1980). *Reiner*, however, presented the question of whether a witness and *potential alternative suspect* to an alleged involuntary manslaughter could invoke the privilege,

notwithstanding her protestations of innocence. *Reiner* does not address the need to identify potential terrorist threats to transportation systems.

2. **The Border Search Exception Permits the Government to Require that Electronic Devices Be Presented in a Manner Allowing for Their Inspection.**

Assuming, *arguendo*, that the Fifth Amendment privilege against self-incrimination has any application here, there is no serious dispute that the border search doctrine permits the Government to require that electronic devices, like all other merchandise and cargo, be presented to customs officials in a manner that allows for their inspection. Plaintiffs aver that they "are not arguing the Fifth Amendment bars the Government from searching the[ir] electronic devices. It simply cannot compel testimonial assistance from Plaintiffs." Opp. p. 55. Initially, Plaintiffs are correct that even if they ultimately were to obtain a favorable ruling on this claim, the Fifth Amendment only protects "[a] party … from producing the evidence"; it does not protect against the evidence's "production" by other means. *Andresen v. Maryland*, 427 U.S. 463, 473-74 (1976). This principle recognizes that the Fifth Amendment "adheres basically to the person, not to information that may incriminate him." *Id.* at 473 (citation omitted). Thus, even where an individual cannot himself be compelled "to aid in the discovery, production, or authentication of incriminating evidence," there is no similar prohibition on the government seizing the evidence pursuant to a valid search. *Id.* at 474.

Accordingly, even under the most expansive reading of the relevant caselaw, the Fifth Amendment privilege against self-incrimination could only protect a traveler from *himself unlocking* a digital device; CBP could still permissibly remove or decrypt the lock (and if necessary, to detain the electronic device for the time necessary to do so) in order to satisfy its mandate. In other words, even under Plaintiffs' theory, there is no argument that a traveler may refuse to unlock a digital device (or any other merchandise), and *still bring the device or merchandise into the United States*. Yet Plaintiffs appear to contemplate precisely such a result—which is to say, a large-scale evisceration of the border search doctrine, in which any cargo locked with a password (as opposed to a key) is immune from an otherwise lawful border search. This Court should not countenance such a dangerous outcome.

Further, where the scope of otherwise lawful border searches have presented arguable tension with other constitutional protections, courts have consistently declined to limit the border search doctrine on such grounds. *See Ickes*, 393 F.3d at 502-06; *U.S. v. Arnold*, 533 F.3d 1003, 1010 (9th Cir. 2008). Likewise, a similar result has obtained where the Fifth Amendment right against self-incrimination has been in tension with administrative or regulatory searches—another noted exception to the Fourth Amendment's generalized warrant or probable cause requirement. *See* MTD p. 68-69, and authorities cited therein. For all of the reasons given in Defendants' opening memorandum and above, this Court should dismiss Count VIII for failure to state a claim.

      3.      **At Minimum, Biometric Passwords are Not "Testimonial."**

Finally, although the Court need not reach this issue, the provision of a biometric password—such as a fingerprint or voice recognition—cannot violate the Fifth Amendment, because such information is not "testimonial" in nature. In response to the reasoned explanation for this position in Defendants' opening memorandum, *see* MTD p. 69-71, Plaintiffs have interposed a short paragraph citing three cases that reached a different conclusion, *see* Opp. p. 55. Defendants acknowledge that courts have thus far not ruled uniformly on this question. However, and in short, the gravamen of the privilege against self-incrimination is that an individual may not be compelled to use "the contents of his own mind" to assist the Government in acquiring potentially self-incriminating information. *U.S. v. Hubbell*, 530 U.S. 27, 43 (2000). Because biometric features cannot, by definition, implicate this concern, they are not "testimonial" in nature and provide no basis for the invocation of a Fifth Amendment claim of privilege. *See* MTD p. 69-71, and legal authorities cited therein.

**XII.**    **Count VII (First Amendment) Should Be Dismissed.**

Plaintiffs' Opposition withdraws any argument that electronic device searches inhibit their speech or expression through compelled disclosure—instead Plaintiffs now argue only that these searches "have a chilling effect on their right to association" in the abstract. Opp. p. 49. This does not state a valid First Amendment claim, because the First Amendment protects a right to "expressive

association," that is, a "right to associate for the purpose of speaking," *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 68 (2006), not a freestanding right to associate. *See* MTD p. 73. This is particularly true in the context of border searches, which are a far cry from the compelled disclosure of organizational membership lists, and other such cases that have validly invoked the right to association. *See Ickes*, 393 F.3d at 506 (declining to carve out a First Amendment exception to border searches); *cf. NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958). The First Amendment freedom of association protects against several types of government intrusion, including "impos[ing] penalties or withhold[ing] benefits from individuals because of their membership in a disfavored group …, attempt[ing] to require disclosure of the fact of membership in a group seeking anonymity, and … interfere[ing] with the internal organization or affairs of the group." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622–23 (1984) (internal citations omitted). Plaintiffs' allegations encompass none of these, and consequently should be dismissed. Indeed, courts have dismissed similar First Amendment claims in cases implicating the TSDB. *See, e.g., Fikre v. FBI*, 142 F. Supp. 3d 1152, 1166 (D. Or. 2015); *Shearson v. Holder*, 865 F. Supp. 2d 850, 863 (N.D. Ohio 2011), *aff'd*, 725 F.3d 588 (6th Cir. 2013).

It is unsurprising that in opposition Plaintiffs rely on the lone district court in *Alasaad*, which Plaintiffs describe as a "landmark" decision. *See* Opp. p. 48-49 (citing *Alasaad v. Nielsen*, No. 17-CV-11730-DJC, 2018 WL 2170323, at *22-23 (D. Mass. May 9, 2018)). In reality, it is an outlier—no fewer than two circuit courts, including the Fourth Circuit, have rejected the call to require heightened First Amendment scrutiny for border searches of expressive material. *See Ickes*, 393 F.3d at 506; *see also Arnold*, 533 F.3d at 1010; *U.S. v. Seljan*, 547 F.3d 993, 1011-12 (9th Cir. 2008) (Callahan, J., concurring); *U.S. v. Hilliard*, 289 F. App'x 239, 239-40 (9th Cir. 2008). Plaintiffs attempt to distinguish *Ickes* on the ground that that case involved searches of "expressive material," whereas the claim here is purportedly a claim of chill as to Plaintiffs' association. Opp. p. 50. But this attempts to draw a distinction without a difference—as described, a freestanding right to associate without any connection to expressive material does not reside within the First Amendment at all. Moreover, *Kolsuz* changed nothing about

the application of *Ickes* when it comes to border searches of electronic devices, *see supra* p. 29; MTD p. 64-65. This analysis should be the same in the First Amendment context.

Plaintiffs also dispute the Government's reliance on *AT&T* for the proposition that courts conduct a good faith analysis where law enforcement activity may implicate First Amendment rights. *See* Opp. p. 50.  Plaintiffs note, correctly, that Section VI(A)(1)(b) of *AT&T* was not joined by the other judge who was otherwise in the majority in that case, *see Reporters Comm. for Freedom of the Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1055 (D.C. Cir. 1978) ("*AT&T*"), but they are incorrect that no courts have required good faith with respect to law enforcement activity that may implicate the First Amendment. *See e.g. U.S. v. Mayer*, 503 F.3d 740, 751-52 (9th Cir. 2007) (rejecting the suggestion that there be a "reasonable suspicion requirement, separate from good faith, for investigations of organizations that are protected by the First Amendment" and requiring only "a legitimate law enforcement purpose").[28] Certainly, the law enforcement and border security functions of CBP at the border with respect to individuals on the TSDB have a legitimate law enforcement purpose, *see Flores-Montano*, 541 U.S. at 152, and Plaintiffs do not attempt to argue otherwise.

But regardless, border searches are not aimed at uncovering protected, expressive materials at all, but rather are focused on identifying and interdicting contraband or evidence of the violation of federal laws, at the border. Thus, the policies can have only an incidental burden, if any, on First Amendment rights. *Cf. U.S. v. Sayer*, 748 F.3d 425, 433-34 (1st Cir. 2014) ("Speech integral to criminal conduct is . . . a 'long-established category of unprotected speech.'"). And in any event, such an inquiry is irrelevant in light of Plaintiffs' withdrawal of any argument that their speech or expression has been inhibited, which is the only way their claim could sound in the First Amendment.[29]

---

[28] Plaintiffs' attempt to distinguish the *Mayer* case on the ground that it implicated *criminal*, rather than civil remedies, s*ee* Pls.' Opp. p. 51-52, is unavailing. The reasoning of that case applies broadly to the activities of law enforcement that implicate First Amendment interests. *See Mayer*, 503 F.3d at 751.

[29] Plaintiffs' argument that certain Plaintiffs may bring claims on behalf of third parties also relies on an incorrect theory of the First Amendment. The cases they cite to support their contention that Rami El Ali, Mia El Ali, Abdirizak Wehelie, Shamsa Hashi Noor, Fatima Wehelie, Baby Doe, Child Doe, and Child Doe 2 have standing to bring a First Amendment claim—each involved *speech* or expressive activity through group membership, not simply the ability of persons to associate with others in general. *See* Opp. p. 49-50; *see, e.g., In re*

**XIII.   All RFRA Claims (Counts X, XI, XII, and XIII) Should Be Dismissed.**

**A.     Plaintiff Elamin Lacks Standing to Pursue His RFRA Claim (Count XIII).**

Initially, Count XIII—which alleges that a Maryland state correctional facility, not party to this suit—denied Plaintiff Elamin's application to serve as a volunteer within the facility, SAC ¶¶ 1695-1706, must be dismissed for lack of standing. It is well-established that in order to satisfy the causation and redressability prongs of the standing analysis, a plaintiff's injury must be "traced to the challenged action of the defendant," as opposed to "the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *see also, e.g.*, *Lujan*, 504 U.S. at 568-71; *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) ; *Mirant Potomac River, LLC v. EPA*, 577 F.3d 223, 232 (4th Cir. 2009). And as the Fourth Circuit affirmed in *Frank Krasner Enterprises, Ltd. v. Montgomery County*, 401 F.3d 230 (4th Cir. 2005), these principles preclude standing even where the third party's injurious action "result[s]" from a defendant's policy or predicate action, *id.* at 232, as long as the third-party intermediary "stands directly between the plaintiffs and the challenged conduct in a way that breaks the causal chain," *id.* at 236. These precepts plainly preclude Elamin from establishing standing here.

**B.     All RFRA Claims Should Be Dismissed for Failure to State a Claim.**

**1.     None of the RFRA Claims Adequately Allege a Substantial Burden.**

First, none of these claims adequately alleges any "substantial burden" on any Plaintiff's "exercise of religion," as required by the RFRA. 42 U.S.C. § 2000bb-1. In order to meet this threshold element, a plaintiff must allege either (1) that he is under "substantial pressure," as a result of the challenged governmental action or policy, to "modify his behavior and to violate his beliefs," or that she is being "force[d] … to choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on

---

*Search of Info. Associated with the Facebook Account Identified by Username Aaron.Alexis that is Stored at Premises Controlled by Facebook, Inc.*, 21 F. Supp. 3d 1, 7 (D.D.C. 2013) (warrant requiring Facebook to turn over group membership lists implicated the right to free association). Plaintiffs do not state a First Amendment claim at all—let alone one on behalf of third parties.

the other hand." *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (internal quotations and citations omitted). No Plaintiff has alleged any facts that satisfy either of these tests.

Initially, Plaintiffs incorrectly assert that "[w]hether a practice constitutes a substantial burden is determined solely by looking at whether a RFRA plaintiff believes the practice at issue constitutes a burden on their [sic] religion"). Opp. p. 56. But as the very case that Plaintiffs cite for this mistaken proposition, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014), itself explains, there is a crucial distinction between, on the one hand, the "plausibility of a religious claim"—and, on the other, the "very different" question of whether the challenged government action *substantially burdens* the religious belief or practice at issue. While "the federal courts have no business addressing" the former question of "whether the religious belief asserted … is reasonable," *id.*, it remains within the clear province of the judiciary to assess the latter, and entirely separate, question of whether the asserted—and accepted—religious belief *has been burdened* within the meaning of the RFRA. *Id.*; *see also, e.g., Real Alternatives, Inc. v. HHS*, 867 F.3d 338, 356 (3d Cir. 2017) ("While the Supreme Court reinforced in *Hobby Lobby* that we should defer to the *reasonableness* of the [RFRA claimant's] religious beliefs, this does not bar our objective evaluation of the *nature* of the claimed burden and the *substantiality* of that burden on the [claimant's] religious exercise.") (emphasis in original).[30]

Turning to Plaintiffs' specific claims, none allege a qualifying "substantial burden."

**"Religious Questioning" (Count X).** Ten of the forty Plaintiffs make any allegation about any questioning regarding their religious beliefs by federal law enforcement, generally upon their reentry into the United States after foreign travel—and, for nine of these Plaintiffs, only in one, isolated, instance.[31] In response to Defendants' explanation as to why these incidents have constituted, at most, a one-time-only burden on some Plaintiffs' ability to cross the border quickly—as opposed to

---

[30] *Accord Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008); *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013).
[31] Plaintiffs Doe, Mohammad Paryavi, Hawa Whelie, El-Shahat, Mumivov, Hachem, Riad, Hijaz, and Elamin. *See* SAC ¶¶ 380, 485, 504, 650, 1101, 1191, 1238, 1347, 1411. Al-Sahlani alleges he is "routinely questioned by CBP officers about his religion upon re-entering the country," but only alleges one specific instance of this occurring. *Id.* ¶¶ 1518-19.

any arguable obstruction to the practice of their faith, *see* MTD p. 80-81, Plaintiffs fail to explain what purported "religious belief" is implicated by answering questions by law enforcement *at all*. Where no religious belief is identified as burdened, it necessarily follows that no substantial burden can exist. And just as in *Cherri v. Mueller*, 951 F. Supp. 2d 918, 935 (E.D. Mich. 2013), the alleged questioning has not had any alleged impact whatsoever on the Plaintiffs' ability to "attend their respective places of worship or otherwise freely exercise their Islamic practices and beliefs." *See also E.K. v. Tolleson Union High Sch. Dist.*, No. 14-cv-1625, 2015 WL 11118116, at *5 (D. Ariz. Jan. 28, 2015) ("merely questioning [plaintiff] about his religion" does not substantially burden religious exercise).[32]

Plaintiffs' remaining arguments in support of this claim are equally inapposite. They cite *Mitchell v. Helms*, 530 U.S. 793 (2000), for the proposition that "'inquiry into' an individual's 'religious views … is not only unnecessary but also offensive.'" Opp. p. 56 (quoting *Mitchell*, 530 U.S. at 828). But *Mitchell* held only that inquiries into the religious practices of institutions as part of a legal determination such as whether funding may be given can, potentially, run afoul of the Establishment Clause; it did not consider, and has no bearing on, the question of what can properly constitute a "substantial burden" under the RFRA. 530 U.S. at 828.[33]

**"Religious Travel" (Count XI).** Count XI, which alleges that Plaintiffs Sulayman and Siddiqui subjectively dislike the travel-related screening they have allegedly received enough to have been "chill[ed]" in their desire to travel for religious purposes, SAC ¶ 1673, also fails for substantially similar reasons. Any minor delay during travel does not "burden" these Plaintiffs' practice of religiously-oriented travel. Indeed, any such contention is belied by Plaintiffs themselves: Sulayman alleges that "he travels *frequently* with large groups for umrah," *id.* ¶ 715 (emphasis added), and Siddiqui

---

[32] Plaintiffs cite to Paragraph 1663 of the SAC, which alleges that "Plaintiffs are subjected to less harsh treatment when they act against their sincerely-held religious beliefs, such as by declining to wear a hijab." Mujanovic alleges that a CBP officer once told her that "she should remove her hijab when she travels to avoid travel delays and enhanced screening." *Id.* ¶ 1148. But there is no allegation that she has ever done so, much less received more favorable treatment as a result, and this alleged statement does not rise above the level of a permissible inconvenience, as opposed to a "substantial burden" within the meaning of the RFRA.

[33] Likewise, *Isakhanova v. Muniz*, No. 15-cv-03759-TEH, 2016 WL 1640649 (N.D. Cal. Apr. 26, 2016), also involved only the Establishment Clause, not any RFRA claim.

similarly alleges having taken "many" trips," *id.* ¶ 1003. Thus, none of Defendants' alleged actions has prevented or will prevent Sulayman or Siddiqui from travelling abroad to perform religious pilgrimages—or, for that matter, from participating in any other aspect of their religious practice.

Finally, although Count XI is entitled "Violation of the [RFRA]—Umrah/Hajj," and focuses on religious travel, Plaintiff Sulayman's additional allegation is that "Defendants' actions have also damaged [his] standing in his community thereby jeopardizing his ability to lead congregations in the future." SAC ¶ 1671. This entirely speculative assertion about a possible future harm fails an even more fundamental test—namely, Article III's requirement that any judicially cognizable injury be "concrete and particularized," as opposed to "conjectural or hypothetical." *Lujan*, 504 U.S. at 560. It also fails to establish any substantial burden, where Sulayman does not allege that he has actually been denied any opportunity to serve as a faith leader, and in fact alleges just the opposite. *See* SAC ¶ 671 ("Imam Farid Sulayman is a local iman … As a *well-known religious leader* in his area … [he] *routinely leads large groups* of American Muslim worshippers on an annual umrah[.]") (emphasis added).

 **"Informant Recruitment" (Count XII).** Plaintiffs Doe 2 and Hall also fail to adequately allege any substantial burden. In Count XII, they allege that unnamed agents told them that if they agreed to work as FBI informants, their travel issues would be resolved, SAC ¶¶ 795, 935, but that their religious beliefs, which restrict bearing false witness and betraying the trust of their religious community, barred them from accepting this offer, *id.* ¶ 1686-87. However, as Defendants have explained, MTD p. 83-84, there is no extant legal authority for the proposition that, even if a plaintiff sincerely believes that serving as an informant would encroach on his religion, the government burdens such religious beliefs or practices merely by *asking* for such assistance.

In rejoinder, Plaintiffs cite *Tanvir v. Tanzin*, 894 F.3d 449 (2d Cir. 2018), describing this decision as finding that a RFRA claim for "keeping plaintiffs on watchlist in retaliation" for not serving as informer was "proper, subject to potential qualified immunity." Opp. p. 60. Plaintiffs' characterization is inaccurate; to the contrary, *Tanvir* dealt with only the narrow question—not

presented here—of whether a plaintiff can pursue money damages against federal officers sued in their individual capacities under RFRA. *Tanvir*, 894 F.3d at 461-63. Thus, as a district court in Oregon recently concluded when considering a substantially similar claim, "*Tanvir* does not provide any support for Plaintiff's assertion that the government's placement or maintenance of an individual on the No-Fly List in retaliation for refusal to serve as an informant violates RFRA." *Fikre v. FBI*, No. 3:13-CV-00899-BR, 2019 WL 2030724, at *7 (D. Or. May 8, 2019); *see also id.* at *9. Finally, even accepting that serving as informants would violate their religious beliefs, neither Doe 2 nor Hall alleges that they alerted the FBI of their religious belief, or that the FBI continued to press the issue after being so informed. Count XII should also be dismissed for failure to state a claim.

**"Inability to Volunteer at a State Prison" (Count XIII).** Finally, Plaintiff Elamin does not allege any substantial burden on his religious practice, resulting from Maryland state officials' denial of his application to serve as a prison chaplain. Here, Plaintiffs again fundamentally misapprehend Defendants' arguments. Defendants do not, as Plaintiffs assert, cite either *O'Malley*, 477 F.2d at 793-94, or *Heap v. Carter*, 112 F. Supp. 3d 402, 422 (E.D. Va. 2015) for the proposition that "the Government has a compelling justification to … bar[] [Elamin] from volunteering as a chaplain." Opp. p. 61. Indeed, as Defendants have explained, they *did not "bar"* Elamin from serving in this role at all; nor is there any allegation that any Defendant has the ability to *allow* him to serve in this role. *See* MTD p. 77-79; *supra* Section XIII.A. Rather, what Defendants have argued—and Plaintiffs have not disputed—is that "there is no principle in the law granting to clerics an absolute right to enter a prison," and thus any claimed "right" to "practice [one's] religious profession within the penitentiary walls … [is] nonexistent." *O'Malley*, 477 F.2d at 793-94. Further, neither an effect on an individual's "subjective, emotional religious experience," nor "a government action that decreases the spirituality, the fervor, or the satisfaction with which a believer practices his religion," can constitute a substantial burden within the meaning of the RFRA. *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1070, 1063 (2008).  For this reason as well, Elamin—who alleges only diminished religious "satisfaction" resulting

from an inability to exercise a "nonexistent" right "within the penitentiary walls"—has not alleged a "substantial burden" within the meaning of the RFRA. *See also Heap*, 112 F. Supp. 3d at 422 (rejecting RFRA claim premised on the plaintiff's rejected application to serve as a Navy chaplain).

### 2.     Plaintiffs Otherwise Fail to State a RFRA Claim.

Further, even if Plaintiffs' religious exercise were somehow substantially burdened, the challenged actions are the least restrictive means of achieving a compelling government interest. In their opening memorandum, Defendants explained at length the primacy of the Government's compelling interests in protecting its borders; preventing and investigating potential acts of terrorism; and expeditiously solving crime, including by facilitating the sharing of relevant information among federal, state, and local law enforcement authorities. *See* MTD p. 84-87, and legal authorities cited therein. As explained, courts have already upheld the watchlisting process and the resulting enhanced process at both airports and the border under similar strict scrutiny analyses. *See Mohamed*, 266 F. Supp. 3d at 88 ("[The] Court finds that the [No Fly] List is necessary and sufficiently narrowly tailored to achieve a compelling government interest and therefore does not violate Plaintiff's substantive due process rights."); *see also Elhady*, 303 F. Supp. 3d at 466 (dismissing claims materially similar to those of the Screening Plaintiffs here), *Abdi*, 2018 WL 1940411, at *3 (same); *Kovac v. Wray*, 363 F. Supp. 3d 721, 752 (N.D. Tex. 2019) (same); *Tabbaa*, 509 F.3d at 103, 106 (upholding an alleged policy of detaining and searching the attendees of a particular Islamic conference upon their re-entry, where the challenged tactics "were in furtherance of [the] compelling governmental interest" in preventing terrorism, and "were the least restrictive means of furthering that interest").

In their opposition, Plaintiffs fail to address any of Defendants' cited authorities; nor do they otherwise seriously dispute any of the various compelling governmental interests that Defendants identified. Accordingly, and for the reasons set forth in greater detail in Defendants' opening memorandum, the Court should dismiss all RFRA claims on these independent grounds as well.

### XIV.   Count XIV (Non-Delegation/Ultra Vires) Should Be Dismissed.

Finally, Plaintiffs' non-delegation claim also fails. In their Opposition, Plaintiffs "clarify" that they do not disagree that the relevant statutory authorities provide sufficiently "intelligible" standards. Opp. p. 63. Rather, Plaintiffs now contend that this claim rests on a theory that Congress has not authorized the TSDB, the TSC, or the WLAC "at all." *Id.* p. 63-65.

This theory is, in a word, specious. Numerous components of the federal Government work together—pursuant to their *separately delegated authorities*—to secure the U.S. and its borders and aviation system from terrorist threats. For example, DHS is charged with "prevent[ing] terrorist attacks within the United States," 6 U.S.C. § 111(b)(1)(A), and "reduc[ing] the vulnerability of the United States to terrorism," *id.* § 111(b)(1)(B); *see also id.* § 202(1) (charging DHS with the responsibility of "[p]reventing the entry of terrorists and the instruments of terrorism into the United States."). Within DHS, TSA is responsible for securing transportation, with a focus on preventing terrorist attacks against civil aviation and other methods of transportation. *See* 49 U.S.C. § 114(d). TSA is further responsible for federal security screening operations for passenger air transportation, 49 U.S.C. § 114(e)(1), and for developing "policies, strategies, and plans for dealing with threats to transportation security," *id.* § 114(f)(3). TSA may "issue . . . such regulations as are necessary to carry out [its] functions," *id.* § 114(l)(1), as well as "prescribe regulations to protect passengers and property on an aircraft," *id.* §44903(b). The TSA Administrator is also required to establish procedures for notifying appropriate officials "of the identity of individuals" who are "known to pose, or suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety," *id.* § 114(h)(2)—a mandate which expressly requires TSA "to use information from government agencies" to identify travelers who may pose a threat to national security, and to "prevent [those] individual[s] from boarding an aircraft, or take other appropriate action," *id.* § 114(h)(3)(A), (B).

Also within DHS, CBP exercises authority under numerous statutes to search persons and goods at the nation's border. *See, e.g.*, 19 U.S.C. §§ 482, 1455, 1459, 1461, 1467, 1499, 1581, 1582. These authorities include, but are not limited to, inspections for the purpose of preventing terrorist

attacks. *See*, *e.g.*, 6 U.S.C. § 211(g)(3)(a). And the FBI investigates and analyzes intelligence relating to both domestic and international terrorist activities, *see* 28 U.S.C. § 533, 28 C.F.R. § 0.85(l).

Plaintiffs' theory that HSPD-6 and the WLAC "usurp [] … Congress' legislative function," SAC ¶ 1713, is equally unfounded. HSPD-6 directs the Attorney General to "establish" the TSC in order "to consolidate the Government's approach to terrorism screening and provide for the appropriate and lawful use of Terrorist Information in screening processes." HSPD-6 ¶ 2. On its face, HSPD-6 is a statement of Executive branch "policy" with respect to terrorist watchlisting. It "*does not alter existing authorities or responsibilities of department and agency heads to carry out operational activities or provide or receive information*," and "*is intended only to improve the internal management of the executive branch ….*" HSPD-6 (emphasis added). Thus, as Defendants explained—and Plaintiffs, tellingly, failed to dispute or in any way address—HSPD-6 is simply a "management directive," the source of authority for which is "the President's general constitutional powers to direct the exercise of powers statutorily delegated"—pursuant to many authorities cited above and throughout the briefing on this motion— "to executive branch officials." *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1339 (4th Cir. 1995).

Likewise, as Defendants have explained, the WLAC is simply a *forum*, in which participating agencies address certain types of watchlisting-related issues. Groh Decl. ¶ 3. Any watchlisting-related policies to which the WLAC members may commit themselves, and any actions that they may take pursuant to such policies are both voluntary and pursuant to their own separate and individualized legal authorities. *Id.* Plaintiffs cite no authority—because none exists—that precludes such salutary inter-agency cooperation and coordination. Accordingly, their non-delegation or "*ultra vires*" claim fails. *See Elhady*, 303 F. Supp. 3d at 467-68 (rejecting identical non-delegation claim). *Kadura*, 2017 WL 914249, at *9-10 (same); *Abdi*, 2018 WL 1940411, at *4 (same); *Kovac*, 363 F. Supp. 3d at 761 (same).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed in its entirety for lack of subject matter jurisdiction, or alternatively, for failure to state a claim.

Respectfully submitted,


JOSEPH H. HUNT
Assistant Attorney General
Civil Division

ROBERT K. HUR
United States Attorney

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

_____/s/_____
Antonia Konkoly
Christopher Healy
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, Room 11110
Washington, DC 20005
(202) 514-2395 (direct)
(202) 616-8470
antonia.konkoly@usdoj.gov
christopher.healy@usdoj.gov

*Counsel for the Official Capacity Defendants*

DATED: July 12, 2019

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 12, 2019, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification to all counsel of record.

/s/
Antonia Konkoly
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, Room 11110
Washington, DC 20005
(202) 514-2395 (direct)
(202) 616-8470
antonia.konkoly@usdoj.gov
