**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

RAMI KHALED EL ALI, *et al.*,       *

     Plaintiffs,             *

     v.                     *       Civil Action No. 8:18-cv-02415-PX

WILLIAM BARR, *et al.*,          *

     Defendants.           *
                        ***

<u>**MEMORANDUM OPINION**</u>

Plaintiffs are 39 individuals—37 U.S. citizens and two legal residents—who claim that inclusion in the Government's Terrorism Screening Database ("TSDB") and various related Watchlists impair or prohibit air and land travel in the United States.[1]  Plaintiffs allege that their list status, or status by association with those on a list, subjects them to constitutionally impermissible detentions, searches, and screening at airports and land border entries, or in some cases, denial of air travel altogether.  Relatedly, Plaintiffs allege that their list status has burdened their families and businesses, and inflicted other wide-ranging harms.

Plaintiffs have filed this mass action, averring that their inclusion in the TSDB and Watchlists violates (1) Procedural Due Process (Count I), (2) Substantive Due Process (Count II), (3) the Administrative Procedure Act (Counts III and IV), (4) the Equal Protection Clause (Count V), (5) the Fourth Amendment (Count VI), (6) the First Amendment (Count VII), (7) the Fifth Amendment Right against self-incrimination (Count VIII),[2] (8) The Religious Freedom Restoration Act (Counts X, XI, XII, and XIII), and (9) the non-delegation doctrine (Count XIV).

---

[1] Plaintiff Khaled El Ali, a foreign national residing outside of the United States, voluntarily withdrew his claims against Defendants.  ECF No. 68.  He is dismissed from this action.

[2] Plaintiffs voluntarily dismissed Count IX (violation of the Second Amendment).  ECF No. 52 at 70.

Pending before the Court is a Motion to Dismiss (ECF No. 49-1), filed jointly by 26 Defendants[3] who, with the exception of the Watchlisting Advisory Council (WLAC), each head a federal agency and have been sued in their official capacities.  Defendants contend that this Court lacks jurisdiction over the claims and, alternatively, that the claims fail as a matter of law.  On June 18 and 26, 2020, the Court held a virtual hearing on the motion.  ECF Nos. 70, 72.  For the reasons below, Defendants' motion will be granted in part and denied in part.

## I.     Background[4]

### A.     The TSDB and Watchlist Infrastructure

Plaintiffs have been the objects of an interagency watchlisting system, led by the WLAC.  The WLAC is comprised of member agencies who are the defendants in this case.  According to Plaintiffs, the WLAC is:

---

[3] Defendants are William Barr, Attorney General, U.S. Department of Justice ("DOJ"); Christopher Wray, Director of the Federal Bureau of Investigation; Charles H Kable, IV, Executive Assistant Director of the Terrorism Screening Center; Joseph Maguire, Director of the National Counterterrorism Center, Office of the Director of National Intelligence; John C. Demers, Assistant Attorney General for National Security, National Security Division, DOJ; Beth A. Williams, Assistant Attorney General, Office of Legal Policy, DOJ; Peter A. Winn, Acting Chief Privacy and Civil Liberties Officer, Office of Privacy and Civil Liberties, DOJ; Daniel R. Coats, Director of National Intelligence, Office of the Director of National Intelligence; Kirstjen Nielson, Secretary of Homeland Security, U.S. Department of Homeland Security ("DHS"); Kevin K. McAleenan, Acting Commissioner, U.S. Customs and Border Protection; David P. Pekoske, Administrator, Transportation Security Administration, DHS; L. Francis Cissna, Director, U.S. Citizenship and Immigration Services, DHS; Tracy Renaud, Deputy Director, U.S. Immigration and Customs Enforcement; Cameron Quinn, Officer, Office for Civil Rights and Civil Liberties, DHS; David J. Glawe, Under Secretary, Office of Intelligence and Analysis, DHS; John Mitnick, General Counsel, DHS; James W. McCament, Deputy Under Secretary, Office of Strategy, Policy, and Plans, DHS; Jonathan R. Cantor, Chief Privacy Officer, Privacy Office, DHS; Mike Pompeo, Secretary of State, U.S. Department of State; Patrick M. Shanahan, Acting Secretary of Defense, U.S. Department of Defense; General Paul M. Nakasone, Commander, U.S. Cyber Command and Director, National Security Agency/Chief, Central Security Service, U.S. Department of Defense; Lieutenant General Robert P. Ashley, Jr., Director, Defense Intelligence Agency; Steven Mnuchin, Secretary of the Treasury, U.S. Department of Treasury; Ken Blanco, Director, Financial Crimes Enforcement Network, U.S. Department of the Treasury; Gina Haspel, Director, Central Intelligence Agency; and the Watchlisting Advisory Council.

Plaintiffs also name several unidentified "John Doe" defendants, against whom they purport to state individual capacity and/or *Bivens* claims.  None of these defendants have been identified or served, and the time period to do so has long passed. Fed. R. Civ. P. 4(m).  As such, all claims against the "John Doe" defendants are dismissed.

[4] In reviewing a motion to dismiss under Rule 12(b)(6), the Court accepts "the well-pled allegations of the complaint as true," and construes all facts and reasonable inferences in the light most favorable to the plaintiffs.  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

> [A] government entity that promulgates decisions regarding all policies,
> procedures, practices and instructions pertaining to the federal terrorist watchlist,
> including, but not limited to: (1) watchlist nomination and removal procedures;
> (2) specific criteria used to nominate persons to the TSDB; (3) redress procedures;
> (4) vetting of information used to nominate persons to the TSDB; and, (5)
> dissemination of a person's designation in the TSDB to state and local authorities,
> courts, foreign governments, private corporations, private contractors, airlines,
> gun sellers, financial institutions, the captains of sea-faring vessels, and others.

ECF No. 48 ¶ 82.  It is through the WLAC's interagency watchlisting system that Defendants

have identified Plaintiffs as worthy of scrutiny and placement in the TSDB and Watchlists, to

include the No Fly List, the Selectee List, and the Expanded Selectee List.  *Id.* ¶ 3.

The WLAC operates by consensus and each member agency retains decision-making

authority and veto power over all WLAC decisions.  *See, e.g.*, *id.* ¶¶ 57, 64, 69.  The member

agencies play a variety of roles.  Some nominate individuals to Watchlists, *see, e.g.*, *id.* ¶¶ 60,

61, 63, 68, 74, some accept nominations, *see id.* ¶¶ 59, 54, and some disseminate Watchlist

information to "state and local authorities, courts, foreign governments, private corporations,

private contractors, airlines, gun sellers, financial institutions, the captains of sea-faring vessels,

and others."  *See e.g.*, *id.* ¶¶ 57, 79, 80.  Some conduct frontline screening of Watchlist listees,

*see, e.g.*, *id.* ¶¶ 65, 66, 67,68, 75, while others develop policies for the frontline screening

agencies.  *Id.* ¶ 73, 74.  The WLAC also reviews and approves by consensus written Watchlisting

Guidance (WLG).  ECF No. 67-1 at 5–6.  The WLG governs the Watchlisting process and is

considered government policy once adopted.  *Id.*

The TSDB functions as a "master repository for suspected international and domestic

terrorist records."  *Id.* ¶ 93.  The TSDB is developed and maintained by the Terrorist Screening

Center ("TSC"), which was established in 2003 by Attorney General John Ashcroft to

consolidate the government's approach to terrorism screening.  *Id.*  The TSC itself is a multi-

agency center, administered by the Federal Bureau of Investigation ("FBI") and consisting of the

Department of Homeland Security ("DHS"), the National Counterterrorism Center ("NCTC"), the Transportation Security Administration ("TSA"), and U.S. Customs and Border Protection ("CBP"). *Id.* ¶ 59; ECF No. 48-6 at 3 ("Overview of the U.S. Government's Watchlisting Process and Procedures as of January 2018").

The WLAC and the TSDB work as follows: agency members of WLAC "nominate" individuals to the TSDB. ECF No. 48-6 at 4; ECF No. 48 ¶¶ 60, 61, 63, 68, 74. The TSC reviews the individual nominee and, if he or she is "reasonably suspected of being a known or suspected terrorist," adds the individual to the TSDB. ECF No. 48-6 at 4, 6; ECF No. 48 ¶ 94. In particular, an individual is placed in the TSDB based on:

> articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities.

ECF No. 48-6 at 5. This inclusion standard, according to the Second Amended Complaint ("Amended Complaint"), is so broad and amorphous as to render it useless in identifying known or suspected terrorists. ECF No. 48 ¶ 220. In practice, TSDB inclusion is driven not by suspected terrorism but by an individual's race, ethnicity, country of origin, religion, religious practices, languages spoken, family, mere associations,[5] travel history, and social media history—criteria determined by WLAC. *Id.* ¶¶ 82, 95, 199. Approximately 99% of all proposed additions to the TSDB are accepted each year, and between 2009 and 2016, the number of individuals added to the TSDB has tripled. *Id.* ¶ 14.

The TSDB has grown to over one million people whose inclusion, say Plaintiffs, has

---

[5] The close association with someone already in the TSDB may itself be the catalyst for placement on the TSDB and Watchlists. *See, e.g., id.* ¶ 896 (Faatimah Knight placed on TSDB and Watchlists due to association with her husband Hicham Hall).

done nothing to improve national security.  *Id.*  A DHS-funded study performed by the University of Maryland assessed the efficacy of the TSDB and concluded that of the approximately 250 terrorist acts committed inside the United States over the last decade, *none* of the offenders were included in the database.  *Id.* ¶¶ 179–80.  The study demonstrates that the Watchlisting system would perform similarly if persons were included in TSDB by random selection rather than using the existing inclusion criteria.  *Id.* ¶ 188.

The TSDB acts as a feeder for placement on the Expanded Selectee List, Selectee List, and No Fly List—Watchlists related to air travel.  *Id.* ¶ 97.  Everyone in the TSDB is automatically also on the Expanded Selectee List if minimum identifiers for the person are available.  *Id.* ¶ 98.  The Selectee List includes individuals for whom undefined "derogatory information" exists and for whom the government suspects association or affiliation with a foreign or domestic terrorist organization, or other association with terrorist activities.  *Id.* ¶ 99. Boarding passes for Expanded Selectee List or Selectee List individuals have "SSSS" printed on them for ease of identification among airline and airport employees, agents, and screeners. Consequently, those listees are routinely subjected to extra screening at airports.  *Id.* ¶ 100.

 A person makes the No Fly List if, in addition to non-specific "derogatory information," the government suspects the individual presents a threat of committing an act of terrorism in the United States, against an international United States government facility, or with respect to an aircraft, or if the individual is capable of carrying out a violent act of terrorism.  *Id.* ¶ 101. Persons on the No Fly List are prevented altogether from boarding an aircraft that flies through United States airspace.  *Id*. ¶ 102.

Still other lists exist that are not dependent on inclusion in the TSDB.  The "Quiet Skies" and "Silent Partner" lists are developed and maintained by the TSA and operate in parallel to the

TSDB.  *Id.* ¶ 112.  Quiet Skies and Silent Partner lists may cross-reference with the TSDB and

may be used to help identify individuals whose backgrounds result in nomination to the TSDB.

*Id.* ¶¶ 95 n. 2, 113, 114.  Those identified through the Quiet Skies and Silent Partners programs

are surveilled at the airport and in the air, and their information is shared with foreign carriers

and governments.  *Id.* ¶ 112, 115.

Any TSDB listee may be blocked from crossing U.S. land borders or from boarding

international flights headed to the United States.  *Id.* ¶ 103.  CPB refers to those in the TSDB as

"Armed and Dangerous," subjecting them to secondary inspection or flagging them as potential

terrorists in automatic alerts sent to officers.  *Id.* ¶ 104.  The secondary inspection often includes

advanced electronic searches.  *Id.* ¶ 105.

More generally, state and local authorities, courts, foreign governments, private

corporations, private contractors, airlines, gun sellers, financial institutions, and captains of sea-

faring vessels have access to the TSDB.  *Id.* ¶¶ 82, 154.  In addition, a subset of the TSDB is

placed in a "Known or Suspected Terrorist" ("KST") file that is distributed to the National Crime

Information Center (NCIC) for access by more than 18,000 law enforcement agencies and

100,000 law enforcement officers.  *Id.* ¶ 106.

### B.     Plaintiffs in the TSDB and on Watchlists

Most Plaintiffs, of whom all are Muslim, allege placement in the TSDB and related

Watchlists.  *Id.* ¶¶ 119, 232.[6]  Plaintiffs often surmise on which lists they are included, but rarely

receive confirmation.  Nor do they know why they are in the TSDB or on Watchlists.  None have

been arrested, charged, or convicted of any type of terrorism-related offense.  *Id.* ¶ 234.  A few

---

[6] Defendants object to Doe Plaintiffs proceeding anonymously without leave of Court.  ECF No. 49-1 at 41 n.9.  The Court grants Plaintiffs 14 days to move for the Doe Plaintiffs to proceed pseudonymously.  If no motion is filed, the Doe Plaintiffs shall be dismissed without further consideration.

other Plaintiffs are family members of TSDB Plaintiffs, and primarily allege harms flowing from membership in the Quiet Skies and Silent Partner programs.  *Id.* ¶ 119.

Plaintiffs allege, collectively, a host of injuries resulting from the above-described surveillance programs.  The Court summarizes those related to air and land travel, as well as broadly applicable consequential harms.

### 1.    Air Travel

 Watchlisted Plaintiffs are routinely selected for screening, searches, and questioning at airports beyond that of the normal traveler.  Plaintiffs first must be cleared by airline administrators and TSA at check-in.  Next, they are screened and searched at the security checkpoint, and then again at the gate prior to boarding.  Such screenings include full-body patdowns, chemical residue testing, extensive searches of personal belongings, and interrogations.  *See, e.g., id.* ¶¶ 325–34 (Jardaneh); ¶¶ 424–43 (Abdurrashid); ¶¶ 459–78 (M. Paryavi); ¶¶ 498–502 (H. Wehelie); ¶¶ 655–59 (El-Shahat); ¶¶ 1212–18 (Riad).

Almost all searches are conducted in front of travel companions and other passengers. Plaintiffs Hicham Hall and Faatimah Knight, after undergoing extensive public screening at the security checkpoint, were subjected to additional chemical testing and protracted pat downs at the gate and were publicly photographed by agents as they boarded their flight.  *Id.* ¶¶ 922–25. A TSA agent made Mustafa El-Shahat "stand with his hands against the wall" in front of fellow travelers, and "then kicked [him] to force his legs apart, causing him pain."  *Id.* ¶ 661.

Plaintiffs' travel companions typically receive similar treatment simply because they accompany Plaintiffs.  *See, e.g., id.* ¶¶ 444, 479, 552–585, 686, 1083.  Imam Farid Sulayman's disabled, seventy-eight-year-old mother was subjected to patdowns, chemical testing, and interrogations because she was traveling with her son.  *Id.* ¶¶ 686–90, 697–98.  Faraz Siddiqui's

two-months-old baby was screened, *id.* ¶ 1004, and the children who are old enough to talk, such as Anisa Mujanovic's son and daughter, had to answer questions about their mother.  *Id.* ¶ 1154–55.   Fourteen-year-old Mia El Ali was patted down and questioned, and her body subjected to chemical testing, both at the security checkpoint and in front of other passengers at the gate, while en route to visit her father.  *Id.* ¶ 256–57.

Even after Plaintiffs are cleared at security checkpoints and the gate, they continue to endure adverse treatment due to their status.  Alaa Abunijem, his wife, and their two young children, were forcibly removed from their flight because, according to airport officials, "Americans did not want them to travel on the flight."  *Id.* ¶¶ 1315–17.  On other occasions, undercover agents surveilled Plaintiffs en route to their final destinations.  *See, e.g.*, *id.* ¶ 334 (Jardeneh); ¶¶ 1116–19 (Muminov).  Upon arrival, agents sometimes removed certain Plaintiffs from the plane in front of fellow passengers.  *See e.g.*, *id.* ¶ 999 (Siddiqui); ¶ 1513 (Al-Sahlani).  On Hicham Hall's flight, the pilot instructed all passengers to present their passports to the CBP officers.  *Id.* ¶ 909.  Once CPB officers identified Hall, they announced publicly "[w]e got him" and then proceeded to take Hall off the plane and to a private room.  *Id.* ¶ 910.  There, CBP officers questioned him about the purposes of his trip, copied his Arab language books, and seized and searched his laptop and phone.  *Id.* ¶¶ 910–14.

FBI agents or CPB officers often detain and interrogate Plaintiffs during their travel.  Plaintiffs are pressed about work and travel history, Islamic practices and culture, associations with persons in Muslim-majority countries, social media usage, personal religious beliefs and practices, topics of study, political opinions, and mosque attendance.  *See, e.g.*, *id.* ¶ 485 (M. Paryavi); ¶¶ 635–41 (Mohallim); ¶¶ 646, 650 (El-Shahat); ¶ 941 (Knight); ¶ 1279 (Kamel); ¶ 1519–20 (Al-Sahlani).  Further, agents often search Plaintiffs' phones and laptops, confiscate the

devices, and download their contents. *See, e.g.*, *id.* ¶ 648 (El-Shahat); ¶ 1312 (Abunijem); ¶ 1348 (Hijaz); ¶ 1491 (Kadoumi). The devices are sometimes not returned for weeks, months, or at all. *See, e.g., id.* ¶ 761 (Suliman).

Because these procedures are lengthy, Plaintiffs often miss their flights. Many Plaintiffs having experienced such delays in the past, and so they make sure to arrive at the airport several hours in advance of their scheduled departure. Nonetheless, the extensive delays result in missed flights. *See, e.g., id.* ¶¶ 663, 908. In one instance, Mohamed Albadawi missed *four flights* on the same trip. *Id.* ¶ 868. *See also id.* ¶¶ 501–13 (Hawa Wehelie and sister Fatima Wehelie subjected to four-hour interrogation and, after missing a connecting flight, re-interrogated the following day before boarding their new flight).

To avoid such invasive searches and interrogations, Plaintiffs have chosen to travel by means other than air or not at all. As a result, Plaintiffs have lost business opportunities and have missed important family gatherings and other celebrations. *See, e.g.*, *id.* ¶ 337 (Jardeneh); ¶ 446–48 (Abdurrashid).

No Fly List Plaintiffs have been denied air travel altogether. *See, e.g.*, *id.* ¶¶ 600, 607, 617 (Mohallim); ¶¶ 814, 818 (Sehwail); ¶¶ 1023, 1041 (Bosnic); ¶1432 (Shirwa). Mahad Mohallim was twice denied from boarding a flight from Doha, Qatar back to the United States. *Id.* ¶¶ 587–643. It would be over a year until he and his mother were able to return home. *Id.* ¶ 616. Nader Sehwail, too, could not return to the United States for a month, despite the aid of counsel and multiple exchanges with the U.S. embassy. *Id.* ¶¶ 812–37. Even when he was finally allowed to fly into the United States, he was immediately denied boarding for a domestic flight and had to rent a car and drive the last leg of his journey. *Id.* ¶ 840. As of the filing of this lawsuit, seventy-one-year-old Hassan Shirwa was stranded in Kenya, unable to return home. *Id.*

¶ 1433.

## 2.     Land Travel

Certain Plaintiffs are also subjected to similar searches, screening, and interrogations when they enter the United States at a land border.  CBP officers have ordered Plaintiffs and their companions out of their car, sometimes at gunpoint, where they are then patted down and questioned at length while held in confinement.  *See, e.g., id.* ¶¶ 309–13 (Jardaneh undergoing four-hour interrogation and invasive pat down); ¶¶ 493–94 (H. Wehelie); ¶¶ 664–67 (El-Shahat). Mirrakhmat Muminov, returning from a business trip in Canada, was ordered out of his car by gunpoint by several CBP officers, handcuffed, and detained in a cold cell for several hours.  *Id.* ¶¶ 1096–99.  He was then interrogated—for four hours—about his religious views and mosque attendance, as well as subjected to a pat down, finger printing, hair analysis, iris scan, mouth swab, and search of his belongings.  *Id.* ¶¶ 1100–105.  He has, as a result, stopped traveling to Canada for business.  *Id.* ¶ 1106.

As for searches and seizures, agents take Plaintiffs' portable electronic devices (phones and laptops) and in some instances download electronic data, all without a warrant or consent. *See, e.g., id.* ¶¶ 316 (Jardaneh); ¶ 495 (Wehelie); ¶ 673, 680 (Sulayman).  Agents sometimes return devices after a couple of days, *id.* ¶ 319 (Jardaneh), or a couple of months.  *Id.* ¶ 577 (Wehelies).

Certain Plaintiffs also have been approached to act as informants in exchange for being pulled off Watchlists.  During Hall's detention at the border, the FBI offered to streamline his travel and remove him from all Watchlists if he assisted them.  *Id.* ¶¶ 934–35.  Hall understood that acting in such capacity would require that he associate under false pretenses with religious leaders to gather information for the FBI.  *Id.* ¶ 936.

### 3.     Other Harms from TSDB and Watchlist Placement

Collectively, Plaintiffs correlate placement in the TSDB and Watchlists with a wide variety of deprivations.  Plaintiffs aver that because their placement in the TSDB and watchlists is shared liberally, their bank accounts have been closed, *see, e.g., id.* ¶ 1007–09 (Siddiqui); ¶ 1161 (Mujanovic); ¶ 1205 (Hachem).  Other Plaintiffs have been denied government accommodations such as membership in TSA PreCheck and Global Entry, both of which allow for expedited screenings at ports of entry.  *See, e.g., id.* ¶¶ 483–84 (M. Paryavi), ¶ 764 (Suliman); ¶¶ 972–79 (E. Paryavi).  Several Plaintiffs have experienced delays in immigration proceedings for their loved ones.  *See e.g., id.* ¶ 669 (immigration application for El-Shahat's wife delayed over three years); ¶ 1124 (Muminov's mother's visitor visa revoked).

Plaintiffs also contend that placement results in receiving the undeserved moniker of "known or suspected terrorist."  They are identified by the "SSSS" printed on their boarding passes and are searched openly in front of family and friends.  As a result, no one will travel with them.  *See, e.g.*, *id.* ¶ 891 (Albadawi); ¶ 1005 (Siddiqui); ¶¶ 1177–94 (Hachem); ¶ 1421 (Elamin); ¶ 1156 (after experiencing interrogations due to their mother's list status, Mujanovic's son and daughter told her they "never wanted to travel with her again").

For some Plaintiffs, this shunning has resulted in clear loss of business opportunity.  Fadi Suliman had been repeatedly screened and searched in front of his employees, a customer, and a vendor.  *Id.* ¶¶ 718–26.  His Muslim travel companions withstood similar treatment.  *Id.*  As a result, Suliman missed his flight and was forced to travel separately from his companions.  *Id.* ¶ 731.  At his next stop, he was delayed again because of additional screening, and therefore missed several meetings.  *Id.* ¶ 737.  The same thing happened on the return trip.  Consequently, his travel companions—his employees, customer, and vendor—vowed to never again travel with

11

him. *Id.* ¶ 740.

Plaintiffs have also lost jobs, accounts, and contracts after repeatedly missing flights because they were subjected to protracted searches and interrogations. *See, e.g., id.* ¶¶ 340–41 (Jardaneh); ¶ 1382 (Soueidan); ¶ 1537 (Al-Sahlani); ¶ 1192 (Hachem). Farid Sulyaman, an uber driver, could not pick up his passenger at a military base; he was instead handcuffed and detained for an hour. *Id.* ¶¶ 702–13. Khalil Thadi, similarly, could not access a military base to provide a work estimate. *Id.* ¶ 950–53. When he arrived for his job, he was detained at the entrance gate, questioned, photographed, and ultimately denied access. *Id.* Not surprisingly, Thadi lost the government subcontract. *Id.* Zijad Bosnic, a truck driver, had his Transportation Worker Identification Credential (TWIC) suspended such that he can no longer complete many of his work routes. *Id.* ¶ 1046. Some have simply forgone jobs that require travel. *See, e.g., id.* ¶ 1011 (Siddiqui).

### C. Limited Recourse for TSBD-Watchlisted Plaintiffs

Plaintiffs have found limited avenues to redress erroneous placement on the TSDB or Watchlists. The only extra-judicial redress procedure lies with the Department of Homeland Security's Traveler Redress Inquiry Program ("DHS TRIP"). DHS TRIP was established to assist in resolving travel complaints, including those related to Watchlist status. *Id.* ¶ 15.

When an individual in the TSDB files a DHS TRIP inquiry, the inquiry is forwarded to TSC for review. *Id.* ¶ 212; ECF No. 48-6 at 9. TSC may then contact the NCTC and the agency that nominated the individual to the TSDB to assist in its review. ECF No. 48-6 at 9. TSC next decides whether to keep or remove the individual from the TSDB and sends the results to DHS TRIP. *Id.*; ECF No. 48 ¶ 217. DHS TRIP, in turn, sends a standard form letter that neither confirms nor denies the individual's Watchlist status. *Id.* ¶ 217.

However, in 2015, and in response to litigation, DHS TRIP procedures were revised as to persons on the No Fly List.[7]   Under the revised procedures, TSC after review may remove the individual from the No Fly List.  ECF No. 48-6 at 10.  If the TSC decides not to remove the individual, the TSC provides such a recommendation to the TSA administrator who, in turn, decides either to remove or maintain the individual on the No Fly List, or to seek additional information from the TSC.  *Id.*  In the end, the TSA Administrator provides the individual with a final determination.  *Id.*  If the person remains on the No Fly List, TSA states the reasons for continued placement unless doing so would compromise national security or law enforcement interests.  ECF No. 48 ¶ 218; ECF No. 48-6 at 10.[8]  According to Plaintiffs, since 2015, TSA has not processed a single No Fly List determination under its new DHS TRIP procedure.  ECF No. 48 ¶ 222.

In practice, DHS TRIP "refuses to discuss specific facts and refuses to even process many redress complaints[,]" including for those on the No Fly List.  ECF No. 48 ¶ 15.  For those Plaintiffs who have filed DHS TRIP inquiries, some have simply received a letter which includes only a "redress control number."  Plaintiffs have often waited months or years for additional information, but none has been provided.  *See, e.g., id.* ¶ 339 (Jardeneh receiving letter in September 2017); ¶ 964 (Thadi receiving letter on March 13, 2018); ¶ 455 (Aburrashid); ¶ 487 (M. Paryavi); ¶ 586 (Noor); ¶ 879 (Albadawi).  The only two Plaintiffs who received confirmation that they are on the No Fly List, Bosnic and Shirwa, have since been removed from

---

[7] The 2015 revisions do not affect all other inquiries related to TSDB and Selectee Lists or Quiet Skies/Silent Partner lists.  ECF No. 48 ¶ 220; *see also* ECF No. 48-6; ECF No. 49-6 at 9–10.

[8] Although the Amended Complaint alleges that the 2015 revisions *require* that No Fly List complaints receive confirmation from DHS TRIP of their status, ECF No. 48 ¶ 218, the government overview document states otherwise.  *See* ECF No. 48-6 ("*In certain instances*, however, a U.S. person denied boarding because of their presence on the No Fly list *may* be apprised of their status through the DHS TRIP process.  When a U.S. citizen or Lawful Permanent Resident applying for redress is, in fact, on the No Fly List, DHS TRIP *may* inform the applicant of his or her status on the list.) (emphases added).

the list during the pendency of this case.  ECF Nos. 49-2, 49-3.  Still others have received no

response at all.  *See, e.g., id.* ¶ 1495 (Kadoumi).

## II.     Standards of Review

Defendants lodge an array of challenges, some of which implicate the Court's subject

matter jurisdiction, while others attack the merits of the claims.  The applicable review standard

is set forth for each.

### A.     Subject Matter Jurisdictional Challenges, Federal Rule 12(b)(1)

Rule 12(b)(1) motions challenge a court's authority to hear the matter.  *See Jones v.*

*Calvert Group, Ltd.*, 551 F.3d 297, 300–01 (4th Cir. 2009).  The plaintiff bears the burden of

establishing subject matter jurisdiction by a preponderance of the evidence.  *Lovern v. Edwards*,

190 F.3d 648, 654 (4th Cir. 1999).  In determining whether jurisdiction exists, "the court may

look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever

evidence has been submitted on the issue."  *Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D.

Md. 2003) (internal marks and citation omitted).  Where a defendant contends that the complaint

"simply fails to allege facts upon which subject matter jurisdiction can be based," the Court

construes the factual allegations as true and most favorably to the plaintiff.  *Adams v. Bain*, 697

F.2d 1213, 1219 (4th Cir. 1982).  Whether the Court retains subject matter jurisdiction must be

decided before reaching the merits of the case.  *Jones v. Am. Postal Workers Union*, 192 F.3d

417, 422 (4th Cir. 1999).

Motions to dismiss brought pursuant to Rule 12(b)(1) may proceed either as a facial

challenge, asserting that the allegations in the complaint are insufficient to establish subject

matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the

complaint [are] not true."  *Kerns v. United States,* 585 F.3d 187, 192 (4th Cir. 2009) (citation

omitted); *see also Richardson v. Mayor & City Council of Baltimore*, No. A. RDB-13-1924, 2014 WL 60211, at *2 (D. Md. Jan. 7, 2014).  Where Defendants mount a facial challenge, Plaintiffs are "afforded the same procedural protection as [they] would receive under a Rule 12(b)(6) consideration" and the court must "assume the truthfulness of the facts alleged." *Kerns*, 585 F.3d at 192–93 (citations omitted).  A factual challenge, in comparison, allows the Court to "go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts." *Id.* at 193.  In this case, Defendants attack Plaintiffs' allegations on both fronts and the Court therefore uses both standards.

### B.      Merits Challenges, Federal Rule 12(b)(6)

A motion brought pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  The Court accepts "the well-pled allegations of the complaint as true," and construes all facts and reasonable inferences most favorably to the plaintiff.  *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  To survive a motion to dismiss, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).

In ruling on a Rule 12(b)(6) motion, the Court generally may not consider extrinsic evidence.  *Zak v. Chelsea Therapeutics, Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) ("Consideration of extrinsic documents by a court during the pleading stage of litigation improperly converts the motion to dismiss into a motion for summary judgment.").  However, the Court may consider documents attached to a motion if "integral to and explicitly relied on in the complaint."  *Id.* at 606–07 (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir.

1999)); *see also Marshall v. Anne Arundel Cty., Md*, No. ELH-18-74, 2019 WL 568676, *5 (D. Md. Feb. 12, 2019).  Moreover, the Court may take judicial notice of "matters of public record" without converting the motion to dismiss into a motion for summary judgment.  *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

### III.     Subject Matter Jurisdiction

#### A.     Standing

Defendants argue that all Plaintiffs lack standing as to certain defendants, and that certain Plaintiffs lack standing as to all defendants.  A court retains jurisdiction only where the plaintiff has standing to bring the claim.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Pursuant to Article III of the United States Constitution, federal courts are of limited jurisdiction, hearing only live "cases" and "controversies."  *Id.* at 559; U.S. Const. art. III, § 2.  A legal action meets the case-or-controversy requirement where the "questions [are] presented in an adversary context."  *Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007) (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968)) (internal quotation marks omitted).

For a case to satisfy the case-or-controversy requirement, the plaintiff must have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts*, 549 U.S. at 517.  Each Plaintiff must demonstrate "(1) . . . an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

1.      **Standing as to WLAC Agency Defendants**

The WLAC Agency Defendants argue that Plaintiffs lack standing to bring any claim against them because Plaintiffs have failed to allege both traceable and redressable injuries.  ECF No. 49-1 at 41–45.  Although these Defendants do not dispute membership in the WLAC, they contend that the majority of them play no role in the creation or management of the Watchlisting system sufficient to confer standing.  Accordingly, the Court focuses its standing analysis on whether the claimed injuries are both traceable and redressable as to all WLAC Agency Defendants.

Traceability and redressability are best addressed jointly as "they rise or fall together." *Friends for Ferrell Parkway, LLC v. Stasko,* 282 F.3d 315, 323 n. 1 (4th Cir. 2002).  Traceability requires plaintiffs to aver plausibly that their injury "was caused by the challenged conduct of the defendant, and not by the independent actions of third parties not before the court."  *Stasko*, 282 F.3d at 320 (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 154 (4th Cir.2000) and *Lujan,* 504 U.S. at 560).  Redressability requires that the requested relief as to the challenged defendants is "likely, and not merely speculative . . . [to] remedy the plaintiff's injury."  *Id.*  (citations omitted).  However, "no explicit guarantee of redress to a plaintiff is required to demonstrate a plaintiff's standing."  *Equity in Athletics, Inc. v. Dep't of Educ.,* 639 F.3d 91, 100 (4th Cir.2011).

Where, as here, standing turns on involvement with policymaking, a plaintiff must show that the defendant is involved in the promulgation or enforcement of such policies, or otherwise exerts control over the disputed provision.  *See, e.g., Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014); *Nat'l Ass'n for Advancement of Multijurisdiction Practice, (NAAMJP) v. Howell,* 851 F.3d 12, 17 (D.C. Cir. 2017) (standing absent where plaintiff "failed to identify any

17

role whatsoever of the Attorney General" in enforcement of challenged rule); *Calzone v. Hawley*, 866 F.3d 866, 870 (8th Cir. 2017) (plaintiff lacked standing to sue entities without enforcement authority as to challenged provision).

Plaintiffs assert that the WLAC as a whole "promulgates decisions regarding all policies, procedures, practices and instructions pertaining to the federal terrorist watchlist," ECF No. 48 ¶ 82, and that each WLAC member has "decision-making authority" and "veto power" over those decisions.  *See id.* ¶¶ 57–81.  Defendants respond that the WLAC retains no such authority. Rather, the member agencies operate by consensus to review and adopt the WLG, which in turn becomes the policy governing the TSDB and Watchlisting system.   ECF No. 49-1 at 43; ECF No. 67-1 ¶ 3.  According to Defendants, WLAC and its members "address (a) questions from participant agencies about how specific provisions of the [WLG] should be interpreted or implemented, (b) technical issues arising from the exchange of TSDB information between and among participant agencies, and (c) whether portions of the WLG should be changed or updated."  ECF No. 67-1 ¶ 6.  Absent objections from the National Security Council, the WLG then becomes government policy.  *Id.* ¶ 9.

The facts in this respect are hotly contested and invoke matters of first impression.[9]  At this stage, the Court must allow further factual development to resolve the scope of the WLAC Agency Defendants' participation in the TSDB and Watchlists.  *See Kerns*, 585 F.3d at 193 (recognizing standing may require factual development to resolve jurisdictional question).  The Court is centrally concerned that WLAC Agency Defendants' role in approving WLG changes as "policy" is sufficient to confer standing.  This is because, as averred, the WLG governs the

---

[9] Although individuals subjected to Watchlist restrictions have pursued similar litigation in other districts, *see, e.g., Elhady v. Piehota*, 303 F. Supp. 3d 453, 457 (E.D. Va. 2017), none have named as defendants the WLAC and all its member agencies.

TSDB and Watchlist inclusion criteria, as well as dissemination of the same.  Thus, the Court will not dismiss the WLAC Agency Defendants at this time.  The Court, however, will entertain a streamlined discovery plan, tightly focused on the WLAC's role in management of the TSDB and Watchlists, to include promulgating WLG.  The motion to dismiss on this basis is denied.

### 2. Standing for Rami Khaled El Ali

Defendants urge the Court to dismiss Plaintiff Rami Khaled El Ali from the suit because he has not alleged inclusion on the TSDB or any inhibition of travel whatsoever.  ECF No. 49-1 at 49.  Rami is the son of former Plaintiff Khaled El Ali who has voluntarily withdrawn from this suit after the State Department granted his tourist visa.  ECF No. 68.  Rami has pleaded constitutional injuries arising from Defendants' initial refusal to admit his father into the United States.  ECF No. 48 ¶ 276.  *See Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018) ("a person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury").  Because Khaled El Ali may now return to the United States, and Rami only sought to redress the injury flowing from his inability to see his father in the United States, Rami no longer maintains any cognizable injury.  ECF No. 68.  Defendants' motion is granted as to him.

### B. Other Jurisdictional Challenges

### 1. Lack of Jurisdiction Pursuant to 49 U.S.C. § 46110

Defendants next contend that this Court lacks subject matter jurisdiction pursuant to the statutory jurisdictional channeling provision, 49 U.S.C. § 46110 ("Section 46110") for certain of Plaintiffs' claims implicating DHS TRIP redress procedures.  Section 46110 provides that any person who seeks to challenge "an order" issued by "the Administrator of the [TSA] with respect to security duties and powers designated to be carried out by the Administrator of the [TSA]"

must first petition for review in the Circuit Court in which the person lives or works.  49 U.S.C.
§ 46110(a).  Section 46110 expressly mandates that federal courts of appeals retain exclusive
jurisdiction to review "orders" issued by the TSA.  *See Long v. Barr*, No. 1:15-CV-1642, 2020
WL 1644570, at *9 (E.D. Va. Apr. 2, 2020).  What constitutes a TSA order, however, is less than
straightforward.

On this question, *Long v. Barr* provides important guidance.  *Id.  Long* recognized that an
"order" under Section 46110 is any "final disposition of the matter" issued by TSA.  2020 WL
1644570, at *9 (citing *Blitz v. Napolitano*, 700 F.3d 733, 740 (4th Cir. 2012) and *Alexandria v.
Helms*, 728 F.2d 643, 646 (4th Cir. 1984)).  *Long* also recognized such an order may encompass
broader constitutional challenges to TSA's actions, *id.* at *8 (citing *Blitz*, 700 F.3d at 741), as
well as TSA procedures and protocols that represent the TSA's final disposition.  *Id* at *9 (citing
*Blitz*, 700 F.3d at 740).  *See also Amerijet Intn'l, Inc. v. U.S. Dept. of Homeland Security, et al.*,
43 F. Supp. 3d 4, 13–14 (D.D.C. 2014) (finding a TSA Security Directive to be an "order" as it
was the consummation of the agency's decision-making process.).  However, for an order to be
subject to Section 46110's jurisdictional channeling, it must be the "consummation of TSA's
*independent* action," and not action undertaken by any other agencies such as the TSC.  *Long*,
2020 WL 1644570, at *12 (emphasis added) (detailing intersection between Section 46110 and
Article III's causation and redressability requirements).  *See also Mohamed v. Holder*, No. 11–
1924 (4th Cir. May 28, 2013) (Circuit court unable under Section 46110 to "directly review the
TSC's actions, direct the agency to develop necessary facts or evidence, or compel its
compliance with any remedy [it] might fashion.") (citing *Elgin v. Dept. of Treasury*, 132 S. Ct. at
2126, 2138 (2012)).

Defendants maintain that two broad categories of claims are subject to Section 46110

channeling; namely, Plaintiffs' challenges to the adequacy of the DHS TRIP procedures and

Plaintiffs' placement in the TSDB.  The Court discusses each separately.

### a.      Adequacy of DHS TRIP

The parties' arguments concerning the adequacy of DHS TRIP are circumscribed by

whether the Plaintiffs are on the No Fly List, the Selectee Lists, or the Quiet Skies/Silent Partner

Lists.  For the reasons stated below, the Court rejects Defendants' contentions as to the No Fly

and Selectee List Plaintiffs but agrees that challenges related to the Quiet Skies/Silent Partner

programs and attendant screenings must be dismissed for lack of jurisdiction.

### i.      No Fly List Plaintiffs

The Amended Complaint includes a handful of No Fly List Plaintiffs, only two of whom

received confirmation of their placement on the list after availing themselves of DHS TRIP

procedures.  ECF No. 48 ¶¶ 1041, 1455.[10]  The remaining No Fly List Plaintiffs have either

inquired through DHS TRIP about their status and not received a response or have never sought

redress through DHS TRIP.  All squarely challenge that the revised 2015 DHS TRIP procedures

fail to provide a constitutionally sufficient procedure concerning their absolute ban on air travel.

Defendants principally contend that the 2015 revisions to DHS TRIP compel this Court

to transfer all claims for the No Fly List Plaintiffs to the Fourth Circuit because the 2015 DHS

TRIP revised process renders TSA the final arbiter of DHS TRIP complaints.  ECF No. 49-1 at

52.  Although the Court agrees that the 2015 revisions nominally identify the TSA as the final

decisionmaker, this change alone does not invoke Section 46110 channeling here.  Unlike the

plaintiff in *Long*, no Plaintiff is currently challenging TSA's final determination arising out of

DHS TRIP.  Either the No Fly list Plaintiffs have availed themselves of DHS TRIP and not

---

[10] These two Plaintiffs, Bosnic and Shirwa, were then "removed" from the No Fly List during the pendency of this litigation.  ECF Nos. 49-2, 49-3.

received a final determination, or had not engaged the process at all.

Moreover, the No Fly List Plaintiffs squarely challenge the adequacy of DHS TRIP procedure itself which does not solely implicate the "independent action" of TSA.  Under the 2015 revisions, TSC still remains a "key actor" in deciding who is included on, and removed from, the No-Fly List.  *See Long* at *12; *see also* ECF No. 48-6 at 10.  In this respect, the 2015 revisions have not altered the analysis much at all.  *See Long*, 2020 WL 1644570, at *12 (finding that "[a]side from the removal of a name from the No Fly List," the 2015 revisions did not alter either TSA's or TSC's roles).  ECF No. 49-1 at 52; ECF No. 48-6 at 10 (TSC initially decides after review whether to remove or retain a complainant on the No Fly List; if the TSC retains the individual on the No Fly List, TSA then issues the ultimate determination on removal or retention for that individual).  Where, as here, TSC remains the driving force behind DHS TRIP, challenges to adequacy of the procedure are not subject to Section 46110 channeling.  *See Latif v. Holder*, 686 F.3d 1122, 1128 (9th Cir. 2012) ("TSC—not TSA—actually reviews the classified intelligence information about travelers and decides whether to remove them from the List. And it is TSC—not TSA—that established the policies governing that stage of the redress process."); *Ege v. United States Dep't of Homeland Sec.*, 784 F.3d 791, 796 (D.C. Cir. 2015) (TSC, not TSA, is responsible for putting a name on the No Fly List and for maintaining classified information; thus, the Court of Appeals cannot "provide relief to an individual . . . by simply amending, modifying, or setting aside TSA's orders") (citations omitted); *Mohamed v. Holder*, No. 11–1924 (Order) (Section 46110 only extends to the TSA's orders, and not those actions where a remedy would involve both the TSA and the TSC.).[11]  The claims brought by No

---

[11] Defendants rely heavily on *Mokdad v. Lynch*, 804 F.3d 807 (6th Cir. 2015), for the proposition that the adequacy of the DHS TRIP redress procedures amounts to a TSA "order" that cannot be reviewed by the district court.  ECF No. 49-1 at 50–51.  However, *Mokdad* never reached this question.  *See Mokdad*, 804 F.3d at 812 ("We decline to opine at this time whether § 46110 would deprive the district court of subject-matter jurisdiction over

Fly List Plaintiffs are properly before this Court.

### ii.        Selectee List Plaintiffs

The same analysis applies to Selectee List Plaintiffs.  The 2015 DHS TRIP revisions did not affect Selectee Listee inquiries.  TSC remains integral to any DHS TRIP procedures relevant to Selectee Listees and therefore DHS TRIP procedures do not constitute a TSA "order." Moreover, Selectee List Plaintiffs either did not avail themselves of the DHS TRIP process, or if they sought redress, never heard anything from DHS TRIP.  Accordingly, none have received any determination from which they could seek review in the Fourth Circuit.

### iii.       Quiet Skies/Silent Partner Plaintiffs

Defendants finally argue that Section 46110 bars any claims brought by Plaintiffs challenging "particular security measures authorized by Congress and chosen by TSA to ensure aviation security," namely inclusion on the Quiet Skies and Silent Partner programs and the enhanced screenings that result.  ECF No. 53 at 8.  The Court agrees with Defendants.

Congress has directed that TSA, "in consultation with other appropriate Federal agencies and air carriers, establish policies and procedures requiring air carriers— use information from government agencies to identify [travelers] who may be a threat to civil aviation or national security," and "prevent [that] individual from boarding an aircraft or take other appropriate action with respect to that individual[.]"  49 U.S.C. § 114(h)(3).  TSA implements Quiet Skies and Select Partners as part of this mandate.  TSA exclusively chooses how to implement these programs, including how to search, screen, and question travelers in the programs.  ECF No. 48 ¶ 67.  Implementation of these programs constitute "orders" within the meaning of Section 46110.

---

Mokdad's claims challenging the adequacy of the redress process, including any broad constitutional claims, if he were to file a new suit naming TSA as a defendant.")

*See Blitz*, 700 F.3d at 740 (standard operating procedure including advanced imaging technology and invasive patdowns is an "order" subject to Section 46110 channeling); *Corbett v. United States*, 458 F. App'x 866, 870 (11th Cir. 2012) (same); *Gilmore v. Gonzales*, 435 F.3d at 1133 (TSA security directive governing presentation of passenger identification constitutes an "order" under Section 46110).  Challenges to these programs, therefore, must proceed before the Fourth Circuit, not this Court.  The claims arising from placement in these programs are dismissed for lack of jurisdiction.[12]

### b.  Challenges to Placement in TSDB

Watchlisted Plaintiffs also lodge several procedural due process challenges to their initial placement on the TSDB.  Defendants urge that these challenges too fall within the scope of Section 46110 under the doctrine of "inescapable intertwinement."  ECF No. 49-1 at 53.  Under this doctrine, "statutes…that vest judicial review of administrative orders exclusively in the courts of appeals also preclude district courts from hearing claims that are 'inescapably intertwined' with review of such orders."  *Merritt v. Shuttle, Inc. (Merritt II)*, 245 F.3d 182, 187 (2d Cir. 2001) (citation omitted).  The purpose of the doctrine is to prevent a plaintiff from "circumvent[ing] the exclusive jurisdiction of the court of appeals by collaterally attacking an administrative order in a federal district court."  *Ligon v. LaHood*, 614 F.3d 150, 155 (5th Cir. 2010) (citation omitted).  The appropriate inquiry is "whether the claim that the plaintiff seeks to raise . . . is inescapably intertwined with an order of a covered agency."  *Mokdad*, 804 F.3d at 813.

---

[12] The Court cannot discern which Plaintiffs clearly challenge placement or processes related to Quiet Skies/Silent Partners.  The Court surmises that those Plaintiffs who allege placement in the TSDB or Watchlists would not also be members of Quiet Skies or Silent Partners.  However, the Amended Complaint does not differentiate claims on this basis.  Accordingly, the Court can conclude only that claims challenging the placement or process related to Quiet Skies or Silent Partners are dismissed.

Because the Court has already determined that Plaintiffs' challenges to DHS TRIP are not subject to Section 46110's channeling provision, their related challenges to initial placement on the TSDB necessarily are also not subject to the provision.  Moreover, even if the DHS TRIP challenges were subjected to Section 46110 channeling, the claims are not inescapably intertwined with challenges to initial placement on the TSDB.  The doctrine "cannot do such heavy lifting as to bring all of plaintiff's constitutional claims to the Courts of Appeals," *Long*, 2020 WL 1644570, at *14 (citing *Amerijet Intn'l*, 43 F. Supp. 3d at 14–15).  This is particularly true where, as here, the subject of the broader claims is TSDB inclusion and the challenged TSA "order" is "entirely derivative" of those broader claims.  *Id.*

In sum, Section 46110 does not divest this Court of jurisdiction for the lion's share of the challenged claims.  Rather, the Court lacks jurisdiction only as to those claims related to the Quiet Skies and Silent Partner programs.  Those claims only shall be dismissed.

## 2.    Failure to Exhaust DHS TRIP Procedures

Defendants next contend that this Court lacks jurisdiction to hear claims for which Plaintiffs did not exhaust DHS TRIP procedures.  Defendants seem to suggest that unexhausted claims are not "ripe" for adjudication and thus deprive this Court of the power to hear the claim.  ECF No. 49-1 at 54.  Defendants do not cite any statute or regulation requiring exhaustion, but instead argue that exhaustion "would serve the 'twin purposes of protecting administrative agency authority and promoting judicial efficiency' that the ripeness doctrine is meant to support."  ECF No. 53 at 10 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144–45 (1992)).

Exhaustion does not implicate this Court's jurisdiction unless Congress expressly says so.  *See Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1850 (2019).  Otherwise, whether to require exhaustion is left to the Court's "sound judicial discretion."  *McCarthy,* 503 U.S. at 144.  For

claims challenging a final agency action under the APA, a court cannot require exhaustion where neither the relevant statute nor an agency rule imposes such a requirement. *Darby v. Cisneros,* 509 U.S. 137, 144–45 (1993). For all other claims, the court must balance the "interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy,* 503 U.S. at 146. Institutional interests include allowing the agency to "correct its own mistakes with respect to programs it administers before it is haled into federal court." *Id.* at 145.

Defendants urge this Court to follow *Shearson v. Holder* in requiring Plaintiffs to exhaust remedies in advance of pressing their claims here. 725 F.3d 588, 594 (6th Cir. 2013). *Shearson* involved a single plaintiff's challenge to her placement on the TSDB and Watchlists. The Sixth Circuit affirmed the district court's determination that the *Shearson* plaintiff must first raise her broad constitutional challenges to her placement through DHS TRIP. *Id.* Notably, while the *Shearson* plaintiff raised many of the same arguments that Plaintiffs lodge against the sufficiency of the redress procedure, the *Shearson* Court held out hope that the "Redress Program's inquiry process" would develop an administrative record and "may help remove her from the terrorist list and help end her continuing injury." *Id.*

By contrast, Plaintiffs have pleaded robustly that the DHS TRIP procedure has historically offered little redress with no prospects of improvement. ECF No. 48 ¶¶ 211–17. Plaintiffs expressly contend that as to the Selectee Lists, most responses are wholly lacking in pertinent information, including whether the complainant is on or has been removed from a Watchlist. As to the No Fly List Plaintiffs, many complaints fall into a DHS TRIP black hole. *Id.* ¶¶ 218, 222. This Court simply does not share the *Shearson* Court's optimism that exhaustion will aid the decision-making process. *See Mohamed v. Holder*, 995 F. Supp. 2d 520

(E.D. Va. 2014).  Defendants' exhaustion argument is rejected.

### 3. Statute of Limitations

Defendants' last jurisdictional contention is quickly disposed.  Defendants maintain that many Plaintiffs have filed suit well beyond the applicable limitations period set for challenging placement on the TSDB and watchlists.  ECF No. 49-1 at 54.  But each Plaintiff has alleged continuous and *current* inclusion on the TSDB and Watchlists.  ECF No. 48 ¶ 247.  Because limitations do not begin to run until the violation ends, and the violations continue for as long as Plaintiffs remain on the TSDB and Watchlists, the claims are not time barred.  *Virginia Hosp. Ass'n v. Baliles*, 868 F.2d 653 (4th Cir. 1989), *aff'd sub nom. Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990); *see also Rehab. Ass'n of Virginia, Inc. v. Kozlowski*, 838 F. Supp. 243, 249 (E.D. Va. 1993), *aff'd*, 42 F.3d 1444 (4th Cir. 1994) (denying defendants' motions on the statute of limitation bar "due to the continuing nature of the alleged harm" resulting from the continued application of an allegedly unlawful policy).

## IV.   Merits

Having concluded that Defendants' jurisdictional challenges do not significantly alter the landscape of this case, the Court turns to the legal sufficiency of each claim.

### A.   Violation of the Fifth Amendment – Procedural Due Process (Count I)

Count I, broadly stated, challenges the TSDB and Watchlisting system as lacking in adequate procedural safeguards when governmental action visits substantial deprivation of a constitutional right.  The Fifth Amendment provides that a person shall not "be deprived of life, liberty or property, without due process of law."  U.S. Const. amend. V.  "The procedural component of due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process

27

Clause." *D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016) (citation and quotation marks omitted).  To state a procedural due process claim, Plaintiffs must allege "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate."  *Shirvinksi v. U.S. Coast Guard*, 673 F.3d 308, 314 (4th Cir. 2012) (quoting *Kendall v. Balcerzak*, 650 F.3d 515, 528) (4th Cir. 2011)).

If Plaintiffs plausibly aver government deprivation of a cognizable interest, the trier of fact must then weigh three factors, commonly referred to as the *Mathews* factors, to determine if a due process violation has occurred: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

With this framework in mind, the Court turns to whether Plaintiffs have plausibly averred deprivation of an interest protected under the Due Process Clause.

### 1.    Travel-Related Liberty Interests

Both Selectee and No Fly List Plaintiffs aver erroneous deprivation of a protected interest in travel.  It is undisputed that "the right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment."  *See Kent v. Dulles*, 357 U.S. 116, 125 (1958); *see also Saenz v. Roe*, 526 U.S. 489, 498 (1999) (noting that the right to travel is "firmly embedded" within the jurisprudence of the Supreme Court).  Plaintiffs maintain a clear liberty interest in domestic travel, *see id.*; *Shapiro v. Thompson*, 394 U.S. 618, 630 (1969), as well as international travel.  "Travel abroad, like travel within the

country, may be necessary for a livelihood.  It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads." *Kent,* 357 U.S. at 126; *see also Kashem v. Barr*, 941 F.3d 358, 378 (9th Cir. 2009) ("Plaintiffs undoubtedly have a strong liberty interest in domestic and international travel."); *Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *6 (E.D. Va. July 16, 2015); ("It must be recognized that a meaningful right of travel in today's world cannot be understood as cleanly divided between interstate and international travel . . .").

Defendants do not meaningfully challenge that No Fly List Plaintiffs have adequately averred that placement on this list results in a total ban on air travel.  The Court easily concludes such Plaintiffs have averred deprivation of a protected liberty interest.

Defendants instead vigorously contend that Selectee List Plaintiffs have not averred sufficient impediments to travel to constitute a deprivation of a constitutional right to travel.  In this respect, the Court recognizes that routine travel-related delays are not actionable.  *See generally Cramer v. Skinner*, 931 F.2d 1020, 1030 (5th Cir. 1991); *U.S. v. Shenandoah*, 595 F.3d 151, 162–63 (3d Cir. 2010); *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 535 (6th Cir. 2007).  Even several hour delays do not amount to a constitutional deprivation in the eyes of some courts.  *Cf. Beydoun v. Sessions*, 871 F.3d 459, 467–68 (6th Cir. 2017) (delays from airport screenings, even if resulting in missed flights, do not implicate the fundamental right to travel under substantive due process); *Abdi v. Wray*, No. 2:17-CV-622-DB, 2018 WL 1940411, at *3 (D. Utah Apr. 23, 2018), *aff'd*, 942 F.3d 1019 (10th Cir. 2019) (dismissing procedural due process claim because challenges such as obtaining a boarding pass from a ticketing agent rather than a kiosk and undergoing a lengthy screening process, even if resulting in the occasional missed flight, were minor "inconveniences").

That said, when Watchlist status results in repeated, prolonged delays that "actually deters travel, when impeding travel is its primary objective, or when it uses a classification that serves to penalize the exercise of the right," an individual suffers a deprivation of constitutional dimension.  *See generally Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986); *see also Elhady v. Piehota*, 303 F. Supp. 3d 453, 464 (E.D. Va. 2017) (deprivation of right where plaintiffs avoided travel because of "invasive additional screening and other liberty-constraining activities" such as hours-long detentions and interrogations).  Such deprivation occurs even if a plaintiff could avail himself of a less convenient form of transportation.  *Compare Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) (holding, in the equal protection context, that "travelers do not have a constitutional right to the most convenient form of travel…") (quotation marks and alterations omitted) *with Kashem*, 941 F.3d at 378 (finding, in the procedural due process context, that "plaintiffs may not possess a fundamental right to travel *by airplane*, but in many instances air travel constitutes the only practical means of traveling across great distances") (internal citation and quotation marks omitted) (emphasis in original).

Using the collective wisdom of the decisions defining the contours of this right, the Court turns to Plaintiffs' claims.  Regrettably, the structure of the Amended Complaint frustrates straightforward application.  Although all Watchlisted Plaintiffs assert the claim, clearly all do not plead significant impediment to travel.  Some Plaintiffs have suffered only a one-time lengthy delay, or screening processes that engender nonspecific "humiliation" or "inconvenience."  *Cf. Abdi*, 2018 WL 1940411, at *3 (rejecting claim where plaintiff alleging minor delays on four occasions, only one resulting in a missed flight); *Beydoun*, 871 F.3d at 467 (rejecting claim where plaintiff had "not attempted to provide any information about when those

30

delays occurred, how long the delays were, what type of enhanced screening he was subjected to, or indeed any information beyond general allegations that he has been prevented from traveling.").

Others, however, allege experiencing a pattern of multi-hour delays nearly every time they travel, arising from hours-long searches, detentions, and interrogations, often conducted in front of fellow passengers and travel companions. *See, e.g.*, ECF No. 48 ¶¶ 324–34, 424–43, 459–78, 498–513, 656–59, 1212–18 (by air); *id.* ¶¶ 309–13, 493–94, 664–67, 1096–105 (by land). Some have endured displays of force, *see, e.g.*, *id.* ¶ 1098 (detention by gunpoint), ¶ 661 (kicking plaintiff's legs open for a search); threats, *see, e.g.*, *id.* ¶¶ 392, 614; property confiscation, *see, e.g.*, *id.* ¶¶ 534, 495; and verbal humiliation, *see, e.g.*, *id.* ¶ 1269 (airline representative informing Kamel "America doesn't want you"). These experiences, as pleaded, amount to a significant impediment to travel—a far cry from the "delays that many individuals are likely to experience at the airport." *Beydoun*, 871 F.3d at 468 (concluding that a fundamental right cannot be implicated if Plaintiffs allegations are similar to those typically experienced by regular travelers).

For example, Plaintiff Sulayman is "afraid to travel again" after he was detained twice and interrogated with his wife and four children for hours upon arriving at the U.S.–Canadian border. ECF No. 48 ¶¶ 674–680, 715. There, he was forced to undergo multiple extensive searches and lengthy interrogations in front of his fellow Muslim community members and family. *Id.* ¶¶ 681–701. Plaintiff Jardaneh went so far as to move to Canada, restrict his travel, and seek asylum from the U.S. government after being subjected to humiliating searches and interrogations at the U.S.–Canadian border. *Id.* ¶¶ 308–41. On one occasion, he was handcuffed to a stretcher on the way to the hospital. *Id.* ¶ 318. On another, he was searched at the airport

and surveilled by air marshals while on flight.  *Id.* ¶ 334.  Plaintiff Muminov, when arriving

home from a business trip, was detained at the U.S.-Canadian border, ordered out of his car at

gunpoint, handcuffed, held in a cold cell, interrogated for four hours, and subjected to a pat

down, finger printing, hair analysis, iris scan, mouth swab, and search of his personal property.

*Id.* ¶¶ 1096–105.  He has consequently ceased all travel to Canada.  *Id.* ¶ 1106.

Viewing the Amended Complaint facts as true and most favorably to Plaintiffs, the court

concludes that several have adequately alleged deprivation of a liberty interest triggering due

process protection.[13]

## 2.        Reputational Liberty Interests

Certain Plaintiffs also allege an infringement of their constitutionally protected interest in

their "good name, reputation, honor, or integrity."  *Wisconsin v. Constantineau,* 400 U.S. 433,

437 (1971).  But, "injury to reputation by itself [is] not a 'liberty' interest protected under the

[Due Process Clause]."  *Siegert v. Gilley,* 500 U.S. 226, 233 (1991).  To show that reputational

harm infringes a liberty interest, Plaintiffs must satisfy the "stigma-plus" test.  *See Paul v.*

*Davis,* 424 U.S. 693, 710–12 (1976).  In particular, Plaintiffs must aver plausibly that they

suffered (1) a "stigma" from governmental action; "plus" (2) an alteration or extinguishment of

"a right or status previously recognized by state law."  *Id.*; *see also Evans v. Chalmers,* 703 F.3d

636, 654 (4th Cir. 2012); *Shirvinski*, 673 F.3d at 315; *Piehota*, 303 F. Supp. 3d at 464–65.

With respect to the "stigma" prong, plaintiffs must plausibly aver that the government

publicly disseminated defamatory information.  *See Bd. of Regents v. Roth*, 408 U.S. 564, 573

(1972); *Bishop v. Wood*, 426 U.S. 341, 348 (1976); *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir.

---

[13] Plaintiffs who have adequately pled deprivation of their travel-related liberty interest are: Jardaneh, Doe, H. Wehelie, A. Wehelie, Mohallim, El-Shahat, Sulayman, Suliman, Doe 2, Sehwail, Albadawi, Hall, Bosnic, Muminov, Mujanovic, Hachem, Riad, Abunijem, Elamin, Shirwa, and Al-Sahlani.

2010).  As to state action, or the "plus" prong, each plaintiff must allege suffering "a change in a right or status previously recognized by law." *Piehota*, 303 F. Supp. 3d at 464–65 (quoting *Paul*, 424 U.S. at 711) (quotation marks omitted).  Simple reputational damage alone is not sufficient. *Id.* (citing *Siegert*, 500 U.S. at 234).

Plaintiffs aver that Defendants have publicly disseminated defamatory content by allowing "state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, financial institutions, and captains of sea-faring vessels" access to the TSDB which falsely touts that members are "known and suspected terrorists."  ECF No. 48 ¶ 154. Defendants have also shared the database with "553 private entities including airlines, universities, hospitals, private correctional facilities, private security services and private city attorneys." *Id.* ¶ 160.  Such widespread dissemination is "tantamount to public disclosure, even if only distributed to other government and private entities that need the information for official objectives." *Piehota*, 303 F. Supp. 3d at 465.

Adding to the "stigma," the Court notes that Plaintiffs are effectively outed as supposed "known or suspected terrorists" in front of family, friends, travel companions, fellow passengers, and even business acquaintances who witness Plaintiffs' detentions, interrogations, and searches during travel. *Cf. Mohamed*, 2015 WL 4394958, at *6.  This, aver Plaintiffs, has undoubtedly diminished their standing in the community. *See Roth*, 408 U.S. at 573 (plaintiff can show state imposition of stigma where government's action "seriously damage[d] [the plaintiff's] standing and associations in his community[.]").  Members of the public have ceased to travel with Plaintiffs, *see, e.g., id.* ¶¶ 740, 891, 1005, 1156, 1177–94, 1421, refused to do business with them, *see, e.g., id.* ¶ 1192 (business leader cancelling all meetings with Hall after learning he had been subjected to enhanced screenings), or avoided them altogether. *See, e.g., id.* ¶¶ 715 ("Imam

Sulayman . . . is also discouraged from organizing and leading Muslim community members").
*Cf. Mohamed*, 995 F. Supp. 2d at 532 ("Inclusion on the No Fly List [] labels an American citizen a disloyal American who is capable of, and disposed toward committing war crimes, and one can easily imagine the broad range of consequences that might be visited upon such a person if that stigmatizing designation were known by the general public").  When viewing the facts most favorably to Plaintiffs, they have averred sufficient government dissemination of defamatory information.

Only certain Plaintiffs, however, have even arguably alleged that the defamatory dissemination has altered their legal status to establish the "plus" in the stigma-plus deprivation. Esmaeel Paryavi has alleged that he lost access to the Global Entry travel program implemented by CBP.  ECF No. 48 ¶¶ 972–79.  Likewise, Bosnic has averred that he lost his TWIC credentials, which he needs to perform his job, due to his Watchlist status.  *Id.* ¶ 1045– 46. Sulayman and Thadi too aver that they are no longer permitted to access military bases.  *Id.* ¶¶ 702–13, 950.  And Abdurrashid has been denied a state license to purchase a firearm.  *Id.* ¶¶ 450–54.   All other Plaintiffs have failed to allege sufficiently a constitutional deprivation on this liability theory.

Defendants pressed at oral argument that as to these specific Plaintiffs, none of the alleged denials amount to an alteration of legal status sufficient to constitute a "plus."  However, Defendants provide no reasoned basis at this stage for the Court to so conclude.[14]  Plaintiffs pressed in the opposite direction, urging that this Court find any of the other alleged

---

[14] Defendants' reliance on stigma-plus cases treating loss of government employment are inapposite. *See Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 51 (2d Cir. 2001), *rev'd sub nom. Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003) (finding that cases addressing "stigma plus" claims in the context of termination of government employment "yield principles that are sometimes difficult to apply in delineating 'plus' factors in other contexts.").

constitutional injuries, such as the unconstitutional searches and interrogations discussed *infra*, to constitute a "plus." They too provide no support for expanding the doctrine to include any and every possible infringement as a loss of legal status.

The Court notes the relative dearth of applicable precedent addressing the nature of the state "right" sufficient to support the "plus" prong. To the extent courts have held that deprivation of state-authorized "privileges" as opposed to "rights" are insufficient to constitute a "plus," clearly more factual development in this case is warranted. *See, e.g.*, *Al Turki v. Tomsic*, 926 F3d 610 (10th Cir 2019) (prisoner transfer is a "privilege" not a "right," the loss of which would be sufficient to constitute a "plus"); *Behrens v. Regier*, 422 F.3d 1255 (11th Cir. 2005) (state discretionary decision to allow adoption not a "right or interest guaranteed" sufficient to establish "plus" prong); *cf. University Gardens Apts. Joint Venture v. Jack B. Johnson*, 419 F.Supp 2d 733, 739 (D. Md. 2006) (recognizing "loss of a government-issued license" as a "plus"); *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp 3d 712, 722 (ED. Va. 2015) (expulsion from public university sufficient as a "plus".) Accordingly, those Plaintiffs who have pleaded *some* loss of a specific state authorized status will proceed. The Court awaits further factual development as to the question of loss of "legal status" before concluding whether the deprivation satisfies the "plus" as a matter of law.[15]

### 3.   The *Mathews* Factors

Having found that certain Plaintiffs have pleaded a deprivation of a constitutional liberty interest, the Court turns to weighing the *Mathews* factors to determine whether the Plaintiffs

---

[15] Defendants also argue that Plaintiffs lack standing to challenge denials of Military Base Access, TWIC, and TSA Precheck and Global Entry. ECF No. 49-1 at 45–46. Plaintiffs, however, do not ask the Defendants to restore their rights of access and placement in these programs directly. Rather, these are identified as the alleged harms that flow from placement in the TSDB. These deprivations are particularly relevant to the stigma-plus claim, which highlights that this standing argument is misplaced.

have pleaded constitutionally inadequate redress procedures.

As to the first two *Mathews* factors, Defendants contend that the redress procedures afforded are sufficient to address the constitutional deprivations when balanced against the Government's keen interest in protecting the country's borders. Defendants maintain the internal procedures applicable to the TSDB protect against erroneous constitutional deprivations. ECF 49-1 at 69. They highlight that potential TSDB listees must be nominated and approved before being placed in the database and that the TSDB is then subject to ongoing internal audits. The DHS TRIP procedure, say Defendants, provides further protection in that it draws attention to possible erroneous placement in the database. *Id.* Although TSDB Plaintiffs not on the No Fly List have no way to confirm their watchlist list status, No Fly List individuals do receive such confirmation after submitting a DHS TRIP inquiry. *Id.* Thus, according to Defendants, the Amended Complaint fails to demonstrate that procedures were inadequate to protect against erroneous deprivation of a protected liberty interest.

Viewing the Amended Complaint most favorably to Plaintiffs, the TSDB nomination and approval process is, in short, a black box. The process is governed by "amorphous criteria," devoid of any notice, and utterly lacking in safeguards, such that over 98% of those nominated are approved. ECF No. 48 ¶¶ 135, 185, 220. As a result, the risk of erroneous deprivation is high, according to Plaintiffs: given that none of the million-plus individuals in the database have ever perpetrated an act of domestic terrorism, the government would be better off randomly choosing individuals to include in the TSDB. *Id.* ¶¶ 179–80, 188. Once in the TSDB, no redress mechanism exists for individuals who suffer overly broad and seemingly irrational restrictions with air and land travel, government credentialing, or financial institutions. *Id.* ¶ 211.

Plaintiffs further aver the DHS TRIP process is unavailing. DHS TRIP provides no

information on how the TSA and TSC evaluates complaints, *id.* ¶ 212; inquiries generate merely a "standard form letter that neither confirms nor denies the existence of any terrorist watchlist records relating to the individual." *Id.* ¶ 217. Allegedly, "as of December 2017, the TSA Administrator had taken no action regarding the removal of TSDB Listees in two years." *Id.* ¶ 213. Indeed, each affected Plaintiff alleges having received only a "redress control number" in response to their DHS TRIP inquiries, nothing else. *See, e.g.*, *id.* ¶¶ 765, 879.

As for the DHS TRIP inquiries filed by those on the No Fly List, the 2015 revisions require DHS TRIP response letters to "affirmatively state" whether an individual appears on the list. *Id.* ¶ 218; ECF No. 49-1 at 36. DHS TRIP also is supposed to provide No Fly list individuals "criteria on which his placement was based and, to the extent possible consistent with national security and law enforcement interests, a summary of the factual basis for the No Fly List determination." ECF No. 49-1 at 36. Further, the individual should be able to submit information to DHS TRIP relevant to his No Fly List status, which DHS TRIP will then review. *Id.* But the Amended Complaint allegations do not square with these revisions: DHS TRIP "continue[s] to provide no information on historical watchlist status, no information as to whether a person is included in the TSDB generally, no meaningful factual basis for the individuals inclusion on the watchlist, and no information as to whether the government has resolved the specific complaint at issue." ECF No. 48 ¶ 218. And not a single No Fly List determination arising out of DHS TRIP has been processed, say Plaintiffs, since 2015. *Id* ¶ 222.

Accordingly, the existing procedural protections are inscrutable, opaque, and as to DHS TRIP No Fly List inquires, not followed. The process affords little to no opportunity to be heard, before, during, or after being placed in the TSDB and deprived of protected liberty interests. *Cf. Fuentes v. Shevin*, 407 U.S. 67, 80, 92 (1972) (due process requires "[p]arties whose rights are to

be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.") (internal quotation marks omitted); *see also Mathews*, 424 U.S. at 333 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'") (quoting *Armstrong v. Manzo*, 380 U.S. 545 (1965)).  As pleaded, therefore, the claims survive.

As to the third *Mathews* factor, whether the Watchlist system furthers national security interests, is best addressed after discovery.  To be sure, the Government maintains a strong interest in national security.  *See Haig v. Agee*, 453 U.S. 280, 307 (1981); *Wayte v. United States*, 470 U.S. 598, 612 (1985); *Mohamed v. Holder*, 266 F. Supp. 3d 868, 880 (E.D. Va. 2017) ("There is obviously a compelling government interest in preventing terrorist attacks against commercial aviation.").  The central question, however, is whether government has implemented "reasonable measures to ensure basic fairness" to include implementing reasonably designed procedures.  *See Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012).  Discovery as to whether and how TSDB and the Watchlisting system furthers national security interests, as well as the administrative burdens that additional procedural protections will place on the Government, remain critical to the final analysis.

The Court recognizes that, in the end, the Government's internal processes may provide sufficient protection to withstand scrutiny.  But the Court cannot make that determination as a matter of law when considering all complaint facts most favorably to Plaintiffs.  Indeed, the *Mathews* balancing test depends upon "fact-intensive considerations" not capable of resolution now.  *Piehota*, 303 F. Supp. 3d at 465; *see also Kovac*, 363 F. Supp. 3d at 758.  Striking the balance between the parties' competing interests, as well as the value of additional or substitute procedural safeguards, cannot be done in the abstract.  The procedural due process claims

survive challenge as to those plaintiffs who plausibly aver deprivation of travel and reputational liberty interests.[16]

**B.      Violation of the Fifth Amendment – Substantive Due Process (Count II)**

The substantive due process claim is confined to the No Fly List Plaintiffs[17] who allege deprivation of their fundamental right to travel, or as they say "movement," as recognized by the Supreme Court in *Kent v. Dulles*, 357 U.S. 116 (1958) and *Shapiro v. Thompson*, 394 U.S. 618 (1969).  Substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them."  *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (citation and quotation marks omitted).  However, such heightened protections against government interference extend to a narrower set of "rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (internal quotations and citations omitted).  To assert a substantive due process claim, Plaintiffs must allege that Defendants' action burdens a fundamental right and cannot withstand strict scrutiny.  *Hawkins v. Freeman*, 195 F.3d 732, 739 (4th Cir. 1999).  Surviving strict scrutiny requires the government to demonstrate that its interference is necessary to further a compelling governmental interest and has been narrowly tailored to achieve that interest.  *Id.*

---

[16] Plaintiffs who have sufficiently pled deprivation of their protected travel or reputational liberty interests are: Jardaneh, Doe, H. Wehelie, A. Wehelie, Mohallim, El-Shahat, Sulayman, Suliman, Doe 2, Sehwail, Albadawi, Hall, Bosnic, Mujanovic, Muminov, Hachem, Riad, Abunijem, Elamin, Shirwa, Al-Sahlani, Thadi, E. Paryavi, and Abdurrashid.

[17] Plaintiffs conceded in the June 18, 2020 hearing that the substantive due process claims were only brought by Plaintiffs on the No Fly List: Doe, Mohallim, Sehwail, Bosnic, and Shirwa.

The No Fly List burdens a plaintiff's fundamental right to interstate travel.  *See Shapiro*, 394 U.S. at 630; *Kent*, 357 U.S. at 125; *Saenz*, 526 U.S. at 498; *Kashem*, 941 F.3d at 378.  That the No Fly List Plaintiffs may use a less convenient means of transportation does not change the analysis when considering, in many instances, the tremendous effort and time required to take such an alternative option.  *See Kashem*, 941 F.3d at 378.  Further, although protecting U.S. borders and combatting terrorism is clearly a compelling government interest, whether Defendants' actions are narrowly tailored to achieve that purpose cannot be decided now.  The Amended Complaint makes plausible that the No Fly List, as an outgrowth of the TSDB, is both under and overinclusive and so has been wholly ineffectual in furthering the government's legitimate security interests.  *See* ECF No. 48 ¶¶ 177–90.  This question is fact-dependent and inappropriate for complete resolution at this stage.  The Count therefore survives, but only as to the No Fly List Plaintiffs.

### C.      Violation of the APA, 5 U.S.C. § 706 – DHS TRIP (Count III)

The Court next turns to the legal sufficiency of Count III.  Under the Administrative Procedure Act ("APA"), the reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375 (1989); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Plaintiffs allege the decisions to place Plaintiffs in the TSDB constitute agency actions that fall under the ambit of the APA, 5 U.S.C. § 706.  ECF No. 48 ¶ 1592.  Plaintiffs further aver that such placement was driven solely, or primarily, because of race, ethnicity, national origin, religious affiliation, or other First Amendment protected activities, that they do not "present a security threat to commercial aviation." *id.* ¶¶ 1595–96, 1598, and that they have not been

afforded an adequate redress process.  *Id.* ¶ 1597.  Defendants' decision as to Plaintiffs' TSDB

and Watchlist status, according to Plaintiffs, is arbitrary, capricious, and otherwise not in

accordance with law, and thus in violation of the APA.  *Id.* ¶¶ 1594, 1597–98.

The parties agree that Plaintiffs' APA claim is coextensive with their procedural due

process claims.  ECF No. 70.  Accordingly, to the extent the procedural due process claims

survive for certain Plaintiffs, so too do their APA claims.

### D.      Violation of the APA, 5 U.S.C. § 706 – National Crime Information Center (Count IV)

Plaintiffs allege that Defendants lack authority to share Plaintiffs' identities and personal

information through the National Crime Information Center (NCIC), and as such, Defendants'

actions violate the APA, 5 U.S.C. § 706.  ECF No. 48 ¶¶ 1600–07.  Defendants challenge both

the sufficiency of the claim and Plaintiffs' standing for failure to allege any injury-in-fact that

stems from the dissemination.  ECF No. 49-1 at 77–80.  Because the Court concludes that

Plaintiffs have pleaded absolutely no injury arising from the NCIC, it grants Defendants' motion

on this basis alone.

In the 268 page Amended Complaint, two factual allegations relate to NCIC.  First, that

NCIC includes some nonspecific cohort of TSDB identified as "Known or Suspected Terrorists"

("KSTs"), which can be accessed by more than 18,000 law enforcement agencies and 100,000

law enforcement officers.  ECF No. 48 ¶ 106.  And second, that law enforcement may query

NCIC during routine police encounters such as traffic stops.  *Id.* ¶ 158.

The Amended Complaint, however, is silent as to how NCIC actually affected any named

Plaintiff.  No Plaintiff adequately pleads any police encounters arising from an NCIC query or

any factual basis to support that law enforcement access to NCIC caused any injury.  Although

the disclosure mechanism through NCIC may provide helpful context regarding the wide-

ranging uses of the TSDB, the allegations do not give rise to a legally cognizable claim for any Plaintiff.  Count IV, therefore, must be dismissed.

> ### E.        Violation of the Fifth Amendment – Equal Protection (Count V)

Watchlist and TSDB Plaintiffs allege their inclusion amounts to intentional discrimination based on race, alienage, religion, and national origin, without a compelling, legitimate, or rational justification and in violation of Equal Protection under the Fifth Amendment.  ECF No. 48 ¶¶ 1608–20.  *See* U.S. Const. amend. XIV, § 1 (the government may not "deny to any person within its jurisdiction the equal protection of the laws."); *Bolling v. Sharpe,* 347 U.S. 497 (1954); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638, n. 2 (1975).  The Equal Protection Clause prohibits "governmental decisionmakers from treating differently persons who are in all relevant respects alike."  *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir. 2001) (citing *Nordlinger v. Hahn,* 505 U.S. 1, 10, (1992)).  "To survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus."  *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011) (citations omitted).  The court must then assess, as a matter of law, whether the disparate treatment is justified, employing the requisite level of scrutiny.  *Garraghty*, 239 F.3d at 654.

Plaintiffs maintain that they are subjected to ongoing adverse differential treatment based upon membership in a suspect class.  Accordingly, the Court must apply "strict scrutiny" to the governmental action, which dictates that only such action "suitably tailored to serve a compelling state interest" will survive challenge.  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

Where, as here, the claimed unconstitutional discrimination is based on a facially neutral law or policy, Plaintiffs must allege facts that allow the plausible inference that such law or policy has been applied in an intentionally discriminatory manner, *see Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995), or that its adoption was motivated by discriminatory animus.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).  Evidence of discriminatory intent is key.  Thus, even when a facially neutral statute has a "racially disproportionate impact," discriminatory animus must nevertheless be proved to establish an equal protection violation.  *See Washington v. Davis,* 426 U.S. 229, 239 (1976).

Both direct and circumstantial evidence of discrimination may be considered.  *Arlington Heights*, 429 U.S. at 266.  Among such circumstantial evidence most relevant to this claim, the Court may look to consistent patterns of governmental conduct that adversely affect a protected class, as well as statements of the policy makers (or lack thereof).  *Sylvia Dev. Corp.*, 48 F.3d at 819 (citing *Arlington Heights,* 429 U.S. at 266–68).   While "purposeful discrimination is the condition that offends the Constitution[,]" "impact provides an important starting point."  *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 274 (1979) (citation and quotation marks omitted).

The criteria for TSDB inclusion amounts to a facially neutral policy.  *See* ECF No. 48-6 at 5.  It states expressly that nominations "must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  *Id.*  Although Plaintiffs would invite the Court to take this policy statement as evidence of discrimination, ECF No. 52 at 55–56, the policy points in the opposite direction.  The policy does *not* demand consideration of those factors, and in fact prohibits consideration of such factors alone.  Accordingly, the Court begins with the presumption that the TSDB criteria are facially neutral.

43

As for evidence of discriminatory animus, the Court notes, as do Defendants, that the Amended Complaint is peppered with bald allegations that alone would not survive challenge. *See, e.g.,* ECF No. 48 ¶ 1611 ("Defendants selectively apply and enforce watchlist and screening policies to individuals who appear to be or who are known or suspected to be Muslim or Middle Eastern"); ¶ 1612 ("The disparate treatment between Muslims and non-Muslims is the result of Defendants' intentional and purposeful discrimination."); ¶ 194 ("Defendants, knowingly, intentionally, and purposefully use impermissible and inaccurate religious profiles to nominate, accept, disseminate, and deploy the federal terrorist watchlist against American Muslims in a manner that is different from other faith backgrounds.").

However, the Amended Complaint also avers sufficient detail to "nudg[e] the claim of purposeful discrimination across the line from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Some Plaintiffs contend, for instance, that their answers regarding religious and cultural practices is what landed them in the TSDB and on the respective Watchlists. *See, e.g.,* ECF No. 48 ¶¶ 485–86 (FBI interrogation of M. Paryavi as to his Islamic religious beliefs and practices and political opinions, including the mosque he attends and details about its imam, contributed to his TSDB designation); ¶¶ 649–51 (Interrogation of El-Shahat regarding "what he thinks of jihad, what mosque he attends, how religious he is, whether he teaches at a mosque, whether he is an imam" contributed to his TSDB designation). Probing interrogations about travel to Muslim-majority countries, religious pilgrimages, learning Arabic, attending mosques, affiliations with Muslim organizations, religious donations, and associations with other Muslims, provide further factual basis to infer plausibly that placement on the list was tied directly, and perhaps solely, to Plaintiffs' race, alienage, religion, and national origin. *Compare id.* ¶¶ 485, 635–41, 646–50, 941–42, 1279, 1147–48, 1519–20 *with Cherri v. Mueller*, 951 F. Supp. 2d 918,

937 (E.D. Mich. 2013) (upholding equal protection claim because "[p]laintiffs have adequately

pled that Defendants have a policy, custom and practice of questioning only Muslim–

American[s] at the border about their religious practices and beliefs.").

In further support of the equal protection claim, the Amended Complaint also provides

sufficient facts from which to infer that similarly situated white or Christian individuals do not

receive the same treatment as their Muslim counterparts.  Plaintiffs allege that

> [W]hen Defendants review lists of social networks and known associates of a
> currently watchlisted individual, they routinely chose to nominate Arab or
> Muslim names that cross their desk on the stereotyped basis of race, religion, or
> national origin alone. Meanwhile, Defendants gloss over any stereotypically
> white, Christian, English, or Western-European names that may appear in the
> same network lists, such as classmates or colleagues. This is true even when the
> only distinction between a nominated person and a non-nominated person are
> improper race, religion, or national origin criteria.

ECF No. 48 ¶ 198.  *See also id.* ¶ 201 ("[T]hough they facially satisfy the same known associate

watchlist criteria, close families and friends of convicted white-nationalist domestic terrorists are

not routinely added to the federal terrorist watchlist, while distant families and friends of

innocent Muslims often discover that their mere association with other watchlisted individuals

has caused them to be labeled potential terrorists.").

The Amended Complaint next provides specific instances of white Christians not in the

TSDB whose conduct would likely have led to TSDB inclusion if they were Muslim.  Lieutenant

Christopher Hasson was indicted on February 20, 2019 for plotting a large-scale domestic

terrorist attack.  *Id.* ¶ 202.  Yet, "[d]espite significant evidence of Hasson's extremism and

potential for terrorism, not only does it appear that [] Hasson not on the terrorism watchlist, he

held a Secret level security clearance."  *Id.*  "Nor is there any reason to believe any of Hasson's

friends or relatives have been added to the watchlist," even though the same would not have been

true of the Muslim friends and relatives of a known or suspected Muslim terrorist.  *Id.*

45

With regard to Plaintiffs' own experiences, Plaintiff Suliman and his Muslim travel companions were subjected to extensive additional screening and searches at the airport arising from Suliman's inclusion in the TSDB.  However, a similarly situated non-Muslim travel companion was inexplicably *not* searched, detained, or subjected to any additional screening.  *Id.* ¶¶ 739.  Such allegations, construed broadly, underscore how Muslim individuals may be nominated to Watchlists while similarly situated non-Muslims may not.

In addition to concrete examples of disparate treatment, Plaintiffs also aver direct evidence of discriminatory animus.  To be sure, a stray remark by a non-decisionmaker does not alone support an equal protection violation.  *See Orgain v. City of Salisbury*, 521 F. Supp. 2d 465, 492–93 (D. Md. 2007), *aff'd in part sub nom. Orgain v. City of Salisbury, Md.*, 305 F. App'x 90 (4th Cir. 2008).  When viewed cumulatively, however, such remarks can support an equal protection claim.  *See* ECF No. 48 ¶ 1148 (CBP officer telling Mujanovic to remove her *hijab* to avoid travel delays); ¶ 759 (CBP officer telling Suliman that "lately, most of the people that come into [a secondary screening] room are from your background"); ¶ 659 (TSA agent interrogating El-Shahat and informing him that "he is subjected to enhanced screening because he frequently travels to countries in the Middle East, because he travels alone, and because he is a Muslim male").  Viewing the entirety of these facts as true and most favorably to Plaintiffs, Defendants' discriminatory intent is plausibly established.

The Court determines next whether Defendants' discriminatory actions are "suitably tailored to serve a compelling state interest" such that they survive strict scrutiny.  *City of Cleburne*, 473 U.S. at 440.  If the government's stated interests "could be achieved by narrower ordinances that burden [the right] to a far lesser degree," then the actions are not narrowly tailored.  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).

National security undoubtedly constitutes a compelling government interest. *See Holder v.*

*Humanitarian Law Project*, 561 U.S. 1, 28 (2010) ("[T]he Government's interest in combating

terrorism is an urgent objective of the highest order."); *Mohamed v. Holder*, 266 F. Supp. 3d at

880. Whether Defendants' actions are narrowly tailored, however, is a fact-dependent question

inappropriate for complete resolution at this stage.

Plaintiffs thus far have alleged enough to show that the government's interests could be

achieved in a more effective and targeted, and less burdensome, alternative. Specifically,

Plaintiffs argue that the TSDB and Watchlist system is ineffective, having "never prevented an

act of terrorism inside the United States." ECF No. 48 ¶ 8. It is also imprecise and overbroad, as

it fails to include those committing attacks. Indeed, Plaintiffs allege that none of the 250 acts of

terrorism committed within the U.S. were perpetrated by anyone from within the database. *Id.* ¶

179–80. Further, the government's internal audits reveal "serious flaws" and "significant

problems with the nomination and removal process." *Id.* ¶ 228. Defendants may later show that

the policy is effective and suitably tailored to achieving its national security interests, but for

now, Plaintiffs' allegations are sufficient. Count V survives as to Plaintiffs who have alleged

inclusion in the TSDB.

    **F.**    **Violation of the Fourth Amendment (Count VI) and Fifth Amendment Self-Incrimination (Count VIII)**

The Court next turns to claims asserting violations of the Fourth and Fifth Amendments

arising from discrete searches and seizures, as well as interrogations, of certain Plaintiffs (Counts

VI, VIII). ECF No. 49-1 at 81–82. Defendants again correctly note that these claims must go

forward, if at all, only as to those Plaintiffs who allege an unconstitutional search or

interrogation. Defendants further press that even those Plaintiffs who allege a historic Fourth or

Fifth Amendment violation lack standing because none have alleged any specific plans for future international travel and so have not averred risk of future injury.  ECF No. 49-1 at 81.

Defendants are correct that because Plaintiffs seek declaratory and injunctive relief, "they must establish an ongoing or future injury in fact."  *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."  *O'Shea*, 414 U.S. at 495–96.  Speculative claims of future injury will not suffice.  *Id.* at 497.

However, where as here, Plaintiffs aver a historic pattern of such violations during similar travel, the Court may plausibly infer that such infringements will continue in the future. *See Elhady v. Kable*, 391 F. Supp. 3d 562, 575 (E.D. Va. 2019); *Mohamed*, 266 F.Supp.3d at 875 ("Plaintiff's decision not to engage in international travel because of the difficulties he reasonably expects to encounter upon return to the United States is sufficient to demonstrate standing."); *Wilwal v. Nielsen*, 346 F. Supp. 3d 1290, 1302 (D. Minn. 2018) (same); *Alasaad v. Nielsen*, No. 17-CV-11730-DJC, 2018 WL 2170323, at *11 (D. Mass. May 9, 2018) (similar); *Cherri*, 951 F. Supp. 2d at 929 (similar); *but see Jibril v. Wolf*, No. 1:19-CV-2457-RCL, 2020 WL 2331870, at *4 (D.D.C. May 9, 2020) (no standing for plaintiffs who alleged a series of minimal disruptions during the course of one international trip because they could not show concrete and immediate future travel plans).  Simply put, Plaintiffs may demonstrate that what is past is also prologue, and this is sufficient to confer standing.

The Plaintiffs averring Fourth and Fifth Amendment violations have alleged not only historic and repeated illegal searches and seizures but particular needs or desires to travel in the future.  *See, e.g.,* ECF No. 48 ¶ 1164 (Mujanovic) ¶ 448 (Abdurrashid), ¶ 715 (Sulayman).  The

Court may thus reasonably infer that Plaintiffs not only will travel in the future, *see Alasaad*, 2018 WL 2170323, at *11, but be subjected to similar unconstitutional searches and seizures when they do.  *See Suhre v. Haywood Cty.*, 131 F.3d 1083, 1088 (4th Cir. 1997) ("[P]ast injury [i]s probative of likely future injury.").  The Court rejects Defendants' standing challenge.

The Court next turns to the Amended Complaint to determine whether Plaintiffs sufficiently aver Fourth and Fifth Amendment violations.

### 1.    Violation of the Fourth Amendment (Count VI)

Certain Plaintiffs allege that government agents seized and forensically searched their electronic devices in violation of their Fourth Amendment right to be free from warrantless searches and seizures.  ECF No. 48 ¶¶ 1621–31.  The Fourth Amendment establishes that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  Generally, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment."  *Katz v. United States*, 389 U.S. 347, 357 (1967).

One well established exception to the warrant requirement covers searches conducted at the border.  Recognizing that national security remains at its "zenith" at ports of entry, including international airports, law enforcement may conduct *routine* searches of persons and property even in the absence of a warrant, probable cause, or even any individualized suspicion.  *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985); *United States v. Kolsuz*, 890 F.3d 133, 137 (4th Cir. 2018), as amended (May 18, 2018).  The "border exception" is grounded in the recognition that individual liberties must sometimes yield to the "longstanding right of the

sovereign to protect itself by stopping and examining persons and property crossing into this

country," *United States v. Flores-Montano*, 541 U.S. 149, 152–53 (2004) (quoting *United States*

*v. Ramsey*, 431 U.S. 606, 616 (1977).  Thus, to protect and secure U.S. borders, "the Fourth

Amendment's balance of reasonableness is qualitatively different . . . than in the interior. . . ."

*Montoya de Hernandez*, 473 U.S. at 537–40.

But the exception is not limitless.  After all, "[t]he suspicionless search is the very evil

the Fourth Amendment was intended to stamp out."  *Samson v. California*, 547 U.S. 843, 858

(2006) (Stevens, J., dissenting).  Not every search at the border is "routine" and thus immune

from the individualized suspicion requirement.  Although the Supreme Court has not clarified the

precise standard used for non-routine searches, where law enforcement conducts "highly

intrusive searches of the personal-dignity and privacy interests of the person" some "support a

requirement of some level of suspicion" is necessary.  *Flores-Montano*, 541 U.S. at 152. *See also*

*Montoya de Hernandez*, 473 U.S. at 541 (requiring reasonable suspicion of alimentary drug

smuggling in order to extensively detain individual).

In the Fourth Circuit, a "forensic border search of a phone must be treated as nonroutine,"

and permitted only with individualized reasonable suspicion.  *Kolsuz*, 890 F.3d at 144–45 (a

forensic search of devices "dwarfs the amount of personal information that can be carried over a

border . . .[t]he average 400–gigabyte laptop hard drive can store over 200 million pages. . .

[e]ven a car full of packed suitcases with sensitive documents cannot hold a candle to the sheer,

and ever-increasing, capacity of digital storage.") (quotation marks and citation omitted).  *See*

*also US v. Aigbekaen*, 943 F.3d 714, 723 (4th Cir 2019) ("We simply apply the teaching of

Kolsuz: where a search at the border is so intrusive as to require some level of individualized

suspicion, the object of that suspicion must bear some nexus to the purposes of the border search

exception in order for the exception to apply."). Reasonable suspicion exists when "specific and articulable facts" known to the searching officers, along with "rational inferences from those facts," demonstrate that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 21 (1967). A "mere hunch" is not enough. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Whether reasonable suspicion exists depends on the totality of the circumstances observed by a reasonable law enforcement officer in the agent's position. *Id.* at 274–75; *see also United States v. Cortez*, 449 U.S. 411, 418 (1981).

For certain Plaintiffs, agents confiscated their electronic devices and downloaded their contents with a level of intrusiveness sufficient to deem the search nonroutine and thus requiring individualized reasonable suspicion of criminal activity. *See, e.g.*, ECF No. 48 ¶¶ 495, 563, 636, 1151, 1492, 1516, 1625. Further, these searches, as pleaded, were without reasonable suspicion that each Plaintiff was engaged in terrorist activity. Thus, as to those Plaintiffs subjected to this kind of warrantless search, the claims survive challenge.

Defendants respond that the searching agents possessed such reasonable articulable suspicion by virtue of Plaintiffs' inclusion in the TSDB. ECF No. 53 at 32–33. TSDB membership, argue Defendants, provides the very individualized evidence that every Plaintiff "is engaged, has been engaged, or intends to engage, in conduct . . . in preparation for, in aid or furtherance of, or related to, terrorism and/or terrorist activities." ECF No. 48-6 at 5.

Although Defendants may be correct in the end, the Court must at this stage confine its analysis to the Amended Complaint. Plaintiffs aver lifetime inclusion in the TSDB based on associational status, religious belief, race, or travel preference. *See* ECF No. 48 ¶¶ 10, 194–95. They claim that the TSDB includes over one million people precisely because the inclusion

criteria is grossly nonspecific.  Mere membership in the database, therefore, cannot supply

individualized reasonable articulable suspicion.  As the Court in *Mohamed v. Holder* aptly noted:

> What constitutes conduct sufficiently "related to" or "in aid of terrorism" is not
> explained, but it is not difficult to imagine completely innocent conduct serving as
> the starting point for a string of subjective, speculative inferences that result in a
> person's inclusion on the No Fly List. For example, is the academic study of
> terrorism or the investigative reporting of terrorist activities "related to terrorism
> and terrorist activities"? Is providing financial support to a charitable organization
> enough, even without knowledge that some of the organization's activities are "in
> aid of ... terrorist activities"? Is it enough to be a member of a lawfully operating
> social or religious organization whose membership may include other persons
> suspected of terrorism? Is studying Arabic abroad, as Mohamed concedes he did,
> conduct "in preparation for ... terrorist activities"?

995 F. Supp. 2d at 532.

The TSDB cannot serve as a proxy for individualized reasonable suspicion that an

individual plaintiff is engaging in—or intends to engage in—terrorist activity at all, let alone at

the time of the search.  *Id.*  Accordingly, for those Plaintiffs who have averred facts to make

plausible that they had been subjected to a non-routine search of their devices, Defendants'

motion is denied.[18]  As to all other Plaintiffs, the motion is granted.

## 2.      Violation of the Fifth Amendment – Self-Incrimination (Count VIII)

Plaintiffs whose electronic devices were searched during border interrogations bring a

companion Fifth Amendment challenge for being "forced" to provide cellphone and laptop

passwords and "biometric means such as facial recognition or fingerprints" to facilitate searches

of the devices.  ECF No. 48 ¶ 1644.  They argue specifically that such information amounts to

compelled testimony sufficient to support a Fifth Amendment self-incrimination claim.  *Id.* ¶

1646.

---

[18] Plaintiffs are: Jardaneh, Doe, Abdurrashid, H. Wehelie, A. Wehelie, Noor, F. Wehelie, Mohallim, El-
Shahat, Sulayman, Suliman, Doe 2, Sehwail, Albadawi, Hall, Knight, Thadi, E. Paryavi, Siddiqui, Muminov,
Mujanovic, Hachem, Riad, Kamel, Abunijem, Hijaz, Soueidan, Elamin, Kadoumi, and Al-Sahlani.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This constitutional protection is triggered only when the individual is (1) compelled to make a (2) testimonial communication (3) that is incriminating. *Fisher v. United States*, 425 U.S. 391, 408; *United States v. Sweets*, 526 F.3d 122, 127 (4th Cir. 2007). Determining whether the right applies is decidedly a fact-intensive inquiry. *See Fisher*, 425 U.S. at 410.

The parties focus on whether Plaintiffs' "forced" use of "biometric" information to unlock devices is testimonial. Plaintiffs urge the Court to narrow the focus solely to whether "forcing" Plaintiffs to give over electronic pass codes, to or use their thumbs or faces to unlock their devices, can make out a Fifth Amendment violation. Perhaps in the hope that yet another Court will weigh in on an unsettled question of law, *see, e.g., Matter of Residence in Oakland, California*, 345 F. Supp. 3d 1010, 1015–16 (N.D. Ca. 2019), *dismissing review*, No. 19-MJ-70053-KAW-1 (JD), 2019 WL 6716356 (N.D. Cal. Dec. 10, 2019), Plaintiffs artificially attempt to parse the claim in a manner which does violence to the settled jurisprudence in this area. This the Court is not willing to do.

Rather, the Court must consider the more fundamental question of whether any Plaintiff has alleged sufficiently coercive circumstances that plausibly give rise to an inference that *any* incriminating testimony was involuntarily obtained. The Fifth Amendment "speaks of compulsion." *Minnesota v. Murphy*, 465 U.S. 420, 427 (1984) (citation omitted). A statement is compelled when "considering the totality of the circumstances, the free will of the [person making the statement] was overborne." *United States v. Washington*, 431 U.S. 181, 188 (1977) (citing *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)). "To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must

consider the 'totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) (citation and quotation marks omitted).

Certain Plaintiffs have averred sufficient facts to make plausible the claim that their will had been overborne during their interrogations. These are the Plaintiffs whose interviews arose under coercive circumstances such as being held at gunpoint, *see, e.g.,* ECF No. 48 ¶ 1098, in handcuffs, *see, e.g., id.* ¶¶ 318, 382, 390, 1099, or in separate interrogation rooms. *See, e.g., id.* ¶¶ 530, 613, 1279. These same plaintiffs were often subjected to lengthy detentions during which access to family or counsel was denied. *See, e.g., id.* ¶¶ 313–15, 506, 614–15, 640, 1197– 201. Additionally, Defendants do not dispute that the purpose of the interrogations was to gather information regarding terrorist activities, so any such interview may be plausibly inferred as designed to elicit incriminatory statements. Thus, certain Plaintiffs allege sufficient facts to make plausible that their Fifth Amendment rights against compelled self-incrimination had been violated.[19]

Accordingly, the more nuanced and perhaps legally titillating question of whether provision of cell phone passcodes or biometric information amounts to testimonial statements simply cannot be ascertained at the motion to dismiss stage. Once discovery is obtained on each alleged incident in which Plaintiffs' right against self-incrimination was allegedly abridged, the Court will be in a better position to determine whether this narrower question matters at all as to

---

[19] The Plaintiffs that plead sufficient facts to make plausible a Fifth Amendment Self-Incrimination violation are: Jardaneh, Doe, Abdurrashid, M. Paryavi, H. Wehelie, A. Wehelie, F. Wehelie, Mohallim, El-Shahat, Sulayman, Suliman, Doe 2, Sehwail, Albadawi, Hall, Knight, E. Paryavi, Siddiqui, Cyeef Din, Muminov, Mujanovic, Hachem, Riad, Kamel, Hijaz, Souiedan, Elamin, Kadoumi, and Al-Sahlani.

those Plaintiffs who have pleaded facts sufficient to make plausible a Fifth Amendment self-incrimination violation.

### G.    Violation of the First Amendment (Count VII)

Plaintiffs separately allege that the searches of their electronic devices violate their freedom of expressive association as protected under the First Amendment.  ECF No. 48 ¶¶ 1634, 1638; ECF No. 52 at 63.  Because the "[g]overnment takes the data they obtain from private searches and uses it to nominate the friends and relatives of Plaintiffs to the watchlist as well," avers Plaintiffs, the government "directly interferes with Plaintiffs' ability to freely associate with those individuals."  ECF No. 52 at 63.

The First Amendment to the U.S. Constitution provides that "Congress shall make no law. . .  abridging the freedom of speech . . . or the right of the people peaceably to assemble." U.S. CONST. amend. I.  The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

This right, however, is not absolute.  The law recognizes that some difficulty imposed on such freedoms do not "without more, result in violation of the First Amendment."  *Fighting Finest, Inc. v. Bratton,* 95 F.3d 224, 228 (2d Cir. 1996).  "To be cognizable, the interference with associational rights must be 'direct and substantial' or 'significant.'"  *Id.* (quoting *Lyng v. Int'l Union,* 485 U.S. 360, 366, 367 & n. 5 (1988)) (further citation omitted)).  Interferences that qualify as "direct and substantial" could include "impos[ing] penalties or withhold[ing] benefits from individuals because of their membership in a disfavored group . . . , attempt[ing] to require disclosure of the fact of membership in a group seeking anonymity, and . . . interfere[ing] with

the internal organization or affairs of the group." *U.S. Jaycees*, 468 U.S. at 622–23 (internal

citations omitted).  Plaintiffs, therefore, must allege government action that imposed a direct and

substantial interference with association in pursuit of political, social, economic, educational,

religious, or cultural ends.  *See id.*

      Defendants level a host of arguments to defeat this claim. The Court need not tick

through all of them because the bare bones allegations simply do not make the claim plausible.

The Amended Complaint alleges loosely that Plaintiffs have the protected right to associate, but

wholly fails to identify the association—religious, social, religious, or otherwise—that

government action has inhibited.  *U.S. Jaycees*, 468 U.S. at 622.  Desired association with the

contacts in one's phone is simply not enough.  This alone defeats the claim.

      Alternatively, no averred facts make plausible that any interference was "direct and

substantial."  Plaintiffs aver only that government agents obtained their "contacts" and included

that information on the TSDB after cursory investigation.  But they give not one example of how

such government conduct has hampered, hindered, impacted, or affected in any way their

association with said "contacts."  *Cf. NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449,

462–63 (1958) (disclosure of membership in organization sufficient to "induce members to

withdraw from the Association and dissuade others from joining it because of fear of exposure of

their beliefs shown through their associations and of the consequences of this exposure."); *AFL-

CIO v. Fed. Election Comm'n*, 333 F.3d 168 (D.C. Cir. 2003).  Without any allegations

regarding the limitations on Plaintiffs' ability to associate, the Court cannot even begin to

determine whether Defendants' actions infringe on Plaintiffs' associational rights protected

under the First Amendment.  The claim must be dismissed.

### H.        Plaintiffs' RFRA Claims (Counts X, XI, XII, XIII)[20]

Plaintiffs bring four discrete claims pursuant to the Religious Freedom Restoration Act

("RFRA"), 42 U.S.C.A. § 2000bb *et seq*. Plaintiffs allege that: (1) agents' interrogations related

to religious beliefs substantially burden Plaintiffs' exercise of religion (Count X); (2) Watchlist

placement as to Sulayman and Siddiqui substantially burdens Sulayman's and Siddiqui's

performance of Umrah[21] and Hajj,[22] respectively, *id.* ¶¶ 1667–80 (Count XI); (3) agents' offers

to remove Hall and John Doe from Watchlists if they agreed to act as informants burdened their

religious freedom, *id.* ¶¶ 1681–93 (Count XII); and (4) disclosure of Plaintiff Elamin's Watchlist

status burdened his religion by leading to his termination as a prison chaplain, *id*. ¶¶ 1694–706

(Count XIII).

The RFRA provides that the "Government shall not substantially burden a person's

exercise of religion even if the burden results from a rule of general applicability, except . . . if it

demonstrates that application of the burden to the person-(1) is in furtherance of a compelling

governmental interest; and (2) is the least restrictive means of furthering that compelling

governmental interest." 42 U.S.C. §§ 2000bb–1(a)-(b).  Thus, in analyzing a claim under the

RFRA, the Court must ask whether the government's action imposes a substantial burden on

religious exercise, and if so, whether those actions are the least restrictive means of serving a

compelling government interest.  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 691 (2014).

The RFRA defines "religious exercise" to include "any exercise of religion, whether or

not compelled by, or central to, a system of religious belief."  42 U.S.C. §§ 2000bb–2(4),

---

[20] Plaintiffs reaffirm they are not seeking money damages under RFRA against any of the Defendants in their official capacities.  ECF No. 52 at 77.  The Court limits the claims and defenses accordingly.

[21] Umrah is a pilgrimage made by Muslims to Mecca, Saudi Arabia, that may be performed at any time during the year.  ECF No. 48 ¶ 671.

[22] Hajj is a pilgrimage made by Muslims to Mecca during a specific time of the year.  *Id.*

2000cc–5(7).  A litigant's claimed beliefs "must be sincere and the practices at issue must be of a religious nature."  *Levitan v. Ashcroft,* 281 F.3d 1313, 1320 (D.C. Cir. 2002).  A substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs . . . or one that forces a person to choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand."  *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (quoting *Thomas v. Review Bd.,* 450 U.S. 707, 718 (1981) and *Sherbert v. Verner,* 374 U.S. 398, 404 (1963)).

In assessing whether a plaintiff's exercise of her religious beliefs has been substantially burdened, a court must not judge whether the plaintiff's beliefs "are mistaken or insubstantial," but rather "whether the line drawn reflects an honest conviction."  *Hobby Lobby*, 573 U.S. at 724–25 (2014) (citation and quotation marks omitted); *see also Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990) ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.").

Defendants broadly argue that all the RFRA claims must be dismissed because, as a matter of law, the challenged actions are the least restrictive means of achieving a compelling government interest.  ECF No. 49-1 at 108.  It is undisputed that the government maintains a compelling interest in national security, which includes protection of our borders and prevention of terrorist attacks.  *See Haig*, 453 U.S. at 307 ("It is obvious and inarguable that no governmental interest is more compelling than the security of the Nation."); *Humanitarian Law Project*, 561 U.S. at 28.  The Court will not belabor that point here.  But whether the government's implementation of such policies aimed at protection are in fact the least restrictive

means is inextricably intertwined with whether the same acts impose a substantial burden on the individual Plaintiffs forming the subject of the RFRA counts.  The inquiry, therefore, is best left for exploration at discovery to the extent the claim survives challenge on more specific grounds addressed below.

The Court next turns to each RFRA claim separately.

### 1.      General Intrusion of Religious Practice (Count X)

Plaintiffs confine this claim to the substantial burden exacted "when the government conducts an intrusive inquiry into a person's religious beliefs as a component of official government action."  ECF No. 48 ¶ 1660.  This is because "[s]uch inquiries place pressure on the person to modify or violate their beliefs and singles them out for disfavored treatment."  *Id.* ¶ 1660.  The Court finds certain Plaintiffs allege plausible violations.

In conjunction with invasive screening at airports and land borders, Plaintiffs have been detained and questioned for hours specifically about their religious beliefs.  Although Defendants maintain the questioning is "wholly secular," the Amended Complaint facts say otherwise.  *See e.g.*, *id.* ¶ 485 (mosque details, religious beliefs and practices); ¶ 504 (church attendance, enrollment in religious courses); ¶ 650 (mosque attendance, views on  jihad, religious leadership, degree of religiousness); ¶ 1147 (differences between Sunni and Shia Muslims); ¶ 1238 (Hajj attendance, discussions with others about religion).  The "very process of inquiry" may itself impose a substantial burden on the individuals' religious beliefs, such that it amounts to a RFRA violation.  *See generally N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979); *Cf. Mitchell v. Helms*, 530 U.S. 793, 828 (2000) ("[I]nquiry into the recipient's religious views required by a focus on whether a school is pervasively sectarian is not only unnecessary but also offensive. It is well established, in numerous other contexts, that courts should refrain from

trolling through a person's or constitution's religious beliefs").  As pleaded, Defendants' singling

out of Plaintiffs and their persistent inquiry into Plaintiffs' religious beliefs and practices places

pressure on Plaintiffs to modify or violate those beliefs or risk being subjected to the pattern of

detentions and interrogations in connection with their travel.  *See United States v. Ramon*, 86 F.

Supp. 2d 665, 676 (W.D. Tex. 2000) (finding that governmental policy of detaining and

questioning individuals who display religious decals on their vehicles "threatens to burden the

sincerely held beliefs of those who do so for the purpose of emphasizing their faith."); ECF No.

48 ¶ 488; ¶ 507; ¶ 1152.

Plaintiffs further aver that the questioning has punitive consequences because the "details

of Plaintiffs' adherence to the Muslim faith" *is* the reason they end up on the Watchlists, *id.* ¶

1662, and so all of the attendant harms that flow from Watchlist placement imposes a substantial

burden on their free exercise of religion.  *Cf. Brown v. Woodland Joint Unified School Dist.*, 27

F.3d 1373, 1378 (9th Cir. 1994) ("A government practice has the effect of impermissibly . . .

disapproving of religion if it is 'sufficiently likely to be perceived by. . . nonadherents [of the

controlling denomination] as a disapproval[] of their individual religious choices.") (quoting

*School Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 390 (1985)); *Cherri*, 951 F. Supp. 2d at 935

(dismissing RFRA claim where plaintiffs did not plead that questioning "require[d] them to

affirm or deny a belief that is contrary to their faith" nor that the Government "sought to impose

civil or criminal sanctions on religiously motivated conduct.").  The Court agrees and finds that

the Amended Complaint sufficiently states a RFRA claim as to Count X.  Once again, the Court

denies dismissal only as to those Plaintiffs who have averred interrogations about their Muslim

beliefs or practices.[23]  The claim is dismissed as to all other Plaintiffs.

_____

[23] Those Plaintiffs are: Doe, M. Paryavi, H. Wehelie, El-Shahat, Sulayman, Doe 2, Knight, Mujanovic,
Muminov, Hachem, Riad, Kamel, Hijaz, Elamin, Kadoumi, and Al-Sahlani.

### 2.      Violation of the RFRA – Umrah/Hajj (Count XI)

Count XI is brought solely by Plaintiffs Sulayman and Siddiqui, who allege that inclusion in the Watchlist interferes with their ability to perform Umrah and Hajj respectively.  ECF No. 48 ¶ 1667–80.  Defendants do not contest that Plaintiffs maintain sincerely held religious beliefs in performing Umrah and Hajj.  Rather, they argue that "nothing alleged . . . has prevented or will prevent Sulayman or Siddiqui from travelling abroad to perform religious pilgrimages or from participating in any religious exercise."  ECF No. 49-1 at 106.

The Court cannot agree with Defendants.  Sulayman, as an Imam, "routinely" leads groups on an annual Umrah pilgrimage to Mecca.  ECF No. 48 ¶ 671.  However, due to Defendants' stigmatizing and burdensome searches, interrogations, and detentions, he is afraid to travel abroad again, *id.* ¶ 715, and so is "discouraged" from engaging in Umrah.  *Id.*  Sulayman has also lost his standing in his religious community, which has jeopardized his effectiveness as their leader going forward, and more particularly in guiding his congregation in Umrah.  *Id.* ¶¶ 715, 1671.  Similarly, Siddiqui alleges that repeated invasive detentions and searches has caused him to abandon performing Hajj "out of fear of the terrorist scrutiny and treatment he would receive by Defendants."  *Id.* ¶¶ 1672; 1012.  The Court concludes that both Plaintiffs adequately allege that they had to modify their behavior in a manner that violates their religious beliefs.  *Cf. Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 99–100 (4th Cir. 2013).

Defendants alternatively argue that the claim fails because Plaintiffs have been only deprived, in part, of certain aspects of religious exercise.  ECF No. 49-1 at 107 ("That Plaintiffs do not cross the border anymore so that they can avoid religious questioning is not the equivalent of ceasing their participation in the tenets of their religion.").  But a RFRA violation does not turn on government's total prohibition of religious exercise; rather where, as here, allegations

reflect a substantial burden on such exercise in the absence of a compelling government interest effected by the least restrictive means, the claim must survive.  *See Hobby Lobby*, 573 U.S. at 724; *Smith*, 494 U.S. at 887.  Defendants' motion to dismiss Count XI is denied.

### 3.   Violation of the RFRA – Informant Pressure (Count XII)

Count XII focuses on Plaintiffs Hall and John Doe 2 who specifically aver that offers to act as informants for the FBI in exchange for resolution of their travel woes substantially burden their free exercise of religion.  ECF No. 48 ¶¶ 795, 935.  In particular, Hall and Doe 2 contend that because their religious beliefs restrict bearing false witness and betraying the trust of their religious community, they are prohibited from accepting this offer.  *Id.* ¶¶ 797, 937, 1686–87.

Defendants do not contest that acting as an informant is in fact at odds with Hall and Doe 2's sincerely held religious beliefs.  However, Defendants rightfully point out that a mere "ask" for assistance in exchange for favorable treatment does not constitute a substantial burden on free exercise.  ECF No. 49-1 at 107.  The Court agrees with Defendants.

As with all potential law enforcement informants, the relationship begins with an "ask," and possible favorable treatment in exchange for helpful information.  Also, as with many "asks," they too begin with the potential informant having something to gain, and often something to lose, from saying yes.  Suspects are sometimes paid for their testimony or "work off charges" in exchange for turning on their friends, coworkers, family, and community leaders.  This Hobson's choice is the same faced by scores of suspects who enter into cooperation agreements with the government on a daily basis.  Plaintiffs' choice is a variation on this theme.  As pleaded, the Court can discern no principled reason to find the mere offer of a chance to cooperate as placing a substantial burden on the exercise of religion sufficient to support a RFRA violation.  Count XI is dismissed.

####         4.        Inability to Volunteer at Prisons or Jails (Count XIII)

In the fourth RFRA Count (Count XIII), Plaintiff Elamin alleges that Defendants'

disclosure of his Watchlist status caused Jessup Correctional Institute ("Jessup") to end his stint

as a volunteer prison chaplain.  ECF No. 48 ¶¶ 1423–27; 1694–706.  Defendants, in response,

argue that Elamin does not have standing to bring a RFRA claim as Jessup is not a party to this

suit.  ECF No. 49-1 at 101–03.  Defendants do not contest that Jessup knew of Elamin's

Watchlist status, but instead argue that it was the state correctional facility's independent

decision to deny Elamin's volunteer services that imposed, even in theory, the substantial burden

on the exercise of his religion.  ECF No 49-1 at 101.  When viewing the Amended Complaint

facts as true and most favorably to Elamin, the Court must agree with Defendants.

 In *Frank Krasner Enterprises, Ltd. v. Montgomery County. Md.*, the Fourth Circuit had

the opportunity to address under what circumstances a non-party's intervening decisions break

the "causal chain" between the claimed government action and the plaintiff's potentially

redressable injury.  401 F.3d 230 (4th Cir. 2005).  There, the government regulation at issue was

a law prohibiting the appropriation of county funds to any entity permitting the display of guns at

any of its facilities.  *Id.* at 232.  The non-party convention center, in response to the County

regulation, refused to provide display space to the plaintiff gun-show promoter.  *Id.* at 232–33.

Plaintiff sued the County, not the convention center, for violating, among other things, his First

Amendment free speech rights.  *Id.* at 233.

The Fourth Circuit held that the plaintiff lacked standing because the injuries stemmed

from the non-party convention center's independent decision to not lease the space.  *Id.* at 236.

Importantly, the Court reasoned that when standing "depends on the *unfettered choices made by*

*independent actors not before the courts* and whose exercise of broad and legitimate discretion

the courts cannot presume either to control or to predict," the causal chain necessary to confer

standing has been severed.  *Frank Krasner*, 401 F.3d at 235 (quoting *Lujan*, 504 U.S. 562)

(emphasis in original).  The Court went on to find that the plaintiff could not obtain redress

because even if it were to succeed in its claim, invalidating the County regulation would not

necessarily result in plaintiff's ability to lease space from the convention center.  *Id.*

As pleaded, Elamin's claims suffer the same fate.  The Amended Complaint avers that

non-party Jessup, having received information regarding Elamin's Watchlist status, terminated

Elamin.  ECF No. 48 at ¶ 1426.  No facts support that Jessup's decision was other than

independent, voluntary, and intervening, even if prompted by Elamin's presence on the various

Watchlists.  *Id.* at ¶¶ 1423–27.  Further, to the extent such information is corrected and he is

removed from the Watchlist, this does not redress Elamin's injury as it pertains to his removal as

Jessup's chaplain.  Only Jessup may redress the substantial burden that it placed on Elamin's

exercise of his position as prison chaplain.  Jessup, however, is not a party to this case.

Accordingly, Count XIII is dismissed for lack of standing.

### I.      Violation of the Non-Delegation Doctrine (Count XIV)

Plaintiffs' last claim is mired in confusion.  Plaintiffs initially alleged that Congress

violated the non-delegation doctrine by failing to provide the Executive Branch with intelligible

principles from which the Executive could implement its watchlist schemes regarding civil

aviation and national security.  ECF No. 48 ¶¶ 1708–12.  Plaintiffs later withdrew such

allegations entirely.  ECF No. 52 at 77 ("To be fair, this is not a typical nondelegation claim, in

which there is a statute authorizing the creation of a massive, far-reaching, and highly-

consequential terrorist watchlist, but did not provide an intelligible principle.").

Plaintiffs also allege that Defendants acted outside of their statutory authority.  ECF No. 48 ¶¶ 1713–18.  The Court notes that such allegations do not amount to a violation of the non-delegation doctrine, which provides that "Congress may not constitutionally delegate its legislative power to another branch of Government."  *Touby v. United States*, 500 U.S. 160, 165 (1991).  Plaintiffs have done little to assist the Court or Defendants in understanding this claim—not in their 268 page Amended Complaint or in the robust pleadings submitted over the course of several months.  As the Court views it, Plaintiffs have jettisoned the claim; the Court will not shore it up for them now. The claim is dismissed.[24]

## V.     Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.[25]  Following the issuance of the opinion, the Court will hold a discovery conference to address the most efficient and streamlined procedure for exchange of evidence critical to addressing threshold issues while balancing important questions of privacy and national security clearly raised in this matter.

A separate Order follows.

_____7/20/2020_____                         _____/S/_____
Date                                                                            Paula Xinis
                                                                                 United States District Judge

---

[24] Plaintiffs also summarily argue that this "lack of delegation separately constitutes a violation of the Administrative Procedures Act, in that the TSDB—as well as many of its components, including the CBP's usage and participation—are wholly without any statutory authorization."  ECF No. 52 at 79.  In attempting to shoehorn their theory—which is, again, not even about the nondelegation doctrine—now into Count III (Violation of the APA–DHS TRIP), they add confusion in place of any clarity.  Nowhere in Count III do Plaintiffs plausibly aver such a claim, and the Court cannot discern any facts which support the bare legal assertion.  ECF No. 48 ¶¶ 1591–99.

[25] After comprehensively reviewing the Amended Complaint and the parties' arguments, the Court finds that Plaintiffs Mia Khaled El Ali, Baby Doe, Child Doe, and Child Doe 2 have failed to sufficiently allege any plausible claims against any Defendants.  They are dismissed from this case.