**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| MUTASEM JARDANEH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 8:18-cv-02415-PX |
| PAMELA BONDI, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' OMNIBUS MOTION TO DISMISS, MOTION IN LIMINE, AND
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................1

    A.    The Threat Environment ....................................................................................1

    B.    Defendants and the Watchlisting Enterprise.......................................................2

    C.    The Terrorist Screening Dataset ........................................................................5

    D.    Redress ................................................................................................................8

    E.    Information Sharing and Uses of the TSDS ......................................................11

    F.    Efficacy of the Watchlist ...................................................................................16

    G.    The Watchlisting Advisory Council (WLAC) ...................................................18

          1.    The WLAC Generally...............................................................................18

          2.    WLAC Member Agencies .........................................................................19

    H.    Plaintiffs' Allegations. .......................................................................................27

    I.    *Ex Parte* Submissions .......................................................................................39

ARGUMENT......................................................................................................................40

I.    The Court Should Dismiss All Claims Against the WLAC Defendants for Lack of
Jurisdiction or Grant Summary Judgment for the WLAC Defendants. ....................................40

    A.    Standards.............................................................................................................40

    B.    Plaintiffs' Standing Theory Is Flawed Because Participation in Policymaking
Does Not Confer Standing. ................................................................................41

    C.    The Factual Record Further Confirms that Plaintiffs Cannot Establish
Traceability or Redressability Against the WLAC Defendants......................................43

    D.    Even If a Defendant's Level of Involvement in the WLAC, or in Enforcing
the WLG, Were Relevant to the Standing Inquiry, the WLAC Defendants
Still Should be Dismissed. .................................................................................45

II.    The Court Should Dismiss the No Fly List Claims and Certain Other Plaintiffs'
TSDS Claims for Lack of Jurisdiction............................................................................47

i

A.    Standing and Mootness Standards. ................................................47

B.    The Court Lacks Jurisdiction Over the No Fly List Claims...........................49

C.    The Court Lacks Jurisdiction Over the Claims of Certain TSDS Plaintiffs. ..............52

D.    Consideration of the *Ex Parte* Information Is Appropriate. ...........................54

III.    The Court Should Enter Summary Judgment on the Procedural Due Process Claims of the TSDS Plaintiffs and Coextensive APA Claims. ........................................57

A.    The TSDS Plaintiffs Have Not Been Deprived of a Right to Travel........................58

B.    The No Fly List Plaintiffs Have Not Been Deprived of a Right to Travel. ...............63

C.    The TSDS Plaintiffs Do Not Have a Cognizable "Stigma-plus" Reputational Injury. ...........................................................................63

D.    The Procedures Available for the TSDS Are Constitutionally Adequate. ..................68

E.    The Procedures Available for the No Fly List Are Constitutionally Adequate...........72

IV.    The Court Should Enter Judgment on Count II Because the No Fly List Plaintiffs Have Not Been Deprived of a Fundamental Right in Violation of Substantive Due Process. .........................................................................75

A.    The No Fly List Plaintiffs Have Not Been Deprived of a Fundamental Right.. ...........................................................................76

B.    The No Fly List Satisifes Strict Scrutiny.. ........................................79

V.    The Court Should Enter Summary Judgment for Defendants on Plaintiffs' Equal Protection Claim (Count V).....................................................82

A.    The Court Should Exclude the Expert Report of Dr. Huber Under *Daubert*. ............83

1.    Dr. Huber's Opinions and Methodology .........................................84

a)    Dr. Huber's Data.......................................................85

b)    Dr. Huber's Opinions and Methods ......................................85

2.    Plaintiffs Cannot Demonstrate That Dr. Huber Relied on Sufficient Data When Reaching Either His Authenticity Opinion or His Religion Opinions. ...........................................................88

a)    Dr. Huber's admission that the CSV Datafiles are "likely incomplete" renders any analysis of them unreliable................................88

ii

b) Dr. Huber cannot reliably authenticate the CSV Datafiles himself...89

c) Plaintiffs' belated attempts to authenticate the CSV Datafiles are inadmissible and unpersuasive.................................................................93

3. Plaintiffs Cannot Demonstrate that the Methodology Underlying Dr. Huber's Religion Opinions Was Reliable, Either In General or As Applied to the Facts of This Case. ........................................................95

a) Dr. Huber's analysis reflects the sort of novel, unreliable methodology Rule 702 and *Daubert* prohibit. .......................................95

b) Dr. Huber's methodology was applied unreliably because of the total reliance on the impressions of Plaintiffs' legal team. ............................98

c) Dr. Huber's methodology was applied unreliably because the CAIR employees' classification methods were inconsistent and haphazard. ............................................................................................................99

d) Dr. Huber's flawed accuracy assessment cannot save his opinions— and in fact further impugns them. .........................................101

4. Dr. Huber's Religion Opinions Are Not Relevant or Helpful to the Trier of Fact. ........................................................................................104

B. Watchlist Nominations Are Based on Neutral Criteria and Defendants Have Implemented Robust Safeguards to Keep It That Way. ..............................105

C. Plaintiffs Have Offered No Compelling Evidence of Disparate Impact or Discriminatory Intent..........................................................................108

D. Defendants Use the TSDS to Effectively Protect National Security........................111

VI. The Court Should Grant Summary Judgment on Plaintiffs' Fourth Amendment Claims Because the Challenged Searches Were Reasonable. ....................................113

A. Many Plaintiffs Lack Standing to Bring This Claim. ....................................114

B. CBP Policy Regarding Border Searches of Electronic Devices is Consistent with the Fourth Amendment.................................................................115

C. Additional Evidence Justifies Summary Judgment for the Government..................118

VII. The Court Should Grant Summary Judgment on Plaintiffs' Fifth Amendment Self-Incrimination Claims (Count VIII)................................................................118

A. Plaintiffs Lack Standing Because They Have Not Shown Certainly Impending Future Injury. ..................................................................119

iii

| | B. | Plaintiffs Have Not Shown a Violation of their Criminal Trial Rights. .................... 120 |
|---|---|---|
| | C. | Plaintiffs Have Not Established that Any Testimony Was Incriminating. .............. 121 |
| | D. | CBP's Policy Does Not Violate the Fifth Amendment. ............................................. 122 |
| VIII. | | The Court Should Grant Defendants Summary Judgment on Plaintiffs' RFRA Claims.................................................................................................................................. 124 |
| | A. | Defendants Did Not Violate RFRA By Occasionally Questioning Plaintiffs About Both Religious and Secular Topics (Count X). .................................................. 125 |
| | B. | Defendants Did Not Deter or Prevent Plaintiff Sulayman From Performing Umrah (Count XI). .......................................................................................................... 127 |
| | C. | The TSDS and Questioning at Borders and By Law Enforcement Enhance Security. ....................................................................................................................... 129 |
| | | CONCLUSION ....................................................................................................................... 130 |

# TABLE OF AUTHORITIES

**Cases**

*Abdellatif v. United States Dep't of Homeland Sec.,*
 109 F.4th 562 (D.C. Cir. 2024) ........................................................................................ 54

*Abdi v. Wray,*
 942 F.3d 1019 (10th Cir. 2019) .................................................................................... 58, 64

*Abdi v. Wray,*
 No. 2:17-CV-622-DB, 2018 WL 1940411, at *3 (D. Utah Apr. 23, 2018) .................................. 129

*Abu Irshaid v. Garland,*
 No. 1:24-CV-01405-MSN-WPB, 2025 WL 756544 (E.D. Va. Mar. 10, 2025) ...................... 78, 121

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treas.,*
 686 F.3d 965 (9th Cir. 2012) .......................................................................................... 112

*Alasaad v. Mayorkas,*
 988 F.3d 8 (1st Cir. 2021) .............................................................................................. 116

*Almy v. Sebelius,*
 679 F.3d 297 (4th Cir. 2012) ............................................................................................ 49

*Already, LLC v. Nike, Inc.,*
 568 U.S. 85 (2013) ......................................................................................................... 48

*Am. Cargo Transp., Inc. v. United States,*
 625 F.3d 1176 (9th Cir. 2010) .......................................................................................... 49

*Am. Fam. Ass'n, Inc. v. City & Cnty. of San Francisco,*
 277 F.3d 1114 (9th Cir. 2002) ........................................................................................ 124

*Andresen v. Maryland,*
 427 U.S. 463 (1976) ...................................................................................................... 123

*Antonio v. Moore,*
 174 F. App'x 131 (4th Cir. 2006) .................................................................................... 121

*Asbill v. Housing Auth. of Choctaw Nation,*
 726 F.2d 1499 (10th Cir. 1984) ........................................................................................ 64

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) ...................................................................................................... 111

*Bassiouni v. CIA,*
  392 F.3d 244 (7th Cir. 2004) ............................................................................................ 71

*Bennett v. Spear,*
  520 U.S. 154 (1997) ........................................................................................... 41, 42, 45

*Beydoun v. Sessions,*
  871 F.3d 459 (6th Cir. 2017) ............................................................................................ 58

*Blitz v. Napolitano,*
  700 F.3d 733 (4th Cir. 2012) ............................................................................................ 56

*Brinkley v. Harbour Recreation Club,*
  180 F.3d 598 (4th Cir. 1999) .......................................................................................... 110

*Busic v. TSA,*
  62 F.4th 547 (D.C. Cir. 2023) .............................................................................. 72, 77, 79

*Cafeteria and Restaurant Workers Union v. McElroy*
  367 U.S. 886 (1961) .......................................................................................................... 68

*Califano v. Aznavorian,*
  439 U.S. 170 (1978) .......................................................................................................... 78

*Calzone v. Hawley,*
  866 F.3d 866 (8th Cir. 2017) ............................................................................................ 42

*Chavez v. Martinez,*
  538 U.S. 760 (2003) ........................................................................................................ 120

*Cherri v. Mueller,*
  951 F. Supp. 2d 918 (E.D. Mich. 2013) ......................................................................... 125

*City of Los Angeles v. Patel,*
  576 U.S. 409 (2015) .......................................................................................................... 76

*Claar v. Burlington N. R. Co.,*
  29 F.3d 499 (9th Cir. 1994) .............................................................................................. 90

*Clapper v. Amnesty Int'l,*
  568 U.S. 398 (2013) ........................................................................... 47, 48, 50, 114

*Collins v. City of Harker Heights,*
  503 U.S. 115 (1992) .......................................................................................................... 76

*Common Cause v. Biden,*
  748 F.3d 1280 (D.C. Cir. 2014) ....................................................................................... 41

*Cooper v. Smith & Nephew, Inc.*,
   259 F.3d 194 (4th Cir. 2001) ............................................................... 84

*Coral Springs St. Sys., Inc. v. City of Sunrise*,
   371 F.3d 1320 (11th Cir. 2004) ............................................................ 49

*Cty. of Riverside v. McLaughlin*,
   500 U.S. 44 (1991) ............................................................................... 48

*D.B. v. Cardall*,
   826 F.3d 721 (4th Cir. 2016) ............................................................... 76

*Daubert v. Merrell Dow Pharms., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ............................................................... 91

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ........................................................................... 104

*Dep't of Navy v. Egan*,
   484 U.S. 518 (1988) ............................................................................. 55

*Dobbs v. Jackson Women's Health Org.*,
   597 U.S. 215 (2022) ............................................................................. 77

*EEOC v. Freeman*
   778 F.3d 463 (4th Cir. 2015) ............................................................... 88

*EEOC v. Freeman*
   961 F. Supp. 2d 783 (D. Md. 2013) ................................................ 88, 89

*EEOC v. Kaplan Higher Educ. Corp.*
   748 F.3d 749 (6th Cir. 2014) ................................................ 95, 101, 103

*Elhady v. Kable*,
   391 F. Supp. 3d 562 (E.D. Va. 2019) ................................................... 74

*Elhady v. Kable*,
   993 F.3d 208 (4th Cir. 2021) ......................................................... *passim*

*Elhady v. Piehota*,
   303 F. Supp. 3d 453 (E.D. Va. 2017) .............................................. 65, 129

*Elliot v. Amadas Indus., Inc.*,
   796 F. Supp. 2d 796 (S.D. Miss. 2011) ............................................... 90

*Fields v. Blake*,
   349 F. Supp. 2d 910 (E.D. Pa. 2004) ................................................... 68

*Fikre v. FBI,*
    601 U.S. 234 (2024) ............................................................................. 48, 51

*Fisher v. United States,*
    425 U.S. 391 (1976) ............................................................................. 121

*Fisher v. Univ. of Tex. at Austin,*
    570 U.S. 297 (2013) ............................................................................. 80

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA,*
    313 F.3d 852 (4th Cir. 2002) ................................................................ 42

*Frank Krasner Enterprises, Ltd. v. Montgomery Cnty.,*
    401 F.3d 230 (4th Cir. 2005) ................................................................ 41

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. Inc.,*
    528 U.S. 167 (2000) ............................................................................. 48

*General Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) ............................................................................. 104

*Ghedi v. Mayorkas,*
    16 F.4th 456 (5th Cir. 2021) ................................................................ 58

*Gilbert v. Homar,*
    520 U.S. 924 (1997) ............................................................................. 68

*Gilmore v. Gonzales,*
    435 F.3d 1125 (9th Cir. 2006) ............................................................. 77

*Grande Vista, LLC v. United States,*
    680 F. Supp. 3d 550 (D. Md. 2023) .................................................... 97

*Haig v. Agee,*
    453 U.S. 280 (1981) ............................................................. 78, 79, 111

*Hertz Corp. v. Friend,*
    559 U.S. 77 (2010) ............................................................................... 54

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010) ................................................................... 79, 112

*Honig v. Doe,*
    484 U.S. 305 (1988) ............................................................................. 49

*In re Dep't of Investigation of City of New York,*
    856 F.2d 481 (2d Cir. 1988) ................................................................ 55

viii

*In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig.* (No. II),
   341 F. Supp. 3d 213 (S.D.N.Y. 2018) ................................................................ 102, 103

*In re Paoli R.R. Yard PCB Litig.,*
   35 F.3d 717 (3d Cir. 1994) ................................................................................... 84

*In re Paraquat Prods. Liab. Litig.,*
   730 F. Supp. 3d 793 (S.D. Ill. 2024) ................................................................. 91, 99

*In re The City of New York,*
   607 F.3d 923 (2d Cir. 2010) ................................................................................ 57

*Jibril v. Mayorkas,*
   101 F.4th 857 (D.C. Cir.) ........................................................................ 50, 53, 54

*Jibril v. Mayorkas,*
   No. 1:19-CV-2457-RCL 2023 WL 2240271 (D.D.C. Feb. 27, 2023) ............................ 54

*Jifry v. FAA,*
   370 F.3d 1174 (D.C. Cir. 2004) ............................................................................ 54

*Johnson v. United States,*
   228 U.S. 457 (1913) ............................................................................................ 122

*Kaseberg v. Conaco, LLC,*
   No. 15-CV-1637, 2019 WL 1641161 (S.D. Cal. Apr. 16, 2019) .................................. 99

*Kashem v. Barr,*
   941 F.3d 358 (9th Cir. 2019) ...................................................................... 55, 72, 78

*Kitchen v. Herbert,*
   755 F.3d 1193 (10th Cir. 2014) ........................................................................... 42

*Koehler v. Infosys Techs. Ltd. Inc.,*
   628 F. Supp. 3d 835 (E.D. Wis. 2022) ........................................................... *passim*

*Kovac v. Wray,*
   No. 3:18-CV-00110-X, 2022 WL 717260 (N.D. Tex. Mar. 10, 2022) ........................... 55

*Latif v. Obama,*
   666 F.3d 746 (D.C. Cir. 2011) ............................................................................ 93

*Leifert v. Strach,*
   404 F. Supp. 3d 973 (M.D.N.C. 2019) ................................................................. 48

*Lovelace v. Lee,*
   472 F.3d 174 (4th Cir. 2006) ...................................................................... *passim*

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ................................................................................................ 114

*Maniar v. Mayorkas,*
  No. CV 19-3826 (EGS), 2023 WL 2709040 (D.D.C. Mar. 30, 2023) ............................ 50

*Matar v. TSA,*
  910 F.3d 538 (D.C. Cir. 2018) ................................................................................. 56

*Mathews v. Eldrige,*
  424 U.S. 319 (1976) ................................................................................................. 71

*Mayor & City Council of Baltimore v. Trump,*
  416 F. Supp. 3d 452 (D. Md. 2019) ......................................................................... 40

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.,*
  892 F.3d 624 (4th Cir. 2018) ................................................................................... 99

*Mohamed v. Holder,*
  266 F. Supp. 3d 868 (E.D. Va. 2017) ............................................................... 81, 129

*Mohamed v. Holder,*
  No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958 (E.D. Va. July 16, 2015) ................... 74

*Mohney v. USA Hockey, Inc.,*
  300 F. Supp. 2d 556 (N.D. Ohio 2004) .................................................................... 91

*Mokdad v. Lynch,*
  804 F.3d 807 (6th Cir. 2015) ................................................................................. 117

*Munoz v. Orr,*
  200 F.3d 291 (5th Cir. 2000) ................................................................................... 99

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ..................................................................................... 40, 47, 50

*Nat'l Fed'n of the Blind v. United States Dep't of Educ.,*
  407 F. Supp. 3d 524 (D. Md. 2019) ......................................................................... 47

*Navarette v. California,*
  572 U.S. 393 (2014) ............................................................................................... 118

*New Doe Child #1 v. Cong. of United States,*
  891 F.3d 578 (6th Cir. 2018) .......................................................................... 124, 126

*New York State Tchrs. Ret. Sys. v. Kalkus,*
  764 F.2d 1015 (4th Cir. 1985) ................................................................................. 47

*Nur v. Unknown CBP Officers,*
    No. 1:22-CV-169-AJT/JFA, 2022 WL 16747284 (E.D. Va. Nov. 7, 2022) .................................. 54

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ....................................................................................................... 46

*Olivares v. TSA,*
    819 F.3d 454 (D.C. Cir. 2016) ......................................................................................... 54

*Orgain v. City of Salisbury,*
    521 F. Supp. 2d 465 (D. Md. 2007) ................................................................................ 110

*Payne v. Travenol Labs.,*
    673 F.2d 798 (5th Cir. 1982) ....................................................................................... 88, 89

*Perrier-Bilbo v. United States,*
    954 F.3d 413 (1st Cir. 2020) ......................................................................................... 124

*Prison Legal News v. Fed. Bureau of Prisons,*
    944 F.3d 868 (10th Cir. 2019) ......................................................................................... 49

*In re Zoloft (Sertraline Hydrocloride) Prod. Liab. Litig.,*
    No. 12-md-2342, 2015 WL 7776911 (E.D. Pa. Dec. 2, 2015) ......................................... 99

*Ragsdale v. Turnock,*
    841 F.2d 1358 (7th Cir. 1988) ......................................................................................... 49

*Rahman v. Chertoff,*
    530 F.3d 622 (7th Cir. 2008) ......................................................................................... 69

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.,*
    867 F.3d 338 (3d Cir. 2017) .................................................................................... 124, 128

*Ridpath v. Bd. of Governors Marshall Univ.,*
    447 F.3d 292 (4th Cir. 2006) ....................................................................................... 65, 66

*Rockwell Int'l Corp. v. United States,*
    549 U.S. 457 (2007) ....................................................................................................... 48

*Ross v. City of Oakland,*
    No. 14-CV-00800, 2015 WL 4365309 (N.D. Cal. July 14, 2015) ................................... 94

*Sanchez v. Bos. Sci. Corp., No. 2:12-CV-05762,*
    2014 WL 4851989 (S.D.W. Va. Sept. 29, 2014) ...................................................... 97, 101

*Sardis v. Overhead Door Corp.,*
    10 F.4th 268 (4th Cir. 2021) .................................................................................. 95, 96, 97

xi

*Scherfen v. U.S. DHS,*
   No. 3:CV-08-1554, 2010 WL 456784 (M.D. Pa. Feb. 2, 2010) ................................................... 54, 56

*Seraji v. Gowadia,*
   No. 8: 16-CV-01637-JLS-JCG, 2017 WL 2628545 (C.D. Cal. Apr. 28, 2017) .............................. 66

*Shearson v. Holder,*
   865 F. Supp. 2d 850 (N.D. Ohio 2011) ................................................................................................. 56

*Shirvinksi v. U.S. Coast Guard,*
   673 F.3d 308 (4th Cir. 2012) ................................................................................................................ 57

*Siegert v. Gilley,*
   500 U.S. 226 (1991) ............................................................................................................................... 65

*Sierra Club v. U.S. Dep't of the Interior,*
   899 F.3d 260 (4th Cir. 2018) ................................................................................................................ 40

*Snepp v. United States,*
   444 U.S. 507 (1980) ............................................................................................................................... 71

*Snodgrass v. Ford Motor Co.,*
   No. 96-cv-1814, 2002 WL 485688 (D.N.J. Mar. 28, 2002) ............................................................... 88

*Sossamon v. Texas,*
   560 F.3d 316 (5th Cir. 2009) ................................................................................................................ 49

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) ............................................................................................................................... 40

*Star Scientific, Inc. v. Beales,*
   278 F.3d 339 (4th Cir. 2002) .......................................................................................................... 41, 44

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ................................................................................................................................. 54

*Sylvia Dev. Corp. v. Calvert Cnty., Md.,*
   48 F.3d 810 (4th Cir. 1995) ........................................................................................................... *passim*

*Tabbaa v. Chertoff,*
   509 F.3d 89 (2d Cir. 2007) ............................................................................................................. *passim*

*Talley v. Folwell,*
   133 F.4th 289 (4th Cir. 2025) ......................................................................................................... 76, 77

*Thomas v. City of Memphis, Tennessee,*
   996 F.3d 318 (6th Cir. 2021) ................................................................................................................ 49

xii

*TransUnion LLC v. Ramirez,*
  594 U.S. 413, (2021) ................................................................................................ 40

*U.S. Postal Serv. v. Gregory,*
  534 U.S. 1 (2001) ............................................................................................. 48, 52

*U.S. v. Aigbekaen,*
  943 F.3d 713 (4th Cir. 2019) ............................................................................... 117

*U.S. v. Aigbekaen,*
  No. CR 15-0462, 2022 WL 3106949 (D. Md. Aug. 3, 2022) ................................. 121, 122

*U.S. v. Armstrong,*
  517 U.S. 456 (1996) ............................................................................................. 83

*U.S. v. Barrera,*
  415 F. Supp. 3d 832 (N.D. Ill. 2019) .................................................................... 119

*U.S. v. Braxton,*
  112 F.3d 777 (4th Cir. 1997) ............................................................................... 123

*U.S. v. Campbell*
  963 F.3d 309 (4th Cir. 2020) ............................................................................... 104

*U.S. v. Crisp,*
  324 F.3d 261 (4th Cir. 2003) ................................................................... 90, 95, 99

*U.S. v. Flores Montano,*
  541 U.S. 149 (2004) ................................................................... 4, 60, 61, 116

*U.S. v. Johnson,*
  122 F. Supp. 3d 272 (M.D.N.C. 2015) ................................................................. 110

*U.S. v. Ickes,*
  393 F.3d 501 (4th Cir. 2005) ............................................................................... 116

*U.S. v. Kolsuz,*
  890 F.3d 133 (4th Cir. 2018) ....................................................................... 116, 117

*U.S. v. Kolsuz,*
  185 F. Supp. 3d 843 (E.D. Va. 2016) ................................................................... 116

*U.S. v. Matish,*
  193 F. Supp. 3d 585 (E.D. Va. 2016) ..................................................................... 55

*U.S. v. McAuley,*
  563 F. Supp. 2d 672 (W.D. Tex. 2008) ................................................................. 122

*U.S. v. Montoya de Hernandez,*
   473 U.S. 531 (1985) ........................................................................................................ 116

*U.S. v. Nkongho,*
   107 F.4th 373 (4th Cir. 2024) ................................................................................. 116, 118

*U.S. v. Payne,*
   99 F.4th 495 (9th Cir. 2024) ........................................................................................... 119

*U.S. v. Pelton,*
   835 F.2d 1067 (4th Cir. 1987) ........................................................................................ 123

*U.S. v. Ramsey,*
   431 U.S. 606 (1977) ........................................................................................................ 129

*U.S. v. Riley,*
   920 F.3d 200 (4th Cir. 2019) .......................................................................................... 121

*U.S. v. Romero-Lobato,*
   379 F. Supp. 3d 1111 (D. Nev. 2019) ............................................................................ 101

*U.S. v. Saboonchi,*
   990 F. Supp. 2d 536 (D. Md. 2014) ............................................................................... 122

*U.S. v. Sanchez-Gomez,*
   584 U.S. 381 (2018) .................................................................................................... 48, 49

*U.S. v. Sweets,*
   526 F.3d 122 (4th Cir. 2007) .......................................................................................... 121

*U.S. v. Umana,*
   750 F.3d 320 (4th Cir. 2014) .......................................................................................... 123

*U.S. v. Verdugo-Urquidez,*
   494 U.S. 259 (1990) ................................................................................................. 76, 120

*Veney v. Wyche,*
   293 F.3d 726 (4th Cir. 2002) ............................................................................................ 82

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens,*
   529 U.S. 765 (2000) .................................................................................................... 41, 43

*Viterbo v. Dow Chem. Co.,*
   646 F. Supp. 1420 (E.D. Tex. 1986) ................................................................................ 90

*W. Virginia v. Env't Prot. Agency,*
   597 U.S. 697 (2022) .......................................................................................................... 50

xiv

*Wall v. Wade*,
    741 F.3d 492 (4th Cir. 2014) ................................................................ 48

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ............................................................................. 76

*Watson v. Fort Worth Bank & Tr.*,
    487 U.S. 977 (1988) ............................................................................. 88

*Wehling v. Sandoz Pharm. Corp.*,
    162 F.3d 1158 (4th Cir. 1998) .............................................................. 91

*West v. Lynch*,
    845 F.3d 1228 (D.C. Cir. 2017) ........................................................... 41

*Withrow v. Larkin*,
    421 U.S. 35 (1975) ............................................................................... 48

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ............................................................................. 76

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ............................................................................. 83

**U.S. Constitution**

U.S. Const. Amend. XIV, § 1 .................................................................. 82

**Statutes**

6 U.S.C. § 111 .......................................................................................... 3

6 U.S.C. § 202 .......................................................................................... 3

6 U.S.C. § 211 .................................................................................. 4, 122

8 U.S.C. § 1365b ..................................................................................... 67

10 U.S.C. § 2801 ............................................................................... 6, 7, 8

18 U.S.C. § 2331 ...................................................................................... 6

19 U.S.C. §§ 482 ...................................................................................... 4

19 U.S.C. § 507 .................................................................................... 122

19 U.S.C. § 1455 ...................................................................................... 4

19 U.S.C. § 1459 ...................................................................................... 4

19 U.S.C. § 1461 ............................................................................... 4, 122

19 U.S.C. § 1467 ...................................................................................... 4

19 U.S.C. § 1496 ...................................................................................... 4

19 U.S.C. § 1499 .................................................................................................... 4, 122

19 U.S.C. § 1581 ......................................................................................................... 4

19 U.S.C. § 1582 .................................................................................................... 4, 122

28 U.S.C. § 533 ........................................................................................................... 3

42 U.S.C. § 2000bb-1 ................................................................................................ 124

49 U.S.C. § 114 .................................................................................................... *passim*

49 U.S.C. § 44903 ..................................................................................................... 4, 8

49 U.S.C. § 44926 ................................................................................................. 8, 9, 10

49 U.S.C. § 46110 ............................................................................................... *passim*

50 U.S.C. § 3056 ......................................................................................................... 3

50 U.S.C. § 3515 ............................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 9 ....................................................................................................... 47

Fed. R. Civ. P. 37 .................................................................................................. 93, 94

Fed. R. Civ. P. 56 ............................................................................................ 93, 94, 130

Fed. R. Evid. 801, 802 ................................................................................................ 94

Fed. R. Evid. 702 ................................................................................................. 84, 88

**Regulations**

8 C.F.R. 235.12 ......................................................................................................... 67

8 C.F.R. § 235.12 ............................................................................................... *passim*

28 C.F.R. § 0.85 .......................................................................................................... 3

49 C.F.R. part 1520 ......................................................................................... 11, 12, 13

49 C.F.R. part 1540 .................................................................................................... 13

49 C.F.R. part 1572 .................................................................................................... 13

49 C.F.R. § 1520.5 ..................................................................................................... 57

49 C.F.R. § 1520.9 ..................................................................................................... 56

49 C.F.R. § 1560.105 ................................................................................................... 6

69 Fed. Reg. 28,066 (May 18, 2004) .......................................................................... 57

75 Fed. Reg. 707 (Dec. 29, 2009) .............................................................................. 55

**Other Authorities**

CBP, Global Entry,
    https://www.cbp.gov/travel/trusted-traveler-programs/global-entry (last modified May 29,
    2025) .................................................................................................................................. 67

Homeland Security Presidential Directive/HSPD-6 (Sept. 16, 2003),
    https://fas.org/irp/offdocs/nspd/hspd-6.html (last visited June 3, 2025) .................................... 3

Nat'l Comm'n on Terrorist Attacks Upon the United States, *The 9/11 Commission Report*, § 13.3,
    available at https://www.9-11commission.gov/report/ (last visited June 3, 2025) ...................... 2

Office of the Director of National Intelligence,
    *Annual Threat Assessment of the U.S. Intelligence Community* (March 2025) ............................. 1

U.S. Dep't of Just., *Criminal Justice Information Services (CJIS) Security Policy* (Aug. 16, 2018),
    https://www.fbi.gov/file-repository/cjis-security-policy_v5-7_20180816.pdf/view ............ 15, 16

## INTRODUCTION

The Terrorist Screening Dataset ("TSDS"),[1] often referred to as the terrorist watchlist, "lies at the very heart of our country's effort to identify those who would inflict upon the public irretrievable loss and irreparable mass harms." *Elhady v. Kable*, 993 F.3d 208, 213 (4th Cir. 2021) (reversing grant of summary judgment for plaintiffs). This action is the latest entry in a lengthy legal saga in search of a court that will strike the TSDS down even though every prior attempt has failed. To that end, twenty remaining Plaintiffs claim to have experienced enhanced screening at airports or additional inspections at the border, which they argue is due to inclusion in the TSDS. These plaintiffs assert well-worn claims under the Constitution and the Administrative Procedure Act, but each such claim fails to find legal or factual support. Rather, extensive discovery confirms the Government is entitled to dismissal of or judgment on each of these claims.

## BACKGROUND

### A. The Threat Environment

The United States continues to face terrorist threats from foreign terrorist organizations, including the Islamic State of Iraq and ash-Sham ("ISIS"). Declaration of Donald Holstead, Federal Bureau of Investigation (DEX2) ¶ 9; Public Declaration of Christina Chesterfield, Transportation Security Administration (DEX5) ¶ 19. The most recent annual threat assessment opined that ISIS's most aggressive branches will continue to seek to attack western countries, including the United States. Office of the Director of National Intelligence, *Annual Threat Assessment of the U.S. Intelligence Community* (March 2025) at 6 (cited in DEX2 ¶ 9). It also assessed that al-Qai'da branches and other organizations continue to seek to target the United States and its citizens. *Id.*; *see also* Declaration of Jason Kane, National Counterterrorism Center ("NCTC") (DEX3) ¶¶ 11-21 (confirming ISIS and al-Qai'da-related threats, including to air travel). The NCTC confirms that the U.S. remains under threat from various international terrorist groups and actors. *Id.* ¶ 11. Domestic terrorism is an increasing threat

---

[1] The TSDS was previously called the "Terrorist Screening Database" or "TSDB," and the terms are used interchangeably throughout this brief.

as well. DEX2 ¶ 10; *see also* JRDH-Merits-0009839 (DEX38) (terrorist attacks since 9/11); JRDH-FBI-0001353 (DEX39) (domestic terror report).

Aviation remains a principal target for terrorists who seek to instill fear, disrupt the economy, and undermine the American way of life, and terrorists are constantly working to find new methods for evading security measures. DEX5 ¶ 16. Multiple terrorist attacks on civil aviation in recent years demonstrate the persistent threat and that adversaries continue to find ways to defeat security measures. *Id.* ¶¶ 19-30 (describing recent attacks and attempted attacks globally). Terrorist groups are expected to continue to use insiders to execute attacks and also to apply their ingenuity to devise new ways to bypass or defeat aviation security measures. *Id.* ¶¶ 16, 22, 32.

As set forth in greater detail below, effective and timely governmental information-sharing is crucial to preventing terrorist attacks. In recent years, through the information sharing system supported by the TSDS, the U.S. has been able to track potential terrorist plots by coordinating derogatory information from the intelligence community with encounter information from local law enforcement or other screening partners. Declaration of Steven McQueen, Threat Screening Center (DEX1) ¶ 11. As was noted by the 9-11 Commission, this was not possible before 9-11 when, for example, the Central Intelligence Agency ("CIA") might have known an individual had ties to terrorism—but did not know the individual was in the U.S.—while local law enforcement knew the individual was in the U.S.—but did not know the individual had ties to terrorism. The common operating picture afforded by the information sharing system (as supported by the TSDS) is absolutely critical to preventing such terrorist plots from coming to fruition in the future. *Id*; Nat'l Comm'n on Terrorist Attacks Upon the United States, *The 9/11 Commission Report*, § 13.3, available at https://www.9-11commission.gov/report/ (last visited June 3, 2025) (recommending greater information-sharing), *id.* § 8.2 (describing what the Commission found to be specific information failures in the months leading up to the 9/11 attacks).

### B. Defendants and the Watchlisting Enterprise.

Several different components of the federal government work together to secure the United States and its borders and aviation system from terrorist threats.

The **Federal Bureau of Investigation ("FBI")** investigates and analyzes intelligence relating to both domestic and international terrorist activities. *See* 28 U.S.C. § 533; 28 C.F.R. § 0.85(l); *see also* DEX2 ¶ 2. It also administers the Threat Screening Center ("**TSC**"), a multi-agency Executive Branch organization established by Presidential Directive in 2003 and tasked with, *inter alia*, "consolidat[ing] the Government's approach to terrorism screening and provid[ing] for the appropriate and lawful use of Terrorist Information in screening processes." Homeland Security Presidential Directive/HSPD-6 (Sept. 16, 2003), https://fas.org/irp/offdocs/nspd/hspd-6.html (last visited June 3, 2025).

The National Counterterrorism Center ("**NCTC**") analyzes and integrates intelligence relating to international terrorism and counterterrorism. *See* 50 U.S.C. §§ 3056(a), (d)(1). NCTC maintains classified national security information concerning international terrorists within its Terrorist Identities Datamart Environment ("TIDE"). DEX3 ¶ 6; DEX1 ¶ 16.

The Department of Homeland Security ("**DHS**") is charged with "prevent[ing] terrorist attacks within the United States," 6 U.S.C. § 111(b)(1)(A), and "reduc[ing] the vulnerability of the United States to terrorism," *id.* § 111(b)(1)(B); *see also id.* § 202(1); Merits Defs.' Objs. & Resps. to Pls.' First Set of Interrogs. (DEX10) at 14-17; Def. DHS Suppl. Resp. to Pls.' Interrog. No. 1 (DEX11). Within DHS, the **TSA** is responsible for securing all modes of transportation, with a focus on preventing terrorist attacks against civil aviation and other methods of transportation. *See* 49 U.S.C. § 114(d). TSA is further responsible for day-to-day federal security screening operations for passenger air transportation, 49 U.S.C. § 114(e)(1), and for developing "policies, strategies, and plans for dealing with threats to transportation security," *id.* § 114(f)(3).

TSA implements a multi-faceted approach to aviation security, including passenger pre-screening, checkpoint screening, post-checkpoint security measures, and security threat assessments for individuals with privileged access to commercial aviation, such as pilots, flight attendants, and aviation workers. *See generally* DEX5. One of TSA's responsibilities is to ensure aircraft security by using information from government agencies to identify individuals on airline passenger lists who may be a threat to civil aviation or national security, and prevent such individuals from boarding an aircraft or take other appropriate actions. *See* 49 U.S.C. § 114(h)(3). TSA executes this mandate in part through

the Secure Flight program, which "compar[es] passenger information to the automatic selectee and no fly lists and utilizes all appropriate records in the [TSDS]." *Id.* § 44903(j)(2)(C)(ii). After completing the comparison of passenger information, TSA provides instructions to aircraft operators to identify individuals for standard, enhanced, or expedited screening at a security checkpoint, or to deny individuals transport or authorization to enter a U.S. airport's sterile area. DEX5 ¶ 38. Designation for enhanced screening may be based on a variety of reasons, including random selection. *Id.* ¶ 10.

U.S. Customs and Border Protection ("**CBP**"), another agency within DHS, is responsible for enforcing hundreds of federal laws at the border, including deterring and preventing terrorists and terrorist weapons from entering the United States. *See* 6 U.S.C. § 211(g)(3)(A)-(B); 6 U.S.C. § 211(c)(5). As part of that mission, CBP has authority to search all those who are entering and exiting the United States and conduct searches of their effects, including passenger electronic devices; these searches and inspections help detect evidence related to terrorism and other national security matters, human and bulk cash smuggling, contraband, and child pornography, among other purposes. *See id.* § 211(c)(9). CBP exercises its authority under numerous statutes to search persons and goods at the nation's air, land, and sea borders. *See, e.g.*, 19 U.S.C. §§ 482, 1455, 1459, 1461, 1467, 1499, 1581, 1582; *U.S. v. Flores Montano*, 541 U.S. 149, 152-53 (2004). These authorities include, but are not limited to, inspections for the purpose of preventing terrorist attacks. *See, e.g.*, 6 U.S.C. § 211(g)(3)(a); *Tabbaa v. Chertoff*, 509 F.3d 89, 97 (2d Cir. 2007) (describing antiterrorism mission of CBP and DHS).

All travelers attempting to enter the U.S. are required to present themselves and their effects for inspection at the port of entry. Public Declaration of Christopher Holtzer, CBP (DEX4) ¶ 10. At primary inspection, a CBP officer verifies the identity of the person and asks the person questions regarding his or her travel and intent in entering the U.S. CBP also performs law enforcement system queries to see if there are any alerts in the system. *Id.* ¶¶ 35-38. Alerts or "lookouts" may be present in the system for a wide variety of reasons. *Id.* ¶ 25. CBP officers have discretion in conducting inspections, subject to legal and policy requirements and in accordance with their training and experience. *Id.* ¶¶ 36, 42. There are myriad reasons a CBP officer might refer a traveler for additional scrutiny, sometimes referred to as secondary inspection. *Id.* ¶¶ 37, 39. Once a traveler is referred for

additional scrutiny, the specific actions taken during the secondary border inspection vary depending on the officer's evaluation of the situation. *Id.* ¶ 42. For example, an officer may choose to search that traveler's luggage or other belongings, subject to legal and policy requirements. *Id.* CBP conducts border searches of electronic devices in accordance with CBP Directive No. 3340-049A, Border Search of Electronic Devices (Jan. 4, 2018) (DEX37). *See* DEX4 ¶¶ 47-57.

### C. The Terrorist Screening Dataset

As part of its duties, TSC maintains the TSDS, which is "the federal government's consolidated watchlist of known or suspected terrorists." *Elhady v. Kable*, 993 F.3d 208, 213 (4th Cir. 2021); DEX1 ¶ 1. The TSDS contains unclassified identifying information of known or suspected terrorists. *Id.* ¶ 12. Federal agencies nominate individuals for inclusion, and TSC determines whether to accept the nominations and add the identities to the TSDS. *Id.* ¶¶ 14, 18. The vast majority of the identities in the TSDS are foreign nationals who are not located in, and have no known nexus to, the U.S. *Id.* ¶ 28. In fact, U.S. persons make up approximately half of one percent (0.5%) of the identities in the TSDS. *Id.* As a result of the dynamic intelligence environment, regular reviews of the data, and the redress process, the TSDS is constantly changing as it is continuously reviewed and updated. *Id.* ¶ 26. The "Overview of the U.S. Government's Terrorist Watchlisting Process and Procedures" (DEX1A) provides a general description of the TSDS and watchlisting processes and procedures.

For TSC to include an identity in the TSDS, the nomination must rely upon articulable intelligence or information that, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting, in preparation for, or in aid or in furtherance of terrorism and/or terrorist activities; and the nomination must include sufficient identifying information.[2] DEX1 ¶ 19. Mere guesses or "hunches" or the reporting of suspicious activity alone are not sufficient to establish reasonable suspicion. *Id.* ¶ 34. And nominations must not

---

[2] The TSDS also includes identifying information of some individuals who are not KSTs and do not meet the reasonable suspicion standard, known as "watchlist exceptions." These individuals are not considered KSTs and are not screened as such. DEX1 ¶ 20.

be based solely on an individual's race, ethnicity, national origin, or religious affiliation, nor solely on beliefs and activities protected by the First Amendment. *Id.* ¶ 17. While underlying derogatory information may include references to religious matters that are inextricably intertwined with facts related to terrorist activity, it is the terrorist activity, not religious elements, that is relevant to TSC's analysis. *Id.* ¶ 18. Persons meeting this standard are considered "known or suspected terrorists," sometimes referred to as "KSTs." *Id.* ¶ 12.

TSA may designate airline passengers for enhanced screening who meet the reasonable suspicion standard for TSDS inclusion and for whom the TSDS record contains a full name and a full date of birth. DEX5 ¶¶ 10, 11. Individuals who meet this minimum requirement are included in the "Expanded Selectee List," a subset of the TSDS. DEX5 ¶ 10. The No Fly List and the Selectee List are separate subset lists of the TSDS, and placement on those subsets requires additional heightened substantive derogatory criteria to be met. *See* 49 C.F.R. § 1560.105(b)(2), (b)(7)(iii). KSTs may be placed on the No Fly List after TSC determines that an individual, in addition to meeting the reasonable suspicion standard, poses at least one of the following: (a) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft (including a threat of air piracy, or a threat to airline, passenger, or civil aviation security); (b) a threat of committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5) with respect to the homeland; (c) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) against any U.S. Government facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations (as defined by 10 U.S.C. § 2801(c)(4)), U.S. ships, U.S. aircraft, or other auxiliary craft owned or leased by the US Government; or (d) a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so. DEX7, Declaration of Erinn Wagner, TSA, ¶ 6. TSA prohibits individuals on the No Fly List from entering the sterile area of an airport and boarding an aircraft. DEX7 ¶ 9. Although the No Fly List criteria are public, the Selectee List criteria are not public because disclosure would give known or suspected terrorists information that could assist in developing strategies to circumvent security screening. DEX1 ¶ 24. The TSA Administrator

6

has final authority over implementation of the No Fly, Selectee, and Expanded Selectee Lists and makes final determinations concerning inclusion on the No Fly List for U.S. persons seeking redress through DHS Traveler Redress Inquiry Program ("DHS TRIP") (described further below).[3] Declaration of Tania Vasquez, TSA (DEX6) ¶ 15.

To maintain thorough, accurate, and current terrorism information, the TSDS is subjected to rigorous and ongoing quality control measures. First, before any individual is added to the TSDS, the nominating agency assesses the available, relevant information, including any exculpatory information, to determine whether the applicable standard is met. DEX1 ¶ 15; *see also* DEX2 ¶¶ 14-16; DEX4 ¶ 28. Identities that meet the standard for inclusion in the TSDS and which have a nexus to international terrorism are generally sent to the NCTC, and identities with a nexus to domestic terrorism are sent to FBI. DEX1 ¶ 14. And TSC completes a *de novo* review of available, relevant information under the same standard and makes the final decision whether to include the individual in the TSDS. *Id.* ¶¶ 15, 54. Further, subsequent to each encounter[4] with an individual on the TSDS TSC conducts a review of that individual to ensure continued placement is warranted based on available, relevant information, and TSC reviews each U.S. person to ensure their TSDS placement is still warranted at least every six months. DEX1 ¶ 56. Nominating agencies also conduct at least annual reviews. *Id.* ¶ 55.

Nominations to the TSDS are made by federal agencies based on credible information from a wide variety of intelligence sources; additionally, foreign partners may submit identities to be considered for inclusion in the TSDS. DEX1A at 3. Accordingly, before a nominated individual is added to the TSDS, information supporting that individual's inclusion has undergone review by the nominating agency, then by NCTC or FBI (as appropriate), and then again by TSC, to ensure compliance with interagency standards for inclusion. DEX1 ¶ 54.

---

[3] The Government has developed a process, sometimes referred to as a One-Time Waiver (OTW), that facilitates U.S. citizens or lawful permanent residents on the No Fly List ability to return to the United States from abroad, subject to certain requirements that mitigate, to some extent, the risk of such travel. *See* DEX1 n.6.

[4] An "encounter" is an event in which an individual is identified during a screening process or law enforcement stop to be a potential match to an individual who is in the TSDS.

This system relies on informed judgments by experienced analysts and agents who evaluate TSDS nominations based on individual circumstances, taking into account the particular intelligence that distinguishes the individual under review, including exculpatory information. DEX2 ¶ 16. These analysts and agents draw on years of experience and training and from a body of source material; they have a variety of investigative and intelligence-gathering tools at their disposal to inform their judgment and make use of subject-matter experts from throughout the intelligence community. *Id.* ¶ 18. Agents and analysts are also guided in their decision-making by detailed analytical standards that structure their discretion and promote scrutiny and professionalism in their work. *Id.* ¶ 15.

TSC is ultimately responsible for determining if the information associated with a nomination meets the established standards for inclusion in the TSDS or its subset lists. DEX1 ¶¶ 21, 22, 54; DEX1A at 4. Any time a federal agency (whether or not it was the nominator) identifies new or updated information about a watchlist record, it is expected to make a request to modify or remove that record. *Id.* ¶ 57. In addition to their annual reviews, nominating agencies each have internal procedures to prevent, identify, and correct any errors. *Id.* ¶ 55; *see also* DEX4 ¶¶ 31-32.

Other government entities provide further oversight and input into watchlisting procedures, including Inspectors General, the Government Accountability Office, and Congress. DEX1 ¶¶ 59-60. Such reviews have resulted in additional quality assurance mechanisms at TSC, which have improved accuracy and efficiency. *Id.* ¶ 59.

### D. Redress

Congress directed DHS to establish a timely and fair redress process for travelers who believe they have been delayed or prohibited from boarding a commercial aircraft because they have been wrongly identified as a threat. *See* 49 U.S.C. § 44926(a). Congress further directed the Administrator of TSA to create a process to enable airline passengers who are delayed or prohibited from boarding a flight because TSA's "passenger prescreening system determined that they might pose a security threat to appeal such determination and correct information contained in the system" as necessary. *Id.* § 44903(j)(2)(C)(iii)(I). TSA implements this mandate through DHS TRIP, which serves as a single

point of contact for a wide variety of complaints and inquiries regarding travel difficulties. *See* DEX6 ¶ 3; DEX1 ¶ 62.

Travelers who have experienced a screening-related travel difficulty, including those who believe that they experienced such problems because they were wrongly identified as a threat, may submit a Traveler Inquiry Form to DHS TRIP.[5] DEX6 ¶ 3. In their inquiry, travelers may provide any comments or additional information they deem relevant, including exculpatory information. *Id.* ¶ 11. DHS TRIP reviews the information submitted and evaluates each inquiry to determine which DHS components or other governmental agencies have equities in the issues underlying the claimed travel difficulties. *Id.* ¶ 6. In addition to reviewing the traveler's submission, DHS TRIP also reviews relevant government databases, and refers the inquiries to the appropriate DHS TRIP component(s), and/or any other governmental agencies with equities. *Id.* Approximately 98 percent of DHS TRIP inquiries have no connection with any identity in the TSDS. *Id.* ¶ 6.

In the small fraction of cases when DHS TRIP determines that a traveler is an exact or possible match to an identity in the TSDS, DHS TRIP refers the matter to the TSC Redress Office. DEX6 ¶ 7; DEX1 ¶ 66. When this occurs and the traveler is a confirmed match to the TSDS, TSC reviews the available derogatory and exculpatory information about the traveler, including any information provided by the traveler as a part of the inquiry, to determine whether the identity in the TSDS continues to satisfy the criteria for inclusion or should be removed or have its status otherwise modified. DEX1 ¶¶ 68-69. The TSC Redress Office consults with the nominator to ensure that any new or exculpatory information is considered as part of the redress review. *Id.* ¶ 68. When changes to a record's status are warranted, TSC's Redress Office ensures such corrections are made and verifies that such modifications or removals are carried over to the various screening systems that receive

---

[5] If a traveler experienced problems because he or she was "misidentified"—*i.e.*, the traveler's name is the same as or similar to the name of a different individual who is included in the TSDS—then DHS TRIP, in coordination with all relevant government agencies, attempts to prevent future misidentification. DHS TRIP provides the traveler a Redress Control Number (RCN), which travelers may use when making future air travel reservations. In conjunction with TSA's Secure Flight Program, airlines have modified their reservation systems to allow an individual with an RCN to enter it into the reservation system to prevent the individual from being misidentified.

TSDS exports. *Id.* ¶ 70. DHS TRIP sends a final determination letter. *Id.* ; *see also* DEX6 ¶ 4. In light of national security and law enforcement interests, the determination letter generally provides the results of the individual's redress inquiry without disclosing whether the traveler was, or is, included in a federal watchlist used by TSA for passenger pre-boarding screening (including the TSDS and its subsets). DEX6 ¶ 9; DEX1 ¶ 71. When appropriate, the DHS TRIP redress process will result in removal of a traveler from the TSDS and/or one of its subsets. DEX6 ¶ 11; DEX1 ¶ 74.

Additional process is available to U.S. persons who have been denied boarding because they are on the No Fly List and request redress through DHS TRIP. DEX6 ¶¶ 12-17; DEX1 ¶¶ 72. Since adoption of this revised redress process in 2015, if a U.S. person submits a redress inquiry, has been denied boarding, and is appropriately on the No Fly List, DHS TRIP will inform him or her of such status and of the opportunity to seek additional information. DEX6 ¶ 12. If the individual takes this opportunity, DHS TRIP will provide the individual with the No Fly List criterion or criteria on which the placement was based and, to the extent possible consistent with national security and law enforcement interests, a summary of the factual basis for the placement. *Id.* ¶ 13. The amount and type of information provided will vary on a case-by-case basis, depending on the facts and circumstances. *Id.* The individual then has an opportunity to submit any information that he considers potentially relevant to status. *Id.* DHS TRIP, in consultation with relevant TSA offices, will review the submission and provide it to TSC for consideration. *Id.* ¶ 14. If, after TSC's review it concludes that the person should remain on the No Fly List, TSC provides a recommendation to the TSA Administrator and the reasons for its recommendation. *Id.* The TSA Administrator will then review available information (including the TSC recommendation and information submitted by the individual) and either remand the case back to TSC with a request for additional information or clarification or issue a final order maintaining the U.S. person on the No Fly List or removing him from the No Fly List. *Id.* ¶ 15. If TSA issues a final order maintaining an individual on the No Fly List, the order will state (to the extent possible consistent with national security and law enforcement interests) the basis for the decision, and will further notify the individual of the ability to seek judicial review in a court of appeals pursuant to 49 U.S.C. § 46110. *Id.* ¶¶ 16-17.

FBI, TSC, TSA, and CBP have each assessed that further disclosure of TSDS status—to individuals who have not been denied boarding—would cause harm to national security, law enforcement efforts and transportation security, and that disclosure of any underlying derogatory information would cause additional harm to national security. DEX1 ¶ 101, DEX2 ¶ 22; DEX4 ¶ 57; DEX6 ¶ 10. Compelled disclosure of a traveler's TSDS status in these circumstances would have a devastating effect on the usefulness of the TSDS and imperil the effectiveness of critical law enforcement tools used to protect national security. DEX2 ¶ 22.

If the Government were forced to disclose TSDS status to those required to undergo enhanced screening, terrorists would know who would be required to undergo additional screening at airports, and could use that information to attempt to evade security measures and gain access to the commercial aviation system to perpetrate an attack. DEX5 ¶¶ 74-76. The information could be used to identify the best operatives, to predict the likelihood of detection, and to employ countermeasures to avoid such detection, and could specifically compromise countermeasures such as Federal Air Marshals. DEX5A at 5-7. Moreover, requiring disclosure of whether an individual is in the TSDS or the reasons for such inclusion, beyond the limited disclosure contemplated by the process for U.S. persons denied boarding, could jeopardize the integrity and secrecy of ongoing counterterrorism investigative or intelligence activities, and prompt individuals to take countermeasures to evade detection. DEX1 ¶¶ 86-93; DEX2 ¶¶ 22-39.

**E. Information Sharing and Uses of the TSDS**

It is the policy of the U.S. Government not to disclose TSDS status. TSDS status is law enforcement sensitive, and certain subset lists of the TSDS are also Sensitive Security Information ("SSI"); *see* 49 U.S.C. § 114(r) and 49 C.F.R. part 1520. DEX1 ¶ 86; DEX5 ¶ 74. TSDS information therefore is not shared with the public and is subject to strict access controls. DEX5 ¶ 65.  The information is protected from disclosure and is accessible only to persons who have an official "need to know," such as law enforcement officials for their screening and vetting functions. DEX1 ¶¶ 39, 86; DEX4 ¶ 12; DEX5 ¶¶ 65, 74.

Pursuant to HSPD-6, agencies and officials authorized or required to conduct terrorist screening or to use information for diplomatic, military, intelligence, law enforcement, immigration, transportation security, visa, and protective processes are given access to terrorism information to facilitate their respective public missions. DEX1 ¶ 39. **TSC** exports subsets of TSDS information to the following federal government entities: DHS, Department of State, FBI (including the National Crime Information Center ("NCIC"), a database administered by the Criminal Justice Information Services ("CJIS") Division of the FBI to enable information-sharing among law enforcement agencies), the Department of Defense, the Food and Drug Administration, and the World Trade Center Health Program. *Id.* ¶ 42. For other agencies and events, TSC runs lists of names against the TSDS and reports the results to the agency requester. *Id.* Memoranda of understanding ("MOUs") between TSC and its screening partners specify the terms by which TSDS information is shared and used. *Id.* As a result, TSC can attest that its screening partners use TSDS information for lawful screening purposes, in accordance with their own legal authorities, and subject to the restrictions specified in relevant MOUs. *Id.* Prohibited disclosure of internal government information, let alone information protected by statutory law and privilege (such as TSDS information), constitutes a serious breach of official duties. *Id.* These partners use TSDS information for lawful screening purposes consistent with their own authorities and subject to restrictions imposed by relevant MOUs. *Id.*

TSC exports subsets of TSDS data to certain foreign partners (including all Visa Waiver Program participants) with which the United States has entered into foreign partner arrangements. DEX1 ¶ 43. As with domestic screening partners (described above), TSC reasonably expect foreign partners to use TSDS information for lawful terrorist screening purposes, subject to their domestic laws and authorities, and subject to the restrictions specified in relevant arrangements. *Id.*

TSC does not provide TSDS information or access to the TSDS directly to any private company. *Id.* ¶ 46. Defendants are not aware of any mechanism, policy, or practice that would permit TSDS information to be shared with entities such as car dealerships, banks, financial institutions, or gun dealers. *Id.*

**TSA**. Aviation passengers are generally required to undergo security screening prior to entering the secure area of an airport and boarding an aircraft, and passengers may be randomly selected for enhanced screening. DEX5 ¶¶ 10, 42. Some passengers selected for enhanced screening may be required to check in at the airline counter so that TSA can verify the identity of the passenger; the required identity resolution call then takes, on average, around 12.5 minutes. *Id.* ¶ 39. TSA applies the same checkpoint screening procedures to individuals Secure Flight designates for enhanced screening, regardless of whether the individual is designated due to TSDS status, randomly, or for other reasons, and the boarding pass does not indicate why someone has been selected for enhanced screening. *Id.* ¶ 12. Enhanced screening typically includes screening of the person through a walk-through metal detector, Advanced Imaging Technology ("AIT"), and a pat-down, and screening of accessible property through a scanner, an explosives trace detection search, and physical search of the interior of the passenger's accessible property, electronics, and footwear.[6] *Id.* ¶ 48. A typical enhanced screening takes 15 to 20 minutes. *Id.* Additional screening may occur at the gate prior to departure, but no one passenger is singled out for such screening. *Id.* ¶ 63. Federal Air Marshals ("FAMS") may also be deployed on any commercial aircraft. *Id.* ¶¶ 14, 65.

In addition to using the Expanded Selectee List, Selectee List, and No Fly List to screen commercial air passengers, TSA also uses TSDS information as part of its process in conducting security threat assessments of individuals who have access to sensitive transportation areas and systems pursuant to regulation. *See, e.g.*, 49 C.F.R. parts 1540 and 1572; DEX5 ¶ 68. In conducting security threat assessments, TSA's eligibility determinations draw on information from multiple federal databases, including the TSDS. DEX5 ¶ 68. An individual's inclusion in one or more government databases is not determinative of TSA's eligibility determinations. *Id.* TSDS status merely serves as a factor indicating that an individual requires further scrutiny. *Id.* Even if a person applied for

---

[6] TSA does not search electronic devices for electronic content that may be contained on the device and does not extract or download data from passenger electronic devices. TSA electronic device searches only require that passengers turn on the device. TSA security officers do not physically detain passengers, and passengers remain free to leave TSA screening checkpoints once the administrative search of the passenger and the passenger's accessible property is complete. DEX5 ¶¶ 51, 53.

employment requiring a TSA security threat assessment, any determination of ineligibility by TSA resulting from that security assessment would be subject to a separate administrative redress process, *see, e.g.,* 49 C.F.R. Part 1515, and review in the Court of Appeals.

**CBP** receives TSDS information and considers it as an important element of fulfilling CBP's border security responsibilities. TSDS status is one of many factors that may indicate that a traveler warrants additional scrutiny, also known as secondary inspection. DEX4 ¶¶ 37, 39 (describing other factors that can lead to secondary inspection, such as potential criminal violations or problems with travel documents). If there is a potential match of a traveler to the TSDS, CBP will coordinate with TSC and CBP's National Targeting Center to query classified databases and learn more about that traveler's background and nature of the derogatory information that led to that person's inclusion in the TSDS, as well as to confirm that the identity of the person encountered matches the identity contained in the TSDS. *Id.* ¶ 44. Those facts will inform any specific actions taken during secondary inspection, which may include further questioning, personal searches, examining electronic devices, queries in government databases, or searches of the traveler's luggage or belongings, subject to legal and policy requirements. *Id.* ¶¶ 42, 45.

CBP conducts two types of electronic device searches, basic and advanced. *Id.* ¶ 51; DEX37. An officer may conduct a basic search with or without suspicion, and supervisory approval is required prior to the search. During a basic search at the border, an officer examines an electronic device and may manually review and analyze information subject to the requirements and limitations provided by policy and applicable law. In circumstances where there is reasonable suspicion of activity in violation of laws enforced or administered by CBP, or in which there is a national security concern, and with supervisory approval, an officer may perform an advanced search of an electronic device. In an advanced search, an officer connects external equipment, through a wired or wireless connection, to an electronic device to gain access to the device and to review, copy, and/or analyze the contents. Many factors may create reasonable suspicion or constitute a national security concern; examples include the existence of a relevant national security-related "lookout" in combination with other

14

articulable factors as appropriate, or the presence of an individual on a government-operated and government-vetted terrorist watchlist. *See* DEX4 ¶¶ 51-56.

CBP also uses TSDS information to assist in vetting activities, including for example, vetting applicants for Global Entry. DEX4 ¶¶ 63-66. Global Entry is one of DHS's Trusted Traveler Programs, which offers travelers expedited clearance upon arrival to the United States after an international flight, but does not guarantee such expediency even when Global Entry is granted. *Id.* ¶ 65. CBP's standard for consideration of Global Entry applications does not directly overlap with the independent policies and procedures of TSC, including those that govern nomination or removal from the TSDS. *Id.* ¶ 66 (citing 8 C.F.R. § 235.12(b)(2)). In general, if there is a match to the TSDS, CBP will still make an independent review of available derogatory and mitigating information related to that individual and independently determine whether the individual meets the standard to be considered a low-risk traveler. *Id.* When Global Entry status is denied or revoked, the traveler may seek redress requesting reconsideration through the Trusted Traveler Program account dashboard. *Id.* ¶ 68.

TSDS exports enable the **FBI** to share relevant information necessary for its partners to carry out their respective missions in a concerted effort to prevent terrorist attacks. DEX2 ¶ 11. The TSDS allows FBI to leverage the combined resources of state, local, and federal law enforcement to provide information on the activities of known or suspected terrorists whom they encounter. *Id.* ¶ 19. TSC therefore exports a subset of the TSDS to the NCIC. *Id.* ¶ 20; DEX8 ¶ 3 & n.1. Users access information in the NCIC files by entering a name and identifier, such as a date of birth or social security number; a user cannot perform a search if only a name is entered, and information is returned to the user only if both the name and numeric identifier match a record in any of the files in NCIC. DEX2 ¶ 20. NCIC access is available to thousands of governmental law enforcement entities nationwide, as well as a limited number of private entities performing or supporting authorized law enforcement functions for criminal justice purposes. *Id.*; DEX8 ¶ 3 n.1. NCIC access is subject to stringent security controls and regular audits, and the applicable federal security policy is set forth in the CJIS Security Policy. *Id.*; *see* DOJ, *Criminal Justice Information Services (CJIS) Security Policy* (Aug. 16, 2018), https://www.fbi.gov/file-repository/cjis-security-policy_v5-7_20180816.pdf/view.

### F. Efficacy of the Watchlist

Agencies use TSDS information to enhance national security and prevent terrorist attacks. DEX1 ¶ 41. The integration, analysis, and sharing of international terrorism information is critical to the creation of a common operating picture among and between U.S. law enforcement agencies and the Intelligence Community—and thus to the protection of national security and achievement of the United States' national counterterrorism objectives, including the identification and disruption of terrorist efforts at home and abroad. DEX1 ¶ 11; DEX3 ¶ 9. Offering near real-time encounter management helps gather additional information on watchlisted subjects and confirms when positively identified watchlisted individuals have attempted to conduct activities such as board planes, attempt to enter the country, or gain unescorted access to sensitive sites. DEX1 ¶ 51. As a result, screening agencies can act on these positive encounters and gather information about relationships between watchlisted individuals, which enables intelligence collection on potential networks. *Id.*

**FBI**. TSDS information is a crucial component of FBI's counterterrorism mission, and FBI generally nominates the subjects of both domestic and international terrorism investigations to the TSDS (with international terrorism nominations going through NCTC), which allows other government agencies to take action in accordance with their own authorities. DEX2 ¶¶ 9, 10; DEX1 ¶ 14. Moreover, when other agencies and governments encounter a subject for whom there appears to be TSDS information, the other agencies can report the encounters to the FBI either directly or through TSC, which can assist the FBI's investigations. DEX2 ¶ 11. The FBI uses encounter reports to gain information about subjects' travel or other activities, and this information can be, and has been, used to disrupt acts of terrorism. *Id.* The FBI has successfully disrupted hundreds of individuals, groups, organizations, or enterprises engaged in terrorism in recent years, including using information gleaned from the watchlist. *Id.*; *see also* Defs.' Obj. & Resp. to Pls.' Interrogs. of Dec. 2022 (DEX12) at 28-29; FBI Supp. Resp. to Def.-Wide Interrog. 3 (DEX13) at 2-4.

**CBP** uses TSDS information to assist in its efforts to, *inter alia*, prevent terrorists and terrorist weapons from entering the United States and to develop and implement targeting capabilities to identify travelers and cargo which may need additional scrutiny. DEX4 ¶ 58. Given the volume of

border inspections conducted annually by CBP, CBP's use of TSDS information is crucial to the agency's ability to prioritize high-risk individuals for secondary inspections and best allocate its limited resources. *Id.* ¶ 60. CBP's security measures have been effective in detecting and intercepting several specific threats posed by individuals on the TSDS. CBP ¶ 61 (describing example).

**TSA**. TSA relies on the TSDS to execute its mission to screen passengers and prevent insider threats, preventing terrorist attacks and enhancing national security, and views the TSDS as essential to preventing terrorist attacks. DEX5 ¶ 4. These measures make it exceedingly difficult for a terrorist targeting aviation to carry weapons or explosives on board civilian aircrafts. No single security measure can completely mitigate the risks posed by current threats or those that will emerge in the future, but enhanced screening greatly enhances security and makes it harder to carry out attacks. Since 2017, TSA has discovered at least twenty prohibited items on individuals on the TSDS at the time of the screening in question; any one of these prohibited items could have been used to carry out an attack. *See* DEX5 ¶ 71 (collecting specific examples too). And TSA has referred TSDS-listed individuals to law enforcement at least a hundred and thirty times for further investigation. *Id.* ¶ 72. TSA vetting has uncovered and prevented insider threats that could have otherwise resulted in attacks. *Id.* ¶ 73 (describing examples).

The No Fly List allows TSA to effectively counter the threat posed by individuals, including U.S. citizens, who have been identified by the intelligence community to pose a heightened threat. DEX7 ¶¶ 6, 7. These individuals are prevented from accessing the sterile area of airports or boarding aircraft. This use of the TSDS is essential to defeating ongoing threats to aviation and national security that could result in a catastrophic loss of life in the air and on the ground. *Id.* ¶ 7 (collecting examples).

**G. The Watchlisting Advisory Council (WLAC).[7]**

**1. The WLAC Generally**

The Watchlisting Advisory Council ("**WLAC**") is an informal inter-agency body co-chaired by TSC and NCTC, comprised of representatives from federal agencies that have a role in the U.S.

---

[7] The parties and the Court have referred to the twenty agencies for which Defendants contest jurisdiction as the "WLAC Defendants": the Department of Justice (DOJ); the National Security

terrorist watchlisting enterprise. DEX1 ¶ 77. The WLAC provides a forum for member agencies to discuss and coordinate matters related to terrorist watchlisting and functions as a deliberative, predecisional body where subject-matter experts from participant agencies can raise questions or issues regarding terrorist watchlisting policy through regular meetings. *Id.* Accordingly, the WLAC was not established by an executive order, action, regulation, policy, or document, and has no charter or bylaws. DEX1 ¶ 79. The WLAC is convened voluntarily, by the mutual agreement of its participant agencies, approximately three to four times per year. *Id.* ¶ 80. The WLAC has no staff of its own and does not take any independent action; it can only act through its individual participant agencies. *See* WLAC Defs.' Objs. & Resps. to Pls.' First Set of Interrogs. (DEX23) at 26; Depo. of Abby Johnson, NCTC, May 25, 2021 (DEX22) at 202 ("each agency that has a role in the watch listing process has certain authorit[ies]. . . . they're bound by their own authorities on what they can and cannot do").

Historically, participant agencies have generally used the WLAC as a forum to address (a) questions from participant agencies about how specific provisions of the Watchlisting Guidance (WLG) should be interpreted or implemented, (b) technical issues arising from the exchange of TSDS information between and among participant agencies, and (c) whether portions of the WLG should be changed or updated. DEX1 ¶ 80. The WLAC (through its individual participant agencies) discusses potential changes to the WLG, drafts proposed language through a consensus-driven process, and ultimately recommends specific WLG modifications to agency decisionmakers. *Id.* The WLAC does not have authority to create official policy, including the WLG, but instead collectively prepares draft updates and other recommendations regarding such policies, which do not become official policy until approved by participating agencies through the National Security Council. *Id.*; *see also, e.g.*, DEX23 at 26. Specifically, upon agreement by the NSC Deputies Committee, the WLG is published and

---

Division, DOJ; Office of Legal Policy, DOJ; Office of Privacy and Civil Liberties; Office of the Director of National Intelligence; U.S. Citizenship and Immigration Services (USCIS); U.S. Immigration and Customs Enforcement; Office for Civil Rights and Civil Liberties, DHS; Office of Intelligence & Analysis, DHS; Office of the General Counsel, DHS; Office of Strategy, Policy and Plans, DHS; Privacy Office, DHS; Department of State; Department of Defense; National Security Agency; Defense Intelligence Agency; Department of the Treasury; Financial Crimes Enforcement Network, Treasury; Central Intelligence Agency; and the Watchlisting Advisory Council. *See* Proposed Disc. Plan at 5 nn. 5–6, ECF No. 98.

disseminated and becomes U.S. Government policy by operation of the individual WLAC participant agencies agreeing, pursuant to their individual legal authorities, to follow the guidance and instructions set forth therein. DEX1 ¶ 83. A revised WLG does not become U.S. Government policy until it is approved through this process. *Id.*

All policy changes recommended by the WLAC's participant agencies are determined through a consensus-driven process, not through majority vote, although participant agencies occasionally conduct non-binding, informal voting as a means of soliciting the views of participant agencies on particular proposals. *Id.* ¶ 81. No participant agency has "veto" power over any proposals discussed. *Id.* In addition, even absent consensus among WLAC participants, participation in the WLAC does not limit the ability of participant agencies to act independently, consistent with their own authorities and responsibilities. *Id.* Participation in the WLAC also does not provide agencies with any greater authority to implement provisions of the WLG; any action to implement the Guidance must be undertaken consistent with each agency's independent legal authorities and other applicable law.[8] *E.g.* DEX23 at 26-27, 28, 32, 34.

### 2. WLAC Member Agencies

The Parties conducted jurisdictional discovery into two primary topics: (1) each WLAC Defendants agency's "role in creating, approving, and using the [WLG]"; and (2) each WLAC Defendant agency's "access and use of watchlist information and their ability to remove or add individuals to the [TSDS]." Rule 16(b) Scheduling Order at 2, ECF No. 104. The record compiled during this discovery, and subsequent discovery, contains a great deal of information regarding each WLAC Defendant's use of TSDS information and its participation in the WLAC, including the purpose of each agency's participation in the WLAC, the frequency and method of each WLAC Defendant's participation, and the various ways in which WLAC Defendants employ the TSDS in service of their operational missions:

---

[8] To support the efforts of the WLAC, subsidiary working groups are sometimes formed to address specific issues.  DEX1 ¶ 82. The working groups exist to support the WLAC and do not have any authority other than to perform tasks assigned by, and make recommendations to, the WLAC.  *Id.*; *see also* DEX23 at 27.

**Department of Justice (DOJ), National Security Division (DOJ-NSD)**: DOJ-NSD participates in WLAC meetings, and has "considered, discussed, and deliberated with its co-participants regarding policy proposals and reviewed and commented on drafts of the [WLG]." DEX23 at 25. However, DOJ-NSD "does not have decision-making authority to establish government policy for watchlisting matters or to approve the [WLG]," and it "does not implement or enforce any of the provisions of the [WLG]." *Id.* at 25-26. DOJ-NSD does not use TSDS information, *see id.* at 7, nor does it nominate individuals for inclusion in the TSDS, *see* DOJ-NSD Objs. & Resps. to Pls.' WLAC-Def.-Specific Interrogs. (DEX25) at 4.

**DOJ, Office of Legal Policy (DOJ-OLP)**: DOJ-OLP participates in the WLAC "solely for purposes of providing deliberative, predecisional advice regarding watchlisting issues." DEX23 at 27. Its "main role in the WLAC and its subgroups is to provide technical and drafting advice on how the policies recommended by the operational agencies and components could be reflected in the WLG." *Id.* However, DOJ-OLP does not implement or enforce any provisions of the WLG, *id.*; it does not nominate individuals for potential inclusion in the TSDS, *id.*; and it does not use TSDS information in any way, *id.* at 7-8.

**DOJ, Office of Privacy and Civil Liberties (DOJ-OPCL)**: DOJ-OPCL participates on the WLAC and its subgroups to "provide[] its views and assist[] in framing . . . policy considerations by agencies with a view to compliance with privacy and civil liberties-related laws and policies, and appropriately minimizing related risks." *Id.* at 29. It does not implement or enforce the WLG, *id.*; does not nominate individuals for potential inclusion in the TSDS, *id.*; and does not receive TSDS exports or use TSDS information in any way, *id.* at 8.

**DOJ**: Some DOJ components attend WLAC meetings, including those listed as Merits Defendants (FBI and TSC), those named as WLAC Defendants (DOJ-NSD, DOJ-OPCL, and DOJ-OLP), and sometimes litigation counsel, as well as more recently the Drug Enforcement Administration and Criminal Division. *Id.* at 30-31; *see also* DEX1 ¶ 78. Certain DOJ offices have access to the NCIC system, through which they may have access to a subset of TSDS information. *See* DEX23 at 8 (naming particular offices). DOJ (aside from the entities separately named) does not

implement or enforce the WLG. *See* WLAC Defs.' Objs. & Rog. Resps. to Pls.' 2d Set of Interrogs. (DEX24) at 8-10.

**Office of the Director of National Intelligence (ODNI)**: ODNI's participation on the WLAC is conducted almost exclusively through its component NCTC, which is separately named as a Merits Defendant. *See* DEX23 at 32. On rare occasions, NCTC personnel may consult with ODNI personnel outside of NCTC regarding a specific WLAC topic, but ODNI is aware of only one instance in which ODNI personnel outside of NCTC attended a WLAC meeting to offer background information regarding a specific topic (and did so in a predecisional, deliberative capacity). *See id.* Aside from NCTC, ODNI does not implement the WLG or use TSDS information, but it is possible that information derived from the TSDS may occasionally be incorporated into ODNI intelligence products. *Id.* at 9; DEX24 at 10.

**U.S. Citizenship and Immigration Services (USCIS)**: Although USCIS interacts with other DHS offices that do participate in the WLAC, USCIS itself does not directly participate in the WLAC or WLAC working groups. DEX23 at 32-33; USCIS's Supp. Resp. to Pls.' Interrog. No. 1 at 2 (DEX26). USCIS personnel have received information regarding the WLG over time, but no USCIS employees have worked on developing or revising it. *See* DEX23 at 33. USCIS screens and vets immigration benefit applicants across a wide spectrum of intelligence and law enforcement databases, including the TSDS, but TSDS information is used as a pointer to the underlying derogatory information to help determine whether an individual is inadmissible under the Immigration and Nationality Act (INA) or is ineligible for a benefit. *See id.* at 10. After the TSDS provides a pointer, USCIS "accesses the underlying derogatory information from other agencies to determine if the applicant is inadmissible" under a terrorism-related inadmissibility ground, or if there are other security-related grounds for inadmissibility under the INA. *Id.* USCIS does nominate individuals for potential inclusion in the TSDS, but does so very infrequently. USCIS Objs. & Resps. to Pls.' WLAC-Def.-Specific Interrogs. (DEX27) at 4-5.

**U.S. Immigration and Customs Enforcement (ICE)**: ICE may have attended one WLAC meeting before 2017, and as of 2023, it attended or planned to attend some WLAC meetings based

on its limited watchlist-related responsibilities. *See* DEX23 at 33; ICE's Supp. Resp. to Pls' WLAC-Def.-Wide Interrog. No. 2 (DEX28) at 2. ICE also does not directly implement the WLG, but instead acts consistent with trainings and guidance provided by DHS-I&A. *See* DEX24 at 11-12. ICE's two main operational directorates can access TSDS information and may use that information to further their missions, but in ways that are not relevant to this case. *See generally* DEX23 at 11-13.

**DHS, Office of Strategy, Policy and Plans (DHS-PLCY)**: DHS-PLCY coordinates and leads all internal DHS meetings related to WLAC issues before and after WLAC meetings to further deliberate on watchlisting-related topics. *Id.* at 39-40. The consolidated positions that DHS-PLCY offers at WLAC meetings constitute predecisional and deliberative advice, and DHS-PLCY does not implement or enforce any provisions of the WLG. *Id.* at 40. It is not an operational component of DHS, and does not use TSDS information in any way. *Id.* at 15.

**DHS, Office of Civil Rights and Civil Liberties (DHS-CRCL)**: DHS-CRCL often attended WLAC meetings and WLAC subgroup meetings relevant to civil rights and civil liberties issues but rarely communicated directly with the WLAC. *Id.* at 34.[9] Rather, most of DHS-CRCL's involvement with WLAC was in the lead-up to WLAC meetings, reviewing drafts and offering deliberative input. *Id.* at 34-35. DHS-CRCL supported and advised other DHS components at WLAC meetings, and provided input on privacy and civil liberties issues. *Id.* at 35. DHS-CRCL had no operational functions and only encountered TSDS information as part of its oversight role, such as while investigating civil rights and civil liberties complaints made by the public regarding DHS policies and activities. *See id.* at 14; DEX24 at 12. For example, whether a person was on the TSDS may have been relevant in DHS-CRCL's review of a complaint regarding CBP's referral of an individual to secondary inspection. DEX23 at 13. DHS-CRCL did not otherwise use TSDS information. *Id.* at 14.

**DHS, Office for Intelligence and Analysis (DHS-I&A)**: DHS-I&A typically participates in all WLAC meetings and working group meetings related to the revision of the WLG. *Id.* at 36. It

---

[9] DHS-CRCL is currently undergoing realignment in which its responsibilities are under review. DHS-CRCL anticipates updating its interrogatory responses in the very near future to reflect this ongoing realignment.

provides insight and support to DHS-PLCY, which is the official representative of DHS to the WLAC, in formulating DHS's position on watchlisting policy issues, including issues related to review of the WLG. *Id.* DHS-I&A is a directorate within DHS, and its Under Secretary has been delegated the authority to serve as the Executive Agent for watchlisting for DHS. *Id.* DHS-I&A is responsible for managing DHS's unified watchlisting process, creating standard operating procedures (SOPs) for DHS entities, and developing trainings. *See* DEX24 at 12-13. DHS-I&A's SOPs inform its' and other DHS components' submission of TSDS nominations, but DHS-I&A does not otherwise implement the WLG. *See id.* DHS-I&A does not directly query the TSDS. *See* DHS-I&A Objs. & Resps. to Pls.' WLAC-Def.-Specific Interrogs. (DEX29) at 6.

**DHS, Office of the General Counsel (DHS-OGC)**: DHS-OGC participates in WLAC meetings as DHS legal advisors, and provides predecisional, deliberative legal advice. DEX23 at 38. It is not an operational component of DHS, and does not implement or enforce the WLG. DEX24 at 13-14. DHS-OGC does not use TSDS information, and to the extent any OGC employees may encounter TSDS information, it would be in the context of providing privileged legal analysis and advice. DEX23 at 15.

**DHS, Privacy Office (DHS-PRIV)**: DHS-PRIV has attended approximately three-quarters of all WLAC and subgroup meetings. *Id.* at 41. It contributes to the formulation of DHS positions relevant to privacy issues, addresses privacy-specific issues raised at the WLAC, and occasionally answers questions raised regarding DHS Privacy Impact Assessments (PIAs) or System of Record Notices (SORNs) related to watchlisting. *See id.* In all of its WLAC interactions, it offers predecisional, deliberative advice. *Id.* It does not implement or enforce the provisions of the WLG, and does not have access to TSDS information or use TSDS information. *Id.* at 16, 41-42.

**Department of State (State)**: State participates in the WLAC due to its watchlist-related operational responsibilities and its role as the U.S. Government's lead foreign affairs agency, and is represented at WLAC meetings by its Bureau of Counterterrorism. *Id.* at 42-43. State also attends sub-group meetings that are relevant to its equities. *See id.* at 43. Its participation in the WLAC is consistent with the WLAC's purpose of soliciting interagency information and views on watchlisting, generating

discussion, informing working groups, and, as necessary, teeing-up decisions to be made through the NSC process. *See id.* at 43-44. State uses certain TSDS information in furtherance of its authorized screening, vetting, and investigative missions. *Id.* at 16. In particular, State accesses downstream systems that include exports of certain TSDS data to assist screening and vetting for visas, in the course of passport issuance and citizen services, during certain Diplomatic Security investigations, and, under certain circumstances, during vetting of potential recipients of State funding. *Id.* Where biographic information from the TSDS exists, State's downstream systems provide a "lookout," which does not in itself dictate whether an individual will receive services or benefits—rather, it helps inform State officials, where appropriate, whether further information exists that may be relevant to service or benefit eligibility under applicable statues, laws, and regulations, such as the INA. *See id.* State's Bureau of Counterterrorism also helps ensure watchlist nominations by the Department are coordinated and complete. *See* DEX24 at 14.

**Department of Defense (DoD)**: Leaving aside entities otherwise named as Defendants (DIA, NSA), whose role in the WLAC is separately addressed below, DoD is not involved in the WLAC, and DoD does not implement or enforce any provisions of the WLG. *See* DEX23 at 44. Similarly, DoD does not make nominations to the TSDS and does not query the TSDS. U.S. Dep't of Defense Objs. & Resps. to Pls.' WLAC-Def.-Specific Interrogs. (DEX30) at 4, 6. DoD uses TSDS information in support of its physical security program, through which DoD determines whether individuals may access military bases and other DoD facilities, but it does not otherwise use TSDS information. DEX23 at 17.

**National Security Agency (NSA)**: NSA participates in the WLAC as a means of collaboration relative to its mission of gathering foreign signals intelligence about international terrorists and foreign powers, organizations, and persons. *Id.* at 45-46. It has participated in predecisional review and comments for potential revision of the WLG, but, like other WLAC participant agencies, has no authority to make changes to the WLG. *See id.* at 46. NSA does not actively engage in all matters being reviewed or discussed by the WLAC—rather, its participation at such meetings is generally limited to discussion with other agencies on topics related to NSA's watchlisting

mission. *Id.* NSA personnel use information derived from the TSDS to inform decisions regarding protection of or access to NSA's facilities, information, systems and personnel, and, on occasion, may consider TSDS information in carrying out its foreign intelligence mission. *Id.* at 18. NSA may also make nominations in accordance with relevant standards. DEX24 at 15-16. NSA does not directly query the TSDS. Nat'l Security Agency's Objs. & Resps. to Pls.' WLAC-Def.-Specific Interrogs. (DEX31) at 7.

**Defense Intelligence Agency (DIA)**: DIA regularly represents DoD interests at meetings of the WLAC and sub-group meetings relevant to DoD reporting, data collection, or screening. DEX23 at 47. On rare occasions, DIA will attend subgroup meetings that do not directly touch on DoD mission requirements in order to better understand the variety of watchlisting issues facing the Intelligence Community and other WLAC participants. *Id.* Through this involvement, DIA makes recommendations on standards and processes to be included in the WLG, provides information for situational awareness, discusses nominations, and provides other similar policy recommendations and inputs for consideration by the WLAC participant agencies. *Id.* at 47-48. DIA may use TSDS information from NCIC in connection with its vetting of current employees, prospective employees, and visitors, but only uses TSDS information as a pointer to determine whether there is underlying information demonstrating that the individual should not hold a security clearance. *See id.* at 18-19. There may be occasions when DIA considers information derived from the TSDS in carrying out its foreign intelligence and counterintelligence missions. *Id.* DIA also reviews intelligence reports to identify individuals who may be included in nominations, and, after review, determines whether to nominate individuals to TSC for potential inclusion in the TSDS. DEX24 at 16.

**Department of the Treasury (Treasury)**: Aside from FinCEN, which is separately named as a WLAC Defendant, Treasury has not located any information that suggests that it has ever been invited to or participated in WLAC meetings or subgroups. DEX23 at 48. Furthermore, Treasury does not implement or enforce any of the provisions of the WLG. *Id.* Certain Treasury components may have access to databases that contain TSDS information, but they do not use TSDS information for any operational purpose. *Id.* at 20-21. Treasury does not direct financial institutions to close bank

25

accounts or block transfers based on the status of a person on the TSDS. *Id.* at 21. Treasury also does not make nominations to the TSDS, and does not use TSDS information to trigger or review any disclosures about individuals or transactions from financial institutions, including Suspicious Activity Reports (SARs) pursuant to the Bank Secrecy Act (BSA). Dep't of Treasury's Objs.' & Resps. to Pls.' WLAC-Def.-Specific Interrogs. (DEX32) at 4, 6, 9.

**Financial Crimes Enforcement Network (FinCEN)**: FinCEN has occasionally participated in the WLAC in a limited fashion since 2017, to help it maintain its awareness of national security and counterterrorism issues and to maintain relationships with other agencies. *See* DEX23 at 49-50. FinCEN has provided general information regarding the work it does under its various authorities, but has generally not opined on substantive watchlisting matters except to a limited extent to address issues related to data access and security of information. *Id.* at 50. It generally does not provide substantive input into drafting and updating watchlisting policy, including the WLG, and has opted out of engaging in such efforts when asked for input from time to time. *See id.* FinCEN does not implement or enforce any of the provisions of the WLG. *Id.* It also does not direct or request the closure of bank accounts, block wire transfers, or engage in real-time transaction monitoring. *See id.* at 21. FinCEN does not have access to the TSDS or use TSDS information, including to "trigger or review [SARs] or other disclosures made by financial institutions."[10] *Id.*; FinCEN's Objs. & Resps. to Pls.' WLAC-Def.-Specific Interrogs. (DEX33) at 6-7.

**Central Intelligence Agency (CIA)**: CIA representatives have attended most meetings of the WLAC, and have participated in working groups that could have an impact on CIA mission equities. *See* DEX23 at 51. It does not participate in all working groups, but it does engage in pre-decisional discussions on topics including sourcing of information and coordination of information sharing. *Id.* CIA has also reviewed drafts of the WLG, but its participation on the WLAC and its sub-groups, and its review of the WLG, are solely for the purpose of providing pre-decisional advice. *Id.*

---

[10] Other agencies, on occasion, may include individual subject identifiers derived from the TSDS in their requests to FinCEN for information under the BSA, which FinCEN administers, but FinCEN is not aware of which specific subject identifiers may have been included in the TSDS, and FinCEN does not provide input on other agencies' consideration or use of such information. DEX23 at 22.

CIA may make limited use of TSDS information for physical security purposes, specifically, to inform decisions regarding the protection of CIA's facilities from individuals not authorized to access those facilities pursuant to 50 U.S.C. § 3515. *See* CIA's Supp. Resp. to Pls.' Interrog. No. 1 (DEX34) at 1-2. CIA does not otherwise use TSDS information as defined in the interrogatories, but it may review certain information contained in the TSDS primarily to ensure that information has been correctly entered into the TSDS. DEX23 at 22. CIA refers to the WLG to inform its own internal decisions on nominations, and seeks to ensure that workflow and processes related to decisions on nominations are in alignment with the WLG. DEX24 at 18. CIA does not directly query the TSDS. CIA's Objs.' & Resps. to Pls.' WLAC-Def.-Specific Interrogs. (DEX35) at 7.

### H. Plaintiffs' Allegations.

The remaining Plaintiffs are 20 U.S. citizens who believe that they are or were on the terrorist watchlist at some point.[11] Although four of the remaining Plaintiffs claim they were previously denied boarding on flights, none believe they are currently on the No Fly List, and none of the Plaintiffs has been prohibited from travel. The Court dismissed many of their specific claims as inadequately pleaded in 2021, Mem. Op., ECF No. 73 ("MTD Op."); the Counts of the operative complaint pertaining to each Plaintiff's remaining claims are indicated in brackets next to their names.

**Bilal Abdurrashid** [I (stigma plus), III, V, VI, VIII] believes he was on a watchlist based on what he viewed as three unpleasant travel experiences to/from Morocco in 2007 (involving an issue with his passport), Abdurrashid Depo. (DEX44) at 24-25, in 2014, *id.* at 26, 49-55, and in 2017, *id.* at 44, 56-72, (although he had a smooth international travel experience in 2010 and never missed a flight, *see id.* at 29-32, 85; *see also* Abdurrashid 3d Interrog. Resp. (DEX43) at 9-13. He claims that CBP searched his phone on more than one occasion. DEX44 at 70-71, 127-28. He also stated that he would willingly unlock the phone in response to a government request, and that he has no incriminating

---

[11] Several Plaintiffs whose claims survived the Motion to Dismiss subsequently noticed or stipulated to dismissal.  *See* ECF Nos. 91 (John Doe 2); 165 (Elamin); 167 (Kadoumi); 172 (A. Wehelie); 173 (Hijaz); 174 (Noor); 252 (Knight); 254 (Suliman); 258 (F. Wehelie); 259 (H. Wehelie); 263 (Hall); 271 (Siddiqui); 274 (Shirwa); 287 (Riad). Orders approving most of these stipulations are at ECF Nos. 170, 175, 253, 255, 261, 264, 291.

material on his phone. *Id.* at 70-71, 129, 137. He claims that around 2008, he was denied a security clearance, which he thinks might have influenced his demotion at his private employment and ultimate decision to leave, although he has no information about what caused the demotion or the clearance denial. *Id.* at 33-34, 39, 158-61. In the security clearance interview, he recalls being asked questions about his religion. *Id.* at 158. Other than that interview, he has not experienced religious questioning. *Id.* at 180-81. He claims he was unable to sponsor his niece's visa for a visit, even though he was able to assist other family members around the same time, but he does not recall the reason given for denial. DEX43 at 7; DEX44 at 139-49. Around February 2018, his purchase of a firearm was delayed but successful. DEX43 at 8, 18-19; DEX44 at 150-57.

**Alaa Abunijem** [I (travel), III, V, VI] believes he was previously on a watchlist from approximately 2001-2020 because of frequent travel difficulties during extensive travel from 2015-2020, Abunijem 4th Interrog. Resp. (DEX45) at 10-17; Abunijem Depo. (DEX46) at 28-29, 33, 216. He recalls lengthy delays to get a boarding pass, additional delays at the security line, and additional screening at the gate during domestic flights, as well as occasional scrutiny from CBP upon entry of varying lengths. DEX46 at 117-19. As a result, he claims that he missed at least one flight, *id.* at 119, and tried to reduce his air travel, choosing to drive instead on some occasions between 2015-2020, *id.* at 92-93. He continued to travel extensively from at least 2016 to 2023. DEX45 at 10-21. In 2020, he believes he was removed from the watchlist when he received TSA PreCheck and his travel issues ceased. DEX46 at 28-29, 34, 62, 66-67. He was asked about his religion "about once or twice" but he did not find the question disrespectful. *Id.* at 283-88. He recalls that CBP frequently asked for his electronic devices; sometimes he unlocked them and sometimes he refused; later, he just started wiping his phone before traveling. *Id.* at 127-28, 263; DEX45 at 25. He believes there is one occasion where he never got the phone back after refusing to unlock the phone. DEX46 at 128-29, 199-201.

**Mohamad Albadawi** [I (travel), III, V, VI, VIII] described regular delays in frequent domestic and international travel from approximately 2013 to 2020. Albadawi 4th Interrog. Resp. (DEX47) at 6-12; Albadawi Depo. (DEX48) at 168-69. Those extensive travel experiences varied. *Compare* DEX48 at 140-58 (missed multiple flights during 2018 return from Turkey), *with id.* at 222-27 (on return trip

in 2020 customs took about an hour). But customs typically took about 1.5-2 hours, *id.* at 118, and airport screening related delays typically required him to get to the airport early to avoid missing flights, *id.* at 190. He continues to travel frequently and extensively, DEX47 at 13-26, has TSA Precheck, DEX48 at 177, and has not had difficulty travelling since 2020, *id.* at 33, although on one trip in 2021 he was designated for enhanced screening but did not receive it, *id.* at 228-30. His travel has increased over time since 2020. *Id.* at 62-63. He identified no instance in which CBP asked questions about religion. *Id.* at 316-17; *see also id.* at 99-100, 113, 115, 150-51, 339. He claims his electronic devices were usually searched by CBP upon his return, *id.* at 164, and that he usually disabled the password or gave them the password or unlocked the phone for them, *id.* at 101-02, 365. He never asked what would happen if he refused, *id.* at 313-14, and started travelling with wiped devices, *id.* at 311-13.

**Fadhel Al-Sahlani** [I (travel), III, V, VI, VIII, X] claims to have been routinely subject to enhanced screening at airports and secondary inspection on domestic and international travel since approximately 2012, but did not recall specifics of most trips. Al-Sahlani 3d Interrog. Resp. (DEX49) at 9-18. In one recent domestic flight example, he recalled having to wait 15-30 minutes for a boarding pass, 30 minutes at security screening, then experiencing additional gate screening before boarding the flight as scheduled. Al-Sahlani Depo. (DEX50) at 81-91. While he claims he tries to minimize travel as a result, *id.* at 25, he has continued to travel extensively both domestically and internationally, DEX49 at 9-18; DEX50 at 53, and occasionally drives for domestic trips as well, DEX50 at 69, 198-200. Al-Sahlani claims that his electronic devices are searched each time he returns to the United States, DEX49 at 21, and recalled three specific times where CBP sought and he provided his password, DEX50 at 148, 194-96, 208-12. For recent trips, he has erased his devices and no password is required. *Id.* at 228-30, 235. Although the FBI has asked him about specific religious organizations, they have not asked him about his faith or practice. *Id.* at 277; DEX49 at 22. He recalls CBP asking him questions about his religion on at least one trip as part of a broader interview, DEX50 at 211-12, and he thought they were trying to educate themselves, *id.* at 278, but he was not asked on more recent trips, *id.* at 138-40, 155-57. Those questions have not impacted his faith or practice. *Id.* at 278.

**Zijad Bosnic** [I (travel and stigma-plus), II, III, V] described travel delays in regular international travel to Bosnia from 2017 to present day. Bosnic 3d Interrog. Resp. (DEX51) at 9-12 (listing trips); Bosnic Depo. (DEX52) at 30 (travels to Bosnia twice a year); *id.* at 43-53, 219-22 (summarizing issues). In the spring of 2017, he was denied boarding for a flight from Bosnia to the U.S. (by way of Istanbul) but the U.S. government facilitated his travel home. DEX51 at 10-11; DEX52 at 145-61. Bosnic sought redress through the DHS TRIP process, which confirmed that he was on the No Fly List, but later confirmed he was removed from the No Fly List (all prior to the filing of this lawsuit). DEX6 ¶ 28. Although Bosnic has never again been denied boarding, DEX52 at 166-67, 218-19, he claims he always faces travel issues, *id.* at 219-22. These various issues add time to his journey—for example, the CBP inspections take 30 minutes to an hour, *id.* at 66—so he tries to give himself at least four hours for layovers, to avoid missing flights like he has done a few times, *id.* at 60, 67. These issues have not deterred his travel. *Id.* at 92, 229. Bosnic does not know of anyone else who knows he is on a watchlist. *Id.* at 230. Bosnic also lost and has not re-obtained a Transportation Worker Identification Credential, which allows him to pick up freight at ports, and he does not know why. DEX51 at 6-7; DEX52 at 185-88, 241-42.  FBI has never asked him about his religion, and CBP asked him one question all in his years of travel. DEX52 at 177-79.

**Abdu Wakil Cyeef Din** [V, VIII] assesses that he is or has been on the watchlist based on one experience with CBP secondary inspection in 2014 and two 2017 domestic air roundtrips in which he experienced enhanced screening on some legs of the trips, Cyeef Din 3d Interrog. Resp. (DEX53) at 12-16; Cyeef Din Depo. (DEX54) at 62-142; as well as several interactions with state or local police dating from 2012 to about 2017, and interviews by federal agents, DEX53 at 8-9; DEX54 at 203-09, 220-26. He also has a copy of what appears to be an internal local police situation report stating he was on the watchlist. DEX54 at 167-69, 178; DEX105. He also has a lengthy criminal history, including multiple arrests and convictions for violent and nonviolent criminal offenses and being discharged from the military for fighting. DEX53 at 19-20; DEX54 at 13, 293-97, 301-13. In his one experience with secondary inspection, CBP did not ask him religious questions and he does not recall

30

any CBP search of an electronic device or anyone asking for a password. DEX53 at 13-14; DEX54 at 75-90, 263-66. He does not recall any religious questions from FBI. DEX54 at 263-66.

**John Doe** [I (travel), II, III, V, VI, VIII, X] has a criminal history including convictions for violent and nonviolent offenses, John Doe Supp. Interrog. Resp. at 20-21 (DEX55); John Doe Depo. (DEX56) at 24, 27-28, 188-89, 192-200, and once described himself as a sovereign citizen, DEX106. Doe believes he was on a watchlist starting in around 2016, DEX56 at 39-40, and stated that he was denied boarding on flights from around that time until about 2018, *id.* at 272. Doe believes it might have all started because his ex-wife called the FBI to report him for terrorism. *Id.* at 133, 142, 144-6. In June 2017, he sought redress through DHS TRIP and received a final determination letter, but did not qualify for the revised redress procedures. DEX7 ¶ 30. Although he has claimed that these previous experiences affected his willingness to travel, *e.g.* DEX56 at 112, Doe flew frequently both before and after the operative complaint was filed and continues to do so (around 8 times/year), *id.* at 272; DEX55 at 17-19, and splits his time between Indonesia and the United States, DEX56 at 15-16. His recent flights and encounters with U.S. law enforcement have been smoother, *id.* at 273-74, although he sometimes receives additional scrutiny, particularly from foreign countries, *see id.* at 48-49, 65-67, 253, 266-68, 273. Doe claims there were several occasions between 2016 and 2018 when CBP detained him for hours upon entry, and that he was once injured after refusing to follow CBP instructions. DEX55 at 13-15; DEX56 at 241-43. He was also twice arrested at the border, once when suspected of driving stolen vehicles across the border and once when he was charged with benefits fraud in California, although neither incident resulted in conviction. DEX55 at 11, 18, 21; DEX56 at 83, 185-86, 198-99.[12] During one border crossing in 2017, CBP took his electronic devices when he refused to unlock them and returned them months later with some data erased. *Id.* at 169-70, 176-78. On other occasions he agreed to unlock his devices for CBP and they searched them in front of him.

---

[12] Doe testified that he prefers a pseudonym because the case is not about him personally, DEX56 at 233-34, and because he fears retaliation by the FBI, *id.* at 238-40, but that he does not fear retaliation from the public or others, *id.* at 240. There is no reason for John Doe to continue under a pseudonym.

*Id.* at 171-72. He believes that FBI agents (who did not identify themselves as FBI) once asked him questions about religion, which made him want to be more private about his religion. *Id.* at 103-08.

**Moustafa El-Shahat** [I (travel), V, VI, VIII, X] believes he was on the TSDS from about 2013 to about 2022. El-Shahat Depo. (DEX58) at 25. Over that period, he recalls that he almost always had a boarding pass marked SSSS and had delays to get a boarding pass, security screening, and gate screening. *Id.* at 110, 119, 279, 282, as well as delays of 2-3.5 hours for secondary inspection, *id.* at 282; *see also id.* 177-78 (1-hour inspection). He remembers missing two flights out of approximately 40-60 over that period, *id.* at 113, 287, 291-92, and had an unusually bad experience once at Abu Dhabi security where an official kicked him and made him stand against a wall for a patdown, El-Shahat 3d Interrog. Resp. (DEX57) at 6; DEX58 at 180-82. He continued to travel extensively during this timeframe and still does. *Id.* at 291-92; DEX57 at 11-14. El-Shahat recalls that his electronic devices were searched at least twice, DEX58 at 76, 294-295, but he never gave his phone passcode because he doesn't use one, *id.* at 76-77, and may have given his laptop passcode once, *id.* at 295. He was asked questions about his religion during some but not all secondary inspections, *compare id.* at 67, 73 *with id.* at 134-135, and at least once during an FBI interview, *id.* at 215-16, but the questioning did not affect his religious practice, *id.* at 312. El-Shahat was also told by an unidentified officer that his travel delays could have been due to his travel patterns and gender, but El-Shahat understood that "maybe he's just assuming . . . that they stop me for that reason." *Id.* at 319-20.

**Mohamad Hachem** [I (travel), III, V, VI, VIII, X], who has a misdemeanor tax conviction, Hachem 4th Interrog. Resp. (DEX59) at 19, believes based on his travel experiences that he has been on a watchlist since around 2006, Hachem Depo. (DEX60) at 42-43, 70-71. When Hachem flies, he reports delays getting boarding passes (30 min-1 hour), *id.* at 37-41, and at security (30 minutes), *id.* at 60-61, and additional screening at the gate, *id.* at 62-65, but he is not sure of the times, *id.* at 60-61, 64-65. He arrives early to avoid missing flights. *Id.* at 65. He travels extensively both domestically and internationally. DEX59 at 10-18. He claims that he has been asked questions about his religion by either FBI or CBP, *id.* at 22-23, and on the one occasion he specifically recalled he described the questioning officer as "being nice" and "want[ing] to learn about" him, DEX60 at 200. He claims that

the watchlist affected how he practiced his religion for a while, but not anymore. *Id.* at 201-02, 204-05. He admits that he thought watchlisting was based on religion based on conversations with his attorneys. *Id.* at 206-07. Hachem recalls providing the password for his electronic devices to CBP prior to 2015, but since then, he has refused to provide a password or unlock. DEX59 at 20-21. He recalls two occasions when CBP officers then took the phone and returned it. *Id*; DEX60 at 259-60, 280-81.

**Mustasem Jardaneh** [I (travel), III, V, VI, VIII] believes he is currently on the watchlist and was placed there not long after he was fired from his airport job for being intoxicated when going through security, Jardaneh Depo. (DEX62) at 30-34, 79-80; FBI records indicate that he attempted to evade security, DEX85; DEX62 at 57-59. Regardless, he thinks he was likely on a watchlist because one of his roommates reported him as a terrorist, *id.* at 324-25, and around the same time he was questioned by FBI, DEX85, and experienced travel delays on two trips. In August 2017, he was delayed upon entry to the US from Canada, where he was referred to secondary inspection and questioned and had a panic attack, perhaps as a result of missing his medication dose. Jardaneh 3d Interrog. Resp. (DEX61) at 8-9, DEX62 at 214-230. In roundtrip flights in August 2017, he experienced what he believes was enhanced screening and believes he was followed by air marshals. DEX61 at 13-14; DEX62 at 119-20, 131-54. Later that year, he was detained by Canadian officials for driving while intoxicated to try to enter Canada and apply for asylum; he made untruthful statements to CBP upon reentering the United States. DEX62 at 237-38; DEX86. Since then, he has travelled both domestically and internationally, and claims that he has occasionally but not regularly experienced extra security or minor delays. DEX61 at 14-15; *see, e.g.* DEX62 at 165-72 (10 minutes of screening on one leg of roundtrip); *id.* at 190-93 (no issues on Saudi Arabia trip). Jardaneh recalls his phone being taken by CBP on the August 2017 border crossing when he refused to provide a password, and it was returned a few days later. *Id.* at 224-25, 230. He thinks a CBP agent may have asked him once what religion he is, *id.* at 317-18, and did not recall any other religious questions, *id.* at 223-26, 296-97.

**Moustafa Kamel** [V, VI, VIII, X], an imam, flew once or twice a year between 2008 and 2018, almost always for religious pilgrimages. Kamel 3d Interrog. Resp. (DEX63) at 8-11, Kamel Depo. Pt. 1 (DEX64) at 63-64; Kamel Depo. Pt. 2 (DEX65) at 6. After a pause, he resumed travel in 2022 and

has had few issues since then. DEX63 at 7, 11; DEX64 at 92-93. On one trip in early 2024, he had issues related to his passport but was able to re-enter the country without difficulty. *Id.* at 83-88. Kamel's delays never prevented him from getting to where he wanted to go. *Id.* at 82. Kamel recalls that his cellphone was searched on most entries to the US from 2008-18 but maybe not all, *id.* at 76-77, 115, that he generally provided his password, *id.* at 115; DEX65 at 66-67, and his laptop was searched at least once, DEX63 at 14. Kamel recalls that CBP officials questioned him about his mosque and sect once in 2008, but he had trouble recalling specifics. *Id.* at 15; DEX65 at 53-60. Kamel believes that FBI officials questioned him on matters related to religion more than once, DEX63 at 16-17, and also states that the FBI asked him many questions not about his religious faith, *see, e.g.*, *id.* at 16-17 (FBI agents asking him to intervene with respect to attendees at his mosque with possible mental issues, or asking questions about ISIS or the Muslim Brotherhood), DEX64 at 110-13 (questions about world conflicts), and he recalls that sometimes his faith was not mentioned, DEX65 at 71-72. Religious questioning did not change his faith or practice. *Id.* at 70-72.

**Mahad Mohallim** [I (travel), II, V, VI, VIII]. Mohallim's brother died after joining ISIS, Mohallim Depo. (DEX67) at 188, 202-04, and Mohallim was questioned by the FBI, *id.* at 174-75, DEX89, and then subject to additional screening and inspection on roundtrip to Kenya, Mohallim 3d Interrog. Resp. (DEX66) at 9-13. Namely, in 2015, Mohallim was subject to what he viewed as unusual searches in connection with his flight leaving the United States as a teenager. DEX67 at 75-81. When he returned to the U.S. three years later, he was prevented from boarding flights back to the US. *Id.* at 89-93, 151. Upon visiting the embassy, he received instructions on how to book return flights and was able to return a few weeks later. *Id.* at. 93-95, 104-08; DEX87. He was directed to secondary inspection and subject to additional searches during his return. DEX67 at 111-34. When he sought redress a few years later, he received confirmation that he was able to fly, DEX6 ¶ 35 & ex.19, and has since travelled repeatedly without incident, DEX67 at 179-80, 183, 186-87.

**Anisa Mujanovic** [I (travel), III, V, VI, VIII, X] received enhanced screening at airports and secondary inspection from CBP on two international trips (in 2015 and 2017), Mujanovic 3d Interrog. Resp. (DEX68) at 10-12; Mujanovic Depo. (DEX69) at 140-258; she recalls CBP officers questioning

her on many topics, including but not limited to her religious activities abroad, her commitment to her hijab, and her charitable donations, *id.* at 182-88, 199-201, 203-04, 224-48. With respect to the hijab, it appears that the CBP officer was responding to her accusation that she was singled out because of it. *Id.* at 235-36. On both occasions, she unlocked her phone for CBP to search. *Id.* at 181, 188-92, 224-25, 238; DEX90. Her travel activity has increased since these incidents, DEX69 at 68-69, 71, 138-39; DEX68 at 12-14. Since then, she has occasionally but not always experienced additional patdowns at the airport or secondary inspection at CBP when returning from lengthy international trips, but she considers these encounters much less significant and they did not involve any questions about religion. *See* DEX69 at 261-65 (2019 trip); *id.* at 267 (2021 trip); *id.* at 117-37 (2022 trip); *id.* at 107-17 (2022 domestic trip); *id.* at 78-107 (2023 trip), *id.* at 270-72.

**Mirakhmat Muminov** [I (travel), III, V, VI, VIII, X] experienced travel delays on many but not all flights from 2009 to present (sometimes SSSS, sometimes not), but mostly or entirely experienced enhanced screening since 2023. Muminov 3d Interrog. Resp. (DEX70) at 14-18; Muminov Depo. (DEX71) at 51-52, 156, 308. The specific trips he remembers include one involving a 30-45min wait for boarding pass and a 30-45min secondary screening at TSA security and one involving a 3.5-hour secondary inspection at immigration in 2019, DEX71 at 159, 163, 209, 218, and he has missed two flights total, *id.* at 301-304. Other trips involved minor or no delays. *See, e.g., id.* at 183-85. He continues to travel regularly, both domestically and internationally, *id.* at 145, 295; DEX70 at 13-20, and often travels by car instead for domestic trips, *id.* at 6. Muminov recalls that his electronic devices were searched several times, *e.g.* DEX71 at 198, 211, 212; DEX70 at 23-24, including one time in which he refused to give his password and was let through customs without a phone search, DEX71 at 215, 224. Muminov recalls that officers asked him questions during entries to the United States that he perceived as being in part about his religion several times, *e.g. id.* at 62, 269; DEX70 at 25, but also noted that FBI was asking what he called "the right questions" on one occasion about a particular terrorist attack, DEX71 at 269, 273, and the questioning did not change how he practices his religion, *id.* at. 269-270, 272.

**Esmaeel Paryavi** [I (stigma-plus), III, V, VI, VIII] believes he may have been on a watchlist because he experienced what he believed was enhanced screening on one set of roundtrip domestic flights in 2018, E. Paryavi Depo. (DEX73) at 192-208, and was referred to secondary inspection by CBP three times (twice in 2018 and once in 2021), *id.* at 155-92, 258-69, 241-51. He never missed a flight, *id.* at 271, and otherwise has travelled extensively both domestically and internationally without incident (before, during and after this timeframe), *see* E. Paryavi Interrog. Resp. (DEX72) at 8-19. E. Paryavi never gave his password or electronic devices to CBP, even when asked, and showed CBP information on his phone twice. DEX73 at 167, 310-11. CBP revoked his Global Entry status in 2018 because he no longer met program requirements, and he has not reapplied, even though he has not had trouble travelling in years. *Id.* at 290-302; DEX91.

**Muhammad Paryavi** [V, VIII, X] is the father of Esmaeel Paryavi. M. Paryavi believes he was previously on the watchlist because he believes he consistently experienced enhanced screening and secondary inspection from approximately mid-2017 to late 2022, but not before or since. M. Paryavi Depo. (DEX76) at 21-22, 80, 85; M. Paryavi Supp. Interrog. Resp. (DEX75) at 3-4; M. Paryavi 2021 Interrog. Resp. (DEX74) at 9-17. He missed one flight and had delays of around an hour for domestic flights. DEX76 at 80, 85, 212-13 (30-40 minute wait for boarding pass; 30-45 minute TSA screening). M. Paryavi recalls FBI questioning him twice in broad-ranging detailed interviews that included questions about his religion, but neither interview changed how he observes his religion, only made him uncomfortable. *Id.* at 246-253. He believes he may be on the watchlist in part because of a family member's work for the Iranian government. *Id.* at 258. CBP never questioned him on religious topics. *Id.* at 257. He recalls that CBP searched his phone twice, *id.* at 241, and believes they asked for the passcode, *id.* at 152-54, 183-84.

**Hashem Nader Sehwail** [I (travel), II, III, V, VI, VIII] was jailed in Israel for six months in 2017, Sehwail 3d Interrog. Resp. (DEX77) at 14, Sehwail Depo. (DEX78) at 163-67, although he claims to not remember the reason, *id.* at 165. He believes he may have subsequently been placed on a watchlist because of air travel issues in 2018 and 2019. *Id.* at 28. He was denied boarding on two flights returning to the United States in the winter of 2018, *id.* at 35, 44-46, and on three domestic

flights in 2019 and 2020, *id.* at 35-36, 54-56, 66-67. He returned by plane in February 2018 after visiting the embassy, although it took a few weeks to arrange, and he encountered some additional security. *Id.* at 39-54; *see also* DEX100. During this timeframe, he often took trips by car instead. DEX78 at 33-34, 174-77. Before these issues, he had only ever flown twice. *Id.* at 29. At the time of his deposition, he had not flown since 2018, and he stopped trying to fly. *Id.* at 113. Sehwail sought redress through DHS TRIP but initially failed to provide an address; following his deposition, TSA informed him that there was no reason he cannot fly. DEX6 ¶ 40 & ex. 26. On his last flight in February 2018, he recalls that CBP took his phone and asked him to unlock it. DEX78 at 150-52. They did not ask him any questions about religion. *Id.* at 157-58. Sehwail believes that the FBI agent who interviewed him in Turkey after he was denied boarding yelled at him. *Id.* at. 39-40, 161-62.

**Abdallah Soueidan** [V, VI, VIII] has experienced enhanced screening on flights and secondary inspection upon entering the United States, Soueidan Depo. (DEX80) at 25-26, starting as early as 2002, *id.* at 35-36, and regularly by 2015, Soueidan 3d Interrog. Resp. (DEX79) at 8-12. He has not experienced similar security measures on his most recent travel, including a January 2022 international roundtrip, DEX80 at 94-98, 106-08. He recalled approximately four trips on which CBP officers asked for him to provide his electronic device and passcode. DEX80 at 155, 186-87, 212, 237. He confirms that there was nothing incriminating on the phone and no particular reason he would not want them to see it. *Id.* at 266-68. He never felt like CBP questions related to religion were discriminatory or affected his religious practice. *Id.* at 210, 233-34, 258-60, and "do[es]n't recall ever being treated disrespectfully," *id.* at 153.

**Farid Sulayman** [I (travel and stigma-plus), III, V, VI, VIII, X, XIII] believes he was placed on a watchlist shortly after September 11, 2001, Sulayman Depo. (DEX82) at 36, 75, although he did not experience regular enhanced security screenings until 2016 or 2017, *id.* at 30-31. His travel delays typically entailed a 45-60-minute wait for his boarding pass and a 45-60-minute trip through airport security, *id.* at 27, 29, but he never missed a flight because of these security screenings. *Id.* at 199. He continues to travel by plane 3-4 times/year. *Id.* at 64. He recalled approximately three occasions when CBP officers asked him for his electronic device and passcodes, *id.* 113-14, 191;DEX81 at 22. Many

people know about his perceived watchlist status, in part because there is a newspaper article about his experiences, but he does not think that his reputation has declined as a result of his perceived status, *id* at 204-05; in fact, he has received dozens of supportive calls from his community, *id.* 249-50, without a single negative response, *id.* 250. Sulayman was asked questions about his religion on two occasions. *Id.* at 236-37. He was offended by these interactions, but the questioning did not affect his religious practice. *Id.* at 236-38. Additionally, he has been able to make Umrah, a religious pilgrimage, *id.* at 130, "consistently," *id.* at 133, with interruptions only for the pandemic or because of his work schedule. *Id.* at 133-34; *but see* Sulayman 3d Interrog. Resp. (DEX81) at 7.

**Khalil Thadi** [I (stigma plus), III, V, VI] believes he may have been on a watchlist beginning around 2004. Thadi Depo. (DEX84) at 24, 40. In general, he traveled to Morocco about every 3 months and experienced many travel complications from about 2004 to 2014 as he travelled extensively during this timeframe. Thadi Interrog. Resp. (DEX83) at 11-14; DEX84 at 31. He then ceased travel for several years because of his cancer treatment (and not because of his perceived watchlist status). DEX84 at 32, 50-51. Since he resumed travelling around 2019, his travel has been without security difficulties. DEX83 at 13-14; DEX84 at 33-34, 43, 48. Other than his wife, he does not believe people knew about his perceived watchlist status. DEX84 at 99-102. He runs a flooring business and was once excluded from a military base where he hoped to work on a flooring job. DEX83 at 7; DEX84 at 111-13. He believes his seven traffic stops by local law enforcement between 2004 and 2014 may have been related in part to the watchlist, *id.* at 117-19, but acknowledges other stated reasons like speeding or tinted windows, *id.* at. 120. He also encountered delays in obtaining immigration documents for his siblings and eventually gave up. *Id.* at 123-25. Prior to 2015, upon entering the country, CBP would ask for his phone about half of the time, and return it. *Id.* at 64-66, 152. He does not recall if he unlocked the phone and does not care if it was inspected. *Id.* at 108, 111.

**No Fly Plaintiffs**. Defendants have confirmed that the four plaintiffs who allege they were denied boarding (Bosnic, Doe, Mohallim, Sehwail) are now able to fly. DEX6 ¶¶ 28, 30, 35, 40. TSC has assessed the available evidence and confirmed that none of these four plaintiffs will be placed on the No Fly List based on information currently known to TSC. DEX1 ¶ 103. Rather, to support a

future placement, new articulable intelligence or information would have to support a reasonable suspicion that those individuals are engaged in terrorist activities and meet the heightened derogatory criteria for the No Fly List. DEX1 ¶¶ 76, 104.

Of the 20 remaining plaintiffs, 3 never sought redress through DHS TRIP or failed to complete the inquiry. The remaining 13 non-No Fly plaintiffs who completed the process received the standard letter. DEX6 ¶¶ 24-27, 31-34, 37-39, 41-42.

## I. *Ex Parte* Submissions

CBP *ex parte* submission: The parties stipulated that Defendants would provide the Court *ex parte, in camera* the following information for each remaining plaintiff with a Fourth Amendment claim: (a) A list of CBP encounters at the border; (b) Confirmation of whether CBP performed an electronic device search during each encounter—and if so, whether the search was an advanced one; (c) CBP's basis for conducting any advanced search; (d) Each plaintiff's current TSDS status; and (e) Each plaintiff's TSDS status at the time of any CBP encounters at the border during which an electronic device search was performed. *See* Joint Stipulation, ECF No. 239-2; *Ex Parte* DEX121.

TSA *ex parte* submission: TSA is providing two declarations as part of its *ex parte* submission. One fully *ex parte* declaration provides additional contextual information necessary for this Court to evaluate its jurisdiction. The other declaration provides additional information regarding the No Fly List without which the Court cannot properly evaluate the merits of the substantive due process claim; a redacted version is filed on the public record. Both contain Sensitive Security Information. *See Ex Parte* DEX118, 119.

TSC *ex parte* submission: TSC has made an *ex parte* submission of the certified administrative records including all information considered directly or indirectly by TSC regarding decisions of placement, redress and removal for any Plaintiffs who have ever been on the TSDS. *See* Notice of Lodging, filed concurrently. The *ex parte* submission also includes the unredacted version of the McQueen Declaration (which provides context, background, and explanation for the record of decision), and a wholly classified declaration providing additional context and explanation for the information underlying nominations. *See Ex Parte* DEX118, 122, 123.

Part II.D, below, explains the grounds on which the Court may consider this information *ex parte* and *in camera*.

## ARGUMENT

### I. The Court Should Dismiss All Claims Against the WLAC Defendants for Lack of Jurisdiction or Grant Summary Judgment for the WLAC Defendants.

Plaintiffs alleged in their Second Amended Complaint that the WLAC is a secretive "government agency" that "promulgates decisions regarding all policies, procedures, practices and instructions pertaining to the federal terrorist watchlist." Pls.' 2d Am. Compl., ¶ 57, ECF No. 48 ("SAC"); *see also* MTD Op. at 18. This Court allowed jurisdictional discovery into each WLAC Agency's role and access to and use of watchlisting information. The factual record now belies Plaintiffs' inaccurate speculation, and the Court should dismiss all WLAC Defendants.

#### A. Standards

To establish "the 'irreducible constitutional minimum' of standing," Plaintiffs must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Article III standing must be evaluated on a defendant-by-defendant basis. *See Murthy v. Missouri*, 603 U.S. 43, 61, (2024) ("[P]laintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek.") (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431, (2021)); *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 491 (D. Md. 2019) ("The City must establish Article III standing for each claim against each defendant.").

Here, Defendants dispute the traceability and redressability elements with respect to the WLAC Defendants. Traceability is satisfied where there is "a causal connection between the injury and the conduct complained of that is 'fairly traceable,' and not 'the result of the independent action of some third party not before the court.'" *Frank Krasner Enterprises, Ltd. v. Montgomery Cnty.*, 401 F.3d 230, 234 (4th Cir. 2005) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)) (emphasis omitted). Although a party need not demonstrate the challenged action to be "the sole or even immediate cause of the injury," *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018),

indirect injuries are only "fairly traceable" to the intervening action of a third party where that action is "powerfully coercive" of the injury, such as where any other result would incur "substantial penalties." *Star Scientific, Inc. v. Beales*, 278 F.3d 339, 359 (4th Cir. 2002) (citing *Bennett v. Spear*, 520 U.S. 154 (1997)). Redressability, on the other hand, requires a "substantial likelihood" that the requested relief will, in fact, remedy the alleged injury in fact. *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000); *see also West v. Lynch*, 845 F.3d 1228, 1235-36 (D.C. Cir. 2017).

### B. Plaintiffs' Standing Theory Is Flawed Because Participation in Policymaking Does Not Confer Standing.

Plaintiffs' theory of standing appears to be that they can sue any agency that participates in the WLAC, because the WLAC is responsible for developing and recommending adoption of the WLG. *See* MTD Op. at 18 ("The Court is centrally concerned that WLAC Agency Defendants' role in approving WLG changes as 'policy' is sufficient to confer standing."); *see also, e.g.*, Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss SAC at 5, ECF No. 52 ("Pls.' MTD Opp."). Essentially, Plaintiffs contend that each WLAC Defendant's purported role in the policymaking process—*i.e.*, the process of developing the WLG—is sufficient to provide standing to sue each and every WLAC Defendant. To the contrary, standing to sue an agency based on a policy that injures Plaintiffs would be appropriate only where that agency actually enforces that policy in a way that injures Plaintiffs, not against every agency that may have provided deliberative advice during the development of the policy. *See, e.g.*, *Common Cause v. Biden*, 748 F.3d 1280, 1285 (D.C. Cir. 2014) (dismissing a defendant whose role was "purely advisory," because only defendants that "enforced or executed" the challenged rule to Plaintiffs' detriment would be traceable to the injury and redressable). Accordingly, the general rule is that an agency operating in an advisory capacity cannot be sued based on injuries caused by others. *See, e.g.*, *Bennett*, 520 U.S. at 169 (standing does not exist for an advisory action, but standing does exist if the action has "determinative or coercive effect" upon the decisionmaker); *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 860 (4th Cir. 2002) ("Even if other agencies have relied on the Report in imposing tobacco related restrictions, these regulations are not direct consequences of the Report, but are the product of independent agency decisionmaking.").

In the MTD Op., the Court stated that where "standing turns on involvement with policymaking, a plaintiff must show that the defendant is involved in the promulgation or enforcement of such policies, or otherwise exerts control over the disputed provision." MTD Op. at 17. But the three cases cited do not actually support Plaintiffs' contention that mere involvement in the policymaking process is sufficient; they instead emphasize that standing typically exists only against agencies that have authority to *directly enforce* a policy against a plaintiff. *See, e.g.*, *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014) ("the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision, and the redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute."); *Calzone v. Hawley*, 866 F.3d 866, 869-70 (8th Cir. 2017) (finding plaintiff had standing to bring suit against the superintendent of state highway patrol who was specifically given authority to implement the law allowing inspection of certain vehicles, but lacked standing to sue the governor and attorney general, neither of whom had any involvement in the highway patrol's vehicle inspections).

Finally, Plaintiffs' theory that standing exists against the WLAC Defendants because they assisted in the formulation of the WLG erroneously treats this case as a straightforward challenge to a discrete agency policy. But Plaintiffs' claims here are not simply seeking to invalidate the WLG. Indeed, Plaintiffs' operative pleading does not mention the WLG anywhere in its substantive claims or in the prayer for relief. *See* SAC ¶¶ 1549-1718 & Prayer for Relief. Instead, Plaintiffs have brought broad-ranging claims on a variety of different topics and policies. Plaintiffs cannot plausibly argue that mere participation in the WLAC is sufficient to justify standing for all such claims against twenty different agencies. The SAC identifies a variety of allegedly injurious *actions* against them, not a policy. Whether the injury was allegedly caused by placement on a watchlist or border searches or religious questioning, standing should inhere as to the agencies that took those actions. Plaintiffs' only theory of standing as to the WLAC Defendants is legally foreclosed. The WLAC Defendants' mere participation in the WLAC and its policymaking process does not suffice for Article III standing.

### C. The Factual Record Further Confirms that Plaintiffs Cannot Establish Traceability or Redressability Against the WLAC Defendants.

The factual record here likewise confirms that all of the WLAC Defendants should be dismissed under traditional principles of traceability and redressability. Plaintiffs seek an injunction (1) requiring their removal from the TSDS, (2) adopting revised redress procedures; (3) prohibiting Defendants from searching electronic devices absent a warrant supported by probable cause; (4) prohibiting the confiscation of electronic devices at the border; (5) prohibiting mandatory provision of passwords or biometric information to unlock electronic devices at the border; (6) requiring the return of electronic devices allegedly taken at the border; (7) requiring expungement of any information collected from electronic devices; and (8) prohibiting the sharing of information through the National Crime Information Center (NCIC). *See id.* at 264-65 (SAC, Prayer for Relief ¶ 4). Plaintiffs also seek a declaratory judgment that (1) unspecified "policies, practices, and customs related to the federal terrorist watchlisting system" are unconstitutional and unlawful; and that (2) policies and practices related to electronic device searches, too, are unconstitutional and unlawful. *See id.* at 263-64 (SAC, Prayer for Relief ¶¶ 1-3).

Tellingly, *none* of Plaintiffs' requested relief would operate against the WLAC Defendants. Indeed, the requested relief is entirely directed at the Merits Defendants: TSDS removal is TSC's job; the redress procedures are TSA's; the alleged electronic device searches are CBP's; and NCIC dissemination is within FBI's responsibility. Thus, even if Plaintiffs got every shred of relief they requested, the WLAC Defendants would not be required to take any action, and Plaintiffs' purported injuries would be fully redressed. Because the complaint itself requests no relief against the WLAC Defendants at all, there is no likelihood, let alone a "substantial likelihood," *Vt. Agency of Nat. Res.*, 529 U.S. at 771, that any such relief will remedy the alleged injuries in fact.

Nor are Plaintiffs' injuries traceable to the WLAC Defendants. On the face of Plaintiffs' 265-page SAC, the WLAC and its participant agencies are mentioned only at the very outset, and unconnected to any particular Plaintiff's injuries. *See* SAC ¶¶ 3, 57-82. Critically, no Plaintiff has shown that any WLAC Defendant harmed them directly. *See generally id.* Moreover, the factual record now belies the majority of the WLAC-related allegations that led to discovery here, MTD Op. at 18, and

demonstrates that participation in the WLAC does not make Plaintiffs' alleged injuries "fairly traceable" to the WLAC Defendants. First, the inter-agency watchlisting system is not "led" by the WLAC, DEX1 ¶ 77, nor do the WLAC Defendants each have "decision-making authority and veto power over all decisions made by the WLAC," *compare* SAC ¶¶ 57-82, *with* DEX1 ¶ 80. To the contrary, the WLAC is an "informal inter-agency advisory group" with no authority on its own "to create official policy." DEX23 at 26; DEX1 ¶¶ 77, 80. Instead, the WLAC makes recommendations and prepares predecisional draft updates regarding the WLG through a consensus-driven process, "but the WLG does not become official policy until it is approved through the National Security Council." DEX23 at 26; *see also* DEX1 ¶ 84. No WLAC participant agency has "veto" power over any proposals, and participation in the WLAC does not limit the ability of participant agencies to act independently, even absent consensus among WLAC participants. DEX23 at 26. Nor does participation in the WLAC "provide agencies with any greater authority to implement provisions of the [WLG]," that is, "any action to implement the [WLG] must be undertaken consistent with each agency's independent legal authorities and other applicable law." *Id.* at 26-27. Thus, while the WLG is government policy, it is unlike a co-promulgated agency rule for which a court order against all promulgating agencies may be necessary to effectuate relief. The WLG simply represents the agreement of various agencies to adhere to its contents, as applicable, consistent with the authorities they already possess. *See* DEX22 at 202 ("each agency that has a role in the watch listing process has certain authorit[ies]. . . . they're bound by their own authorities on what they can and cannot do.").

The WLAC Defendants are not the direct cause of any of Plaintiffs' core purported injuries: no WLAC Defendant made the determination to place any Plaintiff in the TSDS, denied them boarding on an aircraft, searched them at the border, or disseminated their purported status through NCIC. *See* DEX23 at 7-22 (describing WLAC Defendants' uses of TSDS information). For any of the WLAC Defendants' actions to be sufficient for standing based on injuries allegedly caused by the Merits Defendants, the WLAC Defendants' conduct must "powerfully coerce[]" the injurious act, such as where acting otherwise would incur "substantial penalties." *Star Scientific*, 278 F.3d at 359 (citing *Bennett*, 520 U.S. at 154). Surely, participation in ongoing deliberative discussions, submitting

recommendations, and providing other similar input into changes to watchlisting policy does nothing to "powerfully coerce" any of the allegedly injurious actions taken by the Merits Defendants. *See id.* Plaintiffs' injuries are not fairly traceable to the WLAC Defendants.

**D.    Even If a Defendant's Level of Involvement in the WLAC, or in Enforcing the WLG, Were Relevant to the Standing Inquiry, the WLAC Defendants Still Should be Dismissed.**

Even if this Court did examine the specific role played by each WLAC Defendant, it should dismiss all of them, either because they do not participate in the WLAC, do not implement the WLG, or do so in ways unconnected to Plaintiffs' allegations. As an initial matter, numerous WLAC Defendants barely participate in the WLAC, if at all. *See supra* Background Section G at 20-27 (DOJ, ODNI and DoD only participate via their separately named components, USCIS does not participate at all, ICE has limited attendance, Treasury has no information indicating it has ever participated in the WLAC, and FinCEN attends when schedules allow but generally does not provide substantive input); *see also* WLAC Defs.' Resps. to Pls.' 1st Set of Requests for Admission at 21-23, 25-26 (DEX36). Under any theory of standing pertaining to the WLAC Defendants, these entities should be dismissed.

Additionally, over half of the WLAC Defendants do not make any operational use of TSDS information. *See supra* Background Section G.2 at 19-27 (DOJ-NSD, DOJ-OLP, DOJ-OPCL, ODNI, DHS-CRCL, DHS-OGC, DHS-PLCY, DHS-PRIV, Treasury, FinCEN); *see also* DEX23 at 7-22. And more than half of the WLAC Defendants have no role whatsoever in implementing or enforcing the WLG. *See supra* Background Section G.2 at 19-27 (DOJ, DOJ-NSD, DOJ-OLP, DOJ-OPCL, DHS-OGC, DHS-PLCY, DHS-PRIV, DHS-CRCL, ODNI, DoD, Treasury, FinCEN); *see also* DEX36 at 4-19. Given that these entities do not use TSDS information or implement the WLG, they cannot plausibly be said to have caused any of Plaintiffs' alleged injuries, nor could they possibly redress any of those injuries.

Other WLAC Defendants do use TSDS information and/or implement portions of the WLG, but have no conceivable connection to the claims remaining in this case. For example, ICE makes use of TSDS information in various ways. *See* DEX23 at 11-13. But no Plaintiff alleges that they are, were, or will be the subject of any ICE investigation or removal proceeding, let alone explains how their

45

purported TSDS status could plausibly cause them harm during any such proceedings. Similarly, the State Department uses TSDS information in furtherance of its screening, vetting, and investigative missions, *see id.* at 16, but no Plaintiff alleges that he or she is or will be screened, vetted, or is under investigation by the State Department. Indeed, because Plaintiffs are all U.S. citizens or Lawful Permanent Residents, they do not need to apply for visas from the State Department. Plaintiffs have not made any showing that they were injured by DHS-I&A, NSA, DIA, or CIA. None of these Defendants should remain either.

Moreover, Treasury and FinCEN do not use TSDS information, and have attested repeatedly that they do not direct financial institutions to close bank accounts or block wire transfers based on TSDS status, notwithstanding allegations that they have closed certain Plaintiffs' bank accounts or blocked wire transfers. *See id.* at 19-22. They, too, should therefore be dismissed for lack of standing.

Still other WLAC Defendants are mentioned in the complaint, but the injuries pleaded against them are not cognizable. As discussed, the Fourth Circuit has determined that such outlier instances cannot form a basis for Plaintiffs' claims where Plaintiffs "seek a remedy that far transcends any individual plaintiff's plight." *See Elhady*, 993 F.3d at 217-18. Moreover, it is far from clear that these isolated allegations about past events would provide standing for Plaintiffs' prospective claims here. *See O'Shea v. Littleton*, 414 U.S. 488, 495 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief[.]"). Even absent these threshold defects, however, such injuries would not be cognizable. Two Plaintiffs allege denial of entry to a DoD military base, for example, but that allegation is relevant only to establishing a stigma-plus claim for the purpose of pursuing additional procedures pertaining to placement. *See* MTD Op. at 34. Thus, the actual legal claim still operates against a Merits Defendant, and there is no need for DoD to remain in this suit because Plaintiffs are not seeking relief against DoD, *i.e.*, the ability to re-enter those military bases. *See id.* at 35 n.15. And as discussed in more detail in Section III.C, if Plaintiffs were seeking such relief, the injury still would not be cognizable because there is no right to enter a military base. *See infra* p. 68. DoD has no other use of TSDS information. DEX23 at 17 (describing DoD uses of TSDS information). Similarly, Plaintiffs cannot pursue any claims against USCIS, even assuming they

sufficiently alleged delays in immigration proceedings for family members. None of the stigma plus claims identified at the MTD Op. involved delays in immigration proceedings, MTD Op. at 34, and indeed no Plaintiff plausibly attributes such issues to TSDS status.  Even if one of the Plaintiffs had claimed such an injury in the past, they certainly have not alleged a threat of future injury, as is required for the prospective relief sought here. *See Clapper v. Amnesty Int'l*, 568 U.S. 398, 401-02 (2013). Notwithstanding Plaintiffs' allegations, then, these WLAC Defendants, too, must be dismissed.

Finally, this Court must dismiss the WLAC itself because it has no independent corporate status that would allow it to be sued. *See* Fed. R. Civ. P. 9(a)(2), 17(b); DEX23 at 3 (objecting that "[t]he WLAC is not a governmental agency or other entity established by law."). Plaintiffs appear to concede this point, as they never moved to compel any discovery responses from the WLAC. *See* Pls.' Motions to Compel, ECF Nos. 114, 123. Pursuant to Federal Rules of Civil Procedure 9 and 17, an entity with no capacity to be sued should be dismissed for lack of jurisdiction. *See, e.g.*, *New York State Tchrs. Ret. Sys. v. Kalkus*, 764 F.2d 1015, 1019 (4th Cir. 1985).

In sum, even if this Court determines that the level of participation in the WLAC is relevant to the standing inquiry, the WLAC Defendants should all be dismissed for lack of standing.

## II. The Court Should Dismiss the No Fly List Claims and Certain Other Plaintiffs' TSDS Claims for Lack of Jurisdiction.

### A. Standing and Mootness Standards.

As discussed in Section I.A, Plaintiffs must demonstrate standing for each form of relief sought. *See Murthy*, 603 U.S. at 61. Where a plaintiff files an amended complaint seeking prospective injunctive relief, the court assesses standing as of the time the amended complaint was filed. *See, e.g., Rockwell Int'l Corp. v. United States,* 549 U.S. 457, 473-74 (2007); *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991); *Nat'l Fed'n of the Blind v. United States Dep't of Educ.*, 407 F. Supp. 3d 524, 530 (D. Md. 2019); *Leifert v. Strach*, 404 F. Supp. 3d 973, 983 (M.D.N.C. 2019) ("Standing is evaluated at the time the *operative* pleading was filed: in this case, the Fifth Amended Complaint.") (citing *Cty. Of Riverside* and *Hunter v. Branch Banking & Tr. Co.*, Civil Action No. 3:12-CV-2437-D, 2013 WL 4052411, at *3 n.4 (N.D. Tex. Aug. 12, 2013) (collecting cases)).

Moreover, for the prospective relief sought here, Plaintiffs must demonstrate the existence of a future "threatened injury [that is] 'certainly impending.'" *Clapper*, 568 U.S. at 401 (citation omitted). So each Plaintiff seeking relief must demonstrate an ongoing injury or threat thereof from Defendants at the time the Second Amended Complaint was filed on March 22, 2019. *See* SAC.

Even if all Plaintiffs had standing as of that date, some claims may have become moot. A case that becomes moot during the proceedings is "no longer a 'Case' or 'Controversy' for purposes of Article III," and is outside the jurisdiction of the federal courts. *U.S. v. Sanchez-Gomez*, 584 U.S. 381, 385-86 (2018) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Already*, 568 U.S. at 91 (internal citations omitted). In *Fikre v. FBI*, 601 U.S. 234 (2024), the Supreme Court declined to dismiss claims brought by a former No Fly Listee as moot, and confirmed that voluntary cessation of challenged behavior moots a case only if "the defendant can show that the practice cannot 'reasonably be expected to recur,'" which "standard holds for governmental defendants no less than for private ones." *Fikre*, 601 U.S. at 235 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

The Supreme Court did not disturb two other doctrines. First, while the Supreme Court affirmed that the same standards apply to government and private parties, it did not address or disturb the general principle that government actions are entitled to a presumption of regularity. *See U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("a presumption of regularity attaches to the actions of Government agencies"); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (discussing the "presumption of honesty and integrity in those serving as [agency] adjudicators"); *Almy v. Sebelius*, 679 F.3d 297, 309 (4th Cir. 2012) (same).[13] Second, the Supreme Court has been unwilling to assume that a particular

---

[13] The Fourth Circuit has declined to decide whether Government actions may be treated with greater solicitude than those of private parties under the voluntary cessation doctrine. *See, e.g., Wall v. Wade*, 741 F.3d 492, 498 (4th Cir. 2014). The *Fikre* Court also did not address or disturb that doctrine as articulated by other courts, which the Government urges the Fourth Circuit to adopt. *See, e.g., Sossamon v. Texas*, 560 F.3d 316, 325 (5th Cir. 2009); *Thomas v. City of Memphis, Tennessee*, 996 F.3d 318, 324 (6th

plaintiff's misconduct will recur where the government's challenged conduct depends on such misconduct. *See, e.g., Sanchez-Gomez*, 584 U.S. at 391 (assuming that litigants "will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct"); *cf. Honig v. Doe*, 484 U.S. 305, 320 (1988) ("[W]e generally have been unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury.").

### B. The Court Lacks Jurisdiction Over the No Fly List Claims.

Only four of the remaining Plaintiffs (Bosnic, Doe, Mohallim, Sehwail) claim to have been denied boarding on flights in U.S. airspace in the past. Thus, as of the time of the MTD Op., these four Plaintiffs had claims under Counts I (procedural due process), II (substantive due process), and III (APA procedural claim) that are unique to the No Fly List.

Of the four, Bosnic was confirmed to be on the No Fly List (in 2017) and he was informed through the DHS TRIP process that he was removed from the No Fly List in January 2018, DEX6 ¶ 28; DEX1 ¶ 103, months before joining this lawsuit and over a year before the filing of the operative Complaint. TSC confirms that he will not be placed back on the No Fly List absent additional information. *Id.* ¶¶ 103-104. Bosnic flew again shortly after his removal, and has flown extensively since then. DEX51 at 11-12. Mohallim waited years (until 2021) to complete his DHS TRIP inquiry, was informed that the U.S. government knew of no reason that he should be unable to fly in April 2021, and has flown repeatedly since then. DEX66 at 13-14; DEX6 ¶ 35. Sehwail failed to provide required information to complete his DHS TRIP inquiry, and when DHS TRIP gained the required information in discovery, Sehwail was given the same response as Mohallim in August 2024. DEX6 ¶ 40. Only John Doe was not informed through DHS TRIP of his ability to fly because he did not qualify for the revised redress process, but he has flown extensively since he was last denied boarding in 2018. DEX56 at 272; DEX55 at 17-19; DEX6 ¶ 30. For each of these Plaintiffs, TSC has confirmed

---

Cir. 2021); *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988); *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010); *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 881 (10th Cir. 2019); *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328–29 (11th Cir. 2004).

that they are not on the No Fly List and will not be placed back on the No Fly List without additional information or without following the watchlisting procedures. DEX1 ¶¶ 103-104.

Because Bosnic joined this lawsuit in the First Amended Complaint in August 2018, ECF No. 31, he had already been informed that he was not on the No Fly List at the commencement of his claims here.[14] He therefore lacks standing to bring these claims. *See, e.g., Jibril v. Mayorkas*, 101 F.4th 857, 869-70 (D.C. Cir.) (distinguishing standing and mootness in evaluating watchlist claim); *Maniar v. Mayorkas*, No. CV 19-3826 (EGS), 2023 WL 2709040, at *17 (D.D.C. Mar. 30, 2023) (no standing for No Fly plaintiff removed from No Fly List prior to bringing suit). Both at the time he commenced this lawsuit (August 2018) and at the time of the operative complaint (March 2019), he was facing no imminent threat of irreparable harm from placement on the No Fly List. Similarly, as described *supra* at 31, Doe was able to fly prior to filing of the operative complaint in this matter in March 2019, and has flown extensively since then. Thus, he was facing no imminent threat of irreparable harm from alleged placement on the No Fly List at that time. There was and is no injury for the Court to redress. These two plaintiffs should be dismissed for lack of standing. *See Murthy*, 603 U.S. at 61; *Clapper*, 568 U.S. at 401.

Sehwail and Mohallim received the responses to their DHS TRIP inquiries after the filing of the operative complaint, and their claims should be dismissed as moot. Because they claimed an injury at the time of the filing of the Complaint, the burden shifts to Defendants to show that the claims are moot. *See W. Virginia v. EPA*, 597 U.S. 697, 719 (2022).[15] Under recent case law, Plaintiffs' current ability to fly alone is insufficient for Defendants to meet their burden. In *Fikre*, the Supreme Court held that the Government's removal of Fikre from the No Fly List and a "sparse declaration" attesting that he would "not be placed [back] on the No Fly List in the future based on the currently available

---

[14] Bosnic brought a previous lawsuit during the pendency of which he was removed from the No Fly List. The district court dismissed his No Fly List claims as moot without prejudice, permitting him to replead the TSDS claims. Instead, he noticed a voluntary dismissal without prejudice prior to being added to this case. *See Bosnic v. McCabe*, No. 3:17-cv-00826 (M.D. Fla), ECF No. 33 (Aug. 15, 2018).

[15] To the extent the Court disagrees that Bosnic and Doe lack standing, their claims would also then be analyzed under the mootness framework, with the same result.

information" was insufficient to moot the case because the Government had failed to establish that it would not relist him if he did the same or similar things in the future. *Fikre*, 601 U.S. at 241-42. The Supreme Court's determination that the Government had not established mootness was explicitly based only on "uncontested factual allegations and a terse declaration," and the Court held that the Government could challenge that determination with additional facts. *Id.* at 244.

In this case, the Government has now established additional facts showing that any alleged placement of these Plaintiffs on the No Fly List cannot reasonably be expected to recur. The redacted McQueen Declaration reviews watchlisting procedures, confirms that none of these Plaintiffs are currently on the No Fly List, explains what would be required to place them on the No Fly List, explains the conclusion that the alleged injury cannot reasonably be expected to recur, and explains why certain information cannot be disclosed without risking undue harm to national security and law enforcement interests. *See generally* DEX1. Because the underlying substantive reasons for any alleged placement are classified, those are submitted to the Court in a separate classified declaration that also explains why those reasons are not likely to recur, as well as the actual administrative record and underlying documents regarding the agency's decisions. *See* Class. Decl.; AR Cert.. Accordingly, the Court now has material, beyond Plaintiffs' uncontested allegations and the prior declaration, demonstrating that the challenged conduct cannot reasonably be expected to recur. The *ex parte* submission is not based on "speculation about Plaintiff's actions" but on the actual record of Defendants' actions, Defendants' reasons, and changed world circumstances, all of which preclude recurrence of the challenged conduct – placement on the No Fly List. The *ex parte* submission therefore satisfies the Government's burden as described by the Supreme Court in *Fikre*.

The *ex parte* submission is further bolstered by additional public information before this Court, including the redacted McQueen Declaration and the declarations from the other Merits Defendants. These materials demonstrate that there is an established process with defined standards with respect to placement and removal from the TSDS and the No Fly List, DEX1 ¶¶ 17-25, 74-76, that the procedures include multiple layers of review across more than one federal agency to ensure accuracy and sufficiency, *id.* ¶¶ 53-58, that policies prohibit placement based solely on constitutionally protected

activity or characteristics, such as religious affiliation, *id.* ¶ 17, and that people are not removed from the No Fly List or TSDS as a matter of litigation strategy, ¶ 75. The procedures provide additional assurance that the injury cannot reasonably be expected to recur. Moreover, the Government is entitled to a presumption of regularity that its procedures have been and will be followed. *See Gregory*, 534 U.S. at 10. Allegations that Plaintiffs could have been listed because of their religion or other constitutionally protected characteristics are implausible and speculative, particularly in the face of the actual reasons provided *ex parte*. But even if these allegations were plausible, they would not provide a reason to believe that the agency would violate these clear requirements in the future.

Accordingly, the Court lacks jurisdiction over the claims tied specifically to No Fly List status because the Plaintiffs lack standing or because those claims are moot. The Court previously let procedural due process claims premised specifically on placement on the No Fly List proceed, MTD Op. at 29, 37; those claims, as well as the co-extensive APA claims, should be dismissed. The only remaining substantive due process claim is the one directed specifically at No Fly List status, which cannot reasonably be expected to recur for the reasons above; moreover, the Plaintiffs' ability to travel is not restricted, and the Government has stated publicly that they do not meet the standards for inclusion on the No Fly List.

### C. The Court Lacks Jurisdiction Over the Claims of Certain TSDS Plaintiffs.

The Court lacks jurisdiction over the claims of certain Plaintiffs claiming to have been in the TSDS, including: Abdurrashid, Abunijem, Albadawi, Din, Doe, El-Shahat, Jardaneh, Kamel, Mohallim, Mujanovic, E. Paryavi, M. Paryavi, Soueidan, Thadi. As set forth in the Background Section, these Plaintiffs have not experienced travel difficulties or related issues for years, many since before the filing of this lawsuit or before the filing of the operative complaint. Therefore, as a factual matter, they cannot establish the Court's jurisdiction. TSC is also submitting for the Court's *ex parte* and *in camera* review law enforcement sensitive, sensitive security information, and classified materials that provide further information addressing whether, as a factual matter, each of the Plaintiffs has standing to pursue his or her asserted claims for prospective declaratory and injunctive relief with respect to the watchlist. To the extent the Court agrees that this submission requires the dismissal of Plaintiffs'

claims for lack of jurisdiction, Defendants respectfully request that it dismiss those claims without revealing any information concerning watchlist status.

In *Jibril v. Mayorkas*, the D.C. Circuit upheld a district court's decision to dismiss certain challenges to the Selectee List on the basis of an *ex parte* submission without revealing the past or current watchlist status of any Plaintiff. *See generally* 101 F.4th 857. The Court of Appeals found that the "District Court usefully employed hypotheticals to impartially assess the matters in dispute while avoiding explicitly disclosing the contents of the Government's ex parte submission," understanding that "hypotheticals would be a thoughtful way to meaningfully respond to Appellants' quest for redress in a case in which important information is beyond their reach due to national security concerns." *Id.* at 868. Here, hypothetically, a plaintiff who was never in the TSDS at the time of the operative complaint or whose claimed difficulties were entirely attributable to other issues would lack standing to challenge the TSDS. Similarly, a plaintiff who was removed from the TSDS or previously misidentified with someone on the TSDS prior to bringing this lawsuit would likewise lack standing to challenge the TSDS. And a plaintiff who was removed from the TSDS during the pendency of this litigation may have moot claims under the appropriate *Fikre* analysis if the Government could show that the challenged conduct could not reasonably be expected to recur. The McQueen declaration, the classified administrative record, the classified declaration, and the *ex parte* TSA declarations collectively provide the factual information necessary for the Court to evaluate these questions as to all twenty of the remaining Plaintiffs.

Accordingly, the Court lacks subject matter jurisdiction over the watchlist-related claims of the Plaintiffs listed at the beginning of this subsection, including Counts I, III, V, X, and XI.

### D. Consideration of the *Ex Parte* Information Is Appropriate.

In accordance with previous practice in this case, Defendants seek leave for the concurrent lodging of the *ex parte* submission and submit that the Court's consideration of the *ex parte* materials is appropriate with respect to both jurisdictional and merits issues. The *ex parte*, *in camera* materials include: the unredacted McQueen declaration, the classified declaration, the classified administrative record, the stipulated submission of CBP, the unredacted TSA declaration regarding the No Fly List,

and an additional TSA declaration regarding specific plaintiffs. *See* DEX118-23; Notice of Lodging.

Generally speaking, the Court has an obligation to satisfy itself of its own jurisdiction before proceeding to the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998); *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010). Here, the Court cannot do so without recourse to the *ex parte* materials.

"[I]n cases in which sensitive materials may be in issue, . . . the court has inherent authority to review classified material *ex parte, in camera* as part of its judicial review function." *Olivares v. TSA*, 819 F.3d 454, 462 (D.C. Cir. 2016) (cleaned up) (citation omitted); *see also Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004) (collecting cases). For example, courts have upheld the legitimacy of *in camera, ex parte* submissions related to "[a]n individual's placement on the [Terrorist Screening Dataset], as well as any explanation for the placement[.]" *Jibril*, 101 F.4th at 866-67 (holding the district court did not abuse its discretion in reviewing a Government declaration *ex parte* and *in camera*, without giving plaintiffs an opportunity to challenge its contents), *cert. denied*, No. 24-293, 2024 WL 4743104 (U.S. Nov. 12, 2024); *cf. Nur v. Unknown CBP Officers*, No. 1:22-CV-169-AJT/JFA, 2022 WL 16747284, at *7 (E.D. Va. Nov. 7, 2022) (relying on *ex parte* materials to evaluate subject matter jurisdiction).

Courts presented with *in camera, ex parte* submissions may grant motions based on those submissions, and "endeavor to explain [their] reasoning as clearly as possible" without revealing the information submitted *in camera, ex parte. Jibril v. Mayorkas*, No. 1:19-CV-2457-RCL, 2023 WL 2240271, at *6 (D.D.C. Feb. 27, 2023); *Abdellatif v. United States Dep't of Homeland Sec.*, 109 F.4th 562, 570 (D.C. Cir. 2024) (confirming that TSA review conformed to statutory standards without disclosing result); *Scherfen v. U.S. DHS*, No. 3:CV-08-1554, 2010 WL 456784, at *8 n.5 (M.D. Pa. Feb. 2, 2010).

Defendants' submission includes classified material, information protected by the law enforcement privilege, and information protected under statute as Sensitive Security Information. The *ex parte* classified declaration and administrative record contain classified information and may not be disclosed. *See, e.g.*, Exec. Order No. 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) (prescribing uniform system for classifying, safeguarding, and declassifying national security information); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 527-30 (1988) (holding that decisions about who may access or use classified information and under what circumstances are committed to the Executive Branch). The

classified declaration confirms that proper classification procedures were followed, and that the information cannot be disclosed without risking harm to national security. Other courts have relied on such information to resolve the merits of watchlisting matters on the basis of a classified administrative record. *See, e.g., Kashem v. Barr*, 941 F.3d 358, 386 (9th Cir. 2019) (affirming summary judgment for defendants on due process claims regarding No Fly List procedures, including judicial review of *ex parte* information); *Salloum v. Kable*, No. 4:19-cv-13505, ECF No. 61 (E.D. Mich. Sept. 29, 2022) (describing procedure for *ex parte* administrative record and denying motion to compel); *Kovac v. Wray*, No. 3:18-CV-00110-X, 2022 WL 717260, at *4 (N.D. Tex. Mar. 10, 2022) (granting motion for *ex parte* review of administrative record).

The *ex parte* submission contains information protected under the law enforcement privilege and as Sensitive Security Information ("SSI"). The law enforcement privilege is a common law privilege to protect investigatory files and law enforcement techniques. *See In re Dep't of Investigation of City of New York*, 856 F.2d 481, 483 (2d Cir. 1988); *see also U.S. v. Matish*, 193 F. Supp. 3d 585, 597 (E.D. Va. 2016). Courts have upheld the assertion of this privilege to "prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *See In re Dep't of Investigation of City of New York*, 856 F.2d at 484. During discovery, the magistrate judge repeatedly upheld the assertion of the privilege over, for example, watchlist status and certain related information. *See, e.g.*, ECF Nos. 225, 227, 295 (each denying production of current or former watchlist status and other TSDS-related information), 312 (denying motion to compel certain statistical information about the TSDS).

Consistent with the law enforcement privilege, the Government does not acknowledge in public filings whether any individuals are or are not included in the TSDS, as that revelation would compromise important law enforcement and national security interests. DEX1 ¶ 87. This is true notwithstanding prior disclosures (*e.g.*, disclosure of prior No Fly status) in light of the more sensitive information at issue here and the impact of cumulative disclosures. *Id.* ¶¶ 97-101. Courts have overwhelmingly upheld this assertion of the privilege. *See, e.g., Elhady*, 993 F.3d at 215 ("Disclosure [of

55

TSDS status] would disrupt and potentially destroy counterterrorism investigations because terrorists could alter their behavior, avoid detection, and destroy evidence."); *Salloum v. Kable*, No. 4:19-cv-13505, ECF No. 61 at 12–15, 17 (E.D. Mich. Sept. 29, 2022) (upholding assertion of LEP over status); *Scherfen*, 2010 WL 456784, at *8 n.5 (similar).

SSI is a statutory privilege that constitutes, in relevant part, information the disclosure of which would "be detrimental to the security of transportation." 49 U.S.C. § 114(r)(1)(C); *see also* 49 C.F.R. pt. 1520 (governing the maintenance, safeguarding, and disclosure of information that TSA has determined to be SSI). Congress has prohibited disclosure of SSI without TSA approval, *see* 49 U.S.C. § 114(r), and, in accordance with its statutory mandate TSA has issued regulations regarding the protection of SSI, *see* 49 C.F.R. pt. 1520. As a general matter, SSI may only be disclosed to "covered persons who have a need to know, unless otherwise authorized in writing by TSA." *See* 49 C.F.R. § 1520.9(a)(2). TSA's SSI determinations are exclusively reviewable in United States courts of appeals. 49 U.S.C. § 46110.

Generally speaking, with a limited exception related to the No Fly List status of U.S. persons, an individual's status on or off certain subsets of the TSDS, as well as certain related information, such as reasons for any such placement, is SSI. Disclosure of that information is prohibited under the pertinent statutes and regulations because such disclosure would be detrimental to transportation security. *See Matar v. TSA*, 910 F.3d 538, 540 (D.C. Cir. 2018) (noting that placement on certain TSDS subsets, as well as any explanation for placement, is SSI "restricted from public access"); *Blitz v. Napolitano*, 700 F.3d 733, 737 n.5 (4th Cir. 2012) (describing sensitive information that, by regulation, may not be released by TSA); *Shearson v. Holder*, 865 F. Supp. 2d 850, 861 n.2 (N.D. Ohio 2011) (recognizing that "the TSD[S] status of a particular individual can neither be confirmed nor denied"), *aff'd,* 725 F.3d 588 (6th Cir. 2013); *see also* 49 C.F.R. § 1520.5(b)(9)(ii) (SSI includes "[i]nformation and sources of information used by a passenger or property screening program or system, including an automated screening system"); Protection of Sensitive Security Information, 69 Fed. Reg. 28,066, 28,071 (May 18, 2004) (interim final rule adding 49 C.F.R. § 1520.5(b)(9)(ii) ("This is intended to cover . . . lists of individuals identified as threats to transportation or national security.").

Finally, "attorneys' eyes only" procedures "provide insufficient protection for the confidential law enforcement information at issue" given "the consequences of accidental disclosure." *In re The City of New York*, 607 F.3d 923, 936–37 (2d Cir. 2010). Here, a redacted version of the McQueen Declaration makes as much information public as possible without risking national security or law enforcement interests. And the declaration explains that disclosure pursuant to a protective order is inadequate protection for the more sensitive information at issue here. DEX1 ¶¶ 102.

### III.    The Court Should Enter Summary Judgment on the Procedural Due Process Claims of the TSDS Plaintiffs and Coextensive APA Claims.

To the extent any such claims are not moot, the Fourth Circuit's decision in *Elhady* forecloses the procedural due process claims of Plaintiffs claiming to be on the TSDS, including those based on either travel or reputational injuries. *See Elhady v. Kable*, 993 F.3d 208 (4th Cir. 2021). *Elhady*, in which the Fourth Circuit reversed a decision of the Eastern District of Virginia on which this Court heavily relied in ruling on Defendants' Motion to Dismiss, *see* MTD Op. at 30, 32, 33, compels judgment for the Government as a matter of law. The factual record developed here is consistent with *Elhady* and does not justify any deviation from that holding. A procedural due process claim requires a plaintiff to show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Shirvinksi v. U.S. Coast Guard*, 673 F.3d 308, 314 (4th Cir. 2012) (citation omitted).

### E.  The TSDS Plaintiffs Have Not Been Deprived of a Right to Travel.

The MTD Op. held that 13 of the remaining Plaintiffs had stated a claim for a deprivation of the liberty interest in travel: Abunijem, Albadawi, Al-Sahlani, Bosnic, Doe, El-Shahat, Hachem, Jardaneh, Mohallim, Mujanovic, Muminov, Sulayman, Sehwail. MTD Op. at 32 n.13. In *Elhady*, the Fourth Circuit analyzed travel-related delays and inconveniences that are indistinguishable from those asserted by Plaintiffs here and concluded that they were inadequate to establish a deprivation of the right to travel. *Elhady*, 993 F.3d 208, 219-24. Specifically, the Fourth Circuit considered and rejected possible constitutional injuries based on delays in airports and at border crossings. This is consistent with rulings from every other Circuit court to consider the issue. *See Ghedi v. Mayorkas*, 16 F.4th 456,

466-67 (5th Cir. 2021); *Abdi v. Wray*, 942 F.3d 1019, 1032 (10th Cir. 2019); *Beydoun v. Sessions*, 871 F.3d 459, 468 (6th Cir. 2017).

The Fourth Circuit began by noting the need to "carefully fram[e] plaintiffs' asserted liberty interest," *Elhady*, 993 F.3d at 220, and that the "right to travel is qualified, not absolute," *id.* at 221. The Fourth Circuit found that the *Elhady* plaintiffs only alleged that they were "subject to enhanced screening in airports before boarding flights." *Id.*; *see also id.* ("Aside from complaints about delays in airports, they do not allege any obstruction of their ability to travel domestically by means other than planes, like trains and automobiles."). The Fourth Circuit found that these burdens "do not rise to the level of constitutional concern" in light of the government's long history of imposing burdens on travel, such as security screenings and quarantines. *Id.* at 220-21. Indeed, the delays that the *Elhady* plaintiffs alleged "[we]re not dissimilar from what many travelers routinely face, whether in standard or enhanced screenings, particularly at busy airports." *Id.* at 221.

Importantly, the Fourth Circuit acknowledged that some of the *Elhady* plaintiffs experienced longer delays, with much more extreme treatment. *See id.* at 225 (noting that some of the "plaintiffs state they experienced extreme encounters with law enforcement," and recounting allegations about a plaintiff being "repeatedly arrested at gunpoint" and being "detained in a freezing room for twelve hours until he passed out"). But the Fourth Circuit held that these outlier experiences were legally irrelevant because, for the facial relief sought, the analysis was based on the *typical* plaintiff's experience. *See id.* at 225 ("When considering this type of broad procedural due process claim, we are required, as noted, to focus on the 'generality of cases, not the rare exceptions.'" (quoting *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976))); *see also id.* at 217 (discussing the "multiple reasons why we cannot accept plaintiffs' invitation to have our decision turn on the most dramatic incidents to which they point"). After analyzing the experiences of the *Elhady* plaintiffs, the Fourth Circuit concluded that plaintiffs' allegations regarding travel delays "boil down to an asserted constitutional right to convenient travel. But as any experienced airport traveler knows, that wish finds little support in reality." *Id.* at 222.

Ultimately, the Fourth Circuit found it "decisive" that the plaintiffs still had available non-flight modes of transportation including trains, cars, and boats:

> Plaintiffs can travel domestically without interference by train or automobile. Plaintiffs can travel internationally by boat or by taking some later flight. No plaintiff alleges he is unable to get to a particular destination because of the TSDB. That is decisive. Although our law may guarantee the citizen's right to travel, it is less attentive to how he gets there.

*Elhady*, 993 F.3d at 222. This holding forecloses Plaintiffs' asserted travel-related liberty interest for all of the remaining non-No Fly Plaintiffs.

Here, as in *Elhady*, "[n]either plaintiffs nor anyone else have a constitutionally protected interest in being able to travel domestically or internationally without incurring some burdens." *Id.* at 221. As explained above, all airport travelers are required to undergo screening and all can be designated for enhanced screening for a variety of reasons, including random selection or TSDS status, and most individuals designated for enhanced security screening are so designated for reasons other than TSDS status. DEX5 ¶ 10. Individuals selected for enhanced screening by TSA all have their boarding passes marked "SSSS" and are all subject to the same checkpoint screening procedures, regardless of whether the individual is designated due to TSDS status, randomly, or for other reasons. *Id.* ¶¶ 12, 40. Enhanced screening typically takes approximately 15-20 minutes; some additional delay may also occur at check-in for the purposes of identity resolution, which (if it occurs) takes on average 12.5 minutes. *Id.* ¶¶ 39, 48. For all passengers, additional screening may occur at the gate. *Id.* ¶ 63.

Plaintiffs with travel claims assert from their recollection (lacking contemporaneous notes) that time spent in airport screening or getting a boarding pass were longer than TSA's records reflect, *see* DEX5 ¶¶ 39, 48 (providing average times for resolution calls and enhanced screening), but ultimately Plaintiffs allege airport-related travel-related delays similar to those at issue in *Elhady*. *See, e.g.*, DEX46 at 117-18 (Abunijem claiming that it always took at least an hour to get his boarding pass and 45 minutes to be screened, requiring arrival at airport 2 hours before domestic flights); DEX48 31-32 (Albadawi recalling that it used to take 10-45 minutes to get a boarding pass and the screening could take 45 minutes); DEX50 at 85-87 (Al-Sahlani took over 20 minutes to get boarding pass and maybe half hour at security); DEX52 at 47-49 (Bosnic recalls that screening takes 20 minutes to an hour); DEX60 at 47-48, 60-61 (Hachem, 30-90 minutes to get boarding pass, maybe up to 30 minutes

at security); DEX62 at 133-35 (Jardaneh, 5 minutes to get boarding pass, 45 minutes to be searched); DEX82 at 27-28 (Sulayman, at least 45 minutes to obtain boarding pass and 45 minutes for security line). Besides the alleged No Fly List Plaintiffs, Plaintiffs have not shown that they have been prevented from flying entirely—instead they allege a variety of delays and inconveniences in the airport, including delays in receiving boarding passes, enhanced security screening, pat-downs, and chemical residue testing. While a few Plaintiffs do allege that delays caused them to miss flights on occasion, that experience was not common, and as the Fourth Circuit noted "that misfortune [of missed flights] is regrettably shared with many travelers not in the TSDB but selected for enhanced screening." *Elhady*, 993 F.3d at 222. *See, e,g*., DEX48 at 144 (Albadawi missed connecting flight when international flight arrived with less than 2-hour layover for customs), 190 (showing up early avoided missing flights); DEX58 at 291-92 (El-Shahat recalls missing two flights out of at least 40-60 flights); DEX71 at 149-53, 304 (Muminov missed two flights over the course of more than 15 roundtrips); DEX82 at 199 (Sulayman never missed flight). The airport delays alleged by Plaintiffs are generally well within the claims considered and rejected by the Fourth Circuit. *See Elhady*, 993 F.3d at 221 (finding no constitutional issue with "delays [that] took up to three hours").

The Fourth Circuit also considered and rejected the *Elhady* plaintiffs' purported injury to a liberty interest based on alleged burdens when crossing the border, an argument that it found "even less persuasive" than their arguments based on delays in airports. 993 F.3d at 223. The Fourth Circuit concluded that the government may properly exercise "substantial power" in regulating border crossings. *Id.*; *see also id.* (noting that the government's "interest in preventing the entry of unwanted persons and effects is at its zenith at the international border" (quoting *Flores-Montano*, 541 U.S. at 152-53); *id.* ("The Supreme Court has made clear that the government has broad power to search and seize individuals at the border."). Given this substantial government authority, the Fourth Circuit held that the *Elhady* plaintiffs' "delays and detentions ranging from a few minutes to twelve hours" when crossing the border were not of constitutional concern in a procedural due process analysis. 993 F.3d at 223; *see also id.* at 216 (describing allegations that some *Elhady* plaintiffs were handcuffed, held at

gunpoint, and detained for hours at the border, as well as one plaintiff who alleged he was held in a "very cold room" for hours until he "pass[ed] out from the cold").

Here, CBP confirms that watchlist status is one of many reasons that a person can be referred to secondary inspection, but the steps taken during secondary inspection are at the discretion of the officer. DEX4 ¶¶ 42-43, 60. Plaintiffs' recollections of their border issues here vary widely, but do not tend to differ in kind from the border issues claimed in *Elhady*, and certainly are not more extreme. *See, e.g.*, DEX52 at 66 (Bosnic: CBP inspections take 30 minutes to an hour); DEX48 at 118 (Albadawi recalls CBP inspections typically took 1.5-2 hours); DEX56 at 241-43 (Doe claims he was once injured by CBP officers); DEX62 at 222-30 (Jardaneh had panic attack at border due to not having medication with him and was transported to hospital; entire episode including medical treatment took approximately 6 hours); DEX69 at 194, 246-47 (Mujanovic recalls 2-4 hours in customs on one occasion and 1-2 hours on the next trip, including waiting, searches, and questioning); DEX71 at 202-03 (Muminov recalls one 7-8 hour land border stop included waiting, handcuffing, searching, and questioning). The Fourth Circuit emphasized in *Elhady* that "searches and seizures" at the border "'are reasonable simply by virtue of the fact that they occur at the border.'" 993 F.3d at 224 (quoting *Flores-Montano*, 541 U.S. at 152-53). In light of the Fourth Circuit's recent ruling, it is clear that these inconveniences and obstacles when entering the country are not of constitutional significance. *See id.* (finding no injury to liberty interest when "secondary inspection at the border has not prevented plaintiffs from entering or exiting the United States").

Finally, some Plaintiffs claimed to avoid or minimize certain types of travel as a result of their screening experiences, and prior to *Elhady*, this consideration led the Court to deny the motion to dismiss. MTD Op. at 31-32; *see, e.g.*, DEX46 at 92-93 (Abunijem tried to avoid air travel, choosing to drive when possible). But other Plaintiffs have explicitly stated they are not deterred. *See, e.g.*, DEX48 at 170-71 (Albadawi); DEX52 at 92 (Bosnic). And the vast majority of Plaintiffs have continued to travel, often extensively. *See, e.g.*, DEX45 at 10-21 (Abunijem); DEX47 at 13-26 (Albadawi); DEX49 at 9-18 (Al-Sahlani); DEX56 at 272 (Doe); DEX57 at 11-13 (El-Shahat); DEX59 at 10-18 (Hachem); DEX61 at 14-15 (Jardaneh); DEX69 at 68-69, 71, 138-39 (Mujanovic); DEX67 at 187 (Mohallim).

Sulayman, who originally pleaded that he was "afraid to travel again," MTD Op. 31, travels by plane at least 3-4 times per year, DEX82 at 64. The subjective chill asserted by some but not all Plaintiffs here does not amount to a deprivation of a liberty interest. The Fourth Circuit noted that the Supreme Court had not adopted "anything like" a subjective standard, and that objective standards "spare courts the practical difficulties of assessing the sincerity and idiosyncrasies of individual litigants." *Elhady*, 993 F.3d at 222. Moreover, even if some Plaintiffs alleged a pattern of delays—and even if some alleged particularly extreme treatment during inspections, *see Elhady*, 993 F.3d at 221—the Fourth Circuit made clear that "[w]hen considering this type of broad procedural due process claim, we are required . . . . to focus on the generality of cases, not the rare exceptions." *Id.* at 225. But in any event, like the plaintiffs in *Elhady*, it is also "decisive" of all Plaintiffs' claims that Plaintiffs retain access to alternative methods of travel. *Id.* No Plaintiff alleges that he or she has been denied access to cars, boats, or other non-flight methods of travel. Because "[n]o plaintiff alleges he is unable to get to a particular destination because of the TSDB . . . [t]hat is decisive" and forecloses Plaintiffs' claims. *Id.* Thus, Plaintiffs cannot identify a cognizable liberty interest on the basis that they have been subjectively deterred from travel.

**B. The No Fly List Plaintiffs Have Not Been Deprived of a Right to Travel.**

Plaintiffs Bosnic, Doe, Mohallim, and Sehwail each claim to have been denied boarding on flights in U.S. airspace in the past. Although *Elhady* did not address claims involving the No Fly List as such, the Fourth Circuit nonetheless considered procedural due process claims asserting that certain plaintiffs no longer traveled by plane due to their inclusion in the TSDS. The court held that such a claim does not implicate the right to travel because "individuals do not have a protected liberty interest to travel via a particular mode of transportation." *Id.* at 222. And there is no allegation that these Plaintiffs cannot "travel domestically without interference by train or automobile," or that they are unable to "travel internationally by boat," for instance. *Id.* Indeed, the U.S. Government facilitated the return travel of Bosnic, Mohallim, and Sehwail to the United States by air shortly after they were denied boarding. And all have subsequently been informed that they are not on the No Fly List. The temporary inability to board one flight, or even a handful of flights, does not alone amount to

deprivation of a liberty interest. Accordingly, their claimed past placement on the No Fly List does not deprive them of the right to travel either.

**C. The TSDS Plaintiffs Do Not Have a Cognizable "Stigma-plus" Reputational Injury.**

The MTD Op. held that 5 of the remaining Plaintiffs had stated a claim for a deprivation of reputational liberty interests in a stigma-plus claim: Abdurrashid, Bosnic, E. Paryavi, Sulayman, Thadi. MTD Op. at 34. The Fourth Circuit's decision forecloses these claims, and the factual record is indistinguishable from *Elhady*. To state a stigma-plus claim, "Plaintiffs must aver plausibly that they suffered (1) a 'stigma' from governmental action; 'plus' (2) an alteration or extinguishment of 'a right or status previously recognized by state law.'" MTD Op. at 32 (citation omitted). The *Elhady* decision establishes three principles, each of which forecloses Plaintiffs' remaining stigma-plus claims.

As an initial matter, *Elhady* confirms that Plaintiffs "have not shown adequate 'public disclosure' by the government" sufficient to support a stigma-plus claim. *Elhady*, 993 F.3d at 225. In particular, the Fourth Circuit noted that "[t]he government does not publicly disclose TSDB status." *Id.* The Fourth Circuit further held that "[t]he federal government's intragovernmental dissemination of TSDB information to other federal agencies and components, to be used for federal law enforcement purposes, is not 'public disclosure' for purposes of a stigma-plus claim." *Id.* at 225 (citing *Asbill v. Housing Auth. of Choctaw Nation*, 726 F.2d 1499, 1503 (10th Cir. 1984)); *see also id.* ("That comports with common sense; government could not function if every intra- or inter-departmental memo critical of a person created a constitutional claim."). The Fourth Circuit further concluded that "[t]he same rationale explains why disclosure to state or tribal law enforcement agencies does not constitute public disclosure." *Id.* at 225-26. And the Fourth Circuit rejected the plaintiffs' argument that "the government's decision to allow certain private entities to access the TSDB constitutes publication." *Id.* at 226; *see also id.* (noting that "TSDB status is made available only to a select number of private companies that work closely with issues related to national security," and therefore "we do not think the government has publicly disseminated the plaintiffs' TSDB statuses in a manner sufficient to constitute an injury of constitutional proportion"). The factual record here supports the

same conclusion. TSDS status is not publicly disseminated, access is tightly controlled, and TSDS status may be used only for official purposes. *See* DEX1 ¶¶ 39, 86; DEX4 ¶ 12; DEX5 ¶¶ 65, 74.

Second, in order to satisfy the "plus" factor, Plaintiffs must "demonstrate[] that TSDB status has altered their legal status or extinguished rights." *Id.* at 226. Moreover, a person's TSDS status must *mandate* the denial of a right or privilege. In this respect, the Fourth Circuit explicitly incorporated the reasoning of the Tenth Circuit in *Abdi v. Wray*, 942 F.3d 1019 (10th Cir. 2019), which affirmed the district court's grant of a motion to dismiss a stigma-plus claim where plaintiffs had not sufficiently alleged that TSDS status mandatorily resulted in denials of rights or privileges. *See Elhady* at 993 F.3d at 227 ("government's act of including names in the TSDB does not *mandate*" denial of privileges (emphasis in original) (citing *Abdi*, 942 F.3d at 1034)). Here, for each of the five Plaintiffs with remaining stigma-plus claims, Plaintiffs allege only that their benefits were denied "because of" or "due to" their TSDS status. *See* SAC ¶¶ 454, 713, 953, 979, 1045; *see also* MTD Op. at 34 (limiting stigma-plus claims to these five individuals based on these alleged denials). Plaintiffs have not and cannot factually establish that TSDS status mandated any of those denials. Thus, Plaintiffs' claimed harms are insufficient under *Elhady* because they do not allege that TSDS status mandated the denial of any of their alleged rights or privileges. *See* 993 F.3d at 227 (even if "the government disseminates the watchlist 'with the purpose and hope' that recipients will impose consequences on those individuals," that is insufficient because "such 'purpose and hope' is not a mandate that constitutes the alteration of a legal right or status for purposes of a stigma-plus claim").

Third, the Fourth Circuit's decision expressly confirmed that stigma-plus cases arising in the government employment context are applicable to stigma-plus claims pertaining to the TSDS. Previously, this Court expressed skepticism about that point. *See* MTD Op. at 34 n.14. But *Elhady* now confirms that such cases are applicable, by expressly quoting and affirming the holding of one such case: "A plaintiff must demonstrate that his reputational injury was accompanied by a state action that distinctly altered or extinguished his legal status." *Elhady*, 993 F.3d at 226 (quoting *Shirvinski*, 673 F.3d at 315); *see also id.* (discussing *Paul v. Davis*, 424 U.S. 693 (1976), and *Sciolino v. City of Newport News*, 480 F.3d 642 (4th Cir. 2007)). These cases are important because they demonstrate that the alleged stigma

must be "incident to" the alleged "plus" deprivation. *Siegert v. Gilley*, 500 U.S. 226, 234 (1991); *see also, e.g.*, *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 309 (4th Cir. 2006) ("[I]n order to deprive an employee of a liberty interest, a public employer's stigmatizing remarks must be made in the course of a discharge or significant demotion."). Here, even assuming the five remaining Plaintiffs have established the deprivation of cognizable "plus" factors, none of the five have alleged that those deprivations were *incident to* the alleged stigmatic disclosures. That the alleged "plus" deprivations were undertaken at separate times and by separate actors than the alleged stigmatizing disclosures likewise forecloses Plaintiffs' remaining claims, as confirmed by the framework set forth in *Elhady*.

These holdings dispose of Plaintiffs' claims here. For one thing, all five Plaintiffs with surviving stigma-plus claims allege dissemination to, and deprivations by, federal agencies and state law enforcement agencies alone. *See* MTD Op. at 34 (five remaining Plaintiffs allege deprivations by CBP, TSA, DoD, and the Florida Department of Law Enforcement based on alleged dissemination of TSDS status to those agencies). Thus, all five stigma-plus Plaintiffs have claimed harm only from dissemination to state and federal agencies for official purposes—precisely the type of intra-governmental information-sharing that was held insufficient to constitute public disclosure in *Elhady*. Previously, in the motion to dismiss opinion, this Court relied on the *Elhady* district court to conclude that dissemination of TSDS status to certain private entities was "tantamount to public disclosure, even if only distributed to other government and private entities that need the information for official objectives," and was sufficient to support a claim. *See id.* at 33 (quoting *Elhady v. Piehota*, 303 F. Supp. 3d 453, 465 (E.D. Va. 2017)). The Fourth Circuit has now rejected that very form of dissemination as sufficient to constitute public disclosure. *See Elhady*, 993 F.3d at 226.

Finally, this Court's prior decision also noted allegations that Plaintiffs were "effectively outed as supposed 'known or suspected terrorists' in front of family, friends, travel companions, fellow passengers, and even business acquaintances who witness Plaintiffs' detentions, interrogations, and searches during travel." MTD Op. at 33. Again, that alleged stigma has nothing to do with the deprivations supporting the five remaining Plaintiffs' claims here, as discussed above. But in any event, *Elhady* confirms that screening experiences do not themselves publicly say anything about a person's

TSDS status. *See Elhady*, 993 F.3d at 214 ("Enhanced screening is a relatively common experience for frequent airport travelers because the TSA will often randomly select people for this screening. Further, most passengers chosen for enhanced screening are not in the TSDB."). Because those facts were insufficient to support a stigma-plus claim in *Elhady*, they likewise do not support the remaining Plaintiffs' claims here.

The factual record developed at summary judgment further supports these conclusions with respect to each stigma-plus Plaintiff. First, Abdurrashid originally claimed he was denied a state license to buy a firearm. MTD Op. at 34. In fact, the purchase was only slightly delayed by a few days. DEX44 at 155-56. As in *Elhady*, "[t]his isolated wait, which could have occurred for a whole host of reasons, does not lead us to conclude that TSDB status results in the termination of one's Second Amendment rights." *Elhady*, 993 F.3d at 227. In any event, TSDS status is not a basis for denial of a firearm, and the section of the FBI that handles these checks does not communicate that information to a gun seller. Declaration of Trudy Ford, NICS (DEX8) at ¶¶ 12-14. The facts therefore fail to make out a stigma-plus claim because (1) his alleged status was not publicly disseminated; (2) any alleged public stigma was unrelated to the gun purchase; (3) he was able to purchase a gun after a short delay and in fact owns multiple firearms; (4) watchlist status alone does not mandate, denial of a firearms license.

Second, Bosnic claims he lost his Transportation Worker Identification Credential ("TWIC"), although he does not know why. DEX52 at 183-89. He does not believe that anyone knows whether he is on a watchlist. *Id.* at 230. TSA does not automatically deny TWICs based on watchlist status; it is only a factor indicating that further research is necessary. DEX5 ¶ 68; DEX17 at 279. The denial of a TWIC is the result of a TSA process with its own separate procedural protections, *see* 49 C.F.R. pt. 1572, including an administrative appeal before an ALJ, and results in a TSA order subject to review in the Court of Appeals under 49 U.S.C. § 46110. If Bosnic were to challenge the denial of such a license, that process would be different than the watchlisting procedures, and in any event, not subject to review here. *Cf. Seraji v. Gowadia*, No. 8: 16-CV-01637-JLS-JCG, 2017 WL 2628545, at *7 (C.D. Cal. Apr. 28, 2017). Any stigma plus claim therefore fails because: (1) the process for denial of a TWIC is subject to review only in the Court of Appeals; (2) Bosnic is not publicly stigmatized; (3) any stigma

is not related to the revocation of his TWIC; (4) watchlist status does not mandate denial of a TWIC; (5) watchlist status does not result in denial of a TWIC; and (6) the procedural protections for TWIC denial have not been exhausted, and Plaintiff has not alleged they are inadequate.

Third, E. Paryavi claims he lost his Global Entry credentials in 2018 because he no longer met program requirements and he has not reapplied, even though he has not had trouble travelling in years. DEX73 at 290-302. Global Entry is a CBP Trusted Traveler Program "that allows expedited clearance for pre-approved, low-risk travelers upon arrival in the United States." CBP, Global Entry, https://www.cbp.gov/travel/trusted-traveler-programs/global-entry (last modified May 29, 2025); *see also* 8 U.S.C. § 1365b(k); 8 C.F.R. § 235.12. There is an administrative process for seeking review of a Global Entry denial or revocation. 8 C.F.R. 235.12(k); *see also* DEX4 ¶ 68. Enrollment in this program simply means travelers are eligible for expedited treatment but still can be selected for secondary inspection. DEX4 ¶ 65. Given that neither standard nor enhanced screening infringes a protected liberty interest, nor does inspection at the border, there is no cognizable liberty interest in being eligible for expedited screening or inspection. Individuals are ineligible to participate in Global Entry if CBP, at its sole discretion, determines that the traveler is not a sufficiently low-risk traveler or otherwise does not meet program requirements. CBP considers all available information when evaluating an application for a Trusted Traveler Program during its adjudication process, including both derogatory and mitigating information (and not watchlist status alone). CBP ¶ 64. Accordingly, E. Paryavi has failed to make out a stigma-plus claim because (1) he is not publicly stigmatized; (2) any stigma is unrelated to the revocation of Global Entry; (3) watchlist status does not mandate Global Entry revocation; (4) Global Entry status is not protected as a plus factor; and (4) he has not challenged the procedures available for Global Entry revocation.

Fourth, Sulayman and Thadi both claim to have been denied access to military bases. MTD Op. at 34. Sulayman recalls being detained upon attempting to enter a military base in 2018 and refused entry, DEX82 at 216-17, and Thadi was denied entry to a military base on one occasion in 2017, DEX84 at 111-12. Sulayman has publicized his belief that he is on the watchlist, and it has not sullied his reputation. DEX82 at 204, 249-50. Thadi does not believe anyone knows about his alleged status

67

other than his wife. DEX84 at 99-102. Regardless, there is no right to enter a military base. *See Fields v. Blake*, 349 F. Supp. 2d 910, 920-21 (E.D. Pa. 2004) ("[c]ivilians have no constitutional right to enter a military base") (citing *Greer v. Spock*, 424 U.S. 828 (1976)); *see also, e.g., Cafeteria and Restaurant Workers Union v. McElroy* 367 U.S. 886, 893-94 (1961) (recognizing "the historically unquestioned power of a commanding officer summarily to exclude civilians from the area of his command"). The discretionary power of the military to refuse entry cannot reasonably be seen as a plus factor because it does not extinguish any right or status recognized at law. DoD policy generally prohibits granting unescorted access to individuals who are listed in the TSDS, subject to multiple exceptions, redress and appeal. DEX30 at 7. Accordingly, any stigma-plus claim on this basis fails because: (1) they were not stigmatized; (2) any stigma is unrelated to their inability to enter a military base; (3) watchlist status does not mandate denial of entry (much less detention or other specific security measures); and (4) denial of entry to a military base does not extinguish a status or right recognized by law.

### D. The Procedures Available for the TSDS Are Constitutionally Adequate.

Plaintiffs' claims also fail because the process available to them is constitutionally adequate. "'[D]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (citation omitted). Rather, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (citation omitted). In *Elhady*, the Fourth Circuit discussed the tripartite framework from *Mathews v. Eldridge* and explained that it was "unclear that additional DHS TRIP procedures may be judicially mandated" with respect to inclusion in the TSDS. 993 F.3d at 228. Indeed, "[s]everal factors" made the court "doubt the merits of plaintiffs' arguments under this framework." *Id.* First, "the Government's interest in combating terrorism is an urgent objective of the highest order." *Id.* (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010)). Second, as discussed above, "the weight of the private interests at stake is comparatively weak." *Id.* And third, a court should "not casually second-guess Congress's specific judgment as to how much procedure was needed in this context," as "[s]triking the balance in this most sensitive of areas belongs principally with the people's representatives." *Id.* at 229. The Court reasoned that Congress "did not require the DHS TRIP redress

process to eliminate all possibility of error, but only to reasonably mitigate the risk of possible errors" and in so doing "made a policy choice, balancing the burdens imposed on the victims of false positives with the costs imposed on the entire country when a terrorist attack occurs." *Id.*

The factual record here is substantively identical and yields the same result. First, the Government has a compelling interest in preventing and combatting terrorism, which remains a very real threat. *See generally* DEX2 ¶¶ 8-11; DEX3 ¶¶ 11–21; DEX5 ¶¶ 16–32. The TSDS advances that goal. DEX2 ¶ 11; DEX3 ¶¶ 9–10; DEX4 ¶¶ 58-61; DEX5 ¶ 34. Second, the private interest is relatively limited. All plaintiffs can currently fly and travel, and most have done so extensively despite their alleged status.

Third, the DHS TRIP redress process appropriately balances these interests. The current nomination, placement, and quality assurances, and DHS TRIP procedures, ensure that the risk of erroneous deprivation is appropriately low. *See* DEX1 ¶¶ 53-58; DEX2 ¶¶ 13-15; DEX3 ¶ 7; DEX6 ¶¶ 11. First, before any individual is added to the TSDS, the nominating agency assesses the available, relevant information, including any exculpatory information, to determine whether the applicable standard is met, and TSC completes a *de novo* review of available, relevant information to make the same assessment before the individual is included in the TSDS. DEX1 ¶ 54; DEX2 ¶ 14. In addition, TSC conducts semiannual reviews of all U.S. persons in the TSDS to ensure continued placement is warranted based on available, relevant information. DEX1 ¶ 56. Further, individuals who experience travel-related screening difficulties may seek redress through DHS TRIP and, if the individual is a match to the TSDS, the TSC Redress Unit and the nominator will consider the individual's inquiry and other available, relevant information to determine whether continued placement is warranted. *Id.* On balance, the harm to counterterrorism efforts caused by alerting individuals as to whether they are on a terrorist watchlist far outweighs the benefits of additional process for people who are merely subject to travel delays. *See Elhady*, 993 F.3d at 229; *Rahman v. Chertoff*, 530 F.3d 622, 627 (7th Cir. 2008) ("Any change that reduces the number of false positives on a terrorist watch list may well increase the number of false negatives.").

Fourth, the process that Plaintiffs demand—notice of the reasons and bases for placement on the TSDS—would impair the government's interest in preventing acts of terrorism through the maintenance of an effective watchlisting system. In light of the Government's paramount interest in preventing terrorist attacks, due process does not require the Government to disclose a traveler's TSDS status every time that traveler experiences enhanced screening, or even after multiple screenings. Unlike the No Fly List, where denial of boarding tends to strongly suggest No Fly List status, TSDS status cannot be deduced based on experiences at airports or the border. DEX1 ¶ 90. Travelers may be required to undergo additional screening or inspection for a wide variety of reasons having nothing to do with the TSDS. DEX5 ¶ 10; DEX4 ¶¶ 37-38, 41. And TSA applies the same screening procedures to individuals that are designated for enhanced screening, regardless of whether the individual is designated due to watchlist status, randomly, or for other reasons. DEX5 ¶ 12.

Compelled disclosure of a traveler's TSDS status—beyond those circumstances contemplated by the DHS TRIP procedures—would have a devastating effect on the usefulness of the TSDS and imperil the effectiveness of critical law enforcement tools used to protect national security. DEX2 ¶ 22. For example, disclosure of TSDS status would tend to reveal the Government's investigative interest (or lack thereof) in that individual, as well as the investigative procedures and techniques of investigating agencies associated with that individual's status. DEX1 ¶¶ 87-88; DEX2 ¶¶ 23-34. It would be of considerable value to terrorist groups to confirm which individuals may not be of investigative or intelligence interest and who are thus more likely to escape scrutiny. DEX1 ¶ 87; DEX2 ¶ 26. Signaling the FBI's investigative interest in a particular person can be especially damaging where FBI subjects or former subjects have associates whom the FBI may still be investigating for potential ties to terrorist activity because those associates might also take steps to avoid detection or destroy evidence. DEX2 ¶ 25. Terrorists would also know whether they are required to undergo additional screening at airports, and use that information to attempt to evade enhanced security screening and other security measures to gain access to the commercial aviation system to perpetrate an attack. DEX5 ¶ 76. Similarly, advance knowledge of the process to be employed in connection with a specific border inspection – including the likelihood that a specific individual will undergo additional

scrutiny or the reason the additional scrutiny is applied – would enable those seeking to harm U.S. interests to take evasive measures. DEX4 ¶ 57.

Particularly in light of Plaintiffs' limited interest, due process does not require that the Government provide notice of the reasons and bases for placement on the TSDS. Inclusion in the TSDS is sometimes based on sensitive law enforcement information, including information that pertains to law enforcement techniques and procedures, information that would undermine the confidentiality of sources, information that would endanger witness and law enforcement personnel, information that would undermine the privacy of individuals involved in the investigation, or information that would seriously impair the ability of a law enforcement agency to conduct future investigations. DEX2 ¶ 23-34. Revealing information about why a person was included in the TSDS would therefore reasonably be expected to risk circumvention of the law and cause harm to national security by providing potential terrorists with operationally valuable information about the nature of the government's interest in them, as well as exposing Government sources and methods used to obtain the relevant derogatory information. DEX1 ¶ 87-88; DEX2 ¶¶ 26-27. *See Bassiouni v. CIA,* 392 F.3d 244, 246 (7th Cir. 2004) (disclosing confidential information could demonstrate "how the CIA is deploying its resources and what subjects it is investigating," which "could be useful to both nations and terrorists."); *Snepp v. United States,* 444 U.S. 507, 509 n.3 (1980) (per curiam) ("The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service."). As the FBI attests, requiring Defendants to disclose the reasons and bases for placement on the TSDS would force nominating agencies such as the FBI to choose between, on the one hand, disclosing information that could reasonably be expected to compromise an investigation, expose a source, or reveal sensitive surveillance techniques, and, on the other, withholding information that could be used to identify and prevent a terrorist attack. DEX2 ¶ 35.

Finally, any additional procedural requirements would pose an enormous administrative and fiscal burden on the affected agencies. *See Mathews*, 424 U.S. at 335. For example, expanding the revised redress procedures available to U.S. persons who are denied boarding to U.S. persons who simply

71

experience enhanced screening would pose an extraordinary burden on the involved agencies, which the impacted private interests do not warrant. As explained *supra*, travelers are required to undergo additional screening or inspection for a wide variety of reasons having nothing to do with the TSDS. And if the revised redress process for U.S. persons on the No Fly List were applied to U.S. persons who receive enhanced screening, DHS TRIP estimates that its workload for revised redress cases would increase by more than 1,100%. DEX6 ¶ 22. This would lead to an impact on DHS TRIP's ability to provide a fair and timely redress process for all applicants, including the 98 percent of applicants who are cleared of any connection to the TSDS. *Id.* Additional challenges are posed by the fact that status in certain TSDS subsets constitutes SSI. DEX5 ¶ 74. None of these administrative and fiscal burdens are warranted by the limited travel delays alleged by plaintiffs.

## E. The Procedures Available for the No Fly List Are Constitutionally Adequate.

The revised redress process for U.S. persons on the No Fly List fully comports with any due process requirements. Applying the *Mathews* framework, both the D.C. Circuit and the Ninth Circuit have upheld the revised redress process for U.S. persons on the No Fly List. *See Busic v. TSA*, 62 F.4th 547, 549-0 (D.C. Cir. 2023); *Kashem*, 941 F.3d at 377-90. The Ninth Circuit in *Kashem* found that the interest in international travel "is subordinate to national security and foreign policy considerations" and is "subject to reasonable government regulation." *Id.* The Court acknowledged that national security "is a compelling government interest and combatting terrorism is an urgent objective of the highest order," and that "keeping sensitive information confidential in order to protect national security is a compelling government interest." *Id.* at 378–79 (citation omitted). Moreover, the Court explained that the government had "presented persuasive evidence describing the potential harms posed by disclosure of privileged information regarding an individual's inclusion on the No Fly List." *Id.* Based on a thorough analysis of the redress process, the Court held that the revised DHS TRIP process available to U.S. persons on the No Fly List was constitutionally adequate as applied to those individuals and rejected various arguments that they had inadequate notice or were entitled to classified information. *See id.* at 378-90 (granting summary judgment to official capacity defendants at DOJ, FBI,

and TSC, and dismissing substantive due process claims against those defendants because the claims would need to be brought against TSA in the Court of Appeals under 49 U.S.C. § 46110).

The No Fly List Plaintiffs may claim that they were subject to an elevated burden on their liberty interests in light of the increased difficulty in travelling overseas without access to U.S. airspace. But the Government also has a heightened interest in keeping off commercial aircraft suspected terrorists about whom they have more specific derogatory information. Further, the revised redress procedures available to U.S. persons on the No Fly List and denied boarding offers more robust process than that available to people who believe they are just on a TSDS, including confirmation of status on the No Fly List, notice of the unclassified and nonprivileged reasons for continued placement, and an opportunity to respond. DEX6 ¶¶ 12-17. When TSC has recommended someone for retention on the No Fly List through this process, it forwards this recommendation to TSA and the TSA Administrator makes the ultimate determination as to continued placement or removal. *Id.* ¶ 14. When TSA issues a final order, it states the basis for the decision to the extent possible without damaging national security or law enforcement interests. *Id.* ¶ 16. The Government has maintained the resulting TSA order and the procedures themselves are subject to review only in the Court of Appeals. Recognizing this Court has ruled otherwise in part, MTD Op. at 21-22, this memorandum addresses the merits of the claim that the Defendants must provide additional process.

Relying on Plaintiffs' allegations, the Court previously found that Plaintiffs had alleged a claim because they had sought redress and received no information, and also that TSA was not processing redress inquiries. *Id.* at 37. The factual record does not support those allegations. TSA has continuously been processing redress inquiries. DEX6 ¶¶ 24-43; *see also* Declaration of Tania Vasquez, TSA (DEX15) ¶¶ 7-10. Moreover, Plaintiffs have all received more information. Bosnic received confirmation that he had been removed from the No Fly List before filing this lawsuit. *See* DEX6 ¶ 28; DEX1 ¶ 103. Sehwail and Mohallim, when their redress inquiries were finally completed some years after being denied boarding, received confirmation that the government knew of no reason why they should be unable to fly. DEX6 ¶¶ 35, 40; DEX1 ¶ 103. Only Doe did not qualify for further

information, based on his redress inquiry, but he was eventually informed that he is not on the No Fly List. DEX1 ¶ 103.

Plaintiffs did not receive any underlying derogatory information because they all instead received confirmation that they can in fact fly. This comports with due process. Even if their claims are not moot, *see supra* Section II.B, they have not shown (and cannot show) that they were entitled to additional process beyond the confirmation they received.[16] Plaintiffs would have to show that, in a generality of cases, the past denial of boarding somehow justifies now revealing law enforcement sensitive and classified information about their alleged past placement, when the Government no longer maintains that placement is appropriate. This defies all reason and all evidence before the Court. Their ongoing deprivation, if any, is extremely limited, as shown by these Plaintiffs' own behavior: Bosnic is not at all deterred from travel, DEX52 at 92, 229, Doe travels by air around 8 times per year, DEX56 at 272, and Mohallim recommended air travel shortly after receiving confirmation he could fly, DEX67 at 151.[17] The deprivation, even if real and not moot, does not prevent travel and does not justify the serious harm to national security and law enforcement interests that are described in Section III.D from disclosure of derogatory information. More, revealing such information does virtually nothing to reduce the risk of "false positive" determination, because a negative determination has already been made with respect to Plaintiffs: TSC determined that they do not belong on the No Fly List. The process these Plaintiffs have received (confirmation that they can now fly) is thus adequate.

---

[16] The SAC does not allege that they were entitled to notice of alleged No Fly List placement prior to denial of boarding; nor would such an allegation be plausible. *See, e.g.*, *Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *8 (E.D. Va. July 16, 2015) (in the context of the No Fly List, "[g]iven the effects pre-deprivation notice would have on the government's compelling interests, the Court concludes that a balancing of the respective interests does not weigh in favor of pre-deprivation notice."); *Elhady v. Kable*, 391 F. Supp. 3d 562, 583 (E.D. Va. 2019) (same in the TSDS context), *rev'd and remanded*, 993 F.3d 208. To alert a potential terrorism suspect that the Government is considering placing him or her on the No Fly List provides valuable operational intelligence to adversaries.

[17] Sehwail's redress inquiry was incomplete until after discovery closed, but he has received confirmation that is no reason he cannot fly. *See supra* at 37; DEX6 ¶ 40.

*** 

The *ex parte, in camera* classified administrative record (and accompanying declarations) establish that these watchlisting nomination and review procedures (*see supra* at 5-11) were followed with respect to any of the Plaintiffs who were on the TSDS or any of its subset lists. All nomination and placement determinations met the applicable standards and were subject to appropriate review, including redress, in which TSC exercised independent judgment to determine whether the applicable standards were met. This material also shows that neither status nor underlying derogatory information can be disclosed without harming national security and law enforcement interests.

## IV.     The Court Should Grant Summary Judgment on Count II Because the No Fly List Plaintiffs Have Not Been Deprived of a Fundamental Right in Violation of Substantive Due Process.

Four remaining Plaintiffs (Bosnic, Doe, Mohallim, Sehwail) assert substantive due process claims in Count II because they claim to have been denied boarding on flights in U.S. airspace in the past, although all are able to fly now, and most have been doing so for years. These Plaintiffs must show that the Government's purported action in temporarily refusing to let them fly on commercial aircraft, both burdens a fundamental right and cannot withstand strict scrutiny. *See generally* MTD Op. at 39 (setting for relevant standards). Plaintiffs have not established deprivation of a fundamental right in light of recent case law, and in any event, No Fly List placement satisfies any applicable level of scrutiny. Congress determined that the risk of future attacks necessitated that individuals who pose a threat to aviation and national security be prevented from boarding flights on U.S. carriers and over U.S. airspace. Congress therefore delegated to the Executive Branch the task of developing the standards and criteria appropriate to carry out this mandate. In response, the Executive Branch developed carefully calibrated standards and criteria for identifying individuals who pose a sufficient threat of terrorism to warrant denial of boarding, and has diligently updated and recalibrated those standards as needed. As terrorist networks become more connected, sophisticated, and lethal, it is imperative that the Government use every tool at its disposal to counter the threat. While the Government is regularly updating aviation security measures in an attempt to keep up with the threat, these measures have limitations, and terrorist groups are continually looking for new ways to

circumvent them. The political branches have thus determined that the No Fly List remains an indispensable part of the U.S. Government's strategy to prevent terrorist attacks, and no reasonable interpretation of substantive due process requires the Court to override that determination.[18]

### D. The No Fly List Plaintiffs Have Not Been Deprived of a Fundamental Right.

Substantive due process prohibits certain government actions "regardless of the fairness of the procedures used." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992); *Talley v. Folwell*, 133 F.4th 289, 302 (4th Cir. 2025) ("a substantive due process claim requires government action that is so illegitimate that no process could cure it."). But these extraordinary protections extend to a narrower set of rights and liberties than those protected by procedural due process. *D.B. v. Cardall*, 826 F.3d 721, 740 (4th Cir. 2016). In *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), the Supreme Court explained that the Due Process Clause of the Fourteenth Amendment includes only "two categories of substantive rights[:]" (1) "rights guaranteed by the first eight Amendments" and (2) "a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Id.* at 237. Under either category, a right must be "deeply rooted in [our] history and tradition" and must be "essential to our Nation's 'scheme of ordered liberty.'" *Id.*; *see also Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). Ultimately, substantive due process "covers only state action which is so arbitrary

---

[18] To the extent Plaintiffs are still making a claim that the No Fly List is *facially* invalid, that claim fails as a matter of law. *See* SAC ¶ 1588 (claim is "also facial"). A plaintiff can succeed on a facial challenge only by "establish[ing] that no set of circumstances exists under which the Act would be valid," *i.e.*, that the "law is unconstitutional in all of its applications." *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015) (quoting *U.S. v. Salerno*, 481 U.S. 739, 745 (1987)). This showing is implausible if for no other reason than that most applications of the No Fly List involve aliens who either are not present in, or lack sufficient ties to, the United States and thus cannot claim a constitutional right to international travel. *See* DEX7 ¶ 10 (only a "very small percentage" of Ny Fly List are US persons; *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990). Nor can Plaintiffs seriously maintain that there are no circumstances in which it would be proper to place someone on a No Fly List. For an individual to be included on the No Fly List, the individual must be in the TSDS, and the Government must have reasonable suspicion that the individual poses a threat of carrying out certain specified terrorist acts. DEX1 ¶ 21; DEX7 ¶ 6. Even if a particular plaintiff may contend that there is insufficient evidence for him or her to have been so designated, this does not render the list invalid where, under the applicable criteria, the evidence in a given case would amply justify barring an individual who is reasonably suspected to pose a terrorist threat from boarding an aircraft. The mere fact that these are individualized determinations should itself foreclose facial invalidation of the use of this important tool for protecting national security.

and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." *Talley,* 133 F.4th at 302.

This Court previously found that the No Fly List burdens a plaintiff's "fundamental right to interstate travel" in light of the potential burden imposed by alternative means of transportation. MTD Op. at 40. Although the Fourth Circuit did not rule on a substantive due process claim in *Elhady* and was not considering the No Fly List, the court's analysis makes clear that interstate *air* travel is not the sort of fundamental right that is always protected from infringement regardless of the procedures available. The Fourth Circuit explained that, "[a]lthough our law may guarantee the citizen's right to travel, it is less attentive to how he gets there." *Elhady,* 993 F.3d at 222. The Court collected a long list of historical impediments to and burdens on travel, including air travel, and reasoned that Plaintiffs continued to be able to travel even if they were deterred from air travel. *Id.* at 219-23. Because air travel is subject to reasonable regulation and may be limited or burdened, it is necessarily not a fundamental right protected by substantive due process. This is not the situation where no pre- or post-deprivation remedies could rectify the alleged violation. *See Talley,* 133 F.4th at 302.

Indeed, multiple other courts have found that there is no fundamental right to air travel. In *Busic,* the D.C. Circuit rejected a due process challenge to the No Fly List reasoning that the plaintiff does not possess a fundamental right to travel by airplane, and that her liberty interest is invariably subordinate to national security and foreign policy considerations. *See* 62 F.4th at 550 (rejecting due process challenge to NFL). Similarly, in *Kashem,* the Ninth Circuit reasoned that, even though the No Fly List reasonably could impair *international* travel, the interest in international travel "is subordinate to national security and foreign policy considerations" and is "subject to reasonable government regulation," and specifically acknowledged that it could yield to the Government's compelling interest in national security and combatting terrorism. *Kashem,* 941 F.3d at 378–79 (citation omitted); *Abu Irshaid v. Garland,* No. 1:24-CV-01405-MSN-WPB, 2025 WL 756544, at *14 (E.D. Va. Mar. 10, 2025) (dismissing substantive due process claim of No Fly List Plaintiff); *see also Gilmore v. Gonzales,* 435 F.3d

1125, 1137 (9th Cir. 2006). *See also Haig v. Agee*, 453 U.S. 280, 306–07 (1981); *Califano v. Aznavorian*, 439 U.S. 170, 177 (1978).

The *Elhady* analysis should be the end of the inquiry and this claim. But the undisputed facts support Defendants' position too: any burden on interstate travel is minimal to nonexistent, and not the kind of burden that supports a substantive due process claim. For example, Bosnic was only denied boarding on one international trip in 2017, the United States facilitated his return travel, and he was told a few months thereafter that he could fly. *See supra* at 30. He generally does not fly domestically because he does not need to do so, unrelated to any watchlist issues, DEX52 at 70; Bosnic has never decided not to take a trip because he thought he was on a watchlist, *id.* at 229. John Doe claims he was denied boarding a few times around 2017-2018, *see supra* at 31, but during that time he also travelled by train and car, including long distances, DEX56 at 68-70, and by his own admission, has been able to fly since at least 2018, *see supra* at 31. Mohallim was denied boarding on one international trip in 2018, the United States facilitated his return travel, and when he sought redress a few years later, he was informed he could fly, and has travelled repeatedly without incident. *See supra* at 34-35. During the time he believed he could not fly, he took multiple roadtrips, and all of his domestic travel has been without incident. DEX67 at 148-51. Finally, Sehwail was denied boarding on two flights on one international trip in 2018, after which the United States facilitated his return travel, and on several domestic trips in 2019-2020. *See supra* at 37. While he never completed a DHS TRIP inquiry, TSA obtained the necessary information and informed him that the government knew of no reason that he should be unable to fly. *See id.* He traveled often by car while he believed he was unable to fly, DEX78 at 31, 33-34, 64, 174-77, which was not a substantial change for him: he had travelled by air only twice in his life prior to being denied boarding, *id.* at 29 (2 trips, 8 years apart). Even if we assume that some of these Plaintiffs travelled less than they otherwise would have during this time, this temporary lack of access to the most convenient form of travel does not rise to the level of constitutional concern, especially for domestic travel, given their demonstrated ability to travel by other means.

**E. The No Fly List Satisfies Strict Scrutiny.**

Moreover, even if a fundamental right was impaired, placement on the No Fly List would survive any applicable level of scrutiny because it is narrowly tailored to further a compelling government interest, and no less restrictive alternatives would suffice. *See, e.g.*, *Busic*, 62 F.4th at 550 (D.C. Cir. 2023) (rejecting due process challenge to NFL). It is beyond dispute that protecting national security from terrorist threats to civil aviation is a government interest of the highest order. *See supra* at 1-2, 69, 72-73; MTD Op. at 40; *see also Haig*, 453 U.S. at 307; *Humanitarian Law Project*, 561 U.S. at 28; *Elhady*, 993 F.4th at 228; *Busic*, 62 F.4th at 550. Moreover, the Executive Branch's "evaluation of the facts [in national security contexts] is entitled to deference," and "[c]ourts lack the expertise and competence to second-guess decisions made about national security needs." *Elhady*, 993 F.4th at 228 (citing *Humanitarian Law Project*, 561 U.S. at 33). The record shows that "Terrorists remain intent on attacking civil aviation, and the threat environment remains complex, diverse, and persistent." DEX5 ¶ 4. Aviation is a principal target for these groups around the world; they adapt to counter and evade airport security measures, and provide instructions for sole actors to carry out attacks as well. *Id.* ¶¶ 16-30 (also collecting multiple examples of attacks).

Additionally, the record shows that placement on the No Fly List is narrowly tailored to further the compelling interest in preventing terrorist attacks. The No Fly List is carefully calibrated to identify specific terrorist threats and prevent attacks; to place an individual on the No Fly List, the nominating agency must conclude that derogatory information supports a "reasonable suspicion" that an individual in the TSDS poses a threat of committing a violent or life-endangering act of terrorism with respect to civil aviation, the homeland, or the United States' interests located abroad, or that the person is operationally capable of engaging in or conducting a violent act of terrorism. DEX1 ¶ 21; DEX7 ¶ 6. These criteria are the product of years of inter-agency review, and have been carefully calibrated to cover a range of dynamic threats to civil aviation and national security domestically and internationally. DEX1 ¶ 21. The vast majority of people on the TSDS are not on the No Fly List and are able to travel on commercial aircraft, subject only to additional security screening, *compare* DEX1 ¶ 28 *with* DEX7 ¶ 10, and that screening is likely to add less than an hour to their total travel time,

DEX5 ¶ 48. Individuals are only placed on the No Fly List when there is additional evidence of these specific types of terrorist threats, and they are removed if and when the evidence no longer supports their placement. DEX1 ¶¶ 21, 74. These are the individuals that U.S. law enforcement and intelligence agencies believe are both most willing and most capable of carrying out terrorist attacks. DEX7 ¶ 9. The intelligence-driven determinations about who poses the most significant threat are based on considerable expertise and experience. DEX2 ¶¶ 15-16. Given proper deference to the Executive Branch in evaluating these types of threats, *Elhady*, 993 F.4th at 228, the evidence is more than sufficient to find that the No Fly List is narrowly tailored to serve a compelling Government interest.

Moreover, national security officials have provided testimony reasonably explaining why other measures will not suffice and it is necessary to deny boarding to individuals meeting the No Fly List criteria. To survive strict scrutiny, the Government need not exhaust "every conceivable" alternative to the No Fly List, but, instead, must show only that no "workable . . . alternatives" would achieve the Government's goals of protecting civil aviation and national security. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013) (citation omitted). Defendants have done so. The multiple layers of aviation security used by the TSA (including checkpoint screening, insider threat screening, and in flight measures) cannot adequately protect against all threats, especially given adversaries' commitment to finding and exploiting vulnerabilities in those measures, and the reality of resource constraints. DEX7 ¶¶ 21, 31, 52, 53, 56. "[N]o screening technology or countermeasure, even in combination, provides certainty that a threat will be detected" and screening is "not an equal substitute for[] denying boarding to individuals who meet the heightened threat criteria for inclusion on the No Fly List." *Id.* ¶ 21. The No Fly List "allows TSA to counter the threat posed by terrorists who would conspire with insider airport employees to introduce a prohibited item beyond the security screening checkpoint," "prevents terrorists who would attempt to avoid the most effective checkpoint security technologies by targeting security screening checkpoints that do not have all security countermeasures" and "enables TSA to mitigate in-flight security threats and security screening limitations at Last Point of Departure airports." *Id.* ¶ 57. It is a "critical defense" against terrorist threats that could result in catastrophic loss

of life. *Id.* The No Fly List provides a carefully circumscribed, yet effective and reliable, tool to combat the continuing terrorist threat.[19]

Plaintiffs' opinion that the list must be over and under-inclusive is entitled to no weight in these circumstances, and is generally baseless. Plaintiffs opine, for example, that the watchlist must be ineffective because, as far as they know, very few of the people who have committed terrorist attacks in the United States were previously on the watchlist. *See* SAC ¶¶ 177-90. But that analysis does not suggest ineffectiveness of the No Fly List, even if Plaintiffs' had complete knowledge of who was on the watchlist. The purpose of the watchlist is not to serve as a crystal ball; the watchlist identifies suspected terrorists so that all of the other tools of law enforcement and intelligence agencies may be brought to bear in order *to prevent* terrorist attacks. *See, e.g.*, DEX2 ¶ 11; DEX5 ¶¶ 32-33. Plaintiffs fundamentally misunderstand the task Congress assigned to the Executive Branch: to identify individuals who pose too great a threat to aviation or national security to board an aircraft so that such attacks can be prevented. In other words, if the No Fly List worked perfectly and with 100% accuracy (a goal not required even by strict scrutiny), no one on the No Fly List would be able to carry out these types of attacks. The task imposed by statute is to identify persons, through a combination of intelligence gathering and analysis, who may pose threats and to deny them access to civilian aircraft and the means to carry out mass-casualty attacks. *See* 49 U.S.C. § 114(h)(3). An assessment that someone may pose a threat of committing an act of terrorism emerges from specific intelligence about that individual and his or her circumstances that point to known or possible terrorist activity. To this end, the Government, applying its expertise in intelligence and threat analysis, identifies individuals who satisfy one or more of the criteria for inclusion on the No Fly List. *See* DEX2 ¶¶ 17-18.

---

[19] The only court to rule that strict scrutiny was required in these circumstances found that the No Fly List satisfied strict scrutiny. *See Mohamed v. Holder*, 266 F. Supp. 3d 868, 880 (E.D. Va. 2017). In evaluating similar arguments by these same counsel, the court found that "the Government has provided cogent reasons as to why each of the alternatives to the List that Plaintiff has suggested would be inadequate" and that the DHS TRIP provided a meaningful process for U.S. persons on the No Fly List to remedy any errors. *Id.* at 882-83. The court therefore concluded "that the List is necessary and sufficiently narrowly tailored to achieve a compelling government interest and therefore does not violate Plaintiff's substantive due process rights." *Id.*

Finally, while the Court can reject Plaintiffs' substantive due process claim without considering classified information, the *ex parte* administrative record further supports the Government's claims here and shows that Plaintiffs' treatment satisfies the applicable watchlisting standards and any applicable scrutiny. In each and every instance where a Plaintiff was placed on the No Fly List, the nominating agency and TSC determined that he satisfied one or more of the No Fly List criteria on the basis of articulable intelligence and reasonable inferences. Any No Fly List placements were also subject to rigorous review, re-review and modification, and all of the Plaintiffs are currently able to fly. The Court should enter judgment for the Government on these claims.

## V. The Court Should Grant Summary Judgment for Defendants on Plaintiffs' Equal Protection Claim (Count V).

Defendants are entitled to summary judgment on the Equal Protection claims for those Plaintiffs claiming to be on the TSDS because they have not established that they are treated differently than those similarly situated as a result of purposeful discrimination. The Fourteenth Amendment prohibits "den[ying] any person . . . the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

An equal protection claim has two elements. First, the "plaintiff must . . . demonstrate that he has been treated differently from others with whom he is similarly situated." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). In cases like this that concern a "facially neutral law or policy," MTD Op. at 43, "the plaintiff has the burden of proving that" a distinction between different groups "was actually utilized," *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 820 (4th Cir. 1995).

Second, the plaintiff must show "that the unequal treatment was the result of intentional or purposeful discrimination." *Veney*, 293 F.3d at 730 (4th Cir. 2002). So "even when an administrative action disparately impacts members of a particular . . . group, it will not be found to violate the Equal Protection Clause unless the plaintiff demonstrates that the action was motivated, at least in part, by an 'invidiously discriminatory' intent." *Sylvia Dev. Corp.*, 48 F.3d at 819. Importantly, discriminatory intent "implies more than intent as volition or intent as awareness of consequences." *Id.* at 819 n.2 (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). Discriminatory intent

requires "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

And in the context of discriminatory prosecution, the Supreme Court has recognized that Equal Protection claims may "ask[] a court to exercise judicial power over a 'special province' of the Executive"—specifically, the "constitutional responsibility to 'take Care that the Laws be faithfully executed'"—and thereby risk "impair[ing] the performance of a core executive constitutional function." *U.S. v. Armstrong,* 517 U.S. 456, 464-65 (1996). No executive function is more important than protecting national security. *See Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017). Moreover, a "presumption of regularity supports" the acts of public officers in carrying out their enforcement duties, and "in the absence of clear evidence to the contrary, courts presume that they have properly discharged" those duties. *Armstrong*, 517 U.S. at 464 (citation omitted).

Discovery does not support Plaintiffs' allegations that Defendants improperly consider national origin and religious factors in implementing the terrorist watchlist, *see* SAC ¶¶ 1610-11, or that "[t]he disparate treatment between Muslims and non-Muslims is the result of Defendants' intentional and purposeful discrimination." *Id.* ¶ 1612. As an initial matter, Plaintiffs are likely to submit, in support of their equal protection claim, an expert analysis of purportedly leaked government materials. The Court should not consider that analysis.

Turning to the material the Court *should* consider, discovery has made three conclusions clear. *First*, Defendants have no discriminatory intent and the watchlist program has no discriminatory impact. *Second*, Plaintiffs' allegations of discriminatory impact and intent have no basis in fact. And *third*, the watchlist effectively supports the compelling government interest in national security. The Court should thus grant Defendants' motion for summary judgment on this claim.

## F. The Court Should Exclude the Expert Report of Dr. Huber Under *Daubert*.

The expert report of Dr. William Huber purports to analyze allegedly stolen information derived from the TSDS in order to advance Plaintiffs' equal protection claims. Defendants move to exclude Dr. Huber as an expert witness.

Because "expert witnesses have the potential to be both powerful and quite misleading," the

Court must "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). For an expert opinion to be admissible, the opinion must be (1) helpful to the "trier of fact"; (2) "based on sufficient facts or data"; and (3) the product of "reliable principles and methods" that (4) have been "reliably applied . . . to the facts of the case." Fed. R. Evid. 702. The "proponent" of an expert witness must "demonstrate[] to the court" that the expert opinion meets these standards by a preponderance of evidence. *Id.*; *see Cooper*, 259 F.3d at 199. "[T]he objective of *Daubert*'s gatekeeping requirement is to 'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Cooper*, 259 F.3d at 201 (quoting *Kumho Tire Co. Ltd., v. Carmichael*, 526 U.S. 137, 152 (1999)). "[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

Dr. Huber's opinions should be excluded for three independent reasons under *Daubert*. *First*, Dr. Huber's opinions do not rely on sufficient data, both because he admits the data on which he relied was incomplete and because Plaintiffs cannot authenticate that data as relating to the TSDS. *Second*, Dr. Huber's opinions about the religious composition of the allegedly leaked TSDS are unreliable, both because they rest on a novel methodology—deriving supposed religious affiliation merely from an individual's name—that has not been adequately tested and because Dr. Huber implemented his methodology in an unreliable way by using haphazard and inconsistent methods; unflinchingly accepting the inherently biased conclusions of Plaintiffs' counsel; and failing to adequately control for admitted potential biases in his work. And *third*, Dr. Huber's conclusions are irrelevant and unhelpful to the trier of fact.

### 1. Dr. Huber's Opinions and Methodology

Dr. Huber has presented his opinions in this case twice: first, in a 2023 declaration attached to one of Plaintiffs' motions to compel (DEX110); and second, in 2024 in Dr. Huber's expert report in this case (DEX111). Because Dr. Huber's 2024 report contained his complete and updated set of

opinions, this exclusion motion focuses on the 2024 report, but the arguments below hold true as to Dr. Huber's opinions as expressed in the 2023 declaration too.

### a) Dr. Huber's Data

Dr. Huber's opinions were based on two CSV files, titled "nofly.csv" and "selectee.csv" (collectively "the CSV Datafiles").[20] Huber Depo. (DEX114) at 66–67. The CSV Datafiles included data limited to a set of apparent first names, last names, dates of birth, SID numbers (a unique, eight-digit number), and very rarely, a passport number or country code. *Id.* at 73, 79. Dr. Huber opined that the rows (or records) in the CSV Datafiles corresponded to aliases, not individuals. DEX111 ¶ 14. In other words, a single individual was likely represented in the datafiles by multiple rows, and according to Dr. Huber "there was no discernible way to identify with any reliability when two records [i.e. aliases] refer to the same person." DEX114 at 96. For some people, there are "many entries that appear to correspond to one individual," while other people may have just one unique entry. Huber *Id.*; DEX111 ¶ 52. In an extreme example, Dr. Huber found 120 records that he believed corresponded to one individual. DEX114 at 96. Due to this shortcoming in his data, Dr. Huber testified that it was "not possible to determine precisely how many people are represented [in the CSV datafiles] or even to provide a reliable range for that number." *Id.* at 96-97.

### b) Dr. Huber's Opinions and Methods

Dr. Huber offered three principal opinions: 1) "[t]he records in the 'nofly.csv' and 'selectee.csv' tables are aliases of individuals in a version of the TSDB c. 2019;" 2) "[a]t least 98.3% of these aliases identify Muslim people. Consequently, nearly the same proportion of all individuals represented in these lists are Muslims;" and 3) "[a]lthough changes to the TSDB since 2019 could have changed the proportion of Muslims in the TSDB by 2023, that proportion must still exceed 70%." DEX111 ¶¶ 6–8. Dr. Huber corrected his report at his deposition, testifying that references to "Muslim people" and "Muslims" were "shorthand for people whose names were identified as being Muslim." DEX114 at 59. He disclaimed any opinion "that the people associated with these names or aliases are necessarily

---

[20] A CSV (or "Comma Separated Values") file is a text file that stores data separated by commas; it can be viewed and edited in Excel.

practicing Muslims or even culturally Muslims or anything like that." *Id.* at 37. He offered only "an opinion about the proportion of *Muslim-sounding* names in the lists." *Id.* at 159 (emphasis added).

To obtain his first opinion—his "authenticity opinion"—Dr. Huber compared the CSV Datafiles with what Dr. Huber knew about the true TSDS across several features: overall size, distributions of dates of birth, and frequency of certain groupings of names or "tokens." DEX111 ¶¶ 3–6. None of these numbers matched. DEX114 at 105 (size); *id.* at 107 (dates of birth); *id.* at 120 (names). Dr. Huber nevertheless concluded that the numbers were close enough to conclude the CSV Datafiles were "derived from the government watch list as it existed in 2019, but that [they were] likely incomplete." *Id.* at 69. Dr. Huber did not determine what differences would be "close enough" until after he ran the results. Id. at 119–20. He "simply examined the results; and from the perspective of are they close enough, or are they so far apart that they require some alternative explanation." *Id.*

To obtain his second and third opinions—his "religion opinions"—Dr. Huber performed a religion-guessing analysis of the datafiles. Dr. Huber was not qualified to classify the names in the CSV datafiles himself, so he did not personally determine whether the aliases in the files sounded Muslim. *Id.* at 58, 160. Rather, Dr. Huber relied on three CAIR employees to perform that task: "one CAIR attorney litigating cases involving the federal watch list, a CAIR paralegal, and a CAIR legal assistant." *Id.* at 170. CAIR, of course, is the legal organization that represents Plaintiffs in this lawsuit and retains and pays Dr. Huber. *Id.* at 162. And at least one of the reviewers, Justin Sadowsky, noticed his appearance in this case. *See* ECF No. 54.

And rather than have the reviewers review the full CSV datafiles, Dr. Huber put together a sample of 3,000 names for the CAIR reviewers to review and classify as Muslim or non-Muslim. This sample included 2,702 records from the CSV Datafiles, 146 names from a list of known "Muslim names" and 152 from lists of known "non-Muslim names." DEX111 ¶¶ 60–61. The list of "known Muslims" came from a list obtained from the internet titled "Worldwide Muslims Condemn List." *Id.* at ¶ 59 & §6 (Materials Used). The list of known "non-Muslim names" appears to have come from a Wikipedia article titled "List of Catholic bishops in the United States" and from what seems to be a list of then-students at Carleton College in Minnesota. *Id.*; Huber Backup ("Student Religious

Groups.xlsx") (DEX113).

While Dr. Huber provided short instructions to the CAIR employees, the instructions did not tell them how to classify names as Muslim or non-Muslim. DEX111 § 8.4. And Dr. Huber did not actually "know how the CAIR evaluators set about to actually classify each name as Muslim or non-Muslim." DEX114 at 192. He did not know whether they "followed any sort of standardized guidelines when they were making their classifications," nor did he know whether all three reviewers used the same or different methodologies. *Id.* at 193.

Plaintiffs did not affirmatively disclose in discovery any information regarding how the CAIR employees classified the names, nor are any of the CAIR employees listed in Plaintiffs' initial disclosures. Plaintiffs' Initial Disclosures (DEX42) at 2. The available information, from a deposition of Plaintiffs' attorney Justin Sadowsky, revealed that Mr. Sadowsky at least sought to identify "person[s] who consider[] themselves Muslim," Sadowsky Depo. (DEX116) at 35, and used multiple different approaches to do so. Mr. Sadowsky "googled a large number" of the names and let the Google results guide those names' classification. *Id.* at 41. With other names, Mr. Sadowsky classified them based on the names' apparent ethnicity or national origin. *Id.* ("[I]f the name sounded like it was Arabic, Urdu, or Eastern European, I generally would have marked it as Muslim . . . ."). And with still others, Mr. Sadowsky "recognized" the names as belonging to a specific person and classified those names based on his understanding of the religion of that person. *Id.* at 45, 47.

The three CAIR reviewers each marked between 2,518 and 2,658 of the 3,000 total names as Muslim, Huber Backup ("Combined Coding.xlsx") (DEX112), and their "consensus" final marking was 2,672/3,000 Muslim names, *id..* Of the names drawn from the CSV Datafiles, the consensus classification was 2,530/2,702 names as Muslim-sounding, or 93.6%. DEX111 ¶ 20 & Table 6.

Dr. Huber then conducted a statistical analysis to "correct" the raw results to account for what he called the "classification error rates." *Id.* ¶ 65. This produced Dr. Huber's final result: "a 95% chance that at least 98.3% of all records in the combined watch lists identify" Muslim-sounding names. *Id.* ¶ 69. Dr. Huber noted that "[t]he accuracy of these results . . . depends on the accuracy with which the reference lists of known Muslims and known non-Muslims are correct and on the implicit

assumption that the classification error rates for names on these known lists will be the same as the classification error rates for names on the watch lists." *Id.* ¶ 71.

Finally, because the CSV Datafiles purported to be from 2019, Dr. Huber considered the number of additions and deletions from the TSDS since 2019 and determined that these changes "could not reduce the proportion of Muslim names to less than 70% of the total [on the 2023 watchlist], even if all deletions were Muslim and all additions were non-Muslim." *Id.* ¶ 27.

## 2. Plaintiffs Cannot Demonstrate That Dr. Huber Relied on Sufficient Data When Reaching Either His Authenticity Opinion or His Religion Opinions.

An expert's opinion must be based on "sufficient facts and data." Fed. R. Evid. 702. "If [an expert's] database is not an accurate portrayal of what it purports to be . . . then [an expert's] use of this database . . . is methodologically unsound." *Snodgrass v. Ford Motor Co.*, No. 96-cv-1814, 2002 WL 485688, at *10 (D.N.J. Mar. 28, 2002). So it is Plaintiffs' burden to establish that Dr. Huber analyzed what he claims he analyzed: "aliases of individuals in a version of the TSDB c. 2019." DEX111 ¶ 6. Plaintiffs cannot meet that burden here.[21]

### a) Dr. Huber's admission that the CSV Datafiles are "likely incomplete" renders any analysis of them unreliable.

Dr. Huber admitted that the CSV Datafiles are likely incomplete, rendering any results drawn from them—including his authenticity opinions and religion opinions—unreliable.

"Expert statistics are unreliable if they are based on 'incomplete data sets and inadequate statistical techniques.'" *EEOC v. Freeman*, 961 F. Supp. 2d 783, 792 (D. Md. 2013) (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 996 (1988) (plurality)); *see also EEOC v. Freeman*, 778 F.3d 463, 468 (4th Cir. 2015) (concurrence) ("[C]ourts often caution experts against drawing broad conclusions from incomplete data."); *Payne v. Travenol Labs.*, 673 F.2d 798, 823 (5th Cir. 1982) (expert evidence

---

[21] To be clear, Defendants take no affirmative position on the authenticity of the CSV Datafiles. Given the privileges that cover the TSDS and the identities of those on it, *see, e.g.*, ECF Nos. 225, 227, 295 (denying production of current or former watchlist status), Defendants are unable to confirm or deny the authenticity of any purportedly leaked copies of the TSDS and are correspondingly unable to introduce additional evidence regarding any relationship between the TSDS and the CSV Datafiles. But Defendants need not take a position on the CSV Datafiles' authenticity to point out that Plaintiffs have not met their affirmative burden to establish that Dr. Huber's opinion relies on "sufficient facts and data." Fed. R. Evid. 702.

"exclud[ing] one-fourth of all applications for the time it covered" without testimony "that the missing applications were removed randomly" "detract[s] significantly from the value of the . . . showing").

Dr. Huber agrees that "an analysis performed on a subset of the full population data but not knowing how that subset was selected is potentially biased, invalid, and inconclusive." DEX114 at 34, 136–37. Yet that is precisely the analysis that Dr. Huber appears to have performed. During Dr. Huber's analysis of the CSV Datafiles, he "examined the distribution of the SID numbers," which Dr. Huber described as a "unique" field that "identif[es] the records," and found that, in his words, "there are some big gaps in there." *Id.* at 73, 80. Figure 1 in his report makes this point clear in stark terms. *See* DEX111 at 10, Figure 1. Dr. Huber conceded that "somebody might have excised a bunch of -- of records from something based on SID." DEX114 at 80. The bottom line is that the CSV Datafiles "are likely incomplete." *Id.* at 68. Dr. Huber was unable to "quantitatively" estimate an upper limit for records or names that might be missing from the CSV Datafiles, and Dr. Huber provided no reason to believe that he "know[s] how that subset was selected," *id.* at 34, nor did he provide evidence establishing that any "missing [data] were removed randomly," *Payne*, 673 F.2d at 823. Without more information about what is missing, Dr. Huber's opinions are in his own words "potentially biased, invalid, and inconclusive." DEX114 at 34, 136–137; *see also Freeman*, 961 F. Supp. 2d at 792.

**b)  Dr. Huber cannot reliably authenticate the CSV Datafiles himself.**

Even if the CSV Datafiles were complete, Dr. Huber's inability to authenticate them render his opinions invalid. Dr. Huber first attempted to authenticate the CSV Datafiles himself. He cited some public reporting to support his understanding that a 2019 version of the TSDS had been obtained by a European hacker from a server maintained by an air transportation service called CommuteAir. DEX111 ¶ 2; DEX114 at 86. But when Dr. Huber received the CSV Datafiles from CAIR, he "did not investigate the chain of custody" of the datafiles and was not shown any transmittal documents. DEX114 at 92. So his opinion that the CSV Datafiles are, as he claims, "aliases of individuals in a version of the TSDB c. 2019," DEX111 ¶ 6, rested entirely on his own comparison of statistics based on those files to government interrogatory responses about the true watchlist. Dr. Huber compared three different variables: overall size, distribution of dates of birth, and groupings

of specific names (or "tokens"). *Id.* at ¶¶ 15, 19, 21. But for multiple reasons, these comparisons do not establish that the CSV Datafiles were "derived from" a true copy of the 2019 watchlist and do not meet Plaintiffs' burden to establish that Dr. Huber relied on sufficient data.

*First*, Dr. Huber had already concluded that the CSV Datafiles were "authentic" before he actually performed his comparison analysis. In Dr. Huber's 2023 declaration, he testified that the CSV Datafiles "appear to be versions of the . . . [TSA] 'watch lists' from 2019." DEX110 ¶ 1. But he did not begin to statistically analyze whether the CSV Datafiles were "authentic" until "after th[at] report" was filed. DEX114 at 126. So, by the time Dr. Huber began his "authentication" analysis, he was already committed to the CSV Datafiles being real and exactly what he had already concluded they were. As the Ninth Circuit has held, "[c]oming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method." *Claar v. Burlington N. R. Co.*, 29 F.3d 499, 502–03 (9th Cir. 1994). Otherwise put, "a scientist who forms an opinion before beginning his research lacks the objectivity needed to produce reliable scientific results." *Viterbo v. Dow Chem. Co.*, 646 F. Supp. 1420, 1425 (E.D. Tex. 1986); *see also Elliot v. Amadas Indus., Inc.*, 796 F. Supp. 2d 796, 808 (S.D. Miss. 2011) (excluding an expert who "decided that additional warnings were necessary before he even knew what warnings were already on the combine at the time of the accident"). Dr. Huber claimed in his deposition that he did not firmly believe that the CSV Datafiles were from the TSDS until later. DEX114 at 123. But given his 2023 opinion that the datafiles "appear to be versions" of the TSDS, DEX110 ¶ 1, Dr. Huber plainly "form[ed] an opinion before beginning his research," *Viterbo*, 646 F. Supp. at 1425, rendering his subsequent authenticity opinion unreliable.

*Second*, Dr. Huber's comparison analysis is itself unreliable. Expert opinions are inadmissible if they lack "standards controlling the technique's operation." *U.S. v. Crisp*, 324 F.3d 261, 266 (4th Cir. 2003) (quoting *Daubert*, 509 U.S. at 593-94). But Dr. Huber employed no objective standards or statistical tests to determine whether the CSV Datafiles sufficiently resembled the TSDS to allow him to conclude that the datasets were related. He "simply examined the results; and from the perspective of are they close enough, or are they so far apart that they require some alternative explanation." DEX114 at 119. "I know it when I see it" is not a reliable statistical methodology. Expert opinions

cannot be based on "*ad hoc* demonstration[s] without any controlling standards, rather than [on] an objective scientific test that is replicable and verifiable." *Mohney v. USA Hockey, Inc.*, 300 F. Supp. 2d 556, 567 (N.D. Ohio 2004). Dr. Huber's authenticity opinion is thus unreliable.

Further, "[w]hen creating a study, the alpha, or confidence level, should be specified before any intervention or collection of data. It is easy for a researcher to 'see what the data shows' and then pick an alpha to give a statistically significant result. Such approaches compromise the data and results as the researcher is more likely to be lax on confidence level selection to obtain a result that looks statistically significant." Steven Tenny & Ibrahim Abdelgawad, Statistical Significance, StatPearls Publishing (2025). Courts agree: an expert's "failure to clearly predefine" key parts of their methodologies can render that expert's work unreliable. *In re Paraquat Prods. Liab. Litig.*, 730 F. Supp. 3d 793, 839 (S.D. Ill. 2024). Dr. Huber's method violated that principle. Instead of deciding what would be a close enough match between the CSV Datafiles and the TSDS and then checking if the datafiles met that standard, he performed his comparisons and *then* determined that the comparisons were "close enough." An ex-post approach like this is not a reliable expert method.

Worse, Dr. Huber admitted that his assessment of the "close enough" results hinged in part on the specific needs of his client, CAIR: "'[C]lose enough' depends on purpose and context. In this case, I think CAIR's primary concern is . . . what appears to be the overrepresentation of Muslim-sounding names in the TSDB." DEX114 at 131. An expert employing methodologies tailor-made to litigation strategy weighs against that expert's admissibility. *See Wehling v. Sandoz Pharm. Corp.*, 162 F.3d 1158, 1998 WL 546097, at *3 (4th Cir. 1998) (unpublished) (noting that "[a]nother significant fact weighing against admitting the testimony is where, as here, the expert developed his opinions expressly for the purposes of testifying"); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.").

*Third*, and even taking Dr. Huber's comparison analysis on its own terms, his results do not persuasively establish that he relied on sufficient data. Dr. Huber compared the CSV Datafiles to

91

government interrogatory responses about the true TSDS across three different characteristics: overall size, dates of birth, and frequencies of specific names (or "tokens"). DEX111 ¶¶ 15, 19, 21. But the CSV Datafiles and the TSDS did not match on any of these variables.

For size, the "total number of records in the [CSV Datafiles] is 20 percent larger than the reported size of the 2019 TSDB." DEX114 at 105. Despite this dramatic difference, Dr. Huber concluded that this size comparison *supports* his authenticity conclusion. DEX111 ¶ 20. While Dr. Huber speculated the difference was due to the difference between the CSV Datafiles being a list of aliases and the TSDS statistic being a count of individuals, he conceded that he would "need more information" to "demonstrate this possibility that aliases were the issue." DEX114 at 106.

Dr. Huber next compared dates of birth in the CSV Datafiles to government statistics concerning the decade of birth of TSDS listees, but again the lists did not match. *Id.* at 107; DEX111 at Figures 10–11. While Dr. Huber opined that the distributions of birth decades "exhibit similar shapes," and have "approximately the same distribution of ages" (without applying objective standards), he acknowledged that his comparison does not demonstrate that the same individuals are in both lists. *Id.* ¶ 19; DEX114 at 107–08. And of course, any "approximate[]" similarity is weakened by the obvious apples-to-oranges nature of any comparison between the birthdates of *aliases* in the Datafiles and the birthdates of *individuals* in the TSDS.

Last is the name distribution. Of the six name groups that Dr. Huber considered, Dr. Huber testified that some of the groups were "close enough" to be comparable (again, without any objective standards), DEX114 at 119, and he concluded that the name comparison supports his authenticity opinion, DEX111 ¶ 24. But other groups were significantly different between the CSV Datafiles and the TSDS and defied easy explanation. DEX114 at 120. In his deposition, Dr. Huber admitted that this discrepancy, if true, indicated that it could be possible there was "a problem with the CSV data files." *Id.* at 123. No matter his attempts to downplay this discrepancy, the mismatch in name counts between the CSV Datafiles and the TSDS provides evidence against Dr. Huber's authenticity opinions.

Equally problematic is Dr. Huber's suggestion in his report that the discovery responses of Defendants that were inconsistent with the CSV Datafiles were "erroneous." DEX111 ¶ 23. Of

course, those responses have been sworn to and are covered by the presumption of regularity that attaches to government responses of this kind. *See Latif v. Obama*, 666 F.3d 746, 750 (D.C. Cir. 2011). Dr. Huber's unflinching acceptance of Defendants' discovery responses when those responses (in his view) supported his conclusions and his evidence-less insinuations that those responses are "erroneous" when the responses contradict his conclusions provides further evidence that his work is results-driven and unreliable.

To summarize, Dr. Huber compared the CSV Datafiles with the TSDS in three ways and in all ways the datafiles and the TSDS differed. Indeed, Dr. Huber acknowledged that the CSV Datafiles and the TSDS are different "in . . many ways." DEX114 at 126–27. So even setting aside the unreliability of Dr. Huber's comparison analysis, the analysis's results do not meet Plaintiffs' burden to establish that the data Dr. Huber analyzed was sufficient.

### c) Plaintiffs' belated attempts to authenticate the CSV Datafiles are inadmissible and unpersuasive.

Perhaps realizing that Dr. Huber's efforts to affirmatively authenticate the CSV Datafiles were insufficient, on the last day of expert discovery in this case Plaintiffs served on Defendants a declaration purportedly signed by Maia Arson Kottman, a Swiss national currently under federal indictment and evading arrest. Declaration of Maia Arson Kottman (DEX117); *see* Order Issuing Bench Warrant, *U.S. v. Kottmann*, No. 2:21-cr-48 (W.D. Wash. Mar. 18, 2021), ECF No. 5.

But the Kottman Declaration and its attachment cannot be considered at summary judgment because they are inadmissible at trial. *See* Fed. R. Civ. P. 56(c)(2) (parties "may object that the material cited to support or dispute a fact [at summary judgment] cannot be presented in a form that would be admissible in evidence"). The Declaration and attachment are inadmissible under Federal Rule of Civil Procedure 37(c)(1), as Defendants have already argued in more detail. *See* Defs.' Mot. to Strike Later Disc., ECF No. 319. In short: 1) as early as mid-2023, Plaintiffs knew both of Ms. Kottman and that Plaintiffs intended to present evidence pertaining to the CSV datafiles, yet contrary to their discovery obligations they never disclosed Ms. Kottman as a potential witness and inexplicably waited until August 1, 2024—the day discovery closed—to serve the declaration even though the declaration was signed on July 8, 2024; 2) Plaintiffs have provided no substantial justification for this delay; and 3) the

93

delay was highly prejudicial, as Ms. Kottman—a third party located in Switzerland currently under federal indictment—cannot be deposed without extensive preparations including permission from the Swiss government. *See generally id.*

Magistrate Judge Simms earlier denied Defendants' motion to strike this declaration but emphasized that the issue remained open as whether the materials were appropriately considered at summary judgment. *See* Letter Order, ECF No. 333 at 7; *see also* Fed. R. Civ. P. 56(c)(2). And in any event, Judge Simms's ruling was premised on two key errors. First, she mistakenly concluded that Defendants' "switch[ed] their position," ECF No. 333 at 6, but Defendants have always maintained that they cannot confirm or deny the authenticity of any purportedly leaked lists. Defendants do not argue that the CSV Datafiles are definitely inauthentic but that Plaintiffs have not met their affirmative burden to authenticate them. Second, she wrongly found that Defendants had already "cured the surprise," *id.* at 7, created by Plaintiffs' belated disclosure through Dr. White's Report, but Dr. White does not opine on the so-called "chain-of-custody" issues addressed in the Kottman Declaration.

But even if the Kottman Declaration and attachment were not stricken as belated discovery, they should be excluded as inadmissible hearsay. The Declaration is an out-of-court statement offered for its truth. *See* Fed. R. Evid. 801, 802. And because Ms. Kottman is a federal fugitive living in Switzerland, Plaintiffs cannot establish that Ms. Kottman will testify at trial in the United States, where she is subject to arrest. The Declaration is thus inadmissible at summary judgment. *See Ross v. City of Oakland*, No. 14-CV-00800, 2015 WL 4365309, at *8 (N.D. Cal. July 14, 2015) (excluding a declaration at summary judgment where "(1) the declaration itself is hearsay; [and] (2) there is no indication that [the declarant] will be available to testify at trial").

Finally, even if the Kottman Declaration and attachment were admissible, they address only whether Kottman herself modified the CSV Datafiles, not whether what she purportedly obtained (from, she claims, a "test" data file) is actually derived from the TSDS, let alone a complete copy of it. The Declaration thus does little to "authenticate" the CSV Datafiles and does not contradict—let alone rebut—Dr. Huber's concession that the datafiles are "likely incomplete." DEX114 at 68.

### 3. Plaintiffs Cannot Demonstrate that the Methodology Underlying Dr. Huber's Religion Opinions Was Reliable, Either In General or As Applied to the Facts of This Case.

Even if Plaintiffs could meet their burden to establish that Dr. Huber relied on sufficient data, his religion opinions would still be inadmissible. Those opinions are unreliable in multiple ways and should be excluded under *Daubert*.

#### a) Dr. Huber's analysis reflects the sort of novel, unreliable methodology Rule 702 and *Daubert* prohibit.

Dr. Huber's overall project—divining potential religious affiliations from names—is exactly the kind of novel, untested methodology that Rule 702 and *Daubert* were designed to preclude. Defendants know of no federal court that has allowed similar expert evidence into the record, and for good reason: the approach relies on a host of unproven assumptions and belies common sense. Indeed, the only comparable analyses of which defendants are aware were excluded as unreliable. *See EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3d 749 (6th Cir. 2014) (excluding an expert who purported to identify a person's race from their drivers' license photo); *Koehler v. Infosys Techs. Ltd. Inc.*, 628 F. Supp. 3d 835, 878 (E.D. Wis. 2022) (excluding an expert who purported to "determine[e] whether someone is or is not Indian or South Asian based on surname"). Dr. Huber's should be excluded too.

*Daubert* provides "five factors" for assessing the "reliability of expert testimony: (1) whether the particular scientific theory 'can be (and has been) tested'; (2) whether the theory 'has been subjected to peer review and publication'; (3) the 'known or potential rate of error'; (4) the 'existence and maintenance of standards controlling the technique's operation'; and (5) whether the technique has achieved 'general acceptance' in the relevant scientific or expert community." *Crisp*, 324 F.3d at 266 (quoting *Daubert*, 509 U.S. at 593-94). District courts have latitude to determine which factors are "reasonable measures of reliability in a particular case." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021). Dr. Huber's analysis fails every factor.

*First*, "[o]ne especially important factor for guiding a court in its reliability determination is whether a given theory has been tested," *Sardis*, 10 F.4th at 290, but Dr. Huber's methodology has not. His method for classifying names by religion is bespoke, developed for this case and subject to no testing from anyone. Nor could Dr. Huber's method *be* properly tested. Dr. Huber was not able to

determine who the individuals on the list were, "because all [he had] are groups of names and groups of dates of birth." DEX114 at 82. Based on the limited information included in the CSV files, it was "exceedingly difficult to even determine who any individual might be" who was in his files. *Id.* at 83. Dr. Huber therefore could not "attempt to survey any of the people purportedly represented in the CSV data files to ask about their religion." *Id.* at 139.

Dr. Huber tried to "assess[] the accuracy" of the religion-guessing exercise by including in his 3,000-name sample some names for which Dr. Huber "kn[ew]" the religion and assessing the CAIR employees' guesses of those names' religions. DEX111 ¶ 59. But even assuming that internal testing rather than external testing suffices, as explained in more detail below this accuracy analysis is itself unreliable, leaving Dr. Huber's larger method untested in any reliable way.

*Second*, Dr. Huber's methodology of divining religion from names has been subject to no "peer review [or] publication," *Sardis*, 10 F.4th at 281, or indeed any other type of professional verification or imprimatur of validity. Dr. Huber consulted no academic literature or any other outside source to support his methodology. DEX114 at 140, 154.

*Third*, while Dr. Huber couches his results in a 95% confidence interval, that interval reflects only a fraction of the actual sources of error for Dr. Huber's estimates. As Dr. Huber admitted in his deposition, that confidence interval excludes error from "weaknesses" in his methodology that "could introduce possible biases" into his results. *Id.* at 214. Otherwise put, he acknowledged that his method has "systematic errors that [h]e cannot detect or adjust for." *Id.* More, the confidence interval was built using the "known" religion groups. DEX111 ¶ 66 (showing that the "Bayesian analysis" incorporates the classification rates of the "known Muslim" and "known non-Muslim" groups). As Dr. Huber conceded, the confidence intervals assume that his analysis is "representative of Muslim names generally" and "non-Muslim names generally." DEX114 at 215. And for the reasons explained in more detail below, those assumptions are ill-founded. Dr. Huber's "known" religion groups are suspect and any confidence interval built using those groups under those assumptions is unreliable. *See infra*, Section V.A.3.d. The real "potential rate of error" in Dr. Huber's analysis is not captured by his confidence interval and is likely far more significant.

*Fourth*, Dr. Huber set no "standards" whatsoever for the classification of names by religion and indeed does not even "know how the CAIR evaluators set about to actually classify each name as Muslim or non-Muslim." DEX114 at 192. And he did not know whether they "followed any sort of standardized guidelines when they were making their classifications," although he "would guess that they did not." *Id.* at 193. Courts have rejected expert methodologies that "lacked standards to govern the process," *Sanchez v. Bos. Sci. Corp.*, No. 2:12-CV-05762, 2014 WL 4851989, at *22 (S.D.W. Va. Sept. 29, 2014), and Dr. Huber's analysis should be rejected for the same reason. Further, this District has already found that when an expert "did not conduct the testing himself and lacked knowledge of the manner in which the testing was conducted, the Court cannot conclude that the data he relied upon was obtained by reliable principles and methods." *Grande Vista, LLC v. United States*, 680 F. Supp. 3d 550, 562 (D. Md. 2023). Here, Dr. Huber similarly "lacked knowledge of the manner in which" the CAIR employees classified names, and so his data was similarly not "obtained by reliable principles and methods." *Id.*

*Fifth*, Dr. Huber's methodology is not "generally accepted" in any "field of expertise," let alone Dr. Huber's own. *Sardis*, 10 F.4th at 281. Dr. Huber describes himself as a "statistical consultant." DEX114 at 50. Outside of his work on this case, Dr. Huber has never tried to "classify someone by potential religious affiliation from their name" and has never "run a survey" with that goal. DEX114 at 142. He has no expertise related to religious studies, Islamic religion or culture, demographics of the Muslim population worldwide, or any Muslim-majority country. *Id.* at 56–57. Plaintiffs have provided no evidence that Dr. Huber's methodology is accepted in his field of expertise—statistics— or any field of expertise at all.

Taking a step back from *Daubert*'s reliability factors, the critical premise "underpinning" Dr. Huber's opinions is that "it's possible to determine . . . potential Muslim or religious affiliation based on someone's name." *Id.* at 144. But that premise is untested and questionable on its face. Indeed, even Dr. Huber acknowledges the fundamental point that religion can be a choice which is "not something that can be determined just by looking at someone's name." *Id.* at 155. Indeed, Dr. Huber agreed that "it is possible that two people with the same name could have different religions." *Id.* at

194. It must therefore mean very little for a name to be "Muslim-sounding," by Dr. Huber's parlance, if it doesn't take the realities of religious identification into account. Naming conventions are complicated. Dr. Huber knows that factors such as geography and language, but also things like popular culture and simple idiosyncratic choices, help determine names in a population. *Id.* at 155–156. And Dr. Huber acknowledged that the world's roughly two billion Muslims live in different countries and speak different languages and consume different patterns of popular culture. *Id.* at 157. Plaintiffs cannot possibly prove by a preponderance of evidence, as they must, that the CAIR reviewers were able to condense all of those factors into any sort of scientific determination that names sounded Muslim.

Importantly, Dr. Huber accepts all the above difficulties inherent in classifying names by religion. And he admits that he did not "rely on anything other than the use of [his] control groups for [his] determination that it's possible to classify names according to likely religious affiliation." *Id.* at 138, 154. But as described in detail in Section V.A.3.d below, Dr. Huber's analysis of those groups is itself unreliable, and thus does not bolster his overall methodology.

The Court should not defer to Dr. Huber's claim that he has proven, possibly for the first time, that one can reliably determine religious affiliation from names alone. *See Koehler*, 628 F. Supp. 3d at 878 (excluding expert in the absence of "evidence that he was qualified to create a method for determining whether someone is or is not Indian or South Asian based on surname").

**b) Dr. Huber's methodology was applied unreliably because of the total reliance on the impressions of Plaintiffs' legal team.**

Dr. Huber's opinions are further undermined by his total reliance on Plaintiffs' legal team to generate the relevant facts. Using CAIR—who Dr. Huber readily admits were biased actors—reflects an unreliable application of Dr. Huber's already suspect methodology.

Dr. Huber tasked CAIR with determining whether the names in the CSV Datafiles sounded Muslim or not, even though he had "no doubt that prior to [his] survey CAIR believed that the terrorist watch list was disproportionately Muslim." DEX114 at 160, 164; *see also* SAC ¶ 194 (alleging without that watchlist was disproportionately Muslim). Indeed, one of the CAIR name classifiers acknowledged his own bias, conceding that he has believed that the watchlist is "predominantly

Muslim" "since as far as [he's] been aware of the [list's] existence," which long predated his review of the names in the CSV Datafiles. DEX117 at 11. Nor can Dr. Huber point to some compelling reason to trust these reviewers despite their bias. He admitted that the "familiarity with Muslim and Islamic issues that [he] presume[d] the CAIR evaluators had" could be found elsewhere. DEX114 at 179-80.

Likely due to the inherent risk of bias, reliance on a party's own legal team to generate the facts underlying an expert opinion is virtually unheard of. Dr. Huber, a professional witness who has been retained as an expert 30–50 times, had never based his opinions "on data that was generated by the legal organization or law firm that retained [him]." DEX114 at 48, 170. He acknowledged that it was not common in his field. *Id.* at 171. And he agreed that it was "[n]ot best practices for the lawyers for one side or the other to be generating the facts that you rely on as an expert." *Id.* at 176.

Courts agree that relying on lawyers for data renders analysis of that data unreliable. The Fifth Circuit has held that reliance on "the plaintiffs' compilations of data . . . gives rise to a 'common-sense skepticism' regarding the expert's evaluation." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000); *see also Kaseberg v. Conaco, LLC*, No. 15-CV-1637, 2019 WL 1641161, at *5 (S.D. Cal. Apr. 16, 2019) (excluding expert in part because his "opinions were based on evidence furnished by [p]laintiff's counsel"). More generally, using biased evaluators reflects a "[r]esult-driven analysis" that is a "quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018). Dr. Huber's total reliance on the CAIR employees provides an independent basis to exclude his opinions.

### c) Dr. Huber's methodology was applied unreliably because the CAIR employees' classification methods were inconsistent and haphazard.

As noted above, Dr. Huber had no idea what methodology the CAIR employees used to classify the names by religion. But as bad as Dr. Huber's ignorance is, the truth of the CAIR employees' methodology is even worse. Again, a key factor in the Daubert reliability analysis is "standards controlling the technique's operation." *Crisp*, 324 F.3d at 266. For instance, an expert's opinions are unreliable if they "fail[] to consistently apply the scientific methods he articulated" or "inconsistently appl[y] methods and standards to the data," *In re Zoloft (Sertraline Hydrocloride) Prod. Liab. Litig.*, No. 12-md-2342, 2015 WL 7776911, at *16 (E.D. Pa. Dec. 2, 2015); *see also In re Paraquat Prods. Liab. Litig.*, 730

F. Supp. 3d at 839 (rejecting an expert opinion because of its "inconsistent application of quality criteria"). And here, a deposition of one of the CAIR employees, attorney Justin Sadowsky, revealed a haphazard approach to classifying the CSV Datafiles' names.

Mr. Sadowsky classified the 3,000 names using many different approaches. Even though "it is possible that two people with the same name could have different religions," DEX114 at 194, Mr. Sadowsky claims he "recognized" a name and classified the name's religion based on the person he believes he recognized. DEX117 at 45, 47. Other times, and regardless that many factors such as "geography," "language," "popular culture," "societal norms," and the "personalities of individual parents" can all influence names, DEX114 at 155-56, Mr. Sadowsky classified a name based on how his assumptions about the ethnicity or national origin of the name, DEX117 at 41. Still other times, Mr. Sadowsky just "googled" the name and classified the name's religion based on what he found. *Id.* And Mr. Sadowsky applied these divergent approaches differently "in the early" parts of his classification process than he did "in the later" part of the process. *Id.*

Further, Mr. Sadowsky seems not to have followed the little guidance that Dr. Huber did provide. Dr. Huber recommended that the CAIR employees "get together . . . and compare [their] results to produce a consensus classification," DEX114 § 8.4, and Dr. Huber used a "consensus classification" for his actual analysis, *see* DEX112. But Mr. Sadowsky remembers no such meeting with the other two CAIR employees to reconcile their results, DEX117 at 52, leaving it a mystery how the CAIR employees consolidated their individual religious classifications into the "consensus" classification that Dr. Huber actually used.

Evidence from Dr. Huber's backup files corroborate the haphazard nature of the CAIR employees' approach. The three CAIR employees—who each reviewed the same set of 3,000 names—classified the names differently to a statistically significant degree. White Report (DEX115) at 12–13. What is more, the "consensus" classification that Dr. Huber ultimately relied on in his work does not appear to reflect any standard process for reaching a "consensus" between the reviewers, given that for 10 names, all three reviewers agreed that they were non-Muslim but the consensus classification was Muslim, and for 37 names, two out of the three reviewers classified them as non-Muslim but the

consensus was Muslim. *Id.* at 16–17.

These problems are disqualifying. Courts have rejected expert opinions where evaluators classifying individuals by race using their drivers' license photos "had no particular standard in classifying each applicant" and "instead . . . just eyeballed the DMV photos" *Kaplan*, 748 F.3d at 753; where the expert's methodology "lacked standards to govern the process," *Sanchez*, 2014 WL 4851989, at *22; and where a method "essentially comes down to the examiner's subjective judgment." *U.S. v. Romero-Lobato*, 379 F. Supp. 3d 1111, 1121 (D. Nev. 2019). The CAIR employees' approach has every single one of these problems, and thus so does Dr. Huber's overall methodology.

### d) Dr. Huber's flawed accuracy assessment cannot save his opinions—and in fact further impugns them.

In an attempt to salvage his work, Dr. Huber employed a separate method to "assess[] the accuracy with which" the CAIR employees guessed the religion of the names in the CSV Datafiles. DEX110 ¶ 58. In simplified terms, the known Muslim and known non-Muslim names served as "control group[s]", DEX114 at 182, allowing Dr. Huber to compare the employees' performance classifying the names in those control groups with the employees' performance classifying the names in the experimental group, which were the names drawn from the CSV Datafiles, *see* DEX111 ¶¶ 64–68. This assessment was the only step that Dr. Huber took to correct for any "inherent bias" introduced by using Plaintiffs' counsel to collect his data, DEX114 at 179; it formed the basis of the 95% confidence interval that is the only purported "error rate" of Dr. Huber's novel analysis, DEX111 ¶¶ 64–68; and the assessment also is the only "test" of Dr. Huber's novel analysis that could potentially satisfy *Daubert*'s "testing" prong. But the accuracy assessment is itself unreliable and cannot save Dr. Huber's religion opinions from exclusion.

As an initial matter, the use of control groups for "known" Muslim names and "known" non-Muslim names suffers from an intuitive flaw. As Dr. Huber acknowledged, "it is possible that two people with the same name could have different religions." DEX114 at 194. Just because one person is Muslim or Non-Muslim does not mean that all people with that name share the same potential religious identity. But that is exactly what Dr. Huber's methodology assumes. He asserts it is possible to determine that names are "Muslim-sounding" or not based entirely on these "known" religion

control groups, but the control groups are only useful if the control names are "Muslim-sounding" or "non-Muslim-sounding," a fact that Dr. Huber never establishes. It's circular. If the Court finds that Dr. Huber lacks sufficient support for his belief that likely religious affiliation can be gleaned from names alone, Dr. Huber cannot find that support by reference to the control groups. *See Koehler*, 628 F. Supp. 3d at 856–57 (excluding expert who attempted to classify names as South Asian in part by comparing them to names of employees known to be South Asian).

But more fundamentally, the accuracy assessment suffers from a major statistical flaw. Assuming that Dr. Huber is correct that the CSV Datafiles are drawn from the 2019 TSDS, the control groups (the list of "known" Muslim and "known" non-Muslim names) and the experimental group (the CSV Datafiles) are dramatically different. As Dr. Huber acknowledged, a basic principle of statistics is that control groups and experimental groups "should not differ in ways relevant to the analysis because of the risk of confounding factors." DEX114 at 39. If a control group *does* differ from the experimental group, the mismatch creates a "gaping design flaw" that can justify exclusion of the analysis. *In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 276 (S.D.N.Y. 2018); *see also id.* (excluding an expert's opinion that heavily relied on a study which "fail[ed] to limit [the] control group to reproductive age women" but "us[ed] an experimental group that was *de facto* limited to reproductive age women").

Dr. Huber acknowledged—both in his report, DEX111 ¶ 71, and in his deposition, DEX114 at 182, 215—that the reliability of his analysis requires that the "known" religion names be relevantly similar to the names in the CSV Datafiles. But he conceded later in his deposition that this requirement was not met. For example, Dr. Huber knew and acknowledged that "[t]he number of U.S. individuals on the watch list is dwarfed by non-U.S. individuals;" as of 2019, there were 1,502,600 non-U.S. persons and 5600 U.S. persons on the TSDS. DEX114 at 199. However, his "control group of known non-Muslim names was drawn entirely from people who were located in the United States." *Id.* at 200–201. Indeed, when Dr. Huber was asked how he knew that the CAIR employees were "good at picking out non-Muslim names rather than being good at picking out American names," Dr. Huber conceded the question was "well-directed" and that it reflected "a potential weakness of the result." *Id.* at 202.

There was also a mismatch in age. Catholic bishops are "likely older" than the population writ large and college students are "likely younger," but the names in the CSV Datafiles "skew[] toward the middle . . . [p]eople in their 30s and 40s." *Id.* at 205. Dr. Huber agreed that age could have an association with naming, and that this was another weakness in his chosen groups. *Id.* at 205, 206.

At his deposition, Dr. Huber could not avoid this significant flaw in his accuracy assessment. He conceded that his control groups did not meet the "gold standard" and he "acknowledge[d] the resulting imperfections." *Id.* at 208–209. Dr. Huber deserves credit for his honesty, but at bottom his accuracy assessment is simply not reliable. *See In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d at 276.

* * *

The many problems with Dr. Huber's methodology are perhaps best illustrated by the Sixth Circuit's analysis in *EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3d 749 (6th Cir. 2014). In *Kaplan*, the plaintiff sponsored an expert opinion that "purported to identify the race of each person" in a set of drivers' license photos, which they called "race rating." *Id.* at 751. Like Dr. Huber's methods, the process in *Kaplan* "was crafted by [the expert] himself, specifically for purposes of litigation." *Id.* Like Dr. Huber, who had never before tried to "classify someone by potential religious affiliation from their name," DEX114 at 142, the *Kaplan* expert did not have "any particular expertise in constructing methodologies to identify race by visual means." *Id.* Similar to Dr. Huber's employment of the CAIR reviewers here, the *Kaplan* expert "assembled a team of five 'race raters'" of uncertain expertise to review a sample of 1090 drivers' license photos and classify them by race. *Id.* Like at least one of the CAIR employees, the *Kaplan* raters "had no particular standard in classifying each applicant; instead, they just eyeballed the DMV photos." *Id.* at 753. And just as Dr. Huber's sample was taken from a "likely incomplete" dataset, *see supra* Section V.A.2.a, the *Kaplan* expert's sample was not "representative of the applicant pool as a whole"—an "independent ground" for exclusion. *Id.* at 753–54. The Sixth Circuit concluded that "[t]he [plaintiff] brought this case on the basis of a homemade methodology, crafted by a witness with no particular expertise to craft it, administered by persons with no particular expertise to administer it, tested by no one, and accepted only by the witness himself.

103

The district court did not abuse its discretion in excluding [the expert's] testimony." *Id.* at 754. Dr. Huber's opinions should similarly be excluded.

### 4.    Dr. Huber's Religion Opinions Are Not Relevant or Helpful to the Trier of Fact.

Setting aside how Dr. Huber reached his religion opinions, his opinions are separately inadmissible because they are irrelevant and unhelpful to the trier of fact. "[W]hether testimony assist[s] the trier of fact is the touchstone of Rule 702." *U.S. v. Campbell*, 963 F.3d 309, 314 (4th Cir. 2020) (cleaned up). "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility" and must "fit" the facts of the case. *Daubert*, 509 U.S. at 591. Dr. Huber's topline figures are irrelevant and unhelpful for three reasons: 1) the numbers represent aliases, not individuals; 2) the numbers do not refer to actual Muslims but rather "Muslim-sounding" names; and 3) the analysis fails to consider any other explanation besides religion.

*First*, because Dr. Huber can only provide statistical analyses of aliases in the CSV Datafiles and cannot translate the results to actual individuals, his conclusions reveal nothing about the potential religious makeup of the individuals on the watchlist. Recall that Dr. Huber opined that "[a]t least 98.3% of these aliases identify Muslim people. Consequently, nearly the same proportion of all *individuals* represented in these lists are Muslims." DEX111 ¶ 7. But Dr. Huber admitted that he was not able to reach any conclusions about how the number of aliases on the CSV Datafiles related to the number of individuals in those files. Individual by individual, Dr. Huber found "no discernible way to identify with any reliability when two records refer to the same person." DEX114 at 96. And in the aggregate, Dr. Huber conceded that it was "not possible to determine precisely how many people are represented [in the CSV datafiles] *or even to provide a reliable range for that number*," Id. at 96–97 (emphasis added); *see also id.* at 105–106. With no information of how aliases and individuals correspond, Dr. Huber thus provides no support whatsoever for his opinion that "nearly the same proportion" of aliases and individuals in the datafiles are Muslim (or have Muslim-sounding names). DEX114 ¶ 7. His individual-level opinion is thus inadmissible. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

104

That leaves only Dr. Huber's opinion about the proportion of Muslim-sounding aliases in the CSV Datafiles. And again, because Dr. Huber has no way of determining how aliases relate to individuals, Dr. Huber's alias-level opinion is not helpful to a trier of fact who must determine whether, as Plaintiffs allege, they were subject to discrimination *as individuals*.

*Second*, Dr. Huber's conclusions about the prevalence of "Muslim-sounding" names is irrelevant because Plaintiffs cannot show a connection between "Muslim-sounding" names and actual Muslim people. The CSV Datafiles do not indicate religious affiliation. DEX114 at 144. And Dr. Huber acknowledged that "there's no certain connection between a name and someone's religion or religious affiliation." *Id.* He repeatedly testified that he had no opinion "that the people associated with these names or aliases are necessarily practicing Muslims or even culturally Muslims or anything like that." *Id.* at 37; *see also Koehler*, 628 F. Supp. 3d at 890 ("[A] person with a 'Spanish' surname is not necessarily a person of 'Hispanic descent.'"). So, because Dr. Huber disclaimed any opinion about the names in the CSV Datafiles being names of people who are actually Muslim, his conclusions are not relevant to Plaintiffs' claims of "disparate treatment between Muslims and non-Muslims." SAC ¶ 1612.

## G. Watchlist Nominations Are Based on Neutral Criteria and Defendants Have Implemented Robust Safeguards to Keep It That Way.

Discovery has demonstrated that placement on the TSDS or its sub-lists is a careful process with rigorous safeguards, that considers only substantive derogatory information about an individual and not impermissible factors such as religion, race, or other protected characteristics.

*First*, the standards governing watchlist placement are neutral. Nominations must satisfy the reasonable suspicion standard: There must be "reasonable suspicion that the individual is engaged, has been engaged, or intends to engage in conduct constituting, in preparation for, or in aid or in furtherance of terrorism and/or terrorist activities." DEX1 ¶ 19. The reasonable suspicion standard requires "articulable intelligence or information," not "mere guesses or hunches" or the "reporting of suspicious activity alone." *Id.* ¶¶ 19, 34; DEX1A at 3. Further, "[n]ominations to the TSDS must not be based solely on the individual's race, ethnicity, national origin, or religious affiliation." DEX1 ¶ 17.

As this Court has recognized, this standard is "facially neutral," and rather than constituting "evidence of discrimination," "points in the opposite direction." MTD Op. at 43.

In this reasonable suspicion analysis, religion or protected characteristics are not factors supporting placement on the TSDS. In the process of determining whether the reasonable suspicion standard is met, "[a]n individual's race, ethnicity, national origin, or religion is not considered derogatory." DEX1 ¶ 17. Of course, derogatory information "may include certain references to religious matters that are inextricably intertwined with facts related to terrorist activity." *Id.* ¶ 18. But "it is the terrorist activity, not the religious element, that is relevant to the TSC's analysis" for whether an individual meets the reasonable suspicion standard. *Id.* If the derogatory information is that the individual "met with [known terrorist] at his local mosque," the "relevant information for watchlisting would be that the subject met with a known terrorist;" the "fact that the meeting occurred at a mosque is incidental." *Id.*  The conclusion that religion and protected characteristics are not the basis for watchlisting is also consistent with the robust anti-discrimination policies that Defendants maintain. *See, e.g.*, DEX2 ¶¶ 13, 14; DEX3 ¶ 7; DEX4 ¶¶ 73-75, 78.

The *ex parte* materials further support Defendants' position that placement on the TSDS is based on neutral, substantive criteria rather than on religion or any other protected characteristic.

*Second*, Defendants employ a variety of safeguards and quality control measures to ensure that all watchlisted individuals properly meet the substantive standards. Before any individual is added to the TSDS, the nominating agency must first assess the available, relevant information, including exculpatory information, and determine that the applicable substantive standard is met. DEX1A, at 3-4; DEX2 ¶ 14; DEX4 ¶¶ 29-33. And TSC must complete a *de novo* review of available, relevant information under the same standard and make a final decision whether to include the individual in the TSDS. DEX1 ¶ 54. Nominations to the Selectee List or No Fly List have additional safeguards, including additional layers of internal review at TSC involving employees with additional, specific training. Depo. of James Hartje, TSC (DEX16) at 345–347.

Defendants also employ quality control measures after the initial nomination to ensure that existing watchlist entries continue to meet the substantive standards for watchlisting. Nominating

agencies conduct annual reviews to ensure that their nominations meet the relevant substantive standard, and submit removal or modification nominations if their nominees no longer meet the relevant standard. DEX1 ¶ 55. Separately, TSC conducts a review in connection with every TSDS encounter to ensure the individual's placement is still warranted, and also conducts semiannual reviews of all U.S. persons in the TSDS to ensure continued placement is warranted based on available, relevant information. DEX1 ¶ 56. Defendants also employ quality control measures after the initial nomination to ensure that existing watchlist entries continue to meet the substantive standards for watchlisting. Nominating agencies conduct annual reviews to ensure that their nominations meet the relevant substantive standard, and submit removal or modification nominations if their nominees no longer meet the relevant standard. DEX1 ¶ 55. Further, subsequent to each encounter with an individual on the TSDS TSC conducts a review of that individual to ensure continued placement is warranted based on available, relevant information, and TSC reviews each U.S. person to ensure their TSDS placement is still warranted at least every six months. DEX1 ¶ 56.

And *third*, Defendants themselves understand the TSDS to be a neutral tool and the substantive nomination standards to be applied regardless of a nominee's religion, race, or other protected characteristics. "[W]atchlisting is focused on terrorists, domestic and international terrorists, not on Muslims." Depo. of Richard Langham, FBI (DEX19) at 164-65; *see also id.* at 164; DEX16 at 241, 320, 326; Depo. of Lewis Robinson, NCTC (DEX18) at 127, 130. The Defendants who only nominate individuals to the TSDS but have no role in administering the list itself share this understanding of the TSDS's neutrality. "[N]ominations are not based on race, ethnicity, or religion." Depo. of Casie Antalis, DHS (DEX21) at 121. Rather, individuals are nominated if they meet the relevant substantive inclusion standards. *See* Depo. of Jennifer De La O, CBP (DEX20) at 144; Depo. of Christina Chesterfield, TSA (DEX17) at 155.

More, while discriminatory intent requires more than mere "awareness of consequences," *Sylvia Dev. Corp.*, 48 F.3d at 819 n.2, Defendants are not even *aware* of the religious composition of the watchlist, nor do they track the watchlist's religious composition over time, DEX12 at 54-56. Indeed, learning or tracking the religious composition of the TSDS would be a time-consuming and likely

107

impossible exercise because "there is no 'religion' field in the TSDS, nor is 'religion' a subcategory of any field in the TSDS." DEX12 at 54; *see also* DEX16 at 242 ("I mean, we wouldn't know if any individual on the watchlist was Muslim or not."). So too with place of birth, citizenship, and ethnicity. There are fields in the TSDS that can record this information but only a fraction of records have this field populated (approximately 20%, 30%, and 3% respectively for the three fields). DEX12 at 57.

These facts impugn any argument that Defendants have the "'invidiously discriminatory' intent" required for Plaintiffs' equal protection claim to succeed. *Sylvia Dev. Corp.*, 48 F.3d at 819.

### H. Plaintiffs Have Offered No Compelling Evidence of Disparate Impact or Discriminatory Intent.

While fact discovery has only substantiated the race- and religion-neutrality of the watchlisting program, discovery has refuted Plaintiffs' allegations that, at the motion to dismiss stage, supported their equal protection claim. *See* MTD Op. at 44-46 (discussing allegations of religious questioning or stray allegedly discriminatory remarks as supporting Plaintiffs' equal protection claim).

First, the evidence fails to support Plaintiffs' claims about religious questioning. Plaintiffs alleged that a particular FBI interview of M. Paryavi in which he was allegedly questioned about his religion led to his claimed TSDS placement, *see* SAC ¶¶ 485–86, but in his deposition, M. Paryavi repeatedly declined to link his two interviews with the FBI to the TSDS, *see* DEX76 at 249, 259. And in any event, his two FBI interviews occurred well before and well after the time M. Paryavi believes he was added to the TSDS, making any link between those interviews and his claimed placement unlikely. *Compare id.* at 245, 249 (FBI interviews in about 2009 and 2022), *with id.* at 21 (believes he was added to the TSDS around 2017). More generally, the Plaintiffs making allegations concerning religious questioning were questioned not just about their religion but also about other topics too, weakening any inference that it was the religious questioning (or answers to that questioning) in particular that led to Plaintiffs' claimed watchlisting. For instance, M. Paryavi testified that during his first interview with the FBI, the agents asked about "[a]nything under the sun." *Id.* at 245. Similarly, El-Shahat testified that during the secondary inspection that the complaint alleges led to his watchlisting, *see* SAC ¶¶ 649–51, he was asked "so many questions," some of which "w[ere] personal

questions" and only "[s]ome of [which] [we]re about [his] own religion," DEX58 at 67. Other Plaintiffs likewise testified that they were asked about their religion only sometimes, and along with questioning on other topics. *See* DEX65 at 50–51; DEX64 at 139-140; DEX69 at 182-83, 185-86; DEX50 at 277; *id.* at 212. Government records memorializing these interactions tell the same story: the records contain a wealth of non-religious information obtained from Plaintiffs during the interactions. *See, e.g.*, JRDH-Merits-0005700 (DEX101) (Al-Sahlani CBP interview); JRDH-FBI-0000714 (DEX102) (Al-Sahlani FBI interview summary); JRDH-FBI-0000717 (DEX103) (same); JRDH-FBI-0000719 (DEX104) (same); JRDH-FBI-0001331 (DEX92) (M. Paryavi FBI interview). Plaintiffs' testimony is further consistent with DHS policy, which bars discrimination "against any individual for exercising his or her First Amendment rights" but notes that questioning regarding religion is authorized when "pertinent to and within the scope of an authorized criminal, civil, or administrative law enforcement activity." JRDH-MERITS-0008841 (DEX40).

Second are allegations about certain stray remarks, such as a CBP officer allegedly telling El-Shahat that he is subject to enhanced screening "because he is a Muslim male." SAC ¶ 659. But El-Shahat testified that an officer in fact told him: "maybe they stop you because you're a male" and "[y]ou travel alone" to "countr[ies] mostly in the Middle East." DEX58 at 319. The officer thus did not link El-Shahat's experiences to El-Shahat's religion, and in any event was hypothesizing that "maybe" El-Shahat was stopped for those reasons. Indeed, El-Shahat acknowledged that "maybe [the officer was] just assuming that they stop me for that reason," and was not expressing any definitive view on why El-Shahat had been stopped at the airport. *Id.* at 320. And while the complaint alleges that a CBP officer suggested to Mujanovic that she could remove her hijab to avoid travel delays, *see* SAC ¶ 1148, Mujanovic testified that the officer in fact said: "*if you think we are mistreating you based on your hijab*, why don't you just take your hijab off" to avoid any mistreatment, DEX69 at 235 (emphasis added). The officer thus was not admitting that Mujanovic was being discriminated against but was instead asking about the discrimination that Mujanovic subjectively thought might be occurring.

Of course, even if these isolated statements by low-level officers did evince some discriminatory intent, the statements would not be sufficient to create a material issue of fact as to the

Defendants' discriminatory intent here. The "oral statements of government officials have rarely been held to be express classifications," *U.S. v. Johnson*, 122 F. Supp. 3d 272, 350 (M.D.N.C. 2015), and as the Fourth Circuit has recognized, albeit in the Title VII context, "to prove discriminatory animus, the derogatory remark cannot be stray or isolated." *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 608 (4th Cir. 1999); *see also Orgain v. City of Salisbury*, 521 F. Supp. 2d 465 (D. Md. 2007) (finding that a single reference to the predominant race of club's customers raised no inference of racial discrimination). These holdings apply with force here, where Plaintiffs have interacted with low-level government officials on numerous occasions. *See, e.g.*, DEX58 at 291–292 (40–60 flights for El-Shahat); JRDH-Merits-0011180 (DEX108) (nearly 20 international flights for Mujanovic). Cherry-picking two isolated comments by low-level officials—even if those comments did show discriminatory intent, which they do not—out of all the hundreds of interactions that Plaintiffs have collectively had with Defendants' officials, lends no support Plaintiffs' allegation that Defendants have discriminatory intent "[a]s a matter of policy and official practice." SAC ¶ 1610.

Beyond these now-debunked allegations in the complaint, the best Plaintiffs can do is to offer evidence that certain names, such as different spellings of "Muhammad," are found more frequently in the TSDS than are other names. *See* Declaration of Steven McQueen, TSC (DEX14) at 3-4. Plaintiffs apparently associate those names found more frequently in the TSDS with Islam, and have submitted the afore-discussed expert opinions on this point. *See supra* Section V.A. Plaintiffs' apparent theory is that because they believe that a large proportion of the names on the TSDS are "Muslim-sounding," Defendants must be deliberately nominating to the TSDS people with those names. *See also* SAC ¶ 1611. But for many reasons, the frequency of names like "Muhammad" does not establish disparate impact, let alone "'invidiously discriminatory' intent." *Sylvia Dev. Corp.*, 48 F.3d at 819.

First, and as addressed more thoroughly above in Section.A.3.a concerning Dr. Huber's Report, any connection between a person's name and their religion is tenuous at best and pure speculation at worst. *See supra*. Second, the record unequivocally reflects that Defendants make watchlist nominations based on substantive derogatory criteria, not based on a nominee's name. *See supra*. Defendants are "not focused on any specific name, whether that be Muhammad or David."

DEX19 at 162; *see also id.* 168 ("We don't investigate anyone because of their name. Like we would never open an investigation on anyone just because their name was Muhammad.").

Finally, and even if Plaintiffs' name analysis did establish conclusively that a large fraction of the watchlist were comprised of Muslims, Plaintiffs would at best have adduced evidence of disparate impact. The watchlist's supposed religious composition does nothing to show that Defendants had any "'invidiously discriminatory' intent." *Sylvia Dev. Corp.*, 48 F.3d at 819.

Indeed, Defendants have provided multiple plausible explanations besides invidious discrimination for the name composition of the TSDS. The TSDS "is meant to be a global database, not just a U.S.-specific database," DEX19 at 157, and spellings of Muhammad are among the most common names in many parts of the world, *see id.* at 157 ("[M]y understanding is that Muhammad is an extremely common name worldwide."). Similarly, "the two biggest threats to the United States have been overseas groups that claim to be Muslim Islamic groups: al-Qai'da, ISIS and their affiliates." DEX18 at 132-133; DEX3 at 12 (Sunni Violent Extremist groups have been a major focus for the U.S. Government counterterrorism community since September 11th, 2001). And the membership of Islamic terrorist organizations "is composed mostly of Muslims." DEX19 at 157; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) ("It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the [September 11] attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims."). And as the evidence presented above shows, Defendants believe and intend the TSDS to be a religion-neutral tool and nominate people for watchlisting based on the substantive nomination standards, not based on religion. *See supra.*

I. **Defendants Use the TSDS to Effectively Protect National Security.**

As already explained, the No Fly List effectively protects national security and satisfies whatever level of scrutiny is appropriate. *See supra* Section IV.B.

The same is true of the TSDS, which provides essential support for Defendants' efforts to advance the compelling governmental interest in defending the United States from national security threats at home and abroad and satisfies whatever level of scrutiny applies to it. There is no dispute

that the Government has a compelling interest in preventing and investigating potential acts of terrorism. *See Haig*, 453 U.S. at 307 ("It is obvious and inarguable that no governmental interest is more compelling than the security of the Nation."); *Humanitarian Law Project*, 561 U.S. at 28 ("Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order."); *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treas.*, 686 F.3d 965, 980 (9th Cir. 2012) (similar); *Tabbaa*, 509 F.3d at 103 (similar).

As an initial matter, Defendants are limited in the information they can present here. The full details of how the TSDS protects national security, including most specific examples, contain classified and privileged information that cannot be revealed publicly. But even the public information set out below makes clear how the watchlist supports Defendants' compelling interest in national security.

*First*, the watchlist is essential to the U.S. government's efforts to effectively and timely share information regarding terrorist threats. *See* DEX18 at 142. The common operating picture afforded by the information sharing system (as supported by the TSDS) is absolutely critical to preventing such terrorist plots from coming to fruition in the future. DEX1 ¶ 11; DEX3 ¶¶ 9–10.

*Second*, information obtained through the use of the watchlist has been used by federal law enforcement to disrupt terrorist threats. The FBI tracks terrorism "disruptions," which is an affirmative action by the FBI, or a partner in coordination with the FBI, which significantly alters or impedes the threat posed by an FBI terrorism subject, and FBI achieves hundreds of disruptions every year. *See* DEX12 at 27-29. Disruptions include actions like arrest; seizure of assets, or impairing the operational threat capabilities of key threats. *Id.* FBI reviewed just a small sample of terrorism disruptions from several short periods between 2019 and 2023, and determined that a total of 13 disruptions, or 20.3% of the 64 total disruptions that occurred during those periods, were aided by watchlist information. *See* DEX13 at 2, 3. While this analysis covered only a small sample of the FBI's 3,218 total terrorism disruptions between 2019 and 2023, *compare* DEX13 at 2–4, *with* DEX12 at 27-29, this analysis demonstrates that watchlist information contributes substantially to the FBI's anti-terrorism efforts.

And *third*, other Defendants' use of watchlist information has also mitigated potential threats on many occasions. TSA applies enhanced screening to known or suspected terrorists at airport checkpoints, and through that screening has discovered prohibited items, including a firearm, a box cutter, and items testing positive for explosives. DEX5 ¶ 71. TSA also credits its use of the watchlist as an indicator for the existence of derogatory information in its process to deny or revoke TSA-issued credentials (which may include credentials for airline crew members or airport employee) to at least one individual who could have used that credential to carry out an attack and at least one individual who was suspected of plotting an attack on critical infrastructure. *Id.* ¶ 73.

CBP's inspections of individuals listed on the terrorist watchlist have also led to the discovery of information pertaining to weapons or other indicators of potential terrorist attacks, which has been shared with the relevant U.S. agencies for further action. For example, a secondary inspection conducted by CBP in August 2009 based on a subject's match to a TSDS record provided significant leads to the FBI and directly contributed to the subject's subsequent arrest in 2009 as he was about to leave the country. DEX4 ¶ 61. The subject subsequently pleaded guilty to multiple criminal counts related to his role in planning the November 2008 terrorist attacks in Mumbai, India, and a proposed attack on a newspaper in Denmark. *Id.*; DEX12 at 39; DEX4 ¶¶ 61-62.

For these reasons and others, there is no doubt that the TSDS enhances security.

## VI. The Court Should Grant Summary Judgment on Plaintiffs' Fourth Amendment Claims Because the Challenged Searches Were Reasonable.

Following the resolution of the Motion to Dismiss, 17 of the remaining Plaintiffs had claims under the Fourth Amendment: Abdurrashid, Abunijem, Al-Sahlani, Albadawi, Doe, El-Shahat, Hachem, Jardaneh, Kamel, Mohallim, Mujanovic, Muminov, E. Paryavi, Sehwail, Soueidan, Sulayman, and Thadi. *See* MTD Op. at 52 n.18. They alleged that, when they entered the country, CBP forensically searched their devices in violation of the Fourth Amendment. *Id.* at 49; SAC ¶¶ 1621-31. The Court concluded that these Plaintiffs had stated a claim because they had alleged nonroutine, forensic searches of their electronic devices without the individualized reasonable suspicion required for nonroutine border searches. MTD Op. at 47-52. Defendants are entitled to summary judgment on

these claims because most of these Plaintiffs lack standing, because CBP policy regarding border searches of electronic devices is consistent with the Fourth Amendment, and because additional evidence shows that the Government had sufficient basis for any nonroutine searches.

**A. Many Plaintiffs Lack Standing to Bring This Claim.**

The Court held that these 17 plaintiffs had sufficiently alleged standing at the motion to dismiss stage. At that stage, the Court was willing to infer future injury from past searches and future plans to travel. *See* MTD Op. at 48. Plaintiffs seek declaratory and injunctive relief, and thus must establish a "certainly impending" future injury. *Clapper*, 568 U.S. at 401. Each element of standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Here, Plaintiffs need to establish with evidence appropriate for consideration at summary judgment that they have certainly impending future injuries, which at least fourteen plaintiffs (listed below) have failed to do.

As an initial matter, several of these plaintiffs have not established any pattern of nonconsensual searches of their electronic devices in the past that could give rise to an inference of certainly impending future injury under the Court's reasoning. For example, several Plaintiffs indicated that they stopped having travel difficulties years ago. *See supra* Section II.C, pp.52-53. On the one occasion when Mohallim was the subject of secondary inspection, he did not have an electronic device of his own but was sharing his mother's phone. DEX67 at 125-29. He necessarily had no expectation of privacy in her phone that she likely unlocked for CBP. E. Paryavi never turned his device over to CBP and just showed the officers a few things on the phone, DEX73 at 167, 310-11, and he therefore has not established that his devices were ever the subject of a forensic search. Jardaneh's phone was searched only once and he has repeatedly travelled since then without incident. DEX62 at 284-85. Sehwail did not indicate any intention to engage in future international travel that could subject him to such searches and thus has not made a showing of standing. DEX78 at 112-14 (describing hopes for future domestic travel); *see id.* 29-30 (describing that he had not travelled internationally for around a decade before being denied boarding). Several Plaintiffs indicated at depositions that they did not care whether the government accessed their devices. DEX44 at 129 (Abdurrashid would willingly

unlock his phone in response to a government request); DEX80 at 266-68 (no reason Soueidan would not want CBP to see his phone); DEX84 at 108, 111(Thadi did not care if his phone was inspected).

Pursuant to stipulation of the parties, in order to evaluate the Court's jurisdiction, Defendants have provided the Court with the following information for the 17 Plaintiffs with Fourth Amendment claims: a list of their encounters with CBP, confirmation as to whether CBP performed an advanced search, the basis for any advanced search, Plaintiff's status at the time of the search, and Plaintiff's current status. *See* ECF No. 239-2; DEX121 (*ex parte* CBP submission); DEX9 (redacted version). The parties agreed this information could be submitted *ex parte* and *in camera*. Defendants agreed not to dispute the Court's jurisdiction to hear this Fourth Amendment claim with respect to any plaintiff who previously had an advanced search performed on their electronic device at the border based solely on their TSDS status, who continues to have TSDS status, and who has sufficiently established future travel plans under *Lujan. See id.* The stipulated *ex parte* CBP submission is based on review of CBP records; it establishes that several of the plaintiffs lack standing and cannot establish a certainly impending future injury. To the extent the Court rules on this basis, Defendants request that it do so without revealing watchlist status or other privileged information, and there are several different scenarios that could support a lack of standing. For example, a plaintiff would lack standing if: he or she had never been on the watchlist and thus had no injury consistent with the claim here; if he or she had been removed from the watchlist and had no reasonable expectation of future injury; if he or she had never been the subject of an advanced search (regardless of status); if he or she had only once or only occasionally been the subject of an advanced search such that there is no pattern giving rise to an expectation of future injury; or if he or she had been the subject of an advanced search only for unrelated reasons.

With consideration of the deficiencies in Plaintiffs' testimony, as well as the stipulated *ex parte* submission, the Court should dismiss the Fourth Amendment claims of at least the following plaintiffs for lack of standing: Abdurrashid, Abunijem, Albadawi, Al-Sahlani, Doe, El-Shahat, Jardaneh, Kamel, Mohallim, Mujanovic, E. Paryavi, Sehwail, Soueidan, and Thadi.

**B. CBP Policy Regarding Border Searches of Electronic Devices is Consistent with the Fourth Amendment.**

"Routine searches and seizures at the border . . . are exempted from standard Fourth Amendment requirements . . . " (i.e., a warrant and probable cause). *See U.S. v. Kolsuz*, 890 F.3d 133, 137 (4th Cir. 2018), *as amended* (May 18, 2018) (citing *U.S. v. Montoya de Hernandez*, 473 U.S. 531, 537, 544 (1985)); *see also U.S. v. Nkongho*, 107 F.4th 373, 382 (4th Cir. 2024) ("the government's interests at the border are paramount, and forensically searching a traveler's electronic devices may be vital to promoting those interests."). At the border, the "Government's interest in preventing the entry of unwanted persons and effects is at its zenith," *Flores-Montano*, 541 U.S. at 152; additionally, an individual's "expectation of privacy [is] less[er]." *Montoya de Hernandez*, 473 U.S. at 539; *U.S. v. Ickes*, 393 F.3d 501, 506 (4th Cir. 2005) ("A greater interest on the side of the government at the border is coupled with a lesser interest on the side of the potential entrant.").

In *Kolsuz*, the Fourth Circuit held that a "*forensic* search of . . . cell-phone data qualifies as a nonroutine border search, requiring some level of particularized suspicion." *Kolsuz*, 890 F.3d at 144. *Kolsuz* left undisturbed *Ickes*—another Fourth Circuit decision, which explained that a *non-forensic*, or manual, search of a computer constitutes a routine search requiring no suspicion. *Ickes*, 393 F.3d at 505-06; *see Kolsuz*, 890 F.3d at 141, 146 n.5. So *Ickes*, which "clearly stands for the proposition that a manual digital search of an electronic device is a routine border search," *U.S. v. Kolsuz*, 185 F. Supp. 3d 843, 854 (E.D. Va. 2016), remains the law in this Circuit, precluding this Court from imposing the probable cause or warrant requirement sought by Plaintiffs on non-forensic electronic searches. *See also Alasaad v. Mayorkas*, 988 F.3d 8, 19 (1st Cir. 2021) (collecting cases for the proposition that basic searches at the border do not require reasonable suspicion).

As for alleged forensic searches of devices, this Court previously held that the 17 plaintiffs listed above had alleged a forensic search of their devices upon entering the country sufficient to survive a motion to dismiss.[22] As long as any such forensic search was based on reasonable suspicion,

---

[22] While most of these Plaintiffs have alleged that their devices were subject to "advanced" searches, they have little or no evidence to that effect. E. Paryavi outright contradicted the proposition that his device was subject to a forensic search when he explained that his device never left his possession.

however, it complied with the Fourth Amendment and the CBP policy. Specifically, the Fourth Circuit in *Kolsuz* cited CBP's 2018 Directive (here, DEX37) favorably, noting with approval that under the policy, advanced searches "may be conducted only with reasonable suspicion of activity that violates the customs laws or in cases raising national security concerns." 890 F.3d at 146 (citing the 2018 Directive, DEX37); *see also U.S. v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019) (explaining that the individualized suspicion must bear "some nexus to the border search exception's purposes of protecting national security"). Under the 2018 CBP Directive, which remains the agency's current policy at the time of filing, CBP officers may conduct an advanced search of a traveler's electronic devices for several reasons, including if the traveler is identified as a known or suspected terrorist. DEX37 at 5; DEX4 ¶¶ 47-57. At the motion to dismiss stage, this Court held that Plaintiffs had stated a claim based solely on the allegations in the complaint, which included allegations of "lifetime inclusion in the TSDB based on associational status, religious belief, race, or travel preference" such that "[m]ere membership in the database . . . cannot supply individualized reasonable articulable suspicion." MTD Op. at 51-52. With the benefit of evidentiary development, however, Defendants have established that the reasonable suspicion required for placement on the TSDS is consistent with the reasonable suspicion standard required for nonroutine searches at the border. As explained above, an individual may be so included in the TSDS only if, following multiple layers of review, there is a "reasonable suspicion" that he or she has engaged, is engaging, or intends to engage in terrorist activity. *Supra* at 5-8; *see Mokdad v. Lynch*, 804 F.3d 807, 809-10 (6th Cir. 2015); *Elhady*, 993 F.3d at 228 (reviewing TSDS procedures); *see also Kolsuz*, 890 F.3d at 146-47 (acknowledging DHS policy

---

DEX73 at 167, 310-11. Others claim that the devices left their possession but have no information about what searches were conducted. *See, e.g.*, DEX50 at 195-96; DEX82 at 113-15. A few claim that the devices were detained for some period of time when the traveler refused to provide a password or unlock the phone and later returned. *See, e.g.*, DEX60 at 258-60. Here, the Court need not guess at whether an advanced search may have been conducted in any particular instance; the *ex parte* submission answers that question based on review of CBP records. The submission shows that CBP acts consistently with its own policies; *i.e.*, CBP may but is not required to conduct an advanced search of electronic devices when travelers entering the country are on the TSDS or subject to some other basis for particularized suspicion. DEX37. (The current record leaves open the question of whether an "advanced" search is necessarily a "forensic" search under *Kolsuz* but Defendants are willing to assume for the purposes of this motion only that it is.)

classifying forensic searches as "nonroutine border searches" that "may be conducted only with reasonable suspicion of activity that violates the customs laws or in cases raising national security concerns"). Where the Supreme Court has approved even an anonymous phone tip as sufficient to establish reasonable suspicion, there can be no serious argument that the robust process underlying the TSDS lacks "sufficient indicia of reliability to provide reasonable suspicion." *Navarette v. California*, 572 U.S. 393, 397 (2014) (citation omitted). And terrorism concerns regarding individuals traversing the international border certainly bear the necessary nexus to "protecting national security." *Nkongho*, 107 F.4th at 382 (citation omitted). Defendants are thus entitled to summary judgment on the basis of this public information alone.[23]

### C. Additional Evidence Justifies Summary Judgment for the Government.

The *ex parte* CBP submission and the separate certified *ex parte* administrative record further establish that the Government acted consistently with the above-described policies, and that the Government had individualized suspicion consistent with *Kolsuz* with respect to any plaintiffs who were in the TSDS at the time of an advanced search of their electronic devices. The Government can neither confirm nor deny the specifics of particular searches, nor the underlying reasons for those searches—including whether any searches were conducted as a result of status in the TSDS—because that information is protected by the law enforcement privilege and/or as SSI, and because reasons underlying any TSDS status would be classified. Defendants respectfully refer the Court to the *ex parte* submission and, where appropriate, the administrative record for a discussion of the reasons that CBP's searches of Plaintiffs' electronic devices were reasonable. DEX121.

### VII. The Court Should Grant Summary Judgment on Plaintiffs' Fifth Amendment Self-Incrimination Claims (Count VIII).

Seventeen remaining Plaintiffs allege that their rights against self-incrimination were infringed when CBP asked for the passwords or fingerprints to access their electronic devices upon entry to the United States, SAC ¶¶ 1642-46: Abdurrashid, Albadawi, Al-Sahlani, Din, Doe, El-Shahat, Hachem,

---

[23] Plaintiffs have not alleged, much less shown, a Fourth Amendment violation by any agency besides CBP. To the extent Count VI runs against any Defendants other than CBP, they are entitled to summary judgment too.

Jardaneh, Kamel, Mohallim, Mujanovic, Muminov, E. Paryavi, M. Paryavi, Sehwail, Soueidan, Sulayman, MTD Op. at 54 n.19. The Court declined to dismiss the Fifth Amendment claims regarding self-incrimination, holding that that it was a factual question as to whether there were "sufficiently coercive circumstances that plausibly give rise to an inference that any incriminating testimony was involuntarily obtained." *Id.* at 53. The Court need not reach this question for three independent reasons, and Defendants have established, in any event, that Plaintiffs were not coerced into making incriminating statements in violation of the Fifth Amendment.[24]

### A. Plaintiffs Lack Standing Because They Have Not Shown Certainly Impending Future Injury.

First, all but three of these Plaintiffs generally lack standing for the same reason they lack standing to bring their Fourth Amendment claims – they have not established a certainly impending future injury – i.e., that they will be "coerced" into providing passwords or biometric information to unlock their devices in the course of future international travel. *See supra* at 52-53 (no difficulty travelling in years); 114-15 (no pattern of involuntary device searches or future international travel). Din does not allege having been asked for a password. DEX53 at 22-24. For these reasons alone, the Court should dismiss the self-incrimination claims of Abdurrashid, Albawai, Din, Doe, El-Shahat, Jardaneh, Kamel, Mohallim, Mujanovic, E. Paryavi, M. Paryavi, Sehwail, Soueidan, and Sulayman.

More broadly, all seventeen of these Plaintiffs lack standing now because they are aware of the governing CBP policy, and thus there is no risk that they will be coerced into providing incriminating information. Even if selected for electronic device searches in the future, they know they can just travel with unlocked or wiped devices (or, if they believe a privilege applies, assert the privilege).[25]

---

[24] The Court left open another question: whether "provision of cellphone passcodes or biometric information amounts to testimonial statements." *Id.* at 54. No Plaintiff claimed in deposition testimony that they were coerced into unlocking their devices with "biometric means" as alleged in the Complaint. SAC ¶ 1644. Accordingly, there is no arguable violation of the Fifth Amendment on these grounds. Even if they had raised such a factual claim, this Court should follow those courts that have held that biometric information is not testimonial in nature. *See also U.S. v. Payne,* 99 F.4th 495, 509 (9th Cir. 2024) (compelled use of thumb to unlock device was not testimonial); *see also Matter of Search Warrant Application for cellular telephone in U.S. v. Barrera,* 415 F. Supp. 3d 832, 842 (N.D. Ill. 2019).

[25] Alternatively, they could disable the password or unlock the device themselves without providing any information to CBP.

Indeed, most Plaintiffs testified that the consequence to declining to provide a password was that CBP could (but did not necessarily) detain their device temporarily in order to access it and conduct a search. *Cf.* DEX4 ¶¶ 53-55. Jardaneh, for example, claims his devices were searched once, and he refused to provide his password; his device was temporarily detained and returned to him "maybe a week or so" later. DEX62 at 224-25, 231-32. He was not arguably ever coerced into providing allegedly incriminating information, and certainly cannot establish future injury. Mujanovic has not experienced electronic searches since 2017. DEX69 at 334-35. Others sometimes refused to provide their passwords or just unlocked the device some other way without providing information to CBP. DEX48 at 101-02 (Albadawi sometimes just disabled the password rather than provide it); DEX50 at 195 (CBP described choice to Al-Sahlani); *id.* at 220 (input password himself); *id.* at 228-29, 235 (wiped devices with no password); DEX56 at 169-72, 178 (Doe once declined to provide password unless they agreed to keep device with him, and CBP never otherwise took devices from him); DEX60 at 258-60, 280-81 (Hachem routinely refused to provide password and phone returned later); DEX69 at 189-91, 242 (Mujanovic unlocked for them); DEX71 at 223-25 (CBP sometimes requested passcode but when Muminov refused, CBP did not search his phone at all); DEX73 at 310-11 (E. Paryavi refused to surrender his phone and was never asked for password); DEX78 at 151-52 (Sehwail unlocked phone for CBP). So even if CBP had somehow coerced Plaintiffs into providing passwords in the past, Plaintiffs still have not established a "certainly impending" threat of injury in the future.

## B. Plaintiffs Have Not Shown a Violation of their Criminal Trial Rights.

Second, "[t]he privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental *trial* right of criminal defendants," meaning that "a constitutional violation occurs only *at trial.*" *Verdugo-Urquidez*, 494 U.S. at 264 (emphases added); *see Chavez v. Martinez*, 538 U.S. 760, 766 (2003) (plurality) ("We fail to see how, based on the text of the Fifth Amendment, Martinez can allege a violation of this right, since Martinez was never prosecuted for a crime, let alone compelled to be a witness against himself in a criminal case."). Consistent with this understanding, the Fourth Circuit has held that "[e]ven with regard to statements made under circumstances that would otherwise be viewed as coercive, the Self-Incrimination Clause is violated *only* if those statements are used in a

criminal trial." *U.S. v. Riley*, 920 F.3d 200, 205 (4th Cir. 2019) (rejecting application of Self-Incrimination Clause to supervised release revocation proceedings). Plaintiffs provide no authority supporting the existence of a freestanding civil action under the Fifth Amendment's right against self-incrimination, pursuant to which individuals can seek to enjoin future government inquiries wholly disconnected from future criminal proceedings. Indeed, a court in this Circuit recently rejected an identical claim, reasoning that "the Amendment's text . . . protects against self-incrimination 'in any criminal case.'" *Abu Irshaid*, 2025 WL 756544 at *11. Even assuming, without conceding, that Plaintiffs' provision of their passwords or biometric devices constituted coercion of incriminating testimony, there has been no Fifth Amendment violation because they have not shown that their phones, their passwords, their fingerprints, or any evidence obtained from the phones were used against them in a criminal trial, much less that they will be used against them at a future criminal trial.[26]

### C. Plaintiffs Have Not Established that Any Testimony Was Incriminating.

Third, Plaintiffs have now shown that any testimony was incriminating. The right against self-incrimination protects *only* against "compelled self-incrimination, not (the disclosure of) private information." *Fisher v. United States*, 425 U.S. 391, 401 (1976) (citation omitted); *see id.* (Fifth Amendment is not "a general protector of privacy"). Plaintiffs fail to show that any statement they made was *incriminating. See U.S. v. Sweets*, 526 F.3d 122, 128 (4th Cir. 2007) (finding no Fifth Amendment violation where the information at issue did "not incriminate [the defendant] in any real and substantial way"). In fact, Plaintiffs previously stipulated that they would not "proffer any incriminating information on Plaintiffs' devices in support of their Fifth Amendment (Self-Incrimination) claim in this case." Joint Stipulation (DEX109). If the devices themselves do not contain incriminating information, then the supposedly compelled statements – passwords and biometric information – likewise are not incriminating, and thus their alleged coercion does not violate the Fifth Amendment. *See U.S. v. Aigbekaen*, No. CR 15-0462, 2022 WL 3106949, at *16 (D. Md. Aug.

---

[26] And even if Plaintiffs had shown a Fifth Amendment violation—they have not—it still would not warrant the relief sought in this action; rather, "the 'complete and sufficient' remedy" for a Fifth Amendment violation "is the exclusion of such statements at trial." *Antonio v. Moore*, 174 F. App'x 131, 135 n.2 (4th Cir. 2006) (quoting *U.S. v. Patane*, 542 U.S. 630, 641-42 (2004)).

3, 2022) (citing *Sweets*, 526 F.3d at 127). Where the allegedly coerced material is not incriminating, there is no Fifth Amendment violation.

### D. CBP's Policy Does Not Violate the Fifth Amendment.

CBP may lawfully ask for passwords to electronic devices, and detain those devices if no password is provided, because electronic devices, like everything else that crosses the border, is subject to inspection. When a traveler presents himself or herself at the border with luggage or other physical cargo, CBP may lawfully require him or her to present the cargo in a manner in which it may be inspected. For example, if a traveler arrives with a locked container or suitcase, CBP may lawfully require him to unlock the container—and, in the event that he or she refuses, CBP is permitted to take action to remove the lock, and is by no means required to permit the entry of the cargo into the United States until it has ascertained the contents of the container. *See, e.g.,* 19 U.S.C. § 1461 (". . . [A customs] officer may require the owner, or his agent, or other person having charge or possession of any . . . container, or of any closed vehicle, to open the same for inspection, or to furnish a key or other means for opening the same."); 19 U.S.C. § 507(a)(2) (similar); *see also* 19 U.S.C. §§ 1462, 1496, 1499, 1582; 6 U.S.C. § 211(k). Put simply, travelers choose what they bring with them when crossing the border, and they must present *all* of their cargo for inspection; adding a lock to a piece of luggage or electronic device does not exempt that item from inspection. As another judge in this district has observed, "just as a luggage lock does not render the contents of a suitcase immune from search, a password protected file is not unsearchable on that basis alone." *U.S. v. Saboonchi*, 990 F. Supp. 2d 536, 560-61 (D. Md. 2014); *see also U.S. v. McAuley*, 563 F. Supp. 2d 672, 678 (W.D. Tex. 2008), *aff'd*, 420 F. App'x 400 (5th Cir. 2011) ("Locks are usually present on luggage and briefcases, yet those items are subject to 'routine' searches at ports of entry all the time."). There is no reason why any different result should obtain simply because a particular lock is in electronic form. CBP thus may seek access to electronic devices to inspect them, including seeking passwords or decrypting devices.[27]

---

[27] Defendants note that even if granted in full, the relief Plaintiffs seek with respect to Count VIII would not preclude CBP from detaining either physical cargo or an electronic device in order to complete a border search. Under the Fifth Amendment, "'[a] party is privileged from producing the

The Court previously held that one critical question was whether the circumstances of seeking passwords were so coercive such that a reasonable person's will would be overborne, and Plaintiffs were "compelled" to provide testimony. MTD Op. at 54; *see also U.S. v. Umana*, 750 F.3d 320, 344 (4th Cir. 2014) (quoting *U.S. v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc)). The court must consider "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.* (quoting *U.S. v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987)). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary." *Braxton*, 112 F.3d at 780.

Here, the CBP policy supports asking for passwords or unlocking and temporarily retaining the device in order to access it and conduct a search if no access is otherwise provided. DEX4 ¶¶ 53-54. That policy is not inherently coercive, as shown by the multiple plaintiffs subject to such searches refusing to provide passwords or otherwise unlock their devices. *See supra* at 114, 119-20. In most cases, CBP either described this policy to Plaintiffs or Plaintiffs never asked and simply responded to the request. *See, e.g.*, DEX44 at 71 (Abdurrashid did not ask); DEX50 at 195 (CBP described policy to Al-Sahlani). Even if some Plaintiff felt subjectively like he or she had no choice, *see, e.g.*, DEX48 at 313-14 (Alabadawi never asked); *see id.* 365 (thought it was an order), that is not the same as one's will being overborne. Plaintiffs could and did refuse to provide passwords when needed. They cannot make a showing that any particular plaintiff was coerced into providing incriminating information.

---

evidence but not from its production.'" *Andresen v. Maryland*, 427 U.S. 463, 473-74 (1976) (quoting *Johnson v. United States*, 228 U.S. 457, 458 (1913) (Holmes, J.)). Thus, even where an individual cannot himself be compelled "to aid in the discovery, production, or authentication of incriminating evidence," there is no similar prohibition on the government seizing the evidence pursuant to a valid search. *Id.* at 474. It follows that, to the extent the Court were to find—which, for all the reasons set forth above, it should not—that the Fifth Amendment permits travelers to refuse to *themselves* unlock digital locks, such a finding would in no way preclude *CBP* from removing or decrypting the lock, pursuant to its well-established border search authorities.

## VIII.    The Court Should Grant Summary Judgment on Plaintiffs' RFRA Claims.

The RFRA provides that the "Government shall not substantially burden a person's exercise of religion" unless the challenged conduct is (1) "in furtherance of a compelling government interest;" and (2) "the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1. A burden is substantial when it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs" or "forces a person" to choose between "following the precepts of [their] religion" and receiving "governmental benefits." *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (internal quotations and citations omitted). When determining if a government action imposes a substantial burden, courts perform an "objective evaluation of the nature of the claimed burden and the substantiality of that burden on the [plaintiff's] religious exercise." *Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 356 (3d Cir. 2017). In other words, "a subjective chilling effect . . . is not sufficient to constitute a substantial burden." *Am. Fam. Ass'n, Inc. v. City & Cnty. of San Francisco*, 277 F.3d 1114, 1124 (9th Cir. 2002) (substantial burden in context of Free Exercise Clause); *see also New Doe Child #1 v. Cong. of United States*, 891 F.3d 578, 590 (6th Cir. 2018); *Perrier-Bilbo v. United States*, 954 F.3d 413, 432 (1st Cir. 2020).

Two of Plaintiffs' RFRA claims survived Defendants' motion to dismiss: 1) a claim by several Plaintiffs[28] that "persistent inquiry [by Defendants' employees] into Plaintiffs' religious beliefs and practices places pressure on Plaintiffs to modify or violate those beliefs," MTD Op. at 60; and 2) a claim by Plaintiff Sulayman that inclusion in the TSDS violated RFRA by interfering with his ability to perform Umrah, an annual religious pilgrimage to Mecca. SAC ¶¶ 715-16. Notably, the operative complaint ties both of these claims to inclusion in the TSDS: Plaintiffs argue that inclusion in the TSDS violates RFRA because it *causes* these burdens on their religious faith, and the relief sought relates to removal from the TSDS. *See* SAC ¶¶ 1661-64 & Prayer for Relief. The Court should grant summary judgment to Defendants on both of these claims.

---

[28] The remaining Plaintiffs with a religious questioning claim are Al-Sahlani, Doe, El-Shahat, Hachem, Kamel, Mujanovic, Muminov, M. Paryavi, and Sulayman.  *See* MTD Op. at 60 n.23.

## A.    Defendants Did Not Violate RFRA By Occasionally Questioning Plaintiffs About Both Religious and Secular Topics (Count X).

Plaintiffs' religious questioning claim is no different from other RFRA claims: To succeed, they must provide evidence of a "substantial burden" that either places "substantial pressure" on them to "modify or violate" their religious beliefs or forces Plaintiffs to choose between following their religion and receiving government benefits. *Lovelace*, 472 F.3d at 187. As an initial matter, Plaintiff claim that they are "subjected to this [questioning] due to Defendants' policies and practices that use the federal watchlisting system." SAC ¶ 1662. But there is no policy or practice that requires watchlisted individuals to be questioned about their religion, DEX4 ¶ 74, and Plaintiffs have adduced no evidence to the contrary. The Government is entitled to summary judgment on this basis alone.

But even if Plaintiffs could establish that watchlist placement leads to religious questioning, there is no RFRA violation unless a plaintiff establishes that religious "questioning requires them to affirm or deny a belief that is contrary to their faith, or to choose between following tenets of their faith and receiving an important government benefit." *Cherri v. Mueller*, 951 F. Supp. 2d 918, 935 (E.D. Mich. 2013). Otherwise put, a person "being queried about their religious practices and beliefs at the border" is not enough in itself for a successful RFRA claim. *Id.*; *see also Lovelace*, 472 F.3d at 187 (RFRA burden substantial exists when it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs"). So to the extent Plaintiffs still claim that they suffered a substantial burden on their religion due to an "intrusive inquiry" into their religion, without meeting the criteria explained in *Lovelace*, SAC ¶ 1660, such a claim fails, *see also* MTD Op. at 60 ("Defendants' singling out of Plaintiffs and their persistent inquiry into Plaintiffs' religious beliefs and practices *places pressure on Plaintiffs to modify or violate those beliefs . . . .*" (emphasis added)).

But in any event, discovery has revealed that any questioning about Plaintiffs' religious beliefs was sporadic, accompanied by questioning about other topics, and often friendly; and did not place substantial pressure on Plaintiffs to modify their religious beliefs in response to the questioning.

Plaintiffs reported being questioned by Defendants' employees about many different topics, including travel, family, and work. *See, e.g.*, DEX50 at 276-77 (Al-Sahlani); DEX56 at 65, 106 (Doe); DEX58 at 67 (El-Shahat); DEX65 at 55 (Kamel); DEX76 at 95-96, 136-37, 149-50 (M. Paryavi);

DEX69 at 182-183 (Mujanovic); DEX71 at 55-56 (Muminov); DEX82 at 115-16 (Sulayman). M. Paryavi testified that during his first FBI interview, the agents asked about "[a]nything under the sun." DEX76 at 245. Similarly, El-Shahat testified that during the secondary inspection that the complaint alleges led to his placement on the TSDS, *see* SAC ¶¶ 649–51, he was asked "so many questions," some of which "w[ere] personal questions" and only "[s]ome of [which] [we]re about [his] own religion." DEX58 at 67. In fact, many Plaintiffs reported that on some trips they were being questioned about *only* secular topics. *See, e.g.*, DEX82 at 116, 142-43 (Sulayman); DEX 76 at 95-96, 136-37, 149-50 (M. Paryavi); DEX58 at 134-135, 172 (El-Shahat); DEX60 at 200 (Hachem questioned about his religion "one time" out of all his travel). Defendants' own records of the interactions confirm that Plaintiffs' questioning covered secular topics, extensively and at times exclusively. *See, e.g.*, DEX101 (Al-Sahlani); JRDH-Merits-0006243 (DEX93) (El-Shahat); JRDH-Merits-0006863 (DEX94) (Doe); JRDH-Merits-0006630 (DEX95) (Hachem); JRDH-Merits-0004401 (DEX88) (Kamel); JRDH-Merits-0004505 (DEX96) (Mujanovic); JRDH-Merits-0012560 (DEX97) (Muminov); JRDH-Merits-0004445 (DEX98) (M. Paryavi); JRDH-Merits-0004886 (DEX99) (Sulayman). And this type of questioning is consistent with Defendants' policies, which make plain that religion may be a topic of legitimate questioning but CBP officers may not discriminate against any individual for exercising their First Amendment rights. *See* JRDH-Merits-0008824 (DEX41); DEX40; DEX4 ¶¶ 74-78.

Moreover, some Plaintiffs reported that the questioning itself was inoffensive, in that the officers "want[ed] to educate themselves," DEX50 at 278, or were "being nice" and "want[ed] to learn more about [the plaintiff's] personality," DEX60 at 200. The type of religious questioning that this evidence shows—sporadic, part of broader questioning about other topics, and often friendly—does not place "substantial pressure" on Plaintiffs to "violate [their] beliefs." *Lovelace*, 472 F.3d at 187. Viewed objectively, this type of questioning is at most a "mere inconvenience," not a "substantial burden" under RFRA. *New Doe Child #1*, 891 F.3d at 590.

Unsurprisingly, Plaintiffs themselves confirmed that the questioning affected Plaintiffs' religious beliefs minimally if at all, providing further evidence that the questioning did not place "substantial pressure" on them. *See* DEX82 at 238 (Sulayman); DEX56 at 108 (Doe practices religion

"more privately" but otherwise unchanged); DEX76 at 248, 253 (M. Paryavi); DEX58 at 312 (El-Shahat "became more religious"); DEX69 at 343 (Mujanovic); DEX71 at 269-70, 272 (Muminov); DEX60 at 201 (Hachem: "If I want to pray, I pray."); DEX64 at 71 (Kamel); DEX50 at 278 (Al-Sahlani). Admittedly, some plaintiffs reported being emotionally affected by some of the questioning, *see, e.g.*, DEX58 at 333 (El-Shahat); DEX71 at 269-70, 272 (Muminov), or temporarily modifying some habits, *see* DEX60 at 201–205 (Hachem). But neither emotional harm nor a short-term adjustment in habits, standing alone, demonstrates that Plaintiffs endured "substantial pressure." *Lovelace*, 472 F.3d at 187. Indeed, if that were the standard then any individual could create a RFRA claim just by testifying that they took offense to some government action or the action caused them to adjust their habits. And if anything, a single Plaintiff out of the whole group briefly changing their habits and then reverting shows that any "pressure" on Plaintiffs objectively was insubstantial.

Finally, the Court previously described part of this RFRA claim as alleging that "the questioning [of Plaintiffs about their religion] has punitive consequences because the 'details of Plaintiffs' adherence to the Muslim faith' is the reason they end up on the Watchlists, and so all of the attendant harms that flow from Watchlist placement imposes a substantial burden on their free exercise of religion." MTD Op. at 60 (quoting FAC ¶ 1662). To the extent that Plaintiffs still claim that Defendants have substantially burdened Plaintiffs' religious beliefs under RFRA by placing them on the watchlist due to their religion or religious practice (or due to Plaintiffs answers to questions about their religion), Defendants have addressed this argument in Section V, which explains why Plaintiffs' equal protection claim fails. As that section explains, watchlist placement "considers only substantive derogatory information about an individual and not impermissible factors such as religion, race, or other protected characteristics." *See* supra at 105. Thus, any questioning about religion would not have "punitive consequences," further highlighting the lack of substantial pressure.

## B. Defendants Did Not Deter or Prevent Plaintiff Sulayman From Performing Umrah (Count XI).

Next is Sulayman's claim that Defendants have substantially burdened his ability to perform Umrah, a religious pilgrimage. He alleged that his purported watchlist status both discouraged him

from personally performing Umrah and damaged his "standing in his community," "jeopardizing his ability to lead congregations" of Muslims on group Umrah trips. SAC ¶¶ 715, 1671.

As an initial matter, while Sulayman has experienced some travel delays, *see* DEX82 at 27, 29 (at least 45 minutes to obtain boarding pass and 45-60 minutes for security line), and subjectively alleges that those delays "discouraged [him] from organizing and leading" Umrah trips, SAC ¶ 715, RFRA requires an "objective evaluation of the nature of the claimed burden and the substantiality of that burden on the [plaintiff's] religious exercise" to determine if the burden is "substantial." *Real Alternatives, Inc.*, 867 F.3d at 356. And as the Fourth Circuit has already held, certain travel delays—*i.e.*, being "subject to enhanced screening in airports before boarding flights," occasional delays of "up to three hours," or "airport security caus[ing] some missed flights"—are "not dissimilar from what many travelers routinely face." *Elhady*, 993 F.3d at 221, 222. Because the travel delays of which Mr. Sulayman complains are "not dissimilar from what many travelers routinely face," those delays objectively do not place "substantial pressure" on Sulayman to "violate" his beliefs. *Lovelace*, 472 F.3d at 187.

But even if the travel delays that Sulayman experienced *could* constitute a substantial burden on religion, discovery confirmed that Sulayman's religious practice of Umrah was not in fact substantially burdened. Despite believing that he was on the watchlist and despite experiencing some travel delays, Sulayman performed Umrah "consistently before COVID," DEX82 at 133, including at least in 2017, 2018, and 2019, *id.* at 71, 134, and as of his deposition planned to perform Umrah again in 2023, *id.* at 96, 98-99. In fact, Sulayman never missed Umrah because of the watchlist, *id.* at 263-64, only deciding not to perform Umrah in 2020 and 2021 because of the COVID pandemic, *id.* 134, and in 2022 because he was "busy with work," *id.* at 133-134. Sulayman further acknowledged that even with the travel delays that he experienced, with "time," "effort," and "patience" he was still "able to complete [his] job" as an Imam to bring other Muslims on Umrah along with him. *Id.* at 201.

Discovery similarly disproved any Umrah-related damage to Sulayman's "standing in his community." SAC ¶¶ 715, 1671. Sulayman testified that nobody who believes he is on the TSDS thinks less of him: he's "still their imam, [he's] still their leader," and they "trust" him. *Id.* at 204-205. While some may have been initially hesitant to travel with him after hearing about his travel difficulties,

they ultimately realized that "it's okay to travel, to go make Umrah with him," and since then his "groups got bigger and bigger." *Id.* at 205-06. In fact, when an article about Sulayman and his travel experiences was published in the Seattle Times, dozens of people reached out to him in support, and he did not receive a single negative reaction. *Id.* at 249-250. Sulayman's standing in his community remains strong, so the evidence thus does not support Sulayman's Umrah-based RFRA claim.

## C.  The TSDS and Questioning at Borders and By Law Enforcement Enhance Security.

Even if a substantial burden did exist, the RFRA claims would still fail because as explained above the watchlist enhances security and meets whatever level of scrutiny applies to it. *See supra* Section IV.B & V.D. Indeed, courts have already upheld the watchlisting process and the resulting enhanced screening process at airports under similar strict scrutiny analyses. *See Mohamed*, 266 F. Supp. 3d at 88 ("[The] Court finds that the [No Fly] List is necessary and sufficiently narrowly tailored to achieve a compelling government interest and therefore does not violate Plaintiff's substantive due process rights."); *see also Elhady*, 303 F. Supp. 3d at 466 (relying on *Mohamed* to dismiss similar claims).

The same holds true in the specific context of inspection and questioning at the border: the questioning that Plaintiffs underwent is the least restrictive means of advancing the government's compelling interests. In addition to the compelling interest in national security and anti-terrorism, the federal government has the "long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *U.S. v. Ramsey*, 431 U.S. 606, 616 (1977). CBP thus has substantial authority to question travelers upon reentry into the United States, and "deference is owed to CBP due to its considered expertise in carrying out its mission of protecting the border." *Tabbaa*, 509 F.3d at 106.

Indeed, questioning similar to what occurred here has already been held to satisfy strict scrutiny. In *Tabbaa*, the plaintiffs alleged that the government had a policy of detaining Muslims for hours, questioning them, patting them down, fingerprinting them, and photographing them upon their return into the United States from a particular Islamic conference in Canada. *Id.* at 92. The detained individuals had no criminal records, and the government had no individualized suspicion that they were associated with terrorism. *Id.* After recognizing the undisputed compelling governmental interest

129

in preventing terrorism, *id.* at 103, 106-07, the Second Circuit held that the detentions and "intrusive questions" were the least restrictive means of furthering that compelling interest. *Id.* at 98, 103, 106–07. Likewise here, Defendants questioned allegedly "watchlisted" individuals and their families, and as explained above the religious questioning itself was sporadic, accompanied by questioning on secular topics, and often friendly. This type of questioning, especially given the "deference . . . owed to CBP due to its considered expertise," "did not violate plaintiffs' rights, even under heightened scrutiny." *Tabbaa*, 509 F.3d at 106, 107.

Defendants are thus entitled to summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, the Court should:

- Grant the Motion for Leave to File Material *Ex Parte* and *In Camera*;

- Dismiss all claims against the WLAC Defendants for lack of jurisdiction;

- Dismiss the No Fly List claims for lack of jurisdiction;

- Dismiss the TSDS-related claims of the following Plaintiffs for lack of jurisdiction: Abdurrashid, Abunijem, Albadawi, Din, Doe, El-Shahat, Jardaneh, Kamel, Mohallim, Mujanovic, E. Paryavi, M. Paryavi, Soueidan, Thadi;

- Exclude Plaintiffs' expert report under *Daubert*;

- Refuse to consider the Kottman Declaration and attachment under Fed. R. Civ. P. 56(c)(2); and

- Enter judgment for Defendants on any and all remaining claims: procedural due process and coextensive Administrative Procedure Act (APA) claims, substantive due process claims, equal protection claims, Fourth Amendment claims, Fifth Amendment self-incrimination claims, and Religious Freedom Restoration Act (RFRA) claims.

Dated: June 12, 2025                          Respectfully submitted,

                                              BRETT A. SHUMATE
                                              Assistant Attorney General
                                              Civil Division

                                              KELLY O. HAYES
                                              United States Attorney

                                              /s/ Amy E. Powell
                                              AMY E. POWELL
                                              Senior Trial Counsel
                                              ROBERT W. MEYER
                                              Trial Attorney
                                              United States Department of Justice
                                              Civil Division, Federal Programs Branch
                                              1100 L Street NW
                                              Washington, D.C. 20005
                                              Telephone: (202) 305-0872
                                              amy.powell@usdoj.gov
                                              robert.w.meyer@usdoj.gov

                                              *Counsel for Defendants*