# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

**MUTASEM JARDANEH**, *et al.*,

        Plaintiffs,

Case No. 8:18-cv-02415-PX

v.

**PAMELA BONDI**, *et al.*,

        Defendants.

## <u>PLAINTIFFS' OPPOSITION AND CROSS MOTION<br>FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

# Contents

I.  The Federal Watchlisting System ................................................................................1
  1.  Creation, Growth, and Structure of the Watchlisting Enterprise .......................... 1
  2.  The Government's secret list grew from almost nothing........................................ 1
  3.  HSPD-6 directs federal agencies to create a single, secret list ............................ 2
  4.  The Agency Defendants agree to abide by a standard operating procedure—the
  Watchlisting Guidance—to govern their participation in the Watchlisting Enterprise ..... 2
  5.  The Watchlist's Inclusion Standards ..................................................................... 3
  6.  System-Wide Dissemination and Consequences of Watchlist Status.................... 4
  7.  System Failures and Lack of Efficacy ................................................................... 4

II.  The Watchlist as a Multi-Stage, Systemic Travel-Interference Architecture ....................7
  1.  Complete Denial of Air Travel for No-Fly Plaintiffs (Total Denial of the
  Fundamental Right to Travel) ......................................................................................... 7
  2.  John Doe .............................................................................................................. 7
  3.  Mahad Mohallim.................................................................................................. 8
  4.  Hashem Sehwail.................................................................................................... 8
  5.  Zijad Bosnic ........................................................................................................ 9
  6.  Multi-Stage Travel Interference for Selectee/TSDB Plaintiffs ............................ 9
  7.  Phase One: Watchlist-Triggered Check-In Barriers ........................................... 10
  8.  Phase Two: Heightened Security Checkpoint Screening..................................... 10
  9.  Phase Three: Gate-Area Screening and Pre-Boarding Intervention .................... 11
  10.  Phase Four: Planeside Escorts and Multi-Hour Arrival/Secondary Detentions ... 12
  11.  Land-Border Detentions and Vehicle-Based Interference .................................... 13
  12.  Cross-Context Travel Interference (Rail, Roadside, Foreign Ports, Pedestrian) .. 15
  13.  Domestic Roadway Stops .................................................................................. 15
  14.  Foreign Port Interference .................................................................................. 16
  15.  Pedestrian Interference ...................................................................................... 17

III.  Stigma and Reputational/Community Consequences ......................................................17
  1.  Public Stigmatization and Visibility of Watchlist Status.................................... 17
  2.  Spillover Harms to Family Members and Companions........................................ 19
  3.  Community and Workplace Reputational Harm................................................... 21
  4.  Foreign Dissemination of Terrorism Labels ....................................................... 22
  5.  Behavioral and Social Consequences (Self-Censorship, Withdrawal, Humiliation)
  23
  6.  Travel Deterrence............................................................................................... 23
  7.  Deterrence From Religious Practice ................................................................... 23

IV.  Systemic Religious Targeting ......................................................................................24
  1.  Cross-Agency Religious Interrogation ............................................................... 24
  2.  CBP and FBI Religious Questioning at Land Border Crossings and Airports ..... 24
  3.  FBI Religious Questioning in Non-Travel Settings............................................. 25
  4.  Cross-Decade Consistency (2002-2023).............................................................. 25
  5.  Identity Markers Used as Watchlist Triggers ..................................................... 27
  6.  Terrorism and Extremism Stereotypes Applied Only to Muslims....................... 28

7.  National Origin and Political Profiling Tied to Muslim Regions ........................ 29
8.  Substantial Burdens on Imam Sulayman's Religious Exercise: Umrah And Other Pilgrimage Duties ................................................................................................... 30
V.  Legal Status Deprivations ..................................................................................... 31
VI.  Warrantless Electronic Device Searches and Coercive Interrogations ............................ 33
1.  Non-Routine Electronic Device Searches or Seizures ........................................... 33
2.  Out-of-View Digital Searches ............................................................................ 34
3.  Retention and Confiscation of Electronic Devices ............................................... 34
4.  Government Access to Digital Content .............................................................. 35
5.  Coercive Interrogation Conditions Surrounding Digital Searches ....................... 36
6.  Compelled Passcodes, Biometrics Unlocking, and Other Forced Access ............ 37
VII.  Plaintiffs Have Standing to Sue WLAC Defendants and the Court Should Not Grant Summary Judgment for the WLAC Defendants ........................................................... 39
1.  Plaintiffs Have Standing to Sue the WLAC Defendants ..................................... 39
2.  Plaintiffs' Injuries Are Fairly Traceable to the WLAC Defendants, Who Collectively Manage Their "Watchlisting Enterprise" ........................................ 40
3.  A Favorable Decision for the Plaintiffs Would Require Redress from the WLAC Defendants ........................................................................................................ 41
4.  Each Agency Contributed—Either Through the Watchlist's Overall Policy or Directly by Using Watchlist Information—to Plaintiffs' Injuries ........................ 42
VIII.  Each Plaintiff Has Standing to Challenge their Past or Present Placement on the No Fly List and Watchlist. ................................................................................................. 43
1.  Defendants' Voluntary Cessation Does Not Moot Plaintiffs' Claims. ............... 44
2.  Bosnic and Doe Have Standing to Pursue Their No Fly List Claims ................... 45
3.  Plaintiffs Abdurrashid, Abunijem, Albadawi, Din, Doe, El-Shahat, Jardaneh, Kamel, Mohallim, Mujanovic, E. Paryavi, M. Paryavi, Soueidan, and Thadi have Standing. ............................................................................................................ 47
IX.  Defendants' Decision to Place Plaintiffs on The No Fly List Violated Their Substantive Due Process Rights .................................................................................................... 48
1.  The Freedom of Movement Is a Fundamental Right ........................................... 49
2.  The No Fly List Interferes With Listees' Movement Related Rights, No Matter How This Court Decides to Label Them .............................................................. 50
3.  The No Fly List Is Not Narrowly Tailored ........................................................ 51
4.  The No Fly List Is Underinclusive ..................................................................... 52
5.  The No Fly List Is Overinclusive ....................................................................... 53
6.  Less Restrictive Alternatives Demonstrate the No Fly List Is Not Narrowly Tailored .............................................................................................................. 53
X.  Defendants violated Plaintiffs' procedural due process rights by listing them ................ 54
A.  Elhady Only Narrowly Controls a Facial TSDS Challenge ................................ 55
B.  Mathews Prong I: Being Listed Is a Deprivation of Protected Interests .................... 56
1.  The No Fly List Deprived Plaintiffs of Their Right to Travel ............................. 57
2.  TSDS Plaintiffs Are Deprived of Their Right to Travel .................................... 58
3.  Plaintiffs Are Deprived of Their Reputational Interests, Protected by the Stigma-Plus Doctrine ....................................................................................................... 60
4.  Plaintiffs are deprived of property interests in licenses, permits, and agency-conferred statuses, independent of stigma-plus. ................................................. 68

     C.      Mathews Prong II: Risk of erroneous deprivation and value of safeguards ...............69
         1.    The Risk of Erroneous Deprivation Is Extremely High.......................... 70
         2.    Probative value of additional process .................................................. 73
     D.      Mathews Prong III: Government interest and function ...............................78
         1.    The Government's interest in the TSDS ............................................... 79
         2.    No Fly List ........................................................................................... 80
         3.    Judicious Balancing Compels Procedural Reforms .............................. 81
XI.    The Court Should Not Enter Summary Judgment for Defendants on Plaintiffs' Equal Protection Claim (Count V) ..............................................................................................85
         1.    The Court Should Not Exclude the Expert Report of Dr. Huber Under *Daubert*  85
         2.    Dr. Huber's Methodology Passes the *Daubert* Reliability Test and Does Not Contain Undue Bias. .......................................................................................... 85
         3.    Dr. Huber's Methodology Is Reliable. .................................................. 86
         4.    Dr. Huber's Study Does Not Contain the Type of "Incomplete Data" Excluded by the Courts ...................................................................................................... 96
         5.    Dr. Huber's Testimony Is Helpful and Relevant to the Trier of Fact in This Case 99
         6.    The Government's placement and maintenance of Plaintiff's on the watchlist violates the Equal Protection Clause of the Fourteenth Amendment. ........................... 102
         7.    Plaintiffs Have Shown That the Government Acted With Discriminatory Animus to Place and Maintain Their Watchlist Status ................................................. 103
         8.    The Government's implementation of the TSDS interest fails strict scrutiny.... 109
XII.   Defendants Violated Plaintiffs Fourth Amendment Right Against Unreasonable Forensic Searches of their Phones ..........................................................................................................110
     A.      The Remaining Plaintiffs Retain Standing .................................................111
     B.      Watchlist-Based Device Searches at the Border Violate Kolsuz..............................113
XIII.  The Court Should Not Grant Summary Judgment on Plaintiffs' Fifth Amendment Self Incrimination Claims (Count VIII) .........................................................................................116
     A.      Because The Injuries Are Set to Repeat In The Future, Plaintiffs Retain Standing ..116
     B.      Provision of Electronic Device Passcodes Is Protected Testimony and Potentially Incriminating ..................................................................................................................117
     C.      Defendants Impose Sanctions on Plaintiffs Invoking Their Fifth Amendment Rights by Confiscating Their Phones or Prolonging Their Detention ...............................................119
XIV.  Defendants violated Plaintiffs rights to religious exercise under RFRA ...................121
     A.      Plaintiff Sulayman Was Substantially Burdened ........................................122
     B.      TSDS Plaintiffs Were Substantially Burdened .........................................123
     C.      Defendants Cannot Satisfy Strict Scrutiny ............................................125

**TABLE OF AUTHORITIES**

# CASES

"*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992 ..................................................... 39, 42

*Abbot v. Pastides*, 900 F.3d 160 (4th Cir. 2018) .......................................................... 43

*Abdi v. Wray*, 942 F.3d 1019(10th Cir. 2019) ............................................................ 63

*Abu Irshaid v. Garland*, No. 1:24-CV-01405, 2025 WL 756544 (E.D. Va. March 10, 2025) ..... 57

*Am. Civil Liberties Union v. C.I.A.*, 710 F.3d 422 (Dc. Cir. 2013) .............................. 44

*Aptheker v. Sec'y of State*, 378 U.S. 500 (1964) ........................................................ 49

*Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) ................................... 55

*Bell v. Burson*, 402 U.S. 535 (1971) ........................................................................... 68

*Bolling v. Sharpe*, 347 U.S. 497 (1954) ..................................................................... 101

*Borowski v. U.S. Customs & Border Prot.*, 718 F. Supp. 3d 280 (W.D.N.Y. 2024) .................. 66

*Bosnic v. McCabe, et. al*, No. 3:17-cv-00826 (M.D. Fla.), ECF No. 33 (Aug. 15, 2018) ............ 44

*Bosnic v. Wray*, No. 3:17-cv-826 (M.D. Fla. 2017) ....................................................... 9

*Brown v. Nucor Corp.*, 785 F.3d 895 (4th Cir. 2017) ............................................... 97, 98

*Brown v. Walker*, 161 U.S. 591 (1896) ...................................................................... 117

*Brown v. Woodland Joint Unified School Dist.*, 27 F.3d 1373 (9th Cir. 1994) ......................... 123

*Bucklew v. Precythe*, 587 U.S. 119 (2019) ................................................................. 54

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ................................... passim

*Busic v. Trans. Security Admin.*, 62 F.4th 547 (D.C. Cir. 2023) ................................. 83

*Cafeteria and Restaurant Workers Union v. McElroy*, 367 U.S. 886 (1961) .............. 67

*Califano v. Aznavorian*, 439 U.S. 170 (1978) .............................................................. 56

*Carey v. Piphus*, 435 U.S. 247 (1978) ........................................................................ 69

*Chicago Tchrs. Union, Loc. No. 1, AFT, AFL-CIO v. Hudson*, 475 U.S. 292 (1986) ............... 73

*Christopherson v. Allied Signal Corp.*, 939 F.2d 1106 (5th Cir. 1991) ........................................ 90

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ................................................................. 77

*Clapper v. Amnesty Int'l U.S.A.*, 568 U.S. 398 (2013) ................................................... 39

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ............................ 55, 75, 76, 82

*Cnty. of Los Angeles v. Davis*, 440 U.S. 625 (1979)........................................................ 45

*Coalition for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864 (4th Cir. 2023) ................................. 101

*Collins v. City of Harker Heights*, 503 U.S. 115 (1992)...................................................... 47

*Common Cause v. Biden*, 478 F.3d 1280 (D.C. Cir. 2014) ........................................... 39

*Concrete Pipe v. Constr. Laborers Pension Tr.*, 508 U.S. 602 (1993)........................................ 77

*Connally v. General Construction Co.*, 269 U.S. 385 (1926).................................................. 77

*Crandall v. State of Nevada*, 73 U.S. 35 (1867) ........................................................... 48

*Crowley v. Chait*, 322 F. Supp. 2d 530 (D.N.J. 2004) ..................................................... 90

*D.B. v. Cardall*, 826 F.3d 721 (4th Cir. 2016) ....................................................... passim

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).......................................... passim

*Dixon v. Love*, 431 U.S. 105 (1977) ................................................................. 68

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)................................................ 48, 49

*Doe v. Dep't of Public Safety ex rel. Lee*, 271 F.3d 38 (2d Cir. 2001) ....................................... 62

*Educ. Media Co. at Virginia Tech v. Insley*, 731 F.3d 291 (4th Cir. 2013)................................... 55

*EEOC v. Freeman*, 778 F.3d 463 (4th Cir. 2015) ..................................................... 95, 96

*EEOC v. Freeman*, 961 F. Supp. 2d 783 (D. Md. 2013) ............................................ 96, 97, 98

*EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3d 749 (6th Cir. 2014)....................................... 93, 94

*El Ali v. Barr*, 473 F. Supp. 3d 479 (D. Md. 2020)........................................................ 50

*Elhady v. Kable*, 993 F.3d 208 (2021)............................................................... passim

*Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234 (2024) .................................................. passim

*Fernandez v. RentGrow, Inc.*, 116 F.4th 288 (4th Cir. 2024) ........................................ 60

*Fikre v. FBI*, 904 F.3d 1033 (9th Cir. 2018) ............................................................... 44, 45

*Fikre v. Fed. Bureau of Investigation*, 35 F.4th 762 (9th Cir. 2022) ...................................... 58, 73

*Fikre v. Wray*, No. 3:13-CV-00899, 2020 WL 4677516 (D. Or. Aug. 12, 2020) ............ 58, 60, 61

*First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765 (1978) ............................................. 51

*Fisher v. United States*, 425 U.S. 391 (1976) ............................................................ 115

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) .................................... 39

*Friends for Ferrell Pwky, LLC v. Stasko*, 282 F.3d 315 (4th Cir. 2002) ..................................... 39

*Friends of the Earth v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000) .................. 43

*Gete v. I.N.S.*, 121 F.3d 1285 (9th Cir. 1997) ........................................................... 82

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ............................................................... 75, 79

*Goss v. Lopez*, 419 U.S. 565 (1975) ................................................................... 75

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ............................................................ 50, 108

*Haig v. Agee*, 453 U.S. 280 (1981) ................................................................... passim

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ............................................................... passim

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) ................................................. 78

*Ibrahim v. Dep't of Homeland Sec.*, 62 F. Supp. 3d 909 (N.D. Cal. 2014) ................................ 45

*In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213 (S.D.N.Y. 2018) ........................................................................................... 93

*In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, No. 12-md-2342, 2015 WL 7776911 (E.D. Pa. Dec. 2, 2015) ............................................................................. 91

*In Re. Libitor Marketing, Sales Practices and Products liability Litigation v. Pfizer, Inc.*, 892 F.3d 624 (4th Cir. 2018)................................................................................. 99

*In Re: Paraquat Prods. Liab. Litig.*, 730 F. Supp. 3d 793 (S.D. Ill. 2024) ................................ 91

*Incumaa v. Stirling*, 791 F.3d 517 (4th Cir. 2015)............................................................. 71, 78

*Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty., Md.*, 915 F.3d 256 (4th Cir. 2019) ................................................................................................................. 78, 108

*Jibril v. Mayorkas*, 101 F.4th 857 (D.C. Cir. 2024) ................................................................ 47

*Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123 (1951) ....................................... 81

*Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019) ..................................................... 44, 56, 75, 83

*Kastigar v. United States*, 406 U.S. 441 (1972)................................................................... 118

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963)............................................................. 81

*Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018) ................................................................... 110

*Kent v. Dulles*, 357 U.S. 116 (1958) ....................................................................... 48, 57, 59

*Kerry v. Din*, 576 U.S. 86 (2015)........................................................................... 56, 57, 60

*Koehler v. Infosys. Techs. Ltd. Inc.*, 628 F. Supp. 3d 836  (E.D. Wis. 2022)............................ 92

*Kopf v. Skyrm*, 993 F.2d 374 (4th Cir. 1993) ....................................................................... 98

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................. 85, 90, 98

*Latif v. Holder*, 28 F. Supp. 3d  1134  (D. Or. 2014) ............................................................ 50

*Lefkowitz v. Cunningham*, 431 U.S. 801 (1977) .................................................................. 118

*Lefkowitz v. Turley*, 414 U.S. 70 (1973) ............................................................................ 118

*Long v. Bondi*, 151 F.4th 503 (4th Cir. 2025)................................................................ passim

*Lovelace v. Lee*, 472 F.3d 174 (4th Cir. 2006) ............................................................ 120, 122

*Mackey v. Montrym*, 443 U.S. 1 (1979).............................................................................. 65

*Maniar v. Mayorkas*, 2023 WL 2709040 (D. D.C. Mar. 30, 2023)................................................ 44

*Marchetti v. U.S.*, 390 U.S. 39 (1968) ................................................................................. 117

*Mathews v. Eldridge*, 424 U.S. 319 (1976)........................................................................ passim

*McLean v. Morgan*, No. 20-2145, 2020 WL 5094683 (D. Kans. Aug. 28, 2020)................. 65, 66

*Minnesota v. Murphy*, 465 U.S. 420 (1984) .......................................................................... 118

*Mitchell v. Helms*, 530 U.S. 793 (2000) ............................................................................... 123

*Mohamed v. Holder*, 266 F.Supp.3d 868 (E.D. Va. 2017) ..................................... 49, 59, 110, 124

*Mohamed v. Holder*, 995 F. Supp. 2d 520 (E.D. Va. 2014) ................................... 69, 70, 113, 114

*Mokdad v. Sessions*, 876 F.3d 167 (6th Cir. 2017) ................................................................. 44

*Mora v. City of Gaithersburg, Md.*, 519 F.3d 216 (4th Cir.2008) ............................................. 81

*Morrison v. Garraghty*, 239 F.3d 648 (4th Cir. 2001)............................................................. 101

*Morrissey v. Brewer*, 408 U.S. 471 (1972) .............................................................................. 56

*Murthy v. Missouri*, 603 U.S. 43 (2024) ........................................................................... 39, 43

*Nat'l Council of Resistance of Iran v. Dep't of State* (*NCRI*), 251 F.3d 192 (D.C. Cir. 2001)

............................................................................................................................. passim

*Navarette v. California¸* 572 U.S. 393 (2014) ................................................................ 114, 115

*North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) .......... 101

*Nur v. Unknown CBP Officers*, 2022 WL 16747284 (E.D. Va. Nov. 7, 2022) ........................... 44

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ......................................................................... 43, 110

*Paul v. Davi*s, 424 U.S. 693 (1976) ................................................................................. 60, 61

*Payne v. Travenol Labs.*, 673 F.2d 798 (5th Cir. 1982) ............................................................ 96

*Pentlarge v. Murphy*, 541 F. Supp. 2d 421 (D. Mass. 2008)............................................. 118, 120

*Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979) ................................ 101, 103, 105

*Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.* (*Friends*), 767 F. Supp. 3d 293 (D. Md. 2025) ...................................................... 120, 121, 122

*Pope v. Williams*, 193 U.S. 621 (1904) ...................................................... 49

*Rahman v. Chertoff*, 530 F.3d 622 (7th Cir. 2008) ...................................................... 78

*Regino v. Staley*, 133 F.4th 951 (9th Cir. 2025) ...................................................... 54

*Reno v. Flores*, 507 U.S. 292 (1993) ...................................................... 48

*Republican Party of Minnesota v. White*, 416 F.3d 738 (8th Cir. 2005) ...................................................... 50

*Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165 (4th Cir.2009) ...................................................... 55

*Riley v. California*, 573 U.S. 373 (2014) ...................................................... 112, 119

*Rogers v. United States*, 340 U.S. 367 (1951) ...................................................... 117

*Sanchez v. Boston Scientific Corp.*, 2014 WL 4851989 (Sept. 29, 2014) ...................................................... 89

*Sardis v. Overhead Door Corp.*, 10 F.4th 268 (4th Cir. 2021) ...................................................... 85

*School Dist. of Grand Rapids v. Ball*, 473 U.S. 373 (1985) ...................................................... 123

*Sciolino v. City of Newport News*, 480 F.3d 642 (4th Cir. 2007) ...................................................... 60, 61

*Shapiro v. Thompson,* 394 U.S. 618 (1969) ...................................................... 49

*Shaw v. Hunt*, 517 U.S. 899 (1996) ...................................................... 108

*Shirvinski v. Coast Guard*, 673 F.3d 308 (4th Cir. 2012) ...................................................... 60

*Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140 (4th Cir. 2014) ...................................................... 81

*Snowden v. Hughes*, 321 U.S. 1 (1944) ...................................................... 102

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ...................................................... 38

*Sprint Communications Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008) ...................................................... 40

*Suhre v. Haywood Cnty.*, 131 F.3d 1083 (4th Cir. 1997) ...................................................... 47, 116

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ...................................................... 43

*Sylvia Dev. Corp. v. Calvery Cnty., Md.*, 48 F.3d 810 (4th Cir. 1995).............................. 102, 103

*Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) ........................................................ 124

*Tarhuni v. Lynch*, 129 F.Supp.3d 1052 (D. Or. 2015) .................................................. 44

*Terry v. Ohio*, 392 U.S. 1 (1968) ........................................................................... 113

*Turner v. Rogers*, 564 U.S. 431 (2011).................................................................... 69

*Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137 (4th Cir. 1994)....................... 86, 87

*U.S. v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019) ....................................................... 114

*U.S. v. Aigbekaen*, No. CR 15-0462, 2022 WL 3106949 (D. Md. Aug. 3, 2022) .................... 117

*United States v. Arvizu*, 534 U.S. 266 (2002) ........................................................... 113

*United States v. Baller*, 519 F.2d 463 (4th Cir. 1975) ................................................. 87

*United States v. Cortez*, 449 U.S. 411 (1981) ........................................................... 113

*United States v. Crisp*, 324 F.3d 261 (4th Cir. 2003) .................................................. 85

*United States v. Giddins*, 858 F.3d 870 (4th Cir. 2017)............................................... 119, 120

*United States v. Guest*, 383 U.S. 745 (1966)............................................................. 50

*United States v. Hubbell*, 530 U.S. 27 (2000)............................................................ 116

*United States v. Johnson*, 122 F. Supp. 3d 272 (M.D.N.C. 2015)............................................ 106

*United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) ................................................ 112, 114

*United States v. Montoya de Hernandez*, 473 U.S. 531 (1985) ........................................ 112, 123

*United States v. Moore*, 145 F.4th 572 (4th Cir. 2025) ...................................... 104, 105, 106, 107

*United States v. Nkongho*, 107 F.4th 373 (4th Cir. 2024)........................................... 114

*United States v. Ramon*, 86 F. Supp. 2d 665 (W.D. Tex. 2000) ................................. 123, 124, 125

*United States v. Reese*, 92 U.S. 214 (1876) .......................................................... 77, 83

*United States v. Sweets*, 526 F.3d 122 (4th Cir. 2007) ............................................. 116

*United States v. W. T. Grant Co.*, 345 U.S. 629 (1953) ................................................. 43

*United States v. Wilson*, 484 F.3d 267 (4th Cir. 2007) ..................................................... 85

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000) ................................. 41

*Washington v. Davis*, 426 U.S. 229 (1976) ........................................................... 101, 103

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ............................................ 47, 50, 55

*Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990) ..................................... 69

*West Virginia v. EPA*, U.S. 697 (2022) ................................................................. 43

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) ............................ 86, 93, 99, 100

*Wilkinson v. Austin*, 545 U.S. 209 (2005) ....................................................... 71, 74, 75

*Williams v. Fears*, 179 U.S. 270 (1900) .............................................................. 48

*Williams v. Hobbs*, 662 F.3d 994 (8th Cir. 2011) ......................................................... 74

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127 (D.D.C.
2025) ......................................................................................... 67

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. CV 25-917 (RJL),
2025 WL 2105262 (D.D.C. June 26, 2025) ......................................................... 67

*Wilwal v. Nielsen*, 346 F.Supp.3d 1290 (D. Minn. 2018) ............................................. 110

## STATUTES

49 C.F.R. § 1572.5(a) ........................................................................... 64

8 C.F.R. § 235.12(a) ............................................................................ 65

8 C.F.R. § 235.12(b)(2)(vi) ..................................................................... 65

## OTHER AUTHORITIES

U.S. Const. amend. XIV, § 1 .................................................................. 101

# RULES

Fed. R. Evid. 702 ............................................................................................. 84, 95, 98

## INTRODUCTION

This case challenges the federal watchlisting system that Judge Xinis has already described as a "black box" that imposes 'humiliating' travel restrictions and provides individuals with "little to no opportunity to be heard." The undisputed record developed in discovery confirms those findings: Plaintiffs across decades, airports, borders, and agencies were subjected to identical patterns of travel interference, religious interrogation, reputational stigma, warrantless digital searches, and coercive questioning based solely on their watchlist status. These facts, taken together, establish constitutional violations across Procedural Due Process, Substantive Due Process, Equal Protection, the Fourth and Fifth Amendments, and RFRA.

## FACTS

## I.  THE FEDERAL WATCHLISTING SYSTEM

### A.      Creation, Growth, and Structure of the Watchlisting Enterprise

Prior to 9/11, federal watchlists were limited in size and purpose. The No Fly List contained twelve individuals and applied only to persons "known to pose a direct threat to civil aviation." Nat'l Comm'n on Terrorist Attacks Upon the United States, *The 9/11 Commission Report*, §3.3 https://www.9-11commission.gov/report/ (last visited November 25, 2025). As of April 2003, there was still no unified government-wide watchlist; multiple agency-specific lists existed, each narrow in scope and function. *Review of the Terrorist Screening Center Audit Report 05-27*, iii (June 2005) (PLX 42).

### 1.      The Government's secret list grew from almost nothing

Prior to 9/11, federal watchlists were limited in size and purpose. The No Fly List contained twelve individuals and applied only to persons "known to pose a direct threat to civil aviation." Nat'l Comm'n on Terrorist Attacks Upon the United States, *The 9/11 Commission Report*, §3.3 https://www.9-11commission.gov/report/ (last visited November 25, 2025). As of April 2003,

there was still no unified government-wide watchlist; multiple agency-specific lists existed, each narrow in scope and function. *Review of the Terrorist Screening Center Audit Report 05-27*, iii (June 2005) (PLX 42).

### 2. HSPD-6 directs federal agencies to create a single, secret list

HSPD-6 directed federal agencies to consolidate their watchlists into a single, government-wide system. By 2004, it contained 207,553 records, PLX42 at viii n.9, and it now exceeds 1.8 million. PLX23, DEX14 ¶ *7.* This list is disseminated to most federal agencies, every police department in the country, hundreds of private companies, and dozens of foreign governments, resulting in billions of screenings each year. DEX10 at 27, 31–36; *see* PLX20 ¶¶ 4–9; PLX22 ¶ 5; PLX21 Decl. ¶ 8; PLX18 ¶ 4. Consistent with HSPD-6, the agencies sued here created the Watchlisting Enterprise to consolidate federally held terrorist information into one system. *See* DEX1 ¶ 9. This enterprise includes the Watchlist Advisory Committee (WLAC), a decision making body which creates the Government's Watchlisting Guidance through a "consensus driven process." *See* Dkt. 343-1 at G; DEX1 ¶¶ 77–85; PLX17 at 51:16–19; *see generally* DEX23.

### 3. The Agency Defendants agree to abide by a standard operating procedure—the Watchlisting Guidance—to govern their participation in the Watchlisting Enterprise

To implement this system, Defendants have agreed to evaluate the "terrorist information" they possess against inclusion standards in a shared standard operating procedure and nominate individuals who meet those standards for placement on the consolidated list. *See generally* PLX16; *see also* PLX17 at 32:9 (Watchlisting Guidance is a "consensus driven process"). One version of Watchlisting Guidance, dated March 2013, became public after a leak was published on August 5, 2014, and it was in effect when several Plaintiffs were listed. PLX16; PLX17 at at 28:9–11; *see* Dkt. 1 (August 8, 2018). This version was the first public disclosure of the No Fly List inclusion

standard.[1] *See Mohamed v. Holder,* 1:11-cv-00050, Dkt. 102-2, *5 (May 28, 2014) (redacting the

No Fly List's inclusion standard); *Watch Commander, Jeremy Scahill and Ryan Devereaux, The*

*Intercept* (August 5, 2014), https://theintercept.com/2014/08/05/watch-commander/.

### B.    The Watchlist's Inclusion Standards

The Watchlisting Guidance sets the inclusion standards for the consolidated list, adopted

by unanimous consent of participating agencies. PLX17 at 32:9; *see* PLX16 at 50.  The TSDS

standard requires only "reasonable suspicion" that an individual is a "known or suspected

terrorist," a standard that does not require suspicion of criminal activity. PLX16 at 36–37; *see*

DEX1 ¶¶ 12, 19. Under this standard, individuals may be listed based on lawful conduct, "in

preparation for, in aid of, or related to terrorism and/or terrorist activities." *See, e.g.*, PLX16  at 33,

37; DEX1 ¶ 12.

Although formally undisclosed, the Selectee List standard is publicly known from a leak

of the Watchlisting Guidance and permits listing of any person "associated with terrorist activity."

DEX1 ¶ 12; DEX5 ¶ 34; PLX16  at 55. The No Fly List standard requires only reasonable suspicion

that an individual "represents…a threat of engaging in or conducting a violent act of terrorism"

and is "operationally capable" of doing so, without requiring suspicion of criminal wrongdoing.

DEX1 ¶ 21; PLX16  at 52.

Collectively, these standards permit listing based solely on lawful associations or activities.

*See* DEX1 ¶¶ 12, 21; DEX5 ¶ 34; PLX16  at 52, 55. The Watchlisting Guidance authorizes listing

based on foreign travel undertaken for "no known lawful or legitimate purpose to a locus of

terrorist activity," associations with schools or institutions believed to "teac[h] or espous[e]"

---

[1] *Leaked Guidelines for Placement on No-Fly List Show System Ripe for Abuse*, CENTER FOR CONSTITUTIONAL RIGHTS: PRESS CENTER (July 14, 2024), https://ccrjustice.org/home/press-center/press-releases/leaked-guidelines-placement-no-fly-list-show-system-ripe-abuse.

3

ideologies supporting violence, and the listing of "associates or affiliates" of already-listed associations. *See* PLX16 at 36 ; PLX16 at 39 It also permits listing of "individuals with any degree of a terrorism nexus." PLX42 at viii.

### C.    System-Wide Dissemination and Consequences of Watchlist Status

An "encounter" is any event in which an individual is identified during a screening process. PLX16 at 59. Across travel, law enforcement, and administrative contexts, agencies check individuals against the watchlist. DEX1 ¶¶ 39–47. Those designated as "known or suspected terrorists" are subjected to heightened scrutiny during these encounters. DEX1 ¶¶ 47–49.

The Watchlisting Guidance standardizes agency responses to listees. See Evetts Dep. at 31:2–18. Information collected at during encounter is treated as "terrorist information," and may include electronic devices or media, account numbers, photographs, and other materials. PLX16 at 66. TSC disseminates this information in accordance with the Watchlisting Guidance. PLX16 at 71. A person's watchlist status is effectively permanent. DEX12 at 18–19, 21. Even after unlisting, past status can prevent an individual from obtaining permits, licenses, or access to federal buildings. *See id.*

### D.    System Failures and Lack of Efficacy

The Government asserts that its watchlist is effective and points to interdicted items—"at least 20 prohibited items," DEX5 ¶¶ 71–72,—and one specific encounter in August 2009 where "an individual on the watchlist" was arrested "as he was about to leave the country." DEX4 ¶61. But these efficacy assertions are so vague as to be unreliable. Indeed, there is no basis in any of the Government's efficacy facts that it was the watchlist, rather than law enforcement officers' focused attention on an individual of interest, that led to the August 2009 arrest.

4

The watchlist is one of several measures the Government uses to protect civil aviation and national security. *See, e.g.*, DEX5 ¶¶ 12–14. Other security measures—including criminal investigations, airport screening, air marshals, and reinforced cockpit doors—serve the same objectives. *See id*. The watchlist has been used in billions of encounters. PLX20 ¶¶ 4–9; PLX22 ¶ 5; PLX21 ¶ 8; PLX18 ¶ 4; *see* PLX25 ¶ 3. Despite its use in billions of encounters, there is no evidence that the watchlist has ever prevented an act of terrorism, directly or indirectly. *See* DEX18 at 165:2–3 (NCTC has no record of any act of terrorism prevented by the watchlist); *see* PLX20 ¶¶ 4–9; DEX5 ¶ 5; PLX21 ¶ 8; PLX18 ¶ 4.

Although the No Fly List generally bars listees from boarding aircraft that transit U.S. airspace, the Government permits listees to fly under a "one-time waiver" process described in the Watchlisting Guidance. *See* DEX 17 at 319:4–11*;* DEX1 n.6. The waiver process has been used for years without any indication that allowing listed individuals to fly has created a security issue. *See* DEX 17 at 319:4–11*;* DEX17 at 312:17–21 (stating that the criteria for a one time waiver is when an American overseas unexpectedly finds themselves on the No Fly list and needs to get back to the United States); *see, e.g.*, DEX52 at 148:3–5; DEX52 at 148:1–150:18.

The Government asserts that the watchlist advances national security by providing a "common operating picture," allowing agencies share information about individuals encountered across different contexts. *See* Dkt. 343-1 at 2 (citing DEX1 ¶ 11); *The 9/11 Commission Report*, at §§ 8.2, 13.3. This information-sharing function does not depend on imposing adverse consequences such as travel bans, denials, or employment restrictions; it could occur without those impacts. *See also The 9/11 Commission Report*, at § 13.3.

The administrative process for individuals who believe they are on the list is DHS TRIP. PLX19 ¶ 3. DHS TRIP results reflect a high error rate: in one year, of the eighteen U.S. persons

on the No Fly List who used DHS TRIP, eight were removed. PLX19 ¶¶ 7–10. For U.S. persons

on TSDS only, roughly one-third were removed after submitting DHS TRIP complaints. *See id.*

The watchlist's shortcomings are illustrated by several documented failures. Khalid Sheikh

Mohamed was listed before 9/11, yet the list did not prevent the attacks. *The 9/11 Commission*

*Report*, at § 3.3. Umar Farouk Abdulmuttalab's father provided information sufficient to justify

listing, but he was not listed before attempting to detonate explosives on a commercial flight.

PLX28 at 3–4. Foreign authorities raised concerns about one of the Boston Marathon bombers,

but he was not placed on the list. *See, e.g.*, PLX29 at 13. The Times Square bomber was listed only

after his first attempt, and the listing did not prevent him from boarding an airplane before his

arrest. DEX18 at 148:5. Omar Mateen was listed and later removed before killing fifty people at

the Pulse nightclub, and even if he remained listed, PLX30, federal law would not have prevented

him from purchasing a firearm except in states with watchlist-based restrictions, such as New

Jersey. *See* DEX1 ¶ 43; NJ Rev Stat § 2C:58-3 (2024).

I.    **The List is Comprised of Almost Exclusively Muslim Names**

The contents of the watchlist demonstrate that it is composed almost entirely of Muslim

names. *See* Huber Rep., DEX111 ¶ 7; PLX14; PLX15. Plaintiffs' expert estimates that

approximately ninety-nine percent of entries in the Government's watchlist are Muslim. DEX111

¶ 7. PLX14; PLX15; DEX117, Ex. A; *see* PLX44 at 9:20–11:21; *see also* PLX27. Dr. Huber

compared the leaked dataset to the Government's description of its own records and found

substantial statistical overlap, including similar age distribution, entry counts, and distinctive birth-

month patterns, and concentrations of common Muslim names. DEX111 ¶¶ 14, 19–20. Nearly

one-third of the entries include, as part of the first or last name, a component of the Prophet

Muhammad's name, PLX23 ¶ 8, and the fifty most frequent names are Muslim names. DEX 111 at 14 (Table 4). *See generally* DEX111.

## II. THE WATCHLIST AS A MULTI-STAGE, SYSTEMIC TRAVEL-INTERFERENCE ARCHITECTURE

At airports, land borders, and foreign inspection points, federal officers act on watchlist information in coordinated, sequential stages that produce repeated check-in barriers, gate-area searches, planeside escorts, and multi-hour secondary detentions. These burdens reflect coordinated actions by Defendants, foreign authorities, and state and local officers who implement watchlist screening at each stage of travel.

### A. Complete Denial of Air Travel for No-Fly Plaintiffs (Total Denial of the Fundamental Right to Travel)

Four Plaintiffs—Doe, Mohallim, Sehwail, and Bosnic—were entirely barred from flying. Unlike the multi-stage delays and detentions imposed on other Plaintiffs, these individuals were repeatedly denied boarding together, stranded abroad, or permitted to travel under restrictive government waivers.

#### 1. John Doe

In 2017, Doe was removed from a connecting flight in Mexico City by four FBI agents, told he was not permitted to fly, interrogated for approximately an hour, and escorted to the United States—Mexico border.[2] In 2018, Mexican officials detained him at the airport, refused him entry, questioned him, referred to him as a "terrorista, terrorista," and deported him to the United States.[3] In 2020, Turkish officials denied him entry and deported him after stating that the United States

---

[2] DEX56 at 246:14–247:15; DEX55 at 14.
[3] DEX56 at 89:12–19, 91:1–15, 249:18–251:20; DEX55 at 15.

had identified him as a terrorist and a threat.[4] In 2023, airline personnel denied him boarding on a flight connection through Canada and sated that Canada would not permit him in its airspace.[5] Doe was removed from the No Fly List only after filing suit and only after foreign denials had already prevented him from using commercial air travel.[6]

### 2. Mahad Mohallim

In July 2018, Mohallim and his mother were refused boarding twice in Doha, had red "High" stickers affixed to their passports, and were directed to the U.S. Embassy.[7] Embassy officials instructed him to file a DHS TRIP inquiry and return for a follow-up appointment two days later.[8] At that appointment, two FBI agents interrogated him, stated that he could fly only if he cooperated, and told him that neither he nor his mother could return to Kenya until "we sort it out on our end."[9] Despite being instructed to rebook at least two weeks out, subsequent attempts to depart were unsuccessful, and they remained stranded in Qatar for more than one month before being permitted to return to the United States.[10] He was later informed that he was removed from the No Fly List in April 2021.[11]

### 3. Hashem Sehwail

In January 2018, Sehwail was denied boarding at both Istanbul Airport and Queen Alia International Airport in Jordan.[12] He was permitted to fly to the United States only after his attorneys filed suit and notified the Department of Justice of his scheduled flight to Jacksonville.[13]

---

[4] DEX56 at 51:19–21, 52:4–53:12; DEX55 at 18.
[5] DEX56 at 47:20–48:21.
[6] DEX6 at 44–46, Exhibit No. 11 (Sept. 15, 2017).
[7] DEX66 at 10–11; DEX67 at 90:4–22, 91:18–24, 86:15–21.
[8] DEX67 at 94:15–22, 93:9–25.
[9] DEX67 at 98:10–99:16, 100:8–101:13, 102:21–104:10, 106:19–107:9.
[10] DEX67 at 104:13–24, 105:19–106:11, 107:20–108:8, 109:2–4, 110:1–22; DEX66 ¶ 3.
[11] DEX67 at 186:13–25; DEX6 at 68–70, Exhibit No. 19 (Apr. 26, 2021).
[12] DEX78 at 46:6–11, 46:19–21; DEX77 at 10–11.
[13] DEX78 at 95:3–18, 49:18–50:19, 170:21–171:4.

See *Sehwail v. Wray*, No. 1:18-cv-00132 (E.D. Va. 2018). Upon arrival, two FBI agents detained him at the gate for thirty to forty-five minutes, searched his luggage and phone, and denied him boarding on his connecting flight to Fort Lauderdale, forcing him to drive home—arriving more than a month after his originally scheduled return.[14] In 2019, he was denied boarding three times on a trip from Miami to Chicago for his engagement party and instead drove sixteen hours with his fiancé.[15] His No Fly List status also prevented him from flying with his wife to visit her family.[16] He was later informed during this litigation that he is no longer on the No Fly List.[17]

### 4.    Zijad Bosnic

In March 2017, Bosnic was denied boarding in Bosnia, informed that the United States would not permit him to board, and directed to the U.S. Embassy.[18] The embassy instructed him to file a DHS TRIP inquiry, and he remained stranded abroad for one to two months before receiving a DHS TRIP response confirming his No Fly status and granting him a one-time waiver to fly to Jacksonville.[19] He was removed from the No Fly List in January 2018, approximately seven months after filing suit, continued to experience watchlist-related restrictions afterward. *See Bosnic v. Wray*, No. 3:17-cv-826 (M.D. Fla. 2017).

### B.    Multi-Stage Travel Interference for Selectee/TSDB Plaintiffs

Across airports, airlines, and years, watchlisted Plaintiffs experience the same recurring sequence: (1) check-in barriers; (2) prolonged TSA screening; (3) repeat gate-area searches; (4) planeside escorts; and (5) multi-hour secondary inspection.

---

[14] DEX78 at 53:4–5, 51:4–52:17, 95:3–18; PLX2 at 1; DEX77 at 10–11.
[15] DEX78 at 64:9–21, 54:13–57:19, 63:12–64:8, 97:20–98:13, 59:16–61:11, 62:9–12.
[16] DEX78 at 60:10–20.
[17] DEX6 at 89–91, Exhibit No. 26 (Aug. 21, 2024).
[18] DEX52 at 145:4–19, 147:3–7, 147:15–148:2.
[19] DEX52 at 148:1–5, 148:20–151:7, 153:9–155:19, 156:6–14, 157:9–21; DEX6 at 42–43, Exhibit No. 10 (Jan. 19, 2018).

### 1.    Phase One: Watchlist-Triggered Check-In Barriers

Across airports, Plaintiffs encounter early travel barriers, including the inability to check in online, prolonged ticket-counter delays, repeated security clearance calls, and boarding passes marked with "SSSS." Plaintiffs Abdurrashid, Abunijem, Albadawi, Al-Sahlani, Bosnic, Din, El-Shahat, Hachem, Jardaneh, Mujanovic, Muminov, E. Paryavi, M. Paryavi, Soueidan, and Sulayman all experienced similar delays and SSSS designations.[20]

Din was instructed at the gate to obtain a new ticket, waited long enough at the counter to miss his flight, and slept overnight at the airport.[21] Hachem missed flights because airline staff were required to obtain federal clearance before issuing his boarding pass.[22] El-Shahat was denied boarding when his boarding pass lacked required clearance.[23] Airline representatives also had to obtain DHS clearance for Abunijem twice—once at the ticket counter and again at the gate.[24]

### 2.    Phase Two: Heightened Security Checkpoint Screening

---

[20] **Abdurrashid:** DEX44 at 26:2–8, 35:7–13, 50:18–21, 51:10–18, 59:4–6, 60:15–19, 63:16–18, 65:3–14, 66:2–6, 66:15–18, 67:5–10; PLX32; PLX10 at 1–4; **Abunijem:** DEX45 at 12–15; DEX46 at 110:17–111:4, 111:9–10, 117:8–118:2, 135:20–136:12, 152:10–21, 154:2–11, 178:18–179:9; PLX7 at 26-29; PLX7 at 4-7; **Albadawi:** DEX47 at 6–8, 11, 13, 14, 15, 16–18; DEX48 at 29:18–30:12, 31:14–32:3, 88:14–15, 91:5–9, 92:17–93:15, 94:1–5, 94:10–19, 123:1–9, 126:3–13, 130:11–131:20, 133:8–19, 134:5–18, 134:19–136:9, 137:8–9, 137:17–138:14, 145:9–21, 158:9–18, 160:20–21, 161:17–162:14, 169:8–10, 180:1–10, 181:1–10, 182:2–12, 185:18–186:12, 257:17–258:17; PLX31; PLX9 at 1-2; **Al-Sahlani:** DEX50 at 44:4–15, 50:12–13, 51:12–13, 81:22–83:5, 85:3–9, 88:7–21, 88:22–89:1, 89:16–20, 109:1–3, 112:18–20; 113:2–4; 113:18–25; 114:6–10; 116:1; 116:10–25, 132:15–133:5, 137:13–17 187:1–7, 192:18–193:1, 220:18–25, 232:10–233:7; **Bosnic:** DEX52 at 44:4–15, 51:12–13; **Din:** DEX53 at 012–014; DEX54 at 92:6–16, 93:6–8, 124:13–16, 126:7–10; **El-Shahat:** DEX58 at 110:8–11, 128:15–129:9, 139:18–140:3, 140:7–13, 140:17–141:3, 141:8–11, 149:6–8, 153:15–25, 154:1–17, 156:17–157:1, 241:11–14, 241:17–24, 245:11–21, 248:6–249:2, 250:10–13, 267:4–8, 268:5–24, 279:9–280:2; **Hachem:** DEX59 at 13–15; DEX60 at 40:1–18, 46:11–14, 47:22–48:1, 50:17–51:7, 123:9–21, 132:21–133:7; 133:13–15; 147:1–13, 237:15–19; 239:5–11, 267:9–16; **Jardaneh:** DEX62 at 133:4–21, 142:16–21, 152:8–9; **Mujanovic:** DEX69 at 151:22–152:10, 177:1–8, 208:5–21; **Muminov:** DEX71 at 159:13–22, 160:1–2; PLX4 at 11; **E. Paryavi:** DEX 73 at 155:19–21, 156:1, 157:9–21; **M. Paryavi:** DEX76 at 92:4–12, 52:1–3, 52:19–53:2; **Soueidan:** DEX79 at 8–14; DEX80 at 165:4–8, 167:10–20, 166:13–167:3, 183:9–14, 194:21–196:1, 222:6–16; **Sulayman:** DEX81 at 6, 14; DEX82 at 26:14–20, 26:24–27:12, 31:5–10, 82:10–11, 85:2–4, 93:25–94:2, 101:22–104:6, 118:21, 119:15–22, 125:24–126:18, 135:15–22, 136:8–22, 137:2–4, 139:23–25, 140:1–2, 140:5–11, 159:4–8, 294:22–25; PLX11 at 1-2.

[21] DEX54 at 125:13–18, 126:1–4, 126:11–15.

[22] DEX60 at 66:3–10; DEX59 at 10.

[23] DEX58 at 114:4–115:1.

[24] DEX45 at 12–14.

After clearing the ticket counter, watchlisted Plaintiffs are subjected to prolonged security-checkpoint screening, including diversion into separate lanes, full pat-downs, chemical residue testing, full luggage unpacking, and repeated supervisor checks. Plaintiffs subjected to such enhanced screenings include: Sulayman, Hachem, Muminov, Abunijem, Al-Sahlani, Jardaneh, Mohallim, Abdurrashid, El-Shahat, and Din. [25]

Muminov underwent substantially similar extended TSA screenings on two separate trips. On June 27, 2015, TSA surrounded him, conducted chemical testing, searched his luggage and clothing (including socks and underwear), and continued the screening for approximately thirty to forty-five minutes.[26] On August 21, 2021, TSA again isolated him in a public area, searched his belongings, tested him for residue, temporarily confiscated his phone, and screened him for sixty to ninety minutes.[27]

### 3.    Phase Three: Gate-Area Screening and Pre-Boarding Intervention

After clearing security, watchlisted Plaintiffs are stopped again at the gate by multiple officers, subjected to public baggage searches, pat downs, and questioning immediately before boarding. Plaintiffs that experienced repeat gate-area inspections include El-Shahat, Sulayman, Al-Sahlani, Bosnic, Hachem, Albadawi, M. Paryavi, Abunijem, and Soueidan.[28] Mohallim had

---

[25] **Sulayman:** DEX81 at 10, 13; DEX82 at 27:19–29:14, 85:19–20, 86:7–87:7, 27:19–28:9, 85:19–90:23, 104:12–25, 125:17–23, 136:23–137:20; **Hachem:** DEX60 at 43:4–9, 56:17–57:4, 124:8–18; **Muminov:** DEX70 at 10–20; PLX4 at 11; **Mujanovic:** DEX69 at 83:15–84:8, 209:17–210:3, 211:17–18, 223:3–11; **Abunijem:** DEX46 at 111:11–21, 112:1–7, 118:3–7, 118:12–14; **Al-Sahlani:** DEX49 at 10; DEX50 at 83:13–18, 83:21–23, 90:1–11; **Jardaneh:** DEX62 at 185:10–15; **Mohallim:** DEX67 at 112:18–114:13; **Abdurrashid:** DEX44 at 61:9–17; **El-Shahat:** DEX58 at 280:12–23, 281:19–282:3, 141:12–142:6, 142:7–143:6, 144:19–145:16, 242:3–19; **Din:** DEX53 at 13–14; DEX54 at 124:7–125:7.

[26] DEX71 at 160:13–18, 161:2–3, 160:18–19, 161:3–4, 163:14–15, 163:19–21, 166:2–9.

[27] DEX70 at 17–18.

[28] **Albadawi:** DEX47 at 16, 17; DEX48 at 121:15–21, 123:1–9, 126:3–13, 130:11–131:20, 133:8–19, 134:5–136:9, 137:8–9, 137:17–138:14; **Al-Sahlani:** DEX49 at 10; DEX50 at 86:14–23; **Bosnic:** DEX52 at 47:1–21; **El-Shahat:** DEX58 at 66:1–14, 69:15–19, 92:13–14, 93:3–11, 105:19–25, 111:19–112:12, 119:6–14, 186:6–15, 251:2–9, 284:11–20; **Hachem:** DEX59 at 13–15; DEX60 at 51:8–52:8, 123:21–22, 140:8–18, 224:11–226:8, 266:12–18, 267:3–8; **M. Paryavi:** DEX76 at 52:6–18; **Sulayman:** DEX81 at 6; DEX82 at 29:21–30:21, 91:4–92:23, 106:1–18, 126:19–24, 137:21–138:20, 140:12–21; PLX9; PLX11; PLX31; **Abunijem:** DEX46 at 111:11–21, 112:1–7, 118:3–7, 118:12–14; **Hachem:** DEX59 at 12–13; DEX60 at 124:8–18; **Soueidan:** DEX80 at 124:3–16,176:20–177:20,

his suitcase emptied and underwent a physical search for more than three hours during a London layover.[29] Hachem was shouted at by a supervisor, escorted back to security after clearing it, and subjected to repeat screening.[30] Al-Sahlani was also escorted back for reinspection by higher-ranking officers.[31]

### 4.    Phase Four: Planeside Escorts and Multi-Hour Arrival/Secondary Detentions

Upon landing, watchlisted Plaintiffs are routinely met at the jet bridge by CBP or FBI, subjected to passenger-wide identity sweeps, and escorted away from other passengers to private areas for interrogation, baggage searches, and electronic device seizures. Mohallim was identified during a passport-out sweep and subjected to secondary inspection in public view.[32] Between 2013 and 2018, Soueidan repeatedly encountered arrival gate sweeps in which all passengers were instructed to hold their passports out until he was identified, including one occasion when his name was announced over the aircraft speaker.[33] Sulayman is routinely met by two to four armed CBP officers upon arrival and escorted to secondary inspection for questioning and device seizure.[34] Al-Sahlani was escorted off aircraft by FBI agents and CBP officers, including once when passengers were instructed to remain seated.[35]

Once escorted from the jet bridge, Plaintiffs are subjected to multi-hour arrival detentions—typically lasting one to six hours—in private rooms or holding cells where officers

---

199:12–14, 199:19–200:5, 200:21–201:5, 224:8–21, 225:19–226:7; **Muminov:** DEX71 at 166:2–10, 167:22; **Din:** DEX54 at 124:7–125:7, 125:8–126:1, 126:2–4.

[29] DEX67 at 117: 9–17, 120:23–25, 116:8-17, 118:6–21.
[30] DEX60 at 51:14–52:8.
[31] DEX50 at 110:5–21.
[32] DEX67 at 115:13–117:17.
[33] DEX79 at 9, 10; DEX80 at 149:12–150:14, 153:20–154:9, 155:9–13, 187:6–8, 212:7–19, 237:1–21, 243:4–244:10; PLX 1 at 10, 14, 16, 19, 21, 23, 27, 29.
[34] DEX81 at 6; DEX82 at 29:21–30:6, 30:16–20, 32:22–25, 84:7–10, 91:12–25, 92:3–8, 141:22–142:14; 143:5–7, 168:11–22, 174:3–13, 311:13–312:2.
[35] DEX50 at 128:8–10, 148:5–10, 148:15–149:2, 149:6–13, 150:2–3, 150:5–8, 150:9–16, 151:1–11.

conduct repeated questioning, full searches of luggage and personal items, and out-of-view searches of phones or laptops. Plaintiffs subjected to these prolonged detentions include Abunijem, Hachem, Jardaneh, Din, Soueidan, El-Shahat, Sulayman, Albadawi, Kamel, M. Paryavi, Al-Sahlani, Abdurrashid, Mujanovic, E. Paryavi, Muminov, Mujanovic, and Doe.[36] Al-Sahlani was detained in a holding cell during several such inspections in which his phone was seized.[37] Sulayman is also questioned for extended periods during arrival detentions, during which officers routinely take his phone.[38] Several Plaintiffs—including Soueidan, El-Shahat, Sulayman, Albadawi, Muminov, Kamel, M. Paryavi, and Al-Sahlani—had electronic devices taken to separate rooms for out-of-view searches.[39]

## C.    Land-Border Detentions and Vehicle-Based Interference

Across U.S.–Canada and U.S.–Mexico land borders, watchlisted Plaintiffs experience armed vehicle stops, removal from their vehicles, physical restraint, prolonged detention in holding cells, electronic devices seizures, and hours-long interrogation. These encounters function as the

---

[36] **Abunijem:** DEX45 at 11–13; DEX46 at 126:1–21, 127:19–128:4, 128:17–129:3, 174:5–175:5–6, 192:8–14, 196:16–197:1, 197:20–198:10, 200:14–21, 201:6–14; PLX7 at 2-3; PLX7 at 7; PLX7 at 8-10; PLX7 at 11–16; PLX7 at 17-25; **Hachem**: DEX59 at 11, 21; DEX60 at 249:20–250:5, 259:16–18, 260:15–20, 289:22–290:6; **Jardaneh**: DEX62 at 49:7-50:21, 52:2-15, 224:14–225:3, 231:20–232:3; **Cyeef Din**: DEX54 at 95:2–98:18; **Soueidan**: DEX79 at 13; DEX80 at 151:5–152:5, 153:20–154:19, 155:9–13, 187:6–8, 237:1–21, 186:1–21, 206:15–207:1, 212:7–19, 229:10–20, 230:17–231:15, 232:1–2, 237:1–21; PLX1 at 2, 4, 6, 9–10, 13-14, 16, 19; **El-Shahat:** DEX58 at 95:24–97:3, 133:23–134:5, 158:22-160:2, 161:12-19; **Sulayman:** DEX82 at 141:22–142:14; **Albadawi:** DEX47 at 14; DEX48 at 97:9-99:20, 101:2-14, 101:19-102:9, 149:6–151:11; **Kamel:** DEX64 at 13:15-17, 8:17-9:2, 13:15-17, 17:2-5, 29:3-7, 51:1-8, 53:13-19; **M. Paryavi:** DEX76 at 147:20–148:4; 147:12–148:4; 182:16–183:5; **Al-Sahlani:** DEX50 at 194:6–15, 195:24–196:6; PLX8 at 2-5, 8-11; PLX17-19; **Abdurrashid:** DEX44 at 67:14–68:9, 70:7–21, 72:5–13, 128:1–5, 208:6-209:1, 228:23–24; PLX10 at 5; **Mujanovic:** DEX69 at 118:13–14, 180:9-181:8, 181:9-13, 188:15–17, 191:20-22, 224:10–16, 226:1–20, 225:221–226:9, 240:9–11; PLX5 at 6; **E. Paryavi:** DEX72 at 21; DEX73 at 161:5–9; 161:12-17; 165:2–166:6; 260:3-261:11; PLX3 at 2, 6; **Doe**: DEX56 at 50:19–21, 51:1–10, 89:16–19; PLX36 at 4; **Muminov**: DEX70 at 7, 23-24; DEX71 at 213:2–11, 212:5–10.

[37] DEX50 at 128:10–15, 148:5–10, 194:8–15, 195:3–196:3, 208:5–209:22, 228:23–229:7; PLX8 at 4-5; JRDH-5718 at 1, 3; JRDH-5751 at 3; PLX8 at 11; PLX8 at 16; PLX8 at 17.

[38] DEX82 at 32:16–25, 141:22–142:19, 168:11–22, 174:3–13, 311:13–312:2.

[39] **Soueidan:** DEX80 at 155:9–13, 187:6–13, 237:1-21; PLX1 at 9-11; **El Shahat:** DEX58 at 95:24–97:3; **Sulayman:** DEX82 32:16–25, 141:22–142:15, 168:11–169:4, 311:13–312:2; **Albadawi:** DEX47 at 14; DEX48 at 97:9-99:20, 101:2–102:9;**Muminov:** DEX70 at 5, 7; **Kamel:** DEX64 at 13,15–17; **M. Paryavi:** DEX76 at 147:20–148:4; **Al Sahlani:** DEX50 at 194:6–15, 195:24–196:6; PLX8 at 2–5, 8–11.

land-border component of the same multi-stage travel interference architecture observed at airports, often involving even more intrusive and coercive conditions.

At the U.S.–Canada border, CBP officers swarmed Jardaneh's car, shouted commands, ordered him to walk backward toward them, placed him in a barred cell for an extended period, and later transported him to a hospital after he experienced a panic attack.[40] At the San Ysidra Port of Entry, Doe was surrounded by officers with guns drawn, had his arm twisted behind his back, was handcuffed and detained for five to six hours, and had his laptop seized and retained for two months.[41]

Muminov experienced one of the most invasive land-border encounters. At the Port Huron–Windsor crossing, a SWAT vehicle with an armed officer approached his car, multiple trucks surrounded him, and officers ordered him to open his window, show and drop his key, and raise his hands.[42] Officers fingerprinted him twice, performed an iris scan, collected body hair and dental samples, searched his luggage with K9s, and detained him in a room for about ninety minutes before questioning him through a small window in the door.[43] When he objected to the downloading of his phone and invoked his right to legal counsel, officers told him he had no right to a lawyer and that they were permitted to search everyone at the border, then searched his phone.[44]

---

[40] DEX62 at 219:16–220:11, 217:11–218:2, 222:4–11, 222:14–223:13, 227:9–21.
[41] DEX56 at 241:3–243:2, 245:5–21, 41:19–21.
[42] DEX71 at 190:11–192:13.
[43] DEX71 at 192:14–19, 193:4–16, 194:12–195:16, 197:16–22, 198:1–2; DEX70 ¶ 1; PLX4 at 8.
[44] DEX71 at 198:2–199:2; JRDH-4523; DEX70 at 12–13; PLX4 at 2.

Other Plaintiffs—including Sulayman, Kamel, Thadi, and E. Paryavi—encountered similar vehicular stops, extended questioning, and electronic device seizures at land-border crossings.[45] Doe likewise experienced at least 5 documented land-border encounters.[46]

### D.    Cross-Context Travel Interference (Rail, Roadside, Foreign Ports, Pedestrian)

The watchlist's travel interference effects are not confined to air travel or land-border crossings. Plaintiffs experience the same patterns of detention, interrogation, device seizure, and coercive questioning in other transit settings, including interstate rail travel, domestic roadway stops, foreign port detentions, and pedestrian encounters.

**Rail Travel**. During interstate rail travel, Doe was stopped at the New Orleans station by FBI agents, removed from the train, questioned about his travel, and had his luggage searched before being released.[47]

### E.    Domestic Roadway Stops

Between approximately 2004 and 2015, Thadi was subjected to six or seven extended traffic stops, each lasting thirty-five to forty-five minutes while officers retained his identification.[48] On about four occasions, additional units were called to the scene, and on one stop, as many as five police cars arrived despite the minor underlying infraction.[49] Officers stated during one stop that he was pulled over because his name matched someone in their system, and

---

[45] DEX8; PLX6 at 2; PLX6 at 6; PLX6 at 4; **Sulayman:** DEX81 at 10–12, 15–23; DEX82 at 111:4–9, 111:21–112:3, 112:18–114:12, 114:6–12, 312:13–313:2, 190:20–22, 191:12–14, 193:6–195:9, 197:22–25, 197:16–25, 192:8–193:21, 195:9–196:1, 235:4–21; **Kamel:** DEX65 at 54:1–8, 56:5–9, 56:17–19; **Thadi:** DEX 84 at 65; **E. Paryavi:** DEX72 at 21-22; DEX73 at 260:3–261:11, 265:8–12.
[46] **Doe:** DEX56 at 39:10–21, 241:3–21; 242:1–21; 243:1–2; DEX55 ¶¶ 8, 9, 12, 13, 31; PLX36 at 7-55.
[47] DEX56 at 108:21–109:11, 224:5–11.
[48] PLX38 at 2-3; DEX84 at 117:9–118:13, 118:17–119:2
[49] PLX38 at 2, 5, 6; DEX84 at 119:6–11.

15

during another, claimed the back window of his van was "too tinted," even though that is a standard cargo van feature.[50]

Muminov was similarly stopped, each lasting more than an hour and involving both undercover and marked police vehicles.[51] Officers detained him in a police car while they searched his vehicle, made calls, and returned to ask additional questions, including how he came to the United States, whether he was affiliated with a criminal organization, and whether he was a smuggler.[52] Officers also searched his pockets—including inside his socks—without arresting or handcuffing him, stating only that they needed to "check something," and conducted the stop in a manner he described as abnormal compared to a typical traffic stop.[53]

## F.    Foreign Port Interference

Plaintiffs also experienced significant travel interference at foreign airports. In Doha, Qatari officials confiscated Mohallim's and his mother's passports, affixed red "High" stickers to them, and twice refused them boarding on U.S.-bound flights.[54] British officials in London publicly emptied his suitcase, searched him and his mother, and delayed their boarding for more than three hours.[55] At airports in Germany, Turkey, Qatar, and the UAE, Albadawi repeatedly waited 30–60 minutes at check-in while agents sought U.S. clearance and was subjected to additional gate-area and on-arrival inspections.[56] He missed a flight in Amsterdam due to ticketing and security clearance delays, and stayed overnight at the airport.[57] In Abu Dhabi,

---

[50] DEX84 at 119:12–120:5, 122:7–15; PLX38 at 2-3; PLX38 at 5.
[51] DEX71 at 82:1–9, 89:1–15.
[52] DEX71 at 84:17–22, 85:1–10; 87:10–22.
[53] DEX71 at 90:2–9, 90:14–22; 91:15–22.
[54] DEX67 at 90:4–11, 91:20–93:7; DEX66 at 10.
[55] DEX67 at 115:13–117:16, 119:3–8.
[56] DEX47 at 7, 13–16, 18; DEX48 at 91:4–9, 92:8–16, 92:17–93:15, 94:1–5, 95:8–96:18, 110:9–19, 111:10–18, 113:3–115:4, 117:1–118:17; 133:8–19, 134:5–136:9, 137:8–9, 137:17–138:14, 158:9–18, 160:20–21, 161:17–162:14; PLX9 at 5–9; PLX9 at 2–4.
[57] DEX48 at 145:9–21,145:20–148:5, 148:17–19; DEX47 at 16–17.

U.S. officers in a preclearance facility detained El-Shahat for 2–3 hours, directed him to stand with his hands on the wall, searched his phone and luggage, and conducted prolonged pat-downs.[58] He testified that he believes he was also questioned in Germany. [59] Around 2008 in Spain, officers escorted Thadi to a private room and required him to fully undress while they searched his belongings, and he missed several flights in Morocco due to multi-hour ticketing and screening delays.[60]

### G.    Pedestrian Interference

In 2009, after Muminov's truck broke down in Great Falls, Montana and was towed, several vehicles—including an all-black undercover vehicle and police cars—stopped him as he attempted to cross the street.[61] Approximately three or four cars and about six officers from Great Falls Police and DHS were present.[62] Officers pointed guns at him and instructed him to put his hands up; he testified that he was shaking, in shock, and was not read his rights.[63] Officers communicated over the radio using coded language and transported him to a building marked as the Department of Homeland Security Montana Office, where he was placed in a room and his handcuffs were removed after ten to fifteen minutes.[64] DHS officers then questioned him about for approximately two hours about his background and religious views.[65]

## III.    STIGMA AND REPUTATIONAL/COMMUNITY CONSEQUENCES

### A.    Public Stigmatization and Visibility of Watchlist Status

---

[58] DEX58 at 180:18–24, 181:1–16, 182:15–24, 183:5–9, 184:13–18, 184:23–185:4, 186:6–15.
[59] DEX58 at 186:19–187:18, 188:6–8, 188:23–189:2.
[60] PLX38 at 4; DEX84 at 68:3–70:5.
[61] DEX71 at 53–56.
[62] DEX71 at 64:5–14, 65:12–16.
[63] DEX71 at 53:16–54:10.
[64] DEX71 at 54:14–55:8.
[65] DEX71 at 62:16–18; 61:17–18.

Watchlist-driven treatment caused reputational harm within Plaintiffs' social, professional, and religious communities: friends, coworkers, congregants, and other community members altered their behavior after observing or learning of their repeated screening, detentions, and public treatment.

While performing contract work at Sandoval Regional Medical Center, Din—wearing traditional garb and a beard—was reported to police by hospital security. Officers ran his identification, confronted him outside the building, and later issued a public "situational awareness" flyer with his photograph stating that he was on the terrorist watchlist, had a violent criminal history, was armed, and carried multiple cell phones; Din testified that these statements were false. A fellow engineer at the hospital was also detained and questioned by police about Din's whereabouts.[66] FBI agents publicly visited his masjid and questioned the imam about him.[67]

During Sulayman's March 2018 pilgrimage, TSA recalled at least eight members of his 45-person group, after learning they were traveling with him and subjected them to enhanced screening.[68]

Plaintiffs were also repeatedly subjected to highly visible screening that marked them as security risks in front of passengers, family members, and companions. At one airport, a supervisor shouted at Hachem about how he had entered the terminal while his wife and children were present, and he testified that he asked the supervisor to lower his voice because people were watching.[69] He was required to step aside and sit separately from other passengers at the gate and was escorted to the security checkpoint by a ticketing agent rather than permitted to walk on his own.[70]

---

[66] DEX54 at 150:5–151:13, 156:5–21, 157:3–158:1, 160:18–161:2, 174:21–175:3; DEX53 at 006, 007.
[67] DEX54 at 18:4–8, 186:4–188:5, 188:9–189:1; 189:3–191:3, 255:19–257:21, 256:16–257:21; DEX53 at 8.
[68] DEX82 at 136:23–137:14, 156:12–159:8, 159:12–161:23; DEX81 at 12–14.
[69] DEX60 at 51:8–52:8.
[70] DEX60 at 59:2–11, 154:13–19.

Soueidan experienced repeated gate-side baggage checks, residue testing, and pat-down searches.[71] On at least six or seven occasions, gate agents instructed all passengers to hold their passports out until he was identified, and on one arrival, his name was announced over the aircraft loudspeaker upon landing. Plaintiffs, including Muminov, Sulayman, Soueidan, Al-Sahlani, Mohallim, El-Shahat, Hachem, experienced similar treatment.[72]

## B.  Spillover Harms to Family Members and Companions

Family members and close travel companions were repeatedly subjected to the same watchlist-driven treatment as Plaintiffs, resulting in shared detentions, public identification as security risks, and guilt-by-association stigma.

During Sulayman's 2018 Umrah pilgrimage, his mother and another congregant received SSSS designations for the first time, and TSA recalled multiple group members for enhanced screening solely because they traveled with him.[73] Soueidan and his wife and son were escorted to joint interrogations and public baggage searches.[74] Hachem's cousin was detained and interrogated for approximately sixteen hours by CBP officers in Panama and refused to continue traveling with him.[75]

Din's wife was pulled over at gunpoint, ordered to walk backward, and questioned by officers who stated the stop occurred because the vehicle belonged to Din. His children cried and begged officers not to hurt their mother. Din and his wife were escorted by TSA agents

---

[71] DEX80 at 124:3–16, 176:20–177:20, 199:12–14, 199:19–200:5, 200:21–201:5; DEX79 at 8.
[72] **Al-Sahlani:** DEX50 at 128:5-15, 148:15-149:2, 151:1-11, 150:2-3, 150:9-12; **Hachem:** DEX60 at 50:17–51:7, 140:8–18, 147:9–13, 148:1–13; **Mohallim:** DEX67 at 105:15–18, 152:12, 152:22–153:14, 121:19–25, 122:1–123:13; **Muminov:** DEX71 at 166:2–10; **Soueidan:** DEX79 at 9; DEX80 at 128:5-15, 149:12–150:14, 148:15-149:2, 151:1-11; **Sulayman:** DEX81 at 6, 14; DEX82 at 29:21–30:6, 30:16–20, 32:22–25, 84:7–10, 90:25–91:6, 91:16–25, 92:3–8, 92:12–15, 168:16–22, 174:3–13, 106:9–13, 140:24–141:1.
[73] DEX81 at 12–14; DEX82 at 121:15–122:7, 159:12–161:23, 161:24–162:8, 172:23–175:1
[74] DEX79 at 6, 12; DEX80 at 206:15–207:1; PLX1 at 9; PLX1 at 24, PLX1 at 2; PLX1 at 4-5; PLX1 at 16; PLX1 at 25.
[75] DEX60 at 229:17–22, 234:14–235:11, 235:18–236:9; DEX59 at 13, 22–23; PLX39.

19

throughout Los Angeles Airport, which he described as "really intrusive" and "all over them."[76]

Mohallim and his mother repeatedly denied boarding together in Doha, had their passports confiscated and marked "High," remained stranded abroad for more than one month, and were publicly stopped, searched, and questioned together in London and Chicago, including during a plane-wide passport-out sweep until they were identified.[77]

Doe's wife traveled thousands of miles to meet him abroad, only to learn he had been detained and deported..[78] Doe also testified that his former wife and stepdaughter were detained with him for eight hours at the same port of entry, that CBP officers threatened his former wife with deportation, that he felt humiliated in front of her, and that these events contributed to a breakdown of that marriage.[79] He also testified his current wife traveled thousands of miles to meet him abroad, only to learn he had been detained and deported.[80] He further stated that his mother distanced herself after being detained and questioned in Mexico while on a cruise.[81]

Mujanovic's husband was treated as suspicious by association when CBP officers searched his phone and iPad during one of her trips, despite his not being the primary subject of questioning.[82] Her children told her not to be "so different" by praying and wearing hijab after repeated encounters.[83] El-Shahat testified that these experiences strained his relationship with his children for years.[84]

---

[76] DEX54 at 106:9–15.
[77] DEX66 at 10; DEX67 at 75:19–76:1, 76:20–78:7, 78:12–79:5, 79:9–80:2, 82:8–83:19, 85:10–86:3, 86:11–115:5, 115:13–117:12, 121:11–131:23.
[78] DEX56 at 39:10–21, 52:4–21, 53:1–21; 57:12–18; DEX55 at 6.
[79] DEX55 at 6; DEX56 at 39:10–21, 134:3–135:4, 119:6–21.
[80] DEX56 at 51:11–53:1–21, 57:12–18.
[81] DEX56 at 59:2–21, 60:2, 157:3–11.
[82] DEX 69 at 246:20–22, 334:8–19.
[83] DEX 69 at 202:20–21, 203:8–14.
[84] DEX58 **at** 69:23–25, 222:8–16, 222:21–25, 225:12–13, 226:25–227:3, 337:9–338:5,338:11–15, 339:11–16, 341:4–9.

Plaintiffs including Abdurrashid, Sulayman, Abunijem, Din, Soueidan, Al-Sahlani, El-Shahat, Mujanovic, Hachem, Al-Badawi, and Mohallim experienced similar family- or companion-based detentions, escorts, prolonged questioning, or SSSS-associated stigma while traveling.[85]

### C.    Community and Workplace Reputational Harm

Plaintiffs also experienced long-term reputational consequences within their social , professional, and community environments. Several Plaintiffs described strained relationships, humiliation, or social withdrawal resulting from being repeatedly identified as security risks. Jardaneh testified that friends, a business partner and his girlfriend withdrew from him after learning of his watchlist status, resulting in reputational harm and lost business opportunities.[86] Hachem lost a major business deal in Panama after a businessman refused to meet him because of his watchlist status.[87] Din experienced community ostracism after FBI agents publicly visited his mosque and questioned his imam about him.[88]

Many Plaintiffs—including Muminov, Sulayman, Mujanovic, Hachem, Mohallim, Albadawi, El-Shahat, Soueidan, Jardaneh, Din, Doe, Sehwail, E. Paryavi—described humiliation,

---

[85] **Abdurrashid:** DEX44 at 26:2–8, 50:18–21, 51:10–52:4, 58:15–17, 59:4–6, 60:15–19, 61:9–17, 63:16–18, 67:14–68:9, 70:7–21, 72:5–13, 128:1–5; PLX32; PLX10 at 2-4; PLX 10 at 5; DEX43 at 12-13; **Sulayman:** DEX81 at 12–14, 22; DEX82 at 34:3–25, 57:18–22,  121:15–122:7, 136:8-22, 161:24–162:8, 168:11–22, 172:23–175:1, 206:15–22; **Abunijuem:** DEX46 at 140:19-141:12, 141:18-20; DEX45 ¶19; DEX46 at  123:10-11, 125:3-14, 126:1-21; PLX7 at 8-10; **Din:** DEX54 at 92:6–16, 93:6-8; DEX53 at 14; DEX79 at 6; PLX1 at 4; PLX 1 at 2;.PLX1 at 16; **Al-Sahlani:** DEX50 at 83:11–12; DEX49 at 10; PLX40 at 2-13;  **El-Shahat:** DEX58 at 169:4–23,  132:1–15, 67:14–68:9, 70:7–21, 72:5–13, 177:2–21; PLX10 at 5; **Mujanovic:** DEX69 at 209:17–210:3, 211:17–18, 246:18–20; DEX69 at 176:2–5, 208:18–21, 151:22–152:10, 180:9–181:8, 246:18–20; **Hachem:** DEX60 at 50:17–51:7, 141:11–12, 141:22, 142:11–20, 143:1–7; 224:11–225:22, 224:11–225:22; DEX59 at 13; **Albadawi:** DEX48 at 177:18–19, 179:26, 254:17–255:17, 257:2–6, 180:1–10, 181:1–10, 182:2–12, 185:18–186:12, 257:17–258:17, DEX47 at 10; **Mohallim:** DEX67 at 121:19–25, 122:1–123:13, 124:3–125:16, 129:7–17, 130:5–20130:24–131:6, 131:17–23.

[86] DEX62 at 275:5–10, 276:9–18, 277:5–11, 319:5–320:2.

[87] DEX 60 at 228:2–7, 228:10–18; DEX59 at 13.

[88] DEX54 at 186:4–187:5, 188:9–13, 255:19–256:9, 256:16–257:21, 187:6–188:5, 188:14–189:1, 189:3–191:3.

community avoidance, or reputational harm resulting from being repeatedly identified as security risks.[89]

### D.      Foreign Dissemination of Terrorism Labels

Foreign authorities publicly attributed several Plaintiffs' treatment to information originating from the United States, resulting in reputational harm abroad and further public identification as security risks. Mexican officials detained, interrogated, and referred to Doe as a "terrorista, terrorista," before deporting him, Turkish officials informed Doe that the United States identified him as a terrorist and a threat to the country, denied him entry, and deported him, and British airline personnel told him that Canada didn't want him in its airspace.[90]

Mohallim testified that an official at Nairobi Airport showed his photograph to others and asked whether he had joined ISIS.[91] He further testified that Qatari officials confiscated his and his mother's passports, affixed red "High" stickers, repeatedly denied them boarding, and directed them to the U.S. Embassy.[92] British officials publicly emptied and searched his suitcase at the London gate, and upon arrival in Chicago, a plane-wide announcement instructed passengers to deplane with passports out until he and his mother were identified.[93]

In 2019, a Panamanian official told Hachem that his name appeared on a list from the U.S. government.[94]

---

[89] **Mujanovic:** DEX68 at 6; DEX69 at 251:14–17, 252:13–16, 202:4–10, 281:10–282:22, 154:4–12, 155:5–15, 202:4–10; **Muminov:** DEX71 at 147:18–22, 148:10–11, 170:20–22; **Sulayman:** DEX82 at 245:24–246:15 **Hachem:** DEX59 at 6; DEX60 at 162:4–17, 165:13–22, 279, 299:10–16, 162:4–9; **Mohallim:** DEX67 at 105:15–18, 152:12, 152:22–153:14; **Albadawi:** DEX48 at 177:18–19, 179:26, 254:17–255:17, 257:2–6; **El-Shahat:** DEX58 at 181:22–182:1, 212:20–213:13, 227:14–19; **Soueidan:** DEX79 at 6,14; **Jardaneh:** DEX62 at 277:9–11, 230:21–231:17, 186:18–187:6, 226:1–20, 227:9–21; **Din:** DEX54 164:12–16; DEX53 at 23; **Doe:** DEX56 at 39:10–21; **Sehwail:** DEX78 at 134:4–13; **Paryavi:** DEX73 at 190:11–12.
[90] DEX56 at 48:1–21, 52:4–53:21, 91:9.
[91] DEX67 at 82:8–83:19.
[92] DEX67 at 89:12–90:7, 91:20–24; DEX66 at 10.
[93] DEX67 at 115:13–117:16, 120: 24, 121:19–25.
[94] DEX59 at 13.

E.     **Behavioral and Social Consequences (Self-Censorship, Withdrawal, Humiliation)**

1.     **Travel Deterrence**

These burdens recur with such regularity that Plaintiffs materially altered their travel behavior to avoid repeated screening and detention. Plaintiffs testified that they canceled trips, reduced or ceased air travel, altered itineraries, or chose slower or more burdensome routes, or traveled separately from family members or companions to prevent shared treatment. Sulayman asks his employer to be sent outside Seattle only when necessary, travels by air only once or twice a year, drives instead of flying, and books or flies separately from family members, coworkers, and congregants.[95] Muminov relocated his family to Dubai and now takes long road trips to avoid domestic flights.[96] Soueidan arranges for his wife to fly separately.[97] Hachem cannot travel with his children.[98] Jardaneh avoids traveling with others.[99] Mujanovic declined a paid Hajj ticket.[100] Doe took a train from San Diego to New York.[101] And Al-Sahlani drives monthly from New York to Detroit instead flying to visit his children.[102]

2.     **Deterrence From Religious Practice**

Jardaneh is afraid to spend his money and has largely stopped making charitable donations because they trigger scrutiny.[103] Sulayman, Mujanovic, and Din have reduced or declined to perform Umrah and Hajj due to their watchlist status, declined participation in religious activities, and altered their travel behavior to avoid subjecting others to the same treatment.[104] Din further

---

[95] DEX82 at 15:22–17:22, 66:9–12, 66:19–24, 67:17–68:2, 73:14–17,81:16–82:3,117:17–23, 135:8–14, 206:5–14.

[96] DEX71 at 147:12–22, 148:10–11; DEX70 at 6.

[97] DEX80 at 79:3–6, 248:1–5, 249:5–14, 249:17–250:5.

[98] DEX60 at 162:13–17, 279:8–9.

[99] DEX62 at 275:5–10.

[100] DEX69 at 284:15–22.

[101] DEX56 at 69:2–4.

[102] DEX50 at 198:23–199:24.

[103] DEX62 at 322:8–9.

[104] **Sulayman:** DEX81 at 7; DEX82 at 17:2–6, 33:8–9, 66:19–24, 67:17–68:2, 73:14–17,130:17–131:16; **Mujanovic:**  DEX69 at 284:15–22, 344:13–345:1, 347:14–18; **Din:** DEX53 at 8, 11.

testified that he believes mentioning something Islamic could be perceived as "part of the problem" or radicalization, that "anybody can be a suspect at the masjid," that random selection "does not feel random," and that the treatment he experiences is happening primarily to Muslims.[105]

## IV. SYSTEMIC RELIGIOUS TARGETING

### A.    Cross-Agency Religious Interrogation

The undisputed record shows a uniform, cross-agency and cross-context pattern of religious questions, including inquiries in Plaintiffs' Islamic identity, beliefs and practices, sect and prayer routines, mosque attendance and religious leadership roles, Qur'an memorization and religious media, and charitable and community religious activities.

#### 1.    CBP and FBI Religious Questioning at Land Border Crossings and Airports

Hachem was questioned by officers using what appeared to be a prepared list of religious inquiries, including whether he prayed, which mosque he attended, and which sect he belonged to.[106] El-Shahat testified that officers repeatedly pressed him to comment on differences between Sunni and Shia Islam and on his religious beliefs and practices, and TECS records noted his participation in religious retreats, da'wah work, and teaching of the six articles of faith.[107] Plaintiffs including Abdurrashid, Sulayman, Muminov, Din, El-Shahat, Kamel, Mohallim, Mujanovic, Al-Sahlani, Bosnic, Soueidan, and Hachem, experienced similar religious questioning at land border crossings and airports.[108]

---

[105] DEX54 at 32:2–19; 274:18–275:14.
[106] DEX59 at 22–23.
[107] DEX58 67:19–22, 72:3–8; 93:12–94:1, 332:13–21; DEX57 at 11; PLX12 at 5.
[108] **Abdurrashid:** DEX43 at 9, 20, 26; PLX10 at 16; **Sulayman:** DEX82 at 163:10–165:12, 169:3–19, 170:12–25, 236:11–237:5, 237:11–25; **Muminov:** DEX70 at 11, 25-27; DEX71 at 193:6–16, 193:22, 197:16–22, 198:1–14, 186–194:18, 195:10–15, 199:3–8, 204:4–7; 204:10–11, 210:13–210:22, 211:8–14, 264:4–265:2; PLX4 at 11; PLX4 at 2. **Din:** DEX53 at 013–014; PLX13 at 2; **El-Shahat:** DEX58 at 68:16–20; PLX12 at 2, 12; **Kamel:** DEX64 at 102:1–12; 104:13–105:12, 108:6–24, 110:19–111:5, 111:19–23; DEX65 at 8:17–9:2, 12:23–13:8, 13:16–16:3, 16:15–22, 13:15–17, 17:2–5, 18:18–22, 26:3–11, 28:3–6, 29:3–7, 51:1–8, 7–12, 13–15, 53:13–19, 56:17–19; PLX6 at 2, 4, 6; **Mohallim:** DEX67 at 124:3–125:16; **Mujanovic:** DEX69 at 161:1–6, 183:14–184:1, 200:20–22, 187:12–

2.     **FBI Religious Questioning in Non-Travel Settings**

The FBI questioned El-Shahat at work about a New York imam, by phone about his mosque leadership, and at a Starbucks about Islamic sects, sharia law, Salafi identification, and his da'wah travel; agents also demonstrated knowledge of both mosques he attends.[109] Din was questioned at home about a religious text, and the FBI later questioned his imam about him at his mosque, triggering community stigma.[110] M. Paryavi was questioned about his religious sect, mosque attendance, imam, and prayer practices,[111] and was later detained outside his home in an FBI vehicle and asked the same questions.[112] During a roadside encounter, Muminov was questioned about his mosque, sect, and beliefs.[113] Abdurrashid was asked during a security-clearance background check by the FBI and Joint Terrorism Taskforce about his mosque attendance, volunteer work, sect, and religious nonprofit affiliations.[114] Jardaneh was questioned about whether and which religious or Arabic songs he listened to on YouTube.[115]

B.     **Cross-Decade Consistency (2002-2023)**

For more than two decades, from the early 2000s through 2023, Plaintiffs across geographic regions and travel contexts were asked substantively identical questions about their Islamic identity—including sect, mosque attendance, prayer practices, religious leadership, Islamic media, and charitable or community religious activities—demonstrating that Muslim-

---

188:6, 199:20–200:22, 203:21–204:6, 231:20–232:22, 227:16–18, 233:13–233:19, 338:4–338:18, 339:15–340:2; **Al-Sahlani:** DEX50 at 278:4–278:12; **Bosnic:** DEX52 at178:8–16; **Soueidan:** DEX80 at 234:4–235:8, 236:5–20; **Hachem:** DEX59 at 11, 24.
[109] DEX57 at 7–8, 18; DEX58 at 306:8–23, 308:3–16, 309:7–11, 311:7–16; PLX12 at 15–16.
[110] PLX13 at 4; DEX53 at 9; DEX54 at 18:4–8, 186:4–187:5, 187:6–188:5, 188:9–189:1, 189:3–191:3, 204:18–205:1, 205:20–207:1, 255:19–257:21.
[111] DEX76 at 248:2–248:14.
[112] DEX76 at 249:15–252:8.
[113] DEX71 at 65:5–14; 268:15–19.
[114] DEX44 at 158:11–20.
[115] DEX62 at 51:1–21.

identity–based scrutiny is longstanding, persistent, and not tied to any individual officer, airport, or administration.

Beginning in 2002, El-Shahat was questioned about an imam at a mosque.[116] In the mid-to late 2000s, Plaintiffs including Hachem, Abdurrashid, M. Paryavi, Kamel, and Muminov were questioned—often repeatedly—about which mosque they attended, whether they were Sunni or Shia, or Salafi, how often they prayed, who their imam was, and other aspects of their religious beliefs, mosque volunteer work, or leadership.[117]

In the early 2010s, Plaintiffs including Kamel, Muminov, Mujanovic, and Din were similarly questioned about their mosque attendance, sect, religious views, prayer practices, Qur'an memorization, Islamic scholars they listened to, Arabic language books, da'wah activities, or participation in religious retreats.[118] During this period, Mujanovic was asked why she began wearing hijab, whether she was paid to wear it, and whether someone had "Islamized" her.[119] TECS records also reflected El-Shahat's da'wah work and his religious retreats in India where he met with other Muslims and taught the six articles of faith.[120]

In the mid-2010s, Plaintiffs including Abdurrashid, Mujanovic, El-Shahat, and Kamel were questioned about their religious beliefs and practices—for example, their mosque attendance, sect, prayer practices, Islamic scholars they listened to, or conversion to Islam.[121] In 2014, Din was

---

[116] DEX58 at 308:3–21, 309:7–11; PLX12 at 16.
[117] **Hachem:** DEX60 at 200:4–16; DEX59 at 13; **Abdurrashid:** DEX44 at 158:11–20; **M. Paryavi:** DEX76 at 246:2–248:1; **Kamel:** DEX65 at 102:8–15; **Muminov:** DEX71 at 60:13–22,74:7–17, 268:15–22.
[118] **Kamel:** DEX64 at 54:1–8, 56:5–9, 56:17–19; DEX64 at 102:1–12, 104:13–105:12, 108:6–24, 110:19–111:5, 111:19–23; DEX65 at 8:17–9:2, 12:23–13:8, 13:16–16:3, 16:15–22,13:15–17, 17:2–5, 18:18–22, 26:3–11, 28:3–6, 29:3–7, 51:1–8, 7–12, 13–15, 53:13–19; PLX6 at 2; PLX6 at 6; PLX6 at 4; **Muminov:** DEX71 at 195:10–15, 197:16–22, 198:1–14, 193:6–16, 186–191, 193:22, 187:12–194:18, 204:4–204:7, 264:20–265:2; DEX70 at 25–27; **Mujanovic:** DEX69 at 183:14–184:1, 199:20–200:15.
[119] DEX69 at 200:8–16.
[120] DEX58 at 67:19–22, 72:3–8; DEX57 at 11; PLX12.
[121]**Abdurrashid:** DEX43 at 20; **Mujanovic:** DEX69 at 187:12-188:6; **El- Shahat:** PLX12 at 12; **Kamel:** DEX64 at 111:19–23.

asked why he had Arabic-language books, whether he was learning Arabic, and TECS records noted his original name prior to converting to Islam. [122] During this period Mujanovic was asked whether she began wearing hijab due to pressure or payment, why her daughter did not wear hijab, and arranged marriages in Islam, and an officer expressed approval when he learned that her daughter attended a Catholic college.[123]

Between 2017 and 2023, Plaintiffs including Kamel, Muminov, Abdurrashid, Jardaneh, Mohallim, Sulayman, Mujanovic, Al-Sahlani, Hachem, Abunijem, El-Shahat, and M. Paryavi were questioned in different settings about overlapping aspects of their Islamic identity—such as sect, mosque attendance, religious beliefs and practices, Islamic media or anasheed, Qur'an teaching, religious community participation, conversion to Islam, views on sharia law, Salafi identification, other congregants at their mosque, da'wah work or whether they were fasting.[124] During this period, Sulayman was also asked questions about his role in leading an upcoming Umrah pilgrimage, and Din was questioned about a hadith debate.[125] When Mujanovic invoked her right to an attorney, she was told to "be quiet" and answer their questions.

## C.    Identity Markers Used as Watchlist Triggers

Across travel and non-travel encounters, across multiple federal and local agencies, Plaintiffs were questioned based on visible, linguistic, associational, national origin, and ideological indicators of their Islamic identity. Muminov and Din were questioned about whether

---

[122] DEX53 at 013–014; PLX13 at 2.

[123] DEX69 at 183:14–22, 187:12–188:6, 187:12–188:6, 200:8–22, 201:1–2, 338:4–18.

[124] **Kamel:** DEX65 at 13:1–16:3, 16:15–22; **Muminov:** DEX71 at 210:6–213:13; 265:3–265:7; DEX70 at 11; PLX4 at 11; PLX 10 at 16; PLX13 at 6; **Jardaneh:** DEX62 at 51:1–21; **Mohallim:** DEX67 at 124:12; **Mujanovic:** DEX69 at 231:20–232:22,233:13–19; **Al-Sahlani:** DEX50 at 210:24–211:14; **Hachem:** DEX59 at 13; **Abunijem:** DEX46 at 285:16–286:13; PLX12 at 15, 16; **El-Shahat:** DEX57 at 7–8, 18; DEX58 at 306:8—23, 311:7–16; **M. Paryavi:** DEX76 at 250:10–252:8.

[125] DEX82 at 191:14–192:19, 193:7–23, 195:10–14, 235:6–17; DEX81 at 11, 13–14; DEX53 at 9; DEX54 at 205:20–207:1.

they spoke Arabic, Muminov was asked if he memorized the Qur'an, Din was questioned about Arabic-language books, and Jardaneh was asked which anasheed or Arabic-language religious media he listened to on YouTube.[126] Kamel, Sulayman, and El-Shahat were questioned about their leadership roles at their respective mosques and their relationships with congregants, El-Shahat was questioned about his level of religiosity, and El-Shahat's TECS records noted his da'wah work and that he taught the six articles of faith.[127] Abdurrashid and Muminov were both questioned about their volunteer work at their mosques, and Abdurrashid was asked about his wife teaching Qur'an.[128] Soueidan testified that officers typically turned to religious questioning because of his Muslim name, and TECS records noted Din's original pre-conversion name.[129] Mujanovic was asked why she began wearing hijab, why her daughter did not wear hijab, and was told that she could remove it if she wished to be treated "like a normal person."[130] Din was asked about religious charitable practices, including sending money to Muslim family and friends and for zakat.[131]

### D.    Terrorism and Extremism Stereotypes Applied Only to Muslims

Across airports, land borders, foreign ports, roadside stops, and FBI interviews, Plaintiffs—including Soueidan, Din, E. Paryavi, Mujanovic, Kamel, Jardaneh, Muminov, Bosnic, Sehwail, Abdurrashid, and El-Shahat—were questioned about terrorism- and violence- related stereotypes tied to their Muslim identity, including ISIS, jihad, suicide bombers, extremist Muslims, whether they knew anyone that supported terrorism.[132] El-Shahat was questioned about

---

[126] **Muminov:** DEX71 at 199:3–8; **Din:** DEX53 at 14, 25; DEX54 at 81:1–3, 265:2–4; **Jardaneh:** DEX62 at 51:1–19.
[127] **Kamel:** DEX63 at 16–17; DEX64 at 46:6–49:6, 51:8–13; DEX65 at 16:15-22, 50:11–12, 56:5–9; **Sulayman:** DEX81 at 11; DEX82 at 164:13–165:22, 191:14–192:19, 193:7–23, 195:10–14, 235:6–17; **El Shahat:** DEX57 at 11; DEX58 at 67:19–23, 215:1–2, 215:16–21, 304:13–17, 309:9–11; PLX12 at 5-11.
[128] **Abdurrashid:** DEX44 at 169:20–170:2; PLX10 at 16; **Muminov:** DEX70 at 23–24; DEX71 at 213:2–20.
[129] **Soueidan:** DEX80 at 210:2–4; **Din:** PLX13 at 2–5.
[130] DEX 69 at 200:20–22, 203:21–22, 204:1–5
[131] DEX52 at 13–14; PLX13 at 2; PLX13 at 6.
[132] **Soueidan:** DEX79 at 9–11; DEX53 at 9; DEX54 at 204:18–205:1, 205:20–207:1; **E. Paryavi:** DEX73 at 247:14–16, 247:21–248:5; DEX72 at 25; PLX3 at 8; **Mujanovic:** DEX69 at 231:20–232:22, 233:13–233:19; **Kamel:**

the World Trade Center bombing, Kamel was asked his opinion about Muslim extremists, suicide bombers,, and Yemeni fighters in Saudi Arabia and Syria.[133] And Abdurrashid was asked during a security-clearance interview about jihad and who has the legitimacy to declare it.[134] In Kenya, an airport official showed Mohallim's photograph to others and asked whether he had joined ISIS.[135]

### E.    National Origin and Political Profiling Tied to Muslim Regions

Across multiple screening contexts, Plaintiffs including M. Paryavi, E. Paryavi, El-Shahat, Soueidan, Din, Mohallim, Sehwail, and Thadi were questioned about their national origin, travel and ties to Muslim-majority regions, or their political views on conflicts in those regions.[136] Muminov was asked whether he knew any Muslims from overseas who had entered illegally.[137] Mujanovic was questioned about which mosques she attended while living in Bosnia.[138] Kamel was questioned about conflicts in Iraq, Palestine, and Syria, the Muslim brotherhood; Syrian immigration; Yemeni fighters in Saudi Arabia and Syria; and foreign funding.[139] Al-Sahlani was questioned about Iraq and, after travel to Iran and Iraq, about his trip and pilgrimage to Mashhad,

---

[133] El-Shahat: PLX12 at 15; PLX12 at 16; **Kamel:** DEX65 at 7–12; DEX64 at 110:19–111:5.

DEX64 at 54:1–8, 56:5–9, 56:17–19, 110:19–111:5;  DEX65 at 7–12, 102:1–12, 104:13–105:12, 108:6–24, 110:19–111:5, 111:19–23, 8:17–9:2, 12:23–13:8, 13:16–16:3, 16:15–22, 13:15–17, 17:2–5, 18:18–22, 26:3–11, 28:3–6, 29:3–7, 51:1–15, 53:13–19; PLX6 at 2; PLX6 at 6; PLX6 at 4; **Jardaneh:** DEX62 at 51:1–21; **Muminov:** DEX71 at 53–56, 65:5–14; 65:5–14; 268:15–19, 60:13–61:5,74:7–74:17; **Bosnic:** DEX52 at 234:20; **Kamel:** DEX65 at 7–12; DEX64 at 110:19–111:5; **El-Shahat:** DEX58 at 308:3–16; 309:7–1, 68:16–20; **Mujanovic:** DEX69 at 231:20–232:22, 339:15–340:22.

[134] DEX44 at 158:11–158:20; PLX10 at 18-21; DEX44 at 169:18–170:2.

[135] **Mohallim:** DEX67 at 82:8–83:19; **Mujanovic:** DEX69 161:1–6, 183:14–184:1, 187:12–188:6, 199:20–200:15, 200:20–22, 203:21–204:6, 227:16–18, 231:20–232:22, 233:13–19, 338:4–18,339:15–340:2.

[136] **M. Paryavi:** DEX76 at 94:5–8, 95:10–96:2; **M. Paryavi:** DEX76 at 246:2–248:1; **El-Shahat:** DEX58 at 93:12–94:1,117:24–118:2; **Soueidan:** DEX79 at 9–11; DEX80 at 217:9–219:6; PLX1 at 10; **Din:** DEX53 at 13–14; **Mohallim:** DEX67 at 124:3–125:16; PLX2 at 6; PLX38 at 4; **E. Paryavi:** DEX73 at 247:21–248:5, 247:14–16; DEX72 at 25; PLX3 at 8.

[137] DEX71 at 53–56, 65:5–14, 65:5–14, 268:15–19, 60:13–61:5, 74:7–74:17; DEX70 at 10-20; PLX4 at 11.

[138] DEX68 at 10, 18, 20; DEX69 at 183:14–184:1, 233:13–233:19, 339:15–340:22.

[139] DEX63 at 7, 16; DEX64 at 101:25–102:7, 109:5–18; DEX65 at 50:7–19.

Iran.[140] Din was approached by an individual he believed to be an FBI informant posing as an antigovernment convert who attempted to recruit him to "join Syrian forces" and fight in Syria.[141]

Plaintiffs—including El-Shahat, Hachem, and M. Paryavi—were also subjected to political or ideological questioning.[142] Muminov was asked whether he watched CNN or Fox News and about his political views,[143] Doe was asked whether he was a "sovereign citizen," and Din was described to his imam as having "opinions about Muslims having their own country or state."[144]

### F.    Substantial Burdens on Imam Sulayman's Religious Exercise: Umrah And Other Pilgrimage Duties

Imam Sulayman serves as an imam whose duties include leading congregational worship, teaching, and accompanying members of his community on religious pilgrimages.[145] One month before his March 2018 Umrah trip, he was questioned about Islam and his role in leading the pilgrimage.[146] On the outbound leg of that trip, his group cleared TSA screening, but when TSA learned the group was traveling with him, agents recalled at least eight members and subjected them to enhanced screening.[147] On the April 2018 return trip, his mother and another congregant received SSSS designations for the first time, and CBP subjected him to a four-hour interrogation about his duties as an imam and his contacts during Umrah travel.[148]

In 2021, when he traveled for Umrah with family members, he checked in after them to avoid drawing scrutiny.[149] When he did so, the airline recalled all family members and issued new

---

[140] DEX49 at 7–8, 22; DEX50 at 271:25–272:7, 120:7–121:6, 149:14–18; PLX8 at 6–7, 20–21.
[141] DEX53 at 22; DEX54 at 283:19–284:3, 287:5–289:4.
[142] **El Shahat:** PLX12 at 16; **Hachem:** DEX60 at 11, 22; **M. Paryavi:** DEX76 at 246:2–248:1.
[143] DEX70 at 11, 16; DEX71 at 210:6–22, 268:20–269:2; PLX4 at 11–13.
[144] **Doe:** DEX56 at 264:12–16; PLX36 at 2; **Din:** DEX53 at 8.
[145] DEX81 at 7, 11–14; DEX82 at 130:7–16, 178:4–179:14, 259:18–261:8.
[146] DEX81 at 12–14; DEX82 at 192:8–193:21,195:9–196:1, 235:4–21.
[147] DEX81 at 12–13; DEX82 at 159:9–25, 161:18–23, 262:3–5.
[148] DEX81 at 14; DEX82 at 156:18–163:14, 312:23.
[149] DEX81 at 13; DEX82 at 128:13–129:2, 135:25–136:4.

SSSS-marked boarding passes.[150] TSA subjected the entire family to enhanced screening, armed CBP officers waited for him at the departure gate, and CBP again isolated the family for secondary screening on their return to the United States.[151]

Following these repeated experiences, Sulayman reduced the frequency of guided Umrah trips, and materially altered his religious travel behavior. He now typically performs Umrah alone or only with family, books or flies separately from youth groups, coworkers, and congregants to avoid causing them additional screening.[152] He testified that many congregants avoided traveling with him on religious trips because of guilt-by-association, affecting youth programming and group religious travel.[153] Because of the treatment he experiences while traveling, he asks his employer to send him outside the Seattle area only when necessary, travels only once or twice per year while colleagues travel monthly, canceled a trip to an imam's conference, and often drives instead of flying.[154]

## V.  LEGAL STATUS DEPRIVATIONS

In addition to reputational stigma, multiple Plaintiffs experienced concrete changes to legal or administrative status directly traceable to their watchlist designation. Several were denied enrollment in, or had prior enrollment revoked from, federal trusted-traveler programs such as Global Entry and TSA PreCheck.[155] Others lost access to federally controlled facilities or credentials, including TWIC cards, military-base entry, and security clearances necessary for

---

[150] DEX82 at 136:8–22.
[151] DEX81 at 13–14; DEX82 at 136:23–138:20, 140:22–141:21, 262:19–263:22.
[152] DEX81 at 7, 12–14; DEX82 at 67:17–68:2, 81:16–82:3, 117:17–23, 130:17–131:16, 135:8–14, 206:5–14.
[153] DEX81 at 12–14; DEX82 at 67:17–68:2, 81:16–82:3, 95:1–96:5, 117:17–23, 130:17–131:16, 135:8–14, 181:18–182:10, 201:6–15, 206:5–14.
[154] DEX82 at 16:5–18, 17:2–5, 66:9–68:2, 73:14–74:7, 117:17–23, 206:5–14.
[155]**Albadawi:** DEX48 at 231:19–232:7, 288:17–289:15, 290:3–15; PLX31 at 3-11; **E. Paryavi:** DEX72 at 24; DEX73 at 189:15–16; PLX3 at 11; **Hachem:** DEX60 at 107:19–109:1; **Abunijem:** DEX46 at 30:16–18, 63:8–9; 68:7–18, 69:16–20, 71:4–9; PLX41 at 2–5; **Al-Sahlani:** DEX50 at 259:4–263:9; PLX40 at 14–21.

employment.[156] Several Plaintiffs were denied or delayed in state-regulated firearm purchases[157] and others had bank accounts closed.[158]

A number of Plaintiffs also experienced immigration delays and denials for themselves or family members.[159] Muminov's first U.S. citizenship application was denied; he later filed a writ of mandamus and was awarded citizenship upon reapplication in 2015.[160] His mother's visa was revoked on December 12, 2015—a revocation he attributed to his watchlist status—requiring him to travel to Turkey to see her.[161] His wife's green-card application has been indefinitely delayed, and he and his wife filed a writ of mandamus to address the delay.[162]

In 2017, a general contractor offered Thadi a carpet installation job at Joint Base Meyer–Henderson Hall.[163] When he arrived at the base gate, security personnel took his identification, searched his car for more than an hour, and ultimately refused him entry.[164] As a result, he lost the approximately $15,000 contract for that job.[165] The contractor stopped contacting him afterward.[166] Thadi testified that because of the base-access denial and watchlist status, he lost an estimated $60,000 to $70,000 per year in income from that contractor alone.[167]

---

[156] **Bosnic:** PLX35; DEX52 at 14:3–6, 180:4–11, 181:8–18, 183:4–15, 185:4–10 (revocation of TWIC card, losing to access significant portion of work); **Abdurrashid:** DEX44 at 33:5–10, 34:7–16, 36:15–21, 158:2–16, 160:16–161:14, 162:1–163:10, 164:1–8 (security clearance denied and job demotion); **Sulayman:** DEX82 at 216:7–220:6 (denied base access); **Thadi:** DEX84 at 112:3–21 (denied base access).

[157] **Abdurrashid:** DEX44 at 150:13–151:16, 154:18–20; PLX32 at 4–5; **Hachem:** DEX60 at 188:4–10, 191:15–22.

[158] **Hachem:** DEX60 at 173:11–21, 174:2–18, 191:15–22 (or money-transfer privileges restricted). **Mujanovic:** DEX69 at 312:4–11, 317:12, 319:17–20, 321:7–16, 324:6–12, 326:8–327:2; **Din:** DEX53 at 9; PLX13 at 6.

[159] **Abdurrashid:** DEX44 at 140:3–12, 142:3–8; **El Shahat:** DEX58 at 228:16–25, 230:13–233:5; PLX12 at 15.

[160] DEX71 at 227:1–228:2, 229:17–22; DEX70 at 1.

[161] DEX70 at 8; DEX71 at 240:1–6.

[162] DEX71 at 246:1–22; 247:1–6.

[163] DEX84 at 29.

[164] DEX84 at 29.

[165] DEX84 at 42.

[166] DEX84 at 42.

[167] DEX84 at 42.

In 2021, Doe was arrested in California on state healthcare benefit fraud charges.[168] The state investigative report noted that the FBI had referred Doe's information sometime before June 2018, and discovery in the criminal case revealed that the state possessed TECS records generated by CBP agents at Doe's border crossings, including statements he made during enhanced or secondary screenings. The charges were dismissed with prejudice.[169]

# VI. WARRANTLESS ELECTRONIC DEVICE SEARCHES AND COERCIVE INTERROGATIONS

## A. Non-Routine Electronic Device Searches or Seizures

All Plaintiffs experienced at least one electronic device search or seizure during secondary inspection, totaling 63 documented incidents. Soueidan alone had his phone or laptop seized and searched on eight international arrivals.[170] Plaintiffs including Jardaneh, Doe, Abdurrashid, Mohallim, El-Shahat, Sulayman, Sehwail, Albadawi, Thadi, E. Paryavi, Muminov, Mujanovic, Hachem, Kamel, Abunijem, Al-Sahlani, Bosnic, M. Paryavi, and Cyeef Din, likewise experienced electronic device searches or seizures.[171] Laptop searches—which expose substantially greater

---

[168] DEX55 at 21.

[169] DEX 55 at 21; PLX37 at 2–6, PLX37 at 7–64.

[170] DEX79 at 12; DEX80 at 153:20–154:9, 155:9–13, 187:6–8, 212:7–19, 237:1–21, 243:4–244:10; PLX1 at 9–12; PLX1 at 16; PLX1 at 19; PLX1 at 21; PLX1 at 23; PLX1 at 27; PLX1 at 29.

[171] **Jardaneh:** DEX62 at 224:14–225:3, 230:12–232:30; **Doe:** DEX55 at 10, 14; DEX56 at 42:19–21, 81:1–21, 172:1–18, 177:4–12, 180:18-21, 241:3–243:1–2; **Abdurrashid:** DEX44 at 67:14–68:9, 70:7–21, 72:5–13; PLX10 at 5-8; **Mohallim:** DEX67 at 125:19–128:24; **El Shahat:** DEX58 at 76:2–9, 76:17–77:2, 95:24–97:3, 133:9–15, 133:23–24, 134:4–5, 150:20–151:6, 158:22-160:2, 161:12-19, 181:1-7, 182:15-24, 194:5–12, 207:2-208:4, 208:12-209:3, 293:24–294:8; **Sulayman:** DEX81 at 12; DEX82 at 113:10–23, 141:22–142:14, 143:5–7, 193:6–195:9, 311:13–312:25; **Sehwail:** DEX78 at 51:15–52:17, 154:2–15; PLX2 at 2-5; **Albadawi:** DEX47 at 8–9, 14–16. [171] **Jardaneh:** DEX62 at 224:14–225:3, 230:12–232:30; **Doe:** DEX55 at 10, 14; DEX56 at 42:19–21, 81:1–21, 172:1–18, 177:4–12, 180:18-21, 241:3–243:1–2; **Abdurrashid:** DEX44 at 67:14–68:9, 70:7–21, 72:5–13; PLX10 at 5-8; **Mohallim:** DEX67 at 125:19–128:24; **El Shahat:** DEX58 at 76:2–9, 76:17–77:2, 95:24–97:3, 133:9–15, 133:23–24, 134:4–5, 150:20–151:6, 158:22-160:2, 161:12-19, 181:1-7, 182:15-24, 194:5–12, 207:2-208:4, 208:12-209:3, 293:24–294:8; **Sulayman:** DEX81 at 12; DEX82 at 113:10–23, 141:22–142:14, 143:5–7, 193:6–195:9, 311:13–312:25; **Sehwail:** DEX78 at 51:15–52:17, 154:2–15; PLX2 at 2-5; **Albadawi:** DEX47 at 8–9, 14–16. 29; DEX48 at 97:9-99:20, 101:2–102:9, 133:8–19, 134:5–18, 134:19–136:9, 137:8–9, 137:17–138:14, 164:7-11; PLX9 at 2-9; **Thadi:** DEX 83 at 10, 16; DEX84 at 28:1–2, 64:14–65:19, 107:16–108:7, 152:16–18; **E. Paryavi:** DEX73 at 165:2–166:6, 260:3-261:11; PLX3 at 6-7; **Muminov:** DEX70 at 6–13, 15, 18, 23–24; DEX71 at 197:16–22, 198:1–14, 211:14–22, 212:5–10, 213:2–11, 217:8-13, 222:1–22; PLX4 at 2; PLX4 at 4; PLX4 at 6; PLX4 at 11; PLX4 at 13; **Mujanovic:** DEX68 at 10–12, 16–17; DEX69 at 118:13-14, 181:9–13, 188:15–17, 191:20–22, 196:6–197:5, 240:9–11, 242:17–244:10,

quantities of personal and sensitive data—were conducted on devices belonging to Soueidan, El-Shahat, Doe, Albadawi, Muminov, Abunijem, and Al-Sahlani. [172] Individual encounters included Doe's device wiping after officers repeatedly entered incorrect passwords[173] and the search of Mujanovic's husband's phone and iPad during a secondary inspection encounter.[174]

### B.    Out-of-View Digital Searches

CBP officers routinely conducted electronic device searches outside Plaintiffs' presence by removing phones, laptops, or other devices to adjoining rooms and accessing or reviewing digital content outside Plaintiffs' view. Plaintiffs were separated from their devices while officers handled, inspected, or extracted data from them. Plaintiffs who experienced such out-of-view searches include Soueidan, El-Shahat, Sulayman, Albadawi, Muminov, Kamel, M. Paryavi, and Al-Sahlani.[175]

### C.    Retention and Confiscation of Electronic Devices

CBP officers also retained Plaintiffs' electronic devices for extended periods—ranging from days to months—and in some cases never returned them. These retentions occurred during

---

334:8–19; PLX5 at 2; **Hachem:** DEX59 at 14, 20–21; DEX60 at 249:20–250:5, 259:16–18, 260:15–20, 289:22–290:6, 290:11–19; **Kamel:** DEX 63 at 7, 9, 11. DEX65 at 13:15–17, 17:2–5, 53:13–19; PLX6 at 2; PLX6 at 4; PLX6 at 6; **Abunijem**: DEX45 at 11–15; DEX46 at 126:1–21, 128:17–129:3, 174:14–20, 175:5–6, 192:8–14, 196:16–198:10, 200:14–21, 201:6–14, 202:7–21, 206:7–207:1; PLX7 at 2-3; PLX7 at 7; PLX7 at 8-10; PLX7 at 11-16; PLX7 at 17-25; **Al-Sahlani:** DEX49 at 11; DEX50 at 90:12, 128:5–15, 148:3–10, 148:15–149:2, 149:14–18, 151:1–11, 194:6–15, 195:3–196:6, 208:6–209:1, 228:23–229:7, 235:10–20; PLX8 at 2-5; PLX8 at 6-7; PLX8 at 8-11; PLX8 at 12-16; PLX8 at 17-19; **Bosnic:** DEX52 at 222:1–9, 224:5–10; **M. Paryavi**: DEX76 at 147:12–148:4, 182:16–183:5; **Din:** DEX54 at 95:2–98:18, 101:18–102:15.

[172] **Soueidan:** JRDH-7088 at 2; **El-Shahat:** DEX58 at 293:24–294:8; **Doe:** DEX56 at 42:19–21, 81:1–21; **Albadawi:** DEX48 at 97:9–99:20, 101:2–14, 101:19–102:9, 133:8–19, 134:5–136:9, 137:8–9, 137:17–138:14; DEX47 at 15, 17; PLX9 at 2-4; **Muminov:** DEX71 at 198:2–22; DEX70 at 6, 9; **Abunijem:**DEX46 at 196:16–197:1, 197:20–198:10; DEX45 at 13; **Al-Sahlani:** DEX50 at 90:12–14, 148:8–19,195: 3–196:10.

[173] DEX56 at 177:4–12.

[174] DEX69 at 246:16–22, 334:8–19.

[175] **Soueidan:** DEX80 at 155:9–13, 187:6–13, 237:1–21; PLX1 at 9–10; **El-Shahat:** DEX58 at 95:24–97:3; DEX82 141:22–142:14; **Sulayman:** DEX82 at 113:10–114:2; **Albadawi:** DEX48 at 97:9–99:20, 101:2–14, 101:19–102:9; DEX47 at 14; **Muminov:** DEX70 at 7; **Kamel:** DEX64 at 13:15–17; **M. Paryavi:** DEX76 at 147:20–148:4; **Al-Sahlani:** DEX50 at 194:6–15, 195:24–196:6; PLX8 at 2–6, 8–11.

the same secondary inspection encounters in which the devices were seized or searched and often after Plaintiffs refused to provide passwords or unlock their devices. Doe's phone and laptop were retained for two months.[176] Abunijem's phone and laptop were returned to his employer one or two years later, and his phone was never returned.[177] Hachem's phone was confiscated multiple times and retained for periods of three weeks to one month, including one incident in which it was returned with a damaged SIM card slot.[178] Jardaneh's phone was retained for one month.[179] Din's phone was confiscated and never returned after he refused to power it on.[180]

### D.    Government Access to Digital Content

CBP officers accessed digital content stored on Plaintiffs' electronic devices during secondary inspection, including social media information, photo galleries, and messaging applications. In some encounters, officers directed Plaintiffs to navigate through their devices while officers observed, even when Plaintiffs declined to surrender physical possession. CBP officers searched Abdurrashid's social media accounts after confiscating his phone, questioned Muminov about his WhatsApp messages, and required El-Shahat to identify individuals in photographs on his phone and explain media on his WhatsApp and YouTube accounts.[181] Jardaneh provided access to his Facebook and WhatsApp profiles during an FBI interview and Mujanovic provided CBP officers with her email passwords.[182] On two occasions, E. Paryavi declined to

---

[176] DEX56 at 42:19–21, 241:3–243:2, 245:5–13.
[177] DEX46 at 128:17–129:3, 196:16–197:1, 197:20–198:10, 200:14–21, 201:6–14; PLX7 at 2–3; DEX45 at 11 ¶1.
[178] DEX60 at 259:16–18, 260:15–20, 289:22–290:6; DEX59 at 21.
[179] DEX62 at 224:14–225:3, 231:20–232:3.
[180] DEX54 at 95:2–98:18.
[181] **Abdurrashid:** DEX44 at 67:14–68:9, 70:7–21, 72:5–13; PLX10 at 5; **Muminov:** DEX71 at 213:2–11; **El-Shahat:** DEX58 at 133:23–134:5, 158:22–160:2, 161:12–19.
[182] **Jardaneh:** DEX62 at 49:7–50:21, 52:2–15; **Mujanovic:** DEX69 at 191:20–22.

surrender his phone and instead provided access by giving officers his social media handles or scrolling through photographs.[183]

### E.    Coercive Interrogation Conditions Surrounding Digital Searches

Plaintiffs subjected to device searches or requests for digital access were frequently questioned under custodial or coercive conditions, including handcuffing, detention in private rooms or holding cells, prolonged questioning, physical separation from family members, detention and interrogation of accompanying family members, and the presence of FBI agents or armed officers. In several encounters, officers stated or conveyed that compliance with digital access requests was mandatory and that refusal was not permitted.

At the Port Huron–Windsor land border crossing, Muminov was detained under heavily armed conditions, denied access to counsel, told he had no right to a lawyer, and questioned after officers searched his phone.[184] In a separate incident, an officer told him, "What are you hiding? Are you hiding something? Tell me now!" before he complied, asserted his innocence and invoked his right to an attorney.[185] During a 2017 encounter, Mujanovic was escorted with her husband to secondary inspection by the same two CBP officers who had questioned her in 2015; she cried and asserted her right to a lawyer, and an officer told her she was required to answer their questions before returning with a man wearing an FBI jacket who remained for part of the interrogation.[186]

Al-Sahlani was detained in secondary inspection on multiple encounters, including in holding cells where officers took his phone or laptop.[187] Sulayman is often escorted planeside by

---

[183] DEX73 at 165:2–166:6, 260:3–261:11.
[184] DEX71 at 187:12–202:4.
[185] DEX71 at 212:5–10; DEX70 at 23–24.
[186] DEX69 at 180:9–181:8, 224:10–16; PLX5 at 4-7; DEX69 at 225:21–226:20.
[187] DEX50 at 128:5–15, 147:21–149:2, 149:14–18, 151:1–11, 194:6–15, 195:3–196:6, 208:6–209:1, 228:23–229:7; PLX8 at 2-19.

armed officers to secondary inspection and questioned while his phone is taken.[188] Similar coercive conditions occurred when officers escorted Plaintiffs—including Abdurrashid (whose wife was also separately questioned), Soueidan (whose wife and son were questioned), Mujanovic, Albadawi, Hachem, Kamel, Abunijem, M. Paryavi, and E. Paryavi (whose friends were referred to secondary inspection)—to interrogation rooms for questioning and device searches.[189] Anticipating repeated searches, Abunijem removed his device password, and Al-Sahlani wiped his phone data in advance of trips.[190]

## F.    Compelled Passcodes, Biometrics Unlocking, and Other Forced Access

Plaintiffs also provided passcodes, unlocked their phones, or otherwise enabled officers to access their electronic devices during secondary inspection while detained in coercive or custodial conditions. In several encounters, officers stated or conveyed that compliance was mandatory— threatening confiscation, extended detention, or using aggressive tactics to compel access.[191] Some Plaintiffs cowed to these threats and complied; others refused and had their phones confiscated for weeks, months, or indefinitely.[192]

---

[188] DEX82 at 32:16–25, 141:22–142:15, 143:5–7, 168:11–22, 174:3–24, 311:13–312:7, 111:4–9, 111:21–112:3, 112:18–114:12, 312:9–313:2; DEX81 at 12–15, 22–23.

[189] **Abdurrashid:** DEX44 at 67:14–68:9, 72:5–13; PLX10 at 5-8; **Soueidan:** DEX80 at 151:5–152:5, 153:20–154:19, 186:1–21, 206:15–207:1, 212:7–19, 229:10–20, 237:1–21; PLX1 at 2-7; DEX79 at 11; **Mujanovic:** DEX69 at 188:15–17; PLX5 at 2-3; **Albadawi:** DEX48 at 149:6–151:11; **Hachem:** DEX59 at 13–14; **Kamel:** DEX64 at 13:15–17, 17:2–5, 51:1–9, 53:13–19; **Abunijem:** DEX46 at 126:1–21, 174:5–175:6, 192:8–20; PLX7 at 7-25; DEX45 at 13 ¶12; **M. Paryavi:** DEX76 at 147:12–148:10,182:16–183:4; **E. Paryavi:** DEX73 at 161:5–9, 161:12–17, 165:2–166:6, 260:3–261:11; PLX3 at 2-7.

[190] **Abunijem:** DEX46 at 127:19–128:4; **Al-Sahlani:** DEX50 at 208:6–209:1, 228:23–24; PLX8 at 17–19.

[191] **Al-Sahlani:** DEX50 at 195:11–18; **Muminov:** DEX71 at 198:2–21 (released quicker), 212:1–8 ("What are you hiding? . . . Tell me now."); **Sehwail:** DEX78 at 151:3–9 (longer detention and phone confiscation); **Hachem:** DEX59 at 22 (used "good cop bad cop tactics"); **Mujanovic:** DEX69 at 192:2–9 (treated like a "high class criminal"); **M. Paryavi:** DEX76 at 272:12–21 ("abusive").

[192] **Abdurrashid:** DEX44 at 71:7–17 ("[W]hatever you can to get home . . . . I'm not Rosa Parks."); **Albadawi:** DEX48 at 313:15–20; **Al-Sahlani:** DEX50 at 209:2–210:9; **El-Shahat:** DEX58 at 76:5–6, 293:24–294:8 (laptop); **Kamel:** DEX65 at 66:23–67:3; **Mohallim:** DEX67 at 126:15 & 21–24; **Mujanovic:** DEX69 at 181:6–13, 190:10–15, 243:2–245:15 ("[Y]ou start shaking . . . you start crying."); **Muminov:** DEX71 at 198:2–22; **E.Paryavi:** DEX73 at 165:4–14; **M.Paryavi:** DEX76 at 152:6–19; **Sehwail:** DEX78 at 150:11–152:5; **Soueidan:** DEX80 at 155:2–11; **Sulayman:** DEX82 at 113:10–23; **Doe:** DEX56 at 172:2–18 (refused); 170:8–15 (one or two months); **Hachem:**

In Paris, Hachem was separated from counsel, told he had no rights at the border and could be detained indefinitely, and was required to unlock his phone after officers confiscated it.[193] He was yelled at by officers in Detroit and Miami when he declined to give his passcode, including during an encounter in which officers used a "good cop, bad cop" approach.[194] Before 2015, he sometimes provided his passcode moping to mitigate consequences of his watchlist status.[195]

Mohallim provided his passcode after he and his mother were escorted to secondary inspection, denied access to a lawyer, and told by an FBI agent that they were being "a problem" and not "help[ing] the FBI."[196] After two prior encounters in which officers confiscated his phone— which has not been returned— and retained his laptop for approximately two to three years, Abunijem unlocked his phone.[197] Al-Sahlani likewise provided his password in multiple encounters after officers took his phone or laptop.[198]

Sulayman provided his passcode at the U.S.-Canadian border after being told "Get your phone… you need to unlock it."[199] Soueidan provided his passcode and signed documents he believed indicated his consent, believing he had no option to refuse.[200] Sehwail unlocked his phone after officers told him he would be detained longer and his phone confiscated if he did not

---

DEX60 at 258:14–18 (refused); 260:6–20 (three weeks); **Jardaneh:** DEX62 at 224:14–225:11 (refused); 231:18–232:11 (return took "a week or so," long enough to miss a job application).
[193] DEX60 247:4–5, 248:18–249:19, 263:2–18; DEX59 at 14.
[194] DEX59 at 20–21.
[195] DEX59 at 21.
[196] DEX67 at 125:19–128:24.
[197] DEX45 at 12–14; DEX46 at 126:1–21, 174:5–20, 175:5–6, 192:8–14; PLX7 at 7-25.
[198] DEX50 at 128:5–15, 148:3–149:2, 149:14–18, 151:1–11, 194:6–15, 195:3–13, 195:19–196:6, 208:6–209:1, 228:23–229:7; PLX8 at 2–19.
[199] DEX81 at 11; DEX 82 at 190:20–22, 191:12–14, 197:22–25, 193:6–195:9.
[200] DEX80 at 186:1–12.

comply.[201]  Mujanovic testified that she unlocked her phone out of fear.[202]  Doe provided his iCloud password to FBI agents after being arrested at the border.[203]

When Muminov declined to hand over his phone, an officer told him, "What are you hiding? Are you hiding something? Tell me now!"[204] He then provided his passcode, after which officers questioned him about his WhatsApp messages.[205] Officers also fingerprinted him, performed an iris scan, collected body hair and dental samples, and downloaded content from his phone.[206] Jardaneh was fingerprinted and detained in a barred cell, and Hachem was fingerprinted by Panamanian officers acting at the direction of the United States.[207]

# ARGUMENT

## I. PLAINTIFFS HAVE STANDING TO SUE WLAC DEFENDANTS AND THE COURT SHOULD NOT GRANT SUMMARY JUDGMENT FOR THE WLAC DEFENDANTS

### A.    Plaintiffs Have Standing to Sue the WLAC Defendants

Plaintiffs have standing to sue the WLAC Defendants because they were placed on Defendants' watchlists and challenge policies that WLAC develops and promulgates. Article III requires an injury in fact that is traceable to the defendant and likely to be redressed by a favorable ruling. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Although the Government asserts that WLAC is merely advisory, discovery shows that WLAC convenes, drafts, and unanimously approves the Watchlisting Guidance; that the National Security Council (NSC) routinely enacts it;

---

[201] DEX78 at 51:4–52:17; DEX77 at 17; PLX2 at 2–5.

[202] DEX69 at 181:9–13, 118:13–14, 188:15–17, 240:9–11; PLX5 at 2–3.

[203] DEX56 at 180:18–21.

[204] DEX71 at 212:5–10.

[205] DEX71 at 212:2–11; DEX70 at 23–25.

[206] DEX71 at 186:1–191:22, 193:6–16, 193:22, 197:16–198:14; DEX70 at 12; PLX4 at 2–3.

[207] **Jardaneh:** DEX62 at 222:14–223:12, 224:17; **Hachem:** DEX60 at 224:11–225:22; DEX59 at 14.

and that participating agencies are expected to follow it. PLX17 at 30:14–17, 31:10–18, 33:20, 34:17–20.

1.       **Plaintiffs' Injuries Are Fairly Traceable to the WLAC Defendants, Who Collectively Manage Their "Watchlisting Enterprise"**

WLAC's creation, development, unanimous approval, and promulgation of the Watchlisting Guidance directly structure the watchlisting policies that govern Plaintiffs, making their injuries fairly traceable to WLAC Defendants. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024). WLAC provides the causal chain here.

Traceability is satisfied when a defendants' actions predictably shape the conduct of downstream government actors, and court have "been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Murthy v. Missouri*, 603 U.S. 43, 57–58 (2024) (citing *Dept. of Commerce v. New York*, 558 U.S. 752, 768 (2019); *Clapper v. Amnesty Int'l U.S.A.*, 568 U.S. 398, 413 (2013)). WLAC's drafting and approval of the Watchlisting Guidance predictably determine how participating agencies implement watchlist policies.

WLAC's drafting, review, and consensus approval of the Watchlisting Guidance—and each agency's agreement to be bound by it—establish a direct and non-attenuated causal link between WLAC's policymaking and Plaintiffs' injuries. *Friends for Ferrell Pkwy, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). This is not the kind of remote or attenuated policymaking courts that courts have deemed insufficient. *See Common Cause v. Biden*, 478 F.3d 1280, 1285 (D.C. Cir. 2014).

Defendants describe WLAC as "consensus driven," "purely advisory," and "informal" organization, Dkt. 343-1 at 17–19, but discovery shows that WLAC members collaborate, draft, review, edit, and unanimously approve the Guidance. *See* DEX23 at 26, 27, 31, 33, 35, 37, 38, 40,

42, 44, 46, 50; Dkt. 343-1 at 17–19. Agencies participate because the Guidance affects their operations or because they assert equities in the watchlisting and screening processes. *See* Dkt. 343-1 (citing DEX1 ¶ 80, DEX23 at 26); PLX43 at 23:18–19, 24:1–10, 24:15–22, 25:1–2. Agencies are expected to—and do—follow the Guidance when using TSDS information. PLX17 at 31:10– 18. Although the National Security Council holds "ultimate authority" to approve final versions, it has never once rejected a WLAC submission, its role is ceremonial. *See id.* at 31:10–18; 34:17–20.

### 2. A Favorable Decision for the Plaintiffs Would Require Redress from the WLAC Defendants

Traceability and redressability are often "flip sides of the same coin." *Sprint Communications Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008). When a defendant's actions cause an injury, an injunction will typically redress it. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Because the Watchlisting Guidance—drafted, revised, and effectively executed by WLAC—governs how agencies apply watchlist policies, relief directed at those policies necessarily requires WLAC action.

Plaintiffs seek declaratory and injunctive relief targeting the policies governing their watchlist status. Dkt. 48 at 263–65. Although Defendants contend that such relief would not affect WLAC or its members, the Watchlisting Guidance is the primary policy document at issue, and agencies are expected to follow it. *See* Dkt. 343-1 at 43; *see* PLX17 at 31:10–18. A declaration regarding the constitutionality of those policies would require WLAC to revise the Guidance accordingly. *See* Dkt. 48 at 263–64. This Court may also order expungement of records associated with an unlawful listing, and because those records are held and used across WLAC-member agencies, such relief would necessarily bind all WLAC Defendants. *See Ibrahim v. DHS*, 62 F. Supp. 3d 909, 936 (N.D. Ca. 2014) (ordering the destruction of all Plaintiff's No Fly List records).

Plaintiffs further seek injunctive relief to remedy the statutory and constitutional violations alleged in the complaint. *See* Dkt. 48 at pp. 264–65. Any such injunction would require changes to the watchlist policies applied through TSDS—including revisions to the Watchlisting Guidance, which WLAC is responsible for drafting and updating, *see* DEX1 ¶ 80. A favorable decision would therefore require redress by the WLAC Defendants. *See Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000).

### 3. Each Agency Contributed—Either Through the Watchlist's Overall Policy or Directly by Using Watchlist Information—to Plaintiffs' Injuries

Each WLAC Defendant is causally connect to Plaintiffs' injuries. WLAC functions as a joint enterprise whose members agree on inclusion standards and processes and are expected to contribute to the Watchlisting Enterprise's operations. *See* PLX17 at 37:13–16. WLAC includes only agencies with a meaningful stake in watchlisting operations and policy. *See* DEX22, Johnson Dep. at 32:4–9. Defendants' briefing nevertheless suggests that some agencies are marginal participants. *See* Dkt. 343-1 at 45–47; *see generally* DEX 23.

Several WLAC Defendants take a lead role—DIA, DHS PLCY, DHS I&A, DHS CRCL; DOJ OPCL, DOJ OLP, DOJ NSD, and CIA—regularly attend WLAC meetings, draft and edit revisions to the Guidance, and use watchlist information. *See* WLAC First ROGS DEX23 at 22–51. Several of these agencies also organize and direct meetings. *See* DEX23 at 26–27 (DOJ OLP), 33–35 (DHS CRCL), 47–48 (DIA). DHS PLCY represents DHS's consolidated position in WLAC policymaking. *See* DEX23 at 39.

Other WLAC members participate to a lesser degree but still review, draft, revise, discuss, or object changes in the Guidance. PLX17 at 37:13–16; DEX1 ¶ 77; *See* DEX23 at 36–38 (DHSOGC), 40–41(DHS PRIV) 45 (NSA). Because WLAC operates by consensus, any agency

may prevent submission of a revised Guidance by objecting. *See* Dkt. 343-1 at 17–23; *see generally* DEX23; *see also* PLX17 at 37: 13–16.

Some agencies claim minimal or no involvement in WLAC—the DOD and Treasury claim no connection, USCIS claims it only provides only pre-decisional advice, and ODNI and FINCEN claim that their roles are limited. *See* DEX23, 48 (Dept. of Treas.), 44 (DOD), 32–33 (USCIS), 32 (ODNI), 49 (FINCEN); *id.* at 44 (DOD); *id.* at 32–33 (USCIS: provides only pre-decisional advice); *id.* at 49 (FINCEN: limited); *id.* at 32 (ODNI: personnel attend upon request).

Yet each of these agencies used watchlist information in ways that directly harmed Plaintiffs. DOD uses the watchlist to screen individuals entering military bases, including Sulayman and Thadi. DEX82 at 216:13–220:11; DEX84 at 111:19–114:5. USCIS delays or denies immigration applications for individuals on the watchlist and their families, including Abdurrashid, Muminov, and El-Shahat. DEX44 at 140:3–12; DEX58 at 279:16. DOS considers watchlist status in visa adjudications, including the revocation of Muminov's mother's visa after he was added to the watchlist. DEX 23 at 13; DEX 70 at 8; DEX 71 at 239:13–240:10.

## B.    Each Plaintiff Has Standing to Challenge their Past or Present Placement on the No Fly List and Watchlist.

Plaintiffs satisfy Article III because they show an injury in fact, a sufficient "causal connection between the injury and the conduct complained of," and a "[likelihood]" that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61. Defendants argue that some Plaintiffs' claims are moot because they were removed from the TSDS after litigation, Dkt. 343-1 at 50–53, and that others lack standing because they were removed before the operative complaint. Dkt. 343-1 at 48–49. Both arguments fail.

A plaintiff has standing if there is an injury that is ongoing or "certainly impending" or if there is "substantial risk" that the harm will occur. *Murthy*, 603 U.S. at 58 (citing *Susan B. Anthony*

*List v. Driehaus*, 573 U.S. 149, 158 (2014)). "Past wrongs" are evidence of a substantial risk of future harm. *Abbot v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018) (citing *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974).

Voluntary cessation does not moot a case unless defendant shows that the challenged conduct cannot "reasonably be expected to recur." *Friends of the Earth v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 189 (2000). This is a "formidable standard" requiring proof that the Government will not resume the challenged conduct if the plaintiff engages in the same behavior that previously triggered it. *See Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (citing *West Virginia v. EPA*, U.S. 697, 719 (2022)).

### 1.    Defendants' Voluntary Cessation Does Not Moot Plaintiffs' Claims.

Defendants understate *Fikre*. The Government may prove mootness only if it "can show that the [challenged] practice cannot 'reasonably be expected to recur,'" Dkt. 343-1 at 48 (citing *Fikre*, 601 U.S. at 235) or if the Government has not done enough to moot a case. 601 U.S. at 235. In the watchlist context, removal is not enough. See *Fikre*, 601 U.S. at 242 (the Government's "sparse declaration" fails to demonstrate "whether the government might relist [plaintiff] if he does the same or similar things in the future...."). The Government bears the formidable burden to prove that it cannot "reasonably be expected to resume the challenged conduct, "immediately or later at some more propitious moment," *Fikre*, 601 U.S. at 243, and there is "no reasonable expectation" it will "return to [its] old ways." *Fikre*, 601 U.S. at 240, 243 (quoting United States v. W. T. Grant Co., 345 U.S. 629, 632–633 (1953)).

Courts applying *Fikre* confirmed the Government's heavy burden. In *Long v. Bondi*, the Fourth Circuit reversed a mootness finding, holding that the Government "did not address whether [it] might relist him in the future for constitutionally impermissible reasons like those he alleged

it had considered previously." 151 F.4th 503, 512–513 (4th Cir. 2025) (citing *Fikre*, 601 U.S. at 242).

Defendants do not meet this burden for the No Fly List Plaintiffs. They offer no assurance that Sehwail or Mohallim will not be relisted for the same reasons as before. Their declaration closely resembles the ones rejected in *Fikre* and *Long*—statements that a plaintiff "will not be placed on the No Fly List in the future based on the currently available information." *Fikre,* 601 U.S. at 240. Here, Defendants add only a general description TSDS inclusion standards and assert that they do not nominate individuals "solely" because of race, religion, national origin, or protected activity. *See* DEX1 ¶¶ 17–25; *id.* ¶ 17. That falls well short of what *Long* and *Fikre* require. *Long*, 151 F.4th at 512–13.

Nor does it satisfy voluntary cessation principles by asserting that "TSC never removes an individual from the TSDS or any of its subsets as a matter of litigation strategy or convenience." *See* DEX 1 ¶ 75. Courts need not accept government declarations that are not "logical [n]or plausible." *See Am. Civil Liberties Union v. C.I.A.*, 710 F.3d 422, 428–29 (Dc. Cir. 2013). Numerous watchlist cases demonstrate removal only after litigation commenced. *See, e.g., Fikre v. FBI*, 904 F.3d 1033, 1040 (9th Cir. 2018) *aff'd*, 601 U.S. 234 (2024); *Long*, 151 F.4th; *Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019); *Mokdad v. Sessions*, 876 F.3d 167 (6th Cir. 2017); *Nur v. Unknown CBP Officers*, 2022 WL 16747284 (E.D. Va. Nov. 7, 2022); *Tarhuni v. Lynch*, 129 F.Supp.3d 1052 (D. Or. 2015); *Maniar v. Mayorkas*, 2023 WL 2709040 (D. D.C. Mar. 30, 2023); *Bosnic v. McCabe, et. al*, No. 3:17-cv-00826 (M.D. Fla.), ECF No. 33 (Aug. 15, 2018). This Court is not required to accept Defendants' assertion that such removals are unrelated to litigation.

### 2.     Bosnic and Doe Have Standing to Pursue Their No Fly List Claims

Bosnic and Doe have standing because they each face ongoing injury from their past No Fly List placement and "certainly impending" risk of future harm. Although both were removed

from the No Fly List before the operative complaint, "removal from the No Fly List does not 'completely and irrevocably eradicate[] the effects of the alleged violation[s].'" *Fikre*, 904 F.3d at 1040 (quoting *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Their prior placement stigmatized them "as [] known or suspected terrorist[s] and as [] individual[]s who represent[] a threat of engaging in or conducting a violent act of terrorism and who [are] operationally capable of doing so." *Id.* That stigma persists unless the Government acknowledges that they never belonged on the list ." *Id.* The reasoning equally applies to their stigma-plus claims. *Id.*

Bosnic and Doe also face ongoing injuries because Defendants retain and continue to use records about their past No Fly List status. *See* DEX10. As truck drivers who previously held TWIC cards that the Government revoked, both may be barred from actively holding a TWIC based on the permanent "derogatory" record of their past placement. *See, e.g.*, DEX17 at 140:21– 141:2 (TSA retains records of past encounters with listees); 198:12–14 (being watchlisted is "derogatory information"); 277:21–78 (security threat assessments look for "derogatory information . . . outside of just TSDS"). Because their listing was unlawful, they seek expungement and an injunction prohibiting future use of those records. *See Ibrahim v. Dep't of Homeland Sec.*, 62 F. Supp. 3d 909, 936 (N.D. Cal. 2014) (ordering multiple agencies to "search and trace all of its terrorist watchlists and records…and remove all references to the mistaken designations…and/or add a correction in the same paragraph that said designations were erroneous and should not be relied upon for any purpose").

Accordingly, Bosnic and Doe satisfy Article III. Their past No Fly List placement continues to cause present harm, the Government has not disclaimed future relisting, and Defendants' retained records ensure ongoing and imminent injury.

**3.    Plaintiffs Abdurrashid, Abunijem, Albadawi, Din, Doe, El-Shahat, Jardaneh, Kamel, Mohallim, Mujanovic, E. Paryavi, M. Paryavi, Soueidan, and Thadi have Standing.**

Defendants suggest that several Plaintiffs lack standing because they "have not experienced travel difficulties or related issues for years. . . ." Dkt. 343-1, Dkt. 343-1 at 52. But Defendants leave out important context. Abdurrashid traveled fifteen times between 2007 and 2017 and received secondary screening each time before stopping travel due to the treatment imposed on him and his family. *See* DEX44 at 23:15–21; 86:15–87:1, 89:1–12, 90:11–13, 91:6–20; PLX10 at 22-24. Din likewise received watchlist treatment consistently until he stopped traveling to avoid treatment that made him fear for his safety. DEX54 at 53:9–18, 139:11–148:4. Doe has continued to receive watchlist treatment as recently as December 2023; El-Shahat until at least 2022; Jardaneh until at least 2023; and, Mujanovic through at least 2023. *See* DEX56 at 45:14–21; DEX58 at 167:8–15; DEX62 at 197:7–10; DEX69 at 101:4–103:8.

Abunijem received watchlist treatment on every trip for approximately twenty years, stopping only in 2021—after the operative complaint. DEX46 at 28:7–29:5, 30:16–18, 63:8–9, 68:7–18, 69:16–20, 71:4–9; PLX7 at 30-41; PLX41. Albadawi likewise experienced watchlist treatment on every trip until around April 2020, after the operative complaint. *See* DEX48 at 33:11–16. Kamel received it every time he flew from 2008 to 2018, at which point he stopped traveling in part due to his watchlist statis. *See* DEX64 at 34:4–20. Mohallim remained on the No Fly List until after this litigation began. *See* DEX67 at 186:3–19; DEX6 at Ex. 19. E. Paryavi faced watchlist treatment on every trip from 2018 until October 2023. DEX73 at 252:15. M. Paryavi received it on every  trip from 2017 until late 2022. DEX75 at 21:7–22:4, 22:18–23:6. Soueidan began receiving it around 2015 and it did not stop until 2022. DEX80 at 101:18–102:20, 104:2–7. Thadi experienced watchlist treatment on every trip he traveled from 2004 to 2015, and the first

47

time he traveled without receiving such treatment was in 2019. DEX 84 95:3–4, 135:2–3, 150:8–9; DEX84 at 147:14–148:5.

Contrary to Defendants' assertions, nothing in the record indicates that any Plaintiff was removed from a watchlist before the operative complaint was filed. Defendants' reliance on *Jibril v. Mayorkas* is therefore unpersuasive. *See* Dkt. 343-1 at 53 (citing 101 F.4th 857 (D.C. Cir. 2024)). In *Jibril*, the Government represented—via *ex parte* declaration—that the plaintiffs were "not on the Selectee List when they filed suit, *id.* at 861, and the D.C. Circuit Court expressly distinguished *Fikre*, where the Government removed the plaintiff *after* suit was filed and promised not to relist him "based on currently available information," *id.* (emphasis original). Here, all Plaintiffs were on a watchlist when the operative complaint was filed.

Plaintiffs who stopped traveling retain standing because their decision not to travel is itself an injury attributable to their watchlist placement. *See Suhre v. Haywood Cnty.*, 131 F.3d 1083, 1088 (4th Cir. 1997) ("neither Supreme Court precedent nor Article III imposes such a change-in-behavior requirement but such a change would be "an extraordinary showing of injury"). Plaintiffs' avoidance of air travel directly reflects the burdens imposed by Defendants' actions.

## II. DEFENDANTS' DECISION TO PLACE PLAINTIFFS ON THE NO FLY LIST VIOLATED THEIR SUBSTANTIVE DUE PROCESS RIGHTS

Substantive due process protects citizens against government interference with fundamental rights. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). That protection applies regardless of the "fairness of procedures used to implement" the challenged action. *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Fundamental rights encompass the "essential components of our Nation's concept of ordered liberty." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 240 (2022). And thus, any infringement must be "narrowly tailored to serve a compelling interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993).

48

Defendants argue that air travel is not a fundamental right, but they do not address the historical and traditional sources of protection that *Dobbs* requires. *See* Dkt. 343-1 at 77. Plaintiffs do so below.

### A.       The Freedom of Movement Is a Fundamental Right

Substantive due process analysis requires determining what the Fourteenth Amendment means by the term 'liberty.' *Dobbs*, 597 U.S. at 240. To answer that question, the Court must be "guided by the history and tradition that map the essential components of our Nation's concept of ordered liberty.*" Id*. This inquiry demands "a careful analysis of the history of the right at issue." *Id.* at 238. Our legal tradition—dating from the Founding through the present—confirms that the right of movement is among the Constitution's unenumerated fundamental rights.

In 1958, the Supreme Court recognized the right of movement—"across frontiers in either direction, and inside frontiers as well"—as a "part of our heritage." *Kent v. Dulles*, 357 U.S. 116, 126 (1958). The "right of exit is likewise a personal right included within the word 'liberty' in the Fifth Amendment." *Id.* at 129.

Nor was *Kent* creating a new right. Soon after the Civil War, *Crandall* described the right of movement as essential to citizenship, including the right to travel to the seat of government, conduct business, seek protection, and access seaports. *Crandall v. State of Nevada*, 73 U.S. 35, 44 (1867). In 1900, the Supreme Court described Plaintiffs' substantive due process right as the "right of locomotion…[the] "right to remove from one place to another according to inclination." *Williams v. Fears*, 179 U.S. 270, 274 (1900). Four years later, the Supreme Court explained that "free movement" was among the "fundamental rights of citizens," offering protections for movement "out of, into, and settlement within, the confines of any state, district, or territory." *Pope v. Williams*, 193 U.S. 621, 624 (1904).

49

Throughout the 20th century, the Supreme Court reaffirmed the right of movement and its domestic and international dimensions. *See Aptheker v. Sec'y of State*, 378 U.S. 500, 519 (1964) ("freedom of movement" includes travel "both internally and abroad") (J., Black, concurring); *Shapiro v. Thompson,* 394 U.S. 618 (1969) (the right to travel includes movement "throughout the length and breadth of our land"); *Haig v. Agee*, 453 U.S. 280, 307 (1981) ("right of interstate travel" and "right of international travel" are both aspects of a movement right).

The No Fly List implicates a well-recognized component of the right of movement—the freedom to leave and return to one's country— that is neither fully international nor fully interstate. *See Mohamed v. Holder*, 266 F.Supp.3d 868, 878 (E.D. Va. 2017) ("interstate and international travel are increasingly seamless and we can no longer reasonably view interstate and international travel as discrete and separable activities."). Indeed, the Magna Carta,[208] the Articles of Confederation,[209] the Universal Declaration on Human Rights,[210] and the International Covenant on Civil and Political Rights[211] all prove that the freedom to travel by the usual and typical means is inherent to "our Nation's concept of ordered liberty." *Dobbs*, 597 U.S. at 240.

**B.    The No Fly List Interferes With Listees' Movement Related Rights, No Matter How This Court Decides to Label Them**

Plaintiffs' substantive due process survives under any formulation of the movement right. The right to domestic interstate travel is "virtually unqualified." *Haig*, 453 U.S. at 307 (citing *United States v. Guest*, 383 U.S. 745, 757–58 (1966)). As this Court has held, the availability of

---

[208] "All merchants may enter or leave England unharmed and without fear, and may stay or travel within it, by land or water, for purposes of trade, free from all illegal exactions, in accordance with ancient and lawful customs." Art. 41.

[209] "[T]he people of each state shall have free ingress and regress to and from any other state." Art. IV.

[210] "Everyone has the right to freedom of movement and residence within the borders of each state" and "[e]veryone has the right to leave any country, including his own, and to return to his country." Art. 13.

[211] "Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement and freedom to choose his residence," "[e]veryone shall be free to leave any country, including his own, and "[n]o one shall be arbitrarily deprived of the right to enter his own country." Art. 12.

"less convenient means of transportation…does not change the analysis."). *El Ali v. Barr*, 473 F. Supp. 3d 479, 508 (D. Md. 2020).

Although the right to international travel may be subject to reasonable government regulation, the No Fly List still infringes on that right. *Haig*, 453 U.S. at 306–07; *Latif v. Holder*, 28 F. Supp. 3d 1134, 1149 (D. Or. 2014) (finding the right implicated "even though [listees] may not have been completely banned from traveling"). Because the Government's placement of Plaintiffs on the No Fly List interferes with a protected movement right, it must withstand strict scrutiny. *El Ali*, 473 F. Supp. 3d at 514. Strict scrutiny requires the Government to cease infringing fundamental rights "unless the infringement is narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721.

### C.    The No Fly List Is Not Narrowly Tailored

To be narrowly tailored, the Government's conduct must be "specifically designed and narrowly framed to accomplish" its compelling interest. *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) (internal quotation marks and citation omitted). Narrow tailoring asks whether the regulation applies to all and to only relevant conduct as "evidenced by factors of relatedness between the regulation and the stated governmental interest." *Republican Party of Minnesota v. White*, 416 F.3d 738, 751 (8th Cir. 2005). Here, the asserted interest is not just the safety of the airplane, but national security. *See NFL standard* (allowing a listing to stop a person's movement). But a policy is not narrowly tailored if it is underinclusive, leaving "significant influences bearing on the interest unregulated," *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 795 (1978), or overinclusive and "sweep[s] too broadly." *Id.* at 788–95. The No Fly List is both.

The structure of the No Fly List does not reliably identify who poses a genuine threat to aviation. The record shows that the List is underinclusive—failing to bar the Government's own

stated targets—and overinclusive—sweeping in individuals who pose no articulable threat, based on predictive judgments the Government has never validated and does not claim accurate.

### 1.    The No Fly List Is Underinclusive

The Government's own practices confirm that individuals on the No Fly List are regularly permitted to fly when it suits governmental needs. Plaintiffs Bosnic, Mohallim, and Sehwail were allowed to board aircraft while on the List, under Government-directed waivers. A policy that is supposed to prohibit air travel but routinely allows it—even for those the Government identifies as dangerous—cannot be narrowly tailored.

The No Fly List also undermines national security by disclosing the Government's investigative interest to its targets, a flaw Defendants themselves acknowledge. *See Bellotti*, 435 U.S. at 795 (a law fails strict scrutiny where there is "no substantially relevant correlation between the governmental interest asserted and the State's effort").  DEX6 ¶¶ 12–17; DEX1 ¶ 72; *see* DEX5 ¶ 75; DEX1 ¶¶ 87–88; DEX2 ¶¶ 26–27; DEX1 ¶¶ 87–88; DEX2 ¶¶ 26–27. Disclosure enables evasion, endangers officers, and risks acceleration of an attack. *Id.*

The Government's failure to list the individuals it later described as dangerous further demonstrates underinclusiveness. The Underwear Bomber was not listed despite information available to the government by his father. *See* PLX28 at 4-7; DEX18 at 146:7–16 (underwear bomber); Dkt. 343-1 at 112 (citing DEX13 at 2,3). Nor was the Boston Bomber, despite the information available to the Government. These widely acknowledged failures underscore that the No Fly List does not meaningfully capture the individuals the Government claims the List is meant to intercept.

Finally, the List only one mode of mass movement—aviation—while leaving identical risks by travel via train, bus, or ship unaddressed. *See* DEX1 ¶ 21; DEX18 at 151:19–20 (discussing

the general consequence of placement on the No Fly List). A restriction focused solely on air travel cannot be narrowly tailored to the Government's asserted national security interest.

### 2. The No Fly List Is Overinclusive

At the same time, the No Fly List sweeps far more broadly than necessary by prohibiting lawful, constitutionally protected movement. Plaintiffs on the No Fly List were barred from flying for any purpose, including to engage in lawful, constitutionally-protected activities such as attending political and religious gatherings as well as traveling to take part in professional activities, weddings, funerals, school, and vacations. *See, e.g.*, DEX67 at 85:10–86:3 (Mohallim school); DEX78 at 36:17–19 (Sehwail vacation); DEX78 at 54:13–15, 55:11, 56:4–20, 64:13–18 (Sehwail engagement party). The Government identifies no reason why denying these fundamental forms of movement further aviation security.

The List is also overinclusive because of who it includes: Individuals may be listed based on predicted future conduct. DEX7 ¶ 6. Not a single Plaintiff in this case has ever been charged with a terrorism-related offense, and suspicion of criminal wrongdoing is not required for listing.

A system that imposes the most restrictive movement ban available based on unvalidated predictions—while prohibiting movement entirely for individuals who have done nothing wrong—cannot satisfy narrow tailoring. Strict scrutiny is more than just speculation.

### 3. Less Restrictive Alternatives Demonstrate the No Fly List Is Not Narrowly Tailored

Strict scrutiny requires the Government to identify and reject less restrictive means that would advance aviation security without imposing a total ban on air travel. The record shows multiple, readily available measures that already exist within the Government's aviation security architecture, each of which would burden liberty far less than a flight ban and would not undermine national security.

The Government operates layered, universal screening across all commercial airports, and that infrastructure is designed to screen for threats to aviation security. DEX5 ¶ 9; *see* 49 U.S.C. § 114(e)(1); *see* DEX5 ¶ 10.  The Government identifies no reason why these screening measures would be inadequate to detect a true aviation threat or why a total ban is necessary when this infrastructure already exists.

Reinforced cockpit doors, restrictions on onboard items, and the availability of air marshals significantly reduces the risk that a passenger could commandeer an aircraft. *See* DEX5 ¶ 14; DEX17 at 307:11, 316:13. Combined with screening, these measures eliminate the need for an across-the-board flight ban. *See generally* DEX5 ¶¶ 33–73. The Government's investigative interest in suspects would also remain secret.

The Government may also retain and analyze information relevant to national security without publicly disclosing investigative interest or preventing individuals from using air travel. If the Government has evidence that a specific individual poses an actual aviation threat, it may continue investigating that person, and where probable cause exists, arrest them. Targeted law enforcement tools are far less restrictive than a categorical ban on air travel for thousands of individuals who are neither charged or suspected of criminal conduct.

Each of these alternatives already exists and is routinely used. None requires banning individuals from flying or disclosing the Government's investigative interest. Because these measures are less restrictive and would advance aviation security without suspending the fundamental right to travel, the No Fly List cannot satisfy strict scrutiny.

## III.    DEFENDANTS VIOLATED PLAINTIFFS' PROCEDURAL DUE PROCESS RIGHTS BY LISTING THEM

When government action deprives a person of liberty or property, procedural due process requires "constraints on governmental decisions," *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976),

designed to "prevent erroneous decisions," *Elhady v. Kable*, 993 F.3d 208, 219 (2021). Here, Defendants' watchlisting decisions triggered severe liberty deprivations for Plaintiffs.

Due process requires, at minimum, "notice and opportunity for hearing appropriate to the nature of the case." *D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016). Beyond these baseline requirements, "the need for procedural safeguards is ordinarily measured by the three-factor framework established in *Mathews v. Eldridge*[:]"

(1) the nature of the private interest that will be affected,

(2) the comparative risk of an erroneous deprivation of that interest with and without additional or substitute procedural safeguards, and

(3) the nature and magnitude of any countervailing interest in not providing additional or substitute procedural requirements. *Id.*; *see Hamdi v. Rumsfeld*, 542 U.S. 507, 528–29 (2004) (calling for a "judicial balancing")."

### A.    Elhady Only Narrowly Controls a Facial TSDS Challenge

Plaintiffs bring both facial and as-applied procedural due process challenges to the TSDS and the No Fly List. Dkt. 1 ¶ 702. "Whether a challenge is 'facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding breadth of the remedy.'" *Regino v. Staley*, 133 F.4th 951 (9th Cir. 2025) (quoting *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019)). A facial challenge asserts that a law "lacks any plainly legitimate sweep," *Glucksberg*, 521 U.S. at 740, n.7 (Steven, J., concurring), whereas "an as-applied challenge is 'based on a developed factual record and the application . . . to a specific person,'" *Educ. Media Co. at Virginia Tech v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013) (quoting *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir.2009)) (cleaned up).

The Fourth Circuit in *Elhady* addressed a facial challenge to the TSDS, and accordingly held that the "due process inquiry and mandated procedures must be directed at the 'generality of cases, not the rare exceptions'" or "outlier experiences." *See Elhady*, 993 F.3d at 217–18. Under that standard, the court considered whether the "average" or "typical" TSDS experience constituted a constitutionally significant deprivation. *Id.* at 217, 223–24. Plaintiffs dispute that this is the correct framework but acknowledge that it governs facial challenges TSDS challenges in this Circuit.[212]

But *Elhady* did not address as-applied claims, and it did not consider the No Fly List at all. *See generally Elhady*, 993 F.3d. For as-applied challenges, courts evaluate whether the process provided was adequate based on the actual "impact on the *plaintiffs*." *Insley*, 731 F.3d at 298 (emphasis added); *see, e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 536 (1985) (advancing both facial and as-applied procedural due process claims).

### B.    Mathews Prong I: Being Listed Is a Deprivation of Protected Interests

"[A] procedural due process claim must demonstrate a substantial infringement of liberty or property in order to proceed." *Elhady*, 993 F.3d at 219 (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 (1972)); *but see Roth*, 408 U.S. at 570–71 ("[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972))). Property interests include "commercially valuable licenses" and other reputational interests protected by the stigma plus doctrine, *see Long v. Bondi*, 151 F.4th 503, 516 (4th Cir. 2025) (upholding a challenge based

---

[212] The *Mathews* Court only considered the "generality of cases" in the second prong of procedural due process analysis, not when establishing that the plaintiff had shown a deprivation of a liberty or property interest. 424 U.S. at 343–44; *see, e.g.*, *United States v. White*, 927 F.3d 257, 263 (4th Cir. 2019) ("*Mathews* requires the application of a test weighing (1) [Plaintiff's] liberty interest . . .").

on denial of TWIC), whereas liberty interests include those "objectively, deeply rooted in this Nation's history and tradition,'" *Kerry v. Din*, 576 U.S. 86, 94 (2015).

### 1.    The No Fly List Deprived Plaintiffs of Their Right to Travel

Plaintiffs Bosnic, Doe, Mohallim, and Sehwail were denied boarding on international flights because the Government placed them on the No Fly List. *See* DEX52 at 42:20, 144:14; DEX6 at 30; DEX78 at 46:6–11, 46:19–21; DEX67 at 94:6–97:15. Plaintiffs' rights were "substantially infringed" not because they claim a right to use airplanes, Dkt. 343-1 at 77, but a right to international travel. The latter is an "aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment," *Califano v. Aznavorian*, 439 U.S. 170, 176 (1978), recognized in the No Fly List context by the Supreme Court, the Fourth Circuit, and elsewhere. *See Fikre*, 601 U.S. at 242–44 (finding No Fly List plaintiff's procedural due process claim was not moot); *Long*, 151 F.4th at 515–20 (denying motion to dismiss the same); *Kashem* , 941 F.3d at 378 ("[I]n many instances air travel constitutes the only practical means of traveling across great distances, especially internationally . . . . The plaintiffs' liberty interest in air travel, therefore, is substantial." (quotations omitted)).

In arguing that TSDS Plaintiffs were not deprived of a right to travel, Defendants rely only on *Elhady*, Dkt. 343-1 at 62–63, a case without any No Fly List claims, *see Elhady*, 993 F.3d at 220 ("Plaintiffs do not allege a *per se* ban on domestic or international travel. Nor can they, because plaintiffs are not on the No Fly List."). But unlike Elhady, Plaintiffs assert that they were on the No Fly List and thus experienced a "*per se* ban" on travel. DEX 52 at 42:20, 144:14; DEX6 at 30; DEX78 at 46:6–11, 19–21; DEX67 at 94:6–96:8–97:15. Because of the Government, Plaintiffs "could not travel at all," cross-Atlantic journeys on a cargo ship notwithstanding. *Abu Irshaid v. Garland*, No. 1:24-CV-01405, 2025 WL 756544 at *13 (E.D. Va. March 10, 2025) (citing *Elhady*, 993 F.3d at 222) (finding deprivation of liberty interest caused by the No Fly List)

("[T]his Court cannot conclude that the metaphysical possibility of a weeks-long nautical journey is sufficient to cure any deprivation of [the] right to travel. If such a right is to have any meaning, it must encompass the customary modes of transport of the present day.").

Defendants downplay the *per se* ban on Plaintiffs' travel by mischaracterizing it as the "temporary inability to board one flight, or even a handful of flights." Dkt. 343-1 at 62–63. But No Fly List status is permanent until the government affirmatively removes the person. *See* DEX1A at 7 (removal is not automated, requiring affirmative action based either on new information or inclusion standards). And while the Government arranged for single flights for Bosnic, Mohallim, and Sehwail (DEX52 156:1–15, 157:4; DEX67 at 97:16–104:1; DEX78 at 48:13, 49:18–50:16), the waivers intended for use on a "one-time basis" only. DEX 17 at 319:4–11. Even considering waivers, exceptions based on the Government's preferences do not cure the total restriction on Plaintiffs' freedom of movement. *See Kent*, 357 U.S. at 126. If Defendants instead mean that Plaintiffs have no deprivation because they are no longer on the No Fly List, and thus were only on it "temporarily," they attempt to launder a mootness argument that was firmly rejected by the Court in *Fikre*. *See* 601 U.S. at 243 (holding the government must "establish that it cannot reasonably be expected to resume its challenged conduct").

Finally, to the extent "history is the essential guidepost" for establishing where a right either exists or "must give way" to Government restriction, *Elhady*, 993 F.3d at 219 (quoting *Kerry v. Din*, 576 U.S. 86, 91, 95), the No Fly List is a historic aberration. The U.S. has no history of denying individuals the ability to use the only mode of transportation available to travel internationally. Because "history works both ways," the absence of such a tradition proves the No Fly List plaintiffs' travel-related deprivation. *Elhady*, 993 F.3d at 219.

### 2.    TSDS Plaintiffs Are Deprived of Their Right to Travel

Plaintiffs Abunijem, Albadawi, Al-Sahlani, Bosnic, Doe, El-Shahat, Hachem, Jardaneh, Mohallim, Mujanovic, Muminov, Sulayman, and Sehwail were placed on the TSDS Watchlist, triggering dogged targeting by the Government and a pattern of delays, harassment, and humiliation when traveling, actually deterring their travel. In its motion for summary judgment, the Government again relies heavily on the Fourth Circuit's ruling in *Elhady*. Dkt. 343-1 at 57–62. In *Elhady*, the Fourth Circuit found that certain "minor delays of an hour or less" were "not dissimilar from what many travelers routinely face." 993 F.3d at 221–22. But discovery reveals that Plaintiffs experience with TSDS is far more than that—it is an albatross hung around their necks, unlike anything the average traveler may experience.

TSDS status places Plaintiffs in a distinct category apart from other travelers: perpetual "known or suspected terrorists" under the law. DEX1A at 2. Plaintiffs do not need to exhibit particular behavior or characteristics to be subject to additional screenings. DEX1A at 2. This categorization results in an average travel experience qualitatively worse than anything experienced by other travelers. As the district court in *Fikre* explained, the Government "stigmatize[s] [a traveler] as a suspected terrorist (or, at least, a dangerous person) by subjecting him to intensive, repeated, non-random security screenings in front of members of his community and family during his . . . trips." *Fikre v. Wray*, No. 3:13-CV-00899, 2020 WL 4677516 at *8–9 (D. Or. Aug. 12, 2020), *vacated and remanded on other grounds sub nom. Fikre v. Fed. Bureau of Investigation*, 35 F.4th 762 (9th Cir. 2022), *aff'd*, 601 U.S. 234 (2024).

So too here. As one Plaintiff said at his deposition in this case, "I wish you could take a flight with me one time from here to DC . . . and see the humiliation I have to go through. DEX60 at 250:14–17. The Government forces Plaintiffs to explain their situation to confused airline ticketing agents in order to print their boarding passes. *See supra* Facts II.F.1 (Phase One). The

Government parades Plaintiffs through checkpoints and subjects them, and those they are traveling with, to invasive searches. *See supra* Facts II.F.2 (Phase Two).  The Government stops Plaintiffs at departure gates and repeats the process in front of all airplane passengers. *See supra* Facts II.F.3 (Phase Three). The Government publicly seizes and questions Plaintiffs at customs checkpoints and border crossings. *See supra* Facts II.F.4 (Phase Four); Facts II.G. This unusual and yet typical experience for Plaintiffs forces them to arrive three to five hours early for every flight, or as soon as the airport opens. *See, e.g.*, DEX82 at 26:21–23, 93:21–94:2, 135:15–22, 159:4–8. Within and throughout these encounters, the Government is violating other constitutional and statutory rights. *See infra* Argument V–VIII.

For some Plaintiffs, these burdens "actually deter" them from travel. *See Soto-Lopez*, 476 U.S. at 903; *see, e.g.*, DEX50 at 198:23–203:2; DEX82 at 15:22–17:22; DEX71 at 148:10–11, 172:7–21; DEX80 at 76:11–79:6, 248:1–5, 249:5–250:5. Defendants dismiss their deterrence as "subjective," Dkt. 343-1 at 60 (citing *Elhady*, 993 F.3d at 222), but Plaintiffs' actions are objectively reasonable given the burdens on their time, dignity, relationships, reputation, and constitutional rights. *Cf. Mohamed,* 266 F.Supp.3d 868, 875 (E.D. Va. 2017) ("Plaintiff's decision not to engage in international travel because of the difficulties he reasonably expects to encounter upon return to the United States is sufficient to demonstrate standing."). For Plaintiffs who continue to travel, their persistence underscores how indispensable travel can be. *See Kent*, 357 U.S. at 126 ("Travel abroad, like travel within the country, may be necessary for a livelihood.").

### 3.    Plaintiffs Are Deprived of Their Reputational Interests, Protected by the Stigma-Plus Doctrine

Procedural due process is also triggered by the Government's infringements on the "constitutionally protected interest" of plaintiffs "in their reputations." *Elhady*, 993 F.3d at 225 (citing *Din*, 576 U.S. at 91–92). To make out a stigma-plus claim, "[a] litigant must show a

statement "stigmatizing his good name" and damaging his standing in the community; (2) some type of dissemination or publication of the statement; and (3) some other government action that 'alter[s] or extinguishe[s] one of his legal rights,' or his "legal status." *Id.* (quoting *Paul v. Davis*, 424 U.S. 693, 706–711, (1976); *Shirvinski v. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012)). Plaintiffs Bosnic, E. Paryavi, Abdurrashid, Sulayman, and Thadi claim reputational injuries by their placement on the TSDS Watchlist or No Fly List.

### i.    Being Listed Is Stigmatizing

The Government does not contest that it made stigmatizing statements against the Plaintiffs when it assigned them TSDS status. *See* Dkt. 343-1 at 63–68. To the contrary, the Government knows that TSDS status means that the Government has "derogatory information" on the listee. See, e.g., DEX20 at 130:14–17, 192:11–16. As the district court in *Fikre* explained, TSDS status is a "badge of infamy" labeling the individual as a "suspected terrorist (or, at least, a dangerous person)." *Fikre*, 2020 WL 4677516 at *9; *accord Fernandez v. RentGrow, Inc.*, 116 F.4th 288 (4th Cir. 2024) ("[L]abelling someone a potential terrorist, drug trafficker, or serious criminal . . . certainly qualifies" as defamatory).

### ii.    The Stigmatizing List Is Publicly Disseminated

A stigma-plus claim requires "dissemination or publication" of the stigmatizing statement, which the Fourth Circuit has held to require a "public disclosure" by the Government. *See Elhady*, 993 F.3d at 225 (citing *Sciolino v. City of Newport News*, 480 F.3d 642, 647 (4th Cir. 2007)). The Government contests that it disseminated or published Plaintiffs' TSDS Watchlist or No Fly List statuses publicly, relying on the finding from *Elhady* that "[t]he government does not publicly disclose TSDB status." *See* Dkt. 343-1 at 63 (quoting 993 F.3d at 225).

But the *Elhady* court's conclusion that all dissemination on the record occurred "for federal law enforcement purposes" was a finding of fact in one case. *See* 993 F.3d at 225–26. The court

did not hold that dissemination is *always* for that purpose. Further, *Elhady* left open a clear way for future watchlist challenges to prevail—where Plaintiffs allege publication through the dissemination to prospective employers, they can do so by "prov[ing] that [watchlist] information is 'likely to be inspected by prospective employers.'" *Elhady*, 993 F.3d at 226 (quoting *Sciolino*, 480 F.3d at 647 (4th Cir. 2007)).

Discovery shows that the Government announces Plaintiffs' TSDS status at airports and land borders "by subjecting [them] to intensive, repeated, non-random security screenings in front of members of [their] community and family." *Fikre*, 2020 WL 4677516 at *9. As the *Fikre* district court explained, "the government can injure a person's reputation through its actions as well as its speech." *Id.* at *8. "It does not matter whether your neighbors think you are a drug dealer because the police said so in a press release or because they saw dozens of agents swarming your lawn wearing jackets emblazoned with the letters 'DEA,'" such actions stamp a "badge of infamy" on an individual in eyes of onlookers. *Id.* at *9 (citing *Paul*, 424 U.S. at 705–08).

Plaintiffs incorporate the humiliations described, *supra* Facts IV.A–E, due to the Government's public targeting at airports and border crossings. The Government also publicly disclosed Plaintiffs No Fly List status by waiting to notify Plaintiffs of flight denials until Plaintiffs were at the airport. *See supra* Facts III.A (Complete Denial of Air Travel for No-Fly Plaintiffs).

Decisive under the *Elhady* "prospective employer" test, Sulayman testified that his travel encounters occurred in front of work colleagues. *See, e.g.*, DEX82 117:13–118:11, 120:19–24 (his director); 267:20–23 (colleague); 94:8–20 (colleague/other chaperone). Sulayman's employer was also made aware of his status because it impaired his ability to travel for work. DEX82 at 16:1–8, 17:2–5, 66:9–12, 66:19–24. Abdurrashid's status resulted in the loss of his security clearance and a demotion at work. DEX44 at 39:10–12. Bosnic's status led to loss of TWIC, integral to any

trucking work with a future employer. *See, e.g.*, DEX52 at 186:15–187:18. Thadi's status caused a denial of military base access that he had to report to the employing contractor. DEX84 at 111:19–114:15. Discovery thus demonstrates how the Government disclosed Plaintiffs' TSDS status by directly or constructively notifying their employers.

### iii.    There Is a Plus

To complete a stigma-plus claim, Plaintiffs must show that "government action," or more specifically "TSDB status[,] has altered their legal status or extinguished rights." *Elhady*, 993 F.3d at 225–26. All five Plaintiffs assert concrete "government actions" that changed their legal status or altered liberty or property interests, due to the "stigma" attached to TSDS Watchlist status.

The Government overstates the requirements of a "plus" injury as articulated in *Elhady*, arguing that stigma-plus jurisprudence has been collapsed into the Fourth Circuit's employment-related cases because *Elhady* utilizes some of those cases. Dkt. 343-1 at 64–65. But *Elhady* makes no such thunderous announcement. As this court has acknowledged, stigma-plus claims exist beyond the employment context. *See* Dkt. 73 at 34 n. 14 (citing *Doe v. Dep't of Public Safety ex rel. Lee*, 271 F.3d 38, 51 (2d Cir. 2001) (parenthetically explaining that "cases addressing 'stigma-plus claims' in the context of termination of government employment 'yield principles that are sometimes difficult to apply in delineating 'plus' factors in other contexts.'" (quotations omitted)). *Elhady* states explicitly that plaintiffs in that case "cannot make this 'plus' showing because they have not demonstrated that TSDB *status*," not the act of *disclosure*, "has altered their legal status or extinguished rights." 993 F.3d at 226 (emphasis added).

The Government further argues that Plaintiffs must allege "that TSDS status *mandated* the denial of any of their alleged rights or privileges." Dkt. 343-1 at 64 (citing *Elhady*, 993 F.3d at 227) (emphasis added). But to finish the quote from *Elhady*, "the government's act of including names in the TSDB does not mandate that *private entities* deny people such privileges." 993 F.3d

at 227 (citing *Abdi v. Wray*, 942 F.3d 1019, 1034 (10th Cir. 2019) (emphasis added). The Fourth

Circuit's reasoning was plain to see: because a "plus" factor requires "*government* action," "plus"

factors that stem from a *private* actor must occur because of some *mandate* by a government actor.

*Id.* at 225, 227 (emphasis added). Here, all Plaintiffs experienced "plus" factors stemming directly

from the Government. Because "other government action" is present on the face of Plaintiffs'

"plus" factors, there is no need to find the Government "mandated" a private action that is not

alleged. Even so, the Fourth Circuit in *Elhady* did not rely on a "mandate" finding, instead

concluding that evidentiary issues "do[] not allow us to conclude [the harm] was *because of* TSDB

status as opposed to other reasons." *Id.* at 227 (emphasis added). The Fourth Circuit in *Long* also

did not apply a "mandate" requirement, instead finding that the plaintiff's claim was plausible

because he adequately alleged that "TSA relied *at least in part* on TSC's Watchlist determination

in deciding that [he] posed a security threat warranting denial of his TWIC . . . application[]."

*Long*, 151 F.4th at 517 (4th Cir. 2025) (emphasis added).

**Plaintiff Zijad Bosnic** held a TWIC card used to gain access to a significant portion of his

work as a commercial truck driver, which was subsequently revoked because of his TSDS status.

PLX35; DEX52 at 14:3–6, 180:4–11, 181:8–18, 183:4–15, 185:4–10. The revocation of his TWIC,

for no other discernable reason but his watchlist status, was a "public disclosure" of his status, this

time to his contracting employers or partners. *See supra* PDP.B.3.ii.

Defendants argue that watchlist status does not "mandate" nor "result in" the loss of a

TWIC. Dkt. 343-1 at 66–67. But as the Fourth Circuit pointed out in *Long,* this denial is difficult

to square with "pertinent federal regulations." 151 4th at 516. "[A] person's presence on the

Watchlist tells TSA that TSC has a 'reasonable suspicion that the person is engaged, has been

engaged, or intends to engage in conduct constituting, in preparation for, or in aid or in furtherance

64

of terrorism and / or terrorist activities.'" *Long*, 151 F.4th at 517 (quoting government declaration).

Meanwhile, "TSA denies 'an HME or TWIC' to 'an applicant [who] poses a security threat,'" and

"'TSA may determine that an applicant poses a security threat *based on* a search of … [t]errorist

watchlists and related databases.'" *Id.* (quoting 49 C.F.R. § 1572.5(a) & (a)(2)) (emphasis added).

If the Government determines Bosnic meets the TSDS criteria, the statutory overlap suggests that

it would simultaneously find that he is a "security threat" for purposes of TWIC.

Indeed, the Government testified that transportation and travel credentials are continuously

and automatically screened against the TSDS Watchlist, and a match triggers a Security Threat

Assessment, under which TSDS is a derogatory "indicator" that the person is a "threat to

transportation." DEX 17, TSA Depo at 285:1–286:12; *see Long* 151 F.4th at 517. Screening

against TSDS is so "critical" that TSA staff monitor for matches "24/7, seven days a week."

DEX17 at 303:22. The record thus leaves little doubt Bosnic's TWIC was revoked "because of,"

*Elhady*, 993 F.3d at 227, or "at least in part on TSC's Watchlist determination," *Long*, 151 F.4th

at 517.

Finally, as the court makes clear in *Long*, Bosnic does not need to challenge his TWIC

revocation directly, as he argues that a challenge under TWIC would be ineffective because the

underlying cause was his TSDS status. *See Long*, 151 F.4th at 517.

**Plaintiff Esmaeel Paryavi** lost his Global Entry credentials because of his TSDS Watchlist

status. DEX73 at 189:15-16; DEX91. As with TWIC, the Government would be hard-pressed to

defend its claim that revocation of E. Paryavi's Global Entry is "unrelated" to his placement on

the TSDS Watchlist. Dkt. 343-1 at 67. One of the "disqualifying factors" for Global Entry is that

"[t]he applicant is known or suspected of being or having been engaged in conduct constituting,

in preparation for, in aid of, or related to terrorism." 8 C.F.R. § 235.12(b)(2)(vi); *see McLean v.*

*Morgan*, No. 20-2145, 2020 WL 5094683 at *1 (D. Kans. Aug. 28, 2020), identical language to the Government's "reasonable suspicion" standard for the TSDS, *see Long*, 151 F.4th at 517.

Defendants argue that E. Paryavi's Global Entry credential does not confer a "cognizable liberty interest" Dkt. 343-1 at 67. But travel credentials, like licenses conferred by the Government, should be treated as a "protectible property interest." *See, e.g.*, *Mackey v. Montrym*, 443 U.S. 1, 10 (1979) ("suspension of a driver's license for statutorily defined cause implicates a protectible property interest" triggering procedural due process rights). And unlike the plaintiffs in *Elhady*, who could not "demonstrate[] denials of . . . permits [or] licenses," E. Paryavi's loss of travel credentials is a loss of "permit." 993 F.3d at 227. Even if the court disagrees that Global Entry is a "permit," the loss of Global Entry is, at least, a change in "legal status," *Elhady*, 993 F.3d at 225–26, because E. Paryavi can no longer receive "expedited entry into the United States" afforded by the program, *see* 8 C.F.R. § 235.12(a); *McLean*, No. 20-2145, 2020 WL 5094683 at *1.

Defendants argue that eligibility for Global Entry is determined by CBP "at its sole discretion." Dkt. 343-1 at 67. But because Plaintiff does not challenge the revocation directly, the court must merely determine the Government relied "at least in part on TSC's Watchlist determination" in deciding the revocation. *Long*, 151 F.4th at 517. But even if the court needed to review a Global Entry revocation directly, the courts have found the program and related travel credential programs are bound by regulatory criteria and thus subject to judicial review. *See McLean*, 2020 WL 5094683 at *6–7 (finding Global Entry judicially reviewable because the governing CBP regulation "clearly sets forth factors which the agency will consider in denying participation"); *cf. Borowski v. U.S. Customs & Border Prot.*, 718 F. Supp. 3d 280, 291 (W.D.N.Y. 2024) (finding CBP determination of NEXUS eligibility, a "cousin" of Global Entry, "is not beyond review under the APA").

66

**Plaintiff Abdurrashid** was denied a security clearance in 2008, despite the Government granting him an interim clearance and previously granting him a high level of clearance for multiple decades. DEX44 at 33:5–7, 36:15–21. His clearance was denied after FBI agents with a terrorism-related task force came to his place of work to question him. DEX44 at 33:7–10, 34:7–16, 158:8–16. Because a security clearance was integral to his work, denial of his clearance caused his employer to demote him from director to senior manager, DEX44 at 158:2–6, 160:16–161:14. His job was eliminated, and he took the option to retire because he saw his "number [was] up." DEX44 at 162:1–163:10, 164:1–8.

The loss of Abdurrashid's security clearance was a change in his "legal status" sufficient to make out a "plus" factor. *Elhady*, 993 F.3d at 225–26. His demotion, and the later elimination of his job, was also a "denial of employment" directly resulting from his TSDS Watchlist status. *Id.* at 228. Finally, the denial of his security clearance, with no discernable explanation other than his TSDS status, was a "public disclosure" of his status to his employer within the requirements of a stigma-plus claim. *See supra* PDP.B.3.ii.

Finally, Abdurrashid is not asking this court to review the denial of his security clearance directly. *Long*, 151 F.4th at 517. But even so, the court may review clearance denials based on TSDS status where it would constitute a "blanket suspension of security clearances with no individualized review" and no legitimate connection to national security interests. *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 148 (D.D.C. 2025), *amended sub nom*, *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. CV 25-917 (RJL), 2025 WL 2105262 (D.D.C. June 26, 2025).

**Sulayman and Thadi**. The Government denied Plaintiffs Sulayman and Thadi access to military bases because of their TSDS statuses, after Plaintiffs sought access in the course of their

employment. DEX82 at 216:7–220:6; DEX84 at 112:3–21. Because these denials could only be explained by Plaintiffs TSDS Watchlist status, they constitute "public disclosure" of Plaintiffs' statuses to their employers within the requirements of a stigma-plus claim. *See supra* PDP.B.3.ii.

As with all aforementioned stigma-plus claims, *supra*, Plaintiffs do not challenge the denial of access to military bases directly, but instead merely claim that the denials are "other government action" caused by the stigma of his TSDS Watchlist status. But even if the court decides it must review the denials of military base access, review is not foreclosed by *Cafeteria and Restaurant Workers Union v. McElroy*, 367 U.S. 886 (1961). The Court in *McElroy* specifically reserves the questions of reviewability in the context of stigmatization and employment. *McElroy*, 367 U.S. at 898 ("[I]t is to be noted that this is not a case where government action has operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity.").

### 4. Plaintiffs are deprived of property interests in licenses, permits, and agency-conferred statuses, independent of stigma-plus.

Alternative to their stigma-plus claims, *see supra* PDP.B.3, Plaintiffs Bosnic and E. Paryavi assert a direct loss of property rights implicating due process. Having no opportunity to challenge the underlying and controlling categorizations through the processes created by the TWIC and Global Entry regulatory schemes, Plaintiffs challenge TSDS Watchlist determination directly to resolve each deprivation. *See Long*, 151 F.4th at 517 (finding the plaintiff "can contest TSC's decision in this litigation . . . . because he has plausibly alleged that TSC's decision to place him on the Watchlist has injured him in the form of delay and denial of his TWIC and HME applications.").

The Fourth Circuit in *Long* advanced a plaintiff's procedural due process claim based on the denial of his TWIC application, while dismissing the plaintiff's other stigma-plus claims

because, as a group, each failed to allege adequate "public disclosure." *See Long*, 151 F.4th at 516–18. Bosnic's claim, based on the revocation of his TWIC, *see supra* B.3.iii, is nearly identical to the claim advanced in *Long*, and suggesting his claim can also stand independent of a stigma-plus claim. *Accord Bell v. Burson*, 402 U.S. 535, 539 (1971) (finding driver's license "essential to livelihood"); *Dixon v. Love*, 431 U.S. 105, 112–13 (1977) (applying *Bell* in post-*Mathews* analysis). Because the Government's revocation of E. Paryavi's Global Entry is also a loss of a credential, amounting to a property interest that implicates his livelihood, *see supra* 3.iii, he experienced the same form of direct deprivation.

Plaintiffs advance these independent claims under the alternative theory that TSDS Watchlist status does, in fact, "mandate" the revocation of TWIC and Global Entry. *See* Dkt. 343-1 at 66–67. As discussed, *supra* 3.iii, the Government cannot reasonably claim, in light of the overlapping regulatory criteria of the TSDS Watchlist inclusion standard, TWIC, and Global Entry, that placement on the first does not invariably lead to denials of the latter two. Where the Government functionally acts as a "single entity or sovereign" in making these decisions, there is no need for stigma-plus analysis, because there are not two distinct actions nor is there cause for publication. *Accord Long*, 151 F.4th at 522–23 (Gregory, J., concurring in part).

### C.    Mathews Prong II: Risk of erroneous deprivation and value of safeguards

Upon a finding Plaintiffs were deprived of liberty and property interests under *Mathews*, the court next looks to the risk that Plaintiffs would be erroneously placed on the TSDS or No Fly List—that is, that they would be listed without meeting the judicially acceptable criteria for inclusion on these watchlists. *See Hamdi,* 542 U.S. at 530 ("[W]e consider the interest of the erroneously detained individual."); *Carey v. Piphus*, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the *mistaken or*

69

*unjustified* deprivation.") (emphasis added). The court must then consider "the comparative 'risk'

of an 'erroneous deprivation' . . . with and without 'additional or substitute procedural

safeguards.'" *Turner v. Rogers*, 564 U.S. 431, 444–45 (2011) (quoting *Mathews*, 424 U.S. at

335).[213] The facts of this case establish that the risk of erroneous deprivation is extremely high and

would be dramatically reduced by additional or alternative procedures.

### 1.    The Risk of Erroneous Deprivation Is Extremely High

While Defendants claim that instances of erroneous inclusion are "appropriately low," Dkt.

343-1 at 69, all evidence indicates that erroneous placement on the TSDS and No Fly List is

extremely common. Plaintiffs have *all* experienced erroneous inclusions, and the evidence

supports that their experience reflects the "generality of cases."

The *Mathews* Court demonstrated that risk can be quantitatively and qualitatively assessed.

Determinations that, by their nature, are "fact specific" present a "grave risk of erroneous

deprivation." *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 395 (4th Cir. 1990). The nature of

Defendants' inquiry, as reflected in Defendants' inclusion standards, presents such a "grave risk."

None of the Plaintiffs qualify as "known" terrorists, a low risk inquiry one district court described

as "straightforward and based on certain formal actions taken within the criminal justice system."

*Mohamed v. Holder*, 995 F. Supp. 2d 520, 531 (E.D. Va. 2014). All the Plaintiffs, rather, are TSDS

listees because Defendants have labeled them as "suspected terrorists," a determination that

appears "to be based to a large extent on subjective judgments." *Mohamed*, 995 F. Supp. 2d at 531.

The nature of the categorization here thus requires administrative decision-making that is

"sharply focused and easily documented" in order to lower the risk of erroneous deprivation, in

contrast to an administrative process that regards a "wide variety of information" and raises issues

---

[213] Deprivations of Plaintiffs' protected liberty and property interests trigger the "basic requirements of notice and an opportunity to be heard." *Cardall*, 826 F.3d at 743.

of "witness credibility and veracity." *Mathews*, 424 U.S. at 343-44. But the watchlisting scheme does everything to reinforce the risk of error. Gathering information on an individual, nominating them for the TSDS or No Fly List, and approving their nomination, is a highly subjective, open-ended inquiry inviting "a string of subjective, speculative inferences." *Mohamed*, 995 F. Supp. 2d at 532.

The Government fields intelligence or "derogatory information" on individuals from a large cast of primary agents and agencies. PLX17 at 68:2–92:14, 229:14–230:5 ("originators" include TSC, FBI, TSA, CBP, USCIS, OIA, ICE, State, DHS, Consular Affairs, NSA, DIA, CIA, intelligence components of DOD); *see, e.g.*, DEX20 at 20:7–21:13. Despite the wide range of agencies and procedures implicated, the Government does not consider information collection to fall under the Watchlisting Guidance. *See* DEX24 at 6. A similarly large group of actors, including foreign governments, fulfill the role of middle players in a game of telephone—relaying information and nominating individuals to the TSC for inclusion on the TSDS or No Fly List. *See* DEX22 at 92:7, 93:13, 101:19; DEX18 at 21:4–7 (17 or 18 agencies); PLX17 at 69:20, 71:11, 79:3, 97:17-22 (confirming at least one foreign government); DEX24 at 15 (referring to "nominations originating outside of the United States")..

The TSDS and No Fly List are comprised of only nominations that the TSC reviews and accepts. DEX22 at 155:18–21. But the Fourth Circuit has recognized that a "single-layered" review contributes to an "exceedingly high" risk of erroneous deprivation. *Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015), *as amended* (July 7, 2015). The lack of adequate oversight allows for "rubber-stamped" approvals, "encourages 'arbitrary decisionmaking'[,] and risks the possibility" that the Government may target an individual "for an insufficient reason." *Incumaa*, 791 F.3d at 534 (quoting *Wilkinson v. Austin*, 545 U.S. 209, 226–27 (2005)).

71

For No Fly List Plaintiffs, Defendants claim that DHS TRIP creates a second layer of review by assigning "ultimate determination" of watchlist placement to the TSA Administrator. *See* Dkt. 343-1 at 73. But "[t]he involvement of more than one of the servants of that unitary executive in commencing a deprivation does not create an apparent substitute for the notice requirement inherent in the constitutional norm." *See Nat'l Council of Resistance of Iran v. Dep't of State* (*NCRI*), 251 F.3d 192, 207–08 (D.C. Cir. 2001) (evaluating the risk of erroneous deprivation). Furthermore, there is no meaningful second layer of review where the TSA Administrator's decision is based on the recommendation of TSC, DEX1A at 9, TSA is biased towards overinclusion because it is charged with "ensur[ing] aircraft security," Dkt. 343-1 at 3, and TSA is inextricable from the first layer of procedure because it fills every role in the nomination process: intelligence originator, nominator, aggregator, and screener. PLX17 at 116:18–117:11. Even if the TSA Administrator's decision was independent, there is no reason TSC could not re-list an individual without any consultation of the TSA Administrator.

A quantitative review of the TSDS and No Fly List error rate corroborates the above analysis. The existing process has allowed TSC to presently claim that 1.8 *million* individuals are "known or suspected terrorists." DEX14 ¶7 (as of 2023). From 2008 to 2023, TSC placed an average of 113,000 new individuals on the TSDS *every year*, and only rejected 1.3 percent of nominations. *See* PLX24 at 3 (Table). Yet, in an admission of disinterest or willful ignorance, the Government cannot say that WLAC has ever taken note of the precipitous increase in the watchlist's size. PLX17 at 211:21–212:7.

Heightening the evidence of error is the fact that the TSDS is comprised almost entirely of Muslim names. Approximately one-third of the entire TSDS, 627,078 people, share a name with the Prophet of Islam, Muhammad Abd Allah. DEX14 ¶8. The Government repeatedly denies

knowledge of the overwhelmingly Muslim make-up of the TSDS Watchlist. *See, e.g.*, DEX18 at 80:13, 126:12–127:5 (NCTC is "not aware of the allegation" that the watchlist focuses on Muslims and has done no analysis of religious makeup of the watchlist). Yet, the Government is also not surprised when confronted. *See* DEX17 at 155:13–14 ("I don't know that I'd say it surprises me"); DEX18 at 132:21–133:9 (finding the number of names with variations of "Muhammad" "logical").

Rather than face these issues, the Government takes the Kafkaesque approach of refusing to admit that wrongful placement of an individual on the TSDS is even an "error." *See* DEX20 at 235:17–18 (not aware of any wrongfully placed on NFL). Instead, wrongful inclusion in the TSDS is redefined as "information," which can be updated if "new information is received" that reveals the "record is inaccurate." DEX20 at 235:17–22; *see* DEX18 at 75 (reframing "wrongful" as needing "corrections;" "information has changed and the underlying intelligence is no longer there"). As another example, individual agencies claim to audit their nominations. *See, e.g.*, DEX17 at 122:14–20 (DHS and TSA audits). But TSA's former chief watchlist auditing agent, of five years, had "never seen" an audit uncover a person who was placed on a watchlist and should not have been. DEX17 at 134:2–11 ("[T]hat is not something that we encounter.").

When an individual's TSDS or No Fly List status is revoked, the Government cannot say whether or how that correction is reflected in the Government's records. *See* DEX20 at 210:10–213:7; *id.* at 236:11–14 ("the owner of the records would have to modify them" in order for the records to reflect the error). Primary officers interacting with individuals with former watchlist status still have access to that previous status, and may use that information as if the person still carried that status. *See* DEX20 at 213:9–19:21; 236:20 (record of past placement on No Fly List is accessible to primary officers and "potentially" relevant to search at the border).

      **2.**      **Probative value of additional process**

Given the extremely high risk of erroneous deprivation represented by the TSDS and No

Fly List programs, the court must consider what "additional or substitute procedural safeguards,"

including the different forms of notice and hearing, could reduce the risk of error. *See Mathews*,

424 U.S. at 335.

As a threshold matter, Defendants argues that additional process for No Fly List Plaintiffs

would do "virtually nothing to reduce the risk of 'false positive' determination, because a negative

determination has already been made with respect to Plaintiffs." Dkt. 343-1 at 74.[214] But by arguing

that due process analysis must be tailored only to Plaintiffs' "ongoing deprivation" and pointing

out that Plaintiffs are no longer on the No Fly List, Defendants again repackage the failed mootness

argument from *Fikre*. 35 F.4th at 762. Whether or not the Government de-listed Plaintiffs does not

factor in the process Plaintiffs are due under the Fifth Amendment. *See Mathews*, 424 U.S. at 341

(weighing "[t]he degree of *potential* deprivation that may be created by a particular decision")

(emphasis added); *see, e.g.*, C*hicago Tchrs. Union, Loc. No. 1, AFT, AFL-CIO v. Hudson*, 475

U.S. 292, 309–10 (1986) (where union held plaintiffs' fees in escrow, arguing this avoidance

strategy provided adequate remedy in procedural due process challenge, the Court rejected the

mitigating remedy as failing to cure inadequate process).

### a.    Adequate Notice

Notice and hearing requirements are "among the most important procedural mechanisms

for purposes of avoiding erroneous deprivations," *Wilkinson*, 545 U.S. at 226. Plaintiffs on the No

Fly List receive no process until they file a DHS TRIP application. *Cardall*, 826 F.3d at 743. But

Plaintiffs only filed DHS TRIP applications after the Government denied Plaintiff's right to

international travel at least once. DEX56 at 95:1–21, 96:16–21; DEX6 ¶ 28; DEX1 ¶ 103; DEX6,

---

[214] Defendants effectively admit that No Fly List Plaintiffs were deprived of their right to travel erroneously. Dkt. 343-1 at 74 ("TSC determined that they do not belong on the No Fly List.").

ex. 19. Even then, Plaintiffs receive no real "notice of the reasons" for their No Fly List status, or "explanation of the evidence," but instead rote conclusions about their dangerousness. *See Cardall*, 826 F.3d at 743; *Williams v. Hobbs*, 662 F.3d 994, 1008 (8th Cir. 2011) (finding security reviews "lacked the requisite meaningfulness because they failed to explain . . . with any reasonable specificity, why [plaintiff] constituted a continuing threat").

Plaintiffs on the TSDS receive no notice of their status at all—by design. *Compare* Dkt. 343-1 at 70 (arguing that "the process that Plaintiffs demand—notice of the reasons and bases for placement on the TSDS—would impair the government's interest"), *with Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 325 (4th Cir. 2021) ("the Supreme Court has indicated that the risk of an erroneous deprivation is too high where an individual is not provided 'notice of the factual basis' for a material government finding and 'a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker.") (quoting *Hamdi*, 542 U.S. at 533)). Even after filing DHS TRIP, the Government will never confirm Plaintiffs' status one way or another. DEX6 ¶10.

Just as Defendants reference the value of "exculpatory information," Dkt. 343-1 at 69, there is enormous probative value in offering pre-deprivation notice (before status is decided). "Even where the facts are clear, the appropriateness or necessity" of placement on the TSDS Watchlist or No Fly List "may not be [clear]; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the [deprivation] takes effect." *Loudermill*, 470 U.S. at 543 & n.8 (citing *Goss v. Lopez*, 419 U.S. 565, 583–84 (1975) ("[W]here there is an entitlement, a prior hearing facilitates the consideration of whether a permissible course of action is also an appropriate one.").

#### b.    Meaningful & Timely Hearing

A live hearing is the gold standard. "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse

75

witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). Courts have nevertheless held that "due process does not always require a live hearing," particularly when national security is implicated. *See Kashem*, 941 F.3d at 389 (discussing and collecting such cases). *But see Kashem*, 941 F.3d at 389 ("There may be No Fly List cases in which due process would require some type of live hearing or some opportunity to cross-examine witnesses.").[215] But even in cases of "foreign terrorist organization" designation, courts have underscored the value of a hearing to produce evidence, "rebut the administrative record or otherwise negate the [government's] proposition." *See NCRI*, 251 F.3d at 209.

Also of critical value is a *timely* hearing. A pre-deprivation hearing is the Constitutional norm. *See Mathews*, 424 U.S. at 333; *see NCRI*, 251 F.3d at 205. Even in cases of national security, the D.C. Circuit held that *pre*-deprivation hearing is required "unless [the government] can make a showing of particularized need." *NCRI*, 251 F.3d at 208 (emphasis added). Where a post-deprivation hearing is permitted, it should be *prompt*. *See, e.g.*, *Wilkinson*, 545 U.S. at 227 (2005) ("Ohio further reduces the risk of erroneous placement by providing for a placement review within 30 days of an inmate's initial assignment"); *Haig*, 453 U.S. at 310 ("[D]ue process guarantees call for no more than what has been accorded here: a statement of reasons and an opportunity for a prompt post revocation hearing."); *see also Loudermill*, 470 U.S. at 546–57, n.11–12 (reviewing length of delay in written hearing correspondence).

There are many areas for improvement, because No Fly List Plaintiffs received only the most oblique and attenuated version of a post-deprivation "written" hearing. *See, e.g.*, DEX56 at

---

[215] In *Kashem*, the Ninth Circuit's only Supreme Court citation on the permissibility of a written "hearing" is *Loudermill*, 470 U.S. 532 (1985). The *Loudermill* Court was ruling on the process due "prior to termination." *Loudermill*, 470 U.S. at 546. In the next sentence following its finding that written process was adequate, the Court expressly stated that its holding "rests in part on the provisions in Ohio law for a *full post-termination hearing*." *Loudermill*, 470 U.S. at 546 (emphasis added). The present facts are not similar—Plaintiffs are certainly not afforded a "full" hearing at a later date.

95:1–21, 96:16–21; DEX6 ¶ 28; DEX1 ¶ 103; DEX6 ex. 19. Plaintiffs had no opportunity to review evidence, confront witnesses, or appear before an arbiter of any kind to state their case. The "hearing" was merely an opportunity to write a letter to the TSA Administrator pleading their good character. Moreover, the average time for a response from the Government to DHS TRIP application is 2.5 *years*. PLX34 at 37–39, 41 (six months for confirmation, one year for TSC redress decision, one year for TSA Administrator decision).

The Government argues against *any* form of a hearing for TSDS Plaintiffs. *See* Dkt. 343-1 at 71–72 (opposing any "revised redress process"). The Government instead cheekily offers a standing invitation to submit intelligence for TSC to review internally, *see* Dkt. 343-1 at 69; DEX6 10–11, which is not a hearing but an interrogation by correspondence. *See Hamdi*, 542 U.S. at 537 ("An interrogation by one's captor, however effective an intelligence-gathering tool, hardly constitutes a constitutionally adequate factfinding before a neutral decisionmaker.").

### c.    Neutral arbiter

The Government defends the watchlist decision-making scheme as an "established process" with "multiple layers of review across more than one federal agency," *see* Dkt 343-1 at 51, but the "notion" that "more heads are likely to reach a sounder result" is eclipsed by the realities of the unitary executive. *NCRI*, 251 F.3d at 206–07. Instead, the Supreme Court calls for "a neutral and detached judge in the first instance." *Concrete Pipe v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 617 (1993) (citation omitted); *Hamdi*, 542 U.S. at 509.

As discussed, *supra* C.1., the TSA Administrator's role an arbiter of No Fly List status is deeply flawed. Review of TSA Administrator decisions by the Courts of Appeal, under 49 U.S.C. § 46110, is also ineffective at preventing erroneous deprivations for two reasons. First, as with TSA Administrator decisions, the TSC retains the power to re-list individuals. But more, as the D.C. Circuit held, the courts cannot "supply the otherwise absent due process protection" where

they are not present for the initial hearing and "statutory judicial review is limited to the adequacy of the record before the court." *NCRI*, 251 F.3d at 209.

### d.    Clear and Narrow Standard

"The Constitution does not permit a legislature to 'set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.'" *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (quoting *United States v. Reese*, 92 U.S. 214, 221, 23 L.Ed. 563 (1876)). But the watchlist inclusion standards are precisely this type of vague and overly broad dragnet, contributing to the high rate of error. As defined, the inclusion standards are so vague that "men of common intelligence must necessarily guess at its meaning and differ as to its application," *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926). Clearly and transparently defining a narrow standard for inclusion would therefore mitigate the risk of erroneous deprivations.

### D.    Mathews Prong III: Government interest and function

The final consideration to balance under *Mathews* is "the Government's interest, including the *function* involved and the fiscal and administrative burdens that the additional or substitute procedural requirement[s] would entail." *Mathews*, 424 U.S. at 335. Plaintiffs readily concede that "the Government's interest in combating terrorism is an urgent objective of the highest order." *Elhady*, 993 F.3d at 228 (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010)) (emphasis added). But procedural due process analysis must be grounded in the *function* of the watchlist programs in achieving that interest, not a rote deference to "national security" that treats these programs as sacrosanct. *See, e.g.*, *Hamdi*, 542 U.S. at 534 (discussing the detention of enemy-combatants) ("We think it unlikely that this basic process will have the dire impact on the central *functions* of warmaking that the Government forecasts.") (emphasis added).

Under that standard, the Government grossly overstates the value of the TSDS and No Fly List, producing no more than a government official's say-so in their support, and wielding "national security" as a "talisman to ward off inconvenient claims." *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) ("This danger of abuse is even more heightened given the difficulty of defining the security interest in domestic cases.").

### 1.    The Government's interest in the TSDS

Whatever interests or burdens may be implicated by due process under TSDS, they are inapposite to the provision of notice and a meaningful hearing. It is only "*[b]eyond those requirements*" that we look to *Mathews* balancing of burdens. *Cardall*, 826 F.3d at 743 (emphasis added); *see Incumaa*, 791 F.3d at 535 ("the prison's interest does not eclipse Appellant's well-established right to receive notice . . . and to present his rebuttal.").

The Government admits that the TSDS Watchlist is "never" the only layer of the Government's "preventative strategy." DEX17 at 188:9–18. But Defendants nevertheless argue that providing notice to Plaintiffs would impede national security by "increase[ing] the number of false negatives." Dkt. 343-1 at 69 (quoting *Rahman v. Chertoff*, 530 F.3d 622, 627 (7th Cir. 2008)). The argument is flawed. First, the Government has no articulable interest in giving *less* process to TSDS listees than it gives to people on the No Fly List (in Defendants' eyes, the most dangerous subgroup)—yet that is the status quo. Second, the Government claims to value "exculpatory evidence," *see, e.g.*, DEX17 at 196:20–197:5, 279:12–19, which targeted individuals would be uniquely capable of providing. Third, the Government does not functionally hide TSDS status from the individual it targets. It's argument against even the smallest modicum of official notice becomes null as soon as it subjects the targeted individual to watchlist-affiliated harassment. Thus, even if the Government may be burdened by *pre*-deprivation notice and hearing, they show no real burden from *post*-deprivation notice. *See NCRI*, 251 F.3d at 208.

Defendants counter by pointing to the much-touted "random" screening process that may confuse some on the TSDS. Dkt. 343-1 at 70. But Plaintiffs know that they are listed in part because they are *systematically* subjected to "random" searches. *See, e.g.*, DEX82 92:9-15 ("[E]very flight I'm on."). Even if it was a person's first encounter with TSDS status, announcing that the encounter is "random" would only credibly confuse someone who is being targeted *erroneously*, because bad actors would not be so oblivious. Generally speaking, Muslim Americans also know what it means to be targeted. *See, e.g.*, DEX82 at 22:15–24, 98:2–13.

Defendants finally argue that the administrative burden of the TSDS would greatly increase if Plaintiffs and others targeted were afforded due process. *See* Dkt 343-1 at 72 (DHS TRIP's workload would increase "1,100%"). Again, the argument has many flaws. First, when process costs rise from zero dollars to one dollar, the percentage increase is infinite. Second, as noted above, the cost of providing minimum process is *not* a balancing factor. Third, Defendants' cost estimates are exaggerated because the current size of the TSDS is a direct function of the current lack of accountability. As the Court states in *Goldberg*: "The State is not without weapons to minimize these increased costs. Much of the drain on fiscal and administrative resources can be reduced by developing procedures for prompt pre-termination hearings and by skillful use of personnel and facilities." *Goldberg*, 397 U.S. 254, 266 (1970).

## 2. No Fly List

Defendants claim a "heightened interest in keeping off commercial aircraft suspected terrorists about whom they have more specific derogatory information." Dkt. 343-1 at 73; DEX17 at 337:16–19 ("[T]he criteria for the No Fly List is . . . written in a way to prevent individuals that are a threat to an aircraft from boarding an aircraft."). But just as the TSDS Watchlist is "never" the only layer of national defense, the Government allows individuals on the No Fly List to fly anyway, for reasons totally unrelated to that person's purported dangerousness. DEX17 at 312:17–

21 (waiver criteria are merely that the individual was "unexpectedly" overseas and "wasn't aware about their No Fly Status"). Despite the purported danger posed by these individuals, other security measures during waiver flights create "an acceptable level of risk." DEX17 at 342:3–7.

Defendants provide no further specific reasons why additional process for No Fly List Plaintiffs would impinge on its interests or increase its burdens. Plaintiffs nevertheless address possible arguments. First, the Government appears to undertake similar "mitigation factors" any time a person on the TSDS is boarding an aircraft. *See, e.g.*, DEX17 at 307:11, 316:13 (TSA assigns Air Marshals to flights based on TSDS status); *see supra* Facts III.B. Second, the failure to notify Plaintiffs of their No Fly status before they fly ironically *increases* the Government's burden, because it triggers the criterion for issuing a "one-time" waiver: the individual did not know they were on the No Fly List. DEX17 at 312:17–21. Third, broadening waivers to domestic flights would not be prohibitively costly, because the flights would shorter and Air Marshals would be more readily available. *See, e.g.*, DEX17 at 326:15 (TSA representative unaware of any international offices of the Federal Air Marshals); see also DEX17 at 332:1–18 (waivers already permitted for some domestic flights).

If, *arguendo*, the Government has any unique national security interest in the No Fly List, it would be strongest during the *pre*-deprivation phase, before individuals are restricted from flight. *Accord Haig*, 453 U.S. at 309–10. But once a person is on the No Fly List, any interest in preventing their flight is satisfied. Defendants therefore have no compelling argument (and offer none) why they cannot provide "prompt" post-deprivation process. *See Haig*, 453 U.S. at 310.

### 3. Judicious Balancing Compels Procedural Reforms

Considering Plaintiffs' interest, the risk of erroneous deprivation, and the Government's interests in existing procedures and the value of additional or substitute process—the court must

81

resolve through "judicious balancing" the remaining questions: "*what* due process, and *when*." *Hamdi*, 542 U.S. at 529; *NCRI*, 251 F.3d at 205.

a.    **Notice And A Meaningful Hearing Are Required**

Defendants cannot plead away baseline requirements by claiming highly valuable interest. Unlike other aspects of process that may vary as necessary, the Fifth Amendment affords a "'guarantee' that there is notice and an opportunity to be heard." *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140 (4th Cir. 2014) (quoting *Mora v. City of Gaithersburg, Md.*, 519 F.3d 216, 230 (4th Cir.2008)). Not even in the context of enemy-combatants did the Court shy away from procedural due process rights for U.S. and non-U.S. citizens alike. *See Hamdi*, 542 U.S. at 532 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 164–65 (1963) ("The imperative necessity for safeguarding these rights to procedural due process under the gravest of emergencies has existed throughout our constitutional history.")); see DEX1 at ¶ 24. Deficiencies to notice and hearing should therefore be found "not congenial to truth-seeking" and remedied. *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171 (1951) (Frankfurter, J., concurring),

Defendants provide no process to TSDS listees—either before or after the deprivation. See DEX1 at ¶ 24. With regard to people on the No Fly List, the Government cannot articulate a reason why individuals must wait for constructive notice until they get to the airport, and then official notice after filing an inquiry—post-deprivation notice and hearing must occur immediately after the initial decision is made, if not before. *See Haig*, 453 U.S. at 310.

The protracted post-deprivation process-by-correspondence afforded by DHS TRIP is not the *timely* hearing the Fifth Amendment requires. According to the Government, on average, confirmation of status after filing DHS TRIP takes six months, TSC review of Plaintiff's information takes another year, and then the TSA Administrator's decision takes another year— 2.5 years to get a final decision. *Compare* PLX34 at 37–39, 41 (six months for confirmation, one

year for TSC redress decision, one year for TSA Administrator decision), *with Loudermill*, 470 U.S. at 546–47 (a hearing two and half months after appeal, and decision six and a half months later, was not prompt enough to comport with due process). Nor does DHS TRIP afford a *meaningful* hearing: no legitimate "explanation of the evidence," *Cardall*, 826 F.3d at 743, no "neutral and detached judge in the first instance," *Concrete Pipe*, 508 U.S. 617, and no clear standard beyond one so vague that "men of common intelligence must necessarily guess at its meaning and differ as to its application," *Connally*, 269 U.S. 391. Some standards remain entirely secret. *See supra* Facts I.B; *Gete v. I.N.S.*, 121 F.3d 1285, 1297 (9th Cir. 1997) ("[W]ithout knowing the exact reasons" or "regulations they are accused of having violated," individuals cannot "clear up simple misunderstandings or rebut erroneous inferences.").

> **b.    The Government's Interest is Compatible with a Narrow and Clear Inclusion Standard**

The Government makes considerable hay about the burdens of process for TSDS and the No Fly List, but with 113,000 people added to TSDS every year on average, the burden would be best addressed on the front end, during the decision-making process for inclusion. *See supra* PDP.C.1. TSDS effectively lacks "any ascertainable standard for inclusion or exclusion," *Smith v. Goguen*, 415 U.S. 566, 578 (1974), and lazily "set[s] a net large enough to catch all possible offenders . . . leav[ing] it to the courts to step inside and say who could be rightfully detained," *United States v. Reese*, 92 U.S. 214, 221, (1876). And the TSDS standard sits far below even the lowest standards federal courts require agencies to use. See supra I.B. To alleviate the Government's burden, the court should find that due process requires a narrow and clear standard, such as a clear-and-convincing or a preponderance of evidence standard, and apply the standard to criminal conduct rather than vague predictions of future dangerousness.

83

### c.     The Government's other arguments against the balancing are unavailing

Two circuit court cases cited by the Government have found that no additional process was necessary for other plaintiffs challenging the No Fly List: *Kashem* and *Busic*. Dkt. 343-1 at 72. But these cases are distinguishable on critical facts. The Ninth Circuit in *Kashem v. Barr* based its decision on what it considered to be the procedural adequacy of DHS TRIP in 2016. 941 F.3d at 374. But when the *Kashem* record was developed in the district court, it was a mere one year after DHS TRIP was adopted, in response to the district court's earlier finding that process was constitutionally inadequate. *See Kashem*, 941 F.3d at 367–69. Discovery in the present case reveals facts the Ninth Circuit could not know. For example, aside from the many complaints levied against DHS TRIP, from 2016 through 2023, the TSDS Watchlist more than doubled in size, growing by 1.08 million individuals, *see* PLX24 at 3 (Table), while DHS TRIP wait times have been revealed to be *2.5* years on average. PLX34 at 37–39, 41 (six months for confirmation, one year for TSC redress decision, one year for TSA Administrator decision).

In *Busic*, the D.C. Circuit concluded that a criminally convicted hijacker's procedural due process rights were not violated by the No Fly List. *Busic v. Trans. Security Admin.*, 62 F.4th 547, 550 (D.C. Cir. 2023). The opinion can only be understood as applied to that specific and unique plaintiff. *See id.* at 550 (finding "less restrictive means [other than a flight ban] may be insufficient to protect passengers and crews from *another* hijacking attempt." (emphasis added)). Given that plaintiff's criminal conviction, *id.*, presumptively no process could have determined that she was listed in error. In contrast, Plaintiffs have no criminal records relevant to national security. Recognizing that due process could reverse erroneous inclusion of Plaintiffs in these programs, the court should grant summary judgment to Plaintiffs.

84

## IV. THE COURT SHOULD NOT ENTER SUMMARY JUDGMENT FOR DEFENDANTS ON PLAINTIFFS' EQUAL PROTECTION CLAIM

### A.    The Court Should Not Exclude the Expert Report of Dr. Huber Under *Daubert*

Dr. Huber's expert report and scientific testimony is substantially reasonable and helpful to the trier of fact such that it should not be excluded from evidence in this case. Federal Rule of Evidence 702 provides that scientific or specialized knowledge-based evidence may be admitted where the knowledge will assist the trier of fact to understand or determine a fact in issue. Fed. R. Evid. 702. As such, expert testimony must be grounded in the methods of procedures of science, but need not create certainty for a particular result. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993) ("there are no certainties in science"). To determine the trustworthiness of a specific finding by a technical expert, the court should looks at four distinct considerations: (1) whether the theory or technique has been tested; (2) whether the theory has been peer reviewed; (3) the potential rate of error for the specific methodology; and (4) the widespread acceptance of the methodology used. *Id.* at 594–95. Under these factors, Dr. Huber's expert findings should be admitted to this Court.

Dr. Huber's findings related to the authenticity of the alleged watchlist files sufficiently meets the *Daubert* standards. The *Daubert* standards broaden, rather than limit the range of expert opinion evidence previously admissible before the courts. *United States v. Crisp*, 324 F.3d 261, 268 (4th Cir. 2003). Dr. Huber's expert report, which the Government intends to exclude, assesses the genuineness of an allegedly leaked copy of the 2019 Federal Terrorism Watchlist and measures the quantity of Muslim-associated names on the list.

### B.    Dr. Huber's Methodology Passes the *Daubert* Reliability Test and Does Not Contain Undue Bias.

To determine the trustworthiness of a specific finding by a technical expert, a court looks at four distinct considerations: (1) whether the theory or technique has been tested; (2) whether the theory has been peer reviewed; (3) the potential rate of error for the specific methodology; and (4) the widespread acceptance of the methodology used. *Daubert*, 509 U.S. at 594–95. "[T]he test of reliability is flexible." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). District courts are granted "broad latitude" in determining reliability. *See id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999)).

Dr. Huber's conclusions are based on established statistical principles, despite the Government's mystical characterization of the process. *See* Gov. Brief at 95 (identifying Dr. Huber's project as "*divining* potential religious affiliations"). In assessing the reliability of an expert's scientific methodology, the *Daubert* Court identified four factors of consideration. *See Daubert*, 509 U.S. at 593-94. The Fourth Circuit also considers whether the standards exist to control the technique's operation." *Crisp*, 324 F.3d at 266. Courts have discretion to determine what factors reasonably measure the reliability of a specific expert's methodology. *See Sardis v. Overhead Door Corp.*, 10 4th 268, 281 (4th Cir. 2021).

The Government and its rebuttal expert rely on the fact that because Dr. Huber's method was not perfect, and his conclusion not certain, that his method is unreliable. *See* Dkt. 343-1 at 95-101. "There are no certainties in science." *Daubert*, 509 U.S. at 590. Instead of determining whether every expert brought before it is bringing the best and only explanation for a phenomenon, the courts are tasked with ensuring that "[p]roposed testimony [is] supported by . . . 'good grounds,' based on what is known." *Id.* at 590; *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (evidence need not be "irrefutable" to be admissible).

1.    **Dr. Huber's Methodology Is Reliable.**

Dr. Huber's methodology and conclusions satisfy the *Daubert* factors and are reliably based on accepted statistical methods. In arguing for the exclusion of Dr. Huber's expert testimony, the Government interprets *Daubert* too strictly. The *Daubert* Court's reliability factors require the proffering party to demonstrate that its experts testimony is based on a methodology that has been tested, peer reviewed, generally accepted, and has a calculable rate of error. *Daubert*, 509 U.S. at 590 . The *Daubert* Court very clearly does not require that the methodology is perfect or certain— just that it does not "cause unfair prejudice, confusion of the issues, or mislead[] the jury." *See id.* at 595.

Moreover, the Government's assertion that Dr. Huber's report and conclusions should be excluded because he relied on a methodology that was created for the purpose of his testimony fails. Novel methodologies and theories can withstand *Daubert* scrutiny. *See Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 144 (4th Cir. 1994).

The *Daubert* Court's expectation of using reliable methodology by experts does not suggest that anytime a new scientific method is the court should exclude it. *Tyger Const. Co. Inc.*, 29 F.3d at 144. The question of whether a specific scientific theory has been tested is just one factor in the *Daubert* analysis. *See Daubert*, 509 U.S. at 595. Regardless, the Government's assertion that Dr. Huber's scientific theory could not be tested is simply not accurate. *See* Dkt. 343-1 at 95. Dr. Huber's analysis, although tailored to the contours of this specific and unique case, can be tested for accuracy. See DEX111 at  ¶ 59 . The methodology itself shows that Dr. Huber's theory can be independently tested for statistical accuracy. DEX111 at ¶ 58.

By controlling the reviewing and classification of names in his method, Dr. Huber makes his theory open for independent testing and verification. Dr. Huber himself measured the accuracy of the reviewers in his report. DEX111 at ¶ 59. His theory of manually reviewing and sorting could

87

easily be tested in a similar way. See DEX 111 at ¶ 56. The mere fact that the exact data he was reviewing is apparently incapable of being verified with certainty does not mean that Dr. Huber's underlying theory and methodology is unreliable. See DEX 12 at 54–56; *Daubert*, 509 U.S. at 590 (stating that a scientific method does not have to be certain). If the information the Government claims is needed to make Dr. Huber's conclusions—the religious affiliation of individuals on the TSDS—were available to Plaintiffs, then Plaintiffs arguably wouldn't have needed Dr. Huber's expertise at all. See  DEX12 at 54–56.The Fourth Circuit has held that "court[s] should not exclude expert testimony simply because it involves a new method or novel theory." *Tyger Const. Co. Inc.*, 29 F.3d at 144. Instead, it allows exclusion only when "an exaggerated popular opinion of the accuracy of a particular technique makes its use prejudicial or likely to mislead the jury." *Id.* at 144. (quoting *United States v. Baller*, 519 F.2d 463, 466 (4th Cir. 1975), cert. denied, 423 U.S. 1019 (1975)). In fact, this Circuit preferences the *admission* of plausible, novel methods for cross examination. *Id.* at 144*.*

Dr. Huber's testimony is the exact sort of testimony that the Fourth Circuit preferences to permit for presentation to the trier of fact and for cross examination. *See Id.* at 144. Dr. Huber utilized a manual method of an established, peer reviewed scientific theory to determine whether the purported version of the Federal Terrorism Watchlist disproportionately impacted Muslims or individuals with Muslim sounding names. DEX111 at ¶ 2. Despite the Government's contention that "divining" Muslims from a list of names is an impossible—or at least improbable— undertaking, Dr. Huber is not the first statistician or scientist make this type of evaluation. *See* DEX111 at  ¶¶ 55–63 (describing the design of the study).[216]

---

[216] *See, e.g.*, Susanna Grundmann, et al., *First Names and Ascribed Characteristics*, SSRN ELECTRONIC JOURNAL (Jan. 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4641519. (experimental study on implicit bias using similar methodology as Dr. Huber's study); Rochana Chaturvedi and Sugat Chaturvedi, *It's All in the Name: A Character-Based Approach to Infer Religion*, CAMBRIDGE UNIVERSITY PRESS (March 23,

Likewise, the Government's assertion that the rate of error for Dr. Huber's report is unreliable overexaggerates and misconstrues Dr. Huber's report and testimony. The Government claims that the "real 'potential rate of error' in Dr. Huber's analysis is not captured by his confidence interval and is likely far more significant." Dkt. 343-1 at 96. The Government bases these claims off of Dr. Huber's testimony that the 95% confidence interval that grounds his conclusions does not include errors from "the weaknesses that could introduce possible biases." DEX114 at 214:5-6. Dr. Huber, however, goes on to say that these "weaknesses" are "systematic errors that we cannot detect or adjust for." *See* DEX114 at 214:5–9. Otherwise put, they are functional errors that occur naturally in every statistical analysis. *See* DEX114 at 214:5–9. These "unaccounted for" errors may alter the potential rate of error, but not in the devastating way the Government claims. *See* DEX114 at 41:1–6 (noting that some of the misclassification and bias errors have been accounted for in part).

The Government additionally misrepresents the methodology itself in claiming that Dr. Huber's reviewing process lacked the proper standards. It did not. The requirement that a experts methodology invokes proper standards works as part of the "widespread acceptance" factor of *Daubert. See Daubert*, 509 U.S. at 594*.; see Sanchez v. Boston Scientific Corp.*, 2014 WL 4851989, at *22 (Sept. 29, 2014). Dr. Huber's instructions set standards for his analysis. *See* DEX111 at Appx B1. He first identified that he had selected the records for review randomly. DEX111 at Appx B1; *see Sanchez*, 2014 WL 4851989 at *22 (criticizing the non-random selection of records). Dr. Huber explained that he had removed all other identifying features from the records

---

2023) (using linguistic models to infer religious identity—particularly Muslim identity—from names); Richard Webber, *Using names to segment customers by cultural, ethnic, or religious origin*, 8 JOURNAL OF DIRECT, DATA AND DIGITAL MARKETING PRACTICE, 226–242 (Feb. 15, 2007), available at https://link.springer.com/article/10.1057/palgrave.dddmp.4350051 (identifying how names can be used to infer religion and national origin for marking purposes) (also identifying Muslim names as a category with a high categorization success rate).

on the purported 2019 watchlist files so the classifications would be based on name alone. DEX111 Appx B1. This made it so the reviewers could only classify records based on name. *See* DEX111 Appx B1. Finally his instruction included standards for how many records each review should classify to for his evaluation. DEX 111Appx B1. Each of these instructions standardized the methodology. *See* DEX 111 Appx B1. Simply because Dr. Huber's instructions did not dictate how each review was supposed to think about each classification or analyze each record name, does not mean the method lacks standards. *See* DEX111 at § 8.4 (Dr. Huber's instructions).

> a.   **Use of the CAIR team in his methodology does not make Dr. Huber's analysis or conclusions unreliable.**

Dr. Huber's use of the CAIR team as reviewers in his analysis is not fatal to his testimony. The Government argues that Dr. Huber's methods were separately unreliable because he used staff members for Counsel for the Plaintiffs' firm as reviewers in his name classifying analysis. *See* Dkt. 343-1 at 98–103. In its briefing the Government identifies two issues with the reviewers work:(1) the reviewers, as team members for Counsel for the Plaintiffs' are inherently biased; and (2) the reviewer's classifications themselves were not identical. In light of these issues, the Government attacks Dr. Huber's accuracy assessment. But the Government's attacks are insufficient to make Dr. Huber's methodology unreliable.

Dr. Huber curbed and controlled the bias stemming from using CAIR reviewers. Courts may be naturally skeptical when "an expert's factual basis is derived, not from treatment or observation, but from subjective information . . . [b]ut such skepticism should not necessarily lead [it] to exclude the expert's opinion." *Christopherson v. Allied Signal Corp.*, 939 F.2d 1106, 1111 (5th Cir. 1991). It is reasonable for the Government, and the Court, to be skeptical of Dr. Huber's use of Plaintiffs' legal firm to conduct his methodology. *See Id.* at 1111. But Dr. Huber controlled his analysis to prevent obvious biases from seeping through. *See* DEX111 at Appx. B1. In his

instructions and method, Dr. Huber informed the reviewers that he had inserted a control group of names into the reviewable records. *See* Huber Report app B1. Those control records were used to evaluate accuracy of the reviewers. *See* DEX111 at ¶¶ 56–59. Dr. Huber made clear that the results of the reviewers would only "help" his analysis to the extent that the classifications "were generally correctly classified." DEX111 at Appx B1. Thus, the reviewers had nothing to gain from overclassifying names as Muslim sounding. *See* DEX111 at Appx B1. Further, if such biases— conscious or unconscious—did appear in the results, Dr. Huber had means to measure that bias through the classifications of names with known religious affiliations. *See* DEX111 at Appx B1. So this bias is not fatal to Dr. Huber's analysis.

Second, some inconsistencies with the internal methods by which the CAIR reviews classified names does not negate Dr. Huber's conclusions or the methodology. Inconsistent application of a methodology is not fatal to an expert's conclusions. *See Crowley v. Chait*, 322 F. Supp. 2d 530, 540 (D.N.J. 2004). The use of "inconsistent approaches . . . may raise questions about the reliability . . . but  it does not in and of itself show that the methodology they employed was so inherently flawed as to render [it] inadmissible. *See Crowley*, 322 F. Supp. 2d at 541. (citing *Kumho Tire ltd.*, 526 U.S. at 153 (discussing the inconsistent application of methodologies of two experts in the case). Cases where expert testimony is excluded for unreliable inconsistencies generally include some indication that the inconsistent data collection or application came as a result of cherry-picking or other bias. *See In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, No. 12-md-2342, 2015 WL 7776911, at *16 (E.D. Pa. Dec. 2, 2015) (expert using inconsistent standards depending on "whether or not they support his a priori opinion"); *see In Re: Paraquat Prods. Liab. Litig.*, 730 F. Supp. 3d 793, 839 (S.D. Ill. 2024) (expert subsequently redefining eligibility criteria which "conveniently imposed a more onerous standard on a less favorable

91

study"). The reviewers' inconsistencies were not "inconsistent" in the ways the court guards against.

The Government uses the testimony of reviewer Justin Sadowsky as its only evidence of inconsistencies. It first attacks Mr. Sadowsky's individual review methodology because he considered classified names differently based on his level of familiarity with those names. *See* Dkt. 343-1 at 100; DEX116 45:19–20, 47:13. This panelists knowledge does not represent the cherry-picking problem the courts have identified as exclusionary grounds in other cases. *See In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, No. 12- md-2342, 2015 WL 7776911, at *16 (E.D. Pa. Dec. 2, 2015) (expert using inconsistent standards depending on "whether or not they support his a priori opinion"); *see In Re: Paraquat Prods*, 730 F. Supp. 3d at 839.

The Government then attacks the reviewers' "inconsistent" methods for failing to classify each of the 3,000 names identically. *See* Dkt. 343-1 at 101. The Government particularly highlights that some of the classifications that were inconsistent, or occasionally where the individuals review each classified a record as "non-Muslim" the resulting consensus classification was "Muslim." *See* Dkt. 343-1 at 101 (citing White Rep., DEX 115 at 12–13). But Dr. Huber addressed this issue in his Deposition. *See* DEX114, at 191:2–6. In his Deposition. Dr. Huber discussed the potential effects of this inconsistent classification of Muslim-sounding records. *See* DEX114 at 191:2–6. In his testimony Dr. Huber stated that even if he were to rerun his analysis eliminating those types of inconsistencies, "the bottom line number . . . [would] still be very high." DEX114 191:4–5. Moreover, Dr. Huber adjusted for his misclassifications in his analysis. DEX 114 at 41:1–6. These inconsistencies do not make Dr. Huber's analysis unreliable.

**b.      Dr. Huber's accuracy assessment was not flawed.**

Dr. Huber's accuracy assessment was not flawed for the analysis he was running: determining the percentage of the records in the alleged 2019 Watchlist Files contained Muslim

92

sounding names. The Government's attacks on Dr. Huber's accuracy analysis ultimate fail because they continue to mischaracterize the purpose and conclusions of Dr. Huber's analysis. Dr. Huber did not deduce individuals who were in fact Muslim from his analysis. *See* DEX114 at 29:3–8; DEX111 at § 4.3 (discussing Muslim names, not Muslim individuals). Instead he determined what percentage of records in the files contained "Muslim-sounding names." DEX114 at 29:3–8; DEX111 at § 4.3. This distinction is still lost on the Government.

The Government gloms to the fact that if Dr. Huber cannot support his belief that "likely religious affiliation can be gleaned from names alone, [he] cannot find that support by reference to the control groups." Dkt. 343-1 at 102 (citing *Koehler v. Infosys. Techs. Ltd. Inc.*, 628 F. Supp. 3d 836, 856-57 (E.D. Wis. 2022)). Yet again, this shows a misunderstanding of Dr. Huber's goal. Dr. Huber was not determining "likely religious affiliation" but whether an individual had a name that could be perceived as having a particular religious affiliation. *See* DEX114 at 29: 3-8; DEX111 at § 4.3. For that analysis, the control group is relevant, unlike the Government claims. *See* Dkt. 343-1 at 102. The Government argues that the control group differs too much from the actual group to be relevant to the analysis. Dkt. 343-1 at 102. But that is not the case.

The Control group, even if disproportionately individuals from inside the United States, unlike the demographic of the watchlist, *see* DEX1 at ¶ 28, does not meaningfully change the results. Although Dr. Huber recognized that discrepancy as a "point of potential weakness," Dr. Huber's conclusions should not be excluded for failing to be "meet the 'gold standard.'" *See* Dkt. 343-1 at 103. *See  Westberry*, 178 F.3d at 261 (expert testimony need not be irrefutable). Additionally, this discrepancy argument ignores—or at least diminishes—the fact that the reviewers were still able to distinguish between American Muslim and American non-Muslim names. *See* DEX114 at 145:21. There is no indication, made by the government, or otherwise in

Dr. Huber's testimony that this "mismatch" of data created a "gaping design flaw" justifying exclusion. *See* Dkt. 343-1 at 103 (citing *In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 276 (S.D.N.Y. 2018)).

> ### c.    The Sixth Circuit case that the Government relies on is distinguishable from Dr. Huber's analysis.

As its piece de resistance, the Government presents the Sixth Circuit case *EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3d 749 (6th Cir. 2014). In *Kaplan*, the Sixth Circuit rejected the expert conclusions of an EEOC expert who conducted a study which resembled Dr. Huber's. *Compare id. with* DEX111. The *Kaplan* court evaluated the *Daubert* reliability of methodology where a group of five seemingly random "raters" were tasked with identifying the specific races of individual applicants from a small part of Kaplan's relevant applicant pool. *Id.* at 751. None of the raters had any discernable expertise in matching race from photographs. *Id.*. Additionally, each evaluator was also provided with the name of the applicants they reviewed—which they were "supposed to disregard." *Id*. If a consensus was found in the race ratings, the expert used that applicant's race to his data. *Id*. The Sixth Circuit found that this analysis did not meet the *Daubert* standards and excluded it. *Id.* at 754.

Although the broad strokes facts in *Kaplan* resemble Dr. Huber's statistical methodology, the cases varied in important ways. First, Dr. Huber controlled his methodology in a way the expert in *Kaplan* did not. *Compare* DEX111 at Appx B *with Kaplan*, 748 F.3d. In *Kaplan* the "race raters" categorized only the small subset of the applicant pool. *See Kaplan*, 748 F.3d at 752. So long as there was consensus, whatever the raters concluded was used by the expert as fact. *See id.* at 751. Dr. Huber's study did not function this way. S*ee, e.g.*, DEX111 at Appx. B. Dr. Huber implemented a series of controls into his methodology. DEX 111. Dr. Huber, therefore, tested for

accuracy, where the expert in Kaplan was not. *Compare* DEX111 at ¶ 59 *with Kaplan*, 748 F.3d. This distinction grounds Dr. Huber's methodology and makes it more reliable than that in *Kaplan*.

    *Second*, like many of the other cases the Government cites to support its argument, the data in *Kaplan* was incomplete only because the expert purposely omitted data from his analysis. *See Kaplan*, 748 F.3d at 751. The Sixth Circuit criticized the expert's data set, not because it was incomplete, but because the sample of data the expert selected was not "representative of the applicant pool as a whole." *Id*. The expert had access through discovery to over 4,500 applicants' credit checks but used only just over 1,000 in his sampling. *See id.* at 752. The court noted that "23.8% of the applicants in [the expert's sample pool] were rejected . . . whereas only 13.1% of the total [] pool" were rejected. *Id*. This independent ground for exclusion in Kaplan was the product of unjustified expert selection of data, which unreliably inflated the proportion of rejected applicants. *See id*. Dr. Huber's methodology does not have this "cherry-picking" problem. *See* DEX111.

    *Third*, unlike the raters in *Kaplan*, the CAIR reviewers do have an elevated level of familiarity with identifying Muslim sounding names. By nature of their positions, the CAIR team reviewers work frequently with Muslims and Muslim Communities. This elevated exposure gives the reviewers a stronger basis of expertise than the five "'race raters' of uncertain expertise" rejected in *Kaplan*, 748 F.3d at 751.

    *Finally*, as has been thoroughly discussed above, Dr. Huber's methodology, though slightly less sophisticated, is not novel or "homemade." *See Kaplan*, 748 F.3d at 754. The connection between and individual's name and religious identity is well established in the scientific community.[217]  Dr. Huber's methodology merely represents an analog version of what other

---

[217] Susanna Grundmann, et al., *First Names and Ascribed Characteristics*, SSRN Electronic Journal (Jan. 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4641519. (experimental study on implicit bias

statistical researchers have and continued to established in the scientific community.[218]   Dr. Huber's opinion based on this established and controlled methodology should not be excluded.

### 2.    Dr. Huber's Study Does Not Contain the Type of "Incomplete Data" Excluded by the Courts

The Court should reject the Government's sufficiency of data argument because Dr. Huber's analysis does not include the kind of "incomplete data" that the courts and the Federal Rules of Evidence seek to exclude. Federal Rule of Evidence 702 requires an experts testimony to be "based on sufficient facts and data." Fed. R. Evid. 702. As a general principle, the Fourth Circuit has held that expert testimony may be excluded where the expert "draw[s] broad conclusions from incomplete data." *EEOC v. Freeman*, 778 F.3d 463, 468 (4th Cir. 2015) (J., Agee, Concurring). Relying on this principle Defendants assert that because Dr. Huber admits that the data set provided to him—the allegedly leaked 2019 version of the TSDS—is "likely incomplete," DEX114 68:18, any testimony drawing conclusions about that data should be excluded. In doing so, the Government misconstrues the purpose of the incomplete data skepticism and ignore the obvious distinctions between Dr. Huber's analysis and case law it uses to support its argument.

In support of its argument, the Government relies primarily on *EEOC v. Freeman* to support the proposition that where "incomplete data sets are used" the court should exclude an expert's testimony relying on that data set. Dkt. 343-1 at 88–89 (citing *Freeman*, 778 F.3d at 468); *EEOC v. Freeman*, 961 F. Supp. 2d 783, 792 (D. Md. 2013). But the expert testimony the Court

---

using similar methodology as Dr. Huber's study); Rochana Chaturvedi and Sugat Chaturvedi, *It's All in the Name: A Character-Based Approach to Infer Religion*, Cambridge University Press (March 23, 2023) (using linguistic models to infer religious identity—particularly Muslim identity—from names); Richard Webber, *Using names to segment customers by cultural, ethnic, or religious origin*, 8 Journal of Direct, Data and Digital Marketing Practice, 226–242 (Feb. 15, 2007), available at https://link.springer.com/article/10.1057/palgrave.dddmp.4350051 (identifying how names can be used to infer religion and national origin for marking purposes) (also identifying Muslim names as a category with a high categorization success rate).

[218] Id.

excluded in *Freeman* was incomplete because of manipulation and error by the expert, not by nature of the data. *See Freeman*, 778 F.3d at 467.

In *Freeman* the District of Maryland found and the Fourth Circuit affirmed the exclusion of expert testimony of a statistician in an employment discrimination case. *See Freeman*, 961 F. Supp. 2d at 792, *aff'd*, *Freeman*, 778 F.3d at 468. There, a defendant challenged the EEOC's expert's report analyzing the Defendant's hiring patterns to support its disparate impact allegations. *Id.* at 790. The District Court excluded the report. *Id.* at 793. It's exclusion, however, was not because the report relied on data that was incomplete, but because "[the expert] had access to but did not utilize, the materials necessary to create an unbiased, accurate database" and then cherrypicked information to from data outside the relevant time period. *Id.* at 793–94. For example, despite the fact that Defendant provided the EEOC hiring information for almost 60,000 applicants during discovery, the EEOC's expert used just over 2,000 to create his database for his analysis—and many of the applicants in the database were duplicates. *Id.* at 794. The Court also found the report to be riddled with expert caused errors and failed to use data sets within the relevant time periods for the case, despite having access to data sets for the time period. *Id.* at 794–96.

The District Court held in Freeman, and the Fourth Circuit affirmed, that the expert data in was unreliable because it was cherrypicked and manipulated, not because it was incomplete at its reception. *See Freeman*, 961 F. Supp. 2d at 794–96. In fact, the only other case that the Government relies on to support its "incomplete data argument is distinguishable in the same way. *Payne v. Travenol Labs.*, 673 F.2d 798, 823 (5th Cir. 1982) (excluding expert evidence where the party had access to the omitted data and could not show that it omitted that data randomly). The mere use of incomplete data does not require exclusion for unreliability. Instead, "[t]he critical

question is not whether the data used is perfect, but [] whether it is reliable and probative." *Brown v. Nucor Corp.*, 785 F.3d 895, 904 (4th Cir. 2017) (including expert data even where the expert acknowledged the data was complete).

Although Dr. Huber acknowledges that the data he relied on in his analysis is "likely incomplete," DEX 114 at 68:18, his data and analysis is still relevant to and relevant for the trier of fact. *See Daubert*, 509 U.S. at 589; *see also Nucor Corp.*, 785 F.3d at 904. Dr. Huber's expert report analyzed two building questions, neither of which were adversely impacted or made unreliable by the potentially missing information in Dr. Huber's dataset. Dr. Huber identified in his report and deposition that "big gaps" in SID numbers suggested to him that the files he received might be incomplete. *See* DEX114 at 68:18–19 (acknowledging that he has no "solid evidence" that the files are incomplete). Acknowledging this, however, Dr. Huber was still able to provide a reliable statistical analysis about the data provided—the allegedly leaked 2019 version of the TSDS. *See* DEX111 at ¶ 69.

In claiming that Dr. Huber's incomplete data inherently requires exclusion of his testimony from evidence fails to give credence to both Dr. Huber's objective statistical expertise and the Fourth Circuit caselaw regarding incomplete data. Unlike the Defendants in the Government's primary supporting case, Dr. Huber did not alter or select his data. *Compare Freeman*, 961 F. Supp. 2d at 794–96 *with* DEX114 at 72:3–9. Dr. Huber received files which he later identified as incomplete and subsequently made a scientific assessment as to whether he had enough data to conduct his analysis. DEX114 at 72:3 . He did so by making a comparison to the publicly available information regarding the TSDS published by the Government and by reviewing the Government's produced discovery regarding the TSDS. DEX111 at ¶ 3, § 6. Further, in crafting his analysis, Dr. Huber specifically built in discussions of in upper and lower bounds of potential margins of error

to account for the suspected missing data. DEX111 at Appx. B; DEX114 at 90:15–16. This type of assessment is vastly different from those excluded in other expert cases. *See Freeman*, 961 F. Supp. 2d at 794–96. Dr. Huber did not create the "gap" in data, his report addresses the gap and potential shortcomings in his analysis because of the suspected incompleteness of the data, and he provided his assessment as to why the data is still statistically reliable. *See id*. Thus, his conclusions stemming from his analysis of suspected incomplete data sets is reliable and unlikely to mislead the trier of fact. *Kumho Tire Co., Ltd.*, 526 U.S. at 147 (discussing *Daubert*'s gatekeeping function); *see also Nucor Corp*., 785 F.3d at 904.

### 3.    Dr. Huber's Testimony Is Helpful and Relevant to the Trier of Fact in This Case

Dr. Huber's conclusions are both helpful and relevant to the trier of fact. Federal Rule of Evidence 702 requires that an expert's scientific or otherwise specialized knowledge "help the trier of fact understand the evidence or to determine a fact at issue." Fed. R. Evid. 702(a). To be helpful to the trier of fact there must be a "valid scientific connection to the pertinent inquiry." *Daubert*, 509 U.S. at 591–92. That is, the expert's testimony must have the capacity to aid the trier of fact in resolving a fact at issue and draw from the expert's specific knowledge or skillset. *Kumho Tire Co.*, 526 U.S. at 147. Expert testimony is presumed to be helpful unless it concerns matters within the everyday knowledge and expertise of a lay juror." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993).

The Governments assertions that Dr. Huber's reports and testimony fail this relevance prong are flawed. In their motion for Summary Judgment, the Government argues that Dr. Huber's report is irrelevant because 1) his statistics are based on alias names, not individual persons; 2) his conclusions do not identify "actual Muslims" but rather names that were perceived as Muslim; and 3) "the analysis fails to consider any other explanation besides religion." *See* Dkt. 343-1 at 122.

Dr. Huber's statistics regarding the proportions of Muslim sounding names on the TSDS is relevant and helpful to the trier of fact regardless of whether he was able to translate aliases into actual individuals. The Government latches onto Dr. Huber's acknowledgment, in both his report and deposition, that he was unable to find a "discernable way to identify with any reliability when to records refer to the same person." DEX114 at 96; DEX111 at ¶ 14. But expert testimony and reports need not be certain or irrefutable to be helpful to the trier of fact so long as it does not mislead. *See also In Re. Libitor Marketing, Sales Practices and Products liability Litigation v. Pfizer, Inc.*, 892 F.3d 624, 632 (4th Cir. 2018). Moreover, the trier of fact is free to reject the expert's conclusions. *See Westberry*, 178 F.3d at 261. Here, Dr. Huber's statistical analysis determining that 98.3% of the aliases on the allegedly leaked watchlist files identify Muslim sounding names is relevant and helpful to the trier of fact. *See* DEX111 ¶ 7.

Dr. Huber need not prove the proportions of perceived Muslim individual persons as opposed to aliases on the allegedly leaked watchlist files help the trier of fact understand the disproportionate number of names on the files. The Government grounds its entire relevancy argument here on the basis that Dr. Huber is, without support asserting his that the aliases and individual proportions are the same. *See* Dkt. 343-1 at 104. In claiming so it misrepresents Dr. Huber's findings. In fact, it ignores completely the amount of time and space in Dr. Huber's report spent discussing this issue of comparing aliases to individuals and adjusting his findings accordingly. *See e.g.*, DEX111 ¶ 14. Dr. Huber admits that the estimated proportions of Muslim [sounding] records does not necessarily translate to comparable estimates of the proportion of Muslim people on the watchlists." DEX111 ¶ 14. But he provides details explaining how he determined what sets of records (aliases) appeared to correspond to the same individual. DEX111

¶ 51. His groupings of aliases into individuals are not mere presumptions, but analyses of data patterns, tokens, and soundex codes. *See* DEX111 ¶¶ 51–54.

Even without this analysis, Dr. Huber's analysis about the potential religious affiliation of records on the allegedly leaked watchlist files is still helpful to the trier of fact. Dr. Huber's analysis determined with 98.3% confidence that between 82% and 99.9% of all records on the files he received bore Muslim sounding names. DEX111 ¶ 56. That conclusion, though it need not be accepted by the trier of fact, *Westberry*, 178 F.3d at 261, is relevant to the factual question of whether the Government's Federal Terrorism Watchlist (TSDS) in fact discriminates on the basis of religion.

Moreover, Dr, Huber's conclusions about the prevalence of "Muslim-sounding" names are relevant and helpful to the trier of fact, even if not conclusive of the number of "actual Muslims" on the TSDS. Plaintiffs' attempted to gather demographic information about individuals on the TSDS. *See, e.g.*, Dkt. 312 at 3 (denying Plaintiffs' Motion to Compel Discovery). The Government claimed that it could not provide that type of information not only because it would violate national security interests, but also because the Government simply does not log demographics for most individuals on the TSDS. DEX1 ¶¶ 5, 6, 19; *see* DEX16 at 241:16–242:5. If the Government itself does not know, or even if it is just unwilling to disclose the religious affiliation of individuals on the TSDS, information regarding potential religious affiliation is all the more relevant and helpful to the trier of fact. Dr. Huber's statistical analysis will help the trier of facts understanding of what proportions of records on the TSDS may be Muslim or affiliated with Islam. The trier of fact does not have to accept Dr. Huber's conclusions, and the Government will again have an opportunity to rebut his conclusions, but his opinions as to the approximate proportions of Muslim records on the TSDS are relevant and helpful. *See North Carolina State Conference of NAACP v. McCrory*,

831 F.3d 204, 231 (4th Cir. 2016) ("Showing disproportionate impact . . . suffices to establish one of the circumstances evidencing discriminatory intent.").

> **4.** **The Government's placement and maintenance of Plaintiff's on the watchlist violates the Equal Protection Clause of the Fourteenth Amendment.**

The Equal Protection Clause prohibits the government from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1; *Bolling v. Sharpe*, 347 U.S. 497 (1954); *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) (Equal protection prohibits "governmental decision makers from treating differently persons who are in all relevant respects alike) (citations omitted). To prevail on an Equal Protection claim regarding a facially neutral policy, a plaintiff must demonstrate that the challenged government policy or action was motivated by discriminatory animus. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Although a "disproportionate impact" may be probative to the Equal Protection inquiry, *see McCrory*, 831 F.3d at 231, impact alone cannot prove animus. *Washington v. Davis*, 426 U.S. 229, 238 (1976). Disparate impact serves as "an importing starting point to the ultimate inquiry as to 'invidious [] discrimination." *Coalition for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 879–80 (4th Cir. 2023); *see* Dkt. 73 at 43 (citing *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 274 (1979)).

Plaintiffs have demonstrated evidence that the Government has placed and maintained them on the TSDS because of their religion and national origin in violation of the Equal Protection clause. Despite the Government's bare—and contradictory—contention that it does not use national origin or religion as derogatory factors to include an individual in the TSDS, Plaintiffs have demonstrated patters of encounters which have made clear that the Government finds their religion relevant to their security status. Further, Plaintiff's expert report regarding an allegedly leaked copy of the 2019 TSDS suffices probative evidence that the TSDS and watchlisting

102

enterprise has a disparate impact on individuals with Muslim names. The evidence of discriminatory animus, paired with the discovery findings regarding the necessity of the watchlist, is insufficient to meet the strict scrutiny standard. This Court should not grant Summary Judgment for the Government on this claim.

### C.    Plaintiffs Have Shown That the Government Acted With Discriminatory Animus to Place and Maintain Their Watchlist Status

The Government intentionally and discriminatorily places Muslims, including Plaintiffs, on the watchlist because of their religion and national origin. When, as here, a plaintiff challenges a facially neutral law on equal protection grounds, they "bear[] the initial burden of proving that a classification was . . . intentionally utilized." *Sylvia Dev. Corp. v. Calvery Cnty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995) (citing *Snowden v. Hughes*, 321 U.S. 1, 8 (1944)). While the disproportionate impact of a facially neutral statute may be probative of discrimination, the plaintiff must also show "that the action was motivated, *at least in part*, by an 'invidiously discriminatory' intent." *Sylvia Dev. Corp.*, 48 F.3d at 819 (citing *Village of Arlington Heights*, 429 U.S. at 265) (emphasis added).

Courts look at several non-dispositive factors to determine whether discriminatory animus motivated a government action or policy. *See Village of Arlington Heights*, 429 U.S. at 266–68. These factors include: (1) evidence of a "consistent pattern," (2) historical background of the decision; and (3) the specific sequence of events leading up to the particular decision being challenged. *Id.*

Plaintiffs do not contest that the watchlist's reasonable suspicion standard is facially neutral. But the Government's persistent contention that it utilizes too many levels of review to show animus does not negate the evidence of intent that Plaintiffs have produced. *See, e.g.*, DEX1 ¶¶ 53–76, Relevant to discovery in this case, Plaintiffs have shown consistent patterns of actions disparately impacting Muslims in relation to the TSDS. Likewise, the discovery record is rife with

103

statements of both lower-level officers and administrative decision makers that demonstrate that religion may play a role in including individuals on the TSDS. Other factors typically used to show animus, such as the "specific sequence of events" leading up to Plaintiff's placement on the watchlist, have been withheld. Still, with so much questioning about Plaintiffs' religious beliefs and a list almost completely made up of Muslim names, the remaining facts prove intent.

### 1.    Dr. Huber's report and statistical evidence of disparities show a pattern of disparate impact against Muslims.

Plaintiffs' expert report provides probative evidence that a pattern of disparate impact against Muslims in support of Plaintiffs Equal Protection claim. Although evidence of disparate impact is not dispositive to the inquiry of discriminatory animus, it may be probative to the finding that such disparagement and animus exist. *See Sylvia Dev. Corp.*, 48 F.3d at 819 (identifying that patterns of disparate impact may be considered it may serve as "an important starting point" for courts considering Equal Protection claims). Dkt. 73 at 43 (citing *Feeney*, 442 U.S. at 274).

Dr. Huber's expert report, though not the sole evidence of discriminatory animus to be considered by this Court, serves as a significant "touchstone of an invidious [] discrimination forbidden by the Constitution." *Washington*, 426 U.S.  at 242. As the above argument discusses, Dr. Huber's report postulates that over ninety-eight percent of the TSDS contains names that are identifiably Muslim. *See, e.g.*, DEX111 ¶ 7. The Government attempts to downplay this statistic by arguing that many of those individuals reside overseas, DEX1 ¶ 28, or that the TSDS does not track actual religious affiliation, DEX12 at 54 ("there s no 'religion' field in the TSDS"). But that does not negate animus. Dr. Huber's reports provide important context which at least rebuts as pretext the Government's argument that the watchlist is neutral and is applied without regard to religion. Expert evidence that nearly all of the individuals on the TSDS have identifiably Muslim

names may not dispositively show animus, but it demonstrates a clear and obvious pattern of the disparate impact of the TSDS, which supports Plaintiffs' Equal Protection claim.

> **2.    Plaintiffs have demonstrated numerous patterns of statements and lines of questioning from federal officers demonstrating the relationship between their religion and placement on the TSDS.**

Despite the Government's best efforts to cherry-pick issues with Plaintiff's testimony, evidence shows repeated statements by federal employees that prove the relationship between Plaintiff's watch-listed status and their religion. Showing a discriminatory purpose requires proof "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse effects on an identifiable group." *United States v. Moore*, 145 F.4th 572, 580 (4th Cir. 2025). Plaintiffs have presented evidence demonstrating that their responses to the Governments questions about their race and religion have impacted and secured their positions on the TSDS.

Out of the twenty Plaintiffs remaining in the case, at least thirteen individuals could recall and point to specific and multiple occasions where Government officials questioned them about their religious beliefs. Most of these encounters occurred during secondary screening by CBP—a procedure known to collect information used to inform the TSDS. The record is rife with evidence that the Government uses individual's Muslim identity to place and keep them on the watchlist. Plaintiffs have identified a pattern of the federal officers questions about whether a plaintiff is Muslim,[219] what religious sect they belong to (Sunni or Shia),[220] [221] their position on current

---

[219] DEX71 at 195:10–15 (Muminov); DEX64 at 13:16–17:3 (FBI asking whether Kamel is a member of the Muslim Brotherhood)).

[220] DEX71 at 195:10–15 (Muminov); DEX76 at 246:2–248:1 (M. Paryavi); DEX50 at 211:5–14 (repeatedly asking Al-Sahlani to specify which religion and which sect he belongs to); DEX64 at 56:17–19 (Kamel).

[221] The Government also asserts that a "majority of terrorist threats" to the United States come from Islamic Sunni extremists. Dkt. 343-1 at 111.

conflicts,[222] and general questions about their faith.[223] Additionally, Plaintiff Soueidan recalls an officer telling him that he was pulled aside for additional screening because he had a recognizably Muslim name. DEX80 at 251:10–252:9; DEX79 at 19. These are not stray or isolated comments, but a consistent pattern of government officers asking individuals about their religion in conversations known to be used to establish and evaluate their status on the TSDS.

The Government attempts to downplay these encounters either because of the timeliness of the comments, Dkt. 343-1 at 108, or because religion is not the only thing the Government asks. Dkt. 343-1 at 108. This is not the Equal Protection standard. As the Government has attested, an individual's status on the TSDS is fluid and subject to constant evaluation. *See* DEX1 at 24–25. Such status is subject consistent updates and review as new information is received through law enforcement encounters and other sources. *See* DEX1 at 24–25. Moreover, religion need not be the entire reason for Plaintiffs placement on the TSDS to violate Equal Protection. *See Moore*, 145 F.4th at 580 (quoting *Feeney*, 442 U.S. at 279 (discussing selective enforcement for law enforcement)). Equal Protection only requires that a government's action is completed "at least in part" because of group membership. *Id.* at 580. Questions related to religion used in the placement

---

[222] DEX71 at 194:12–18 (Muminov); DEX82 at 163:10–165:12 (Sulayman); DEX76 at 246:2–248:1 (M. Paryavi); DEX52 at 234:20 (asking Bosnic if he is a terrorist); DEX64 at 56:17–19 (asking Kamel's opinion on conflicts in Iraq and Palestine)

[223] DEX80 at 234:4–235:8, 236:5–20 (Soueidan recalling that he often was interrogated about Islam and felt the need to explain to officers that it is a peaceful religion); DEX52 at 178:8–16 (asking what Mosque Bosnic attends); DEX62 at 91:5–21 or 86:21–89:15 (FBI asking Jardaneh whether he prayed); DEX67 at 124:3–125:16 (Mohallim); DEX76 246:2–248:1 (asking M. Paryavi what mosque plaintiff attends and whether he prays); DEX48 at 113:3–14 (Albadawi recalling an interrogation about an Islamic faith convention and his religious activities in the United States); DEX82 at 192:8–193:21 (asking Sulayman questions about his faith and his role in leading an Umrah pilgrimage); DEX58 at 215:16–25 (El-Shahat recalling FBI agents asking him to explain the difference between religious sects); DEX59 at 24 (M. Hachem recalling multiple interrogations by CBP and FBI regarding his religious practices and national origin); DEX71 at 183:14–22 (asking Mujanovic when she began practicing, which mosque she attends, about her hijab, and about arranged marriages as an Islamic practice); DEX64 at 13–15 (asking general questions about Islam and about Kamel's prayers)).

and review of individuals on the TSDS, even if asked in conjunction with other non-religious questions, satisfy this requirement. *See also id.* at 580.

The government relies on an unpublished and out of district authority to claim that oral statements by low-level officials are insufficient to prove characterization. *See* Dkt. 343-1 (citing *United States v. Johnson*, 122 F. Supp. 3d 272 (M.D.N.C. 2015)). But that case is distinguishable from the present matter. First, the Johnson court's holding regarding oral statements relate to *express* classifications, not facially neutral policies. *Johnson*, 122 F. Supp. 3d at 350. The court found that oral statements of express classifications are only relevant where managers "instruct officers to target defined groups." *Johnson*, 122 F. Supp. 3d at 350 (citing *Floyd v. New York City*, 959 F. Supp. 2d 540, 663 n. 768 (S.D.N.Y. 2013)). Here, Plaintiff's agree that the watchlist policy is neutral on its face. The oral statements they proffer are not to show express classification, but to demonstrate the Government's illegal use of religious information to place and keep them on the facially neutral watchlist.

Second, the *Johnson* court found the oral statements ordering a selective enforcement policy unpersuasive because the record did not provide any evidence to plausibly show that such statements actually existed or that the alleged selective enforcement orders were carried out. *See Johnson*, 122 F. Supp. 3d at 351. But the record evidence in this case does support the statements alleged by Plaintiffs—that federal officers routinely asked Plaintiffs questions about their race and religion during law enforcement encounters used to support the watchlist enterprise. Plaintiffs have presented evidence that their responses to questions regarding their religion have impacted and secured their placement or maintenance on the TSDS. *See, e.g.*, DEX58 at 215:16–25 (recalling FBI agents asking him to explain the difference between religious sects); DEX76 246:2–248:1

107

(asking what mosque plaintiff attends and whether he prays); DEX52 at 234:20 (asking Plaintiff if he is a terrorist).

### 3.     The Government's assertions that they have too many checks to include animus in their decision making are irrelevant and do not pass muster.

The Government's argument that the checks put in place to ensure that the neutral reasonable suspicion standard is applied does not create immunity from Plaintiffs' Equal Protection claim. At various points the Government has claimed that it rigorous assessment process, reviews, and statements that the process does not intend to discriminate saves it from an equal protection claim. *See* DEX1 ¶¶ 55, 56; DEX19 at 164–65. But the Governments statements regarding the nexus between religion and placement on the TSDS are riddled with inconsistencies.

Discovery submitted by the Government is filled with statements contradicting the Government's position that religion does not play a role in TSDS placement. For example, the Government cites a declaration by Steven McQueen stating that "an individual's race, ethnicity, national origin, or religion is not considered derogatory" information. DEX1 ¶ 17. But this pull quote does not provide full context. The McQueen declaration actually states that TSDS nominations "must not be based solely on the individual's race, ethnicity, national origin, or religious affiliation." DEX1 ¶ 17. And the Government's decision need to be "based solely" on religion to violate equal protection. *See Moore*, 145 F.4th at 580.

Likewise, in the deposition of James Hartje, the TSC testified that it does not attribute a religious affiliation for the name Muhammad. DEX16 242:6–12. And the Government repeatedly argues that "any connection between name and religion is tenuous at best." Dkt. 343-1 at 110. But the Government knows that is incorrect. In training materials provided by Customs and Border Protection—an agency that is deeply involved in the watch listing enterprise—the DHS specifically singles out and identified Muhammad as a name associated with Islam and a Muslim

identity. PLX33 at JRDH-Merits-0012766 (analogizing the religious affiliation between the Muslim name Muhammad and the Christian name "Mary"). The Government has also argued that most of the terrorism threats they have identified are from individuals who practice Sunni Islam. Dkt. 343-1 at 111 (citing DEX3 ¶ 12). But somehow at the same time argues that religion is not considered in the TSDS nor is it known or tracked. Dkt. 343-1 at 108. Taken in light most favorable to Plaintiffs these inconsistent statements, patterns of religious interrogations in law enforcement encounters, and stark disparities in the TSDS for individuals with identifiably Muslim names satisfies the first prong of Plaintiffs' Equal Protection claim, at least sufficient to overcome the Government's motion for summary judgment.

**4.    The Government's implementation of the TSDS interest fails strict scrutiny.**

The watchlisting enterprise is not a necessity and too under and over inclusive to survive strict scrutiny. Classifications based on race or religion require the Government to prove that its actions are narrowly tailored to serving a legitimate government interest. *Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty., Md.*, 915 F.3d 256, 265 (4th Cir. 2019). Plaintiffs acknowledge that national security is a compelling government interest. *See* Dkt. 343-1 at 112 (citing *Haig*, 453 U.S. at 307). But it does not meet the narrow tailoring requirements because the TSDS over-includes Muslims who are not terrorist threats, under-includes non-Muslims who are known terrorist threats, and is integral to the Government's counter-terrorism enterprise.

The Government's implementation of the TSDS is not narrowly tailored to serve its national security interest. Narrow tailoring requires that the government's "means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate . . . or stereotype." *Grutter*, 539 U.S. at 333 (quoting *Shaw v. Hunt*, 517 U.S. 899, 908 (1996)). The Government argues that the watchlist is narrowly tailored because it is "essential"

to its efforts to "effectively and timely share information regarding terrorist threats." Dkt. 343-1 at 112–13 (arguing that because watchlist information has been used to mitigate or disrupt terrorist threats it is integral and therefore narrowly tailored). But the Government oversells the necessity of the TSDS.

The watchlist consists of over one million names, over ninety-eight percent of which—according to Dr. Huber's report—are identifiably Muslim. *See* DEX111 ¶ 7. Although the Government has stated that most of the threats which inform its counter-terrorism intelligence are from "Sunni Violent Extremist groups," DEX18 at 132–33; DEX3 at 12, it does not assert that Muslims make up ninety-eight percent of the terrorist threats to the United States. This supports Plaintiffs' claim that the TSDS is overinclusive of individuals with identifiably Muslim names. Moreover, despite the Government's insistence that the TSDS is integral to national security, it admits that approximately eighty percent of terrorist "disruptions" were not related to or aided by watchlist information. *See* Dkt. 343-1 at 112 (citing DEX13 at 2, 3). While the TSDS may provide some support to national security interest, the watchlist simply is not as effective as the Government claims. The targeting of Muslims through the watchlisting enterprise is not narrowly tailored to further the Government's national security interest. Under these facts, the Court should deny the Government's motion for summary judgment on Plaintiffs' Equal Protection claim.

## V. DEFENDANTS VIOLATED PLAINTIFFS FOURTH AMENDMENT RIGHT AGAINST UNREASONABLE FORENSIC SEARCHES OF THEIR PHONES

Plaintiffs had their cell phones unlawfully seized at ports of entry to the U.S., namely, border crossings and airports, in violation of their Fourth Amendment rights against unreasonable search and seizure. The Government claims that these searches aligned with CBP policy, which satisfies the Fourth Amendment reasonable suspicion standard applying to "advanced" or "forensic" phone searches at the border. The Government is wrong.

A.      **The Remaining Plaintiffs Retain Standing**

Notwithstanding *ex parte* productions, all Plaintiffs retain standing because they have established either an "ongoing or future injury in fact." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (citing *O'Shea*, 414 U.S. at 495-96 ). However, Plaintiff Esmaeel Paryavi dismisses his Fourth Amendment claim without prejudice.

First, Defendants do not challenge standing for Plaintiffs Hachem, Muminov, or Sulayman. *See* Dkt. 343-1 at 114–15. These Plaintiffs' claims advance on the merits, and Plaintiffs note that the Government does not dispute they were (1) on the TSDS Watchlist at the time of the Government's forensic phone searches, (2) the Government based its search solely on their Watchlist status, and (3) they are still on the Watchlist. *See infra*, Ex Parte Standard.

Second, Defendants do not dispute that the CBP Directive broadly permits forensic phone searches at the border based solely on watchlist status. *See* Dkt. 343-1 at 117 ("CBP officers may conduct an advanced search of a traveler's electronic devices for several reasons, including if the traveler is identified as a known or suspected terrorist."). This admission confers standing on all Plaintiffs who have been or still are on the TSDS Watchlist, because it brings Plaintiffs within a group reasonably certain to experience a future injury.

Defendants next argue that future searches will not happen because some Plaintiffs have "stopped having travel difficulties years ago." Dkt. 343-1 at 114. But this is repetition of previously-addressed standing and mootness claims. "Plaintiffs' decision not to engage in international travel because of the difficulties [they] reasonably expect[] to encounter upon return to the United States is sufficient to demonstrate standing." *Mohamed*, 266 F.Supp.3d at 875; *Wilwal v. Nielsen*, 346 F.Supp.3d 1290, 1302 (D. Minn. 2018) ("Courts do not require plaintiffs to engage in international travel when they have experienced difficulties at the border and reasonably expect the same difficulties when returning . . . from future travel."); *Fikre*. 601 U.S.

111

at 241 (finding removal from the No Fly List did not moot claims because the "voluntary cessation of a challenged practice will moot a case only" if the government meets the "formidable burden" of showing "the practice cannot reasonably be expected to recur.").

Defendants challenge that Plaintiff Sehwail "did not indicate any intention to engage in future international travel that could subject him to such searches," for example, is triply deficient. Dkt. 343-1 at 114. Sehwail testified, "I have to go see my mother. I haven't seen her in almost six years now." DEX78 at 112:10–12. If not for the Government, he would "go right now." DEX78 at 114:1, 113:3–4. Sehwail's mother lives in Palestine. DEX78 at 102:15–17, 139:8–141:6. Second, even if he merely stopped traveling because of the Government, that alone confers standing under Mohamed. Third, Defendants admit that CBP policy permits a forensic search of his phone at any port of entry, based solely on his TSDS status. *See* Dkt. 343-1 at 117.

Finally, the Government's various consent-based arguments are unavailing. Plaintiff Mohallim specifically recalls handling and unlocking the phone the Government searched, DEX67 at 126:15, 128:24, whereas the Government does not support its claim that his mother "likely" unlocked the phone. Dkt. 343-1 at 114.[224] Relatedly, Defendants' claims that Abdurrashid, Soueidan, and Thadi consented to their searches are not reasonable. Dkt. 343-1 at 114–15. Abdurrashid says only that he "would not voluntarily give someone [his] cell phone unless it was requested . . . by [his] government," DEX44 at 129:1–6, professing *compliance* in handing over his phone, not consent to the seizure nor specific consent to a forensic search.[225] Soueidan testified that the Government is "invading his privacy" when it searches his phone. DEX80 at 267:4–7, 267:8–268:1. After Defendants asked whether Thadi sees that other people "have their things

---

[224] Even if Mohallim's mother unlocked his phone, the Government also stops short of claiming Mohallim's mother consented to the forensic search.

[225] *See, e.g.*, DEX 76 at 153:4–10 (agents don't ask for consent to download when they ask for passcodes).

inspected" at the border, he said he "do[esn't] really care" if the his phone is "inspected." DEX84 at 111:1–9. There is no mention of forensic searches. *Id*. He is still demanding an apology for the hardship the Government has caused, DEX84 at 161:19–21, and maintains this claim.

**Ex Parte Standard**. Defendants claim that *ex parte* evidence may deny standing if it confirms that a Plaintiff (1) was not subject to a search of an electronic device "based solely on their TSDS status," (2) does not have active TSDS status, or (3) has not "established future travel plans." Dkt. 343-1 at 115. But Plaintiffs have explained why criteria (2) and (3) do not defeat standing, and now object to criteria (1). Even if *ex parte* evidence supports that the Government did not rely *only* on TSDS status when it conducted a forensic phone search, Plaintiffs' claims survive if the Government's basis for the search, including but not limited to TSDS status, did not create *reasonable suspicion* justifying the search. *See infra* Part B.

## B.    Watchlist-Based Device Searches at the Border Violate Kolsuz

While the Court allows "[r]outine searches of persons and effects" at international borders without "reasonable suspicion," *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985), certain "'nonroutine' border searches remain "constitutionally reasonable only if based on individualized suspicion." *United States v. Kolsuz*, 890 F.3d 133, 138 (4th Cir. 2018) (citing *Montoya de Hernandez*, 473 U.S. at 541); *id.* at 144 ("only with reasonable suspicion"). As the Fourth Circuit has recognized, "a forensic border search of a phone *must be treated as nonroutine*, permissible only on a showing of individualized suspicion," *Kolsuz*, 890 F.3d at 144;[226] *see* Dkt. 73 at 50; *cf. Riley v. California*, 573 U.S. 373, 393 (2014). A well-worn standard in Fourth

---

[226] The Government misstates the rule from *Kolsuz*. The Fourth Circuit did not hold that a forensic phone search at the border requires "some level of particularized suspicion." Dkt. 343-1 at 116. That quote comes from the court's characterization of the plaintiff's argument. *See Kolsuz*, 890 F.3d at 144 ("[W]e begin by considering the first premise of Kolsuz's argument: . . ."). The Fourth Circuit requires "a showing of individualized suspicion." *Id*.

Amendment jurisprudence, reasonable suspicion requires "'specific and articulable facts' known to the searching officers, along with 'rational inferences from those facts' demonstrate that *criminal activity* is afoot." Dkt. 73 at 51 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)) (emphasis added); *see also United States v. Arvizu*, 534 U.S. 266, 274 (2002) ("[W]hether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." (citing *United States v. Cortez*, 449 U.S. 411, 417–18 (1981))).

Defendants' description of the CBP Directive establishes that the policy violates Plaintiffs' Fourth Amendment rights. Defendants affirm that "CBP officers may conduct an advanced search of a traveler's electronic devices for several reasons, including if the traveler is identified as a known or suspected terrorist." Dkt. 343-1 at 117. "Known or suspected terrorist" is the moniker given to all individuals on the TSDS. Dkt. 343-1 at 5 (citing DEX1 ¶ 12). Defendants also do not dispute that CBP's "advanced" searches of electronic devices are the same as "forensic" searches under *Kolsuz*. Dkt. 343-1 at 116–17 n.22.[227] Instead, Defendants mechanically argue that the "reasonable suspicion" standard for inclusion on the TSDS meets the reasonable suspicion standard articulated in *Kolsuz*. Dkt. 343-1 at 117. But this court has already found that "mere membership in the [TSDS] . . . cannot supply individualized reasonable articulable suspicion," Dkt. 73 at 52, nor "serve as a proxy for individualized reasonable suspicion that an individual plaintiff is engaging in—or intends to engage in—terrorist activity at all, let alone at the time of the search," Dkt. 73 at 52 (citing *Mohamed*, 995 F. Supp. 2d at 532). The Government cites no new analysis or evidence to suggest the court should come to a new conclusion.

Defendants instead plead that the Fourth Circuit mentions the CBP Directive "with approval" in *Kolsuz*. Dkt. 343-1 at 117. But there is no relevant argument to be made. First, *Kolsuz*

---

[227] *See, e.g.*, DEX71 at 198:2–6 (agents told Muminov they were taking his phone to download all of its data).

is clear that the CBP Directive was not briefed or argued and only brings up the policy in dicta. *Kolsuz*, 890 F.3d at 146. Second, the Fourth Circuit brings up the CBP Directive for an entirely different purpose, as reassurance that "the distinction between manual and forensic searches is a perfectly manageable one." *Id.*

Third, and crucially, Plaintiffs do not dispute that an encounter or "case[] raising national security concerns" *could* give rise to reasonable suspicion—if it involves the "appropriate level of individualized suspicion" of "criminal wrongdoing." *See Kolsuz*, 890 F.3d at 146–47.[228] The problem is the Government's use of TSDS status during border encounters, when "what constitutes conduct sufficiently 'related to' or 'in aid of terrorism' is not explained, [and] it is not difficult to imagine completely innocent conduct serving as the starting point for a string of subjective, speculative inferences" that fall short of individualized reasonable suspicion. *See Mohamed*, 995 F. Supp. 2d at 532. By allowing border agents to justify a forensic phone search with TSDS status alone, or even with other insufficient supporting factors, the CBP Directive green-lights unconstitutional searches lacking reasonable suspicion.[229]

Defendants cite two further cases of note. In *United States. v. Nkongho*, the Fourth Circuit found that a warrantless search of a phone was conducted *with probable cause* that the phone "would contain evidence of an international fraud scheme, involving sensitive military equipment." 107 F.4th 373, 383–84 (4th Cir. 2024). The Government produces nothing remotely similar here. *See* Dkt. 343-1 at 116, 118. Defendants also cite *Navarette v. California*¸ 572 U.S. 393 (2014), to plead that TSDS status must be as reliable as an anonymous tip. Dkt. 343-1 at 118.

---

[228] Relevant here, Defendants cite to *U.S. v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019). But *Aigbekan* provides the rule that individualized suspicion is *required* for non-routine border searches, *and also* that suspicion *cannot be based on just any criminal activity*—there must be reasonable suspicion of a crime within the "historical rationale" or "sovereign interests" underpinning the border exception. *See* 943 F.3d at 720–21.

[229] Defendants claim that a "non-forensic" or "manual digital search of an electronic device is a routine border search." Dkt. 343-1 at 116 (citing *Ickes*, 393 F.3d 501, 505–06; *U.S. v. Kolsuz*, 185 F. Supp.3d 843, 854 (E.D. Va. 2016)). Setting aside that *Ickes* is a pre-*Riley* case, no remaining Plaintiff alleges a "non-forensic," "manual" search.

But Defendants miss two points underscoring the Fourth Amendment violation in this case: the individualized evidence in *Navarette* was (1) *related to criminal activity*, and (2) corroborated by details related to criminal activity *at the scene of the encounter*. 572 U.S. at 397–98.

## VI. THE COURT SHOULD NOT GRANT SUMMARY JUDGMENT ON PLAINTIFFS' FIFTH AMENDMENT SELF INCRIMINATION CLAIMS

The Fifth Amendment protects Plaintiffs from being "(1) compelled to make a (2) testimonial communication (3) that is incriminating." Dkt. 73 at 53 (citing *Fisher v. United States*, 425 U.S. 391, 408 (1976)). The Government likely violated Plaintiffs Doe, Hachem, and Jardaneh's right against self-incrimination by retaliating against or sanctioning them after they refused to provide testimony, invoking the Fifth Amendment privilege. All Plaintiffs have redress via injunctive relief that ends CBP's unlawful sanctioning practice.

### A.       Because The Injuries Are Set to Repeat In The Future, Plaintiffs Retain Standing

All Plaintiffs have established a "certainly impending" future injury for the reasons set forth in Part VI.A, *supra*, and because (1) they are likely to be detained, phones confiscated, passcodes demanded, and sanctions threatened or levied in the same manner when they next travel based on past repeated encounters; (2) they have not traveled in years specifically because they reasonably expect the Government to injure them again when traveling. Again, the Government's argument that the stopped injuring Plaintiffs years ago is foreclosed as mere voluntary cessation. *See supra* Argument 4APart XX.XX (Fourth Amendment).

Defendants argue that there is "no risk" of a future Fifth Amendment violation during Plaintiffs' future encounters, because Plaintiffs "are aware of the governing CBP policy" and "can just travel with unlocked or wiped devices," "assert the [Fifth Amendment] privilege," or "disable the password or unlock the device themselves." Dkt. 343-1 at 119, n.25. But in the Fourth Circuit,

a change in behavior to avoid constitutional injury is itself an "extraordinary showing of injury" that confers standing. *See Suhre*, 131 F.3d at 1088. Thus, if Plaintiffs took such steps, they would still have standing. Indeed, Plaintiffs who did not refuse to provide passcodes at the Governments request have standing for precisely this reason. *See, e.g.*, DEX48 at 102:9–13 (Albadawi removed password protections from his phone and laptop after several trips because he knew the Government would ask again).

Defendants also argue that Plaintiffs cannot establish impending injury because the Government may instead seize Plaintiffs' electronic devices for weeks at a time and unlock them in the course of an extended forensic search. *See* Dkt. 343-1 at 120. But the Government seizes Plaintiffs' phones for longer than the length of Plaintiffs' detentions because Plaintiffs assert their Fifth Amendment privilege, refusing to provide passcodes. The Government thus seeks to deny standing by admitting to the injury.

B.      **Provision of Electronic Device Passcodes Is Protected Testimony and Potentially Incriminating**

As a threshold matter, the provision of passcodes is testimony within the meaning of the Fifth Amendment. "[T]he Supreme Court made 'clear that the act of production itself may implicitly communicate statements of fact' that—if incriminating—would be privileged as testimonial acts." *United States v. Sweets*, 526 F.3d 122, 127 (4th Cir. 2007) (quoting *United States v. Hubbell*, 530 U.S. 27, 36 (2000)) (cleaned up). Defendants do not contest that providing passcodes to Government agents, or entering passcodes at the Government's request, is Fifth Amendment testimony. *See* Dkt. 343-1 at 119 n.24 (challenging only the testimonial nature of biometric information).

Defendants instead argue that Plaintiffs' testimony is not *incriminating*, because Plaintiffs have not shown that "the devices themselves . . . contain incriminating information." Dkt. 343-1

at 121 (citing *U.S. v. Aigbekaen*, No. CR 15-0462, 2022 WL 3106949, at *16 (D. Md. Aug. 3, 2022)). Defendants would require that Plaintiffs produce for this court self-incriminating information, but Plaintiffs need only show that the "hazards of incrimination" created by compelled testimony "are substantial and 'real,' and not merely trifling or imaginary." *Marchetti v. U.S.*, 390 U.S. 39, 54 (1968) (citing *Rogers v. United States*, 340 U.S. 367, 374 (1951)); *see Brown v. Walker*, 161 U.S. 591, 599 (1896) ("[G]reat latitude should be allowed to [a witness] in judging for himself of the effect of any particular question.").

The danger to Plaintiffs posed by this testimony is obvious, considering how Defendants characterize watchlist listees and encounters throughout their brief in support of summary judgment. To put it bluntly, the Government claims to have "reasonable suspicion that [each Plaintiff] engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." *See Long*, 151 F.4th at 517.

In at least one Plaintiff's case, this danger was realized—Plaintiff Doe was charged under state criminal law based on information gathered during watchlist encounters. In March 2017, during one of the many encounters at the U.S.-Mexico border, CBP stopped Doe and seized his phone. DEX56 at 168:20–172:12. Doe refused to provide the passcode, causing CBP to confiscate the phone for two months. *Id*. During the same period, Doe was repeatedly detained by the FBI. *See* DEX55 at 14 (Mar. 2017; U.S.-Mexico border); *id.* at 7 (Jan. 2018; domestic train); *id.* at 16 (Feb. 2018; San Diego airport). Twice in 2017, the FBI offered to resolve his watchlist status in exchange for information. DEX55 at 14, 16. He refused. *Id*.

Then, in July 2021, Plaintiff Doe was arrested and charged based on false information about his residency. DEX55 at 21. The state investigative report revealed that the FBI referred the

case to California investigators sometime before June 2018, when Doe was "crossing back and forth" between the U.S. and Mexico. PLX37 at 2–6. TECS records were shared with local law enforcement to provide the basis for the charge. *See id.* at 7-64. The charges were dismissed with prejudice, DEX55 at 21, but these false records still exist in Defendants' systems. DEX12 at 22, 38.

**C.      Defendants Impose Sanctions on Plaintiffs Invoking Their Fifth Amendment Rights by Confiscating Their Phones or Prolonging Their Detention**

Plaintiffs may invoke their Fifth Amendment right "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory" where they "reasonably believe[]" their statements "could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 446 (1972). Where properly invoked, the government "cannot penalize assertion of the constitutional privilege . . . by imposing sanctions to compel testimony which has not been immunized." *Lefkowitz v. Cunningham*, 431 U.S. 801, 805–06 (1977); *id*. at 808 (citizens cannot "be forced to incriminate themselves because it serves a governmental need"); *see Minnesota v. Murphy*, 465 U.S. 420, 434 (1984) (collecting cases). This principle makes unlawful sanctions levied on individuals who invoke their Fifth Amendment privilege. *See Gardner v. Broderick*, 392 U.S. 273, 276–78 (1968) (police officer could not be discharged from service for invoking privilege); *Lefkowitz v. Turley*, 414 U.S. 70, 83 (1973) (individuals asserting privilege could not be disqualified from public contracts), because the government is offering "an unconstitutional choice between self-incrimination or denial" of possessions or liberty, *Pentlarge v. Murphy*, 541 F. Supp. 2d 421, 427–28 (D. Mass. 2008).

There is no reason why the Fifth Amendment privilege should not protect Plaintiffs from sanctions when they refuse to provide passcodes to electronic devices at the border. In *United States v. Giddins*, the Fourth Circuit noted that the "economic consequences" of losing one's car,

which police officers threatened to detain indefinitely if the plaintiff asserted his Fifth Amendment privilege, gave rise to a Fifth Amendment claim. 858 F.3d 870, 882–83 (4th Cir. 2017). A cell phone, like a car, is "means of maintaining [one's] livelihood." *Id*. at 883; *see, e.g.*, DEX48 at 164:3–6 ("If you are a businessman, you have to take your telephone . . . . You cannot go without it."); DEX65 at 66:2–7 ("[T]he cell phone is extremely important. So I can't leave it behind"); *accord. Riley*, 573 U.S. at 385 (finding phones "a pervasive and insistent part of daily life").

The Government detained all Plaintiffs at the border and seized their electronic devices because of Plaintiffs status on the TSDS Watchlist or No Fly List. *See supra* Facts VII.A–C. The Government told several Plaintiffs that refusing to provide a passcode or unlock the device in front of agents would result in their phone being confiscated or their detention lengthened,[230] or used more blunt and abusive tactics.[231] Some Plaintiffs cowed to these threats,[232] but others refused to provide passcodes, taking an action that invoked their Fifth Amendment privilege.[233]

When Plaintiffs refused, the Government responded by punishing Plaintiffs for invoking the privilege. The Government confiscated and held Plaintiffs' phones for weeks or months.[234] Some Plaintiffs were detained longer as a result of invoking their privilege.[235] Doe's experience with the FBI would suggest that refusal to provide testimony could also have the effect of retaining Plaintiffs on the watchlist. *See supra* Part b; DEX55 at 14, 16.

---

[230] *See, e.g.*, DEX50 at 195:11–18; DEX60 at :14–259:5; DEX71 at 198:2–21 (released quicker); DEX71 at 212:1–8 ("What are you hiding? . . . Tell me now."); DEX78 at 151:3–9 (longer detention and phone confiscation);

[231] *See, e.g.*, DEX59 at 22 (used "good cop bad cop tactics"); DEX69 at 192:2–9 (treated like a "high class criminal"); DEX76 at 272:12–21 ("abusive").

[232] Abdurrashid, Albadawi, Al Sahlani, El-Shahat, Kamel, Mohallim, Mujanovic, Muminov, E. Paryavi, M. Paryavi, Sehwail. *See, e.g.*, DEX44 at 71:7–17 ("[W]hatever you can to get home . . . . I'm not Rosa Parks."); DEX48 at 313:15–20; DEX50 at 209:2–210:9; DEX58 at 76:5–6, 293:24–294:8 (laptop); DEX65 at 66:23–67:3; DEX67 at 126:15 & 21–24; DEX69 at 181:6–13, 190:10–15, 243:2–245:15 ("[Y]ou start shaking . . . you start crying."); DEX71 at 198:2–22; DEX73 at 165:4–14; DEX76 at 152:6–19; DEX78 at 150:11–152:5; DEX80 at 155:2–11; DEX82 at 113:10–23.

[233] Doe, Hachem, Jardaneh. *See* DEX56 at 172:2–18; DEX60 at 258:14–18; DEX62 at 224:14–225:11.

[234] *See* DEX56 at 170:8–15 (one or two months); DEX60 at 260:6–20 (three weeks); DEX62 at 231:18–232:11 (return took "a week or so," long enough to miss a job application).

[235] *See* DEX56 at 170:7–8 (10 hours); DEX62 at 221:11–230:3 (5.5 hours).

120

The Government's demand that Plaintiffs provide passcodes, and thus waive their Fifth Amendment right, in order to retain control of their phones and expedite their border detention, presented Plaintiffs with of possessions or liberty. *Pentlarge*, 541 F. Supp. 2d at 427–28. Because the Government's sanctions left Plaintiffs with "an unconstitutional choice between self-incrimination or denial" of an indispensable "means of maintaining [their] livelihood[s]," CBP actions and policy violate Plaintiffs' Fifth Amendment right against self-incrimination. *Pentlarge*, 541 F. Supp. 2d at 427–28; *Giddins*, 858 F.3d at 882–83. The court should therefore not grant Defendants motion for summary judgment.

## VII.  DEFENDANTS VIOLATED PLAINTIFFS RIGHTS TO RELIGIOUS EXERCISE UNDER RFRA

The Government violated Plaintiffs rights under RFRA by burdening their religious exercise as Muslims and religious leaders, without narrowly tailoring its watchlist practices. "RFRA provides 'very broad protection for religious liberty.'" *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.* (*Friends*), 767 F. Supp. 3d 293, 328 (D. Md. 2025) (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014)). Where Plaintiffs establish a "substantial burden" on religious exercise, Defendants must "demonstrate that the policy furthers a 'compelling governmental interest' . . . by 'the least restrictive means.'" *Id.* at 328–29. "[S]ubstantial burdens . . . 'put substantial *pressure* on an adherent to modify his behavior and to violate his beliefs.'" *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (emphasis added).[236] It is the *pressure*, rather than Plaintiffs' reaction to it, that establishes the burden. *See*

---

[236] The "objective evaluation" of the religious burden, asserted by Defendants, Gov. Br. 124, is a standing question in the Fourth Circuit, separate from "the issue of whether there is an actual infringement of a First Amendment right." *Philadelphia Yearly Meeting of Religious Soc'y of Friends*, 767 F. Supp. 3d at 325 (citing *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)) (emphasis added). Even so, Plaintiffs religious exercise is objectively burdened by the Government's actions, being completely reasonable. *See, e.g.*, *supra* PDP prong 1 (objective deterrence from international travel).

*Friends*, 767 F. Supp. 3d at 325–30 (finding the presence of armed immigration agents burdened RFRA plaintiffs "pacifist beliefs" and "communal worship").

### A.     Plaintiff Sulayman Was Substantially Burdened

Imam Farid Sulayman is a Muslim religious leader whose duties include leading his congregation on religious pilgrimages. DEX81 at 7; *see* DEX82 at 260:8–261:21. As this court previously found, and Defendants do not contest, this is a religious practice protected by RFRA. *See* Dkt. 73 at 61; Dkt. 343-1 at 124–29.

As a result of his TSDS status, Sulayman faces delays, harassment, detention, and interrogation whenever he travels by air. So does anyone who travels with him. In February 2018, he was interrogated by CBP for between four to six hours at the Canadian border and questioned about his faith and his role in leading an upcoming religious pilgrimage. DEX81 at 11; DEX82 at 191:9–198:6. While leading a religious trip in March-April 2018, Sulayman and his congregation were screened like "known or suspected terrorists," subjected to enhanced screening and an hour-long interrogation after Sulayman alone received the SSSS designation on his boarding pass. DEX81 at 12–13; DEX82 at 166:16–170:9. Upon return., the Government separated Sulayman from his congregation, detained him, and interrogated him for four hours, questioning his role as an imam. DEX81 at 14. That trip, Sulayman's mother and another woman in his group received SSSS designations for the first time. DEX81 at 14; DEX82 at 121:13–122:11, 172:23–173:13.

After this trip, Sulayman began avoiding some travel. He significantly cut back the pilgrimages he led to spare himself and his congregation the humiliation that accompanies them. He traveled less for work. *See, e.g.*, DEX82 at 15:25–17:18 (work travel frequency), 66:15–24 (imam conference). The issues continued. For example, on a 2021 pilgrimage with family, the Government subjected Sulayman's entire group to enhanced screenings because of Sulayman's

122

TSDS status. DEX82 at 134:15–139:1. On return to the U.S., CBP detained and questioned the whole family. DEX82 at 263:7–16.[237]

The Government's actions have caused community members and colleagues of Sulayman to avoid traveling with him. DEX82 at 95:6–7 ("Usually nobody wants to travel on the same flight as me"). To protect congregants that join him, Sulayman altered his religious practices to travel separately, contravening his religious obligations to act as a guide. DEX82 at 81:7–84:1, 97:4–99:15, 206:5–20. After altering his practices, and after filing this lawsuit and speaking about his case publicly, he observed more congregants feeling safe to join him. DEX82 at 204:9–206:2, 224:20–227:17. *But* DEX82 at 246:4–6 (stating that some still "hesitate . . . to come to me").

Defendants argue that Imam Sulayman's continued practice of Umrah and the support in his community negates his RFRA claim. Dkt. 343-1 at 128. But this misunderstands the record and the law. Discovery proves that the Government created a substantial burden on Sulayman by "caus[ing] fewer congregants to attend" religious pilgrimages with him, and by "undermining [Sulayman's] ability to provide such services to as many people as [he] had previously served." *Friends*, 767 F. Supp. 3d at 325. Even if Sulayman's behavior had not changed, which it has, the Government thus placed "substantial pressure" on him "to modify his behavior and to violate his beliefs." *Lovelace*, 472 F.3d at 187.

**B.    TSDS Plaintiffs Were Substantially Burdened**

Defendants do not contest that Plaintiffs' Muslim faith is a protected "exercise of religion." 42 U.S.C. § 2000bb-1(a). Discovery confirmed that Plaintiffs Al-Sahlani, Doe, El-Shahat, Hachem, Kamel, Mujanovic, M. Paryavi, and Sulayman were all questioned about their Islamic

---

[237] Between 2017 and 2023, Sulayman documents at least 22 other trips through airports or land borders that resulted in substantially similar, targeted harassment. DEX81 at 10–11, 15–23.

faith and practices, in connection with their placement on the TSDS Watchlist.[238] This "inquiry

into" their "religious views . . . [was] not only unnecessary but offensive." *Mitchell v. Helms*, 530

U.S. 793, 828 (2000) (Thomas, J., plurality opinion); *see, e.g.*, DEX56 at 108:4–110, 330:13–17;

DEX58 at 311:22–312:10; DEX65 at 71:4–5.

The combination of insulting questions and deprivations of travel combined with invidious

effect.[239] The Government's questions, such as whether Plaintiffs prayed, *e.g.*, DEX65 at 56:17–

19, 16:15–22, what Mosque they attended, *e.g.*, DEX71 at 183:14–22, and whether they had been

"Islamized," DEX69 at 200:8–15, were "perceived" by Plaintiffs as plainly "disapprov[ing] of

their particular individual religious choices." *Brown v. Woodland Joint Unified School Dist.*, 27

F.3d 1373, 1378 (9th Cir. 1994) (quoting *School Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 390

(1985)) (cleaned up); *See, e.g.*, DEX50 at 281:24–282:11; DEX58 at 314:12–317:18; DEX60 at

36:18–21 (caused belief the watchlist targets Muslims); 201:2–13 (caused to stop praying,

attending mosque). As this court previously observed, the "singling out of Plaintiffs and [the

Government's] persistent inquiry into Plaintiffs' religious beliefs and practices places *pressure* on

Plaintiffs to modify or violate those beliefs or risk being subjected to the pattern of detentions and

interrogations in connection with their travel." *See* Dkt. 73 at 60 (citing *United States v. Ramon*,

86 F. Supp. 2d 665, 676 (W.D. Tex. 2000)) (emphasis added).

Indeed, beyond Plaintiffs' personal experiences, other evidence indicates that Muslims are

targeted because of their religion. For example, the Government admits that answers to religious

---

[238] DEX50 at 278:4–278:12 (Al-Sahlani); DEX56 at 107:5–108:16 (Doe); DEX58 at 306:12–23, 311:7–9 (El Shahat); DEX60 at 200:4–13 (Hachem); DEX64 at 54:1–8, 56:5–9, 56:17–19, 110:19–111:5, 111:19–23, 104:13–105:12 (Kamel); DEX65 at 56:17–19, 16:15–22 (Kamel); DEX69 at 183:14–184:1, 199:20–200:15 (Mujanovic); DEX71 at 193:22, 193:6–16, 195:10–15, 199:3–8, 204:10–11, 194:12–18 (Muminov); DEX82 at 192:8–193:21, 195:9–196:1, 235:4–21 (Sulayman).

[239] As discussed, supra Argument PDP.B (*Mathews* prong one), Plaintiffs reject Defendants' mischaracterization of their travel deprivations as "mere inconvenience." *Compare New Doe Child #1 v. Cong. of United States*, 891 F.3d 578, 590–91 (6th Cir. 2018) (use of alternative payment methods without "In God We Trust" was a "mere inconvenience").

questions may heighten suspicion of connections to terrorism. *See, e.g.*, DEX20 280:20–281:12 (discussing "extreme" directive to single out Shia Muslims at the Port of Blaine); DEX20 at 283:16–285:11(religious questioning can "absolutely" come up and trigger "further questioning" and "high side checks"). The Muslim-biased makeup of the TSDS Watchlist also strongly suggests that Plaintiffs are actually targeted for their faith. *See supra* Argument PDP.C.1.

Briefly, contrary to Defendants assertion, the Government policy need not "require" that agents ask religious questions to invoke RFRA, where watchlist allows Muslim religious practice to be "one factor contributing to the formation of reasonable suspicion." *Ramon*, 86 F. Supp. 2d at 673. Second, the Government's assertions that Plaintiffs were not *always* or *exclusively* questioned about their Muslim faith, or that the Government's agents sometimes used friendly tones of voice, are totally inapposite to the demonstrated burdens that Plaintiffs experienced.

## C. Defendants Cannot Satisfy Strict Scrutiny

Under RFRA, "[t]he least-restrictive-means standard is exceptionally demanding." *Burwell*, 573 U.S. at 728. "RFRA . . . 'requires the Government demonstrate that the compelling interest test is satisfied through *application of the challenged law to the person*—the particular claimant whose sincere exercise of religion is being substantially burdened.'" *Burwell*, 573 U.S. at 726 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006)) (emphasis added). Plaintiffs have already shown that the watchlist is ineffective, cutting against any "compelling interest" in the program. *See, e.g.*, *supra* Part XX.XX (fact section merits of watchlist). But even if the watchlist has merit, *Burwell* directs the Government to demonstrate that it furthers national security goals *as applied to Plaintiffs*. Neither case the Government cites applies such an individualized standard. *See Mohamed*, 266 F. Supp. 3d (substantive due process); *Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) (freedom of association).

The "as applied" test from *Burwell* has two interpretations, both are decisive for Plaintiffs. First, national security interests are not served at all by applying the program to Plaintiffs, because no reasonable suspicion could exist that they pose a national security risk. Without merit in continuing to list Plaintiffs, it would be less restrictive on their religious exercise to de-list them.

But second, the watchlist "casts too wide of a net" by permitting the Government to use Plaintiffs' answers to religious interrogation as the basis for reasonable suspicion and inclusion on the watchlist. *See Ramon*, 86 F. Supp. 2d at 677 ("there are more restrictive methods of pursuing this goal than stopping vehicles displaying religious symbols, especially in an area where such symbols are as commonly displayed"); *see also Burwell*, 573 U.S. at 728–30 (alternative programs or policies may be viable even if they incur higher costs or cause some inconveniences). The narrower solution would be to disallow religion as a contributing factor to watchlist nomination.

The stringency of RFRA's narrow tailoring requirement could arguably include additional process, such that Plaintiffs with religious exercise burdens can plead religious exemption or be removed from the watchlist after receiving actual and adequate due process. *See supra* Argument IV.C.2. The mere existence of some modicum of process through DHS TRIP for people on the No Fly List is relevant under RFRA, because that process "established an accommodation" within the meaning of RFRA for another subgroup of the watchlist and "demonstrated that [the Government] has at its disposal an approach that is less restrictive." *See Burwell*, 573 U.S. at 730–31.

## CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request this Court to deny Defendants Omnibus Motion to Dismiss, Motion in Limine, and Motion for Summary Judgment and to grant Plaintiffs' Motion for Summary Judgment on their Procedural Due Process, Substantive Due Process, Equal Protection, Fourth Amendment, Fifth Amendment, and RFRA claims.

Dated: November 25, 2025

Respectfully submitted,

/s/Lena Masri
Lena Masri
Gadeir Abbas*
Nadia Bayado
Catherine Keck
**CAIR LEGAL DEFENSE FUND**
453 New Jersey Ave SE
Washington, D.C. 20003
T: (202) 488-8787
ldf@cair.com

*Licensed in VA; not in D.C., practice
limited to federal matters

127