**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MUTASEM JARDANEH, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 8:18-cv-02415-PX |
| PAMELA BONDI, *et al.*, | ) | |
| Defendants. | ) | |

**PLAINTIFFS' REPLY BRIEF ON CROSS MOTION FOR SUMMARY JUDGEMENT**

# TABLE OF CONTENTS


TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... iv

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. Plaintiffs' Exhibits are Rightfully Included but Not Necessary to Grant Plaintiffs' Summary Judgment .......... 2

A. The leaked Selectee and No Fly Lists. .......... 3

B. The 2013 Watchlisting Guidance .......... 6

II. Plaintiffs Have Standing to Sue WLAC Defendants .......... 8

A. Plaintiffs' injuries are traceable to WLAC Defendants. .......... 8

B. Plaintiffs' injuries are redressable through WLAC Defendants .......... 9

III. Plaintiffs Have Standing for All Claims. .......... 11

A. All Plaintiffs have standing for their claims. .......... 11

B. Plaintiffs' claims are not moot. .......... 12

IV. The Government Violates Plaintiffs' Substantive Due Process Rights. .......... 13

A. The No Fly List interferes with Plaintiffs' Fundamental Right of Travel. .......... 14

B. The No Fly List is not narrowly tailored. .......... 18

1. The waiver program is the exception that swallows the whole. .......... 18

2. Over-inclusion is a clear and solvable tailoring problem. .......... 19

V. The Government Violated Plaintiffs' Procedural Due Process Rights. .......... 20

A. TSDS Plaintiffs .......... 20

1. TSDS Plaintiffs proved liberty interests implicated due process. .......... 21

2. TSDS Plaintiffs proved "stigma-plus" injuries implicating due process. .......... 22

3. TSDS Plaintiffs' "stigma-minus" injuries require due process. .......... 27

4. TSDS Plaintiffs do not receive constitutionally mandated due process .......... 28

B. No Fly List Plaintiffs .......... 32

1. The Government infringes on No Fly List Plaintiffs' liberty interest. .......... 33

2. No Fly List Plaintiffs do not receive constitutionally adequate due process. .......... 34

VI. The Government Violated Plaintiffs' Fourth Amendment Rights. .......... 39

A. Plaintiffs satisfy Fourth Amendment standing requirements. .......... 40

B. Nonroutine border searches of electronic devices without individualized suspicion of criminal activity violate the Fourth Amendment. ....42

C. The *ex parte* record is subject to the same standard. ....44

VII. The Government Violated Plaintiffs' RFRA Rights. ....45

A. Religious questioning connected to watchlist status places substantial pressure on TSDS Plaintiffs' religious exercise. ....46

B. Plaintiff Sulayman has proved a substantial burden under RFRA. ....49

C. The Government fails to satisfy the least-restrictive-means standard. ....50

CONCLUSION ....52

# TABLE OF AUTHORITIES

## Cases


*Abdi v. Wray*, 942 F.3d 1019 (10th Cir. 2019) ....................28
*Abu Irshaid v. Garland*, No. 1:24-CV-01405, 2025 WL 756544 (E.D. Va. March 10, 2025) ....37, 47, 48, 49
*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965 (9th Cir. 2012) ....................42
*Am. Fam. Ass'n, Inc. v. City & Cnty. of San Francisco*, 277 F.3d 1114 (9th Cir. 2002) ....................51
*Bell v. Burson*, 402 U.S. 535 (1971) ....................30
*Bennett v. Spear*, 520 U.S. 154 (1997) .................... 9, 10
*Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114 (10th Cir. 2005) ....................2
*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) .................... 50, 51, 56, 57
*Busic v. Transportation Security Administration*, 62 F.4th 547 ....................43
*Califano v. Aznavorian*, 439 U.S. 170 (1978) ....................36
*Cherri v. Mueller*, 951 F. Supp. 2d 918 (E.D. Mich. 2013) .................... 53, 54
*Chicago Tchrs. Union, Loc. No. 1, AFT, AFL-CIO v. Hudson*, 475 U.S. 292 (1986) ....................38
*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) .................... 9, 45
*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) .................... 33, 34, 38, 39
*Concrete Pipe & Products of Cal., Inc. v. Constr. Laborers Pension Tr. for Southern Cal.*, 508 U.S. 602 (1993) .................... 34, 40
*Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003) .................... 27, 31
*D.B. v. Cardall*, 826 F.3d 721 (4th Cir. 2016) .................... 22, 31, 36, 40
*Doe v. Dep't of Public Safety ex rel. Lee*, 271 F.3d 38 (2d Cir. 2001) .................... 27, 28
*El Ali v. Barr*, 473 F. Supp. 3d 479 (D. Md. 2020) ....................passim
*Elhady v. Kable*, 993 F.3d 208 (4th Cir. 2021) ....................passim
*Elhady v. Piehota*, 303 F. Supp. 3d 453 (E.D. Va. 2017) ....................43
*Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990) ....................51
*Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234 (2024) .................... 14, 36, 38, 45
*Fernandez v. RentGrow, Inc.*, 116 F.4th 288 (4th Cir. 2024) ....................24
*Fikre v. Fed. Bureau of Investigation*, 35 F.4th 762 (9th Cir. 2022) ....................23
*Fikre v. Wray*, No. 3:13-CV-00899, 2020 WL 4677516 (D. Or. Aug. 12, 2020) .................... 23, 24
*Fin. Co. of Am. v. BankAmerica Corp.*, 493 F. Supp. 895(D. Md. 1980) ....................6
*Florida v. J. L.*, 529 U.S. 266 (2000) ....................50
*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) .................... 45, 47
*Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315 (4th Cir. 2002) ....................11
*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000) .................... 14, 45
*Fuentes v. Shevin*, 407 U.S. 67 (1972) ....................38
*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ....................51, 56, 57
*Goss v. Lopez*, 419 U.S. 565 (1975) ....................34
*Haig v. Agee*, 453 U.S. 280 (1981) .................... 34, 42
*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ....................passim

*Holt v. Hobbs*, 574 U.S. 352 (2015) .... 50, 55, 56, 57
*Incumaa v. Stirling*, 791 F.3d 517 (4th Cir. 2015) .... 33, 35
*Isakhanova v. Muniz*, No. 15-cv-03759, 2016 WL 1640649 (N.D. Cal. Apr. 26, 2016) .... 52, 53
*Kashem v. Barr*, 941 F.3d 358 (2019) .... 37, 40, 43
*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) .... 36
*Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018) .... 44
*Kent v. Dulles*, 357 U.S. 116 (1958) .... 36
*Kerry v. Din*, 576 U.S. 86 (2015) .... 23, 29
*Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314 (4th Cir. 2021) .... 32
*Laws. All. for Nuclear Arms Control-Philadelphia Chapter v. Dep't of Energy* (*Lawyers Alliance*), 766 F. Supp. 318 (E.D. Pa. 1991) .... 6
*Long v. Bondi*, 151 F.4th 503 (4th Cir. 2025) .... 13, 29, 30, 36
*Lopez v. Delta Int'l Mach. Corp.*, 312 F. Supp. 3d 1115 (D.N.M. 2018) .... 3, 7
*Lopez v. Stanley Black & Decker, Inc.*, 764 F. App'x 703 (10th Cir. 2019) .... 3
*Lovelace v. Lee*, 472 F.3d 174 (4th Cir. 2006) .... 51, 54, 55
*Mackey v. Montrym,* 443 U.S. 1 (1979) .... 30
*Mathews v. Eldridge*, 424 U.S. 319 (1976) .... 22, 33, 38
*Mitchell v. Helms*, 530 U.S. 793 (2000) .... 52
*Mohamed v. Holder*, 266 F.Supp.3d 868 (E.D. Va. 2017) .... 24
*Mohamed v. Holder*, 995 F. Supp. 2d 520 (E.D. Va. 2014) .... 48
*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) .... 40
*Murthy v. Missouri*, 603 U.S. 43 (2024) .... 9, 10
*Nat'l Council of Resistance of Iran v. Dep't of State* (*NCRI*), 251 F.3d 192 (D.C. Cir. 2001) .... passim
*Navarette v. California*, 572 U.S. 393 (2014) .... 35, 45, 48, 50
*O'Shea v. Littleton*, 414 U.S. 488 (1974) .... 44
*Parker Waichman LLP v. Salas LC*, 320 F. Supp. 3d 327 (D.P.R. 2018) .... 6
*Paul v. Davis*, 424 U.S. 693 (1976) .... 14, 25
*Perrier-Bilbo v. United States*, 954 F.3d 413 (1st Cir. 2020) .... 51
*Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.* (*Soc'y of Friends*), 767 F. Supp. 3d 293 (D. Md. 2025) .... 52, 54, 56, 57
*Reid v. Georgia*, 448 U.S. 438 (1980) .... 49
*Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165 (4th Cir. 2009) .... 23, 24
*Sciolino v. City of Newport News*, 480 F.3d 642 (4th Cir. 2007) .... 27
*Sherbert v. Verner*, 374 U.S. 398 (1963) .... 52
*Snider Int'l Corp. v. Town of Forest Heights*, Md., 739 F.3d 140 (4th Cir. 2014) .... 36
*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .... 13
*Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) .... 56
*Terry v. Ohio*, 392 U.S. 1 (1968) .... 47
*Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707 (1981) .... 51
*U.S. v. Ramsey*, 431 U.S. 606 (1977) .... 57
*United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019) .... 47, 49, 50

*United States v. Davis*, 918 F.3d 397 (4th Cir. 2019) ........ 3, 6, 7
*United States v. Elkins*, 885 F.2d 775 (11th Cir. 1989) ........ 4, 8
*United States v. Howard-Arias*, 679 F.2d 363 (4th Cir. 1982) ........ 5
*United States v. Kolsuz,* 890 F.3d 133 (4th Cir. 2018) ........ 47
*United States v. Nkongho*, 107 F.4th 373 (4th Cir. 2024) ........ 47, 49
*United States v. Ramon*, 86 F. Supp. 2d 665 (W.D. Tex. 2000) ........ 53, 57
*United States v. Recio*, 884 F.3d 230 (4th Cir. 2018) ........ 3
*United States v. Smith*, No. 23-4242, 2025 WL 227717 (4th Cir. Jan. 17, 2025) ........ 3
*United States v. Vidacak*, 553 F.3d 344 (4th Cir. 2009) ........ 3, 4, 7
*Wilkinson v Austin*, 545 U.S. 209 (2005) ........ 32, 34
*Williams v. Hobbs*, 662 F.3d 994 (8th Cir. 2011) ........ 34

**Statutes**

42 U.S.C. § 2000bb et seq. ........ 50
42 U.S.C. § 2000bb(a)(2) ........ 55

## INTRODUCTION

Plaintiffs are ordinary U.S. citizens whom the Government labeled as "Known or Suspected Terrorists" without individualized reasonable suspicion of any crime related to terrorism. On this basis, and without meaningful process, the Government denied Plaintiffs the freedom to travel, denied valuable licenses and credentials, tarnished their reputations, searched their electronic devices, imposed penalties when they refused to provide passcodes, repeatedly interrogated them about their Muslim faith, and pressured them to modify their religious practices.

The Government's actions are the result of a coordinated national security apparatus known as the "watchlisting enterprise." Established in the mid-2000s, the system consolidates terrorism-related information into the Terrorist Screening Dataset ("TSDS"), including the Selectee and No Fly Lists. Defendants are the federal agencies responsible for implementing that system and for the constitutional and statutory violations that followed Plaintiffs' inclusion in it. This Court previously described the Government's watchlisting enterprise as a "black box," governed by "amorphous criteria," "devoid of any notice," and "utterly lacking in safeguards," such that more than ninety-eight percent of nominations to the TSDS are approved. Dkt. 73 at 36 (*El Ali v. Barr*, 473 F. Supp. 3d 479, 512 (D. Md. 2020)). The discovery record confirms this characterization. Across decades, agencies, and travel contexts, Plaintiffs experienced the same recurring patterns of travel interference, religious interrogation, digital searches, reputational stigma, and coercive questioning tied directly to their watchlist status. The Government does not meaningfully dispute the core factual record establishing these patterns.

Plaintiffs now defend their cross-motion for summary judgment on some of their claims.[1]

[1] Plaintiffs submit their brief in reply to Defendants' response to Plaintiffs' cross-motion for summary judgment. Dkt. 359, 363. Plaintiffs limit their reply to those arguments and sections relevant to Plaintiffs' affirmative summary judgment on Count II (Substantive Due Process), Counts I & III (Procedural Due Process & APA), Count VI (Fourth Amendment), and Counts X & XI (RFRA). Plaintiffs do not waive their opposition to summary judgment for Defendants on Count V (Equal Protection) and Count VIII (Fifth Amendment), which Plaintiffs opposed in full in their brief in response to Defendants' summary judgment motion. *See* Dkt. 359.

Summary judgment is warranted because: (1) Plaintiffs have standing to sue all Defendants and pursue each claim at issue; (2) the undisputed record establishes violations of the constitutional and statutory rights addressed in Plaintiffs' motion; (3) in response, Defendants largely rely on the factual records of other cases rather than confront the record developed here; (4) Defendants invoke inapposite or non-binding authority and attempt to extend the Fourth Circuit's decision in *Elhady* beyond its holdings; and (5) nothing in *Elhady* nor any other authority forecloses the claims presented here.

Because the Government does not meaningfully dispute the record establishing these patterns of treatment, the constitutional and statutory violations addressed in Plaintiffs' motion present questions of law appropriate for summary judgment.

## ARGUMENT

### I. Plaintiffs' Exhibits are Rightfully Included but Not Necessary to Grant Plaintiffs' Summary Judgment.

Invoking Rules 56(c)(2) and 901, Defendants argue that certain Plaintiffs' exhibits should not be considered at summary judgment Plaintiffs cannot authenticate them. That objection misunderstands the Rule 56 standard. At summary judgment, the question is not whether evidence has already been authenticated for trial, but whether it could be presented in admissible form. On this record, Plaintiffs satisfy that standard. In any event, the exhibits are not necessary to grant Plaintiffs' cross-motion for summary judgment; and at minimum, they are properly considered in opposition to Defendants' affirmative motion.

In support of their motion for summary judgment, Plaintiffs are not required to "submit evidence in a form admissible at trial; however, the content or the substance of the evidence must be admissible." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005) (citation omitted). Accordingly, Plaintiffs are not required to authenticate exhibits at summary judgment. Instead, when a Rule 56 objection is raised, the proponent need only show that the material "is admissible as

presented or . . . explain the admissible form that is anticipated." FED. R. CIV. P. 56(c)(2) advisory committee's note to 2010 amendment.

"The burden to authenticate under Rule 901 is not high," *United States v. Davis*, 918 F.3d 397, 402 (4th Cir. 2019) (citation omitted), "especially where [the objecting party] gives the Court no evidence to question" the evidence's "genuineness." *Lopez v. Delta Int'l Mach. Corp.*, 312 F. Supp. 3d 1115, 1154 (D.N.M. 2018), *aff'd sub nom. Lopez v. Stanley Black & Decker, Inc.*, 764 F. App'x 703 (10th Cir. 2019). The proponent need only offer "circumstantial evidence that the documents in question are what they purport to be," which may include the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the records, taken in conjunction with circumstances of their seizure." *United States v. Vidacak*, 553 F.3d 344, 350 (4th Cir. 2009) (cleaned up). The court's role is limited at this stage and leaves the ultimate weight and credibility of the evidence to the factfinder, asking only whether "the jury *could* reasonably find that the evidence is authentic, not that the jury necessarily *would* so find." *Davis*, 918 F.3d at 402 (quoting *United States v. Recio*, 884 F.3d 230, 236–37 (4th Cir. 2018)) (emphasis in original); *see United States v. Smith*, No. 23-4242, 2025 WL 227717, at *4 (4th Cir. Jan. 17, 2025) (citing 31 Charles A. Wright, Arthur R. Miller & Victor J. Gold, FED. PRACTICE & PROC. § 7104 (2d ed. 2024) ("The judge should permit the evidence to go to jury unless the showing on authenticity is so weak that no reasonable juror could consider the evidence to be what its proponent claims it to be.").

### A. The leaked Selectee and No Fly Lists.

Plaintiffs can readily explain the admissible form of Plaintiffs' Exhibits 14 and 15. Plaintiffs submitted Exhibit 14 (PLX14, "Leaked Selectee List") and Exhibit 15 (PLX15, "Leaked No Fly List") under seal to show the Court the data underlying Dr. William Huber's statistical analysis. *See* DEX111 ("Report Concerning Data in Two Leaked Copies of Federal Government Watch Lists"). The circumstances of these files' seizure, and their contents, have been repeatedly corroborated by the

record and provide sufficient circumstantial evidence for a reasonable factfinder to conclude that the files are what they purport to be—copies of federal watchlist data.

First, the circumstances of files' seizure corroborate their authenticity. *Vidacak*, 553 F.3d at 350; *see United States v. Elkins*, 885 F.2d 775, 785–86 (11th Cir. 1989) (finding authentication where documents were located in the possession of an arms dealer and there was no evidence of "adulteration or forgery"). In January 2023, files named "nofly.csv" and "selectee.csv" were taken from a server maintained by the regional U.S. airline company CommuteAir. DEX111 ¶ 2. In the wake of the data leak, multiple news agencies reported that CommuteAir confirmed the authenticity of the files.[2] CommuteAir confirmed in deposition testimony that it made direct statements of confirmation to the press. PLX26 at 11:11–13:21, 18:15–19. The Government has not denied the circumstances of the files' seizure. Instead, the Government has corroborated this version of events by admitting that it has reduced subsets of the watchlist to Excel spreadsheets and that it previously exported subsets of the watchlist to small airlines. DEX17 at 151:7–17; *id.* at 45:21–46:12, 293:16–294:7.

Second, the contents and substance of the leaked files further corroborate their authenticity, or that they have "not been altered in any material respect." *United States v. Howard-Arias*, 679 F.2d 363, 366 (4th Cir. 1982) (quotation omitted). The Government confirmed repeatedly that the watchlist contains approximately 1.8 million records, which closely matches the number of unique records in the leaked files. DEX111 ¶ 20; *see, e.g.*, DEX12 at 6–7, DEX14 ¶¶ 6–7, DEX17 at 147:10–14, DEX20 at 139:18–21. Statistical analysis also shows that the age distribution of individuals in the leaked files corresponds to the age distribution of the TSDS, controlling for the four-year lag between the files

[2] Mikael Thalen, *EXCLUSIVE: U.S. airline accidentally exposes 'No Fly List' on unsecured server*, DAILY DOT (Jan. 19, 2023), https://dailydot.com/debug/no-fly-list-us-tsa-unprotected-server-commuteair (cited in DEX111 at 7); *see* Katherine Tangalakis-Lippert, *A bored hacktivist browsing an unsecured airline server stumbled upon national security secrets including the FBI's 'no-fly' list. She says what she found reveals a 'perverse outgrowth of the surveillance state,'* BUSINESS INSIDER (Jan. 25, 2023), https://www.businessinsider.com/hacktivist-finds-us-no-fly-list-reveals-systemic-bias-surveillance-2023-1; Chris Pandolfo, *TSA 'no fly' list leaked after being found on unsecured airline server*, FOX BUSINESS, (Jan. 21, 2023), https://www.foxbusiness.com/politics/tsa-no-fly-list-discovered-unsecured-airline-server-leaked-trans-lesbian-anarchist-kitten-hacker.

and Defendants' production. DEX111 ¶ 19. The naming patterns identified in the leaked files are also supported by the record. In response to discovery requests, Defendants' queried the TSDS for various sets of names associated with Muslims. A query of names derivative of the Prophet Muhammad's name returned 627,078 records, or approximately one-third of the total records in the TSDS. DEX14 ¶ 8 (Query C). Another query of terms including Islam, Ramadan, Hajj, various Muslim religious titles, and derivatives returned another 112,908 records. *Id.* (Query D). By contrast, queries using common names drawn from the broader U.S. population returned only 23,829 records out of approximately 1.8 million. *Id.* (Queries E & F). Statistical analysis led Dr. Huber to conclude that the dramatic disparity between Muslim and non-Muslim signifying names represented by the Government's queries closely matched the naming patterns in the leaked files. See DEX 111 ¶¶ 21–26.

As in *Lopez*, Defendants produce no evidence to rebut the authenticity of the exhibits they oppose. 312 F. Supp. 3d at 1154. Even more, having never actually refuted that the exhibits are authentic versions of the watchlist, Defendants have not "challenged the authenticity of the documents" but merely "attacked plaintiff[s'] failure to comply with methods of authentication set out in [Rule] 901." *Fin. Co. of Am. v. BankAmerica Corp.*, 493 F. Supp. 895, 900 (D. Md. 1980). Accordingly, under the low threshold set by the general rule, the weight of circumstantial evidence heavily favors authentication, and a jury could "reasonably find that the evidence is authentic." *Davis*, 918 F.3d at 402. Plaintiffs thus meet their Rule 56 burden by "explain[ing]" the "admissible form" of Plaintiffs' Exhibits 14 and 15.

Next, even if the leaked lists (PLX14 and 15) were not considered in support of Plaintiffs' cross-motion for summary judgment, Plaintiffs note that the above-documented record is already sufficient to grant each of Plaintiffs' affirmative summary judgment requests.

Finally, even if these exhibits were not considered in support of Plaintiffs' cross-motion, they are still properly considered in opposition to Defendants' summary judgment motion on the same

claims. *See Parker Waichman LLP v. Salas LC*, 320 F. Supp. 3d 327, 335–36 (D.P.R. 2018). The nonmoving party at summary judgment "need not come forward with evidence unless the motion itself is so supported." *Laws. All. for Nuclear Arms Control-Philadelphia Chapter v. Dep't of Energy* (*Lawyers Alliance*), 766 F. Supp. 318, 324 (E.D. Pa. 1991). In *Lawyers Alliance*, the district court considered a similar evidentiary posture: the Government invoked national security privileges to withhold nuclear testing data and then sought summary judgment on the ground that plaintiffs lacked admissible evidence. *Id.* at 323–24. The court rejected that argument, observing that where the Government offers no contrary evidence, plaintiffs are not obligated to refute with more. *Id.* The same principle applies here. The Government does not affirmatively deny the veracity of Plaintiffs' exhibits, nor does it provide the Court with authentic subsets of the watchlist that would contradict Plaintiffs' evidence. Plaintiffs are not obligated to provide more evidence at summary judgment.

### B. The 2013 Watchlisting Guidance

Plaintiffs can similarly show that Plaintiffs' Exhibit 16 (PLX16, "2013 Watchlisting Guidance" or "2013 Guidance) is "admissible as presented" or at least "explain the admissible form that is anticipated." Plaintiffs submitted Exhibit 16, under seal, to show a version of the Government's Watchlisting Guidance published in March 2013 and leaked to *The Intercept* in 2014. PLX16 at pdf2, pdf163.[3] As with the leaked watchlist files, Defendants do not deny nor provide evidence to rebut the authenticity of this document. *See Lopez*, 312 F. Supp. 3d at 1154. Accordingly, the threshold for authenticating the 2013 Guidance is low. *Id.*; *Vidacak*, 553 F.3d at 349.

The detailed content of PLX16, taken together with Defendants' testimony describing the same procedures and decision-making structure, provides ample circumstantial evidence for a reasonable jury to conclude that the document is what it purports to be—a version of the

---

[3] Jeremy Scahill & Ryan Devereaux, *The Secret Government Rulebook for Labeling You a Terrorist*, THE INTERCEPT (Jul. 23, 2014), https://theintercept.com/2014/07/23/blacklisted/.

Government's Watchlisting Guidance. *Vidacak*, 553 F.3d at 350; *Davis*, 918 F.3d at 402. The 2013 Guidance is a 166-page document that describes in extensive detail the structure and operation of the Government's watchlisting enterprise that only the Government would know: its nomination procedures, minimum identifying and derogatory criteria, watchlist subsets, encounter guidance, and various Memoranda of Understanding. *See generally* PLX16. Defendants do not contest any substantive statement of the document, nor do they identify any "evidence of adulteration or forgery" that would undermine its authenticity. *Elkins*, 885 F.2d 775, 786. Defendants implicitly acknowledge the existence of the 2013 Watchlisting Guidance itself, *see, e.g.*, DREX1 at 19 (stating that the document is "no longer in effect"), even if they decline to admit or deny that PLX16 is the authentic version.

As with the leaked lists, Defendants have repeatedly corroborated the watchlisting enterprise as described in PLX16 without ever contradicting it. Defendants do not dispute that the Watchlisting Guidance governs the No Fly List and Selectee List inclusion standards. PLX17 at 61:6–17. They likewise confirmed that the Watchlisting Guidance includes mechanisms allowing agencies to nominate individuals who do not meet the baseline inclusion standards. DEX20 at 184:15–185:7. Testimony further establishes that the Watchlisting Guidance is developed through a consensus-driven process among the WLAC Defendants, "without one single agency making a decision about what goes into it." PLX17 at 32:3–11. In fact, WLAC deliberations themselves center on the Watchlisting Guidance, and all participating agencies in WLAC adhere to the Guidance once adopted. PLX17 at 31:7–18; 201:15–202:8. Defendants' testimony therefore corroborates the substance of PLX16 and sufficiently authenticates the document, even while declining to do so formally.

Regardless, Plaintiffs' motion for summary judgment should be granted even if this exhibit is not considered, because the record independently establishes all relevant facts for Plaintiffs' affirmative summary judgment requests without reliance on PLX16. Finally, as with the previous exhibits, the 2013 Watchlisting Guidance remains properly considered in opposition to Defendants'

motion for summary judgment, regardless of whether the Court relies on it in resolving Plaintiffs' affirmative motion.

## II. Plaintiffs Have Standing to Sue WLAC Defendants

Plaintiffs have standing to sue WLAC Defendants because the injuries they challenge arise directly from watchlist policies set forth in the Watchlisting Guidance—a policy framework that WLAC Defendants collectively draft, revise, and finalize. Article III requires that Plaintiffs show an injury that is concrete and particularized, actual or imminent, fairly traceable to Defendants' conduct, and redressable by a favorable ruling. *Murthy v. Missouri*, 603 U.S. 43, 57 (2024); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Because WLAC Defendants' role is "one-step-removed" from the direct action causing Plaintiffs' injuries, "the plaintiffs must show that the third-party . . . 'will likely react in predictable ways' to the defendants' conduct." *Murthy*, 603 U.S. at 57–58. Plaintiffs have done so. The record shows that WLAC Defendants collectively draft and finalize the Watchlisting Guidance, and participating agencies then implement that Guidance as governing watchlist policy. The resulting actions by downstream agencies are therefore the predictable consequences of WLAC Defendants' policymaking.

### A. Plaintiffs' injuries are traceable to WLAC Defendants.

In its order denying Defendants' motion to dismiss, this Court found that traceability could be established through "WLAC Agency Defendants' role in approving [Watchlisting Guidance] changes," and directed Plaintiffs to show that WLAC Defendants are "involved in the promulgation or enforcement of such policies or otherwise exert[] control over the disputed policy." *El Ali v. Barr*, 473 F. Supp. 3d 479, 501–02 (D. Md. 2020) (citations omitted)). At summary judgment, Parties appear to agree that traceability exists if a defendant's "action has 'determinative or coercive effect' upon the decisionmaker." Dkt. 363 at 2 (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

Defendants' objection to traceability hinges on a disagreement with Plaintiffs about whether

WLAC "approves" the Watchlisting Guidance. Defendants attempt to characterize WLAC merely "recommending" changes to watchlisting policy. *Id.* (citing DEX 1 ¶¶ 78, 80). But the record shows that WLAC Defendants draft proposed language, revise, and finalize the Watchlisting Guidance through a consensus-driven process, after which the participating agencies agree to implement the finalized Watchlisting Guidance. *See* Dkt. 343-1 at 18–19; *infra* pp. 8–9. In practice, the Watchlisting Guidance becomes operative policy precisely because WLAC agencies jointly produce it and commit to follow it. *Id.* That process constitutes policymaking authority sufficient to establish traceability.

Narrowing in on the disagreement, Defendants are using the term "approve" more narrowly than standing requires. Defendants do not dispute that, while the National Security Council may issue a final Guidance, it is WLAC Defendants who "collaborate, draft, review, edit, and unanimously approve the Guidance" and deliver a finalized version to the National Security Council. Dkt. 359 at 40–41 (citing DEX23 at 26, 27, 31, 33, 35, 37, 38, 40, 42, 44, 46, 50; Dkt. 343-1 at 17–19). Defendants do not dispute that the National Security Council has never rejected a WLAC submission. Dkt 359 at 41 (citing PLX17 at 31:10–18; 34:17–20). This undisputed record demonstrates that the final approval step does not break the causal chain: when WLAC Defendants finalize the Watchlisting Guidance, through their "consensus-driven" process, the resulting policy *always* becomes operative government policy, which participating agencies are expected to follow. *El Ali*, 473 F. Supp. 3d at 501); Dkt. 343–1 at 19; *see Bennett*, 520 U.S. at 169.

In demonstrating that the final Watchlist Guidance decisionmaker "will likely react in predictable ways' to [WLAC Defendants'] conduct," Plaintiffs have established traceability to those Defendants. *Murthy*, 603 U.S. at 57–58.

### B. Plaintiffs' injuries are redressable through WLAC Defendants

"Traceability and redressability are best addressed jointly as 'they rise or fall together.'" *El Ali*, 473 F. Supp. 3d at 501 (quoting *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 323 n.1 (4th

Cir. 2002))). Plaintiffs have requested declaratory judgment and an "injunction that requires Defendants to remedy the constitutional and statutory violations identified above." Dkt. 48 at 263–64. Because the Watchlisting Guidance establishes the policies governing watchlist inclusion standards, information sharing, and operational treatment of listees, the challenged constitutional violations arise directly from those policies. Any declaratory or injunctive relief requiring Defendants to remedy those violations would therefore require revision of the Watchlisting Guidance itself—a task that would fall squarely on the WLAC Defendants for drafting, revising, and finalizing.

The record confirms that the Watchlisting Guidance is the central document governing the watchlisting enterprise. Defendants do not dispute that agencies are expected to follow it. Dkt 359 at 41 (citing Dkt. 343-1 at 43; PLX17 at 31:10–18). Nor do Defendants dispute that the Watchlisting Guidance sets the inclusion standards for the consolidated watchlist, governs the information-sharing practices that render watchlist status effectively permanent, establishes the "one-time waiver" program under the No Fly List, and standardizes how agencies respond to listees. *Id.* at 2–6 (citing PLX17 at 31:2–18, 32:9; PLX16 at 50; DEX12 at 18–19, 21; DEX17 at 319:4–11; DEX1 n.6).

The injuries Plaintiffs experienced are the predictable downstream consequences of the Watchlisting Guidance. No Fly List Plaintiffs' substantive due process rights are violated where the No Fly List is over-inclusive of individuals engaged lawful conduct and over-restrictive in the meting out of air travel waivers—both of which are policies under the Watchlisting Guidance. Dkt. 359 at 52–54. All No Fly List and TSDS Plaintiffs' procedural due process rights are violated in part by an inclusion standard that is too secretive and open-ended for them to meaningfully rebut—policy choices that are again represented in the Watchlisting Guidance. *Id.* at 78, 83–84. Plaintiffs' equal protection rights are evidenced by the overrepresentation of Muslims on the watchlist, which Plaintiffs allege to stem in part from discriminatory inclusion standards or improper checks within the nomination process—both of which fall under the Watchlisting Guidance. *Id.* at 103–10. Plaintiffs'

Fourth Amendment rights are violated by non-routine, forensic phone searches that are not based on individualized reasonable suspicion of criminal activity—again governed in part by the TSDS inclusion standard and the Watchlisting Guidance. *Id.* at 113–16. Plaintiffs' Fifth Amendment rights are violated by sanctions applied when Plaintiffs refuse to provide self-incriminating testimony, which is in part reasonably incriminating because of the broad information sharing practices of the watchlisting enterprise—controlled by the Watchlisting Guidance. *Id.* at 117–19. The interrogation of Plaintiffs' Muslim faith, in violation of RFRA, is conducted pursuant to the permissible use of religion under the TSDS inclusion standard. *Id.* at 124–25. The expungement of Plaintiffs' records may be necessary to remedy each of these violations and may also be controlled by the information sharing elements of the Watchlisting Guidance. Dkt. 359 at 41.

As the above demonstrates, the WLAC Defendants have a role to play in any injunction "remedy[ing] the constitutional and statutory violations" that arise from the Watchlisting Guidance. Dkt. 48 at 263–64. Plaintiffs' claims are therefore redressable through WLAC Defendants.

## III. Plaintiffs Have Standing for All Claims.

All Plaintiffs have and retain standing to bring each of their claims. Defendants have alternatively: (1) failed to bring new arguments beyond those addressed by Plaintiffs in the cross-motion for summary judgment; (2) improperly sought to address substantive claims as standing claims; or (3) failed to persuade that Plaintiffs will not be re-listed on the TSDS or No Fly List.

### A. All Plaintiffs have standing for their claims.

Defendants again claim that certain Plaintiffs' lack standing to bring TSDS or No Fly List claims if Plaintiffs were removed from the relevant list before the operative complaint was filed. These arguments have been addressed and are not persuasive.

First, Defendants have not identified any TSDS Plaintiff that was removed from the watchlist prior to the operative complaint. Even if any Plaintiff was removed from the TSDS prior to the

complaint, *ex parte* evidence must demonstrate that Plaintiff's subsequent or ongoing injuries on the record were not "fairly traceable" in any part to TSDS status. *See Long v. Bondi*, 151 F.4th 503, 515 (4th Cir. 2025) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

Defendants assert that certain No Fly List Plaintiffs lacked standing because they were "able to fly" prior to the complaint, but boarding a flight does not establish that an individual was removed from the No Fly List. As the record shows, the Government permits individuals who remain on the No Fly List to travel under special authorization through the No Fly List waiver program. *See, e.g.*, DEX17 at 31:9–17. As the record further demonstrates, watchlist placement carries continuing effects—including stigma, enhanced screening, and collateral consequences in employment and travel contexts—that persist even after an individual is removed from the No Fly List. Dkt. 359 at 46.

Defendants attack standing for Bosnic and Doe on the substantive merits of their "stigma-plus" procedural due process claims. This argument is misplaced. Plaintiffs have demonstrated "plus" actions that are "fairly traceable" to the Government, because the "plus" action "relied at least in part on TSC's Watchlist determination" or was mandated. *Long*, 151 F.4th at 515, 517. Whether Plaintiffs' "stigma-plus" claims satisfy the first prong of *Mathews*, whether a "plus" claim must be mandated by the Government, and whether these actions *are* mandated, are questions properly addressed on the merits under the first prong of *Mathews* analysis. *See, e.g.*, *Elhady v. Kable*, 993 F.3d 208, 225–28 (4th Cir. 2021); *Paul v. Davis*, 424 U.S. 693, 705–12 (1976). Indeed, the Government makes these arguments again in the "stigma-plus" section, which is appropriately where Plaintiffs respond.

**B. Plaintiffs' claims are not moot.**

Defendants cannot carry their "formidable burden" to show that Plaintiffs' claims are moot. Under the voluntary cessation doctrine, a case becomes moot only if the Government demonstrates that the challenged conduct cannot reasonably be expected to recur. *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024); *Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc.*, 528 U.S. 167, 189

(2000). The record here does not come close to satisfying that standard.

Defendants offer three non-classified reasons why Plaintiffs' re-inclusion on the TSDS or No Fly List allegedly will not occur: (1) multi-layered review, (2) constitutional activity or characteristics are not derogatory, and (3) removals are attributable to litigation strategy. Dkt 363 at 8. These cannot carry *Fikre*'s "formidable burden" to establish mootness. *Fikre*, 601 U.S. at 241. Decisively, the Government only claims that the non-classified record is sufficient "because there were no unlawful listings to begin with." Dkt. 363 at 8. Unless the Government contends that Plaintiffs were never placed on the TSDS or No Fly List at all, its argument necessarily requires the Court to decide whether Plaintiffs' listings were lawful under the relevant substantive standards. Mootness cannot be established by resolving the merits of the challenged conduct. Plaintiffs' claims therefore cannot be moot.

Moreover, the Government's non-classified reasons are unpersuasive. The Government does not claim that it began implementing "multiple layers of review" *after* Plaintiffs' inclusion, or that it only now commits to base inclusion "solely on constitutionally protected activity or characteristics." *Id.* These Government claims undoubtedly pre-date Plaintiffs' individual watchlist inclusions and thus cannot provide reassurance that Plaintiffs will not be re-included. The same chronological test would hold true for any information submitted *ex parte*. Finally, the Government may object to allegations of strategic removal from the watchlist, but Plaintiffs merely note that the record of previous cases in which government defendants removed plaintiffs from watchlists during the pendency of litigation is suggestive of a practice that would not satisfy the mootness standard from *Fikre*. *Contra* Dkt. 363 at 8 n.3.

## IV. The Government Violates Plaintiffs' Substantive Due Process Rights.

"Freedom of movement is basic to our scheme of values." *Kent v. Dulles*, 357 U.S. 116, 126 (1958). The No Fly List unreasonably burdens Plaintiffs' freedom of movement without narrowly

tailoring its effect and thus violates Plaintiffs' substantive due process rights. In response, Defendants' rely on non-binding authority and *Elhady*, a case that addressed only enhanced airport screening—not the categorical denial of air travel at issue here—to control this Court's decision. Defendants alternatively argue that No Fly List Plaintiffs' rights have not been violated because they have flown—an argument that mirrors Defendants' failed mootness theory and underscores that the Government itself does not treat the No Fly List as necessary to aviation security.

As an initial matter, Defendants incorrectly characterize the Plaintiffs' burden under a facial challenge. Defendants argue that No Fly List Plaintiffs' facial challenge should fail because the watchlist includes "aliens without ties to the United States," but the scope of the No Fly List's effect is travel in and through the United States. "The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 418 (2015) (citation omitted). Where Defendants contend that Plaintiffs must prove that there are "*no* circumstances under which Defendants could bar *anybody* from traveling," they misstate the governing standard. Courts do not invalidate laws based on speculation about "hypothetical" or "imaginary" cases; instead, the inquiry asks whether the law has a "plainly legitimate sweep." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449–50 (2008) (citations omitted). Plaintiffs show that the No Fly List lacks such a legitimate sweep because it categorically prohibits travel for individuals engaged in lawful conduct without individualized suspicion of criminal activity. At minimum, "a statute may . . . be declared invalid to the extent that it reaches too far." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)).

### A. The No Fly List interferes with Plaintiffs' Fundamental Right of Travel.

The Fifth Amendment protects those unenumerated rights "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *See Mirabelli v. Bonta*, No.

25A810, 2026 WL 575049 (U.S. Mar. 2, 2026) (Barrett, J., concurring) (quoting *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 231 (2022)); *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). The Supreme Court has recognized that the freedom of movement "across frontiers in either direction, and inside frontiers as well," is "basic to our scheme of values" and "included within the word 'liberty' in the Fifth Amendment." *Kent*, 357 U.S. at 126, 129. The fundamental freedom of movement "require[s] that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969).

The No Fly List represents such a burden on Plaintiffs. The program's *per se* ban on air travel bars Plaintiffs' ability to reach certain destinations or to engage in modern travel at all. This ban, which has no lineage to other rules or regulations governing ports of entry, implicates Plaintiffs' freedom of movement in a manner that is neither fully international nor fully interstate, but both. *Mohamed v. Holder*, 266 F.Supp.3d 868, 878 (E.D. Va. 2017). No Fly List Plaintiffs have provided considerable legal and historical analysis demonstrating that the No Fly List imposes a modern analogue to historical restrictions on movement long recognized as constitutionally suspect. Dkt. 359 at 49–50; *see also* Dkt. 52 at 26–33. Defendants do not rebut Plaintiffs' historical analysis.

Citing inapposite or non-binding authority, Defendants argue that substantive due process inquiries have been foreclosed. Not so. The *Elhady* court did not rule on the No Fly List nor on *any* substantive due process claim. *Elhady*, 993 F.3d at 219–220. The Fourth Circuit made clear that those plaintiffs were "not on the No Fly List" and "only claim that they are subject to enhanced screening in airports before boarding flights." *Id.* at 220. Here, enhanced screening delays are not the basis of No Fly List Plaintiffs' substantive due process claims. Instead, Plaintiffs challenge the Government's categorical prohibition on air travel preventing Plaintiffs from boarding flights altogether.

Defendants provide two primary rebuttals of No Fly List Plaintiffs' claim that the No Fly List burdens fundamental right to travel: (1) that Plaintiffs assert only a right to travel by airplane; and (2) that Plaintiffs were eventually able to fly despite their No Fly List status. Neither argument should control the Court's analysis.

First, No Fly List Plaintiffs do not assert a mere right to travel "by airplane," even as Defendants cite no controlling authority for that narrow question. The effect on Plaintiffs' right to travel is far more substantial. "[P]lacement on the No Fly List does far more than 'significantly discourage' designees from traveling; it often absolutely bars them from so doing and effectively precludes them from engaging in a wide range of constitutionally protected activities." *Mohamed v. Holder*, 266 F. Supp. 3d 868, 880 (E.D. Va. 2017). The No Fly List prevents entry to, and exit from, the United States from overseas locations. *Abu Irshaid v. Garland*, No. 1:24-CV-01405, 2025 WL 756544, at *13 (E.D. Va. March 10, 2025) (finding a "weeks-long nautical journey" is not a reasonable alternative to international flight). The No Fly List also "limits [designees'] practical ability" to travel domestically within the United States under the same logic. *Mohamed*, 266 F. Supp. 3d at 879. To illustrate: the distance from Honolulu, Hawaii, to Los Angeles, California is approximately 2,500 miles—about six hours to travel by airplane, or five to seven *days* by cruise line. The distance between Los Angeles and New York City is about the same—five to six hours by airplane, or three *days* by car or train.[4] The No Fly List thus denies listees a right to travel that "encompass[es] the customary modes of transport of the present day." *Abu Irshaid*, No. 1:24-CV-01405, 2025 WL 756544, at *13.

Second, the burden of the No Fly List on Plaintiffs has not been "minimal" simply because Plaintiffs were able to fly again at some later point. Plaintiffs have discussed the "total denial of [their]

---

[4] Geographic distances calculated using Google Earth. *See* https://earth.google.com (last visited Mar. 13, 2026). Air travel and drive times were calculated using Google Maps. *See* https://maps.google.com (last visited Mar. 13, 2026). For boat travel, the fastest option is by cruise line. *See* Richard Hughes, *Cruise from Los Angeles to Hawaii: Duration, Activities, & Maximize Your Experience*, CRUISE DISCOVER (Nov. 21, 2024), https://cruisediscover.com/how-long-is-a-cruise-from-los-angeles-to-hawaii/.

fundamental right to travel" at length and in detail. Dkt. 359 at 7–9, 50–51. In response, Defendants mischaracterize the record of each Plaintiffs' air travel experiences and cite to other inapposite travel by car or train. After Bosnic was denied a flight home to the U.S. from Bosnia, he was stranded abroad for over a month before the Government issued him a one-time flight waiver, and later flights were only permitted after he was removed from the No Fly List a few months later. *Id.* at 9. Doe documented four denials of international flights in 2017, 2018, 2020, and 2023. *Id.* at 7–8. Doe's travel by other means of transportation did not replace the travel he was denied. *Id.*. *Contra* Dkt. 363 at 31. After Mohallim was denied a flight home from Qatar, he was stranded abroad for over a month before the Government issued him a one-time flight waiver, during which time the Government sought to interrogate him in exchange for a flight home. Dkt. 359 at 8. He did not fly again until he received confirmation of removal from the No Fly List, despite identifying several U.S. destinations he sought to visit. *Id.*; *see, e.g.*, DEX67 at 162:9–163:1 Sehwail was denied boarding to Jordan, a destination he could not reach "by car," and denied boarding on three flights from Miami to Chicago, forcing him to complete the trip by driving approximately sixteen hours. *Id.* at 8–9. These experiences demonstrate the practical operation of the No Fly List: individuals placed on the list are categorically barred from commercial air travel, frequently stranded abroad without notice, frequently unable to take even domestic trips within the U.S., and permitted to return to the U.S. only via discretionary waivers.

At bottom, Defendants suggest that removal from the No Fly List, which lifts the total ban, is evidence that the No Fly List is not restrictive. That argument merely repackages Defendants' failed mootness theory. Plaintiffs' claims are not moot. *Supra* Part III.B. Because "[t]he effect of the No Fly List on the fundamental right of interstate travel is at least as great as other effects on fundamental rights found to constitute significant interference," Plaintiffs have established a substantive due process burden that triggers strict scrutiny. *Mohamed*, 266 F.3d at 880.

**B. The No Fly List is not narrowly tailored.**

The No Fly List is not "specifically designed and narrowly framed to accomplish" a compelling government interest. *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003). The record instead shows a program that overwhelmingly targets Muslims without employing meaningful suspicion standards or procedural guardrails. The No Fly List is underinclusive of known national security threats by virtue of its focus on Muslims, overinclusive of peaceful individuals for whom no individualized suspicion of criminal activity exists, and unnecessary to achieve civil aviation security.

**1. The waiver program is the exception that swallows the whole.**

Through the Government's own testimony and practice, the record shows that the No Fly List is not necessary to achieve the Government's national security objectives. The waiver program illustrates that obvious "workable . . . alternatives" are available. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013) (citation omitted).

The watchlisting enterprise as whole, much less the No Fly List, is "never" the only layer of security or response to a perceived threat. DEX17 at 188:9–18; DEX18 at 188:8–11. Unsurprisingly then, the Government permits individuals placed on the No Fly List to fly through its waiver program. DEX17 at 312:17–21 (allowing waivers for citizens overseas who were not "aware about their No Fly Status"). That practice directly undermines the Government's claim that categorical flight bans are necessary to protect aviation security. If individuals whom the Government has designated as too dangerous to board aircraft can nevertheless be permitted to fly under a waiver, the categorical prohibition imposed by the No Fly List cannot be narrowly tailored. DEX17 at 342:3–7.

In response, Defendants claim that these waivers reflect "rare and extraordinary circumstances" and require "extraordinary security measures." But the waivers were not rare in this case—both Plaintiffs who discovered their No Fly List status overseas were granted waivers, albeit only after remaining stranded for months. *Supra* Part IV.A (Bosnic and Mohallim). The Government's

routine use of one-time waivers allowing listed individuals to board aircraft demonstrates that the categorical flight ban is not necessary to advance aviation security.

The Government also testified that it deploys mitigation measures whenever a TSDS listee flies, yet it does not explain why the mitigation measures accompanying No Fly List waivers would impose materially greater costs. *See* DEX5 ¶¶ 14, 33–73; DEX17 at 307:11, 316:13. Plaintiffs have also shown, and Defendants do not dispute, that the Government increases its own costs by failing to notify individuals of their No Fly List status before travel, thereby creating the circumstances that trigger the waiver process. *See* Dkt. 359 at 81.

**2. Over-inclusion is a clear and solvable tailoring problem.**

The No Fly List also "sweep[s] too broadly" without a "substantially relevant correlation between the government interest asserted and the State's efforts." *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 795 (1978). The record shows that the Government does not require individualized suspicion of criminal wrongdoing before placing an individual on the No Fly List. Dkt. 359 at 3 (citing DEX1 ¶ 21; PLX16 at 52). The record also shows the predictable consequence of that sweeping standard: an enormous watchlisting enterprise that disproportionately targets Muslims like Plaintiffs, and thus cannot be narrowly tailored to the Government's asserted security interests. *Id.* at 6–7.

In response, Defendants offer two unpersuasive arguments. First, Defendants claim that Plaintiffs are asking the Government to "exclude from the No Fly List those who [it] knows are planning to commit an act of terrorism just because they have not yet been charged with an offense." Dkt. 363 at 33. That mischaracterizes Plaintiffs' position and the governing standard. Individualized reasonable suspicion of criminal activity does not require a suspect be formally charged before preventive measures may be taken. *See, e.g., Navarette v. California*, 572 U.S. 393, 396 (2014). Plaintiffs argue that applying a well-worn reasonable suspicion standard would narrow the scope of the No Fly List and align it more closely with the Government's asserted security interests, and Defendants do

not rebut the argument on those terms. Indeed, a person who is reasonably suspected of doing something criminal can be temporarily detained and, if the investigation confirms the suspicion, arrested. Second, Defendants claim that the Government "need not let someone fly" based on the stated purpose of their travel. Dkt. 363 at 33. Yet the Government's waiver permits exactly that result by allowing listed individuals to fly when certain conditions are satisfied.

The No Fly List Plaintiffs before the Court are peaceful U.S. citizens who were never reasonably and individually suspected of a crime associated with the Government's national security interests and therefore should not have been placed on the No Fly List or denied boarding. Their experiences illustrate that the Government's current regime imposes categorical travel restrictions without the individualized suspicion necessary to narrowly tailoring those restrictions to its asserted security interests. The existing No Fly List is thus incompatible with substantive due process.

## V. The Government Violated Plaintiffs' Procedural Due Process Rights.

The Government has deprived Plaintiffs of liberty and property interests through its use of the TSDS watchlist and No Fly List and is therefore constrained by the Fifth Amendment to provide Plaintiffs with procedural due process. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Once a protected interest is implicated, the Constitution requires, at minimum, notice and a meaningful opportunity to be heard before a neutral decisionmaker. *D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016). The Government nevertheless maintains that it cannot provide TSDS Plaintiffs with such process. Under the No Fly List, appropriate "judicial balancing" requires that the Government provide procedural safeguards to ensure fairness and timeliness. *Hamdi v. Rumsfeld*, 542 U.S. 507, 528–29 (2004).

### A. TSDS Plaintiffs

The Government affirmatively argues that it cannot provide basic due process to TSDS Plaintiffs, in the form of notice or a meaningful hearing, and yet it continues to impose burdens on these Plaintiffs' liberty interests. On this basis alone, and before even reaching the specific contours

of the procedures required, the Court should find that the Government's position is incompatible with the Fifth Amendment. In completing the *Mathews* analysis, the Court should further conclude that TSDS Plaintiffs are entitled to *timely* post-determination notice and a hearing before a neutral arbiter, with a meaningful opportunity to respond to the Government's evidence or factual assertions and a clear standard against which to make their defensive case.

**1. TSDS Plaintiffs proved liberty interests implicated due process.**

TSDS Plaintiffs proved both facial and as-applied infringements on their liberty interests in travel—particularly international travel—interests that are "objectively, deeply rooted in this Nation's history and tradition." *Kerry v. Din*, 576 U.S. 86, 94 (2015). In response, the Government relies heavily on *Elhady* while minimizing the record developed here and the specific factual distinctions presented by these Plaintiffs.

Under their facial challenge, TSDS Plaintiffs acknowledge that the "due process inquiry and mandated procedures must be directed at the 'generality of cases, not the rare exceptions'" or "outlier experiences" as *Elhady* instructs. 993 F.3d at 217–18. In *Elhady*, the court applied that standard to conclude that the plaintiffs' delays reflected screening experiences that could, at times, occur "randomly" to non-watchlist travelers. *Id.* at 221. In sharp contrast, Plaintiffs proved that individuals placed on the TSDS Selectee list are subjected to predictable, repeat, and category-based treatment distinct from non-watchlist travelers. Dkt. 359 at 59–60. Plaintiffs proved this categorical difference in treatment across a host of quantitative and qualitative factors that burden their liberty interest in travel. *Id.* ("I wish you could take a flight with me one time from here to DC . . . and see the humiliation I have to go through."); *cf. Fikre v. Wray*, No. 3:13-CV-00899, 2020 WL 4677516, at *8–9 (D. Or. Aug. 12, 2020), *vacated and remanded on other grounds sub nom. Fikre v. Fed. Bureau of Investigation*, 35 F.4th 762 (9th Cir. 2022), *aff'd*, 601 U.S. 234 (2024). The record reflects consistent, systematic burdens tied to Selectee status across multiple trips and contexts. This evidence concerns the "generality of cases" for

Selectee listees—not anecdotal outliers—and therefore falls squarely within the *Mathews* framework.

The TSDS Plaintiffs' as-applied challenge is not foreclosed by *Elhady*. An as-applied challenge must be evaluated "based on a developed factual record and the application . . . to a specific person." *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009). In *Elhady,* the court addressed a facial challenge and expressly analyzed the TSDS under the "generality of cases" standard. *Elhady*, 993 F.3d at 217–18. Applying that standard, the court concluded that the plaintiffs' delays did not amount to a constitutional deprivation. *Id.* at 221. Only after reaching that conclusion did the court address arguments concerning subjective deterrence and alternative modes of travel. *Id.* at 221–22.[5]

Here, Defendants do not meaningfully dispute the record of TSDS Plaintiffs' systematic burdens, instead relying on *Elhady*'s conclusions under a facial analysis. Dkt. 363 at 9–11. Because TSDS Plaintiffs have shown that they individually experienced significant and recurring burdens under the watchlist, as applied to them, they have demonstrated both objective and subjective deterrence. *Soto-Lopez*, 476 U.S. at 903; *cf. Mohamed v. Holder*, 266 F.Supp.3d 868, 875 (E.D. Va. 2017). Defendants likewise do not contest that these burdens occurred during international as well as domestic travel, and that Plaintiffs have reported missed flights as a result of the Government's treatment. These facts cannot be characterized as mere outliers when the as-applied analysis must focus on the "specific person." *Herring*, 570 F.3d at 172.

**2. TSDS Plaintiffs proved "stigma-plus" injuries implicating due process.**

TSDS status carries significant reputational consequences by marking an individual as a "suspected terrorist (or, at least, a dangerous person)." *Fikre*, 2020 WL 4677516, at *9; *accord Fernandez v. RentGrow, Inc.*, 116 F.4th 288 (4th Cir. 2024). Plaintiffs Abdurrashid, Bosnic, E. Paryavi, Sulayman, and Thadi have demonstrated both public disclosure of their TSDS status and accompanying "plus"

[5] As they are not decisive to the ruling in *Elhady*, these latter statements are fairly considered dicta.

injuries sufficient to establish a "stigma-plus" procedural due process claim under *Paul v. Davis*, 424 U.S. 693, 710-12 (1976). As *Elhady* explains, a stigma-plus claim fails where government action could have occurred for a "whole host of reasons." *Elhady*, 993 F.3d at 216. Here, by contrast, the record demonstrates that TSDS status was the operative and reasonable explanation for the subsequent "plus" actions. Defendants' remaining arguments do not alter that conclusion.

**a. Plaintiffs have proved public disclosure of their status.**

Plaintiffs have proved "public disclosure" of their TSDS status through: (1) intra- and intergovernmental dissemination beyond purely "law enforcement purposes," (2) systematic, repeat actions at airports and borders that reasonably signal watchlist designation to travel companions and observers, and (3) "plus" actions that place employers or prospective employers on notice. In response, Defendants rely on fact findings in another case to their detriment.

First, the Fourth Circuit's determination in *Elhady* that the government did not disclose TSDS status through intragovernmental communication "for law enforcement purposes" does not require this court to conclude that all of the Government's communications fall within that narrow category. That decision, for example, said nothing of consequential information sharing with foreign governments. *Compare* 993 F.3d at 225–26 (addressing domestic intragovernmental sharing), *with* Dkt. 359 at 22, 71 (detailing dissemination involving foreign governments).

Second, all "stigma-plus" Plaintiffs show a record of systematic and repeat public treatment and humiliation in front of people they know personally and regularly travel with—their employers, friends, family, and community. Dkt. 359 at 61–62. Contrary to a situation where a "whole host of reasons" could explain the treatment at issue, *Elhady*, 993 F.3d at 216, these travel companions witnessed recurring events over time, reducing the likelihood that the Government's actions could be reasonably be viewed as random or isolated. The Government's conduct in these repeated public settings thus places third parties on notice of Plaintiffs' TSDS status. On this developed record, the

Court need not reach the same factual conclusion as in *Elhady*.

Third and finally, Plaintiffs Abdurrashid, Bosnic, Sulayman, and Thadi demonstrated that the Government's "plus" actions have placed their employers or prospective employers on notice of their watchlist status. *Elhady*, 993 F.3d at 226. For example, Sulayman's work colleagues repeatedly witnessed his treatment at airports. See Dkt. 359 at 62. These Plaintiffs also presented evidence that TSDS status was the operative and reasonable explanation for "plus" actions taken by the Government in proximity to their employment. Bosnic's TWIC denial bears directly on his employment opportunities and intersects with statutory security screening requirements. See Dkt. 359 at 64–65. Abdurrashid's security clearance denial resulted in his demotion and eventual retirement after decades of holding such clearances. *Id.* at 67. The denial of military base access to Sulayman and Thadi, while discretionary, was sufficiently unusual on this record to support an inference of watchlist causation. *Id.* at 67–68.

Defendants additionally argue that Plaintiffs "give[] the game away" by asserting that disclosure occurred through constructive notice rather than "in fact," Dkt. 363 at 14, but this is a distinction without a difference. *Elhady* explains that "stigma-plus" disclosure fails where government action could have occurred for a "whole host of reasons." 993 F.3d at 227. Where, however, the record supports the conclusion that a "plus" action reasonably points to watchlist status as the operative cause, the disclosure element is satisfied.

**b. Plaintiffs have demonstrated "plus" factors accompanying TSDS status, disclosure, or both.**

Plaintiffs have demonstrated "plus" factors that accompany TSDS status. *Elhady*, 993 F.3d at 226. In response, Defendants emphasize frameworks found in loss-of-employment "stigma-plus" cases that Plaintiffs' claims satisfy as well.

When a plaintiff alleges the government made stigmatizing information available to prospective employers, plaintiffs must show more than the mere existence of derogatory information;

they must demonstrate that it was 'likely to be inspected by prospective employers.'" *Elhady*, 993 F.3d at 226. (quoting *Sciolino v. City of Newport News*, 480 F.3d 642, 649 (4th Cir. 2007)). The *Elhady* court thus concluded that the plaintiffs had not identified specific instances where private employers relied on TSDS status in making employment decisions. *Id.*

Here, at least four Plaintiffs (Abdurrashid, Bosnic, Sulayman, and Thadi) show that "plus" consequences affecting their employment were tied to watchlist-related determinations. *Id.*; *see* Dkt. 359 at 64–68. Abdurrashid's security clearance denial resulted in his demotion. *Id.* at 62. Bosnic's TWIC denial resulted in lost business opportunities. *Id.* at 64–65. On record, these claims fall within the framework described in *Elhady* and *Sciolino*.

Outside of the loss-of-employment context, Plaintiffs must show a "plus" factor that accompanies the reputational injury, not necessarily one that follows from disclosure. *Elhady*, 993 F.3d at 226. *Elhady* does not hold that all stigma-plus claims require the same employment-based showing discussed in *Sciolino*. Instructive for the court's analysis of non-employment stigma-plus claims is *Doe*, cited by this court in its opinion at the motion to dismiss. Dkt. 73 at 34 n.14 (citing *Doe v. Dep't of Public Safety ex rel. Lee*, 271 F.3d 38, 51 (2d Cir. 2001) *rev'd on other grounds sub nom. Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003).[6] In *Doe*, the Second Circuit recognized a "plus" injury based on the "extensive and onerous" burdens of registration—burdens that flowed from state-imposed obligations rather than solely from the reputational harm caused by disclosure. *Doe*, 271 F.3d at 56–57.

Similar to the "onerous" burdens in *Doe*, Plaintiffs presented evidence of burdensome "plus" consequences that reasonably trace to TSDS status. *See* Dkt. 359 at 64–68. Plaintiffs also demonstrated reputational injury stemming from the Government's repeated public actions at airports and borders

[6] *Doe* was reversed in the Supreme Court on the basis that the law required publication of the names of all persons convicted of the relevant crimes—information that could not itself be considered be derogatory. *See Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. at 5–7. Plaintiffs have no such relevant convictions.

that amount to public disclosure. *Id.* at 61–62.

**c. There is no "mandate" requirement where the "plus" factor already contains the government action**

Both sides agree that "a valid stigma-plus claim needs 'government action that alter[s] or extinguishe[s] one of [a plaintiff's] legal rights.'" Dkt. 363 at 13 (quoting *Elhady*, 993 F.3d at 225 (internal quotations omitted). The parties dispute whether the government action must separately "mandate" an infringement of the Plaintiffs' liberty or property. *Id.* Plaintiffs have explained that the "mandate" language in *Elhady* appears in the context of actions by private actors.

*Elhady* explained that "the government's act of including names in the TSDB does not mandate *that private entities deny people such privileges*." 993 F.3d at 227 (citing *Abdi v. Wray*, 942 F.3d 1019, 1034 (10th Cir. 2019) (emphasis added). That discussion addressed private actors. *Elhady* did not impose an additional "mandate" requirement where the "plus" factor is direct government action.

Indeed, because a "stigma-plus" claim requires government action, *see id.* at 225, a claim arising from a private entity must be accompanied by an allegation that the government compelled or required that entity to act. But a "plus" factor arising from direct government action already contains the "government action that alters or extinguishes one of a plaintiff's legal rights." Thus, where a plaintiff pleaded a "plus" factor arising from government action (denial of HME and TWIC), the Fourth Circuit found that the claim plausibly alleged that "[the government] relied at least in part on TSC's Watchlist determination in deciding that [he] posed a security threat warranting denial of his TWIC . . . application[]." *Long*, 151 F.4th at 517 (4th Cir. 2025).

**d. Plaintiffs have no obligation to challenge their "plus"-related interests directly when the cause is TSDS status.**

Defendants argue that Plaintiffs either lack a cognizable "right" in the "plus" factor or must challenge those discretionary actions in separate proceedings. *See* Dkt. 363 at 15–16. These arguments do not defeat Plaintiffs' stigma-plus claims.

First, the relevant constitutional right at issue is the right to procedural due process. The "plus" injuries Plaintiffs claim are injuries to their liberty or property *interest*s. *Din*, 576 U.S. at 91–92. Bosnic and E. Paryavi assert property interests in TWIC and Global Entry as types of "permits or licenses." *Elhady*, 993 F.3d at 227; *Long*, 151 F.4th at 516 ("TSA's effective denial of Long's applications for these commercially valuable licenses inflicts a concrete and particularized injury on him in his work as a truck driver."). Abdurrashid, Sulayman, and Thadi assert liberty or employment-related interests in security clearances and military base access insofar as those determinations alter their "legal status." *See Elhady*, 993 F.3d at 225–26.

Second, as in *Long*, Plaintiffs do not directly challenge the determinations immediately leading to the "plus" actions. Instead, they challenge the Government's decision to place them on the Watchlist in the first place and allege that one of the harms flowing from that placement is the resulting "plus" injury. 151 F.4th at 517. Just as the Fourth Circuit concluded in *Long*, this Court can adjudicate Plaintiffs' claims and redress the alleged Watchlist injury without reviewing the merits of the separate discretionary decisions. *Id.*

**3. TSDS Plaintiffs' "stigma-minus" injuries require due process.**

Defendants claim that Plaintiffs' "stigma minus" theory is not properly before the Court absent an amended complaint. But Plaintiffs are not adding new counts or expanding the scope of Count I, they invoke the "stigma minus" theory as a theory supporting Defendants' obligation to provide procedural due process for the deprivation of protected interests. If this theory affects the analysis, it simply focuses the Court on the property-interest framework reflected in *Long*.

Plaintiffs Bosnic and E. Paryavi have cognizable property interests in TWIC and Global Entry, respectively, as "licenses or permits" that are essential to livelihood in Bosnic's case, or at least implicate livelihood in E. Paryavi's case. *Elhady*, 993 F.3d at 227; *Long*, 151 F.4th at 516; *cf. Bell v. Burson*, 402 U.S. 535, 539 (1971); *Mackey v. Montrym,* 443 U.S. 1, 10 (1979). They presented evidence that (1)

watchlist status was the operative and reasonable explanation for the denial of their licenses or credentials; and (2) the applicable statutory and regulatory schemes incorporate watchlist-related determinations in the credentialing process, *see* Dkt. 359 at 64–66, 82; *Long*, 151 F.4th at 517.

As in their "stigma-plus" claims, *supra* Part V.A.2, and as in *Long*, the Plaintiffs need not challenge the credential denials as standalone administrative actions or separately plead that each denial is independently unconstitutional. It is sufficient that Plaintiffs challenge watchlist placement as the underlying cause and seek constitutionally guaranteed process due before the Government imposes the watchlist-based deprivation.

#### 4. TSDS Plaintiffs do not receive constitutionally mandated due process

Upon a showing that procedural due process is constitutionally required, Defendants contend that DHS TRIP provides "constitutionally adequate procedures" to TSDS Plaintiffs. Dkt. 363 at 20. Yet the Government simultaneously maintains that it cannot and should not provide Plaintiffs with notice of the factual basis for their designation or a meaningful hearing. *Id.* at 21–22. DHS TRIP provides neither. Without notice of reasons or an opportunity to contest the Government's asserted facts before a neutral decisionmaker, it cannot satisfy due process. *Cardall*, 826 F.3d at 741; *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7 (2003).

*Mathews* balancing does not determine whether notice and a hearing are constitutionally required; "[b]eyond those requirements," it determines what *additional* process is due and when it must be provided. *Cardall*, 826 F.3d at 743; *Hamdi*, 542 U.S. at 529; *Nat'l Council of Resistance of Iran v. Dep't of State* (*NCRI*), 251 F.3d 192, 205 (D.C. Cir. 2001). In balancing the large risk of erroneous deprivation, the probative value of additional safeguards, and the Government's national security interests, the record strongly supports the conclusion that due process requires, at minimum, timely post-designation notice and a meaningful opportunity to respond before a neutral arbiter.

**a. Risk of error in the TSDS is too high in fact and by law**

The TSDS watchlisting process is plainly rife with error, and Defendants' position highlights the absence of meaningful external review. The Government's assertion that it has never wrongfully listed an individual underscores the absence of any meaningful adversarial testing of watchlist determinations.

Before even reaching the facts of the watchlist, the risk of error is too high as a matter of law. "[T]he risk of erroneous deprivation is too high where an individual is not provided 'notice of the factual basis' for a material government finding and 'a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 325 (4th Cir. 2021) (quoting *Hamdi*, 542 U.S. at 533); *compare Wilkinson v Austin*, 545 U.S. 209, 226 (2005) (holding that notice and hearing requirements are "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations"), *with* Dkt. 363 at 21–22 ("[P]roviding TSDS listees notice of their status risks national security" and "a hearing in which listees can challenge their status . . . risks the same.").

The risk of error is also plain on the face of the watchlist—a list of 1.8 *million* people designated as "known or suspected terrorists," almost all of whom are Muslim. Dkt. 359 at 72–73; DEX111 ¶¶ 13, 25–27. The Government reports adding an average of 113,000 individuals annually since 2008, while rejecting only 1.3 percent of nominations. *Id.* These numbers are staggering, and yet Defendants assert that no individual has ever been wrongfully listed. *See, e.g.*, Dkt. 363 at 23–24. In the absence of notice, adversarial testing, or neutral review, these features of the system heighten the risk that erroneous designations will persist uncorrected.

On this point, Defendants argue that "Plaintiffs offer nothing to rebut" CBP testimony that the agency is "not aware of individuals who were placed on the TSDS or No Fly List without meeting the relevant inclusion standards." *Id.* (citing DEX20 at 235:17–18). Plaintiffs addressed this testimony

directly in their cross-motion for summary judgment, along with similar Government assertions. Dkt. 359 at 73. As Defendants point out, in some cases, the Government might determine that a person meets the inclusion standard based on information it considers sufficient, only for that information later to be contradicted or shown to be faulty. In ordinary terms, that sequence reflects an error requiring correction. *See generally Mathews*, 424 U.S. The Government's characterization of this process is simply "how watchlisting . . . work[s]," Dkt. 363 at 24, underscores the absence of adversarial safeguards capable of identifying and correcting erroneous deprivations at the outset.

Finally, Defendants claims regarding the rigor of the nomination and review process are not persuasive. Defendants claim that the TSDS nomination process is not "single-layered" because nominations originate from agencies outside the decision-making body (TSC), and because TSC periodically reviews its own decisions. Dkt. 363 at 23. But these same agencies maintain that they are unaware of any mistaken listing, and ultimate authority to place an individual on the watchlist rests within the executive branch itself. *See Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015). "The involvement of more than one of the servants of that unitary executive in commencing a deprivation does not create an apparent substitute" for due process. *NCRI*, 251 F.3d at 207–08.

**b. Additional characteristics of process would reduce errors.**

Defendants cannot square the Government's current procedures with the minimum requirements of due process. At baseline, TSDS Plaintiffs are entitled to fair notice and an opportunity to mount a defense. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985). DHS TRIP provides neither. Timeliness and other additions would also materially reduce the risk of erroneous deprivation.

On timing, Defendants are correct in stating that pre-designation process is not invariably required, but that only applies where the Government demonstrates a particularized need to act without prior notice. *See NCRI*, 251 F.3d at 208. In cases such as this, where the "appropriateness or necessity" of a designation "may not be clear," pre-designation process may be "the only meaningful

opportunity to invoke the discretion of the decisionmaker." *Id.* at 543 & n.8 (citing *Goss v. Lopez*, 419 U.S. 565, 583–84 (1975)). At minimum, where pre-designation process is not available, due process requires timely and meaningful post-designation review. *See id.* at 546–57, n.11–12. That review must include notice of the basis for the designation and a prompt opportunity to respond before a neutral decisionmaker. *Haig v. Agee*, 453 U.S. 280, 310 (1981); *Wilkinson*, 545 U.S. at 227.

Defendants contend that DHS TRIP is adequately "rapid" process, but DHS TRIP does not confirm placement on TSDS and provides no hearing. Its response period is also irrelevant to a finding of prompt post-designation process, as it does not begin running until an individual independently suspects watchlist placement and affirmatively files a DHS TRIP inquiry.

As to the type of process required to reduce error, baseline notice must "explain . . . with any reasonable specificity, why [Plaintiffs] constituted a continuing threat." *See Williams v. Hobbs*, 662 F.3d 994, 1008 (8th Cir. 2011). A meaningful hearing must afford an opportunity to "rebut the administrative record or otherwise negate [the Government's] proposition," *NCRI*, 251 F.3d at 209; *Loudermill*, 470 U.S. at 543, before a "neutral and detached judge in the first instance." *Concrete Pipe & Products of Cal., Inc. v. Constr. Laborers Pension Tr. for Southern Cal.*, 508 U.S. 602, 617 (1993) (citation omitted). Defendants do not claim that these due process requirements exist.

In defending DHS TRIP's application to TSDS Plaintiffs, Defendants offer only that the program is overseen by "a different set of individuals" and that it permits individuals to submit exculpatory evidence, "providing sufficient post-deprivation process." Dkt. 363 at 22. But intra-agency review within the executive branch does not substitute for neutral adjudication. *NCRI*, 251 F.3d at 206–07. Nor does the opportunity to submit information, without disclosure of the Government's asserted basis for designation, provide a meaningful opportunity to rebut conclusions that the Government conceals from TSDS Plaintiffs. *See Hamdi*, 542 U.S. at 537 ("An interrogation by one's captor, however effective an intelligence-gathering tool, hardly constitutes a constitutionally adequate

factfinding before a neutral decisionmaker.”).

Finally, Defendants contend that the “reasonable suspicion” standard applied in the TSDS nomination process is “just as clear” as the Fourth Amendment’s reasonable suspicion standard. Dkt. 363 at 22 (citing *Navarette v. California*, 572 U.S. 393, 397 (2014)). The Fourth Amendment standard, however, requires “particularized” suspicion of “criminal activity.” *Navarette*, 572 U.S. at 396. By contrast, the TSDS inclusion standard does require suspicion of any crime, but merely suspicion of “terrorist activity” or a “nexus” to terrorism. *See* Dkt. 359 at 3–4. The breadth and indeterminacy of those terms heighten the risk of error in the absence of notice and meaningful review.

**c. The Government’s national security interest does not override Plaintiffs’ due process rights.**

Defendants’ argue that providing meaningful process to TSDS Plaintiffs would jeopardize national security. But the Supreme Court has made clear that national security interests “do[] not eclipse [Plaintiffs’] well-established right to receive notice of the grounds for his [placement] and to present his rebuttal.” *Incumaa*, 791 F.3d at 535. Even in cases involving enemy combatants, far removed from the law-abiding Plaintiffs in this case, the Court has required notice and a meaningful opportunity to be heard. *Hamdi*, 542 U.S. at 532 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 164–65 (1963) (“The imperative necessity for safeguarding these rights to procedural due process under the gravest of emergencies has existed throughout our constitutional history.”)); *Snider Int'l Corp. v. Town of Forest Heights*, Md., 739 F.3d 140, 149 (4th Cir. 2014). Defendants also invoke the “administrative burden” of process, citing an exorbitant increase in costs. Plaintiffs’ have already explained that this increase is irrelevant, because administrative costs are weighed only after baseline requirements of process are in place, *Cardall*, 826 F.3d at 743, and that the cost is over-estimated because it is based on the current size of the TSDS without constitutionally-mandated guardrails.

**B. No Fly List Plaintiffs**

The No Fly List represents a “total ban” on international travel and resulted in the denial of

air travel for all No Fly List Plaintiffs, and DHS TRIP is inadequate to address Plaintiffs' interests and the program's rate of erroneous inclusion. The record before this Court strongly favors a renewed balancing under *Mathews*.

**1. The Government infringes on No Fly List Plaintiffs' liberty interest.**

Individuals have a liberty interest in international travel protected by the Due Process Clause of the Fifth Amendment. *Califano v. Aznavorian*, 439 U.S. 170, 176 (1978); *Kent v. Dulles*, 357 U.S. 116, 125–26 (1958) and courts have repeatedly recognized that the No Fly List burdens that interest. *See Fikre*, 601 U.S. at 242–44 (finding No Fly List plaintiff's procedural due process claim was not moot); *Long*, 151 F.4th at 515–20 (denying motion to dismiss the same); *Kashem v. Barr*, 941 F.3d 358, 378 (2019). All No Fly List Plaintiffs were denied international air travel while on the No Fly List. *See, e.g.*, DEX52 at 144:5–145:21 (Bosnic); DEX56 at 246:10–247:14 (Doe); DEX67 at 89:25–93:7 (Mohallim); DEX78 at 37:10–41:6 (Sehwail). Under *Fikre,* removal from the list does not moot those claims absent assurance that relisting will not recur. *Fikre*, 601 U.S. at 242–44.

In rebuttal, Defendants rely on *Elhady*, which did not involve the No Fly List, for the propositions that Plaintiffs have no right to a "particular mode of transportation" and could take another form of transportation or "some later flight." *See* Dkt. 363 at 24 (citing 993 F.3d at 222). Plaintiffs have already addressed these arguments as fatally flawed. First, the No Fly List operates as a categorical prohibition on international air travel, not merely a restriction on a preferred mode of transportation. Dkt. 359 at 57–58 (quoting 993 F.3d at 220). Other courts have recognized that, particularly in the international context, air travel often constitutes the only practical means of travel. *See, e.g.*, *Kashem*, 941 F.3d at 378 ("[I]n many instances air travel constitutes the only practical means of traveling across great distances, especially internationally . . . . The plaintiffs' liberty interest in air travel, therefore, is substantial." (quotations omitted)); *Abu Irshaid v. Garland*, No. 1:24-CV-01405, 2025 WL 756544 at *13 (E.D. Va. March 10, 2025) ("[T]his Court cannot conclude that the

metaphysical possibility of a weeks-long nautical journey is sufficient to cure any deprivation of [the] right to travel. If such a right is to have any meaning, it must encompass the customary modes of transport of the present day.").

Defendants further note that certain Plaintiffs traveled by land during periods. But those examples concern domestic travel unrelated to the specific international flights Plaintiffs were denied. *Compare* DEX56 at 68–70 (Doe traveled by train within the US), *with id.* at 246–47 (Doe denied flight to Honduras); *compare* DEX67 at 148–51 (Mohallim traveled by car within the US), *with id.* at 89–93 (Mohallim denied flight from Qatar to the US); *compare* DEX78 at 31, 64 (Sehwail traveled by car within the US), *with* DEX78 at 37–41 (Sehwail denied flight from Turkey to the US).

Finally, Defendants argue that No Fly List Plaintiffs' claims fail because their No Fly List status was "temporary"—they took later flights and can currently fly. This argument does not establish mootness under *Fikre*. Plaintiffs remain entitled to prospective relief because the Government has not carried its "formidable burden" of showing that erroneously and unlawfully listing Plaintiffs again "cannot be reasonably expected to occur." *Fikre*, 601 U.S. at 241. Nor does the fact that Plaintiffs ultimately traveled cure the absence of constitutionally adequate process. *Chicago Tchrs. Union, Loc. No. 1, AFT, AFL-CIO v. Hudson*, 475 U.S. 292, 309–10 (1986) (mitigation cannot cure inadequate process); *cf. Mathews*, 424 U.S. at 341 (weighing "[t]he degree of *potential* deprivation that may be created by a particular decision") (emphasis added).

**2. No Fly List Plaintiffs do not receive constitutionally adequate due process.**

Having established a constitutionally-protected liberty interest in international travel, the Government must provide No Fly List Plaintiffs with notice and a hearing "at a meaningful time and in a meaningful manner." *Hamdi*, 542 U.S. at 533 (quoting *Fuentes v. Shevin*, 407 U.S. 67, (1972) (quotations omitted); *Loudermill*, 470 U.S. at 546.

On the risk of erroneous deprivation, Defendants cite to the TSDS to argue that the No Fly

List is adequately safeguarded from error and free from mistaken designations. Dkt. 363 at 28. For their part, No Fly List Plaintiffs cite the same record to demonstrate that the No Fly List is plainly rife with errors. *See supra* Part V.A.4(a); Dkt. 359 at 71–73.

**a. No Fly List notice is neither timely nor adequate.**

Defendants' claims regarding the efficacy and adequacy of DHS TRIP are overstated—the program does not meet the standards for constitutionally required process.

Defendants contend that DHS TRIP provides Plaintiffs with timely notice because "any U.S. Person on the No Fly List who is *denied boarding* because of their No Fly List status and then files a DHS TRIP petition regarding that boarding denial receives notice of their placement on the list and the opportunity to seek additional information about their placement." Dkt. 363 at 26 (emphasis added). But Defendants overlook that the relevant frame of reference for timely pre- *or* post-designation process is the administrative decision at the center of the claim. *See, e.g.*, *Loudermill*, 470 U.S. at 543 (the measure of value is "reaching an accurate decision."). In *Haig*, for example, the Court measured the timeliness of passport revocation process from the time of the revocation *decision*—not from some later denial of passage at an international border. 453 U.S. at 286–87, 310.

Here, the Government has untethered process from designation. Even if the Government could make a "showing of particularized need" to deny pre-determination process, an assertion Plaintiffs strongly contest, the record shows that DHS TRIP does not provide timely post-determination process. Rather than receiving notice of the revocation of their travel right, as the plaintiff received in *Haig*, all No Fly List Plaintiffs only learned of their placement on that list after arriving at an airport and confronting airline personnel, law enforcement, or both about the status of their flight. *See supra* Part V.B.1. Some Plaintiffs learned of their status after being denied international flights thousands of miles from home and seeking assistance at a U.S. Embassy to seek more information. *See, e.g.*, DEX67 at 89:25–93:7 (Mohallim). Plaintiffs' untimely discoveries were totally

decoupled from the administrative decision to place them on the No Fly List in the first place. Years passed in the interim. *See, e.g.*, *id.* at 24:8–25:3 (reflecting at least a three-year gap between an agent's suggestion of placement and the subsequent flight denial). After filing DHS TRIP, individuals wait an average of six additional months before receiving basic confirmation of No Fly List Status. PLX37.

Notice must also be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *See Kashem*, 941 F.3d at 382 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, (1950)). Yet DHS TRIP, at best, provides rote conclusions about the perceived dangerousness of individuals on the No Fly List, without disclosure of the factual basis or evidence supporting the designation. *Cardall*, 826 F.3d at 743.

**b. DHS TRIP is not a substitute for a fair hearing.**

Defendants next argue that DHS TRIP is an adequate substitute for a hearing. But DHS TRIP correspondence is (1) not timely, (2) not conducted before a neutral decisionmaker, and (3) does not provide Plaintiffs with adequate information to permit Plaintiffs to mount a meaningful defense due to the lack of specific factual conclusions, supporting evidence, or a clearly articulated standard. First, the average duration of the DHS TRIP process is 2.5 years, during which individuals remain subject to the underlying watchlist designation. *See* Dkt. 359 at 77; PLX34 at 37–39, 41 (six months for confirmation, one year for TSC redress decision, one year for TSA Administrator decision).

Second, the TSA Administrator is not a "neutral and detached judge in the first instance." *Concrete Pipe*, 508 U.S. 617; *Hamdi*, 542 U,S, at 533. As Defendants acknowledge, the TSA Administrator bears statutory responsibility for "civil aviation security," Dkt. 363 at 27, a mandate that creates an institutional incentive towards over-inclusion on the No Fly List (or over-exclusion of individuals from civil flights), rather than toward the neutral adjudication required "in the first instance." TSA is not an independent adjudicatory body; it participates in the watchlisting enterprise

as an information originator, nominator, aggregator, and screening authority. *See* Dkt. 359 at 72. Review within the same operational structure that implements the challenged designation does not satisfy the requirement of an initial neutral decisionmaker. Moreover, any subsequent judicial review would not occur in the "first instance," would be confined to the DHS TRIP administrative record, and would arise only after an average DHS TRIP process lasting approximately 2.5 years.

Third and finally, DHS TRIP does not provide individuals with notice of the Government's specific conclusions, access to the evidence against them, or disclosure of the operative inclusion standard they must rebut. *See id.* at 82–83. The Government does not dispute this structural deficit exists, only that it should not provide for any changes to the process.

On the inclusion standard for the No Fly List, Defendants argue that standards of "clear and convincing evidence" or even "preponderance of the evidence" would compromise national security—while offering no explanation for that assertion other than that such standards would "permit on flights those that Defendants have determined pose a threat of committing acts of terrorism." Dkt. 363 at 27. But implicit in this defense is the admission that there are individuals on the Government's No Fly List for whom the Government could not demonstrate, before a neutral arbiter, that the individual more likely poses a threat than does not. Furthermore, Defendants do not meaningfully contest Plaintiffs' argument that, at minimum, the inclusion standard should require suspicion of *criminal* activity. Dkt 359 at 83.

**c. National security interests are not persuasive**

While the Government undoubtedly holds a strong interest in national security and civil aviation, Defendants' arguments against additional process for No Fly List individuals on those grounds lack specificity and are unpersuasive. The Court should find it "unlikely that . . . basic process will have the dire impact on the central functions" of the Government's national security apparatus, *Hamdi*, 542 U.S. at 534, and thus that additional "reasonable measures" can be taken to "ensure basic

fairness" to Plaintiffs. *El Ali*, 473 F. Supp 3d at 513 (quoting *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012).

Defendants cannot explain why national security requires that No Fly List Plaintiffs must first arrive at the airport to be denied air travel before they can learn of their No Fly status, nor can Defendants explain why Plaintiffs cannot at least learn why they were denied boarding while they are at the airport, rather than months or years later after protracted correspondence through DHS TRIP. At minimum, the Government should notify individuals of the revocation of their air travel liberties in the same prompt manner in which it notifies individuals of passport revocations on similar grounds, or designates a group as a "foreign terrorist organization." *See generally Haig*, 453 U.S.; *NCRI*, 251 F.3d.

Defendants also fail to explain why the No Fly List must operate under a vague and low standard of inclusion, when national security would not reasonably be undermined by requiring the Government demonstrate that an individual is actually likely to be criminally engaged in an act of terrorism. *Supra* Part V.A.4(b). If the Government cannot show that a person is actually reasonably suspected of engaging in a criminal act of terrorism, Plaintiffs submit that the Government cannot reasonably invoke a "heightened interest" in denying those individuals reasonably fair process.

Finally, Defendants misconstrue No Fly List Plaintiffs' argument that other "mitigation factors" are available to the Government to achieve its national security objectives. The Government has testified that the Federal Air Marshal Service already deploys Air Marshals on flights that have a TSDS listee on board. DEX17 at 316:9–13. The Government also testified that waivers to fly can be issued to No Fly List individuals when measures are taken to ensure an "acceptable amount of risk." *Id.* at 342:13–19. The record thus refutes Defendants' assertion that the No Fly List is so critical to national security that certain reasonable measures cannot be taken to ensure basic fairness.

**d. Non-binding precedent is not persuasive under these facts**

Defendants last effort to preserve the status quo is to rely again on two non-binding cases.

But this Court has observed that "the *Mathews* balancing test depends upon 'fact-intensive considerations.'" *El Ali*, 473 F. Supp. 3d at 513 (quoting *Elhady v. Piehota*, 303 F. Supp. 3d 453, 465 (E.D. Va. 2017)). The *Kashem* and *Busic* courts were not reviewing the same set of facts.

Defendants do not dispute that the record in *Kashem* was developed a decade ago, in 2015–16, or that the No Fly List has grown precipitously since then. *See Kashem*, 941 F.3d at 368–69. Instead, Defendants argue that these facts "say nothing." Not true. Reviewing a record developed contemporaneously with the creation of DHS TRIP, the *Kashem* court did not confront evidence that the DHS TRIP process now takes 2.5 years on average to return a decision. Dkt. 359 at 77 (citing PLX34 at 37–39, 41). Reviewing no statistical record of subsequent nominations growth or inclusion trends since DHS TRIP was enacted, the *Kashem* court could not assess these facts for the rate of erroneous inclusion, or the scale and operational expansion of the program. These material differences distinguish *Kashem* and require renewed balancing under *Mathews* based on the present record.

The plaintiff in *Busic* hijacked a plane in 1976 and was convicted of "aircraft piracy." *Busic v. Transportation Security Administration*, 62 F.4th 547, 548–49. The court evaluated the case as-applied to "Busic's placement" on the No Fly List, and concluded that the risk of "another hijacking attempt" was "not a threat the TSA must accept." Given that plaintiff's criminal record, there was no perceivable risk of *her* erroneous inclusion. *See* Dkt. 359 at 84. No Fly List Plaintiffs here could not be more different than the plaintiff in *Busic*. Plaintiffs do not claim an unconditional right to air travel; they seek only timely, adequate notice and the meaningful opportunity to contest their erroneous designation.

## VI. The Government Violated Plaintiffs' Fourth Amendment Rights.

The Government cannot lawfully use TSDS status as the basis for reasonable suspicion to conduct a forensic search of a traveler's electronic device at the border absent specific and articulable facts known to the searching officers at the time of the encounter that create actual, individualized

reasonable suspicion of criminal activity related to the purpose of the border exception. Because the Government unlawfully relied on TSDS status as the sole or dispositive basis for conducting non-routine forensic searches of Plaintiffs' devices—and continues to defend that policy—Plaintiffs are entitled to relief for violations of the Fourth Amendment rights.

**A. Plaintiffs satisfy Fourth Amendment standing requirements.**

In the cross-motion for summary judgment, Plaintiffs pointed out that Defendants do not dispute standing for Plaintiffs Hachem, Muminov, or Sulayman. *See* Dkt. 359 at 111. Defendants again did not challenge standing for these Plaintiffs in their responsive brief, and therefore the Court should move forward to adjudicate their claims on the merits.

All remaining Plaintiffs with current or past watchlist status also retain standing.[7] Plaintiffs previously listed have standing to seek prospective relief because the Government has not shown that relisting cannot reasonably be expected to recur, and because all Plaintiffs have established "ongoing or future injury in fact." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (citing *O'Shea v. Littleton*, 414 U.S. 488, 496–96 (1974)). Future unlawful searches of Plaintiffs' electronic devices are "certainly impending" where (1) each remaining Plaintiff has been subjected to a non-routine forensic search of their electronic devices at a port of entry; (2) CBP policy enshrines non-routine searches of devices belonging to TSDS listees, and (3) Defendants continue to assert that TSDS status alone supplies reasonable suspicion for such searches. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013); *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

First, Defendants argue that removal from TSDS eliminates standing. But Plaintiffs with past or present watchlist status stand on equal footing, because the Government's "voluntary cessation" of its watchlist practice does not moot their claims unless it can demonstrate that re-inclusion on the

---

[7] Notwithstanding any records submitted *ex parte*, Defendants have not identified Plaintiffs that were never watchlisted. Therefore, this includes all Plaintiffs bringing Fourth Amendment claims except E. Paryavi, who dismissed his Fourth Amendment claim in Plaintiffs' cross-motion for summary judgement.

watchlist "cannot reasonably be expected to recur." *Fikre*, 601 U.S. at 241 (citing *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000)). This is a "formidable burden" that the Government has failed to carry. *Id.*

Second, all Plaintiffs have established a "certainly impending" injury based on three intersecting facts in the record: prior non-routine forensic searches, CBP policy, and Defendants' continued defense of that policy. Defendants acknowledge that "CBP policy permits advanced searches of devices belonging to TSDS listees." Dkt. 363 at 51. They further maintain that "TSDS status . . . provides 'sufficient indicia of reliability to provide reasonable suspicion.'" *Id.* at 53 (citing *Navarette*, 572 U.S. at 397). Those admissions alone establish a "sufficient likelihood of future injury" for any TSDS Selectee who presents at a port of entry. *All. for Hippocratic Med.*, 602 U.S. at 381 (citing *Clapper*, 568 U.S. at 401).

Plaintiffs independently establish a "certainly impending" injury because the Government has already applied this policy to them.[8] Defendants do not dispute the sufficiency of eleven Plaintiffs' previous non-routine forensic searches (Abunijem, Al-Sahlani, Albadawi, Doe, El-Shahat, Kamel, Mujanovic, Sehwail, Soueidan).[9] Instead, Defendants attempt to exclude four Plaintiffs by attacking their past injuries: Mohallim, Abdurrashid, Thadi, and Jardaneh.

Defendants claim Plaintiff Mohallim lacked a privacy interest in his cell phone because it belonged to his mother. Dkt. 363 at 51. The record forecloses that position. Mohallim testified that he shared the phone with his mother, possessed the passcode, maintained his personal accounts and photographs on the device, stored "a lot of private information" on it, and was physically holding the phone during the encounter. DEX67 at 125:19–126:22. Neither Mohallim nor his mother consented

---

[8] At summary judgment, Defendants do not dispute that the "advanced" searches of Plaintiffs' electronic devices were "forensic" in nature, falling under "non-routine" ambit of *Kolsuz*. Dkt. 343-1 at 116 n.22.

[9] Defendants originally challenged Sehwail and Soueidan's standing, but did not renew those challenges in their responsive brief after Plaintiffs' cross-motion for summary judgment. *See* Dkt. 359 at 112.

to the non-routine forensic search—a fact Defendants do not dispute. *See* Dkt. 359 at 125. Defendants similarly argue that Plaintiff Abdurrashid was not injured because he testified that he would "follow [the Government's] request" when handing over his phone. But Defendants do not dispute that Abdurrashid neither consented to, nor testified that he would consent to, a non-routine forensic search of his phone. *Id.* Defendants repeat the same error with Plaintiff Thadi, who testified that he "do[esn't] really care" if the Government "inspect[s]" his phone. That statement does not establish contemporaneous, voluntary consent to a non-routine forensic search. Consent must be specific to the search conducted and given at the time of the encounter. Nothing in Thadi's testimony suggests that he affirmatively authorized a forensic search. DEX84 at 111:1–7. Finally, the Government's prior unlawful search of Plaintiff Jardaneh's phone—combined with a CBP policy that authorizes such searches for TSDS listees and Defendants' continued defense of that practice—establishes a sufficient likelihood that the same search will occur again when he presents at a port of entry. Where a plaintiff has already been subjected to the precise constitutional injury challenged, and the Government maintains both the authority and intent to repeat it, future injury is not speculative; it is certainly impending. *All. for Hippocratic Med.*, 602 U.S. at 381.

### B. Nonroutine border searches of electronic devices without individualized suspicion of criminal activity violate the Fourth Amendment.

Plaintiffs have established, and Defendants do not dispute, that the searches at issue were non-routine forensic searches of electronic devices at the border. Such searches require "particularized suspicion, in the form of the familiar reasonable suspicion standard." *United States v. Kolsuz*, 890 F.3d 133, 140 (4th Cir. 2018).[10] As this Court previously explained, reasonable suspicion exists when

[10] Plaintiffs note that the Fourth Circuit has not yet decided that individualized reasonable suspicion of criminal activity is sufficient for a forensic phone search at the border, or if probable cause is required instead. *United States v. Nkongho*, 107 F.4th 373, 382 (4th Cir. 2024). Defendants did not have probable cause to search Plaintiffs' devices and do not claim otherwise. This Court need not reach that question because the Government also lack the requisite level of individualized, reasonable suspicion.

"specific and articulable" facts known to the searching officers, together with rational inferences from those facts, demonstrate that "criminal activity is afoot." *El Ali*, 473 F. Supp. 3d at 520 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). At the border, "the reasonable suspicion at issue . . . must relate to the border exception's purposes—suspicion of 'grave *domestic* crimes' is not enough." *Abu Irshaid v. Garland*, No. 1:24-CV-01405, 2025 WL 756544, at *8 (E.D. Va. Mar. 10, 2025) (quoting *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019)).

Defendants' argument rests on a conflation between the watchlist's inclusion standard and the Fourth Amendment's "reasonable suspicion" requirement governing non-routine border searches. TSDS inclusion requires "'reasonable suspicion that [an] individual is engaged, has been engaged, or intends to engage, in conduct constituting, in preparation for, or in aid or in furtherance of terrorism and/or terrorist activities." DEX1 at ¶ 19. The Government made no effort through discovery to define or cabin these terms. On this record, this Court has already concluded that the TSDS inclusion standard is incapable even of "serving as a proxy for individualized reasonable suspicion that an individual plaintiff is engaging in . . . terrorist activity at all." *El Ali*, 473 F. Supp. 3d at 521 (citing *Mohamed v. Holder*, 995 F. Supp. 2d 520, 532 (E.D. Va. 2014)).

Defendants claim this standard is sufficient to satisfy *Navarette*, but the Government expressly admitted during discovery that suspicion of *criminal* conduct or wrongdoing is *not* required for TSDS inclusion. DEX20 at 54:13–21, 189:12–190:14. Because TSDS inclusion does not require, and does not indicate evidence of criminal activity, it cannot satisfy *Navarette*'s demand for "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014). Yet Defendants continue to assert that CBP policy permits TSDS status—designation as a "known or suspected terrorist"—to serve as the sole basis for conducting non-routine

searches of Plaintiffs' devices. Dkt. 363 at 52–53.[11]

Furthermore, even if TSDS status did establish reasonable suspicion *of criminal activity*—which it expressly does not—it would still be insufficient to justify a nonroutine forensic search at the border. First, this Court and others have recognized that TSDS status could, at most, indicate suspicion "at and around the time of nomination—not months or years later" when a border officer conducts the forensic search. *Abu Irshaid*, No. 1:24-CV-01405, 2025 WL 756544, at *9 (citing *Reid v. Georgia*, 448 U.S. 438, 440 (1980)); *El Ali*, 473 F. Supp. 3d at 521 (TSDS status cannot justify individualized suspicion, "let alone at the time of the search"). Second, even assuming temporal proximity, the suspected conduct would have to relate to the purposes of the border search exception. *Aigbekaen*, 943 F.3d at 721. Yet, based on the vagueness of the TSDS inclusion standard, "it is far from clear that the scope of activities that might satisfy the standard for inclusion in the TSDB necessarily relate to 'protecting national security.'" *Abu Irshaid*, No. 1:24-CV-01405, 2025 WL 756544, at *9 (citing *United States v. Nkongho*, 107 F.4th 373, 381 (4th Cir. 2024)).

Notably, Defendants' insistence that the TSDS "applies neutral inclusion standards and robust, multi-layer review" is inapposite to the Plaintiffs' Fourth Amendment challenge. Plaintiffs assert that the standard is constitutionally inadequate to justify an advanced search regardless of its neutrality or the review process. Defendants' claim is nevertheless refuted elsewhere, under Plaintiffs' procedural due process claim, *supra* Part V.A.4, and Plaintiffs' response to Defendants motion for summary judgment on the equal protection claims. Dkt. 359 at 103–09.

### C. The *ex parte* record is subject to the same standard.

If the Government relies on the *ex parte* record to supply the reasonable suspicion necessary to justify a nonroutine forensic border search, it is not enough to point to some amount of intelligence

[11] Defendants shared a "revised" CBP Directive as of January 1, 2026, *see* DREX2, but failed to explain what revisions, if any, bear on the merits of Plaintiffs' Fourth Amendment claim. Plaintiffs observe none.

information underlying TSDS status. TSDS designation reflects inclusion criteria at the time of nomination and does not establish ongoing, individualized suspicion at the time of a later border encounter. *Abu Irshaid*, No. 1:24-CV-01405, 2025 WL 756544, at *9

The Government must demonstrate for each Plaintiff, at each encounter, that officers at the encounter actually relied on additional, individualized evidence beyond TSDS status that was contemporaneously available to officers. It must further show that this evidence was sufficient "under the totality of the circumstances" to establish individualized reasonable suspicion of criminal activity relevant to the border search exception allowing for searches on that basis. *Aigbekaen*, 943 F.3d at 721; *Navarette*, 572 U.S. at 396–99; *see Florida v. J. L.*, 529 U.S. 266, 272 (2000) (officers lacked basis to believe tipster had knowledge of concealed criminal activity).

## VII. The Government Violated Plaintiffs' RFRA Rights.

The Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb et seq., provides "greater protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 356 (2015) (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694–95 (2014)). Under RFRA, once a plaintiff demonstrates that government action substantially burdens religious exercise, the Government must satisfy the "exceptionally demanding" least-restrictive-means test. *Id.* at 364 (quoting *Burwell*, 573 U.S. at 728). Plaintiffs establish two independent RFRA violations. First, the Government substantially burdens Plaintiffs' religious exercise by repeatedly interrogating them about their Islamic beliefs and practices during watchlist encounters. Second, the Government's watchlist treatment substantially burdens Plaintiff Sulayman's religious exercise by interfering with his role as an imam and his ability to guide congregants on *umrah* pilgrimage.

Defendants cannot persuasively rebut the "substantial pressure" that the Government places on Plaintiffs to modify their behavior or the demonstrable changes in Plaintiffs' religious exercise that resulted. Nor can Defendants satisfy RFRA's least-restrictive-means standard, relying only on broad

invocations of national security interests without addressing how those interests are achieved through the Government's treatment of these particular Plaintiffs. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006).

As an initial matter, Defendants cite no controlling authority supporting the insertion of an "objective evaluation" into RFRA's "substantial burden" inquiry. Dkt. 363 at 58.[12] Defendants invoke this standard only once to cast doubt on how religious questioning affects TSDS Plaintiffs. *Id.* at 60. That argument improperly reframes the inquiry by introducing "a very different question that the federal courts have no business addressing (whether the religious belief asserted in a RFRA case is reasonable)." *Burwell*, 573 U.S. at 724. It is not up to the Court to "tell the plaintiffs that their beliefs are flawed," or "presume to determine ... the plausibility of a religious claim." *Id.* (quoting *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990)).

### A. Religious questioning connected to watchlist status places substantial pressure on TSDS Plaintiffs' religious exercise.

Plaintiffs demonstrate a substantial burden under RFRA by showing the Government placed "substantial pressure" on them "to modify [their] behavior and to violate [their] beliefs." *See Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (quoting *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981)). A substantial burden may also arise where the Government "force[s] [an individual] to 'choose between following the precepts of her religion and forfeiting . . . benefits . . . and abandoning one of the precepts of her religion.'" *Id.* (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)). TSDS Plaintiffs have shown both. The Government's questioning requires Plaintiffs to explain, defend, or justify their religious beliefs to federal agents in connection with ordinary travel. This RFRA cannot permit absent a showing of least restrictive means.

[12] Of the non-binding cases Defendants cite to support an "objective evaluation," one has no RFRA claim and another makes no reference to an objective inquiry. *Am. Fam. Ass'n, Inc. v. City & Cnty. of San Francisco*, 277 F.3d 1114 (9th Cir. 2002); *Perrier-Bilbo v. United States*, 954 F.3d 413 (1st Cir. 2020).

Plaintiffs have established that the Government's "inquiry into" their "religious views . . . is not only unnecessary but offensive." Dkt. 359 at 123–24 (quoting *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (Thomas, J., plurality opinion)). The Government's religious questioning "has the effect of impermissibly disapproving of religion" because it is "sufficiently likely to be perceived by nonadherents of the controlling denomination as a disapproval of their individual religious choices." *Isakhanova v. Muniz*, No. 15-cv-03759, 2016 WL 1640649, at *6 (N.D. Cal. Apr. 26, 2016) (cleaned up).

In response, Defendants first argue that Plaintiffs fail to identify "specific religious beliefs," but the Government's questions about Plaintiffs' faith and religious practices share a common focus—Islam. Dkt. 359 at 124. RFRA's "substantial burden prong . . . can be satisfied if a government policy imposes substantial pressure to modify one's religious exercise, even if it does not compel a direct violation of a specific religious belief." *See, e.g.*, *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.* (*Soc'y of Friends*), 767 F. Supp. 3d 293, 329 (D. Md. 2025). As "nonadherents of the controlling denomination," Plaintiffs have shown a substantial burden on their Muslim faith and practices through theological interrogation plainly "disapprov[ing]" of Plaintiffs' faith—no more is needed. *Isakhanova*, No. 15-cv-03759, at *6.

Defendants next respond that TSDS does not "require[]" religious questioning or alternatively, that TSDS status has no relationship to such questioning. Dkt 363 at 59. These arguments do not persuade. Whether there is a requirement to ask religious questions is irrelevant; the relevant question is whether government practices place substantial pressure on religious exercise. As Plaintiffs explained, the Government burdens Plaintiffs by allowing Muslim faith to serve as "one factor contributing to the formation of reasonable suspicion." *United States v. Ramon*, 86 F. Supp. 2d 665, 673 (W.D. Tex. 2000). Plaintiffs thus show that the Government imposes a "civil or criminal sanction[] on religiously motivated conduct," distinguishing these facts from those of *Cherri v. Mueller*, 951 F. Supp. 2d 918, 935 (E.D. Mich. 2013).

Further, Defendants' claim that religious questioning is unrelated to TSDS status is contradicted by the record. Defendant testimony confirms that religious questioning can "absolutely" arise during watchlist encounters and trigger "further questioning" and "high side checks." DEX20 at 283:16–285:11; *see also id.* at 280:20–281:12 (discussing an "extreme" directive to question Shia Muslims). The Government also concedes that religious questioning can only occur under express statutory authority or if relevant to DHS law enforcement purposes. *See* DEX4 ¶ 76; DEX40. These statements corroborate Plaintiffs' reasonable belief that the Government is questioning them, and watchlisting them, because of their religious exercise and Muslim identity. Dkt. 359 at 124.

Defendants next argue that Plaintiffs could not have faced "substantial pressure" to modify their religious behavior because questioning was "sporadic," "embedded" within other questions, and "often friendly." Plaintiffs have strongly disputed Defendants' characterization of these interrogations, which the record shows had invidious effect. Dkt. 359 at 124 & n.239. But even accepting Defendants' characterization, none of these adjectives defeat the *pressure* inherent in a Government agent's "singling out of Plaintiffs" for detention and "persistent" interrogation of their Muslim faith. *El Ali*, 473 F. Supp.3d at 526. That pressure is sufficient under RFRA. *Soc'y of Friends*, 767 F. Supp. 3d at 329. But Plaintiffs have also shown more. Decisively, Defendants do not contest that Plaintiff Hachem demonstrated this pressure by actually "violat[ing] his beliefs" and ceasing to attend mosque for prayer after and because of the Government's actions. DEX60 at 201:2–13; *Lovelace*, 472 F.3d at 187. Hachem's avoidance of religious practice provides yet another fact distinguishing this case from *Cherri*, demonstrating government action that caused him to "choose between following tenets of [his] faith and receiving an important government benefit." 951 F. Supp. 2d at 935. The same is true for Plaintiff Sulayman. *Infra* Part VII.B. These experiences illustrate that the Government's actions cause both subjective and objectively reasonable pressure on Plaintiffs' to modify their religious exercise.

### B. Plaintiff Sulayman has proved a substantial burden under RFRA.

Defendants do not contest that Plaintiff Sulayman, as a Muslim imam, practices relevant religious beliefs by providing counsel and guidance to members of his community, including by guiding pilgrimages to Islamic holy sites—a practice known as *umrah*. Dkt. 359 at 122. Defendants instead argue that Sulayman was not substantially burdened by his treatment under TSDS. But these arguments are either inapposite or fail to conform to the record.

First, Defendants repeatedly point to *Elhady*, a case with no RFRA claim, to argue that Sulayman experienced no substantial burden on his religious exercise because his experience was "not dissimilar from what many travelers routinely face." Dkt. 363 at 60–62.[13] But importing *Elhady*'s finding into the RFRA analysis would conflate distinct legal frameworks. In *Elhady,* the Fourth Circuit evaluated whether watchlist screening constituted a substantial infringement of liberty interests under the *Mathews* procedural due process framework. By contrast, RFRA's "substantial burden" test is a statutory standard enacted to provide "greater protection for religious exercise than is available under the First Amendment." *Holt*, 574 U.S. at 356. *Elhady* assessed watchlist screening in the "generality of cases," whereas RFRA requires a "focused inquiry" on the burden imposed on the particular claimant. *Id.* at 363–64. Defendants' efforts to equate Sulayman's experience with that of ordinary travelers invokes the logic of a "neutral, generally applicable law"—a legal test that RFRA specifically displaces. 42 U.S.C. § 2000bb(a)(2) ("[L]aws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise."). Because Sulayman has shown that the Government's watchlist practices specifically burden his religious duties as an imam and guide for *umrah* pilgrimage, *Elhady* does not resolve his RFRA claim.

Next, Defendants argue that changes in Sulayman's travel behavior are not relevant to his

[13] Plaintiffs strongly contest the application of *Elhady*'s finding of fact where it is relevant to their claims—under their facial procedural due process challenge. *Supra* Part IV.

RFRA claim, either because his travel was not "religiously motivated" or because his travel did not change. These arguments misstate the record. Sulayman traveled for "work or conferences" in his capacity *as an imam*. DEX82 at 15:25–16:4, 17:2–22, 66:15–67:4. And while it is true that Sulayman continued to perform *umrah*, the record establishes that these later trips were undertaken alone or with family, and that he significantly curbed the *umrah* trips he previously guided *as an imam*. Dkt. 359 at 122–23. These changes in his travel are thus central to Sulayman's RFRA claim and evince the "substantial pressure" the Government placed on him. *Lovelace*, 472 F.3d at 187.

Finally, Defendants cherry-pick from Sulayman's deposition to suggest that his TSDS status did not affect his standing as an imam in the community. The record shows otherwise. Although Sulayman worked to restore trust among his congregation, he testified that the Government's treatment under TSDS continues to cause mistrust and hesitation, and that members of his community remain reluctant to travel with him. *See, e.g.*, DEX82 at 95:6–7 ("Usually nobody wants to travel on the same flight as me"), 246:4–6 (community members still "hesitate . . . to come to me").

**C. The Government fails to satisfy the least-restrictive-means standard.**

The least-restrictive-means standard "'is exceptionally demanding,' and can be met only if [the Government] shows 'that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties.'" *Soc'y of Friends*, 767 F. Supp. 3d at 333 (quoting *Burwell*, 573 U.S. at 728). "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt v. Hobbs*, 574 U.S. 352, 365 (2015) (quotation omitted). The Government does not carry this burden as applied to Plaintiffs.

Defendants first claim "much deference" is owed to CBP. Dkt. 363 at 62 (citing *Tabbaa v. Chertoff*, 509 F.3d 89, 106 (2d Cir. 2007)). Not true. The Supreme Court has made clear that RLUIPA and RFRA "do[] not permit such unquestioning deference . . . . [I]t is the obligation of the courts to consider whether exceptions are required under the test set forth by Congress.'" *Holt*, 574 U.S. at 364

(quoting *O Centro*, 546 U.S. at 434). Courts must therefore look "beyond broadly formulated interests justifying the general applicability of government [policies] and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *O Centro*, 546 U.S. at 431.

Here, the Government does not identify a compelling interest beyond the general invocation of national security, a "very broad term[]." *Burwell*, 573 U.S. at 726. Nor does the Government assert a "'marginal interest in enforcing' the challenged policy against the parties in the case before it." *Soc'y of Friends*, 767 F.Supp.3d at 332 (quoting *Burwell*, 573 U.S. at 727). Instead, Defendants assert the Government's right to "stop[] and examin[e]" travelers at the border. *U.S. v. Ramsey*, 431 U.S. 606, 616 (1977). But that authority is far too broad for the inquiry required under RFRA. Plaintiffs challenge the application of TSDS watchlist practices to *them*, specifically, under which the Government targets, detains, and interrogates them about their *religion*, specifically.

In defending this practice, Defendants also undermine their own least-restrictive-means argument. They contend that religious questioning is not necessarily tied to TSDS status, does not occur in every encounter, and is "not derogatory." By doing so, Defendants effectively concede that religious questioning is not necessary to advance national security interests in every circumstance. Because the Government has also failed to argue that religious questioning was necessary as applied to Plaintiffs, the Government's concession is fatal to their defense under RFRA's "exceptionally demanding" standard.

At bottom, theological interrogations have no place in the federal government's watchlist enterprise. RFRA does not permit the Government to impose religious burdens where less restrictive investigative tools remain available, *Holt*, 574 U.S. at 365, and therefore the Government must "concentrate on other factors more strongly corroborative" of the national security interests it purports to protect. *Ramon*, 86 F. Supp. 2d at 667. The Government may investigate travelers based on conduct, travel patterns, contacts, or other articulable facts without interrogating them about their

religious beliefs or practices. Likewise, if religious identity or religious practice contributes to the formation of watchlist suspicion, the narrower solution is to prohibit religion as a factor in watchlist nomination or questioning.

## CONCLUSION

For the foregoing reasons, and those in the Plaintiffs' Opposition and Cross Motion for Summary Judgment, Dkt. 359, Plaintiffs respectfully request this Court to deny Defendants Omnibus Motion to Dismiss, Motion in Limine, and Motion for Summary Judgment on all claims, and to grant Plaintiffs' Motion for Summary Judgment on their Substantive Due Process, Procedural Due Process, Fourth Amendment, and RFRA claims.

Dated: March 13, 2026

Respectfully submitted,

/s/Lena Masri
Lena Masri
Gadeir Abbas*
Nadia Bayado
Catherine Keck
CAIR LEGAL DEFENSE FUND
453 New Jersey Ave SE
Washington, D.C. 20003
T: (202) 742-6420
ldf@cair.com

*Licensed in VA; not in D.C., practice limited to federal matter